# Exhibit B

*Execution Version*

---

$619,500,000

CREDIT AGREEMENT

among

PES HOLDINGS, LLC,

as Borrower,

EACH OF THE SUBSIDIARIES OF THE BORROWER,

as Guarantors

and

The Several Lenders from Time to Time Parties Hereto,

and

CORTLAND CAPITAL MARKET SERVICES LLC,

as Administrative Agent

Dated as of August 7, 2018

---

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS.........................................................................1

Section 1.01.     *Defined Terms* ...................................................................1
Section 1.02.     *Other Definitional Provisions* ..........................................42
Section 1.03.     *Accounting Terms; GAAP* ................................................43
Section 1.04.     *Payments Due on Days Other than Business Days*............43

ARTICLE 2 AMOUNT AND TERMS OF COMMITMENTS .......................44

Section 2.01.     *Initial Loan Commitments.*................................................44
Section 2.02.     *Procedure for Initial Loan Borrowing* .................................45
Section 2.03.     *Repayment of Initial Loans* ................................................45
Section 2.04.     *Fees* ...................................................................................46
Section 2.05.     *Optional Prepayments*.......................................................46
Section 2.06.     *Mandatory Prepayments and Commitment Reductions*.......47
Section 2.07.     *Conversion and Continuation Options*.................................48
Section 2.08.     *Limitations on Eurodollar Class* .......................................48
Section 2.09.     *Interest Rates and Payment Dates* .....................................49
Section 2.10.     *Computation of Interest and Fees* ......................................51
Section 2.11.     *Inability to Determine Interest Rate*...................................51
Section 2.12.     *Pro Rata Treatment and Payments* .....................................52
Section 2.13.     *Requirements of Law* .........................................................54
Section 2.14.     *Taxes*..................................................................................55
Section 2.15.     *Indemnity* ...........................................................................60
Section 2.16.     *Change of Lending Office* ..................................................60
Section 2.17.     *Replacement of Lenders* .....................................................61
Section 2.18.     *Extensions of Loans*............................................................61
Section 2.19.     *Incremental Facilities*.........................................................63

ARTICLE 3 REPRESENTATIONS AND WARRANTIES............................65

Section 3.01.     *Organization; Powers* .........................................................65
Section 3.02.     *Authorizations; Enforceability* ...........................................65
Section 3.03.     *Governmental Approvals; No Conflicts.*...............................66
Section 3.04.     *Financial Statements; Material Adverse Effect; Pro Forma Financial Statements* ...........................................................66
Section 3.05.     *Properties* ...........................................................................67
Section 3.06.     *Intellectual Property* ...........................................................67
Section 3.07.     *Capital Stock and Subsidiaries* ...........................................67
Section 3.08.     *Litigation; Compliance with Laws; No Default* ...................68
Section 3.09.     *Federal Reserve Regulations* ..............................................68
Section 3.10.     *Investment Company Act* ....................................................68
Section 3.11.     *[Reserved]* ..........................................................................69
Section 3.12.     *Taxes*...................................................................................69

i

Section 3.13.   *No Material Misstatements* ....................................................69
Section 3.14.   *Labor Matters* ..................................................................69
Section 3.15.   *Solvency* ........................................................................70
Section 3.16.   *ERISA* ............................................................................70
Section 3.17.   *Environmental Matters* ........................................................71
Section 3.18.   *Insurance* ........................................................................72
Section 3.19.   *Security Documents* ............................................................72
Section 3.20.   *Anti-Terrorism Laws* ..........................................................73
Section 3.21.   *Affiliate Transactions* ........................................................73

ARTICLE 4 CONDITIONS PRECEDENT ........................................................73

Section 4.01.   *Conditions of Effectiveness* ..................................................73
Section 4.02.   *Conditions to All Borrowings of Loans* ..................................76

ARTICLE 5 AFFIRMATIVE COVENANTS........................................................77

Section 5.01.   *Financial Statements* ..........................................................77
Section 5.02.   *Certificates; Other Information* ............................................78
Section 5.03.   *Payment of Taxes* ..............................................................80
Section 5.04.   *Maintenance of Existence; Compliance* ................................80
Section 5.05.   *Maintenance of Property; Insurance* ....................................80
Section 5.06.   *Inspection of Property; Books and Records; Discussions* ......81
Section 5.07.   *Litigation and Other Notices* ..............................................81
Section 5.08.   *Environmental Laws* ..........................................................82
Section 5.09.   *Credit Rating* ..................................................................83
Section 5.10.   *Additional Collateral, etc.* ..................................................83
Section 5.11.   *Mortgages, etc.* ................................................................84
Section 5.12.   *Designation of Excluded Subsidiaries* ..................................86
Section 5.13.   *Anti-Terrorism Laws, Sanctions, Anti-Corruption Laws* ......87

ARTICLE 6 NEGATIVE COVENANTS ..........................................................87

Section 6.01.   *Indebtedness* ..................................................................87
Section 6.02.   *Liens* ............................................................................90
Section 6.03.   *Fundamental Changes* ........................................................95
Section 6.04.   *Disposition of Property* ......................................................96
Section 6.05.   *Restricted Payments* ..........................................................97
Section 6.06.   *Lines of Business* ............................................................100
Section 6.07.   *Investments* ..................................................................100
Section 6.08.   *Transactions with Affiliates* ..............................................104
Section 6.09.   *Sales and Leasebacks* ......................................................106
Section 6.10.   *Swap Agreements* ............................................................106
Section 6.11.   *Changes in Fiscal Periods* ................................................106
Section 6.12.   *Negative Pledge Clauses* ..................................................106
Section 6.13.   *Clauses Restricting Subsidiary Distributions* ......................107
Section 6.14.   *[Reserved]* ..................................................................108

Section 6.15.    *Sanctions, and Anti-Corruption Laws* ...................................................108
Section 6.16.    *Additional Financing Agreement* ........................................................108
Section 6.17.    *Anti-Layering* ...............................................................................108

ARTICLE 7 EVENTS OF DEFAULT ...........................................................................108

Section 7.01.    *Events of Default* .........................................................................108
Section 7.02.    *Controlling Lenders* .....................................................................112
Section 7.03.    *Application of Proceeds* ...............................................................114

ARTICLE 8 THE ADMINISTRATIVE AGENT ...........................................................118

Section 8.01.    *Appointment* .................................................................................118
Section 8.02.    *Delegation of Duties*.....................................................................118
Section 8.03.    *Exculpatory Provisions* ................................................................118
Section 8.04.    *Reliance by Administrative Agent* .................................................119
Section 8.05.    *Notice of Default* ..........................................................................120
Section 8.06.    *Non-Reliance on Administrative Agent and Other Lenders*...............120
Section 8.07.    *Indemnification*.............................................................................120
Section 8.08.    *Administrative Agent in Its Individual Capacity* ..............................121
Section 8.09.    *Successor Administrative Agent* .....................................................121

ARTICLE 9 MISCELLANEOUS .................................................................................122

Section 9.01.    *Amendments and Waivers* .............................................................122
Section 9.02.    *Notices* ........................................................................................125
Section 9.03.    *No Waiver; Cumulative Remedies*..................................................126
Section 9.04.    *Survival of Representations and Warranties*....................................126
Section 9.05.    *Payment of Expenses and Taxes*....................................................126
Section 9.06.    *Successors and Assigns; Participations and Assignments*.................128
Section 9.07.    *Adjustments; Set off*.....................................................................133
Section 9.08.    *Counterparts*................................................................................134
Section 9.09.    *Severability*..................................................................................134
Section 9.10.    *Integration* ...................................................................................134
Section 9.11.    ***GOVERNING LAW*** .................................................................134
Section 9.12.    *Submission To Jurisdiction; Waivers* .............................................134
Section 9.13.    *Acknowledgements* .......................................................................135
Section 9.14.    *Releases of Guarantees and Liens* .................................................136
Section 9.15.    *Confidentiality* .............................................................................136
Section 9.16.    *WAIVERS OF JURY TRIAL* ..........................................................137
Section 9.17.    *USA Patriot Act*...........................................................................137
Section 9.18.    *Intercreditor Agreement* ...............................................................137
Section 9.19.    *Acknowledgement and Consent to Bail-In of EEA Financial Institutions* ..............................................................................138
Section 9.20.    *Certain ERISA Matters*.................................................................138

Page

ARTICLE 10 GUARANTEE ...........................................................................140

Section 10.01.    *Guarantee* ...........................................................................140
Section 10.02.    *Rights of Secured Parties* ....................................................141
Section 10.03.    *Obligations Unconditional* ..................................................141
Section 10.04.    *Reinstatement* ......................................................................143
Section 10.05.    *Subrogation; Subordination* ................................................143
Section 10.06.    *Remedies* ..............................................................................143
Section 10.07.    *Instrument for the Payment of Money* ..................................144
Section 10.08.    *Continuing Guarantee* ..........................................................144
Section 10.09.    *General Limitation on Guaranteed Obligations* ..................144
Section 10.10.    *Release of Loan Parties* .......................................................144
Section 10.11.    *Right of Contribution* ..........................................................144
Section 10.12.    *Default; Remedies; Bankruptcy; Etc.* ..................................145
Section 10.13.    *Keepwell* ..............................................................................146
Section 10.14.    *Enforcement Expenses; Indemnification* .............................146
Section 10.15.    *Acknowledgements.* ..............................................................147
Section 10.16.    *Additional Guarantors* ........................................................147
Section 10.17.    *Releases* ...............................................................................147
Section 10.18.    *Reference to Certain Provisions of the Intercreditor Agreement*.......147

iv

**SCHEDULES:**

| | |
|---|---|
| 1.01A | Initial Loan Commitments |
| 1.01B | Mortgaged Property |
| 1.01C | Supply and Offtake Documents |
| 1.01D | North Yard and West Yard |
| 3.03 | Conflicts with Material Contracts |
| 3.07 | Subsidiaries |
| 3.08(a) | Litigation |
| 3.17 | Environmental Matters |
| 3.18 | Insurance |
| 5.11(g) | Specified Tranche B Excluded Buildings |
| 6.01 | Existing Indebtedness |
| 6.02 | Existing Liens |
| 6.07 | Existing Investments |
| 6.08 | Existing Affiliate Transactions |

**EXHIBITS:**

| | |
|---|---|
| A | Form of Security Agreement |
| B | Form of Notice of Borrowing |
| C | Form of Closing Certificate |
| D-1 | Form of Assignment and Assumption |
| D-2 | Form of Affiliated Lender Assignment and Assumption |
| E | Form of Prepayment Option Notice |
| F | Forms of U.S. Tax Compliance Certificate |
| G | Form of Intercreditor Agreement |
| H | Form of Compliance Certificate |
| I | Form of Perfection Certificate |
| J | Form of Notice of Conversion/Continuation |
| K | Form of Assumption Agreement |

CREDIT AGREEMENT (this "**Agreement**"), dated as of August 7, 2018, among PES HOLDINGS, LLC, a Delaware limited liability company (the "**Borrower**"), each of the Guarantors (as defined herein) party hereto from time to time, the several banks and other financial institutions or entities from time to time parties to this Agreement and CORTLAND CAPITAL MARKET SERVICES LLC, as administrative agent.

WHEREAS, the Borrower has requested that the Lenders provide a term loan facility denominated in Dollars in an original aggregate principal amount of $619,500,000 (the "**Facility**"), with all of the Borrower's obligations under the Facility to be guaranteed by each Guarantor, and the Lenders have indicated their willingness to lend on the terms and subject to the conditions set forth herein;

WHEREAS, on January 21, 2018 (the "**Petition Date**"), the Borrower and each of its Subsidiaries (each, a "**Debtor**" and collectively the "**Debtors**") (along with certain of its Affiliates) filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code (each case of the Borrower and each other Debtor, a "**Case**", and collectively the "**Cases**") and have continued in the possession of their assets and the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the joint Reorganization Plan (as hereinafter defined) of the Debtors was confirmed by the Bankruptcy Court on March 26, 2018 and will be consummated on the date hereof;

WHEREAS, the Borrower and the other Guarantors are engaged in related businesses, and each Guarantor will derive substantial direct and indirect benefit from the making of the extensions of credit under this Agreement; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.01.  *Defined Terms*.  As used in this Agreement (including the recitals hereof), the terms listed in this Section 1.01 shall have the respective meanings set forth in this Section 1.01.

"**ABR**":  for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1%, (c) the Eurodollar Rate on such day (or, if such day is not a Business Day, the next preceding Business Day) for a deposit in Dollars with a maturity of one month plus 1.0% and (d) 2.00%. Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or such

Eurodollar Rate shall be effective as of the opening of business on the day of such change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate, respectively.

"**ABR Loans**": Loans the rate of interest applicable to which is based upon the ABR.

"**Additional Financing Agreement**": that certain Promissory Note, dated as of the date thereof among PESRM, Sunoco Logistics Partners Operations L.P. and the other parties thereto, as amended, restated, supplemented or otherwise modified from time to time to the extent permitted hereunder and thereunder.

"**Additional Financing Collateral**":  the "Collateral" as defined in the Additional Financing Agreement.

"**Additional Financing Facility**": the debt facility extended to the Borrower and one or more of its Subsidiaries pursuant to the Additional Financing Agreement.

"**Additional PIK Principal**": as defined in Section 2.09(d).

"**Additional Tranche B Excluded Buildings**":  each Building that becomes subject to a Mortgage after the Closing Date pursuant to Section 5.10(b) until the date which is 45 days after the delivery referred to in clause (ii) of Section 5.10(b); *provided* that such Building will continue to be an Additional Tranche B Excluded Building if a Tranche B Lender has provided written notice to the Administrative Agent and the other Tranche B Lenders that (i) such Building is located in a flood zone (unless otherwise not subject to the flood insurance requirements of the Federal Emergency Management Agency) and (ii) evidence of sufficient flood insurance coverage to satisfy the Flood Insurance Laws on such Building satisfactory to such Tranche B Lender has not been received by such Tranche B Lender; *provided*, *further*, that any such Building shall cease to constitute an Additional Tranche B Excluded Building if the Tranche B Lender that gave the original notice gives written notice to the Administrative Agent and the other Tranche B Lenders that it withdraws the original notice.

"**Administrative Agent**": Cortland Capital Market Services LLC, as the administrative agent for the Lenders under this Agreement and the other Loan Documents, together with any of its successors.

"**Administrative Agent Fee Letter**": that certain fee letter between the Administrative Agent and the Borrower dated as of August 7, 2018.

"**Affiliate**": as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"**Affiliate Lender Assignment and Assumption**": as defined in Section 9.06(e)(i).

"**Affiliate Lenders**": collectively, the Sponsors and their respective Affiliates, in each case, that become an assignee pursuant to Section 9.06(e) or Section 9.06(f).

"**Aggregate Exposure**": with respect to any Lender at any time, an amount equal to the sum of the aggregate then unpaid principal amount of such Lender's Loans.

"**Aggregate Exposure Percentage**": with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the Aggregate Exposure of all Lenders at such time.

"**Agreement**":  as defined in the preamble hereto.

"**All-In Yield**" means, as to any Indebtedness, the effective yield on such Indebtedness calculated by the Administrative Agent in consultation with the Borrower in a manner consistent with accepted financial practice, taking into account the interest rate, applicable interest rate margins, any interest rate floors or similar devices, interest rate indexes and all fees, including upfront or similar fees or original issue discount (amortized over the shorter of (x) the life of such Indebtedness and (y) the four years following the date of incurrence thereof) payable generally to lenders providing such Indebtedness, but excluding any advisory, consent, structuring, success, ticking, amendment, commitment, underwriting or arrangement fees (and/or similar fees) payable to any arranger (or Affiliate thereof) in connection with the commitment or syndication of such Indebtedness, (regardless of whether such fees are shared generally with the providers of such Indebtedness).

"**Anti-Corruption Law**": any Requirement of Law related to anti-corruption or anti-bribery, including the Foreign Corrupt Practices Act of 1977, as amended and the rules and regulations thereunder.

"**Anti-Terrorism Law**": any Requirement of Law related to terrorism financing or money laundering including the Patriot Act, The Currency and Foreign Transactions Reporting Act (also known as the "**Bank Secrecy Act**", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959) and Executive Order 13224 (effective September 24, 2001).

"**Applicable Margin**": (a) with respect to Tranche A Loans that are ABR Loans, 5.25% per annum and with respect to Tranche A Loans that are Eurodollar Loans, 6.25% per annum, (b) with respect to Tranche B Loans that are ABR Loans, 3.50% per annum and with respect to Tranche B Loans that are Eurodollar Loans, 4.50% per annum, (c) with respect to Tranche C Loans, the Tranche C Applicable Margin, (d) with respect to any Incremental Loans, the rate per annum set forth in the applicable incremental amendment and (e) with respect to any Extended Loans, the rate per annum set forth in the applicable Extension Amendment.

"**Approved Fund**":  as defined in Section 9.06(b).

"**Asset Sale**": any Disposition or related series of Dispositions of any assets of Borrower or any Subsidiary (A) constituting Collateral that in any fiscal year yields gross

proceeds to any Loan Party (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $2,000,000 and (B) not constituting Collateral that in any fiscal year yields gross proceeds to any Borrower or any Subsidiary (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other noncash proceeds) in excess of $5,000,000 (in each case, excluding any such Disposition permitted by Section 6.04(a), (b), (c), (e), (f), (g), (h), (i), (j), (k), (m), (n), (o), (p), (r) or (t)).

"**Assignee**":  as defined in Section 9.06(b)(i).

"**Assignment and Assumption**": an Assignment and Assumption, substantially in the form of Exhibit D or such other form as agreed by the Administrative Agent.

"**Attributable Indebtedness**": when used with respect to any Sale and Leaseback Transaction, as at the time of determination, the present value (discounted at a rate equivalent to the Borrower's and its Subsidiaries' then-current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Leaseback Transaction.

"**Bail-In Action**": the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**": (a) with respect to any EEA Member Country which has implemented, or which at any time implements, Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union establishing a framework for the recovery and resolution of credit institutions and investment firms, the relevant implementing law or regulation for such EEA Member Country as described in the EU Bail-In Legislation Schedule from time to time; and (b) and, in relation to any other state, any analogous law or regulation from time to time which requires contractual recognition of any Write-down and Conversion Powers contained in that law or regulation.

"**Bankruptcy Code**": Title 11 of the United States Code.

"**Bankruptcy Court**": the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**": any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or

(c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Benefitted Lender**":  as defined in Section 9.07(a).

"**Board**": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Borrower**":  as defined in the preamble hereto.

"**Borrowing Date**": any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"**Building**": as defined in 12 CFR Chapter 11, Section 339.2.

"**Business Day**": a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close, *provided*, that with respect to notices and determinations in connection with, and payments of principal and interest on, Loans having an interest rate determined by reference to the Eurodollar Rate, such day is also a day for trading by and between banks in Dollar deposits in the interbank eurodollar market.

"**Capital Expenditures**": for any period, without duplication, all cash expenditures made directly or indirectly by the Borrower and its Subsidiaries during such period for capital assets as determined in accordance with GAAP, but excluding capital expenditures from: (i) proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets, equipment or other property to the extent such expenditures are made to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other property or otherwise to acquire, maintain, develop, construct, improve, upgrade or repair assets or properties useful in the business of the Borrower or any Guarantor, (ii) any portion of such expenditures attributable solely to acquisitions of property, plant and equipment in Permitted Acquisitions, and (iii) any leases that as of the date hereof qualify as operating leases under GAAP (whether or not such leases are required to be accounted for as capital leases under GAAP after the date hereof). For purposes of this definition, the purchase price of equipment or other fixed assets that are purchased simultaneously with the trade-in of existing assets shall be included in Capital Expenditures only to the extent of the gross amount by which such purchase price exceeds the credit granted by the seller of such assets for the assets being traded in at such time.

"**Capital Lease Obligations**": as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"**Capital Stock**": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing, but excluding any debt securities convertible into any of the foregoing.

"**Carlyle**": collectively, Carlyle U.S. Equity Opportunity Fund, L.P. and Carlyle Energy Mezzanine Opportunities Fund, L.P.

"**Cases**": as defined in the preamble hereto.

"**Cash Equivalents**":  as to any person,

(a)    securities issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of twelve (12) months or less from the date of acquisition;

(b)    certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any domestic or foreign commercial bank in the United States having capital and surplus of not less than $500,000,000;

(c)    repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clauses (a) and (b) entered into with any financial institution meeting the qualifications specified in clause (b) above;

(d)    commercial paper rated at least P-1 by Moody's or at least A-1 by S&P and in each case maturing within twenty-four (24) months after the date of creation thereof and Indebtedness or preferred stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of twenty-four (24) months or less from the date of acquisition;

(e)    readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having a rating of "BBB+" or higher from S&P or "Baa1" or higher from Moody's with maturities of twenty-four (24) months or less from the date of acquisition; or

(f)    Investments with average maturities of twelve (12) months or less from the date of acquisition in money market funds rated within the top three ratings category by S&P or Moody's.

"**Cash Interest**": as defined in Section 2.09(d).

"**CERCLA**": the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, and any successor statute.

"**Closing Date**": the date on which the conditions precedent set forth in Section 4.01 shall have been satisfied or waived in accordance with Section 9.01.

"**Code**":  the Internal Revenue Code of 1986, as amended.

"**Collateral**": all property upon which a Lien is purported to be created by any Security Document, whether now owned or hereafter acquired.

"**Commitment**": an Initial Loan Commitment or an Incremental Commitment.

"**Commodity Exchange Act**": the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Compliance Certificate**": a certificate duly executed by a Responsible Officer substantially in the form of Exhibit H.

"**Confirmation Order**": the final order confirming the Reorganization Plan.

"**Connection Income Taxes**": Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consolidated Amortization Expense**": for any period, the amortization expense of the Borrower and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP.

"**Consolidated Depreciation Expense**": for any period, the depreciation expense of the Borrower and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP.

"**Consolidated EBITDA**": for any period, Consolidated Net Income for such period, adjusted (without duplication) by (x) adding thereto, in each case only to the extent (and in the same proportion) deducted in determining such Consolidated Net Income and without duplication (and with respect to the portion of Consolidated Net Income attributable to any Subsidiary of the Borrower that is an Excluded Subsidiary only if a corresponding amount has been, or would be permitted to be, in each case as of the date of determination, distributed to the Borrower by such Subsidiary that is an Excluded Subsidiary without prior approval (that has not been obtained), pursuant to the terms of all agreements, instruments and Requirements of Law applicable to such Subsidiary):

    (a)       Consolidated Interest Expense for such period, *plus*

    (b)       Consolidated Amortization Expense for such period, *plus*

(c)      Consolidated Depreciation Expense for such period, *plus*

(d)      Consolidated Tax Expense for such period and, to the extent not included in Consolidated Tax Expense, Permitted Tax Distributions actually made by the Borrower, *plus*

(e)      fees, costs, liabilities and expenses incurred through the Closing Date in connection with the Transactions, the Restructuring Transactions and the Supply and Offtake Documents and after the Closing Date in connection with any amendment to any Loan Document or the Supply and Offtake Documents or the replacement of the Supply and Offtake Documents, *plus*

(f)      the aggregate amount of all other non-cash charges, expenses or losses reducing Consolidated Net Income (excluding any non-cash charge, expense or loss relating to write-offs, write-downs or reserves with respect to accounts or inventory) for such period, *plus*

(g)      any fees, charges and expenses incurred during such period (other than Consolidated Depreciation Expense or Consolidated Amortization Expense), in connection with any acquisition, recapitalization, Investment, Asset Sale, other disposition of assets, issuance or repayment of Indebtedness, issuance of Capital Stock by the Borrower or any contribution to capital of the Borrower, refinancing transaction or amendment or modification of any debt instrument (in each case, including any such transaction consummated prior to the Closing Date and any such transaction undertaken but not completed) and any charges or nonrecurring merger costs incurred during such period as a result of any such transaction (including any non-cash expenses or charges recorded in accordance with GAAP relating to equity interests issued to non-employees in exchange for services provided in connection with the transactions contemplated by the Contribution Agreement); provided that the aggregate amount of adjustments included in this clause (g) for such period shall not exceed 10% of Consolidated EBITDA calculated in accordance with this definition (prior to giving effect to any amounts pursuant to this clause (g)), *plus*

(h)      the amount of any restructuring charges, integration costs, retention charges, stock option and any other equity based compensation expenses or other business optimization expenses, including, costs associated with improvements to IT and accounting functions, costs associated with establishing new facilities, costs or reserves deducted (and not added back) in such period in computing Consolidated Net Income, including any one time costs incurred in connection with acquisitions after the Closing Date and costs related to the closure and/or consolidation of facilities; *provided*, *however*, that the aggregate of amounts under this clause (h) for such period shall not exceed 20% of Consolidated EBITDA calculated in accordance with this definition(prior to giving effect to any amounts pursuant to this clause (h), *plus (or minus in the case of gains)*

(i)     any extraordinary, non-recurring or unusual gains or losses or expenses, *plus*

(j)     any cash receipt during such period in respect of non-cash gains or losses taken during a prior period, *plus*

(k)     any severance, relocation costs or payments and curtailments or modifications to pension and post-retirement employee benefit plans; *provided*, however, that the aggregate of amounts under this clause (k) shall not exceed $1,000,000 for such period, *plus*

(l)     any costs or expense incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such cost or expenses are funded with cash proceeds by third persons that is not Borrower or any Subsidiary contributed to the capital of the Borrower or any of its Subsidiaries, *plus*

(m)     any net loss from disposed or discontinued operations, *plus*

(n)     to the extent not already included in the Consolidated Net Income of Borrower and its Subsidiaries, notwithstanding anything to the contrary in the foregoing, the amount of cash proceeds received from business interruption insurance and reimbursements of any expenses and charges that are covered by indemnification or other reimbursement provisions in connection with any investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder, *plus*

(o)     to the extent deducted from Consolidated Net Income of such Person and its Subsidiaries, all fees and payments made in accordance with Section 6.05(n); and

(y) subtracting therefrom (A) any net gain from disposed or discontinued operations for such period, (B) any cash payments made during such period in respect of non-cash charges taken in a prior period, (C) the aggregate amount of all non-cash items increasing Consolidated Net Income (other than the accrual of revenue or recording of receivables in the ordinary course of business) for such period and (D) only to the extent not deducted in determining Consolidated Net Income, payments made in accordance with Section 6.05(n) during such period.

For the purposes of calculating Consolidated EBITDA for any period of four (4) consecutive Fiscal Quarters (each, a "**Reference Period**"), (i) if at any time during such Reference Period the Borrower or any Subsidiary shall have made any Material Disposition, the Consolidated EBITDA for such Reference Period shall be reduced by an amount equal to the Consolidated EBITDA (if positive) attributable to the property that is the subject of such Material Disposition for such Reference Period or increased by an amount equal to the Consolidated EBITDA (if negative) attributable thereto for such Reference Period and (ii) if during such Reference Period the Borrower or any Subsidiary

shall have made a Material Acquisition, Consolidated EBITDA for such Reference Period shall be calculated after giving pro forma effect thereto as if such Material Acquisition occurred on the first day of such Reference Period. As used in this definition, "**Material Acquisition**" means any acquisition of property or series of related acquisitions of property that (a) constitutes assets comprising all or substantially all of an operating unit of a business or constitutes all or substantially all of the common stock (or equivalent ownership interest) of a Person other than Borrower or a Subsidiary and (b) involves the payment of consideration by the Borrower and its Subsidiaries in excess of $1,000,000; and "**Material Disposition**" means any Disposition of property or series of related Dispositions of property that yields gross proceeds to the Borrower or any of its Subsidiaries, or has a fair market value, in each case in excess of $1,000,000.

Consolidated EBITDA for any period shall not include any Consolidated Net Income or, without duplication, any other amounts attributable to an Excluded Subsidiary, except to the extent actually distributed in cash to, and actually received by, a Loan Party during such period.

"**Consolidated Interest Expense**":  for any period, total interest expense (including imputed interest attributable to Capital Lease Obligations in accordance with GAAP and capitalized interest) of the Borrower and its Subsidiaries (other than Excluded Subsidiaries) on a consolidated basis in accordance with GAAP with respect to all outstanding Indebtedness of the Borrower and such Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and after giving effect to Swap Agreements related to interest rates but excluding unrealized gains and losses with respect to Swap Agreements related to interest rates.

Consolidated Interest Expense shall be calculated after giving pro forma effect to any Indebtedness (other than Indebtedness incurred for ordinary course working capital needs under ordinary course revolving credit facilities) incurred, assumed or permanently repaid or extinguished at any time on or after the first day of the Reference Period and prior to the date of determination in connection with any Permitted Acquisitions and Asset Sale (other than any dispositions in the ordinary course of business) as if such incurrence, assumption, repayment or extinguishing had been effected on the first day of such period.

"**Consolidated Leverage Ratio**": as at the last day of any period, the ratio of (a) Consolidated Total Debt on such day to (b) Consolidated EBITDA for such period.

"**Consolidated Net Income**": for any period, the consolidated net income (or loss) of the Borrower and its Restricted Subsidiaries determined on a consolidated basis in accordance with GAAP; *provided*, that there shall be excluded from such net income, to the extent otherwise included therein, without duplication:

        (a)      the net income (or loss) of any Person (other than the Borrower or a Guarantor) in which any Person other than the Borrower and the Guarantors has an ownership interest, except to the extent that cash in an amount equal to any such income has actually been received by the Borrower or a Guarantor;

(b)    the net income of any Subsidiary of the Borrower (other than a Guarantor) during such period to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary (other than a Guarantor) of that income is not permitted as of the relevant date of determination by operation of the terms of any Contractual Obligation, Organizational Document or Requirement of Law applicable to that Subsidiary (other than a Guarantor) during such period, except that the Borrower's equity in net loss of any such Subsidiary for such period shall be included in determining Consolidated Net Income;

(c)    the after-tax effect of any extraordinary gain (or loss) realized during such period by the Borrower or any of its Subsidiaries upon any Asset Sale by the Borrower or any of its Subsidiaries;

(d)    the after-tax effect of gains and losses due solely to fluctuations in currency values determined in accordance with GAAP for such period;

(e)    earnings resulting from any reappraisal, revaluation or write-up of assets;

(f)    unrealized gains and losses with respect to obligations in respect of Swap Agreements for such period;

(g)    the after-tax effect of any extraordinary or nonrecurring gain (or extraordinary or non-recurring loss) recorded or recognized by the Borrower or any of its Subsidiaries during such period;

(h)    the cumulative effect of changes in accounting principles during such period;

(i)    the after-tax effects of adjustments (including the effects of such adjustments pushed down to the Borrower and its Subsidiaries) in the property and equipment, inventory and other intangible assets, deferred revenue and debt line items in Borrower or such Subsidiary's consolidated financial statements pursuant to GAAP resulting from the application of purchase accounting in relation to the payment of fees, commissions and expenses in connection with the transactions contemplated by the Contribution Agreement or any consummated acquisition or the amortization or write-off of any amounts related thereto;

(j)    the after-tax effect of income (or loss) from the early extinguishment of Indebtedness or swap obligations under Swap Agreements;

(k)    any impairment charge or asset write-off, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP; and

(l)    any non-cash compensation expense recorded from grants of stock appreciation or similar rights, stock options, restricted stock or other rights.

"**Consolidated Tax Expense**": for any period, the tax expense of the Borrower and its Subsidiaries, for such period, determined on a consolidated basis in accordance with GAAP.

"**Consolidated Total Debt**": at any date, the aggregate principal amount of all Indebtedness of the Borrower and its Restricted Subsidiaries at such date, determined on a consolidated basis in accordance with GAAP.

"**Contractual Obligation**": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Contribution Agreement**": that certain Refinancing Contribution Agreement, dated as of July 2, 2012, by and among Philadelphia Energy Solutions LLC, Sunoco, Inc. and Carlyle PES, L.L.C, as amended by that certain Amendment No. 1 to Refining Contribution Agreement, effective as of September 8, 2012, by and among Philadelphia Energy Solutions LLC, Sunoco, Inc., PESRM and Carlyle PES, L.L.C. and as assigned by that certain Assignment Agreement dated as of January 17, 2018 by and among each of the parties thereto.

"**Controlled Investment Affiliate**": as to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies. For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"**Controlling Lender**": the Required Tranche A Lenders, the Required Tranche B Lenders, the Required Tranche B/C Lenders or the Required Tranche C Lenders, as determined by Section 7.02, with the rights to instruct the Administrative Agent to take Enforcement Actions, as set forth in Section 7.02.

"**Credit Party**": the Administrative Agent or any other Lender.

"**CSAM**": Credit Suisse Asset Management, LLC.

"**Debt Fund Affiliate**": any Affiliate of the Sponsors (other than the Borrower and its Subsidiaries) that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course and with respect to which no Sponsor, directly or indirectly, possesses the power to direct or cause the direction of the investment policies of any such Affiliate.

"**Debtor**" and "**Debtors**": as defined in the preamble hereto.

"**Default**": any of the events specified in Article 7, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"**DIP Credit Agreemen**t": that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of January 25, 2018, by and between PESRM, the lenders thereto, Cortland Capital Market Services LLC, as administrative agent, and the other parties thereto as amended, restated, supplemented or modified on or prior to the date hereof.

"**DIP Loan**": "Loan", as defined in the DIP Credit Agreement.

"**Discharge**": with respect to any Tranche or Series, (a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of an insolvency proceeding, whether or not such interest would be allowed in such proceeding) on all outstanding Obligations under such Tranche or Series and (b) payment in full in cash of all other Obligations (other than Obligations in respect to Specified Swap Agreements) under such Tranche or Series that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (other than indemnification and other contingent Obligations for which no claim or demand for payment has been made at such time).

"**Discharge Control Shift**": as defined in Section 7.02.

"**Disposition**": with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof. The terms "Dispose" and "Disposed of" shall have correlative meanings.

"**Disqualified Capital Stock**":  any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part (other than in Capital Stock that are otherwise not Disqualified Capital Stock), on or prior to the date that is 121 days after the Latest Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Capital Stock referred to in (a) above, in each case at any time on or prior to the date that is 121 days after the Latest Maturity Date, or (c) contains any repurchase obligation for cash purchase which may come into effect prior to the date that is 121 days after the Latest Maturity Date; *provided*, that any Capital Stock that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Capital Stock is convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Capital Stock upon the occurrence of a change in control or an asset sale occurring prior to the date that is 121 days after the Latest Maturity Date shall not constitute Disqualified Capital Stock if such Capital Stock provides that the issuer thereof will not redeem any such Capital Stock pursuant to such provisions prior to the repayment in full of the Obligations (other than taxes, costs, indemnifications, reimbursements, damages and other claims and liabilities (including Guarantee Obligations) in respect of which no written assertion of liability or no claim or demand for payment has been made at such time).

"**Dollars**" and "**$**":  dollars in lawful currency of the United States.

"**Domestic Subsidiary**": any Subsidiary of the Borrower organized under the laws of any state of the United States or the District of Columbia.

"**Dual Event of Default**": as defined in Section 7.02(c).

"**Dutch Auction**": an auction conducted by the Borrower or one of its Subsidiaries in order to purchase Loans in accordance with procedures as may be agreed to between the Administrative Agent and the Borrower.

"**EB-5 Financing**": a loan or loans made through the U.S. EB-5 Program ("**EB-5 Program**") to finance or refinance Capital Expenditures or other expenses eligible under the EB-5 Program, that (a) has a final maturity date that is later than six (6) months after the Latest Maturity Date (as determined at the time such loans are initially incurred or committed), (b) in respect of which no Liens are granted on any Collateral (other than (i) a first priority Lien on the property or assets constituting Collateral the acquisition, installation, construction or improvement of which is financed with the proceeds of such loan or loans (so long as the amount of such loan or loans does not exceed 100% of the cost of the acquisition, installation, construction or improvement of such Collateral) and (ii) a subordinated lien (subject to the terms of the EB-5 Intercreditor Agreement referred to below) on Collateral), (c) is subject to an intercreditor agreement in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders (an "**EB-5 Intercreditor Agreement**"), (d) the material terms of such financing (including interest rates) are generally consistent with prevailing market terms for such type of financing facility at the time such financing facility is entered into and as consented to by the Administrative Agent (acting at the direction of the Required Lenders) in writing, such consent not to be unreasonably withheld or delayed, (e) any scheduled amortization payments thereunder shall not exceed an amount per annum equal to 1.0% of the principal amount of Indebtedness incurred under such facility, (f) such loans or loans are incurred and guaranteed only by Loan Parties and (g) such loan or loans have a Weighted Average Life to Maturity no shorter than any of the Loans at the time such loan or loans are incurred.

"**EB-5 Intercreditor Agreement**" as defined in the definition of EB-5 Financing.

"**EEA Financial Institution**": (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any Person established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**": any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

14

"**EEA Resolution Authority**": any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Enforcement Action**": an action (in each case, solely to the extent relating to all or a portion of the Collateral) under applicable law to: (a) foreclose, execute, levy, or collect on, take possession or control of, sell or otherwise realize upon (judicially or non-judicially), or lease, license, or otherwise dispose of (whether publicly or privately), Collateral, or otherwise exercise or enforce remedial rights with respect to Collateral under the Loan Documents (including by way of set-off, recoupment notification of a public or private sale or other disposition pursuant to the UCC or other applicable law, notification to account debtors, notification to depositary banks under deposit account control agreements, or exercise of rights under landlord consents, if applicable), (b) solicit bids from third Persons to conduct the liquidation or disposition of Collateral or to engage or retain sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers, or other third Persons for the purposes of valuing, marketing, promoting, and selling Collateral, (c) receive a transfer of Collateral in satisfaction of Indebtedness or any other Obligation secured thereby, (d) otherwise enforce a security interest or exercise another right or remedy, as a secured creditor or otherwise, pertaining to the Collateral at law, in equity, or pursuant to the Loan Documents (including the commencement of applicable legal proceedings or other actions with respect to all or any portion of the Collateral to facilitate the actions described in the preceding clauses, and exercising voting rights in respect of equity interests comprising Collateral), or (e) effect the Disposition of Collateral by the Borrower or any of its Subsidiaries after the occurrence and during the continuation of an Event of Default pursuant to the terms of this Agreement.

"**Environment**": ambient air, indoor air, surface water and groundwater (including potable and non-potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources, flora, fauna, or as otherwise defined in any Environmental Law.

"**Environmental and Necessary Capex**": capital expenditures deemed reasonably necessary by the Loan Parties, in good faith and pursuant to prudent judgment, to satisfy applicable Requirements of Law (including to comply with Environmental Laws).

"**Environmental Claim**": any claim, notice, demand, order, legal action, suit or proceeding alleging liability for or obligation with respect to any investigation, remediation, removal, cleanup, response, corrective action, damages to natural resources, personal injury, property damage, fines, penalties or other costs resulting from, related to or arising out of (i) the presence, Release or threatened Release in or into the Environment of Hazardous Material at any location, (ii) any Environmental Law, or (iii) any Environmental Liability, and shall include any claim seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or

alleged injury to the Environment or, as it relates to exposure to Hazardous Material, to human health.

"**Environmental Laws**": any and all laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning the Environment, human health and safety and including Governmental Real Property Disclosure Requirements, as now or may at any time hereafter be in effect.

"**Environmental Liability**": any liability, contingent or otherwise (including any liability for damages, costs of investigation and remediation, fines, penalties or indemnities), of or relating to the Loan Parties or any Subsidiary directly or indirectly resulting from or based upon (a) any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure of any person to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the Environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**": any permit, license, approval, registration, consent or other authorization under Environmental Law.

"**ERISA**": the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"**ERISA Affiliate**": (a) any entity, whether or not incorporated, that is under common control with a Loan Party within the meaning of Section 4001(a)(14) of ERISA; (b) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Code of which a Loan Party is a member; (c) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code of which a Loan Party is a member; and (d) solely for purposes of Section 412 of the Code and Section 302 of ERISA, with respect to any Loan Party, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Code of which that Loan Party is a member. Any former ERISA Affiliate of any Loan Party shall continue to be considered an ERISA Affiliate of the Loan Party within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Loan Party and with respect to liabilities arising after such period for which the Loan Party is liable under Section 412 of the Code or Title IV of ERISA.

"**ERISA Event**": (a) any Reportable Event; (b) the failure of any Loan Party or ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived in accordance with Section 412(c) of the Code or Section 302(c) of ERISA; (c) a

determination that any Pension Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (d) the filing pursuant to Section 412 of the Code or Section 302 of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (e) the occurrence of any event or condition which would constitute grounds under ERISA for the termination by the PBGC of, or the appointment by the PBGC of a trustee to administer, any Pension Plan or the incurrence by any Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA to the PBGC with respect to the termination of any Pension Plan, including but not limited to the imposition on a Loan Party of any Lien in favor of the PBGC or any Pension Plan; (f) the receipt by any Loan Party or any ERISA Affiliate of any notice from the PBGC relating to an intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan under Section 4042 of ERISA; (g) the failure by any Loan Party or any ERISA Affiliate to make any required contribution to a Multiemployer Plan pursuant to Section 431 or 432 of the Code; (h) the incurrence by any Loan Party or any ERISA Affiliate of any liability with respect to its complete withdrawal or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan; (i) the receipt by any Loan Party or any ERISA Affiliate of any notice concerning the imposition of Withdrawal Liability on it or a determination that a Multiemployer Plan is, or is expected to be, Insolvent, in "endangered" or "critical" status (within the meaning of Section 431 or 432 of the Code or Section 304 or 305 of ERISA), or terminated (within the meaning of Section 4041A of ERISA) or that it intends to terminate or has terminated (under Section 4041A or 4042 of ERISA); (j) the failure by any Loan Party or any ERISA Affiliate to pay when due (after expiration of any applicable grace period) any installment payment with respect to Withdrawal Liability under Section 4201 of ERISA; (k) the withdrawal by any Loan Party or any ERISA Affiliate from any Pension Plan with two or more contributing sponsors, or the termination of any such Pension Plan, resulting in liability to such Loan Party or such Affiliate pursuant to Section 4062 or 4064 of ERISA; (l) the imposition of liability on any ERISA Loan Party or any ERISA Affiliate pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA;  (m) receipt from the IRS of notice of the failure of any Plan to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Plan to qualify for exemption from taxation under Section 501(a) of the Code; or (n) the imposition of a Lien pursuant to Section 430(k) of the Code or pursuant to ERISA on the assets of Loan Party with respect to any Pension Plan.

"**ERISA Loan Parties**": PES Holdings, LLC and any direct or indirect subsidiary thereof.

"**EU Bail-In Legislation Schedule**": the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Eurocurrency Reserve Requirements**": for any day as applied to a Eurodollar Loan, the average (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day applicable to any member bank of the Federal Reserve System as published from time to time by the Board at

https://federalreserve.gov/monetarypolicy/reservereq.htm (or any successor thereto) or under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"**Eurodollar Base Rate**": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the greater of (a) 1.00% and (b) LIBOR Rate.

"**Eurodollar Class**": the collective reference to Eurodollar Loans under a particular Series the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"**Eurodollar Loans**": Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"**Eurodollar Rate**": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula:

$$\frac{\text{Eurodollar Base Rate}}{1.0 - \text{Eurocurrency Reserve Requirements}}$$

"**Event of Default**": any of the events specified in Article 7, *provided* that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"**Exchange Act**":  as defined in Section 7.01(k).

"**Excluded Information**":  as defined in Section 9.06(g)(ii).

"**Excluded Building Proceeds**": as defined in Section 7.03(a)(i)(D).

"**Excluded Subsidiary**": each Subsidiary formed or acquired after the Closing Date that is designated as an Excluded Subsidiary pursuant to Section 5.12.  For the avoidance of doubt, no Excluded Subsidiary shall be a Guarantor, and to the extent that an Excluded Subsidiary's net income would otherwise be included in the definition of Consolidated Net Income or Consolidated EBITDA or any component thereof such Excluded Subsidiary's net income shall not be included for purposes of calculating Consolidated Net Income or Consolidated EBITDA, in each case except to the extent provided in such definition.

"**Excluded Swap Obligation**": with respect to any Loan Party, any obligation (a "**Swap Obligation**") to pay or perform under any agreement, contract, or transaction that constitutes a "**swap**" within the meaning of section 1a(47) of the Commodity Exchange Act, if, and to the extent that, all or a portion of the guarantee of such Loan Party of, or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any

rule, regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof).

"**Excluded Taxes**": any of the following Taxes imposed on or with respect to a Credit Party or required to be withheld or deducted from a payment to a Credit Party: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Credit Party being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the applicable Commitment or, in the case of a Loan not funded pursuant to a prior Commitment, the date on which such Lender acquires such interest in the applicable Loan (in each case, other than pursuant to an assignment request by the Borrower under Section 2.17) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.14, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Commitment or Loan or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Credit Party's failure to comply with Section 2.14(f) or (g) and (d) any U.S. Federal withholding Taxes imposed under FATCA.

"**Extended Loans**":  as defined in Section 2.18(a).

"**Extending Lender**":  as defined in Section 2.18(a).

"**Extension**":  as defined in Section 2.18(a).

"**Extension Amendment**":  as defined in Section 2.18(c).

"**Extension Offer**":  as defined in Section 2.18(a).

"**Facility**": as defined in the preamble hereto.

"**FATCA**": Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the current Code (or any amended or successor version described above), and any intergovernmental agreements (and any related fiscal or regulatory legislation, rules or official administrative guidance) implementing the foregoing.

"**Federal Funds Effective Rate**": for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average

of the quotations for the day of such transactions received by the Administrative Agent from three U.S. banks recognized standing selected by it.

"**Fiscal Quarter**": three-month period ending on March 31, June 30, September 30, or December 31 of any year.

"**Fiscal Quarter Payment Date**": as defined in Section 2.03(b).

"**Flood Insurance Laws**": collectively, (i) the National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto, (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto, and (iv) all other applicable Laws relating to policies and procedures that address requirements placed on federally regulated lenders relating to flood matters, in each case, as now or hereafter in effect or any successor statute thereto.

"**Foreign Benefit Arrangement**": any employee benefit arrangement mandated by non-US law that is maintained or contributed to by any Loan Party or with respect to which any Loan Party has any material actual or contingent liability.

"**Foreign Plan**": each employee benefit plan (within the meaning of Section 3(3)) of ERISA that is not subject to US law and is maintained or contributed to by any Loan Party or with respect to which any Loan Party has any material actual or contingent liability.

"**Foreign Plan Event**": with respect to any Foreign Benefit Arrangement or Foreign Plan, (a) the failure by a Loan Party to make any employer or employee contributions required by applicable law or by the terms of such Foreign Benefit Arrangement or Foreign Plan; (b) the failure to register or loss of good standing with applicable regulatory authorities of any such Foreign Benefit Arrangement or Foreign Plan required to be registered; or (c) the failure of any Foreign Benefit Arrangement or Foreign Plan to comply with any material provisions of applicable law and regulations or with the material terms of such Foreign Benefit Arrangement or Foreign Plan.

"**Foreign Subsidiary**": any Subsidiary of the Borrower that is not a Domestic Subsidiary.

"**Funding Office**": the office or account of the Administrative Agent specified in Section 9.02 or such other office or account as may be specified from time to time by the Administrative Agent as its funding office or account by written notice to the Borrower and the Lenders.

"**GAAP**": subject to Section 1.03, generally accepting accounting principles in the United States applied on a consistent basis.

"**Governmental Authority**": any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"**Governmental Real Property Disclosure Requirements**":  any Requirement of Law of any Governmental Authority requiring notification of, by or to the buyer, lessee, mortgagee, assignee or other transferee of any Real Property, facility, establishment or business, or notification, registration or filing to or with any Governmental Authority, in connection with the sale, lease, mortgage, assignment or other transfer (including any transfer of control) of any Real Property, facility, establishment or business, of the actual or threatened presence or Release in or into the Environment, or the use, disposal or handling, of Hazardous Material on, at, under or near the Real Property, facility, establishment or business to be sold, leased, mortgaged, assigned or transferred.

"**Group Members**": the collective reference to the Borrower and its Subsidiaries.

"**Guarantee**": the guarantee of the Guaranteed Obligations pursuant to Article 10.

"**Guarantee Obligation**": as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing Person that guarantees or has the economic effect of guaranteeing, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or has the economic effect of guaranteeing, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; *provided*, *however*, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing

21

person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"**Guaranteed Obligations**": as defined in Section 10.01.

"**Guarantor Obligations**": with respect to any Guarantor, all obligations and liabilities of such Guarantor which may arise under or in connection with Article 10 or any other Loan Document, any Specified Swap Agreement to which such Guarantor is a party (other than any Excluded Swap Obligations arising under any Specified Swap Agreement), in each case whether on account of guarantee obligations, reimbursement obligations, fees, indemnities, costs, expenses or otherwise (including, without limitation, all fees and disbursements of counsel to the Administrative Agent or to all or any of the Lenders that are required to be paid by such Guarantor pursuant to the terms of this Agreement or any other Loan Document).

"**Guarantors**": the collective reference to the Subsidiary Guarantors.

"**Halcyon**": Halcyon Capital Management LP.

"**Hazardous Material**": (i) any hazardous substances, hazardous waste, petroleum or fraction thereof, contaminant, polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs, asbestos or any asbestos-containing material in any form or condition, radon or any other radioactive material (including any source, special nuclear or by-product material); and (ii) any other chemical, waste, material, compound, constituent or substance, subject to regulation as hazardous, toxic, a pollutant or a contaminant liability under any Environmental Laws.

"**Hinge Date**": the day falling two years and 180 days following the Closing Date (and if such date is not a Business Day, the next succeeding Business Day).

"**Incremental Commitment**": as to any Person, its obligation to make an Incremental Loan to the Borrower pursuant to Section 2.19(c) in an aggregate principal amount equal to the amount set forth in the relevant Incremental Joinder.

"**Incremental Facility Closing Date**": as defined in Section 2.19(c).

"**Incremental Joinder**": a joinder agreement to this Agreement among the Loan Parties, the Administrative Agent and the relevant Incremental Lenders, in form and substance reasonably satisfactory to the Borrower and the Administrative Agent that will establish an Incremental Commitment.

"**Incremental Lender**": as defined in Section 2.19(a).

"**Incremental Loan**": as defined in Section 2.19(c).

"**Indebtedness**": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade payables

incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all Disqualified Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (g) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, and (j) for the purposes of Section 7.01(e) only, all obligations of such Person in respect of Swap Agreements. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"**Indemnified Liability**": as defined in Section 9.05(d).

"**Indemnified Taxes**": (a) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a) above, all Other Taxes.

"**Indemnitee**": as defined in Section 9.05(d).

"**Initial Lender**": each lender that has an Initial Loan Commitment or that holds an Initial Loan.

"**Initial Loan**": as defined in Section 2.01.

"**Initial Loan Commitment**": a Tranche A Loan Commitment, a Tranche B Loan Commitment or a Tranche C Loan Commitment. The original aggregate amount of the Initial Loan Commitments is $619,500,000.

"**Initial Prepayment Amount**:" as defined in Section 2.06(e).

"**Insolvent**": with respect to any Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

"**Intellectual Property**": the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses,

patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"**Intercreditor Agreement**":  as defined in Section 9.18.

"**Interest Election**": as defined in Section 2.09(e).

"**Interest Election Decrease**": as defined in Section 2.09(e).

"**Interest Payment Date**": (a) as to any ABR Loan, the last Business Day of each March, June, September and December (or, if an Event of Default is in existence, the last Business Day of each calendar month) to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan having an Interest Period of three months or less, the last day of such Interest Period, (c) as to any Eurodollar Loan having an Interest Period longer than three months, (i) each day that is three months, or a whole multiple thereof, after the first day of such Interest Period and (ii) the last day of such Interest Period and (d) as to any Loan, the date of any repayment or prepayment made in respect thereof.

"**Interest Period**": as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower in its Notice of Borrowing or Notice of Conversion/Continuation, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 11:00 A.M., New York City time, on the date that is three (3) Business Days prior to the last day of the then current Interest Period with respect thereto; *provided* that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(i)    if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)    the Borrower may not select an Interest Period under a particular Tranche that would extend beyond the date final payment is due on the relevant Loans;

(iii)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month of such Interest Period;

(iv)    the Borrower shall select Interest Periods so as not to require a payment or prepayment of any Eurodollar Loan during an Interest Period for such Loan.

"**Intermediation Master Transaction Agreement**": that certain Master Transaction Agreement, dated August 7, 2018, by and between Merrill Lynch Commodities, Inc., ICBC Standard Bank Plc, PES Inventory Company, LLC, Philadelphia Energy Solutions Refining and Marketing LLC and the other parties thereto, as in effect on the Closing Date.

"**Investments**": as defined in Section 6.07. For purposes of covenant compliance, the amount of any Investment shall be the fair market value of such Investment as of the time made, without adjustment for subsequent increases or decreases in the value of such Investment.

"**IP Rights**": as defined in Section 3.06.

"**IPO**": the first underwritten public offering by Holdings of its Capital Stock after the Closing Date pursuant to a registration statement filed with the SEC in accordance with the Securities Act of 1933, as amended

"**IRS**": the United States Internal Revenue Service.

"**Joint Venture**": (a) any Person which would constitute an "equity method investee" of the Borrower or any of its Subsidiaries and (b) any Person in whom the Borrower or any of its Subsidiaries beneficially owns any Capital Stock that is not a Subsidiary.

"**Latest Maturity Date**": at any date of determination, the latest Maturity Date applicable to any Loan hereunder at such time.

"**Lenders**": Initial Lenders, Extending Lenders and Incremental Lenders.

"**LIBOR Rate**": the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on the applicable Bloomberg LIBOR Screen Page as of 11:00 A.M., London time, two (2) Business Days prior to the beginning of such Interest Period; *provided* that such rate does not appear on such page (or otherwise on such screen), the "LIBOR Rate" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered to major banks in immediately available funds in the London interbank market at approximately 11:00 A.M., London time, two (2) Business Days prior to the commencement of such Interest Period.

"**LIBOR Successor Rate**": as defined in Section 2.09(h).

"**LIBOR Successor Rate Conforming Changes**": with respect to any proposed LIBOR Successor Rate, any conforming changes to the definition of ABR, Interest Period, timing and frequency of determining rates and making payments of interest and other administrative matters as may be appropriate, in the reasonable discretion of the Administrative Agent and the Required Lenders, to reflect the adoption of such LIBOR Successor Rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent and the Required Lenders reasonably determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such LIBOR Successor Rate exists, in such other manner of administration as the Administrative Agent and the Required Lenders reasonably determine in consultation with the Borrower).

"**Lien**": with respect to any property, (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge, collateral assignment, hypothecation, security interest or encumbrance of any kind or any arrangement effective to provide priority or preference or any filing of any financing statement under the UCC or any other similar notice of lien under any similar notice or recording statute of any Governmental Authority, including any easement, right-of-way or other encumbrance on title to Real Property, in each of the foregoing cases whether voluntary or imposed by law; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such property; and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loan**": any extension of credit made by any Lender pursuant to this Agreement in the form of an Initial Loan, an Extended Loan or an Incremental Loan.

"**Loan Acceleration**": the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents immediately becoming due and payable.

"**Loan Documents**": this Agreement, the Security Documents, the Notes (if any), the Administrative Agent Fee Letter, the Intercreditor Agreement and any amendment, waiver, supplement or other modification to any of the foregoing.

"**Loan Parties**":  the Borrower and Guarantors.

"**Mandatory Prepayment Date**": as defined in Section 2.06(e).

"**Material Adverse Effect**": a material adverse effect on (a) the business, property, financial condition or results of operations of the Loan Parties, taken as a whole, (b) Loan Parties' ability to fully perform their respective payment obligations under any Loan Document or (c) the rights or remedies of the Administrative Agent or the Lenders hereunder or under any other Loan Document.

"**Material Contract**": the Supply and Offtake Documents and any other agreement or contract to which any Loan Party is a party and the failure of which to keep in full force and effect would reasonably be expected to have a Material Adverse Effect.

"**Material Permit**": permits required for the Borrower to conduct its businesses, operations and Real Property in accordance with Requirements of Law, excluding such permits the absence of which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

"**Maturity Date**": with respect to (a) Loans that have not been extended pursuant to Section 2.18, December 31, 2022 and (b) with respect to Extended Loans, the final maturity date therefor as specified in the applicable Extension Offer accepted by the respective Lenders.

"**Minimum Extension Condition**":  as defined in Section 2.18(b).

"**Moody's**":  Moody's Investors Service, Inc.

"**Mortgaged Properties**": the parcels of Real Property described on Schedule 1.01B (which shall include the easement for the North Yard Terminal) and identified as Lots 1-12 and Parcels B-2, B-3, B-4, H-1, H-2 and E in the Owner's Deeds, as to which the Administrative Agent, acting in its capacity on behalf of the Lenders, shall be granted a Lien pursuant to the Mortgages.

"**Mortgagee's Title Policy**": that certain Mortgagee's Policy of Title Insurance issued by First America Title Insurance Company in favor of the Administrative Agent, including any and all endorsements to the same.

"**Mortgages**": each of the mortgages and deeds of trust made by any Loan Party in favor of, or for the benefit of, the Administrative Agent, acting in its capacity on behalf of the Lenders, in form and substance reasonably satisfactory to the Administrative Agent or the Required Lenders.

"**Multiemployer Plan**": a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any ERISA Affiliate (i) makes or is obligated to make contributions, (ii) during the preceding five plan years, has made or been obligated to make contributions or (iii) has any actual or contingent liability.

"**Multiple Employer Plan**": an employee pension benefit plan (as defined in Section 3(2) of ERISA) which has two or more contributing sponsors (including any Loan Party or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"**Net Cash Proceeds**": (a) with respect to any Asset Sale or Recovery Event, the cash proceeds actually received by the Borrower or any of its Subsidiaries (other than an Excluded Subsidiary) (including cash proceeds subsequently received (as and when received by the Borrower or any of its Subsidiaries (other than an Excluded Subsidiary)) in respect of non-cash consideration initially received) net of (i) reasonable and

documented selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional, advisory, consulting, investment banking and transactional fees, transfer and similar taxes and the Borrower's good faith estimate of income taxes actually paid or payable in connection with such sale); (ii) amounts provided as a reserve, in accordance with GAAP, against (x) any liabilities under any indemnification obligations associated with such Asset Sale or (y) any other liabilities retained by the Borrower or any of its Subsidiaries (other than Excluded Subsidiaries) associated with the properties sold in such Asset Sale (*provided*, that to the extent and at the time any such amounts are released from such reserve, such amounts shall then constitute Net Cash Proceeds); (iii) the Borrower's good faith estimate of payments required to be made with respect to unassumed liabilities relating to the properties sold within 180 days of such Asset Sale (*provided*, that to the extent such cash proceeds are not used to make payments in respect of such unassumed liabilities within 180 days of such Asset Sale, such cash proceeds shall then constitute Net Cash Proceeds); (iv) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness or indebtedness which is secured by a Lien on the properties sold in such Asset Sale (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale) and which is repaid with such proceeds (other than any such Indebtedness or indebtedness assumed by the purchaser of such properties); (v) any survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed, mortgage or other recording taxes, other customary expenses and brokerage, consultant and other customary fees in respect of any such Asset Sale; and (vi) taxes paid or reasonably estimated to be actually payable in connection therewith, or amounts to be distributed as Permitted Tax Distributions in connection therewith, and (b) in connection with any issuance or sale of Capital Stock or any incurrence of Indebtedness, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"**NGL Installment Purchase Agreement**" means that certain Installment and Sale Purchase Agreement dated as of May 7, 2014, by and among NGL Energy Partners LP and PESRM, as in effect on May 7, 2014 and as amended on or prior to the Closing Date.

"**Non-U.S. Lender**":  a Lender that is not a U.S. Person.

"**North Yard**" the parcels of Real Property commonly referred to as the "north yard" located north of Passyunk Avenue and adjacent to Philadelphia Gas Works property and described by metes and bounds on Schedule 1.01D and identified as Parcels B-2, B-3, B-4, H-1 and H-2 in the Mortgagee's Title Policy.

"**North Yard Terminal**" means that certain crude oil rail unloading terminal which provides logistics services to the Refinery.

"**Notes**": the collective reference to any promissory note evidencing Loans.

"**Notice of Borrowing**": as defined in Section 2.02.

"**Notice of Conversion/Continuation**": as defined in Section 2.07.

"**Obligations**":  the unpaid principal of and interest on (including interest, fees and other amounts accruing after the maturity of the Loans and interest, fees and other amounts accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower and each Guarantor, whether or not a claim for post-filing or post-petition interest, fees or other amounts is allowed in such proceeding) the Loans and all other obligations and liabilities of the Borrower to any Secured Party, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, any Specified Swap Agreement (other than, with respect to any Guarantor, any Excluded Swap Obligations of such Guarantor arising under any Specified Swap Agreement) or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise.

"**OFAC**":  as defined in Sanctioned Persons.

"**Organizational Documents**": with respect to any person, (i) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such person, (ii) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such person, (iv) in the case of any general partnership, the partnership agreement (or similar document) of such person and (v) in any other case, the functional equivalent of the foregoing.

"**Other Affiliate**": any Sponsor and any Affiliate of a Sponsor, other than the Borrower, any Subsidiary of the Borrower and any natural person.

"**Other Connection Taxes**":  with respect to any Credit Party, Taxes imposed as a result of a present or former connection between such Credit Party and the jurisdiction imposing such Tax (other than connections arising from such Credit Party having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**": all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document,

except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.17).

"**Owner's Deeds**": any or all of the following deeds: Special Warranty Deed dated September 7, 2012, effective September 8, 2012, recorded on October 3, 2012 in the Public Office as Document ID Number 52542486 from Sunoco, Inc. (R&M), a Pennsylvania corporation, to the Borrower;  Special Warranty Deed dated September 7, 2012, effective September 8, 2012, recorded on October 3, 2012 in the Public Office as Document ID Number 52542487 from Atlantic  Refining & Marketing Corp., a Delaware corporation, to the Borrower; Quitclaim Deed dated September 7, 2012, effective September 8, 2012, recorded on October 3, 2012 in the Public Office as Document ID Number 52542488 from Sunoco, Inc., a Pennsylvania corporation, to the Borrower; and Deed of Confirmation dated February 16, 2015, recorded on February 23, 2015 in the Public Office as Document ID Number 52884740  from the Borrower to the Borrower.

"**Participant**":  as defined in Section 9.06(c).

"**Participant Register**":  as defined in Section 9.06(c).

"**Patriot Act**":  as defined in Section 9.17.

"**PBGC**": the Pension Benefit Guaranty Corporation established under Section 4002 of ERISA and any successor entity performing similar functions.

"**PCB**":  as defined in Hazardous Materials.

"**Pension Plan**": any employee benefit plan (including a Multiple Employer Plan, but not including a Multiemployer Plan) which is subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA (i) which is sponsored, maintained or contributed to by, or required to be contributed to by, any Loan Party or any of their respective ERISA Affiliates or (ii) with respect to which any Loan Party or any of their respective ERISA Affiliates has any actual or contingent liability.

"**Perfection Certificate**": a certificate duly executed by a Responsible Officer substantially in the form of Exhibit I.

"**Permitted Acquisition**":  as defined in Section 6.07(k).

"**Permitted Holders**": shall mean (a) Carlyle, (b) CSAM, (c) Halcyon, (d) Energy Transfer Partners, L.P. and (e) in each case, Controlled Investment Affiliates of any of the foregoing.

"**Permitted Reporting Company**": PES Inc. or PES Ultimate Holdings, LLC, so long as the Borrower is a direct or indirect Subsidiary of PES Inc. or PES Ultimate Holdings, LLC, respectively, and each Subsidiary of PES Inc. or PES Ultimate Holdings, LLC, respectively, of which the Borrower is a Subsidiary shall not (i) have conducted, transacted or otherwise engaged in, or committed to conduct, transact or otherwise engage in, any business or operations other than those incidental to its ownership of the

Capital Stock of the Borrower, (ii) have incurred, created, assumed or suffered to exist any Indebtedness or other liabilities or financial obligations, except (x) nonconsensual obligations imposed by operation of law and (y) obligations with respect to its Capital Stock including contractual obligations incidental to its Capital Stock, and (iii) own, lease, manage or otherwise operate any properties or assets (including cash (other than cash received in connection with dividends made by the Borrower in accordance with Section 6.05 pending application in the manner contemplated by said Section) and cash equivalents) other than the ownership of shares of Capital Stock of the Borrower.

"**Permitted Tax Distributions**": (i) for any taxable year ending after the Closing Date for which the Borrower is treated as a disregarded entity, partnership, or other flow-through entity for federal, state, provincial, territorial, and/or local income Tax purposes, the payment of dividends or other distributions or loans to each of the Borrower's direct owner(s) to fund the federal, state, provincial, territorial, and/or local income Tax liability of such owner(s), as applicable (or, if a direct owner is a pass-through entity, of the indirect owner(s)) for such taxable year attributable to the income of the Borrower, in an aggregate amount not to exceed the product of (x) the taxable income or gain of the Borrower, as determined for federal income tax purposes, allocated to such direct (or indirect) owner for such taxable year, reduced by any taxable loss of the Borrower allocated to such direct (or indirect) owner with respect to any prior taxable years ending after the Closing Date to the extent such taxable loss is of a character and type that would permit such loss to be deducted against the income of the taxable year in question and has not previously been taken into account under this clause (x) and (y) the highest combined marginal income tax rate applicable to corporate taxpayers or natural persons residing in New York, New York, as applicable, taking into account the character of the relevant tax items (e.g., ordinary or capital) and any deduction under Section 199A of the Code; *provided* that the amount of any such dividends, distributions or loans in respect of the taxable period beginning prior to, and ending after, the Closing Date shall be reduced by the amount of any tax distributions that should have been made for the direct or indirect equity owners of the Borrower to pay estimated taxes prior to the Closing Date (based on the assumptions used in this definition) and (ii) any "Supplemental Tax Distribution" within the meaning of Section 4.01(b)(2)(iv) of the limited liability company agreement of the Borrower.

"**Person**": an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"**PES Inc.**": PES Energy, Inc., a Delaware corporation.

"**PESRM**":  Philadelphia Energy Solutions Refining and Marketing LLC, a Delaware limited liability company.

"**Petition Date**" as defined in the preamble hereto.

"**PIK Interest**": as defined in Section 2.09(d).

"**Plan**": any employee benefit plan as defined in Section 3(3) of ERISA, including any employee welfare benefit plan (as defined in Section 3(1) of ERISA), any employee pension benefit plan (as defined in Section 3(2) of ERISA but excluding any Multiemployer Plan), and any plan which is both an employee welfare benefit plan and an employee pension benefit plan, and in respect of which any Loan Party is an "employer" as defined in section 3(5) of ERISA.

"**Platinum Sale and Leaseback Transaction**": a sale and leaseback transaction with respect to platinum and/or other precious metals used or to be used as a catalyst in the refining process, in an aggregate amount at any time outstanding not to exceed $35,000,000.

"**Point Breeze Site Lease Agreement**": that certain site lease agreement dated as of November 1, 2017 between PESRM and Point Breeze Renewable Energy, LLC, together with the "Other Agreements" referred to in such site lease agreement, as such lease agreement and any such "Other Agreement" was in effect on the date of execution thereof or as amended, modified, waived, supplemented or replaced in any manner not materially adverse to the Lenders.

"**Preferred Stock**": with respect to any person, any and all preferred or preference Capital Stock (however designated) of such person whether now outstanding or issued after the Closing Date.

"**Prepayment Option Notice**": as defined in Section 2.06(e).

"**Prepetition TLA Credit Agreement**": that certain Credit Agreement, dated as of November 24, 2015, among North Yard Logistics, L.P., as borrower, North Yard GP, LLC, as guarantor, the several banks and other financial institutions or entities from time to time parties to such agreement, as lenders and PNC Bank, National Association, as administrative agent, swingline lender and a letter of credit issuer, as amended, supplemented or otherwise modified from time to time prior to the Petition Date.

"**Prepetition TLA Loans**": "Term Loan", as defined in the Prepetition TLA Credit Agreement.

"**Prepetition TLB Credit Agreement**": the Term Loan Agreement dated as of April 4, 2013, among PESRM, as borrower, the several banks and other financial institutions or entities from time to time parties to such agreement, as lenders and JPMorgan Chase Bank, N.A., as Administrative Agent, as amended, supplemented or otherwise modified from time to time prior to the Petition Date.

"**Prepetition TLB Loans**": "Loan", as defined in the Prepetition TLB Credit Agreement.

"**Prime Rate**": the per annum rate of interest publicly quoted from time to time by The Wall Street Journal as the "Prime Rate" in the United States (or, if The Wall Street Journal ceases quoting a prime rate of the type described, either (as determined by the Administrative Agent) (x) the per annum rate quoted as the base rate on such

corporate loans in a different national publication as reasonably selected by Administrative Agent or (y) the highest per annum rate of interest published by the Federal Reserve Board in Federal Reserve statistical release H.15 (519) entitled "Selected Interest Rates" as the bank prime loan rate or its equivalent) or any similar release by the Federal Reserve Board.

"**Pro Forma Financial Statements**":  as defined in Section 3.04(c).

"**Projected Liquidity**": as to the Borrower and its Restricted Subsidiaries on a consolidated basis, the sum of (i) unrestricted cash and Cash Equivalents, (ii) withdrawable funds from brokerage accounts of the Borrower and its Restricted Subsidiaries, in each case on an average daily basis as projected by the Borrower over the twelve month period commencing on the date of such projection.

"**PTE**": a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Office**"; the office of the Department of Records, City and County of Philadelphia, Commonwealth of Pennsylvania.

"**Purchase Money Obligation**": for any person, the obligations of such person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of any property (including Capital Stock of any person) or the cost of installation, construction, development or improvement of any property and any refinancing thereof; *provided*, that (i) such Indebtedness is incurred within one year after such acquisition, installation, construction or improvement of such property by such person and (ii) the amount of such Indebtedness does not exceed 100% of the cost of such acquisition, installation, construction or improvement, as the case may be.

"**Qualified ECP Guarantor**": in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time such Swap Obligation is incurred or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Real Property**": any parcel or tract, or portion thereof, of real property now or hereafter owned by any Loan Party in fee simple, leasehold, easement or other real property interest, together with any and all improvements thereon.

"**Recovery Event**": any involuntary loss of title, any involuntary loss of, damage to or any destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of the Borrower (other than Additional Financing Collateral and SOA Separate Assets and Collateral) or any of its Subsidiaries (other than Excluded Subsidiaries). "Recovery Event" shall include but not be limited to any taking of all or any part of any Real Property of the Borrower (other than Additional Financing Collateral) or any of its Subsidiaries (other than Excluded Subsidiaries) or any

part thereof, in or by condemnation or other eminent domain proceedings pursuant to any Requirement of Law, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property) of any person or any part thereof by any Governmental Authority, civil or military, or any settlement in lieu thereof.  For the avoidance of doubt "Recovery Event" shall not include proceeds received from business interruption insurance.

"**Reference Period**":  as defined in Consolidated EBITDA.

"**Refinery**": the refinery located in Philadelphia, Pennsylvania (consisting of two formerly separate refining operations commonly known as "**Point Breeze**" and "**Girard Point**").

"**Register**":  as defined in Section 9.06(b)(iv).

"**Regulation T**": Regulation T of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation U**": Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation X**": Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Reinvestment Deferred Amount**": with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by any Loan Party in connection therewith that are not applied to prepay the Loans pursuant to Section 2.06(b) as a result of the delivery of a Reinvestment Notice.

"**Reinvestment Event**": any Asset Sale or Recovery Event in respect of which the Borrower has delivered a Reinvestment Notice.

"**Reinvestment Notice**":  a written notice executed by a Responsible Officer stating that no Event of Default has occurred and is continuing and that the Borrower (directly or indirectly through a Restricted Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale or Recovery Event to acquire or repair assets useful in its business.

"**Reinvestment Notice Date**":  as defined in Section 2.06(b).

"**Reinvestment Prepayment Amount**": with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date to acquire or repair assets useful in the Borrower's business.

"**Reinvestment Prepayment Date**": with respect to any Reinvestment Event, the earlier of (a) the date occurring 365 days following the date of such Reinvestment Event; *provided* that such time may be extended by an additional 180 days if, on or prior to the

365th day following the date of receipt of such proceeds, Borrower delivers a certificate of a Responsible Officer to the Administrative Agent (for prompt distribution to the Lenders) detailing the intended use of such proceeds and certifying that the proceeds will be used in accordance with this clause; and (b) the date on which the Borrower shall have determined not to, or shall have otherwise ceased to, acquire or repair assets useful in the Borrower's business with all or any portion of the relevant Reinvestment Deferred Amount.

"**Related Parties**": with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"**Release**": any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the Environment.

"**Remedies Shift**": as defined in Section 7.02(b).

"**Reorganization Plan**": the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization of PES Holdings, LLC and its Debtor Affiliates dated March 22, 2018 ECF No. 286, Exhibit A, confirmed by the Bankruptcy Court and attached as Exhibit A to the Corrected Order Approving the Debtors' Disclosure Statement for and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization of PES Holdings, LLC and its Debtor Affiliates dated April 2, 2018 ECF No. 357 filed in the main Case of the jointly administered Debtors, Case No. 18-10122 (KG), with such amendments as shall be approved by the Bankruptcy Court and satisfactory in form and substance to the Required Consenting Cash Flow Creditors (as defined therein).

"**Replaced Loans**":  as defined in Section 9.01.

"**Replacement Loans**":  as defined in Section 9.01.

"**Reportable Event**": any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Pension Plan, other than those events as to which notice is waived pursuant to applicable regulations.

"**Required Lenders**": at any time, Lenders constituting (a) the Required Tranche A Lenders and (b) the Required Tranche B/C Lenders.

"**Required Tranche A Lenders**": at least two Tranche A Lenders (Tranche A Lenders affiliated to each other or under common management being deemed, for purposes of this definition, as one single Tranche A Lender) holding more than 50% of the sum of the aggregate unpaid principal amount of the Tranche A Loans then outstanding; *provided* that the Tranche A Loans held by any Affiliate Lender (other than (x) any Debt Fund Affiliate or (y) solely with respect to such Affiliate Lender's Tranche A Loans held as of the Closing Date, any Affiliate Lender that is or becomes a Lender on

the Closing Date) shall be excluded for purposes of making a determination of Required Tranche A Lenders.

"**Required Tranche B Lenders**": at any time, Tranche B Lenders holding more than 50% of the sum of the aggregate unpaid principal amount of the Tranche B Loans then outstanding; *provided* that the Tranche B Loans held by any Affiliate Lender (other than (x) any Debt Fund Affiliate or (y) solely with respect to such Affiliate Lender's Tranche B Loans held as of the Closing Date, any Affiliate Lender that is or becomes a Lender on the Closing Date) shall be excluded for purposes of making a determination of Required Tranche B Lenders.

"**Required Tranche B/C Lenders**": at any time, the holders of more than 50% of the sum of the aggregate unpaid principal amount of the Tranche B Loans and the Tranche C Loans, aggregated together as though such Tranche B Loans and Tranche C Loans were a single tranche, then outstanding; *provided* that the Tranche B Loans and the Tranche C Loans held by any Affiliate Lender (other than (x) any Debt Fund Affiliate or (y) solely with respect to such Affiliate Lender's Tranche B Loans or Tranche C Loans held as of the Closing Date, any Affiliate Lender that is or becomes a Lender on the Closing Date) shall be excluded for purposes of making a determination of Required Tranche B/C Lenders.

"**Required Tranche C Lenders**": at any time, Tranche C Lenders holding more than 50% of the sum of the aggregate unpaid principal amount of the Tranche C Loans then outstanding; *provided* that the Tranche C Loans held by any Affiliate Lender (other than (x) any Debt Fund Affiliate or (y) solely with respect to such Affiliate Lender's Tranche B Loans or Tranche C Loans held as of the Closing Date, any Affiliate Lender that is or becomes a Lender on the Closing Date) shall be excluded for purposes of making a determination of Required Tranche C Lenders.

"**Requirement of Law**": as to any Person, any law, treaty, rule or regulation, official administrative pronouncement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Responsible Officer**":  the chief executive officer, president, chief financial officer, executive vice president of the Borrower, or any executive officer of such Person responsible for administration of the obligations of such Person under this Agreement, but in any event, with respect to financial matters, the chief financial officer or treasurer of the Borrower.

"**Restricted Payments**":  as defined in Section 6.05.

"**Restricted Subsidiary**": each Subsidiary of the Borrower that is not an Excluded Subsidiary.

"**Restructuring Transactions**" shall have the meaning set forth in the Reorganization Plan.

"**S&P**": Standard & Poor's Ratings Services.

"**Sale and Leaseback Transaction**": any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"**Sanctioned Person**": any party that (i) is identified on the "Specially Designated Nationals and Blocked Persons List," the "Sectoral Sanctions Identification List" or any similar sanctions list maintained by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") or the U.S. State Department or is ordinarily resident in, organized or chartered in a country or territory that is the subject of a comprehensive OFAC sanctions or embargo program or (ii) is otherwise a person with whom U.S. persons are prohibited from engaging in transactions or whose property must be blocked by U.S. persons under the International Emergency Economic Powers Act, the Trading With the Enemy Act, or any economic sanctions administered by OFAC other Requirement of Law.

"**Scheduled Unavailability Date**": as defined in Section 2.09(h)(ii).

"**SEC**": the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"**Secured Parties**": collectively, the Administrative Agent, the Lenders and other Persons party to a Specified Swap Agreement.

"**Security Agreement**": the Pledge and Security Agreement to be executed and delivered by the Borrower and each Subsidiary Guarantor, substantially in the form of Exhibit A.

"**Security Documents**": the collective reference to the Security Agreement, the Mortgages and all other security documents hereafter delivered to the Administrative Agent granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"**Series**": (a) the Initial Loan Commitments and the Initial Loans made thereafter, (b) each tranche of Extended Loan and (c) the Incremental Commitments and the Incremental Loans thereunder.

"**SOA Separate Assets and Collateral**":  as defined in the Intercreditor Agreement.

"**Specified Swap Agreement**": any Swap Agreement in respect of interest rates, currency exchange rates or commodity prices entered into by the Borrower or any Restricted Subsidiary and any Person that is a Lender or an affiliate of a Lender at the time such Swap Agreement is entered into.

"**Specified Tranche B Excluded Buildings**":  as defined in Schedule 5.11(g).

"**Sponsors**": (a) Carlyle, (b) Energy Transfer Partners, L.P., (c) CSAM, (d) Halcyon, (e) Sunoco, Inc. and (f) each of their respective Control Investment Affiliates but not including, however, any portfolio companies of the foregoing.

"**Standstill Period**": the period of 30 days immediately following the occurrence of an Event of Default during which an Enforcement Action has not occurred at the request of (a) prior to the Discharge of the Tranche A Loans, the Required Tranche A Lenders and (b) on and after the Discharge of the Tranche A Loans, the Required Tranche B/C Lenders (or, as applicable under Section 7.02, the Required Tranche B Lenders or the Required Tranche C Lenders).

"**Subordinated Indebtedness**": Indebtedness of any Loan Party that is by its terms subordinated in right of payment to the Obligations of the Borrower and the Guarantors, as applicable, on terms reasonably acceptable to the Administrative Agent.

"**Subsidiary**": as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**": each Subsidiary of the Borrower other than any Excluded Subsidiary and any Foreign Subsidiary.

"**Supply and Offtake Agreement**":  at any given time, one or more of the following agreements that are in effect at such time: (i) the MLC Phase-in SOA (as defined in the Intermediation Master Transaction Agreement), as in effect on the Closing Date, (ii) the ICBCS SOA (as defined in the Intermediation Master Transaction Agreement) or (iii) a successor or phased-in supply and offtake agreement with terms, taken as a whole, that are not materially adverse to the Lenders than the agreements referenced in clauses (i) and (ii) (it being agreed that terms set forth in the Intermediation Master Transaction Agreement are not materially adverse to the Lenders), in each case of clauses (i), (ii) and (iii), as amended, amended and restated, supplemented or modified in a manner not materially adverse to the Lenders.

"**Supply and Offtake Documents**":  collectively, (i) the Supply and Offtake Agreement, (ii) the Intermediation Master Transaction Agreement, (iii) any other material agreements related to the Supply and Offtake Agreement, including those listed on Schedule 1.01C, in each case as in effect on the Closing Date or to be entered into pursuant to the Intermediation Master Transaction Agreement, and (iv) successor or phased-in agreements to those referenced in clause (iii) that are not materially adverse to

the Lenders than those agreements as in effect on the Closing Date (it being agreed that terms set forth in the Intermediation Master Transaction Agreement are not materially adverse to the Lenders), and, in each case of clauses (ii), (iii) and (iv), as amended, supplemented or modified in a manner not materially adverse to the Lenders.

"**Swap Agreement**": any agreement related to (a) a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction, forward purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions), (b) a transaction similar to any transaction referred to in clause (a) that is currently, or in the future becomes, regularly entered into in the financial markets (including terms and conditions incorporated by reference into such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, or economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are made and (c) any transaction that is a combination of the transactions described in clauses (a) and (b) above. For the avoidance of doubt, "**Swap Agreement**" shall not include the Supply and Offtake Agreement or the Supply and Offtake Documents or any agreements or obligations entered into in the ordinary course of business to buy or sell any security, commodity, or other financial instrument or instrument in a transaction that contemplates or settles by physical delivery of the underlying security, commodity, or other financial instrument or instrument.

"**Swap Obligation**":  as defined in the definition of Excluded Swap Obligation.

"**Tax Return**": all returns, statements, filings, attachments and other documents or certifications required to be filed in respect of Taxes.

"**Taxes**": all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Title Insurance Company**":  as defined in Section 5.11(b)Section 5.11(c).

"**Tranche**": each tranche of Tranche A Loans, Tranche B Loans and Tranche C Loans, separately.

"**Tranche A Lender**": the financial institutions named on Schedule 1.01A (as amended or supplemented from time to time) and their respective successors and assigns

as permitted hereunder and designated as holding Tranche A Loans, each of which is referred to herein as a Tranche A Lender.

"**Tranche A Loan**": as defined in Section 2.01.

"**Tranche A Loan Commitment**": as to any Tranche A Lender, the obligation of such Tranche A Lender, if any, to make a Tranche A Loan in the form provided in Section 2.01 to the Borrower in a principal amount not to exceed the amount set forth under the heading "**Tranche A Loan Commitment**" opposite such Tranche A Lender's name on Schedule 1.01A. The original aggregate amount of the Tranche A Loan Commitments is $120,000,000.

"**Tranche B Excluded Buildings**": the Specified Tranche B Excluded Buildings and the Additional Tranche B Excluded Buildings.

"**Tranche B Loan**": as defined in Section 2.01.

"**Tranche B Loan Commitment**": as to any Tranche B Lender, the obligation of such Tranche B Lender, if any, to make a Tranche B Loan in the form provided in Section 2.01 to the Borrower in a principal amount not to exceed the amount set forth under the heading "**Tranche B Loan Commitment**" opposite such Tranche B Lender's name on Schedule 1.01A. The original aggregate amount of the Tranche B Loan Commitments is $82,500,000.

"**Tranche B Lender**": the financial institutions named on Schedule 1.01A (as amended or supplemented from time to time) and their respective successors and assigns as permitted hereunder and designated as holding Tranche B Loans, each of which is referred to herein as a Tranche B Lender.

"**Tranche B Payment Event of Default**": as defined in the definition of Tranche B Specific Event of Default.

"**Tranche B Specific Event of Default**": any Event of Default resulting from (i) the failure of the Borrower to pay interest on the Tranche B Loans on any date (unless the Borrower also fails to pay all other interest due under this Agreement (other than PIK Interest) on such date and thereafter so long as the Borrower fails to pay interest on the Tranche B Loans), (ii) the failure of the Borrower to pay any amortization payment under the Tranche B Loans (each Tranche B Specific Event of Default described in clauses (i) and (ii), a "**Tranche B Payment Event of Default**"), (iii) any default in the observance or performance of any provision of (x) the final proviso in Section 6.05, (y) the final proviso to Section 6.07 or (z) Section 6.17 or (iv) the incurrence by the Borrower of Incremental Loans deemed to be Tranche A Loans, except as permitted by Section 2.19(g).

"**Tranche B/C Loans**": as defined in Section 7.03(a)(i)(D).

"**Tranche B/C Lenders**": as defined in Section 7.03(a)(i)(D).

"**Tranche C Applicable Margin**": except as otherwise provided pursuant to Section 2.09(e) (a) during the period commencing on the Closing Date and terminating on the Hinge Date, (x) with respect to Tranche C Loans that are ABR Loans, 2.50% per annum and with respect to Tranche C Loans that are Eurodollar Loans, 3.50% per annum plus (y) PIK Interest of 3.00% per annum and (b) during the period commencing on the Business Day following the Hinge Date and terminating on the Maturity Date, (x) with respect to Tranche C Loans that are ABR Loans, 3.00% per annum and with respect to Tranche C Loans that are Eurodollar Loans, 4.00% per annum plus (y) PIK Interest of 2.50% per annum.

"**Tranche C Lender**": the financial institutions named on Schedule 1.01A (as amended or supplemented from time to time) and their respective successors and assigns as permitted hereunder and designated as holding Tranche C Loans, each of which is referred to herein as a Tranche C Lender.

"**Tranche C Loan**": as defined in Section 2.01.

"**Tranche C Loan Commitment**": as to any Tranche C Lender, the obligation of such Tranche C Lender, if any, to make a Tranche C Loan in the form provided in Section 2.01 to the Borrower in a principal amount not to exceed the amount set forth under the heading "**Tranche C Loan Commitment**" opposite such Tranche C Lender's name on Schedule 1.01A. The original aggregate amount of the Tranche C Loan Commitments is $417,000,000.

"**Transactions**": the entry into this Agreement and the other Loan Documents.

"**Transferee**":  any Assignee or Participant.

"**Transferred Guarantor**": as defined in Section 10.10.

"**UCC**": has the meaning assigned to such term in the Security Agreement.

"**Unasserted Contingent Obligations**": taxes, costs, indemnifications, reimbursements, damages and other claims and liabilities in respect of which no written assertion of liability or no claim or demand for payment has been made at such time.

"**United States**":  the United States of America.

"**U.S. Person**": a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**":  as defined in Section 2.14(f)(ii)(B)(3).

"**Voting Stock**":  with respect to any person, any class or classes of Capital Stock pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors of such person.

"**Weighted Average Life to Maturity**": when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal (excluding nominal amortization), including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"**West Yard**": the parcel of real properly (and any improvements to such parcel of Real Property) commonly referred to as the "west yard" described by metes and bounds on Schedule 1.01D.

"**Withdrawal Liability**": any liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are used in sections 4203 and 4205, respectively, of ERISA.

"**Write-Down and Conversion Powers**": (a) in relation to any Bail-In Legislation described in the EU Bail-In Legislation Schedule from time to time, the write-down and conversion powers described as such in relation to that Bail-In Legislation in the EU Bail-In Legislation Schedule; and (b) in relation to any other applicable Bail-In Legislation, (i) any powers under that Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers; and (ii) any similar or analogous powers under that Bail-In Legislation.

Section 1.02.   *Other Definitional Provisions*.  (a) Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)      As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (ii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, and (iv) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such

agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)    The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

Section 1.03.    *Accounting Terms; GAAP.*  Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP, as in effect on the date hereof unless otherwise agreed to by the Borrower and the Required Lenders and the Required Tranche B Lenders. If, after the Closing Date, any change in the accounting principles used in the preparation of the most recent financial statements referred to in Section 5.01 is hereafter required or permitted by the rules, regulations, pronouncements and opinions of the Financial Accounting Standards Board or the American Institute of Certified Public Accountants (or any successors thereto) and such change is adopted by the Borrower and results in a change in any of the calculations required by Article 6 that would not have resulted had such accounting change not occurred, if requested by the Borrower or the Administrative Agent (acting at the direction of the Required Lenders), the parties hereto agree to enter into negotiations in good faith in order to amend such provisions so as to equitably reflect such change such that the criteria for evaluating compliance with such covenants by Borrower shall be the same after such change as if such change had not been made (subject to the approval of the Required Lenders and not subject to any amendment fee or increase in pricing hereunder); *provided, however*, that (i) no change in GAAP that would affect a calculation that measures compliance with any covenant contained in Article 6 shall be given effect until such provisions are amended to reflect such changes in GAAP and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between such calculations made before and after giving effect to such change in GAAP. Notwithstanding any other provision of this Agreement to the contrary, for all purposes during the term of this Agreement and any other Loan Document, each lease that pursuant to GAAP as in effect on the Closing Date would be classified as a capital lease or an operating lease will continue to be so classified, notwithstanding any change in characterization of that lease subsequent to the Closing Date based on changes to GAAP or interpretation of GAAP.

Section 1.04.    *Payments Due on Days Other than Business Days*.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

ARTICLE 2
AMOUNT AND TERMS OF COMMITMENTS

Section 2.01.  *Initial Loan Commitments*.

(a)     Subject to the terms and conditions hereof, each Initial Lender severally agrees to make Initial Loans to the Borrower on the Closing Date in an amount not to exceed the amount of the Initial Loan Commitment of such Lender. The parties hereto acknowledge and agree that on the Closing Date (i) an aggregate principal amount of DIP Loans under and as defined in the DIP Credit Agreement equal to $120,000,000 shall be converted into Tranche A Loans hereunder as set forth in (b) below, (ii) an aggregate principal amount of Prepetition TLA Loans under and as defined in the Prepetition TLA Credit Agreement equal to $82,500,000 shall be converted into Tranche B Loans hereunder as set forth in Section 2.01(c) below and (iii) an aggregate principal amount of Prepetition TLB Loans under and as defined in the Prepetition TLB Credit Agreement equal to $417,000,000 shall be converted into Tranche C Loans hereunder as set forth in Section 2.01(d)) below.

(b)     Subject to the terms and conditions hereof, each Tranche A Lender severally agrees that the DIP Loans made by such Tranche A Lender under the DIP Credit Agreement and outstanding on the Closing Date immediately prior to giving effect to this Agreement shall remain outstanding on and after the Closing Date and shall be converted into loans ("**Tranche A Loans**") in an equal principal amount equal to, in the aggregate, the Tranche A Loan Commitments, and deemed made pursuant to this Agreement on the Closing Date. The conversion by a Tranche A Lender of its DIP Loans shall be deemed to satisfy, dollar for dollar, such Tranche A Lender's obligation to make Tranche A Loans on the Closing Date. Such DIP Loans of each Tranche A Lender shall hereafter be referred to as "Tranche A Loans," and on and after the Closing Date shall have all of the rights and benefits of Loans as set forth in this Agreement and the other Loan Documents.

(c)     Subject to the terms and conditions hereof, each Tranche B Lender severally agrees that the Prepetition TLA Loans made by such Tranche B Lender under the Prepetition TLA Credit Agreement and outstanding on the Petition Date shall remain outstanding on and after the Closing Date and shall be converted into loans ("**Tranche B Loans**") in an equal principal amount equal to, in the aggregate, the Tranche B Loan Commitments, and deemed made pursuant to this Agreement on the Closing Date. The conversion by a Tranche B Lender of its Prepetition TLA Loans shall be deemed to satisfy, dollar for dollar, such Tranche B Lender's obligation to make Tranche B Loans on the Closing Date. Such Prepetition TLA Loans of each Tranche B Lender shall hereafter be referred to as "Tranche B Loans," and on and after the Closing Date shall have all of the rights and benefits of Loans as set forth in this Agreement and the other Loan Documents.

(d)     Subject to the terms and conditions hereof, each Tranche C Lender severally agrees that the Prepetition TLB Loans made by such Tranche C Lender under the Prepetition TLB Credit Agreement and outstanding on the Petition Date shall remain outstanding on and after the Closing Date and shall be converted into loans ("**Tranche C**

**Loans**" and, together with the Tranche A Loans and the Tranche B Loans, the "**Initial Loans**") in an equal principal amount equal to, in the aggregate, the Tranche C Loan Commitments, and deemed made pursuant to this Agreement on the Closing Date. The conversion by a Tranche C Lender of its Prepetition TLB Loans shall be deemed to satisfy, dollar for dollar, such Tranche C Lender's obligation to make Tranche C Loans on the Closing Date. Such Prepetition TLB Loans of each Tranche C Lender shall hereafter be referred to as "Tranche C Loans," and on and after the Closing Date shall have all of the rights and benefits of Loans as set forth in this Agreement and the other Loan Documents.

Section 2.02.  *Procedure for Initial Loan Borrowing*.  The Borrower shall give the Administrative Agent irrevocable written notice (which notice must be received by the Administrative Agent prior to 11:00 A.M., New York City time, one (1) Business Day prior to the Closing Date) requesting that the Initial Lender make the Initial Loans on the Closing Date, specifying the amount to be borrowed, whether such Initial Loans are to be ABR Loans or Eurodollar Loans, and the Interest Period applicable to such Eurodollar Loans. If the Borrower shall fail to specify the Interest Period applicable, the Borrower shall be deemed to have selected an Interest Period of one month.  Such notice (the "**Notice of Borrowing**") shall be irrevocable and shall be in writing, substantially in the form of Exhibit B, appropriately completed. Upon receipt of such Notice of Borrowing, the Administrative Agent, shall promptly notify each Initial Lender thereof. Upon the satisfaction of the conditions set forth in Section 4.01 and Section 4.02, the Loans to be made on the Closing Date shall be deemed to have been made as described in Section 2.01 above.

Section 2.03.  *Repayment of Initial Loans*.

(a)     The Borrower shall repay to the Tranche A Lenders on the Maturity Date the aggregate principal amount of all Tranche A Loans outstanding on such date.

(b)     The Borrower shall repay to the Tranche B Lenders the aggregate principal amount of all Tranche B Loans outstanding on the last Business Day of each Fiscal Quarter (such Business Day, a "**Fiscal Quarter Payment Date**") set forth in the table below (commencing with the first full Fiscal Quarter after the Fiscal Quarter in which the Closing Date occurs) in an amount equal to the amount set forth opposite such Fiscal Quarter Payment Date (in each case as reduced pursuant to Section 2.12(b)):

| Fiscal Quarter Payment Date | Repayment Amount |
|---|---|
| Each Fiscal Quarter Payment Date in 2018 | An amount equal to (i) $2,500,000 *divided by* (ii) the number of Fiscal Quarter Payment Dates in such year |
| Each Fiscal Quarter Payment Date in 2019 | An amount equal to (i) $5,000,000 *divided by* (ii) the number of Fiscal Quarter Payment Dates in such year |
| Each Fiscal Quarter Payment Date in 2020 | An amount equal to (i) $7,500,000 *divided by* (ii) the number of Fiscal Quarter Payment Dates in such year |
| Each Fiscal Quarter Payment Date in each year following 2020 | An amount equal to (i) $10,000,000 *divided by* (ii) the number of Fiscal Quarter Payment Dates in such year |

*provided* that the final principal repayment installment of the Tranche B Loans shall be repaid on the Maturity Date and in any event shall be in an amount equal to the aggregate principal amount of all Tranche B Loans outstanding on such date.

(c)     The Borrower shall repay to the Tranche C Lenders on the Maturity Date the aggregate principal amount of all Tranche C Loans outstanding on such date.

Section 2.04.   *Fees*.  The Borrower agrees to pay to the Administrative Agent the fees in the amounts and on the dates as set forth in the Administrative Agent Fee Letter and to perform any other obligations contained therein.

Section 2.05.   *Optional Prepayments*.  (a) The Borrower may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty (except as set forth in clause (b) below), upon irrevocable written notice delivered to the Administrative Agent no later than 11:00 A.M., New York City time, three (3) Business Days prior thereto, in the case of Eurodollar Loans, and no later than 11:00 A.M., New York City time, one (1) Business Day prior thereto, in the case of ABR Loans, which notice shall specify the date and amount of prepayment and whether the prepayment is of Eurodollar Loans or ABR Loans; *provided*, that if a Eurodollar Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.15. Upon receipt of any such notice,

46

the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid. Partial prepayments of Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple thereof, or, if less, the amount outstanding.

Section 2.06. *Mandatory Prepayments and Commitment Reductions*. (a) If any Indebtedness shall be issued or incurred by any Loan Parties (excluding any Indebtedness incurred in accordance with Section 6.01), an amount equal to 100% of the Net Cash Proceeds thereof shall be applied on the date of such issuance or incurrence to the prepayment of the Loans as set forth in Section 2.06(d).

(b)     If, on any date, Borrower or any Subsidiary shall receive Net Cash Proceeds from any Asset Sale or Recovery Event that is in excess of $500,000 and that, when taken together with all Net Cash Proceeds from Asset Sales and Recovery Events occurring during the fiscal year of Borrower in which such Asset Sale or Recovery Event shall have occurred, exceeds $5,000,000, then, unless a Reinvestment Notice shall be delivered in respect thereof on or prior to the fifth Business Day following the receipt of Net Cash Proceeds from such Asset Sale or Recovery Event (the "**Reinvestment Notice Date**"), such Net Cash Proceeds shall be applied after the Reinvestment Notice Date to the prepayment of the Loans as set forth in Section 2.06(d) and on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event shall be applied to the prepayment of the Loans as set forth in Section 2.06(d); *provided, however*, that for the avoidance of doubt, any cash proceeds received from business interruption insurance shall not be required to be used by the Loan Parties to prepay the Loans under this Section 2.06(b)

(c)     [Reserved].

(d)     Amounts to be applied in connection with prepayments made pursuant to Section 2.06 shall be applied to the prepayment of the Loans in accordance with Section 2.12(b). The application of any prepayment pursuant to Section 2.06 shall be made, first, to ABR Loans and, second, to Eurodollar Loans. Each prepayment of the Loans under Section 2.06 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

(e)     Notwithstanding anything to the contrary in Section 2.06(d) or 2.12, the Borrower will, in lieu of applying the amount of any mandatory prepayment described in Section 2.06 (such amount, the "**Initial Prepayment Amount**") to the prepayment of Loans as provided in paragraph (d) above, on the date specified in Section 2.06 for such prepayment, give the Administrative Agent written notice (each, a "**Prepayment Option Notice**") at least ten (10) Business Days prior to the date of prepayment (each a "**Mandatory Prepayment Date**"). As promptly as practicable after receiving such notice from the Borrower, the Administrative Agent will send to each Lender such Prepayment Option Notice, which shall include an offer by the Borrower to prepay on the relevant Mandatory Prepayment Date the Loans of such Lender by an amount equal to the portion of the Initial Prepayment Amount indicated in such Lender's Prepayment Option Notice

as being applicable to such Lender's Loans. On the Mandatory Prepayment Date, the Borrower shall pay to the Administrative Agent for the benefit of the relevant Lenders the aggregate amount necessary to prepay that portion of the outstanding relevant Loans in respect of which such Lenders have accepted prepayment as described above.

Section 2.07.   *Conversion and Continuation Options*.  (a) The Borrower may elect from time to time to convert Eurodollar Loans to ABR Loans by giving the Administrative Agent prior irrevocable written notice of such election, in each case in the form of Exhibit J appropriately completed (the "**Notice of Conversion/Continuation**") no later than 11:00 A.M., New York City time, on the Business Day preceding the proposed conversion date, *provided* that any such conversion of Eurodollar Loans may only be made on the last day of an Interest Period with respect thereto. The Borrower may elect from time to time to convert ABR Loans to Eurodollar Loans by giving the Administrative Agent prior irrevocable written notice of such election no later than 11:00 A.M., New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor), *provided* that no ABR Loan under a particular Tranche may be converted into a Eurodollar Loan when any Event of Default has occurred and is continuing and the Administrative Agent (acting at the direction of the Required Lenders) have determined in its or their sole discretion not to permit such conversions. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)      Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable written notice to the Administrative Agent, in accordance with the applicable provisions of the term "**Interest Period**" set forth in Section 1.01, of the length of the next Interest Period to be applicable to such Loans, *provided* that no Eurodollar Loan under a particular Tranche may be continued as such (i) when any Event of Default has occurred and is continuing and the Administrative Agent (acting at the direction of the Required Lenders) has determined in its or their sole discretion not to permit such continuations or (ii) if an Event of Default specified in clause (i) or (ii) of Section 7.01(f) with respect to the Borrower is in existence, and *provided*, *further*, that if the Borrower shall fail to give any required notice as described above in this paragraph or if such continuation is not permitted pursuant to the preceding proviso such Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period. If the Borrower fails to specify the Interest Period applicable, the Borrower shall be deemed to have selected an Interest Period of one month. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

Section 2.08.   *Limitations on Eurodollar Class*.  Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Eurodollar Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Class shall be not less than $1,000,000 or a whole multiple of $100,000 in excess thereof, (b) no more than ten Eurodollar Class shall be outstanding at any one time (or, if less, the entire outstanding principal amount of any Loan) and (c) the proportion of each Tranche made or continued

as Eurodollar Loans (as compared to ABR Loans) shall be the same across the Tranches (e.g., if 50% of the Tranche A Loans are Eurodollar Loans, 50% of the Tranche B Loans and 50% of the Tranche C Loans shall be Eurodollar Loans), and the allocation of each Tranche among Interest Periods shall be the same across the Tranches (e.g., if 25% of the Tranche A Loans have an Interest Period of one month ending on October 31, 2018, 25% of the Tranche B Loans and 25% of the Tranche C Loans shall have an Interest Period of one month ending on October 31, 2018).

Section 2.09.    *Interest Rates and Payment Dates*.

(a)      Except as provided for below in clauses (d) and (e) as to Tranche C Loans, Initial Loans may from time to time be Eurodollar Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.02 and 2.07.

(b)      Each Eurodollar Loan (including any Additional PIK Principal) shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin.

(c)      Each ABR Loan (including any Additional PIK Principal) shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(d)      Tranche C Loans shall bear both cash pay interest ("**Cash Interest**") and interest in the form of additional amounts added to the outstanding principal amount of the Tranche C Loans ("**PIK Interest**", and the amount of any such PIK Interest added to the principal of the Tranche C Loans on any Interest Payment Date, the "**Additional PIK Principal**"), in accordance with the definition of "Tranche C Applicable Margin" (except as provided for below in clause (e)) (with Cash Interest and Additional PIK Principal to be allocated pro rata among the Tranche C Lenders in proportion to the aggregate principal amount of the portion of the Tranche C Loan held by each Tranche C Lender).

(e)      If at any time up to and including the Hinge Date, the Borrower determines that Projected Liquidity, calculated as of the close of business two (2) Business Days immediately prior to any Interest Payment Date is equal to or less than $115,000,000, the Borrower may elect (an "**Interest Election**") to decrease (the "**Interest Election Decrease**") the amount of Cash Interest by any amount up to a maximum of 3.00% per annum by simultaneously increasing the amount of PIK Interest by an amount equal to one and one third (1.33) basis points for each single (1.00) basis point of Interest Election Decrease, up to an aggregate cap of $15,000,000 in Additional PIK Principal with respect to such Interest Election during the term of this Agreement. Interest Elections may be made by delivering an irrevocable notice to the Administrative Agent no later than six (6) Business Days prior to the effective date of any Interest Election, which notice shall (i) certify the amount of Projected Liquidity, calculated as of the close of business two (2) Business Days immediately prior to such Interest Payment Date (together with a reasonably detailed calculation thereof), (ii) specify the effective date of such Interest Election and (iii) certify the aggregate amount of Additional PIK Principal with respect to Interest Elections during the term of this Agreement made as of the date of such notice.

An Interest Election (as to the portion of the interest payable as PIK Interest subject to such Interest Election only) shall remain in effect until the Maturity Date. The Administrative Agent shall promptly forward such notice to each Lender.

(f)     (i) If all or a portion of the principal amount of any Loan shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), all overdue Loans shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section 2.09(f) plus 2% and (ii) if all or a portion of any interest payable on any Loan or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to ABR Loans under the relevant Tranche plus 2% in each case, with respect to clauses (i) and (ii) above, from the date of such non-payment until such amount is paid in full (as well after as before judgment).

(g)     Interest on Tranche A Loans and Tranche B Loans, and Cash Interest on Tranche C Loans, shall be payable in arrears on each Interest Payment Date, *provided* that interest accruing pursuant to Section 2.09(f) shall be payable from time to time on demand. PIK Interest on each Tranche C Loan shall be payable by increasing the outstanding principal amount of the Tranche C Loans by the amount of Additional PIK Principal.

(h)     Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Borrower or the Required Lenders notify the Administrative Agent (with, in the case of the Required Lenders, a copy to the Borrower) that the Borrower or the Required Lenders (as applicable) have determined, that:

(i)     adequate and reasonable means do not exist for ascertaining the LIBOR Rate for any requested Interest Period, including, without limitation, because the LIBOR Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii)     the administrator of the LIBOR Rate or a Governmental Authority having jurisdiction over the Administrative Agent or the Required Lenders has made a public statement identifying a specific date after which the LIBOR Rate shall no longer be made available, or used for determining the interest rate of loans (such specific date, the "**Scheduled Unavailability Date**"), or

(iii)     syndicated loans currently being executed, or that include language similar to that contained in this Section 2.09(h), are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace the LIBOR Rate,

then, reasonably promptly after such determination by the Administrative Agent or receipt by the Administrative Agent of such notice, as applicable, the Administrative Agent, the Required Lenders and Borrower may amend this

Agreement to replace the LIBOR Rate with an alternate benchmark rate (including any mathematical or other adjustments to the benchmark (if any) incorporated therein), giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks (any such proposed rate, a "**LIBOR Successor Rate**"), together with any proposed LIBOR Successor Rate Conforming Changes and any such amendment shall become effective at 5:00 p.m. (New York time) on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and Borrower unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders do not accept such amendment.

If no LIBOR Successor Rate has been determined and the circumstances under clause (i) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Administrative Agent will promptly so notify Borrower and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain Eurodollar Loans shall be suspended (to the extent of the affected Eurodollar Loans or Interest Periods) and (y) the Eurodollar Rate component shall no longer be utilized in determining the ABR. Upon receipt of such notice, any Borrower may revoke any pending request for a borrowing of, conversion to or continuation of Eurodollar Loans (to the extent of the affected Eurodollar Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a borrowing of ABR Loans (subject to the foregoing clause (y)) in the amount specified therein.

   Section 2.10.   *Computation of Interest and Fees*.  (a) Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed (including the first day but excluding the last day), except that, with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed (including the first day but excluding the last day). The Administrative Agent shall as soon as determined pursuant to this Agreement notify the Borrower and the relevant Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as determined pursuant to this Agreement notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

   (b)      Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error. The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.09(a).

   Section 2.11.   *Inability to Determine Interest Rate*.  If prior to the first day of any Interest Period:

(a)    the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrower absent a manifest error) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b)    the Administrative Agent shall have received notice from the Required Lenders that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

the Administrative Agent shall give telecopy or written notice thereof to the Borrower and the relevant Lenders as soon as practicable thereafter. If such notice is given (x) any Eurodollar Loans under the relevant Tranche requested to be made on the first day of such Interest Period shall be made as ABR Loans, (y) any Loans under the relevant Tranche that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans under the relevant Tranche shall be converted, on the last day of the then-current Interest Period, to ABR Loans. Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans under the relevant Tranche shall be made or continued as such, nor shall the Borrower have the right to convert Loans under the relevant Tranche to Eurodollar Loans.

Section 2.12.    *Pro Rata Treatment and Payments*.

(a)    [Reserved].

(b)    Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Loans shall be made *pro rata* according to the respective outstanding principal amounts of the Loans then held by the Lenders (except as otherwise provided in Section 2.06(e) or, in the case of Extended Loans, if the applicable Extension Amendment specifies a less favorable treatment), among each of the Tranches and within each Tranche; *provided* that prepayments of Tranche B Loans and Tranche C Loans will be made on a no less than ratable basis than prepayments with respect to Tranche A Loans, and prepayments of Tranche B Loans will be made on a no less than ratable basis than prepayments made with respect to Tranche C Loans. All prepayments of Tranche B Loans shall be applied to the amortization payments described in Section 2.03(b) on the Tranche B Loans in direct order of maturity. Amounts prepaid on account of the Loans may not be reborrowed.

(c)    All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 Noon, New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the Funding Office, in Dollars and in immediately available funds. Any such payments made later than 12:00 Noon, New York City time on any day shall be deemed to have been made on the next succeeding Business Day for purposes of calculating interest thereon. The Administrative Agent shall distribute such payments to each relevant Lender

promptly upon receipt in like funds as received, net of any amounts owing by such Lender pursuant to Section 8.07.  If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(d)    Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three (3) Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans under the relevant Tranche, on demand, from the Borrower.

(e)    Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrower within three (3) Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

(f)    If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.12(d), 2.12(e), 2.14(e) or 8.07, then the Administrative Agent may, in its discretion and notwithstanding any contrary provision hereof, (i) apply any amounts

thereafter received by the Administrative Agent under any such Section for the account of such Lender to satisfy such Lender's obligations under any such Section until all such unsatisfied obligations are fully paid and/or (ii) hold any such amounts in a segregated account as cash collateral for, and application to, any future funding obligations of such Lender under any such Section, in any order as determined by the Administrative Agent in its discretion.

Section 2.13.  *Requirements of Law*.  (a) If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender or other Credit Party with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)    shall subject any Credit Party to any Taxes (other than (A) Indemnified Taxes and (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) in respect of its Loans, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

(ii)    shall impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in, by any Lender that is not otherwise included in the determination of the Eurodollar Rate; or

(iii)    shall impose on such Lender any other condition (other than Taxes);

and the result of any of the foregoing is to increase the cost to such Lender or such other Credit Party, by an amount that such Lender or other Credit Party deems to be material, of making, converting into, continuing or maintaining Loans, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender or such other Credit Party, upon its demand, any additional amounts necessary to compensate such Lender or such other Credit Party for such increased cost or reduced amount receivable. If any Lender or such other Credit Party becomes entitled to claim any additional amounts pursuant to this paragraph, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)    If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company as a consequence of its obligations hereunder (taking into consideration such Lender's or such Lender's holding company's policies with respect to capital adequacy or liquidity)by an amount deemed by such Lender to be material and, in any event, to a level below that which such Lender or such Lender's holding company could have achieve but for such change in Requirement of Law , then from time to time,

after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for such reduction.

(c)     Notwithstanding anything herein to the contrary, (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented.

(d)     A certificate as to any additional amounts payable pursuant to this Section 2.13 submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error.  Notwithstanding anything to the contrary in this Section 2.13, the Borrower shall not be required to compensate a Lender pursuant to this Section 2.13 for any amounts incurred more than six months prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; *provided* that, if the circumstances giving rise to such claim have a retroactive effect, then such six-month period shall be extended to include the period of such retroactive effect. The obligations of the Borrower pursuant to this Section 2.13 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.14.  *Taxes*.  (a) All payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that, after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.14), the amounts received by the applicable Lender (or, in the case of a payment made to the Administrative Agent for its own account, the Administrative Agent) with respect to this agreement equal the sum which would have been received had no such deduction or withholding been made.

(b)     The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse the Administrative Agent for any Other Taxes.

(c)     As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.14, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)     The Loan Parties shall jointly and severally indemnify each Credit Party, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.14) payable or paid by such Credit Party or required to be withheld or deducted from a payment to such Credit Party and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, setting forth in reasonable detail the basis for the calculations of such payment or liability and including reasonable supporting evidence shall be prima facie evidence thereof absent manifest error.

(e)     Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.06(c) relating to the maintenance of a Participant Register, and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)     (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup

withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than documentation relating to U.S. federal withholding taxes, including such documentation set forth in Section 2.14(f)(ii)(A), (B) and (D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

    (ii)   Without limiting the generality of the foregoing,

     (A)  any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

     (B)  any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

       (1)  in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party, executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E;

       (2)  executed originals of IRS Form W-8ECI;

       (3)  in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and that no payments in connection with any Loan Document are effectively connected with a U.S. trade or business and (y) executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E; or

       (4)  to the extent a Non-U.S. Lender is not the beneficial owner (for example, where the Lender is a partnership,

or is a Participant holding a participation granted by a participating Lender), executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Non-U.S. Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner;

(C)     any Non-U.S. Lender shall, to the extent it is legally eligible to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. Federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA to determine whether such Lender has complied with such Lender's obligations under FATCA and, if necessary, to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any documentation it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such documentation or

promptly notify the Borrower and the Administrative Agent in writing of its legal ineligibility to do so.

Notwithstanding any other provision of this Section 2.14, a Lender shall not be required to provide any documentation pursuant to this Section 2.14(f) that such Lender is not legally eligible to deliver.

Each Lender hereby authorizes the Administrative Agent to deliver to the Loan Parties and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to this Section 2.14(d).

(g)     On or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement, the Administrative Agent shall deliver to the Borrower two duly completed original copies of, if it is not a United States person (as defined in Section 7701(a)(30) of the Code), IRS Form W-8ECI or W-8BEN-E with respect to payments to be received by it as a beneficial owner and IRS Form W-8IMY (together with required accompanying documentation) with respect to payments to be received by it on behalf of the Lenders. If the Administrative Agent is a United States Person (as defined in Section 7701(a)(30) of the Code), the Administrative Agent shall deliver to the Borrower two duly completed original copies of IRS Form W-9. The Administrative Agent shall deliver such documentation on or before any date on which such documentation expires or becomes obsolete or invalid, after the occurrence of any change in the Administrative Agent's circumstances requiring a change in the most recent documentation previously delivered by it to the Borrower, and from time to time thereafter if reasonably requested by the Borrower, and shall promptly notify the Borrower in writing if it is no longer legally eligible to provide any documentation previously provided.

(h)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.14 (including by the payment of additional amounts pursuant to this Section 2.14), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.14 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any

indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)        Each party's obligations under this Section 2.14 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all obligations under the Loan Documents.

(j)        For purposes of this Section 2.14, the term "applicable law" includes FATCA.

Section 2.15.  *Indemnity*.  The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrower has given a Notice of Borrowing or Notice of Conversion/Continuation, as applicable, requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment of or conversion from Eurodollar Loans after the Borrower has given a Notice of Borrowing or Notice of Conversion/Continuation, as applicable, thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto. Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. A certificate as to any amounts payable pursuant to this Section 2.15 submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.16.  *Change of Lending Office*.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.13 or 2.14(a) with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; *provided*, that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending offices to suffer no economic, legal or regulatory disadvantage, and *provided*, *further*, that nothing in this Section 2.16 shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.13 or 2.14(a).

Section 2.17.  *Replacement of Lenders.*  The Borrower shall be permitted to replace any Lender that (a) requests reimbursement for amounts owing pursuant to Section 2.13 or 2.14(a), or (b) does not consent to any proposed amendment, supplement, modification, consent or waiver of any provision of this Agreement or any other Loan Document that requires the consent of each of the Lenders or each of the Lenders affected thereby (so long as the consent of the Required Lenders, Required Tranche A Lenders, Required Tranche B Lenders, Required Tranche C Lenders or Required Tranche B/C Lenders, in each case as may be required by Section 9.01, has been obtained), with a replacement financial institution; *provided* that (i) such replacement does not conflict with any Requirement of Law, (ii) no Event of Default shall have occurred and be continuing at the time of such replacement, (iii) prior to any such replacement, such Lender shall not have eliminated the need for payment of amounts owing pursuant to Section 2.13 or 2.14(a), (iv) the replacement financial institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (v) the Borrower shall be liable to such replaced Lender under Section 2.15 if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (vi) the replacement financial institution shall be reasonably satisfactory to the Administrative Agent, (vii) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 9.06 (*provided* that the Borrower shall be obligated to pay the registration and processing fee referred to therein), (viii) until such time as such replacement shall be consummated, the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.13 or 2.14(a), as the case may be, and (ix) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender. Each party hereto agrees that an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee, and that the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective.

Section 2.18.  *Extensions of Loans.*

(a)      Notwithstanding anything to the contrary in this Agreement but subject in all cases to the limitations and requirements of the fourth to last paragraph of Section 9.01, pursuant to one or more offers (each, an "**Extension Offer**") made from time to time by the Borrower to all Lenders of Loans with the same maturity date, in each case on a pro rata basis (based on the aggregate outstanding principal amount of the respective Loans with the same maturity date) and on the same terms to each such Lender, the Borrower is hereby permitted to consummate from time to time transactions with individual Lenders that accept the terms contained in such Extension Offers to extend the maturity date of each such Lender's Loans and otherwise modify the terms of such Loans pursuant to the terms of the relevant Extension Offer (including by increasing the interest rate or fees payable in respect of such Loans (and related outstandings) and/or modifying the amortization schedule in respect of such Lender's Loans) (each, an "**Extension**", and each group of Loans, in each case as so extended, as well as the original Loans (not so extended), being a "tranche"; any Extended Loans shall constitute a separate tranche of Loans from the tranche of Loans from which they were converted), so long as the

following terms are satisfied: (i) no Default or Event of Default shall have occurred and be continuing at the time the offering document in respect of an Extension Offer is delivered to the Lenders, (ii) except as to pricing (interest rate, fees, funding discounts and prepayment premiums), amortization, maturity, required prepayment dates and participation in prepayments (which shall, subject to immediately succeeding clauses (iii), (iv) and (v), be set forth in the relevant Extension Offer and subject to the limitations contained in the fourth to last paragraph of Section 9.01), the Loans of any Lender that agrees to an Extension with respect to such Loans (an "**Extending Lender**") extended pursuant to any Extension ("**Extended Loans**") shall have the same terms as the tranche of Loans subject to such Extension Offer (except for covenants or other provisions contained therein applicable only to periods after the then Latest Maturity Date of the Loans), (iii) the final maturity date of any Extended Loans shall be no earlier than the then Latest Maturity Date, (iv) the Weighted Average Life to Maturity of any Extended Loans shall be no less than 91 days longer than the remaining Weighted Average Life to Maturity of the Tranche extended thereby, (v) any Extended Loans may participate on a pro rata basis or a less than pro rata basis (but not greater than a pro rata basis) in any voluntary or mandatory repayments or prepayments hereunder, in each case as specified in the respective Extension Offer, (vi) if the aggregate principal amount of Loans (calculated on the face amount thereof) in respect of which Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Loans offered to be extended by the Borrower pursuant to such Extension Offer, then the Loans of such Lenders shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Lenders have accepted such Extension Offer, (vii) the Borrower shall have delivered to the Administrative Agent a "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to the Mortgaged Properties or parcels thereof with improvements thereon (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower in the event any portion of such Mortgaged Properties are Collateral and located in a special flood hazard area), and the flood insurance policies contemplated thereby shall have been procured (viii) all documentation in respect of such Extension shall be consistent with the foregoing and (ix) any applicable Minimum Extension Condition shall be satisfied unless waived by the Borrower.

(b)    With respect to all Extensions consummated by the Borrower pursuant to this Section 2.18, (i) such Extensions shall not constitute voluntary or mandatory payments or prepayments for purposes of Section 2.18 and (ii) each Extension Offer shall specify the minimum amount of Loans to be tendered, which shall be with respect to Loans of a Tranche an integral multiple of $1,000,000 and an aggregate principal amount that is not less than $10,000,000 (or if less, the remaining outstanding principal amount thereof) (or such lesser minimum amount reasonably acceptable by the Administrative Agent) (a "**Minimum Extension Condition**"). The transactions contemplated by this Section 2.18 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Loans on such terms as may be set forth in the relevant Extension Offer) shall not require the consent of any Lender or any other Person (other than as set forth in clause (c) below), and the requirements of any provision of this Agreement (including Section 2.12) or any other Loan Document that may otherwise

prohibit any such Extension or any other transaction contemplated by this Section 2.18 shall not apply to any of the transactions effected pursuant to this Section 2.18.

(c)     The consent (such consent not to be unreasonably withheld, delayed or conditioned) of the Administrative Agent shall be required to effectuate any Extension. No consent of any Lender or any other Person shall be required to effectuate any Extension, other than the consent of the Borrower and each Lender agreeing to such Extension with respect to one or more of its Loans (or a portion thereof).  All Extended Loans and all obligations in respect thereof shall be Obligations under this Agreement and the other Loan Documents that are secured by the Collateral on a pari passu basis with all other applicable Obligations under this Agreement and the other Loan Documents. The Lenders hereby irrevocably authorize the Administrative Agent to enter into amendments to this Agreement and the other Loan Documents (an "**Extension Amendment**") with the Borrower as may be necessary in order to establish new tranches or sub-tranches in respect of Loans so extended and such technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such new tranches or sub-tranches, in each case on terms consistent with this Section 2.18. Without limiting the foregoing, in connection with any Extensions, the respective Loan Parties shall (at their expense) amend (and the Administrative Agent is hereby directed to amend) any Mortgage (i) that has stated within it a maturity date prior to the then Latest Maturity Date so that such stated maturity date is extended to the then Latest Maturity Date (or such later date as may be advised by local counsel to the Administrative Agent), or (ii) covers property in a state where local counsel to the Administrative Agent has advised that because of the establishment of such tranches or sub-tranches and/or the extension of such maturity date, such Mortgage should be amended in the manner specified by such local counsel.

In connection with any Extension, the Borrower shall provide the Administrative Agent at least five (5) Business Days (or such shorter period as may be agreed by the Administrative Agent) prior written notice thereof, and shall agree to such procedures (including, regarding timing, rounding and other adjustments and to ensure reasonable administrative management of the credit facilities hereunder after such Extension), if any, as may be established by, or acceptable to, the Administrative Agent, in each case acting reasonably to accomplish the purposes of this Section 2.18.

Section 2.19.  *Incremental Facilities*.

(a)     Subject to clause (g) below, by no fewer than five (5) Business Days' (or such lesser number of Business Days reasonably satisfactory to the Administrative Agent) notice to the Administrative Agent (which shall promptly notify the Lenders), the Borrower may from time to time, request Incremental Commitments by an amount not exceeding $100,000,000 in the aggregate; provided that (i) any such request for an increase shall be in a minimum amount of $5,000,000 and (ii) the Borrower may make a maximum of two (2) such requests per fiscal year of the Borrower. No Lender shall be obligated to make Incremental Commitments, and the making of Incremental Commitment by any Lender (in such capacity, an "**Incremental Lender**") shall be in the sole discretion of such Lender.

(b)      Subject to the approval of the Administrative Agent, and only to the extent such approval would be required under Section 9.06 for an assignment to such Persons, the Borrower shall select Persons constituting Assignees to participate in any Incremental Commitments. Each Incremental Lender shall effectuate its Incremental Commitment pursuant to an Incremental Joinder.

(c)      If Incremental Commitments are established in accordance with this Section 2.19, the Administrative Agent and the Borrower shall mutually determine the date (an "**Incremental Facility Closing Date**") on which each Incremental Lender shall extend a term loan to the Borrower (an "**Incremental Loan**") in an aggregate principal amount equal to such Incremental Lender's Incremental Commitment. Such Incremental Loans shall be deemed to be Tranche C Loans, except as provided in clause (g) below.  The Administrative Agent shall promptly notify the Lenders of the occurrence of each Incremental Facility Closing Date.

(d)      As a condition precedent to the making of any Incremental Loans, the Borrower shall deliver to the Administrative Agent (i) a favorable opinion of counsel to the Loan Parties, addressed to the Administrative Agent and each Lender, covering such customary matters as may be reasonably requested by the Administrative Agent in connection with such increase, (ii) a certificate of the Borrower dated as of the Incremental Facility Closing Date signed by a Responsible Officer of the Borrower (A) certifying and attaching the resolutions adopted by the Borrower approving such increase and (B) certifying (on behalf of itself and the other Loan Parties) that, before and after giving effect to such increase, (1) the representations and warranties contained in Article 3, the other Loan Documents and the relevant certificates delivered by the Borrower are true and correct in all material respects (except with respect to representations and warranties which are expressly qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) on and as of the Incremental Facility Closing Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (except with respect to representations and warranties which are expressly qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) as of such earlier date, and except that for purposes of this Section 2.19, the representations and warranties contained in subsection (a) of Section 3.04 shall be deemed to refer to the most recent statements of Borrower and its Subsidiaries (or, as applicable, a Permitted Reporting Company) furnished pursuant to clauses (a) and (b), respectively, of Section 5.01, and (2) no Event of Default has occurred and is continuing as of the Incremental Facility Closing Date, (iii) a "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to the Mortgaged Properties or parcels thereof with improvements thereon (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower in the event any portion of such Mortgaged Properties are Collateral and located in a special flood hazard area) and the flood insurance policies contemplated thereby shall have been procured and (iv) such amendments to the Mortgages and updates to Mortgagee's title insurance policies as the Administrative Agent reasonably deems necessary in order for the Obligations (after giving effect to such increase) to continue to be secured on a first lien basis.

(e)     All Incremental Loans shall have the same terms (other than upfront or certain other fees paid to the Lenders as determined by the Borrower) as the other Loans and shall be benefitted by the guarantees from the Guarantors and secured on a pari passu basis by the Collateral.

(f)     This Section 2.19 shall supersede any provisions in Section 2.12 or 9.01 to the contrary.

(g)     Incremental Loans shall be in the form of Tranche C Loans, *provided*, that upon the receipt by the Required Tranche B Lenders of a budget reasonably satisfactory to such Required Tranche B Lenders demonstrating the need, for ordinary working capital purposes, for Incremental Loans in the form of Tranche A Loans, within two Fiscal Quarters of the proposed incurrence of such Incremental Loans, the Borrower may borrow such Incremental Loans in the form of Tranche A Loans in an aggregate principal amount for all such Incremental Loans of up to $15,000,000; *provided* that each Tranche B Lender shall be afforded the opportunity to participate in such Incremental Loans on a ratable basis.

(h)     Any Incremental Loans made by an Other Affiliate shall be subject to the limitations contained in Section 9.06(e)(ii) as if such Incremental Loans were assignments of Loans to such Other Affiliate.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans, the Borrower hereby represents and warrants to the Administrative Agent and each Lender that, as of the Closing Date:

Section 3.01.  *Organization; Powers*.  Each Loan Party (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted and to own and lease its property and (c) is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except (other than in the case of the Borrower as to the Borrower's jurisdiction of organization) in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.02.  *Authorizations; Enforceability*.  The Transactions to be entered into by each Loan Party are within such Loan Party's powers and have been duly authorized by all necessary limited liability company, corporate and limited partnership action on the part of such Loan Party. This Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization,

moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03.  *Governmental Approvals; No Conflicts*.  The Transactions (i) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (A) such as has been obtained or made and are in full force and effect, (B) filings necessary to perfect or maintain Liens created by the Security Documents and (C) consents, approvals, registrations, filings, permits or actions the failure of which to obtain or perform would not reasonably be expected to result in a Material Adverse Effect, (ii) do not violate the Organizational Documents of any Loan Party, (iii) do not violate any Requirement of Law, except for any such violation which would not reasonably be expected to result in a Material Adverse Effect, (iv) except as set forth on Schedule 3.03, do not violate or result in a default or require any consent or approval under any Material Contract binding upon any Loan Party or its property, or give rise to a right under any of the foregoing to require any payment to be made by any Loan Party, except for violations, defaults or the creation of such rights that would not reasonably be expected to result in a Material Adverse Effect and (v) do not result in the creation or imposition of any Lien on any property of any Loan Party, except Liens permitted pursuant to Section 6.02.

Section 3.04.  *Financial Statements; Material Adverse Effect; Pro Forma Financial Statements*.

(a)     *Financial Statements*.  All financial statements delivered pursuant to Section 4.01(b) have been prepared in accordance with GAAP consistently applied and present fairly and accurately in all material respects the financial condition and results of operations and cash flows of Borrower and its Subsidiaries as of the dates and for the periods to which they relate, except for, in the case of interim financial statements delivered, the absence of footnote disclosures and normal year-end adjustments.

(b)     *No Material Adverse Effect*.  Since the Closing Date, there has been no event, change, circumstance or occurrence that, individually or in the aggregate, has had or would reasonably be expected to result in a Material Adverse Effect.

(c)     *Pro Forma Financial Statements*.  The unaudited pro forma consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at December 31, 2017 and the related consolidated statement of income for the twelve (12) month period ended on such date (including the notes thereto) (the "**Pro Forma Financial Statements**"), copies of which have heretofore been furnished to the Administrative Agent (for distribution to each Lender), has been prepared giving effect (as if such events had occurred on such date) to (i) the Transactions, (ii) the Restructuring Transactions and (iii) the payment of fees and expenses expected to have a continuing impact on results of operations. The Pro Forma Financial Statements have been prepared based on the best information available to the Borrower (on a commercially reasonable basis taking into account the context and available timeframe in which they were prepared) as of the date of delivery thereof, and presents fairly on a pro forma basis the estimated financial position of Borrower and its consolidated Subsidiaries as at and for the twelve month

period ended on December 31, 2017 assuming that the events specified in the preceding sentence had actually occurred at such date.

Section 3.05.   *Properties*.

(a)      *Generally*.  Each Loan Party has good and marketable title to, a license to or valid leasehold or easement interests in, all its property material to its business, free and clear of all Liens except for Liens permitted pursuant to Section 6.02 and, in the case of all other property, Liens permitted pursuant to Section 6.02 and minor irregularities or deficiencies in title that, individually or in the aggregate, do not interfere with its ability to conduct its business as currently conducted or to utilize such property for its intended purpose in either case, except where the failure to have such title or other interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The property of the Loan Parties, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted) and (ii) constitutes all the property which is required for the business and operations of the Loan Parties as presently conducted.

(b)      *No Recovery Event*.  No Loan Party has received any written notice of, nor has any knowledge of, the occurrence or pendency or contemplation of any Recovery Event affecting all or any portion of its property, which Recovery Event would reasonably be expected to have a Material Adverse Effect.

(c)      *Collateral*.  No claim has been made and remains outstanding that any Loan Party's use of any Collateral does or may violate the rights of any third party that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 3.06.   *Intellectual Property*.  Each Loan Party owns, licenses or possesses the right to use all of the trademarks, service marks, trade names, copyrights, patents, franchises, licenses and other intellectual property rights (collectively, "**IP Rights**") that are necessary for the operation of its respective business, as currently conducted, and such IP Rights do not conflict with the rights of any other Person, except to the extent such failure to own, license or possess or such conflicts, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. The conduct of the business of any Loan Party as currently conducted or as contemplated to be conducted does not infringe upon or violate any rights held by any other Person except for such infringements and violations which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Borrower, threatened in writing which, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 3.07.   *Capital Stock and Subsidiaries*.  Each Loan Party has no Subsidiaries other than those set forth on Schedule 3.07. Schedule 3.07 sets forth the name and jurisdiction of incorporation of each Subsidiary and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by any Loan Party.  All

of the outstanding Capital Stock in such Subsidiaries that are owned by a Loan Party have been validly issued, are fully paid and non-assessable (to the extent such concepts are applicable in the relevant jurisdiction) and are owned free and clear of all Liens except Liens permitted pursuant to Section 6.02.

Section 3.08.    *Litigation; Compliance with Laws; No Default.*

(a)    Except as set forth in Schedule 3.08(a), there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of any Loan Party, threatened in writing against or affecting any Loan Party or any business, property or rights of any Loan Party (i) that involve any Loan Document or, as of the Closing Date, any of the other Transactions or (ii) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)    Except for matters covered by Section 3.17, no Loan Party or any of its businesses, operations and Real Property is in violation of, nor will the continued operation of its businesses, operations or the facilities and properties owned, leased or operated by such Loan Party as currently conducted or contemplated by any Contractual Obligation of such Loan Party violate, any Requirements of Law where such violation or default, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

(c)    No Default or Event of Default has occurred and is continuing.

(d)    The Borrower or any Affiliate thereof has obtained all Material Permits; all such Material Permits are valid and in good standing and, where subject to renewal and/or transfer, the Loan Parties have timely submitted complete renewal and/or transfer applications; the Borrower is currently in compliance with all such Material Permits, other than any non-compliance that would not reasonably be expected to have a Material Adverse Effect.

(e)    No Loan Party is in default under or with respect to any of its Contractual Obligations in any respect that would reasonably be expected to have a Material Adverse Effect.

Section 3.09.    *Federal Reserve Regulations.*  No Loan Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock (as defined in Regulation U). No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that violates the provisions of Regulation T, U or X.

Section 3.10.    *Investment Company Act.*  No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

Section 3.11.  *[Reserved]*.

Section 3.12.  *Taxes*.  Each Loan Party has (a) timely filed or caused to be timely filed all federal Tax Returns and all material state, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all material respects, (b) duly and timely paid, collected or remitted or caused to be duly and timely paid, collected or remitted all Taxes (whether or not shown on any Tax Return) due and payable, collectible or remittable by it and all assessments received by it, except Taxes (i) that are being contested in good faith by appropriate proceedings and for which such Loan Party has set aside on its books adequate reserves in accordance with GAAP or (ii) which the nonpayment of would not be reasonably expected to, individually or in the aggregate result in a Material Adverse Effect and (c) satisfied all of its withholding tax obligations except for failures that would not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect. Each Loan Party has made adequate provision in accordance with GAAP for all material Taxes not yet due and payable. Each Loan Party is unaware of any proposed or pending tax assessments, deficiencies or audits that would be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect.

Section 3.13.  *No Material Misstatements*.  (a) All written information, other than projections and information of a general economic or industry specific nature, that has been made available by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with this Agreement, when taken as a whole, was or is correct in all material respects and did not or does not, when taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made (giving effect to all supplements and updates thereto that may have been subsequently delivered), (b) the financial projections and other forward- looking information (giving effect to all supplements and updates thereto that may have been subsequently delivered) that have been made available by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with this Agreement have been prepared in good faith based upon assumptions believed by such Loan Party to be reasonable at the time furnished (it being recognized that such projections are as to future events and are not to be viewed as facts, such projections are subject to significant uncertainties and contingencies, many of which are beyond such Loan Party's control, that no assurance can be given that any such projections will be realized and that actual results during the period or periods covered by any such projections may differ significantly from the projected results and such differences may be material) and (c) as of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

Section 3.14.  *Labor Matters*.  There are no strikes, lockouts or slowdowns against any Loan Party pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of each Loan Party have not been in violation of the Fair Labor Standards Act of 1938, as amended, or any other Requirement of Law dealing with such matters in any manner which would reasonably be expected to result in a Material Adverse Effect. All payments due from any Loan Party, or for which

any claim may be made against any Loan Party, on account of wages, have been paid or accrued as a liability on the books of such Loan Party except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party is bound.

Section 3.15.  *Solvency*.  Immediately after the consummation of the Transactions and the Restructuring Transactions, (a) the sum of the present fair saleable value of the assets owned by the Loan Parties on a consolidated basis, on a going concern basis, is greater than the total amount of liabilities (including contingent and unliquidated liabilities) of the Loan Parties on a consolidated basis as they become absolute and matured, the amount of contingent or unliquidated liabilities having been computed at an amount that, in light of all of the facts and circumstances existing at the Closing Date, represents the amount that can reasonably be expected to become an actual or matured liability, (b) the Loan Parties do not, on a consolidated basis, have unreasonably small capital in relation to their business and (c) the Loan Parties, on a consolidated basis, have not incurred, do not intend to incur, and do not believe they will incur, debts beyond their ability to pay such debts as such debts mature in the ordinary course of business.

Section 3.16.  *ERISA*.  (a) Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) each Loan Party and, with respect to a Pension Plan, as applicable, each ERISA Loan Party is in compliance with all applicable provisions and requirements of ERISA and the Code and other federal and state laws and the regulations and published interpretations thereunder with respect to each Plan and Pension Plan and have performed all their obligations required to have been performed under each Plan and Pension Plan; (ii) no ERISA Event or Foreign Plan Event has occurred or is reasonably expected to occur; (iii) each Plan which is intended to qualify under Section 401(a) of the Code has either received from the Internal Revenue Service a favorable determination letter or, if such Plan is a master or prototype plan, it has received a favorable opinion letter from the Internal Revenue Service or, if such Plan is a volume submitter plan, it has received a favorable advisory letter from the Internal Revenue Service and, there are no circumstances reasonably likely to result in revocation of any such letter; (iv) no liability to the PBGC (other than required premium payments), has been or is expected to be incurred by any Loan Party or any ERISA Affiliate; (v) no ERISA Event has occurred and, to the knowledge of the Borrower, no fact, event or circumstance exists that would reasonably be expected to constitute or result in an ERISA Event; and (vi) each Loan Party and each ERISA Affiliate have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan, as applicable, and are not in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

(b)    The Borrower is currently not and at any time during the term of this Agreement will not be (i) an employee benefit plan, as defined in, and subject to Title I of ERISA, (ii) a "plan" as defined in, and subject to Section 4975 of the Code, (iii) an entity deemed to hold "plan assets" of any such "employee benefit plan" or "plan" for purposes of the U.S. Department of Labor Regulation located at 29 C.F.R. Section 2510.3-101, as

modified by Section 3(42) of ERISA or (iv) a "governmental plan" within the meaning of 3(32) of ERISA.

Section 3.17. *Environmental Matters*. (a) Except as set forth in Schedule 3.17, and except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect:

(i) The Loan Parties and their businesses, operations and Real Property are in compliance with all and have not violated any applicable Environmental Law and possess all Environmental Permits required to conduct their business and operations in accordance with applicable Environmental Law; all such Environmental Permits are valid and in good standing and, where subject to renewal and/or transfer, the Loan Parties have timely submitted complete renewal and/or transfer applications and timely and adequately responded to any requests from any Governmental Authority in connection with such applications; and there are no proceedings pending or, to the knowledge of the Loan Parties, threatened which would reasonably be expected to affect the validity of any such Environmental Permit or the ability of the Loan Parties to renew, modify or transfer any Environmental Permits as required under any Environmental Law;

(ii) There has been no Release or, to the knowledge of the Loan Parties, threatened Release of Hazardous Material on, at, under or from any Real Property, or other facilities currently owned, leased or operated by the Loan Parties, or any other location, that has resulted in or would reasonably be expected to result in any Environmental Liability of the Loan Parties;

(iii) There is no Environmental Claim pending or, to the knowledge of the Loan Parties, threatened against the Loan Parties, or relating to any Real Property, or other facilities currently owned, leased or operated by the Loan Parties, and to the knowledge of the Borrower, there are no actions, activities, circumstances, conditions, events or incidents that could form the basis of such an Environmental Claim;

(iv) To the knowledge of the Borrower, no Person with an indemnity or contribution obligation to the Loan Parties relating to compliance with or liability under Environmental Law is in default or has defaulted or threatened to default with respect to such obligation;

(v) To the knowledge of the Loan Parties, no Loan Party is subject to any Environmental Liability and there are no facts, circumstances or conditions arising out of or relating to the operations of any of the Loan Parties, any Real Property or any other facilities currently or formerly owned, operated or leased by any of the Loan Parties that would reasonably be expected to result in any of the Loan Parties incurring any Environmental Liability;

(vi) No Loan Party is obligated to perform any action or otherwise incur any expense under applicable Environmental Law pursuant to any order,

decree, judgment or agreement to which it is bound or has assumed by contract or agreement, and no Loan Party is conducting or financing any investigation, remediation or other response action pursuant to any Environmental Law with respect to any Real Property or any other location;

(vii)    No Real Property or facility is owned, leased or operated by any Loan Party that is material to its business and is listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA or included on any similar list maintained by any Governmental Authority;

(viii)    No Lien has been recorded or, to the knowledge of any Loan Party, threatened under any Environmental Law with respect to any Real Property or other assets of the Loan Parties; and

(ix)    The execution, delivery and performance of this Agreement will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant to any Governmental Real Property Disclosure Requirements or any other applicable Environmental Law.

Section 3.18.    *Insurance*.  Schedule 3.18 sets forth a true, complete and correct description of all insurance maintained by each Loan Party as of the Closing Date. All insurance maintained by the Loan Parties is in full force and effect, all premiums have been duly paid, no Loan Party has received notice of any material violation or cancellation thereof.

Section 3.19.    *Security Documents*.  Each Security Document (and each Mortgage upon delivery thereof) is effective to create in favor of the Administrative Agent for the benefit of the Secured Parties, legal, valid and enforceable (except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law) Liens on, and security interests in, the Collateral to the extent that an enforceable Lien in such Collateral may be created under any applicable law of the United States or any state thereof, including the applicable UCC and when (i) financing statements and other filings in appropriate form are filed in the offices specified on Schedule 5 to the Perfection Certificate with payment of any associated filing fee and (ii) upon the taking of possession or control by the Administrative Agent of the Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent possession or control by the Administrative Agent is required by such Security Document), the Liens created by the Security Documents shall constitute perfected Liens on, and security interests in, all right, title and interest of the grantors in the Collateral (other than such Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Liens permitted pursuant to Section 6.02.

Section 3.20.  *Anti-Terrorism Laws*.

(a)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of the respective officers, directors, brokers or agents of such Loan Party or such Subsidiary has violated or is in violation of Anti-Terrorism Laws in a manner that would be material to the interests of the Lenders.

(b)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of the respective officers, directors, employees or brokers of such Loan Party, such Subsidiary, or agents of such Loan Party or such Subsidiary acting or benefiting in any capacity in connection with the Loans, is a Sanctioned Person or is owned or controlled by one or more Persons that are Sanctioned Persons.

(c)    Each Loan Party, its Subsidiaries and, to the knowledge of each Loan Party and the respective officers, directors, employees, brokers and agents of such Loan Party or such Subsidiary are in compliance in all material respects with sanctions administered by OFAC, all applicable Anti-Terrorism Laws and all applicable Anti-Corruption Laws.

Section 3.21.  *Affiliate Transactions*.  Except as permitted by Section 6.08, there are no existing or proposed agreements, arrangements, understandings or transactions between any Loan Party, Affiliate of any Loan Party or any of their respective officers, members, managers, directors, stockholders, parents, other interest holders or employees, or any members of their respective immediate families.

## ARTICLE 4
## CONDITIONS PRECEDENT

Section 4.01.  *Conditions of Effectiveness*.    This Agreement shall become effective upon the satisfaction or waiver of the following conditions precedent:

(a)    *Credit Agreement; Intercreditor Agreement; Security Agreement*.  The Administrative Agent shall have received (i) this Agreement, executed and delivered by the Administrative Agent, the Borrower and each Person listed on Schedule 1.01A, (ii) the Intercreditor Agreement, executed and delivered by each Person party thereto and (iii) the Security Agreement, executed and delivered by the Borrower and each Subsidiary Guarantor.

(b)    *Pro Forma Balance Sheet; Financial Statements*.  The Lenders shall have received (i) the Pro Forma Financial Statements, (ii) an audited consolidated balance sheet of the Borrower as of December 31, 2017 and (iii) unaudited consolidated financial statements of the Borrower for the period, commencing on January 1, 2018 through March 31, 2018.

(c)    *Lien Searches*.  The Administrative Agent (and each Lender that shall have so requested the same) shall have received the results of a recent Lien search with respect to each Loan Party, and such search shall reveal no Liens on any of the assets of the Loan

Parties except for Liens permitted by Section 6.02 or discharged on or prior to the Closing Date pursuant to documentation satisfactory to the Administrative Agent.

(d)     *Fees.*  The Lenders and the Administrative Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable and documented fees and expenses of legal counsel), on or before the Closing Date.

(e)     *Closing Certificate; Certified Certificate of Incorporation; Good Standing Certificates; Perfection Certificate.*  The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Closing Date, substantially in the form of Exhibit C, with appropriate insertions and attachments, including the certificate of incorporation, formation or limited partnership of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party, (ii) a long form good standing certificate for each Loan Party from its jurisdiction of organization, and (iii) a Perfection Certificate.

(f)     *Legal Opinions.*  The Administrative Agent shall have received the following executed legal opinions:

(i)     the legal opinion of Kirkland & Ellis LLP, counsel to the Borrower and the other Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent; and

(ii)     the legal opinion of local counsel in Pennsylvania and of such other special and local counsel as may be required by the Administrative Agent, in each case in form and substance reasonably satisfactory to the Administrative Agent.

(g)     *Filings, Registrations and Recordings.*  Each document (including any UCC financing statement) required by the Security Documents delivered on or prior to on the Closing Date or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 6.02), shall be in proper form for filing, registration or recordation.

(h)     *Pledged Stock; Stock Powers; Pledged Notes.*  The Administrative Agent shall have received (i) the original certificates representing the shares of Capital Stock pledged pursuant to the Security Agreement, together with an undated stock or transfer power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof and (ii) each promissory note (if any) pledged to the Administrative Agent pursuant to the Security Agreement endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(i)     *Solvency Certificate.*  The Administrative Agent shall have received a certificate of the Borrower signed by its chief financial officer, in form and substance reasonably acceptable to it, certifying that the Borrower and the Loan Parties, on a

consolidated basis after giving effect to the Transactions and the Restructuring Transactions, are solvent.

(j)    *Supply and Offtake Documents*. The Administrative Agent shall have received a duly executed copy of the MLC Phase-in SOA (as defined in the Intermediation Master Transaction Agreement), the Security Agreement (PESRM to MLC) (as defined in the Intermediation Master Transaction Agreement) and the Intermediation Master Transaction Agreement (including all exhibits and annexes thereto), in each case, effective as of the Closing Date.

(k)    *Additional Financing Agreement*. The Administrative Agent shall have received a duly executed copy of the Additional Financing Agreement, effective as of the Closing Date.

(l)    *Material Approvals*. All material Governmental Authority and, except as set forth on Schedule 3.03, third party licenses, registrations, permits, consents and approvals necessary in connection with this Agreement and the transactions contemplated hereby shall have been obtained and no law, regulation, order or decree is then in effect that materially and adversely restrains or prevents this Agreement or the Transactions or imposes conditions that materially impair the rights, or materially increase the liabilities or obligations, of the Administrative Agent or the Lenders, without the prior consent of the Administrative Agent each affected Lender (not to be unreasonably withheld or delayed).

(m)    *Flood Insurance*. The Administrative Agent shall deliver to the Borrower a "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to the Mortgaged Properties or parcels thereof (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party in the event any portion of such Mortgaged Properties are Collateral and located in a special flood hazard area), as well as the flood insurance policies contemplated thereby shall have been procured.

(n)    *Representations and Warranties*. Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (and in all respects if qualified by materiality) on and as of the Closing Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (without duplication of any materiality qualifier contained herein or therein) as of such earlier date.

(o)    *No Default*. No Default or Event of Default shall have occurred and be continuing on the Closing Date or after giving effect to the extension of credit hereunder on the Closing Date.

(p)    *Patriot Act Information*.

(i) The Administrative Agent and the Lenders shall have received all documentation and other information about the Loan Parties as is reasonably

requested in writing at least three (3) days prior to the Closing Date by the Administrative Agent or the Lenders that they reasonably determine is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act.

(ii) At least five days prior to the Closing Date, any Borrower that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall deliver a Beneficial Ownership Certification in relation to such Borrower.

(q)     *Entry of Confirmation Order*.  The Administrative Agent shall have received reasonably satisfactory evidence of the entry of the Confirmation Order, which shall not have been vacated, reversed, modified, amended or stayed without the consent of the Required Consenting Cash Flow Creditors (as defined in the Reorganization Plan).

(r)     *Effectiveness of the Reorganization Plan*.  All conditions precedent to the effectiveness or consummation of the Reorganization Plan shall have been satisfied or waived, and the Reorganization Plan shall have been, or contemporaneously with the effectiveness of this Agreement shall be, consummated.

(s)     The Administrative Agent shall have received a certificate of a Responsible Officer as to the satisfaction of the conditions set forth in this Section 4.01 and in Section 4.02.

For the purpose of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this Section 4.01 unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 4.02.   *Conditions to All Borrowings of Loans*.  The obligation of each Lender to honor any Notice of Borrowing of Loans, including the deemed making of the Loans on the Closing Date pursuant to Section 2.01, is subject to the following conditions precedent:

(a)     The Closing Date shall have occurred.

(b)     The representations and warranties of each Loan Party contained in Article 3 or any other Loan Document shall be true and correct in all material respects (without duplication of any materiality qualifier contained herein or therein) on and as of the date of such borrowing of Loans, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (without duplication of any materiality qualifier contained herein or therein) as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in Section 3.04 shall be deemed to refer to the most recent statements furnished pursuant to Sections 5.01(a) and 5.01(b), respectively, and to the financial condition and results of operations of the Borrower and its Subsidiaries.

(c)     No Default shall exist, or would result from such proposed borrowing of Loans or from the application of the proceeds thereof.

(d)     (i) All fees required to be paid to the Administrative Agent on or before the date of such borrowing of Loans shall have been, or concurrently with the date of such borrowing of Loans are being, paid and (ii) all fees required to be paid to the Lenders on or before the date of such borrowing of Loans shall have been, or concurrently with the date of such borrowing of Loans are being, paid.

(e)     Unless waived by the Administrative Agent, the Required Lenders and the Required Tranche B Lenders, the Borrower shall have paid all reasonable and documented fees, charges and disbursements of Norton Rose Fulbright US LLP, Davis Polk & Wardwell LLP and Cahill Gordon & Reindel LLP, counsel to the Administrative Agent, counsel to the Tranche A Lenders and the Tranche C Lenders and counsel to the Tranche B Lenders, respectively (directly to such counsel if requested by the Administrative Agent), and local counsel to the Administrative Agent in each applicable jurisdiction, in each case in accordance with Section 9.05 and solely to the extent invoiced no later than three Business Days prior to the date of such borrowing of Loans.

(f)     The Administrative Agent shall have received a Notice of Borrowing in accordance with the requirements hereof.

ARTICLE 5
AFFIRMATIVE COVENANTS

The Borrower hereby agrees that, so long as any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, the Borrower shall and shall cause each of its Restricted Subsidiaries to:

Section 5.01.  *Financial Statements*.  Furnish to the Administrative Agent for prompt distribution to each Lender:

(a)     as soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Borrower ending after the Closing Date, a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries (or, as applicable, consolidated and consolidating balance sheets of a Permitted Reporting Company and its consolidated Subsidiaries) as at the end of such year and the related audited consolidated (and consolidating in the event that such financial statements are those of a Permitted Reporting Company) statements of income and of cash flows for such year, setting forth in each case in comparative form the figures for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by KPMG LLP or other independent certified public accountants of nationally recognized standing; and

(b)     as soon as available, but in any event not later than sixty (60) days after the end of each of the first three quarterly periods of each fiscal year of the Borrower beginning from the Fiscal Quarter ending on June 30, 2018, the unaudited consolidated

balance sheet of the Borrower and its consolidated Subsidiaries (or, as applicable, consolidated and consolidating balance sheets of a Permitted Reporting Company and its consolidated Subsidiaries) as at the end of such quarter and the related unaudited consolidated (and consolidating in the event that such financial statements are those of a Permitted Reporting Company) statements of income for such quarter and the portion of the fiscal year through the end of such quarter and of cash flows for the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end adjustments and the absence of footnote disclosures).

Simultaneously with the delivery of each set of financial statements referred to in Section 5.01(a) or (b) above, if during any of the periods for which financial statements are required to be delivered hereunder there shall be one or more Excluded Subsidiaries that, when taken together, have total assets or, over the four fiscal quarters, generate Consolidated EBITDA, in each case of over 5% of the total assets or Consolidated EBITDA (as the case may be) of the Borrower and its Subsidiaries for the relevant period, then such financial statements shall be accompanied by information in reasonable detail summarizing the material differences between the financial statements delivered hereunder and the results of operations and financial condition of the Borrower and its Subsidiaries without giving effect to the results or condition of any such Excluded Subsidiaries.

All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied (except as approved by such accountants or officer, as the case may be, and disclosed in reasonable detail therein) consistently throughout the periods reflected therein and with prior periods.

Section 5.02.  *Certificates; Other Information*.  Furnish to the Administrative Agent for prompt distribution to each Lender (or, in the case of clause (i), to the relevant Lender):

(a)  concurrently with the delivery of any financial statements pursuant to Section 5.01, (i) a certificate of a Responsible Officer stating that Responsible Officer has obtained no knowledge of any Default or Event of Default except as previously disclosed pursuant to Section 5.06(a)(i) or as specified in such certificate (and, in such case, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto) and (ii) in the case of quarterly or annual financial statements, (x) a Compliance Certificate containing in the case any financial statements pursuant to Section 5.01(a), a calculation of Projected Liquidity as of the date of such financial statement and (y) to the extent not previously disclosed to the Administrative Agent and the Lenders, (1) a description of any change in the jurisdiction of organization of any Loan Party, (2) a list of any Trademarks (as such term is defined in the Security Agreement) acquired by any Loan Party and (3) a description of any Person that has become a Group Member, in each case since the date of the most recent report delivered

pursuant to this clause (y) (or in the case of the first such report so delivered, since the Closing Date);

(b)     as soon as available, and in any event no later than thirty (30) days after the end of each fiscal year of the Borrower, a consolidated budget for the following fiscal year (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year, the related consolidated statements of projected sources and uses of cash and projected income and a description of the underlying principal assumptions applicable thereto), accompanied by a certificate of a Responsible Officer stating that such budget is a reasonable estimate for the periods covered thereby and have been prepared in good faith on the basis of assumptions stated therein, which such assumptions were believed to be reasonable at the time of preparation of such budget, it being understood that actual results may vary from the budget and such variances may be material;

(c)     within sixty (60) days after the end of each Fiscal Quarter of the Borrower (or ninety (90) days, in the case of the fourth Fiscal Quarter of each fiscal year), a narrative discussion and analysis of the financial condition and results of operations of the Borrower and its Restricted Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current fiscal year to the end of such Fiscal Quarter, as compared to the previous year, if applicable;

(d)     no later than five (5) Business Days following the effectiveness thereof, copies of any amendment, supplement, waiver or other modification with respect to, or any replacement of, the Supply and Offtake Documents, other than any amendment, supplement, waiver or modification that could not reasonably be expected to adversely affect the Lenders in any material respect;

(e)     within five (5) days after the same are sent, copies of all financial statements and reports that the Borrower sends to the holders of any class of its public debt or equity securities and, within five days after the same are filed, copies of all financial statements and reports that the Borrower may make to, or file with, the SEC (*provided* that such financial statements and reports shall be deemed delivered pursuant to this clause (e) if made available to the Lenders at the SEC's website);

(f)     promptly upon request of the Administrative Agent (*provided* that, for the avoidance of doubt, any Lender may make such request through the Administrative Agent), copies of any documents described in Section 101(k) or 101(l) of ERISA that any Loan Party may request with respect to any Multiemployer Plan to which a Loan Party is obligated to contribute; *provided*, that if the relevant Loan Party has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plans, then, upon reasonable request of such Lender, such Loan Party shall promptly make a request for such documents or notices from such administrator or sponsor and the Loan Party shall provide copies of such documents and notices to such Lender promptly after receipt thereof;

(g)    within seven (7) Business Days (or fifteen (15) Business Days, if the Administrative Agent agrees) after the delivery of financial statements pursuant to Section 5.01(a) or (b), the Borrower shall conduct a meeting by teleconference at a time during normal business hours announced to the Lenders at least one (1) Business Day in advance with the Administrative Agent and the Lenders to discuss such Fiscal Quarter's results and the financial condition of the Borrower and its Restricted Subsidiaries; and

(h)    promptly, such additional financial and other information as the Administrative Agent (acting at the direction of any Lender) may from time to time reasonably request, including information and documentation reasonably requested by the Administrative Agent (acting at the direction of any Lender) for purposes of compliance with applicable "know your customer" requirements under the PATRIOT Act or other applicable anti-money laundering laws.

Section 5.03.    *Payment of Taxes*.  Pay, discharge or otherwise satisfy before they become delinquent, all its Taxes of whatever nature, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves or other provisions in conformity with GAAP with respect thereto have been provided on the books of the relevant Group Member or the failure to pay would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect.

Section 5.04.    *Maintenance of Existence; Compliance*.  (a) Preserve and keep in full force and effect its organizational existence (except, in the case of any Subsidiary, where the failure to do so would not reasonably be expected to result in a Material Adverse Effect) and (b) comply with all Requirements of Law except to the extent that failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.05.    *Maintenance of Property; Insurance*.  (a) Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted.

(b)    Maintain, and cause each Loan Party to maintain, with financially sound and reputable companies, insurance policies (i) insuring all real and personal property (including the inventory and equipment) against loss by fire, explosion, theft and such other casualties as is customary in all material respects and available on commercially reasonable terms for companies in comparable industries as the Loan Parties and (ii) to the extent requested by the Administrative Agent (acting at the direction of the Required Lenders) insuring the Loan Parties, the Administrative Agent and the Lenders against liability for personal injury or property damage relating to such inventory and equipment, such policies to be in such form and amounts and having such coverage as is customary in all material respects and available on commercially reasonable terms for companies in comparable industries as the Loan Parties.

(c)    All such insurance shall (i) provide that no cancellation in coverage thereof shall be effective until at least thirty (30) days after receipt by the Administrative Agent of written notice thereof, (ii) name the Administrative Agent as insured party or loss

payee with respect to applicable insurance policies, and (iii) if reasonably requested by the Administrative Agent, include a breach of warranty clause.

(d)     If any portion of any Mortgaged Property upon which a Building is located is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a Special Flood Hazard Area with respect to which flood insurance has been made available under the Flood Insurance Laws, then the Borrower shall, or shall cause each Loan Party to (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent and the Tranche B Lenders, including, without limitation evidence of annual renewals of such insurance.

Section 5.06.  *Inspection of Property; Books and Records; Discussions*.  (a) Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and (b) permit representatives of the Administrative Agent or any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time during normal business hours upon reasonable advance notice and, unless an Event of Default has occurred and is continuing, no more than once per fiscal year of the Borrower, and to discuss the affairs, finances, accounts, prospects and condition of the Group Members (other than Excluded Subsidiaries) with officers and employees of the Group Members (other than Excluded Subsidiaries) and with their independent certified public accountants. Notwithstanding anything to the contrary in this Section 5.06, none of the Group Members will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (i) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives) is prohibited by any Requirement of Law or binding agreement or (ii) that is subject to attorney–client privilege or constitutes attorney work product.

Section 5.07.  *Litigation and Other Notices*.  Furnish to the Administrative Agent written notice of the following promptly for prompt distribution to the Lenders (and, in any event, within five (5) Business Days of a Responsible Officer having knowledge of the occurrence thereof):

(a)     (i) the occurrence of any Default or Event of Default, (ii) the occurrence of any event of default under any Supply and Offtake Document, (iii) the occurrence of any event of default under the Additional Financing Facility or any other agreement evidencing Indebtedness of the Borrower or one or more of its Subsidiaries exceeding $20,000,000 in aggregate principal amount and (iv) no later than five (5) Business Days after delivery thereof, copies of any notices delivered pursuant to any Supply and Offtake Document with respect to any "Default", "Event of Default", or "Termination Event" (as

each such term is defined in the Supply and Offtake Documents) or similar term or event under a Supply and Offtake Document;

(b)    the filing or commencement of, or any written threat or notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority, (i) against any Loan Party or any Subsidiary that would reasonably be expected to result in a Material Adverse Effect or (ii) with respect to any Loan Document;

(c)    any litigation or proceeding affecting any Group Member (other than any Excluded Subsidiary) (i) in which the amount involved is $20,000,000 or more and not covered by insurance or (ii) in which injunctive or similar relief is sought against such Group Member;

(d)    (i) the occurrence of any ERISA Event that alone, or together with any other ERISA Event, would reasonably be expected to result in liability of the Loan Parties in an aggregate amount exceeding $1,000,000 or the imposition of a Lien on the assets of any Loan Party, a written notice specifying the nature thereof, what action any of the Loan Parties is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the IRS, the U.S. Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness, upon Administrative Agent's (acting at the direction of any Lender) reasonable request, copies of: (1) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by, any of the Loan Parties with the U.S. Department of Labor with respect to each Pension Plan; (2) all notices received by any of the Loan Parties from a Multiemployer Plan sponsor concerning an ERISA Event; and (3) copies of such other documents or governmental reports or filings relating to any Plan or Pension Plan sponsored by an ERISA Loan Party as Administrative Agent shall reasonably request; and

(e)    any development that has had or would reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 5.07 shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the relevant Group Member proposes to take with respect thereto.

Section 5.08.  *Environmental Laws*.  (a) Except as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, comply in all material respects with, and exert commercially reasonable efforts to ensure compliance in all material respects by all tenants and subtenants, if any, with all applicable Environmental Laws, and obtain and comply in all material respects with and maintain, and exert commercially reasonable efforts to ensure that all tenants and subtenants obtain and comply in all material respects with and maintain, any and all Environmental Permits applicable to its operations required by applicable Environmental Laws.

(b)      Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws, except where failure to conduct such investigations, studies, sampling and testing and such remedial, removal and other actions would not reasonably be expected to result in a Material Adverse Effect, and promptly comply in all material respects with all orders and directives of all Governmental Authorities regarding Environmental Laws, unless all measures to challenge such requirements, orders and directives have been timely taken and the pendency of such measures, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 5.09.  *Credit Rating*.  The Borrower shall use commercially reasonable efforts  to maintain at all times, beginning with the date that is 30 days after the Closing Date, a credit rating (but not a specific rating) by each of Moody's and S&P in respect of the Facility and a corporate credit rating of the Borrower.

Section 5.10.  *Additional Collateral, etc*.  (a) Subject to the terms of the Intercreditor Agreement and this Section 5.10, with respect to any property acquired after the Closing Date by any Group Member (other than (x) any property described in paragraph (b), (c) or (d) below, (y) any property subject to a Lien expressly permitted by Section 6.02(e), 6.02(j), 6.02(p) or 6.02(q) and (z) property acquired by any Excluded Subsidiary or Foreign Subsidiary) that is of the same type as that included as Collateral in the Security Documents and that is intended to be subject to the Lien created by any of the Security Documents as to which the Administrative Agent, acting in its capacity as collateral agent on behalf of the Lenders, does not have a perfected Lien, promptly (and in any event within thirty (30) days after the acquisition thereof (or such longer period of time not to exceed an addition thirty (30) days as may be permitted by the written consent of the Administrative Agent) (i) execute and deliver to the Administrative Agent such amendments to the Security Agreement or such other documents as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a security interest in such property and (ii) take all actions necessary or advisable to grant to the Administrative Agent, acting in its capacity as collateral agent on behalf of the Lenders, a perfected first priority security interest in such property, including the filing of UCC financing statements in such jurisdictions as may be required by the Security Agreement or by law or as may be reasonably requested by the Administrative Agent.

(b)      Subject to the terms of the Intercreditor Agreement and this Section 5.10, with respect to any interest in Real Property having a fair market value (together with improvements thereof) of at least $5,000,000 acquired after the Closing Date (or owned by any Subsidiary that becomes a party to the Security Agreement pursuant to Section 5.10(c)) by any Group Member (other than (x) any such Real Property subject to a Lien expressly permitted by Section 6.02(e) and (y) Real Property acquired by any Excluded Subsidiary or Foreign Subsidiary), promptly (i) execute and deliver a first priority Mortgage, in favor of the Administrative Agent, for the benefit of the Secured Parties, covering such Real Property, (ii) deliver to the Administrative Agent and the Lenders the items referred to in Section 4.01(m) and Section 5.11(b) with respect to each such Real

Property and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent the items referred to in Section 5.11.

(c)     Subject to the terms of the Intercreditor Agreement, with respect to any Subsidiary created or acquired after the Closing Date by any Group Member or any Subsidiary that ceases to be an Excluded Subsidiary (but other than any such created or acquired Subsidiary that is an Excluded Subsidiary or Foreign Subsidiary), promptly upon such creation, acquisition or cessation (i) execute and deliver to the Administrative Agent a Joinder to the Security Agreement and such amendments to the Security Agreement as the Administrative Agent deems, in its reasonable discretion, to be necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest in the Capital Stock of such new Subsidiary that is owned by any Group Member, (ii) deliver to the Administrative Agent the certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Group Member, (iii) cause such new Subsidiary (other than an Excluded Subsidiary or Foreign Subsidiary) (A) to become a Guarantor and Loan Party under this Agreement, by executing an Assumption Agreement, substantially in the form of Exhibit K, and to become a party to the Security Agreement and this Agreement, (B) to take such actions reasonably necessary or advisable to grant to the Administrative Agent for the benefit of the Secured Parties a perfected first priority security interest in the Collateral described in the Security Agreement with respect to such new Subsidiary, including the filing of UCC financing statements in such jurisdictions as may be required by the Security Agreement or by law or as may be reasonably requested by the Administrative Agent, (C) to deliver to the Administrative Agent a certificate of such Subsidiary, substantially in the form of Exhibit C, with appropriate insertions and attachments and (D) if requested by the Administrative Agent, the Required Lenders deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance comparable or analogous to the applicable opinions delivered on the Closing Date and shall be from counsel reasonably satisfactory to the Administrative Agent.

(d)     Notwithstanding anything in this Agreement or any Security Document to the contrary, in no event shall the Collateral include, and no Loan Party or any Subsidiary shall be required to take any action to create, grant or perfect a security interest in, any property or assets that constitutes Excluded Property (as defined in the Security Agreement).

(e)     Notwithstanding anything in this Section 5.11 to the contrary, each Building that is an Additional Tranche B Excluded Building (so long as it is an Additional Tranche B Excluded Building) shall be deemed not to secure any Obligations in respect of the Tranche B Loans.

Section 5.11.   *Mortgages, etc.*   As soon as available, but in any event within ninety (90) days after the Closing Date (or such later date as the Administrative Agent and the Required Lenders determine in their reasonable discretion) with respect to the Mortgaged Properties owned by the applicable Loan Party on the Closing Date:

(a)    the Borrower shall deliver to the Administrative Agent Mortgages with respect to the Mortgaged Properties owned on the Closing Date, executed and delivered by a duly authorized officer of the Loan Party thereto and such other documentations related thereto, as may be reasonably requested by the Administrative Agent or the Required Lenders;

(b)    a copy of, or a certificate as to coverage under, and a declaration page relating to, the insurance policies required by Section 5.05 of this Agreement (except that, with respect to flood insurance, the Administrative Agent must have received a copy of the insurance policies) and the applicable provisions of the Security Documents, each of which shall (1) be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable); (2) name the Administrative Agent, on behalf of the Secured Parties, as additional insured; (3) in the case of flood insurance, (x) identify the addresses of each property located in a special flood hazard area, (y) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto and (z) provide that the insurer will give the Administrative Agent thirty (30) days' written notice of cancellation or non-renewal and (4) otherwise be in form and substance satisfactory to the Administrative Agent;

(c)    the Borrower shall deliver or cause to be delivered to the Administrative Agent and to the title insurance company issuing the policy referred to in clause (d) below (the "**Title Insurance Company**") maps or plats of an as-built survey of such Mortgaged Properties certified to the Administrative Agent and the Title Insurance Company in a manner reasonably satisfactory to them, dated a date satisfactory to the Administrative Agent and the Title Insurance Company by an independent professional licensed land surveyor reasonably satisfactory to the Administrative Agent; *provided*, that the Administrative Agent hereby acknowledges and agrees that First American Title Insurance Company is a reasonably satisfactory title insurance company and Ludgate Engineering Corporation is a reasonably satisfactory licensed land surveyor;

(d)    the Borrower shall cause the Title Insurance Company to issue to the Administrative Agent in respect of such Mortgaged Properties a mortgagee's title insurance policy (or policies) or marked up unconditional binder for such insurance issued by a nationally recognized title insurance company, insuring the Mortgage referred to above as a first lien on such Mortgaged Properties (subject to any Lien permitted by Section 6.02), in an amount reasonably satisfactory to the Borrower and the Administrative Agent and the Required Lenders, together with such coinsurance, reinsurance, endorsements and affirmative coverages as the Administrative Agent may reasonably request and consistent with market practice and otherwise in form and substance reasonably satisfactory to the Administrative Agent; the Borrower shall provide the Administrative Agent with evidence satisfactory to it that the Mortgages have unconditionally been delivered to the Title Company with instructions for recordation or that such recordation has occurred, together with evidence that all premiums in respect of such policy, all charges for recording and filing expenses, abstract fees, searches, and all related expenses have been paid; provided, that any and all of the exceptions and the matters or documents stated therein set forth on Schedule B of the Mortgagee's Title Policy pertaining to any or all of the Mortgaged Properties are agreed to be permitted

exceptions or Liens explicitly permitted to exist on the relevant Mortgaged Property under Section 6.02 and the relevant Mortgage and any title endorsements as may be agreed by the Administrative Agent and the Borrower;

(e)     the Borrower shall cause the Title Insurance Company to provide to the Administrative Agent a copy of all recorded documents referred to, or listed as exceptions to title in, the title policy or policies referred to in clause (d) above and a copy of all other material documents affecting such Mortgaged Properties;

(f)     the Borrower shall deliver to the Administrative Agent opinions, addressed to the Administrative Agent of (i) outside counsel or in-house counsel, as to the due authorization, execution and delivery of the Mortgage referred to above by the applicable Loan Party, and (ii) local counsel in Pennsylvania, each in form and substance reasonably satisfactory to the Administrative Agent, subject to customary qualifications, exceptions and disclaimers, including those pertaining to interest rate hedges; and

(g)     notwithstanding anything in this Section 5.11 to the contrary, each Building that is a Specified Tranche B Excluded Building (so long as it is a Specified Tranche B Excluded Building) shall be deemed not to secure any Obligations in respect of the Tranche B Loans; *provided* that if a Specified Tranche B Excluded Building ceases to be abandoned or if the fair market value of such Building and contents therein at any time is at least $5,000,000, then (i) the Borrower shall promptly (and in any event within 30 days thereof) deliver to the Administrative Agent and the Tranche B Lenders the items referred to in Sections 4.01(m) and 5.11(b) with respect to such Building and (ii) such Building shall cease to be a Specified Tranche B Excluded Building on the date which is 45 days after the delivery referred to in the foregoing clause (i).

Section 5.12.  *Designation of Excluded Subsidiaries*.  The Borrower may designate any Subsidiary acquired or formed after the Closing Date, within thirty (30) days of the formation or acquisition thereof (or such longer period of time as may be permitted by the Administrative Agent acting at the direction of the Required Lenders), as an Excluded Subsidiary by written notice to the Administrative Agent (which written notice shall be promptly delivered by the Administrative Agent to the Lenders); *provided*, that (i) immediately before and after such designation, no Default or Event of Default shall have occurred and be continuing, and (ii) after giving effect to such designation, the cash or assets contributed by the Loan Parties or any Subsidiary of Borrower that is not an Excluded Subsidiary to all Excluded Subsidiaries shall not in the aggregate exceed the amount permitted to be contributed to such Excluded Subsidiary pursuant to Section 6.07(aa), measured, in each case, as of the date of each such designation; *provided*, *further*, that such Excluded Subsidiary may be redesignated by the Borrower as a "Subsidiary Guarantor" upon ten (10) Business Days (or such shorter period of time as may be permitted by the Administrative Agent acting at the direction of the Required Lenders) prior written notice to the Administrative Agent as long as (x) the requirements of Section 5.10 are satisfied either before or concurrently with it becoming a Guarantor and (y) the Consolidated Leverage Ratio for the Loan Parties after such redesignation would be lower than such ratio for the Loan Parties immediately prior to such redesignation.

Section 5.13.  *Anti-Terrorism Laws, Sanctions, Anti-Corruption Laws*.

(a)      The Loan Parties shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming the Loan Parties' compliance with Section 6.15.

(b)      Comply in all material respects with sanctions administered by OFAC, all applicable Anti-Terrorism Laws and all applicable Anti-Corruption Laws.

ARTICLE 6
NEGATIVE COVENANTS

The Borrower hereby agrees that, so long as any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

Section 6.01.  *Indebtedness*.  Create, issue, incur, assume, become liable in respect of or suffer to exist any Indebtedness, except:

(a)      Indebtedness of any Loan Party pursuant to any Loan Document;

(b)      Indebtedness of the Borrower to any Restricted Subsidiary and of any Subsidiary Guarantor to the Borrower or any other Restricted Subsidiary;

(c)      Guarantee Obligations (other than Guarantee Obligations in respect of borrowed money) incurred in the ordinary course of business by the Borrower or any of its Restricted Subsidiaries of obligations of the Borrower or any Subsidiary Guarantor;

(d)      Indebtedness outstanding on the date hereof and listed on Schedule 6.01 and any refinancings, refundings, renewals or extensions thereof (without increasing, or shortening the maturity or Weighted Average Life to Maturity of, the principal amount thereof or making the Borrower or any Restricted Subsidiary (other than a Loan Party) an obligor thereunder that was not an obligor with respect to such refinanced, refunded, renewed or extended Indebtedness on the Closing Date);

(e)      Indebtedness (including, without limitation, Purchase Money Obligations, any Attributable Indebtedness and Capital Lease Obligations) secured by Liens permitted by Section 6.02(e), any Indebtedness financing the acquisition, construction, repair, replacement or improvement of any fixed or capital assets and refinancings or renewals thereof and in an aggregate principal amount not to exceed $10,000,000 at any one time outstanding;

(f)      Indebtedness (including any guaranty thereof by any Loan Party) under the Supply and Offtake Documents;

(g)      Indebtedness incurred in connection with EB-5 Financings so long as the principal amount thereof outstanding at any time shall not exceed $125,000,000; *provided* that the first $75,000,000 of such Indebtedness incurred shall be used to indefeasibly

repay, prepay, repurchase, redeem, acquire or retire for value any Indebtedness (other than Indebtedness among Borrower and/or one or more of its Subsidiaries) permitted to be incurred hereunder (and, to the extent such Indebtedness is revolving Indebtedness, to permanently and simultaneously reduce the commitments relating thereto);

(h)     Indebtedness (including any guaranty thereof by any Loan Party) under the Additional Financing Agreement and any refinancings, refundings, renewals or extensions thereof (without increasing, or shortening the maturity or Weighted Average Life to Maturity of, the principal amount thereof or making the Borrower or any Restricted Subsidiary (other than a Loan Party) an obligor thereunder that was not an obligor with respect to such refinanced, refunded, renewed or extended Indebtedness on the Closing Date);

(i)     (i) Indebtedness representing deferred compensation or stock-based compensation to directors, officers, employees, consultants or independent contractors of PES Inc., the Borrower and its Restricted Subsidiaries and (ii) Indebtedness consisting of obligations of PES Inc., the Borrower and its Restricted Subsidiaries under deferred compensation to their directors, officers, employees, consultants or independent contractors or other similar arrangements incurred by such Persons in connection with Permitted Acquisitions or any other Investment expressly permitted under Section 6.07;

(j)     Indebtedness in respect of indemnification, purchase price adjustments or other similar obligations incurred by the Borrower or any Restricted Subsidiary in a Permitted Acquisition or Disposition under agreements which provide for indemnification, the adjustment of the purchase price or for similar adjustments;

(k)     Indebtedness consisting of obligations of the Borrower or any Restricted Subsidiary under deferred consideration (e.g., earn-outs, indemnifications, incentive non-competes and other contingent obligations) or other similar arrangements incurred by such Person in connection with any Permitted Acquisition or other Investment permitted under Section 6.07;

(l)     Indebtedness of a Person or Indebtedness attaching to assets of a Person that, in either case, becomes a Restricted Subsidiary (or is merged or consolidated with or into the Borrower or a Restricted Subsidiary) or Indebtedness attaching to assets that are acquired by the Borrower or any Restricted Subsidiary (including any Indebtedness assumed by the Borrower or any Restricted Subsidiary in connection with any acquisition of any assets or Person), in each case after the Closing Date as the result of a Permitted Acquisition or other Investment permitted by Section 6.07 and any refinancings, refundings, renewals or extensions thereof (without increasing, or shortening the maturity or Weighted Average Life to Maturity of, the principal amount thereof or making the Borrower or any Restricted Subsidiary (other than a Loan Party) an obligor thereunder that was not an obligor with respect to such refinanced, refunded, renewed or extended Indebtedness); *provided* that (i) such Indebtedness is not incurred in contemplation of such acquisition and (ii) such Indebtedness shall not exceed $50,000,000 at any one time outstanding;

(m)     Indebtedness in respect of netting services, overdraft protections, credit card programs, automatic clearinghouse arrangements and similar arrangements in each case in connection with deposit accounts and Indebtedness arising from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(n)     Indebtedness in respect of any bankers' acceptance, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business (including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims);

(o)     obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any Restricted Subsidiary;

(p)     Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(q)     Indebtedness of the Borrower or any Restricted Subsidiary as an account party in respect of trade letters of credit issued in the ordinary course of business (including with respect to customer deposits of advance payments received);

(r)     (i) unsecured Indebtedness in respect of obligations of the Borrower or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; *provided* that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business and not in connection with the borrowing of money and (ii) unsecured Indebtedness in respect of intercompany obligations of the Borrower or any Restricted Subsidiary in respect of accounts payable incurred in connection with goods sold or services rendered in the ordinary course of business and not in connection with the borrowing of money;

(s)     unsecured Indebtedness and Subordinated Indebtedness of any Loan Party in an aggregate amount, for all Indebtedness under this clause (s), not to exceed $10,000,000;

(t)     Indebtedness to current or former officers, directors, managers, consultants and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Capital Stock of the Borrower (or any of its direct or indirect parent companies) (solely to the extent the proceeds of such Indebtedness are ultimately contributed to the Loan Parties) in an aggregate principal amount not to exceed $5,000,000

(u)     Indebtedness incurred in connection with Environmental and Necessary Capex in an amount not to exceed $100,000,000 in the aggregate;

89

(v)     Indebtedness in respect of letter of credit facilities for the purposes set forth in Section 6.02(dd)(A) in an aggregate amount not to exceed  $50,000,000 at any time outstanding;

(w)     Indebtedness of any Loan Party so long as any recourse against such Loan Party and any of such Loan Party's assets in respect of such Indebtedness is expressly limited to the Capital Stock of an Excluded Subsidiary or Joint Venture (on which a Lien was permitted to be granted pursuant to Section 6.02(z));

(x)     Indebtedness of any Loan Party in respect of a deferred compensation plan that provides bonus payouts to employees of any Loan Party, PES Inc. or any other direct or indirect parent company of the Borrower over a defined period based on a percentage of the bonus paid in any given year;

(y)     additional Indebtedness of the Borrower or any other Loan Party that does not have a maturity or Weighted Average Life to Maturity shorter than the Loans, if at the time of incurrence of such Indebtedness, the Consolidated Leverage Ratio of the Borrower and its Restricted Subsidiaries as of the last day of the period of four consecutive Fiscal Quarters ended immediately prior to such incurrence (and calculated on a pro forma basis giving effect to the incurrence of such Indebtedness on the first day of such period) shall be less than 3.00:1.00, and, without limiting any of the forgoing, any refinancings, refundings, renewals, replacement, waivers, amendments, amendments and restatements or extensions thereof (without increasing, or shortening the maturity or Weighted Average Life to Maturity of, the principal amount thereof or making the Borrower or any Restricted Subsidiary  (other than a Loan Party) an obligor thereunder that was not an obligor with respect to such refinanced, refunded, renewed or extended Indebtedness); and

(z)     Indebtedness (other than Indebtedness of the type set forth in clauses (a), (c), or to the extent relating to Indebtedness of the type set forth in such clauses (a) or (c), clause (h), in each case of the definition of Indebtedness) consisting of contractual obligations under the Point Breeze Site Lease Agreement.

Section 6.02.    *Liens*.  Create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except the following:

(a)     Liens for Taxes not yet due or that are being contested in good faith by appropriate proceedings, *provided* that adequate reserves with respect thereto are maintained on the books of the Borrower or its Restricted Subsidiaries, as the case may be, in conformity with GAAP;

(b)     carriers', warehousemen's, mechanics', materialmen's, landlord's, workmen's, suppliers', repairmen's or other like Liens arising in the ordinary course of business that (i) do not in the aggregate materially detract from the value of the operation of the business of the Group Members, taken as a whole, and do not materially impair the use thereof in the operation of the business of the Group Members, taken as a whole,

(ii) are not overdue for a period of more than thirty (30) days or (iii) that are being contested in good faith by appropriate proceedings;

(c)     Liens incurred in the ordinary course of business (i) in connection with workers' compensation, unemployment insurance and other social security legislation, (ii) securing liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Restricted Subsidiaries or under self-insurance arrangements in respect of such obligations or (iii) securing obligations in respect of letters of credit that have been posted by the Borrower or any of its Restricted Subsidiaries to support the payment of items set forth in clauses (i) and (ii);

(d)     Liens to secure the performance of tenders, statutory obligations, bids, trade contracts, governmental contracts, leases and other contracts (other than Indebtedness for borrowed money), statutory obligations (other than any such obligation imposed pursuant to Section 430(k) of the Code or 303(k) of ERISA), surety, stay and appeal bonds, performance and return-of-money bonds, performance and completion guarantees and other obligations of a like nature (including (i) those to secure health, safety and environmental obligations, (ii) those required or requested by any Governmental Authority and (iii) letters of credit issued in lieu of any such bonds or to support the issuance thereof) incurred in the ordinary course of business;

(e)     Liens securing Indebtedness of the Borrower or any Restricted Subsidiary incurred pursuant to Sections 6.01(e) and 6.01(u), in each case, to finance the acquisition of fixed or capital assets (*provided* that (i) such Liens shall be created no later than 180 days after the acquisition of such fixed or capital assets, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and proceeds therefrom, (iii) the amount of Indebtedness secured thereby is not increased and (iv) in the case of clause (u), such Liens, if on Collateral, shall be subject to an intercreditor agreement reasonably satisfactory to the Borrower, the Administrative Agent and the Required Lenders;

(f)     Liens in existence on the date hereof listed on Schedule 6.02 and any Lien granted as a replacement or substitute thereof, *provided* that no such Lien is spread to cover any additional property after the Closing Date (other than after-acquired property that is affixed or incorporated into the property encumbered by such Lien on the Closing Date) and that the amount of Indebtedness secured thereby is not increased;

(g)     easements, rights-of-way, restrictions (including zoning restrictions and other similar permits), covenants, licenses, encroachments, protrusions and other similar charges or encumbrances, in each case existing on the Closing Date or as are incurred in the ordinary course of business and all other non-material exceptions to title that, in the aggregate, are not substantial in amount and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Restricted Subsidiaries;

(h)      (i) any conditions to the Real Property shown on a current survey of the property which has been delivered to the Administrative Agent other than encroachments on such Real Property that materially detract from the value of the property subject thereto or materially and adversely interfere with the ordinary conduct of the business of the Loan Parties (unless otherwise permitted by applicable law) and (ii) all of the exceptions and the matters or documents stated therein set forth on Schedule B of the Mortgagee's Title Policy pertaining to any or all of the Mortgaged Properties;

(i)      Liens created pursuant to the Security Documents;

(j)      any interest or title of a lessor under any lease entered into by the Borrower or any Restricted Subsidiary (i) in the ordinary course of its business and covering only the assets so leased or (ii) pursuant to Section 6.09;

(k)      Liens on Collateral securing obligations under the Supply and Offtake Documents; *provided*, that such Liens are at all times subject to the Intercreditor Agreement as "Supply and Offtake Obligations";

(l)      Liens on SOA Separate Assets and Collateral;

(m)      Liens securing judgments for the payment of money not constituting an Event of Default under Section 7.01(h) and in respect of which the Borrower or such Restricted Subsidiary is contesting such Lien in good faith by appropriate proceedings for which adequate reserves have been established, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(n)      Liens (i) on cash or Cash Equivalents advanced in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 6.07 to be applied against the purchase price for such Investment or (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 6.04, in each case solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(o)      Liens existing on property at the time of its acquisition or existing on the property of any Person that becomes a Restricted Subsidiary after the date hereof and any modifications, replacements, renewals or extensions thereof; *provided* that (i) such Lien was not created in contemplation of such acquisition or such Person becoming a Restricted Subsidiary, (ii) (A) in the case of Liens securing purchase money Indebtedness or Capital Lease Obligations or any replacement, renewal, extension or refinancing thereof, such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and after-acquired property subjected to a Lien pursuant to terms existing at the time of such acquisition or such Person becomes a Restricted Subsidiary, it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition or such Person becoming a Restricted Subsidiary); *provided* that individual financings otherwise permitted to be secured hereunder provided by one Person (or its affiliates) may

be cross collateralized to other such financings provided by such Person (or its affiliates) otherwise permitted to be secured hereunder and (B) in the case of Liens securing Indebtedness other than purchase money Indebtedness or Capital Lease Obligations or any replacement, renewal, extension or refinancing thereof, such Liens do not extend to the property of any Person other than such Person and the Person acquired or formed to make such acquisition and (iii) the Indebtedness secured thereby (or, as applicable, any modifications, replacements, renewals or extensions thereof) is permitted under Section 6.01;

(p)     Liens arising from precautionary UCC financing statement filings (or similar filings under applicable law), filings regarding consignment of goods or leases entered into by Borrower or any Restricted Subsidiary, any Sale and Leaseback Transaction permitted pursuant to this Article 6 or the NGL Installment Purchase Agreement;

(q)     any interest or title of a lessor, sublessor, licensee, sublicensee, licensor or sublicensor under any lease, sublease, license or sublicense agreement or secured by a lessor's, sublessor's, licensee's, sublicensee's, licensor's or sublicensor's interest under any lease, sublease, license or sublicense (including software and other technology licenses), in each case as permitted by this Agreement;

(r)     Liens deemed to exist in connection with Investments permitted under Section 6.07;

(s)     receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(t)     Liens that are contractual rights of set-off relating to purchase orders and other agreements entered into with customers, in the ordinary course of business;

(u)     Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(v)     any and all leases, easements, subleases, tenancies, options, concession agreements, rental agreements, occupancy agreements, franchise agreements, access agreements and any other similar or related agreements, liens and encumbrances (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into, affecting the use or occupancy of all or any portion of any Real Property or other property of the Loan Parties, of the properties from any Loan Party to any Affiliate or Subsidiary or to any third party, in any case, granted by such Loan Party (any of the foregoing, a "Lease"), if the following requirements are met: (i) no Event of Default has occurred and is continuing, (ii) the property rights granted under such Lease are not necessary for the business and operations of the Refinery or the North Yard Terminal, (iii)

such Lease will not cause at any time any material discontinuation or disruption of the business or operations conducted at the Refinery, (iv) such Lease will not interfere in any material respect with the Borrower's or any other Loan Party's performance of and compliance with its obligations hereunder or under the Supply and Offtake Documents and (v) the members of the Borrower's management have determined that such Loan Party's entry into such Lease is reasonably expected to provide a financial benefit to such Loan Party and is in the best interest of such Loan Party; and (vi) such Loan Party has delivered to the Administrative Agent a certificate certifying as to (i) through (vi) above;

(w)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any company in the ordinary course of business;

(x)     Liens on Additional Financing Collateral securing Indebtedness incurred pursuant to Section 6.01(h);

(y)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(z)     Liens on Capital Stock of an Excluded Subsidiary or Joint Venture;

(aa)     Liens on assets constituting or related to Environmental and Necessary Capex securing Indebtedness permitted by Section 6.01(u);

(bb)     such easements, licenses and access rights granted to SXL (as defined in the Contribution Agreement)  to the extent required for the operation and maintenance of assets of SXL which are located at, under or on the Refinery Real Property (as defined in the Contribution Agreement) as of the Closing Date, on the express condition that the exercise of such access, license or easement rights (x) not interfere with the operation of the Refinery and (y) would reasonably not give rise to a Material Adverse Effect;

(cc)     Liens incurred in the ordinary course of business of any Loan Party with respect to obligations that do not in the aggregate exceed $3,000,000 at any time outstanding, so long as such Liens, to the extent covering any Collateral, are junior to the Liens granted pursuant to the Security Documents;

(dd)     Liens on cash collateral accounts in an aggregate amount not to exceed $50,000,000 at any time outstanding securing obligations in connection with (A) any Governmental Authority, (B) any Swap Agreement, or (C) any letter of credit facilities permitted pursuant to Section 6.01(v);

(ee)     bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more deposit, securities and/or other similar accounts maintained by any Loan Party, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, (i) securing fees, charge-backs and other similar obligations and (ii) securing amounts owing to such bank with respect to credit card programs, cash management and operating

account arrangements, including those involving pooled accounts and netting arrangements;

(ff)    Liens not otherwise permitted by this Section 6.02 so long as neither (i) the aggregate outstanding principal amount of the obligations secured thereby nor (ii) the aggregate fair market value (determined as of the date such Lien is incurred) of the assets subject thereto exceeds (as to the Borrower and all Restricted Subsidiaries) $20,000,000 at any one time;

(gg)    [reserved];

(hh)    Liens on property that does not constitute Collateral securing Indebtedness incurred with respect to Swap Agreements, including for the avoidance of doubt Liens on commodity accounts with future commission merchants; and

(ii)    Liens in connection with EB-5 Financings on the assets financed by such EB-5 Financing, and to the extent such Liens are on Collateral, or such Liens are in accordance with clause (b) of the definition of EB-5 Financing and are subject to the EB-5 Intercreditor Agreement.

Section 6.03.    *Fundamental Changes*.  Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, except that:

(a)    any Restricted Subsidiary of the Borrower may be merged or consolidated with or into (x) the Borrower (*provided* that the Borrower shall be the continuing or surviving corporation) or (y) any Subsidiary Guarantor (*provided* that the Subsidiary Guarantor shall be the continuing or surviving corporation);

(b)    any Excluded Subsidiary of the Borrower may be merged or consolidated with any Person or Dispose of any or all of its assets;

(c)    [reserved];

(d)    any Investment expressly permitted by Section 6.07 may be structured as a merger, consolidation or amalgamation so long as (x) if the Borrower is party to such Investment, the Borrower is the surviving Person in such merger, consolidation or amalgamation and (y) if a Subsidiary Guarantor is party to such merger, consolidation or amalgamation, either (i) the surviving Person in such merger, consolidation or amalgamation shall be a Loan Party or (ii) sufficient capacity to make an Investment under Section 6.07 in a Person that is not a Loan Party shall exist to accommodate the surviving Person in such merger, consolidation or amalgamation;

(e)    any Disposition expressly permitted by Section 6.04; and

(f)    any Guarantor may dissolve, liquidate or wind up its affairs at any time; *provided*, that such dissolution, liquidation or winding up, as applicable, is not reasonably expected to have a Material Adverse Effect.

Section 6.04.  *Disposition of Property* .  Consummate any Disposition of any assets in excess of $500,000, except:

(a)      the Disposition of used, surplus, damaged, obsolete, worn out or other immaterial property in the ordinary course of business, including Intellectual Property that is, in the reasonable judgment of the Borrower, no longer commercially desirable to maintain or useful in the conduct of business taken as a whole;

(b)      the sale of inventory or SOA Separate Assets and Collateral in the ordinary course of business;

(c)      the sale or issuance of any Subsidiary's Capital Stock to the Borrower or any Subsidiary Guarantor;

(d)      the Disposition of property that is vacant and not required for ingress or egress for operation of the Refinery; *provided* that such Disposition shall be for fair market value and at least 75% of the consideration for such Disposition shall consist of cash or Cash Equivalents;

(e)      any issuance or sale of Capital Stock of, or Indebtedness or other securities of, an Excluded Subsidiary;

(f)      (i) Dispositions permitted by Section 6.03 (other than clause (d) or (e) thereof), (ii) Investments that would otherwise constitute Dispositions permitted by Section 6.07 (other than clause (g) thereof), (iii) Restricted Payments permitted by Section 6.05, (iv) Liens permitted by Section 6.02, and (v) Dispositions permitted by Section 6.09;

(g)      Dispositions of cash and Cash Equivalents in the ordinary course of business consistent with past practice;

(h)      leases, subleases, licenses or sublicenses, in each case in the ordinary course of business consistent with past practice and which do not materially interfere with the business of the Borrower and its Restricted Subsidiaries, taken as a whole, and any other similar agreements permitted under Section 6.02(v) or 6.02(bb);

(i)      sales, Dispositions or contributions of property (i) between Loan Parties, (ii) between Restricted Subsidiaries that are not Loan Parties or (iii) by Restricted Subsidiaries that are not Loan Parties to the Loan Parties;

(j)      transfers of property subject to Recovery Events upon receipt of the Net Cash Proceeds of such Recovery Event;

(k)      the unwinding of Swap Agreements permitted hereunder;

(l)      transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and

transfers of property arising from foreclosure or similar action or that have been subject to a casualty to the respective insurer of such Real Property as part of an insurance settlement;

(m)    transactions under the Supply and Offtake Documents;

(n)    Dispositions of property for fair market value to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property that is promptly purchased or (ii) the proceeds of such disposition are promptly applied to the purchase price of such replacement property (which replacement property is actually promptly purchased);

(o)    Dispositions of Investments in Joint Ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the Joint Venture parties set forth in Joint Venture arrangements and similar binding arrangements;

(p)    Dispositions of accounts receivable or notes receivables in the ordinary course of business in connection with the collection or compromise thereof solely to the extent not constituting Collateral;

(q)    the Disposition of other property for fair market value if (i) at least 75% of the consideration for such Disposition shall consist of cash or Cash Equivalents and (ii) the fair market value of the property subject to such Disposition shall not exceed $25,000,000 in any fiscal year of the Borrower (which amount, if not used in any fiscal year, may be carried forward to the next succeeding fiscal year);

(r)    any Disposition or series of related Dispositions that Disposes of (A) assets constituting Collateral that do not have a fair market value in excess of $2,000,000 and (B) assets not constituting Collateral that do not have a fair market value in excess of $5,000,000;

(s)    a Disposition of the North Yard or the West Yard to Sunoco, Inc. in each case in accordance with Section 11.10 of the Contribution Agreement as in effect on the Closing Date; and

(t)    Dispositions pursuant to any Platinum Sale and Leaseback Transaction.

Section 6.05.  *Restricted Payments* .  Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of the Borrower or any of its Restricted Subsidiaries, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Borrower or any of its Restricted Subsidiaries (collectively, "**Restricted Payments**"), except:any Subsidiary may make Restricted Payments to the Borrower or any Subsidiary Guarantor;

(b)    the Borrower may make Restricted Payments (i) if the Borrower shall have delivered audited financial statements for the fiscal year ending on December 31, 2018

pursuant to Section 5.01(a), (ii) the Consolidated Leverage Ratio for the four consecutive Fiscal Quarters of the Borrower ending immediately prior to the declaration of a Restricted Payment pursuant to this Section 6.05(b) is not more than 3.0:1.0 and (iii) no Default or Event of Default shall have occurred and be continuing;

(c)    the Borrower or any Restricted Subsidiary may make Permitted Tax Distributions;

(d)    the Borrower or any Restricted Subsidiary may pay any dividend or consummate any irrevocable redemption of Disqualified Capital Stock within sixty (60) days after the date of declaration thereof if on the date of declaration such Restricted Payment would have otherwise been permitted by this Section 6.05;

(e)    the Borrower or any Restricted Subsidiary may make any Restricted Payment in exchange for, or out of, or with the Net Cash Proceeds (i) of the substantially concurrent sale of Capital Stock (other than Disqualified Capital Stock) of the Borrower or (ii) from the substantially concurrent contribution of common equity capital to the Borrower, to the extent, in each case, that such Net Cash Proceeds are not applied to any other use;

(f)    the Borrower or any Restricted Subsidiary may (i) (x) so long as no Default or Event of Default shall have occurred and be continuing, repurchase, redeem or otherwise acquire or retire for value any Capital Stock of the Borrower or any Restricted Subsidiary or (y) make Restricted Payments to PES Ultimate Holdings, LLC to permit such Person to repurchase or redeem such parent company's Capital Stock (other than Disqualified Capital Stock) held by any current or former officer, director or employee of the Borrower or any of its Subsidiaries (or their transferees, estates or beneficiaries under their estates) pursuant to any equity subscription agreement, stock option agreement, shareholders' agreement or similar agreement or compensation plan or upon their death, disability, retirement, severance, resignation or termination of employment or service; *provided* that the aggregate cash consideration paid for all such repurchased, redeemed, acquired or retired equity interests shall not exceed, in any fiscal year of the Borrower (A) $10,000,000 (and up to 50% of such $10,000,000 not used in any fiscal year of the Borrower may be carried forward to the next succeeding (but no other) fiscal year) *plus* (B) the cash proceeds from the sale of Capital Stock that is not Disqualified Capital Stock of the Borrower or any Restricted Subsidiary, in each case, to members of management, directors or consultants of the Borrower, any of its Subsidiaries or any of its direct or indirect parent companies that occurred after the date hereof; *plus* (C) the cash proceeds of key man life insurance policies received by the Borrower after the date hereof; and (ii) cancel Indebtedness owing to the Borrower or any Restricted Subsidiary from any current or former officer, director or employee (or any permitted transferees thereof) of the Borrower or any Restricted Subsidiary (or any direct or indirect parent company thereof), in connection with a repurchase of Capital Stock of the Borrower (or any direct or indirect parent company thereof) from such Persons;

(g)    the Borrower or any Restricted Subsidiary may repurchase Capital Stock deemed to occur upon the exercise of stock options to the extent such Capital Stock represents a portion of the exercise of such stock options;

(h)    so long as no Default or Event of Default has occurred and is continuing, the Borrower or any Restricted Subsidiary may declare and pay regularly scheduled or accrued dividends to holders of any class or series of Disqualified Capital Stock of the Borrower issued on or after the date hereof so long as, at the time of issuance of such Disqualified Capital Stock, the Consolidated Leverage Ratio for the four consecutive Fiscal Quarters of the Borrower then ended is not higher than 3.0:1.0;

(i)    so long as no Default or Event of Default has occurred and is continuing, the Borrower or any Restricted Subsidiary may pay cash, dividends, distributions, advances or other Restricted Payments to allow the payment of cash in lieu of the issuance of fractional shares upon (i) the exercise of options or warrants or (ii) the conversion or exchange of capital stock of any such person;

(j)    so long as no Default or Event of Default has occurred and is continuing, Borrower or any Restricted Subsidiary may repurchase, redeem, defease, acquire or retire for value any Indebtedness of a Loan Party that is contractually subordinated to the Obligations with the Net Cash Proceeds from a substantially concurrent incurrence of Indebtedness of a Loan Party contractually subordinated to the Obligations to the extent permitted hereunder;

(k)    any Group Member may make Restricted Payments (i) to the extent actually used by any direct or indirect parent company of the Borrower to pay franchise Taxes and other fees required to maintain the legal existence of the direct or indirect parent company, and (ii) payments by the Borrower to or on behalf of such direct or indirect parent company in an amount sufficient to pay out-of-pocket legal, accounting and filing costs and other expenses in the nature of overhead in the ordinary course of business of such direct or indirect parent company in an aggregate amount not to exceed $5,000,000 in any fiscal year of the Borrower;

(l)    conveyance, transfer or assignment of the North Yard and the West Yard to Sunoco, Inc., in each case in accordance with Section 11.10 of the Contribution Agreement as in effect on the Closing Date;

(m)    the Borrower or any of its Subsidiaries may declare and make dividend payments or other distributions payable solely in the Capital Stock (other than Disqualified Capital Stock) (on a ratable basis to the holders of such Capital Stock, in the case of such dividends and distributions declared and made by Subsidiaries) of such Person;

(n)    Restricted Payments may be paid to any direct or indirect parent company of the Borrower in connection with customary salary, bonus and other benefits (including retirement, health, stock option and other benefit plans) and indemnification arrangements payable to officers, directors, employees or consultants of such direct or indirect parent

company (and such parent's Subsidiaries) of the Borrower to the extent such salaries, bonuses and other benefits are attributable to such officers', employees' or consultants' services provided to the Borrower and its Restricted Subsidiaries;

(o)     the Borrower or any Restricted Subsidiary may apply the proceeds of Indebtedness incurred pursuant to Section 6.01(g) to repay, prepay, repurchase, redeem, defease, acquire or retire for value any Indebtedness of a Loan Party (*provided* that if the Indebtedness so repaid, prepaid, repurchased, redeemed, defeased, acquired or retired is Indebtedness hereunder, it is applied to all Loans ratably in accordance with the aggregate principal amounts of the Loans then outstanding); and

(p)     so long as no Default or Event of Default has occurred and is continuing or would result therefrom, the Borrower may make additional Restricted Payments in amounts up to $50,000,000 during the term of this Agreement;

*provided* that no Restricted Payment may be made, except for Restricted Payments described in clauses (a), (c), (d) (in clause (d), solely to the extent effectuating a Restricted Payment being made pursuant to Section 6.05(a), (c), (g), (i), or (k)), (e), (g), (i), (j), (k), (l), (m), (n), and (o) of this Section 6.05 (as each such clause is in effect on the Closing Date), until the Discharge of the Tranche B Loans.

Section 6.06.   *Lines of Business*.   Enter into any business, either directly or through any Restricted Subsidiary, except for those businesses in which the Borrower and its Subsidiaries are engaged on the date of this Agreement or that are reasonably related or ancillary thereto or are complementary businesses (including related, complementary, synergistic or ancillary technologies).

Section 6.07.   *Investments*.   Make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets constituting a business unit of, or make any other investment in, any Person (all of the foregoing, "**Investments**"), except the Borrower may make:

(a)     investments in Cash Equivalents;

(b)     Guarantee Obligations permitted by Section 6.01(c); *provided* that this clause Section 6.07(b) shall not permit such Guarantee Obligations to the extent made by Borrower or a Subsidiary Guarantor in respect of the obligations of a Subsidiary that is not a Loan Party;

(c)     loans and advances (i) to directors, employees and officers of the Borrower or any of its Restricted Subsidiaries or (ii) to Persons, including employees of PES Inc. or any other direct or indirect parent company of the Borrower, who are engaged in the management or operations of the Borrower or any of its Restricted Subsidiaries and (iii) for bona fide business purposes or to purchase (among other things) or pay taxes related to, Capital Stock of PES Inc. or any other direct or indirect parent company of the Borrower, in an aggregate amount, for all loans and advances made under this Section 6.07(a), not to exceed $2,000,000 at any one time outstanding;

(d)     Investments in assets useful in the business of the Borrower or any of its Restricted Subsidiaries made by the Borrower or any of its Restricted Subsidiaries with the proceeds of any Reinvestment Deferred Amount; provided that, for the avoidance of doubt, this clause (d) shall not permit Investments in Subsidiaries that are not Guarantors;

(e)     intercompany Investments by the Borrower or any of its Restricted Subsidiaries in the Borrower or any Person that, prior to such investment, is a Subsidiary Guarantor and investments by any Restricted Subsidiary that is not a Subsidiary Guarantor into any other Restricted Subsidiary that is not a Subsidiary Guarantor;

(f)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business (including advances made to distributors), Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors, and Investments consisting of prepayments to suppliers in the ordinary course of business;

(g)     to the extent constituting Investments, transactions expressly permitted under Sections 6.01 (other than 6.01(a), (d), (k) or (l)), Section 6.02, 6.03 (other than 6.03(c), (d) or (e)), 6.04 (other than 6.04(e) or (f)) (including the receipt of noncash consideration for the Dispositions of assets permitted thereunder) and Section 6.05;

(h)     Investments (i) existing on the date hereof and/or on the Closing Date that are set forth on Schedule 6.07, (ii) existing on the Closing Date of the Borrower or any Restricted Subsidiary in the Borrower or any Restricted Subsidiary and (iii) in the case of each of clauses (i) and (ii), any modification, replacement, renewal or extension thereof; *provided* no such modification, replacement, renewal or extension shall increase the amount of Investments then permitted under this Section 6.07(h) as otherwise permitted by this Section 6.07;

(i)     Investments in Swap Agreements permitted under Section 6.10;

(j)     promissory notes and other noncash consideration received in connection with Dispositions permitted by Section 6.04;

(k)     (i) any acquisition or other Investments made solely with the Net Cash Proceeds of any substantially concurrent issuance of Capital Stock of the Borrower (other than Disqualified Capital Stock) that is not applied to any other use or (ii) the purchase or other acquisition of all or substantially all of the property and assets or business of, any Person or of assets constituting a business unit, a line of business or division of such Person, or more than 50% of the Capital Stock in a Person that, upon the consummation thereof, will be a Restricted Subsidiary (including as a result of a merger or consolidation) (each, a "**Permitted Acquisition**"); *provided* that, with respect to each purchase or other acquisition made pursuant to this Section 6.07(k)(ii):

(A)     each applicable Loan Party and any such newly created or acquired Restricted Subsidiary shall have complied with the requirements of Section 5.10 or made arrangements reasonably satisfactory to the

Administrative Agent for such compliance after the effectiveness of such Permitted Acquisition, as applicable;

(B)    immediately after giving effect to any such purchase or other acquisition and any incurrence of Indebtedness in connection therewith, no Event of Default shall have occurred and be continuing;

(C)    any Person or assets or division acquired in accordance herewith shall be in the same business or lines of business or reasonably related, ancillary or complementary businesses (including related, complementary, synergistic or ancillary technologies) in which the Borrower and/or its Restricted Subsidiaries are permitted to be engaged; and

(D)    to the extent such acquisition or purchase constitutes an acquisition of property, assets or a business, such property, assets or business shall be acquired or purchased by a Loan Party and to the extent a purchase or acquisition of Capital Stock, the Person whose Capital Stock is acquired or purchased shall become a Loan Party; *provided* that such an acquisition or purchase by a Loan Party of the Capital Stock of a Person that does not become a Loan Party may be made to the extent the portion of the acquisition consideration attributable to such Person is permitted to be made as an Investment pursuant to either clause (z) or clause (aa) of this Section 6.07.

(l)    Investments in the ordinary course of business consisting of endorsements for collection or deposit;

(m)    Investments (including debt obligations and Capital Stock) received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business and upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(n)    the licensing, sublicensing or contribution of intellectual property rights pursuant to joint marketing arrangements with Persons other than the Borrower and its Restricted Subsidiaries in the ordinary course of business;

(o)    loans or advances made to distributors in the ordinary course of business and consistent with past practice;

(p)    Investments of a Person that is acquired and is not designated an Excluded Subsidiary or of a company merged or amalgamated or consolidated into any Restricted Subsidiary, in each case after the Closing Date and in accordance with this Section 6.07 and/or Section 6.04, as applicable, to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(q)    any Investments in a Restricted Subsidiary that is not a Loan Party or in a Joint Venture, in each case, to the extent such Investment is substantially contemporaneously repaid in full with a dividend or other distribution from such Subsidiary or Joint Venture, in each case, to the extent such dividend or distribution has not been applied to any other use;

(r)    the forgiveness or conversion to Capital Stock of the Borrower (other than Disqualified Capital Stock) of any Indebtedness owed to a Loan Party and permitted by Section 6.01;

(s)    advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business;

(t)    to the extent constituting additional Restricted Subsidiaries of the Borrower established or created in compliance with the requirements of Section 5.10, if applicable; *provided* that to the extent any such new Restricted Subsidiary is created solely for the purpose of consummating a transaction pursuant to an acquisition permitted by this Section 6.07, and such new Restricted Subsidiary at no time holds any assets or liabilities other than any merger consideration contributed to it contemporaneously with the closing of such transaction, such new Restricted Subsidiary shall not be required to take the actions set forth in Section 5.10, as applicable, until the respective acquisition is consummated (at which time the surviving or transferee entity of the respective transaction and its Restricted Subsidiaries shall be required to so comply in accordance with the provisions thereof);

(u)    Guarantee Obligations of the Borrower or any Restricted Subsidiary of leases entered into in the ordinary course of business;

(v)    Investments to the extent that payment for such Investments is made with Capital Stock (other than Disqualified Capital Stock) of the Borrower (or any direct or indirect parent of the Borrower);

(w)    Investments in connection with any lease, utility and other similar deposits in the ordinary course of business;

(x)    Capital Expenditures made by the Borrower or any Restricted Subsidiary on behalf of itself, the Borrower or any other Loan Party;

(y)    Capital Expenditures from: (i) proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets, equipment or other property to the extent such expenditures are made to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other property or otherwise to acquire, maintain, develop, construct, improve, upgrade or repair assets or properties useful in the business of the Borrower or any Guarantor, (ii) any portion of such expenditures attributable solely to acquisitions of property, plant and equipment in Permitted Acquisitions, and (iii) any leases that as of the date hereof

qualify as operating leases under GAAP (whether or not such leases are required to be accounted for as capital leases under GAAP after the date hereof);

(z)    the Borrower may make Investments (1) if the Borrower shall have delivered audited financial statements for the fiscal year ending on December 31, 2018 pursuant to Section 5.01(a), (2) the Consolidated Leverage Ratio for the four consecutive Fiscal Quarters of the Borrower ending immediately prior to the making of an Investments pursuant to this (z) is not more than 3.0:1.0 and (3) no Default or Event of Default shall have occurred and be continuing;

(aa)    in addition to Investments otherwise expressly permitted by this Section 6.07, Investments by the Borrower or any of its Restricted Subsidiaries in an aggregate amount not to exceed $50,000,000 during the term of this Agreement minus capacity utilized under this Section 6.07(aa) pursuant to clause (D) of Section 6.07(k); and

(bb)    Investments by Borrower or any Restricted Subsidiary pursuant to the Joint Venture contemplated by (and not in excess of the Investment set forth in) that certain Letter Agreement, dated as of June 21, 2018, by and between ARFA Enterprises, Inc. and PESRM;

*provided* that no Investment may be made until the Discharge of the Tranche B Loans, except for Investments described in clauses (a) through (y), (aa) and (bb), as each such clause is in effect on the Closing Date.

Section 6.08.    *Transactions with Affiliates.*  Enter into any transaction, including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than the Borrower or any Subsidiary Guarantor) unless such transaction is (a) otherwise permitted under this Agreement, (b) in the ordinary course of business of the Borrower or the relevant Restricted Subsidiary, and (c) upon fair and reasonable terms no less favorable to the Borrower or the relevant Restricted Subsidiary than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate, except that the following shall be permitted:

(a)    Restricted Payments permitted by Section 6.05;

(b)    a conveyance, transfer or assignment of the North Yard and the West Yard to Sunoco, Inc., in each case in accordance with Section 11.10 of the Contribution Agreement, as in effect on the Closing Date;

(c)    [reserved];

(d)    transactions among Loan Parties and the Restricted Subsidiaries (or any entity that becomes a Restricted Subsidiary as a result of such transaction, to the extent such entity was not an Affiliate of the Borrower prior to such transaction);

(e)    the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, current and former directors, officers, employees and

consultants of any of the Loan Parties or any direct or indirect parent company of the Loan Parties in the ordinary course of business to the extent attributable to the ownership or operation of the Loan Parties;

(f)     employment, compensation, bonus, incentive, retention and severance arrangements and health, disability and similar insurance or benefit plans or other benefit arrangements between the Borrower, any direct or indirect parent company of the Borrower or any Restricted Subsidiary and their respective directors, officers, employees, managers, consultants or independent contractors (including management and employee benefit plans or agreements, subscription agreements or similar agreements pertaining to the repurchase of Capital Stock pursuant to put/call rights or similar rights with current or former employees, officers, directors, managers, consultants or independent contractors and stock option or incentive plans and other compensation arrangements) in the ordinary course of business or as otherwise approved by the board of directors of the Borrower (or any direct or indirect parent company thereof) or any Restricted Subsidiary;

(g)     transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 6.08 or any amendment to any such agreement to the extent such an amendment is not materially adverse, taken as a whole, to the Lenders in any material respect;

(h)     transactions between a Loan Party and any Person that is an Affiliate solely due to the fact that a director of such Person is also a director of any Loan Party or any direct or indirect parent company of the Borrower; *provided*, *however*, that such director abstains from voting as a director of such Loan Party or such direct or indirect parent company, as the case may be, on any matter involving such other Person;

(i)     [reserved];

(j)     [reserved];

(k)     [reserved];

(l)     any issuance of Capital Stock (other than Disqualified Capital Stock) of PES Inc., the Borrower, or any other direct or indirect parent company of the Borrower, or other payments, awards or grants in cash, securities, Capital Stock (other than Disqualified Capital Stock) of PES Inc. or any other direct or indirect parent company of the Borrower or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the board of directors of the Borrower or any direct or indirect parent company thereof, as the case may be;

(m)     transactions with Restricted Subsidiaries for the purchase or sale of goods, products, parts and services entered into in the ordinary course of business, in each case, in accordance with past practice;

(n)     transactions with customers, clients, suppliers, Joint Venture partners or purchasers or sellers of goods and services, in each case in the ordinary course of business and otherwise not prohibited by the Loan Documents;

(o)      sales of Capital Stock (other than Disqualified Capital Stock) of the Borrower to Affiliates of the Borrower not otherwise prohibited by the Loan Documents and the granting of registration and other customary rights in connection therewith; and

(p)      any transaction with an Affiliate where the only consideration paid by any Loan Party is Capital Stock (other than Disqualified Capital Stock) of the Borrower.

For the avoidance of doubt, (A) the compliance of the Loan Parties with the terms of the Loan Documents and the performance by the Loan Parties of their obligations under the Loan Documents shall and (B) the execution and delivery of the Loan Documents, do not in and of themselves, constitute a transaction with an Affiliate restricted by this Section 6.08.

Section 6.09.  *Sales and Leasebacks*.  Other than a Platinum Sale and Leaseback Transaction, enter into any arrangement with any Person providing for the leasing by the Borrower or any Restricted Subsidiary of real or personal property used or useful in its business that has been or is to be sold or transferred by the Borrower or such Restricted Subsidiary to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of the Borrower or such Restricted Subsidiary.

Section 6.10.  *Swap Agreements*.  Enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Restricted Subsidiary has actual exposure (other than those in respect of Capital Stock) and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Restricted Subsidiary.

Section 6.11.  *Changes in Fiscal Periods*.  Permit the fiscal year of the Borrower to end on a day other than December 31 or change the Borrower's method of determining fiscal quarters.

Section 6.12.  *Negative Pledge Clauses*.  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of the Borrower or any Restricted Subsidiary to create, incur, assume or suffer to exist any Lien upon any Collateral, whether now owned or hereafter acquired, to secure its obligations under the Loan Documents to which it is a party other than (i) Requirements of Law, (ii) this Agreement and the other Loan Documents, (iii) the Additional Financing Agreement and the other documents entered into in connection with the Additional Financing Facility , (iv) the Supply and Offtake Documents, (v) any EB-5 Financing, (vi) any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby and any proceeds thereof), (vii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Loan Party, (viii) customary provisions restricting assignment of any agreement entered into by a Loan Party in the ordinary course of business, (ix) customary restrictions and conditions

contained in any agreement relating to the sale of any property permitted under Section 6.04 pending the consummation of such sale, (x) any agreement in effect at the time such Restricted Subsidiary becomes a Loan Party, so long as such agreement was not entered into in connection with or in contemplation of such Person becoming a Loan Party, (xi) any instrument governing Indebtedness assumed in connection with any Permitted Acquisition, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired, (xii) any Liens permitted pursuant to Section 6.02 in respect of assets subject thereto (other than Sections 6.02(g), (h), (k), (l), (m), (s), (t), (u), (v), (bb) and (cc)), (xiii) customary provisions in Joint Venture agreements and other similar agreements or written arrangements applicable to Joint Ventures permitted hereunder and applicable solely to such Joint Venture, (xiv) customary restrictions in leases, subleases, licenses, asset sale or similar agreements, including with respect to intellectual property and other similar agreements, otherwise permitted hereby so long as such restrictions relate to the assets subject thereto, (xv) customary provisions restricting assignment of any agreement or (xvi) restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business or otherwise permitted hereunder.

Section 6.13.  *Clauses Restricting Subsidiary Distributions*.  Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to (a) make Restricted Payments in respect of any Capital Stock of such Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any other Restricted Subsidiary, (b) make loans or advances to, or other Investments in, the Borrower or any other Restricted Subsidiary or (c) transfer any of its assets to the Borrower or any other Restricted Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under (x) the Loan Documents and (y) any EB-5 Financing, the Supply and Offtake Documents and the Additional Financing Agreement ; (ii) any restrictions with respect to a Restricted Subsidiary imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Subsidiary; (iii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Guarantor; (iv) customary provisions restricting assignment of any agreement entered into by a Guarantor in the ordinary course of business; (v) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Section 6.04 pending the consummation of such sale; (vi) any agreement in effect at the time such Subsidiary becomes a Guarantor of the Borrower, so long as such agreement was not entered into in connection with or in contemplation of such Person becoming a Guarantor of the Borrower; (vii) any instrument governing Indebtedness assumed in connection with any Permitted Acquisition, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired; (viii) any Liens permitted pursuant to Section 6.02 in respect of assets subject thereto; (ix) customary provisions in Joint Venture agreements and other similar agreements or written arrangements applicable to Joint Ventures permitted hereunder and applicable solely to such Joint Venture; (x) customary restrictions on leases, subleases, licenses, asset sale or similar agreements, including with respect to

intellectual property and other similar agreements, otherwise permitted hereby so long as such restrictions relate to the assets subject thereto; (xi) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any of its Subsidiaries; (xii) customary provisions restricting assignment of any agreement; or (xiii) restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business or otherwise permitted hereunder.

Section 6.14.  *[Reserved]*.

Section 6.15.  *Sanctions, and Anti-Corruption Laws*.  (a) Directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, (i) to fund any activities or business of or with any Sanctioned Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of comprehensive sanctions administered by OFAC, or (ii) in any other manner that would result in a violation of sanctions administered by OFAC by any Person (including any Person participating in the Loans, whether as lender, underwriter, advisor, investor, or otherwise).

(b)      Directly or indirectly, use the proceeds of the Loans in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any applicable Anti-Corruption Law.

Section 6.16.  *Additional Financing Agreement*.  Amend, restate, supplement or otherwise modify the Additional Financing Agreement in any manner materially adverse to the Lenders; provided however that the foregoing shall not be construed to restrict the ability of any Loan Part to prepay the Additional Financing Facility in whole or in part.

Section 6.17.  *Anti-Layering*.  Notwithstanding anything to the contrary contained in any Loan Document, other than as expressly permitted by Section 2.19(g), the Borrower shall not, and shall not permit any of its Restricted Subsidiaries, to incur or suffer to exist (a) any Indebtedness (or Guarantee Obligation in respect of Indebtedness) that is or purports to be senior in right of payment to the Tranche B Loans or (b) any Lien on Collateral securing any Indebtedness (or Guarantee Obligation in respect of Indebtedness) that is or purports to be senior in right of priority (whether as to exercise of remedies with respect thereto or right to receive proceeds from such Collateral) to any Lien on such Collateral securing the Tranche B Loans.

ARTICLE 7
EVENTS OF DEFAULT

Section 7.01.  *Events of Default*.  If any of the following events shall occur and be continuing:

(a)      the Borrower shall fail to pay any principal of any Loan when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan, or any other amount payable hereunder or under any other Loan Document, within

five (5) days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)      any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made unless, if such misstatement (and any effect thereof) is capable of being cured, such Loan Party cures such misstatement (and any effect thereof) within ten (10) Business Days of receipt of notice thereof or a Responsible Officer becoming aware thereof; or

(c)      any Loan Party shall default in the observance or performance of any agreement contained in clause (a) of Section 5.04 (with respect to the Borrower only), Section 5.07(a)(i) or Article 6 of this Agreement or Section 4.5(a) of the Security Agreement; or

(d)      any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section 7.01), and such default shall continue unremedied for a period of thirty (30) days after notice to the Borrower from the Administrative Agent, the Required Lenders or the Required Tranche B Lenders; or

(e)      any Loan Party shall (A) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Loans) on the scheduled or original due date with respect thereto beyond any applicable grace period; or (B) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (C) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; *provided*, that a default, event or condition described in clause (A), (B) or (C) of this clause (e)(i) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (A), (B) and (C) of this clause (e)(i) shall have occurred and be continuing with respect to Indebtedness the aggregate outstanding principal amount of which is $20,000,000 or more; *provided* that this clause shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is expressly permitted hereunder; or

(f)      (i) an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (A) relief in respect of any Loan

Party, or of a substantial part of the property of any Loan Party, under the Bankruptcy Code or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law; (B) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or for a substantial part of the property of any Loan Party or (C) the winding-up or liquidation of any Loan Party; and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered; or (ii) any Loan Party shall (A) voluntarily commence any proceeding or file any petition seeking relief under the Bankruptcy Code or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law; (B) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in clause (i) above; (C) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or for a substantial part of the property of any Loan Party; (D) file an answer admitting the material allegations of a petition filed against it in any such proceeding; (E) make a general assignment for the benefit of creditors; (iii) become unable, admit in writing its inability or fail generally to pay its debts as they become due; (iv) take any action for the purpose of effecting any of the foregoing; or (A) wind up or liquidate (other than as permitted by Section 6.03); or

(g)      (i) an ERISA Event and/or a Foreign Plan Event shall have occurred; (ii) a trustee shall be appointed by a United States district court to administer any Pension Plan; (iii) the PBGC shall institute proceedings to terminate any Pension Plan; or (iv) any Loan Party or any of their respective Affiliates shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such entity does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner; and in each case in clauses (i) through (iv) above, such event or condition, together with all other such events or conditions, if any, would reasonably be expected to result in a Material Adverse Effect; or

(h)      one or more judgments or decrees shall be entered against any Loan Party involving in the aggregate a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $20,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed, insured or bonded pending appeal within thirty (30) days from the entry thereof; or

(i)      this Agreement, any of the Security Documents or any other Loan Document shall cease, for any reason, to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Lien created by any of the Security Documents on Collateral (other than Collateral the value of which is de minimis) shall cease to be enforceable and of the same effect and priority purported to be created thereby subject to Liens that are permitted to exist on such Collateral under Section 6.02; or

(j)      the guarantee contained in Article 10 shall cease, for any reason, to be in full force and effect or any Loan Party or any Affiliate of any Loan Party shall so assert; or

(k)    (i)  PES Ultimate Holdings, LLC at any time ceases to own directly or indirectly 100% of the Capital Stock of the Borrower, on a fully diluted basis; or (ii)  any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**")), other than the Permitted Holders shall "beneficially own" (within the meaning of Rule 13d-3 under the Exchange Act), directly or indirectly, shares representing more than the greater of (x) 35% of the aggregate ordinary voting power represented by the issued and outstanding equity interests of PES Inc. or PES Ultimate Holdings, LLC and (y) the percentage of the aggregate ordinary voting power represented by such equity interests beneficially owned by such person or group that exceeds the percentage of the aggregate ordinary voting power represented by equity interests of the Borrower then beneficially owned, directly or indirectly, by the Permitted Holders unless (A) the Permitted Holders have, at such time, the right or the ability, directly or indirectly, by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of PES Inc. or PES Ultimate Holdings, LLC, as applicable or (B) during any period of twelve (12) consecutive months, a majority of the seats (other than vacant seats) on the board of directors of PES Inc. or PES Ultimate Holdings, LLC, as applicable, shall be occupied by persons who were (x) members of the board of directors of PES Inc. or PES Ultimate Holdings, LLC, as applicable, on the Closing Date or nominated by the board of directors of PES Inc. or PES Ultimate Holdings, LLC, as applicable, or by one or more of the Permitted Holders or persons nominated by one or more of the Permitted Holders or (y) appointed by directors so nominated (it being understood and agreed that, for purposes of this clause (k), a person shall not be deemed to have beneficial ownership of Capital Stock subject to a stock purchase agreement, merger agreement or similar agreement until the consummation of the transactions contemplated by such agreement (unless such agreement provides for the ability of the purchaser therein to vote the Capital Stock) or (iii) a "change of control" or similar event shall occur under any documentation Indebtedness the aggregate outstanding principal amount of which is $20,000,000 or more or under a Supply and Offtake Document;

(l)    there shall occur a permanent suspension or termination (including by expiration) of, or with respect to the transactions contemplated by, the Supply and Offtake Documents, unless, solely in the case of an expiration of the Supply and Offtake Agreement on or following the second anniversary of the Closing Date, such Supply and Offtake Documents and such transactions so contemplated thereby are thereupon replaced with a facility or arrangement that provides raw material supply, product sale and/or marketing benefits and accommodations and working capital availability to the Borrower and the other Loan Parties in a manner and scope customary for independent oil refiners in the United States of America; or

(m)    the Refinery (or any successor refinery or refineries fulfilling the same or substantially the same functions as all or a portion of the Refinery) has permanently or indefinitely suspended operations and such suspension has continued for a period of 12 consecutive months, unless, as of the time of the expiration of such 12 consecutive month period, (i) such suspension would not reasonably be expected to result in a Material Adverse Effect or (ii) the Borrower shall have, as of the time of the expiration of such 12-month period, established a replacement business that is reasonably acceptable to the

Administrative Agent or demonstrated to the Administrative Agent's reasonable satisfaction that actions have been commenced to restore or replace business lost as a result of such suspension of operations;

then, subject to Section 7.02, in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (f) above with respect to the Borrower, a Loan Acceleration shall automatically occur and (B) if such event is any other Event of Default, with the consent of the Controlling Lenders that are then permitted to pursue Enforcement Actions under Section 7.02, upon the request of the Controlling Lenders that are then permitted to pursue Enforcement Actions under Section 7.02, the Administrative Agent shall, by notice to the Borrower, declare a Loan Acceleration to have occurred. Except as expressly provided above in this Section 7.01, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.

Section 7.02.  *Controlling Lenders.*  Following (A) the occurrence of an Event of Default until the Discharge of the Tranche A Loans, the Required Tranche A Lenders shall be the Controlling Lenders authorized to exclusively direct the Administrative Agent to pursue any Enforcement Action and (B) the occurrence of an Event of Default on and after the Discharge of the Tranche A Loans, the Required Tranche B/C Lenders shall be the Controlling Lenders authorized to exclusively direct the Administrative Agent to pursue any Enforcement Action (a "**Discharge Control Shift**"), subject in all cases to each of the following:

(a)     whether or not a Discharge Control Shift shall have occurred, after the expiration of a Standstill Period, the Required Tranche B Lenders and the Required Tranche C Lenders (but not the Required Tranche A Lenders) shall each constitute, and have the rights and ability of, the Controlling Lender to initially direct the Administrative Agent to pursue any Enforcement Action (a "**Remedies Shift**"),

(b)     subject to paragraph (c) below, (i) after a period 10 Business Days following the occurrence of a  Tranche B Payment Event of Default, the Required Tranche B Lenders (but not the Required Tranche A Lenders or Required Tranche C Lenders) shall be the Controlling Lenders authorized to exclusively direct the Administrative Agent to pursue any Enforcement Action without the consent of any other Secured Party and (ii) following the occurrence of a Tranche B Specific Event of Default other than a Tranche B Payment Event of Default, the Required Tranche B Lenders (but not the Required Tranche A Lenders or Required Tranche C Lenders) shall be the Controlling Lenders, authorized to exclusively direct the Administrative Agent to pursue any Enforcement Action,

(c)     if any Event of Default in addition to a Tranche B Specific Event of Default has occurred and is continuing (such additional Event of Default, a "**Dual Event of Default**"), both the Required Tranche A Lenders (subject to the Discharge Control Shift) and the Required Tranche B Lenders shall each constitute, and have the rights of, the Controlling Lender to initially direct the Administrative Agent to pursue any Enforcement Action,

(d)    notwithstanding anything to the contrary in this Section 7.02 and subject to the proviso below, (i) if and as long as the Required Tranche A Lenders (subject to the Discharge Control Shift, Remedies Shift and except following the occurrence of a Tranche B Specific Event of Default when there is not then an occurrence of a Dual Event of Default) pursue an Enforcement Action, such Enforcement Action will be exclusively controlled by the Required Tranche A Lenders (subject to the Discharge Control Shift and/or Remedies Shift), without the requirement of the consent of any other Lender or Secured Party; *provided* that if, in such circumstances, the Required Tranche A Lenders are not diligently pursuing Enforcement Actions against a substantial portion of the Collateral, the Required Tranche B/C Lenders shall become the Controlling Lenders with the exclusive right to direct the Administrative Agent and control the Enforcement Actions; *provided, further*, that if the Required Tranche B/C Lenders have become the Controlling Lenders in such circumstances and are not diligently pursuing remedies against a substantial portion of the Collateral, the Required Tranche B Lenders shall become the Controlling Lenders with the exclusive right to direct the Administrative Agent and control the Enforcement Actions, (ii) if and as long as the Required Tranche B Lenders pursue an Enforcement Action following the occurrence of a Tranche B Specific Event of Default when there has not been an occurrence of a Dual Event of Default , such Enforcement Action will be exclusively controlled by the Required Tranche B Lenders without the requirement of the consent of any other Lender or Secured Party, (iii) upon a Discharge Control Shift or a Remedies Shift (other than in an event where clause (ii) of this clause (d) applies), if the Required Tranche B Lenders or the Required Tranche C Lenders have initially directed the Administrative Agent to pursue (or consented to the Administrative Agent's pursuit of) any Enforcement Action, the consequent Enforcement Action will be controlled exclusively by the Required Tranche B/C Lenders; *provided* that if, in such circumstances, the Required Tranche B/C Lenders are not diligently pursuing remedies against a substantial portion of the Collateral, the Required Tranche B Lenders shall become the Controlling Lenders with the exclusive right to direct the Administrative Agent and control the Enforcement Actions and (iv) subject to the other provisions of this Agreement, including those of this Section 7.02, in the event more than one Tranche constitutes the Controlling Lenders at such time with a right to trigger an Enforcement Action, no tranche of Lenders can prevent any other tranche of Lenders that constitutes the Controlling Lenders from pursuing an Enforcement Action,

(e)    upon the occurrence of (i) any Loan Acceleration of the Tranche A Loans, (ii) an Event of Default under Section 7.01(a) with respect to the Tranche A Loans, and expiration of the subsequent Standstill Period, (iii) an Event of Default under Section 7.01(f) or (iv) any Enforcement Action against a substantial portion of the Collateral by or at the direction of the Tranche A Lenders, each of the Tranche B Lenders and Tranche C Lenders shall have the option, but not the obligation, to, on customary terms, purchase (*pro rata* among them based on the principal amount of such Tranche B Lenders' and Tranche C Lenders' Loans then outstanding under the Facility) the Tranche A Loans (in full but not in part) at par plus accrued and unpaid interest (it being understood that if any Tranche B Lender or Tranche C Lender does not exercise its right to participate in such purchase option, the participating Tranche B Lenders and Tranche C Lenders may, if they wish to exercise such option, ratably increase their participation in such purchase option), and

(f)     notwithstanding anything to the contrary in this Section 7.02, and whether or not a Discharge Control Shift, a Remedies Shift, a Tranche B Specific Event of Default, or a Dual Event of Default shall have occurred, (A) in any proceeding referred to in Section 7.01(f), each of the Tranche A Lenders, the Tranche B Lenders and Tranche C Lenders may file a claim, proof of claim, or statement of interest with respect to the Obligations relating to such Tranche A Lenders', Tranche B Lenders' and Tranche C Lenders' Loans, (B) any Tranche A Lender, Tranche B Lender and Tranche C Lender may exercise their rights and remedies as unsecured creditors, to the extent not in contravention of this Agreement, (C) any Tranche B Lender and Tranche C Lender may seek adequate protection with respect to their interests in the Collateral in any proceeding referred to in Section 7.01(f) (*provided* that such adequate protection shall be subject to arrangements substantially similar to the terms of Section 7.02 and Section 7.03) and may file any responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance or avoidance of the claims or Liens of the Tranche B Lenders and Tranche C Lenders, and (D) any Tranche A Lender, any Tranche B Lender or Tranche C Lender may vote on any plan of reorganization, plan of liquidation, agreement for composition, or other type of plan of arrangement proposed in or in connection with any proceeding referred to in Section 7.01(f) to the extent in a manner that is not inconsistent with the terms and conditions of this Agreement.

Section 7.03.   *Application of Proceeds*.

(a)     (i) At all times from the date of this Agreement, any amounts or proceeds received (other than cash interest payments made pursuant to Section 2.09 and amortization payments made pursuant to Section 2.03(b) from proceeds of Collateral by the Administrative Agent or any other Secured Party, as the case may be, in respect of the Obligations whether after an Event of Default, acceleration or by sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Administrative Agent or any other Secured Party, as the case may be, of its remedies, or otherwise, shall be applied (including after any Event of Default under this Agreement or in any other Loan Document (or after the Loans and any other Obligations have been accelerated or have otherwise automatically become immediately due and payable as set forth in Section 7.01)), and including any such amounts or proceeds received following the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower and each Guarantor at any time from the date of this Agreement), in full or in part, together with any other sums then held by such Secured Party pursuant to this Agreement, promptly by such Secured Party as follows:

(A)     First, to the payment of all reasonable costs and expenses, fees (including amounts owed under the Administrative Agent Fee Letter) and taxes of such sale, collection or other realization including compensation to the Administrative Agent and its agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent in connection therewith and all amounts for which the Administrative Agent is entitled to indemnification pursuant to the provisions of any Loan Document;

(B)    Second, to the payment of all reasonable costs and expenses of such sale, collection or other realization including compensation to the other Secured Parties and their agents and counsel and all costs, fees, expenses, liabilities and advances made or incurred by the other Secured Parties in connection therewith, therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full, in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(C)    Third, without duplication of amounts applied pursuant to clauses (A) and (B) above, to the indefeasible payment in full in cash, *pro rata*, of the principal amount of Tranche A Loans and interest with respect to the Tranche A Loans, and other amounts constituting Obligations (other than principal) in respect of the Tranche A Loans arising under the Loan Documents (including all amounts owing in respect of post-petition interest, default interest, fees, costs, expenses, premiums, and other charges in respect of the Obligations owed to Tranche A Lenders, irrespective of whether a claim for such amounts is allowed or allowable in such proceeding under any federal, state or foreign bankruptcy, insolvency, receivership or similar law), in each case equally and ratably among the Tranche A Lenders in accordance with the respective amounts thereof then due and owing;

(D)    Fourth, without duplication of amounts applied pursuant to clauses (A) and (B) above, to the indefeasible payment in full in cash, *pro rata*, of the principal amount of the Tranche B Loans and the Tranche C Loans, aggregated together as though such Tranche B Loans and Tranche C Loans were a single tranche (for purposes of this Section 7.03(a)(i)(D), such aggregated Loans being "**Tranche B/C Loans**" and the Lenders of such aggregated Loans being the "**Tranche B/C Lenders**") and interest with respect to the Tranche B/C Loans, and other amounts constituting Obligations (other than principal) in respect of the Tranche B/C Loans arising under the Loan Documents (including all amounts owing in respect of post-petition interest, default interest, fees, costs, expenses, premiums, and other charges in respect of the obligations owed to Tranche B/C Lenders, irrespective of whether a claim for such amounts is allowed or allowable in such proceeding under any federal, state or foreign bankruptcy, insolvency, receivership or similar law) and the Specified Swap Agreements, in each case equally and ratably among the Tranche B/C Lenders and the Secured Parties in their capacities as holders of Specified Swap Agreements in accordance with the respective amounts thereof then due and owing (*provided* that if proceeds from any Tranche B Excluded Buildings ("**Excluded Building Proceeds**") are received before or at the same time as proceeds from other Collateral, such Excluded Building Proceeds shall be applied to the indefeasible payment in full in cash, *pro rata*, of the principal amount of Tranche A

Loans and subject to the provisions set forth above in this Section 7.03(a)(i)(D), the Tranche C Loans and interest with respect to the Tranche C Loans, and other amounts constituting Obligations (other than principal) in respect of the Tranche C Loans arising under the Loan Documents (including all amounts owing in respect of post-petition interest, fees, costs, expenses, premiums, and other charges in respect of the Obligations owed to Tranche C Lenders, irrespective of whether a claim for such amounts is allowed or allowable in such proceeding under any federal, state or foreign bankruptcy, insolvency, receivership or similar law) and the Specified Swap Agreements, in each case equally and ratably among the Tranche C Lenders in accordance with the respective amounts thereof then due and owing, with the Tranche B Lenders receiving subject to the provisions set forth above in this Section 7.03(a)(i)(D), *pro rata*, amounts equal to such Excluded Building Proceeds from the proceeds of the other Collateral not constituting Tranche B Excluded Buildings at such time as such proceeds are available, in application to the indefeasible payment in full in cash of the Tranche B Loans and other amounts constituting Obligations (other than principal) in respect of the Tranche B Loans arising under the Loan Documents (including all amounts owing in respect of post-petition interest, fees, costs, expenses, premiums, and other charges in respect of the Obligations owed to Tranche B Lenders, irrespective of whether a claim for such amounts is allowed or allowable in such proceeding under any federal, state or foreign bankruptcy, insolvency, receivership or similar law), in each case equally and ratably among the Tranche B Lenders in accordance with the respective amounts thereof then due and owing); and

(E)     Fifth, the balance, if any, to the person lawfully entitled thereto (including the applicable Loan Party or its successors or assigns) or as a court of competent jurisdiction may direct.

(ii)     In the event that any such proceeds are insufficient to pay in full the items described in clauses (A) through (E) of clause (a)(i) above, the Loan Parties shall remain liable, jointly and severally, for any deficiency.

(b)     At all times from the date of this Agreement, and any amounts or proceeds received (other than cash interest payments made pursuant to Section 2.09) and amortization payments made pursuant to Section 2.03(b)) from sources other than proceeds of Collateral by the Administrative Agent or any other Secured Party, as the case may be, in respect of the Obligations after an Event of Default, including any such amounts or proceeds received following the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower and each Guarantor at any time from the date of this Agreement, accelaration or pursuant to the exercise by the Administrative Agent or any other Secured Party, as the case may be, of its remedies shall be applied (including after any Event of Default under this Agreement or in any other Loan Document (or after the Loans and any other Obligations have been accelerated or

have otherwise automatically become immediately due and payable as set forth in Section 7.01)), in full or in part, together with any other sums then held by such Secured Party pursuant to this Agreement, promptly by such Secured Party as follows:

> (i)     First, to the payment of all reasonable costs and expenses, fees (including amounts owed under the Administrative Agent Fee Letter) and taxes of the Administrative Agent and its agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent in connection therewith and all amounts for which the Administrative Agent is entitled to indemnification pursuant to the provisions of any Loan Document;

> (ii)    Second, to the payment of all reasonable costs and expenses of the other Secured Parties and their agents and counsel and all costs, fees, expenses, liabilities and advances made or incurred by the other Secured Parties in connection therewith, therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full, in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

> (iii)   Third, without duplication of amounts applied pursuant to clauses (i) and (ii) above, to the indefeasible payment in full in cash, *pro rata*, of the principal amount of the Loans and interest with respect to the Loans, and other amounts constituting Obligations (other than principal) in respect of the Loans arising under the Loan Documents (including all amounts owing in respect of post-petition interest, default interest, fees, costs, expenses, premiums, and other charges in respect of the Obligations owed to Lenders, irrespective of whether a claim for such amounts is allowed or allowable in such proceeding under any federal, state or foreign bankruptcy, insolvency, receivership or similar law) and the Specified Swap Agreements, in each case equally and ratably among the Lenders and the Secured Parties in their capacities as holders of Specified Swap Agreements in accordance with the respective amounts thereof then due and owing; and

> (iv)    Fourth, the balance, if any, to the person lawfully entitled thereto (including the applicable Loan Party or its successors or assigns) or as a court of competent jurisdiction may direct.

(c)     If any Secured Party collects or receives any amounts received on account of the Obligations to which it is not entitled under this Section 7.03, such Secured Party shall hold the same in trust for the applicable Secured Parties entitled thereto and shall forthwith deliver the same to the Administrative Agent, for the account of such Secured Parties, to be applied in accordance with this Section 7.03, in each case until the prior payment in full in cash of the applicable Obligations of such Secured Parties.

(d)     Without limiting the generality of the foregoing, it is the intention of the parties hereto that the provisions set forth above in (i) this Section 7.03 shall be deemed to constitute a "subordination agreement" within the meaning of Section 510(a) of the

Bankruptcy Code and shall be interpreted to be enforceable to the maximum extent permitted by applicable non-bankruptcy law and (ii) to the maximum extent permitted by law, the Obligations in respect of the Tranche A Loans (and the security therefor) constitute a separate and distinct class and separate and distinct claims from the other Obligations (and the rights with respect to the security therefor).

## ARTICLE 8
## THE ADMINISTRATIVE AGENT

Section 8.01.  *Appointment*.  Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.

Section 8.02.  *Delegation of Duties*.  The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys in fact selected by it with reasonable care, except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct.

Section 8.03.  *Exculpatory Provisions*.  Neither the Administrative Agent nor any of its officers, directors, employees, agents, advisors, attorneys in fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and non- appealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder. The Administrative Agent shall not be under any obligation to any Lender to ascertain or to

inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.  The Administrative Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; business interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.  The Administrative Agent does not warrant, nor accept responsibility, nor shall Administrative Agent have any liability with respect to the administration, submission, or any other matter related to the rates in the definition of LIBOR Rate or with respect to any comparable or successor rate thereto (including as may be provided pursuant to Section 2.09(h)).

Section 8.04.  *Reliance by Administrative Agent*.  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy or email message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Administrative Agent. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders or the Controlling Lenders under Section 7, as applicable) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders or the Controlling Lenders under Section 7, as applicable) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.  No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby shall require the Administrative Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers. No request given to the Administrative Agent by the Required Lenders or the Borrower or any Subsidiary Guarantor that in the sole judgment of the Administrative Agent imposes, purports to impose or might reasonably be expected to impose upon the Administrative Agent any obligation or liability not set forth in or arising under this Agreement and the other Loan Documents will be binding upon

the Administrative Agent unless the Administrative Agent elects, at its sole option, to accept such direction.

Section 8.05.  *Notice of Default*.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders or the Controlling Lenders as set forth in Section 7 hereof, as applicable; *provided* that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

Section 8.06.  *Non-Reliance on Administrative Agent and Other Lenders*.  Each Lender expressly acknowledges that neither the Administrative Agent nor any of its respective officers, directors, employees, agents, advisors, attorneys in fact or affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, advisors, attorneys in fact or affiliates.

Section 8.07.  *Indemnification*.  The Lenders agree to indemnify the Administrative Agent and its officers, directors, employees, affiliates, agents, advisors and controlling persons (each, an "**Agent Indemnitee**") (to the extent not reimbursed by the Borrower and without limiting its obligations to do so), ratably according to their

respective Aggregate Exposure Percentages in effect on the date on which
indemnification is sought under this Section 8.07 (or, if indemnification is sought after
the date upon which the Loans shall have been paid in full, ratably in accordance with
such Aggregate Exposure Percentages immediately prior to such date), from and against
any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits,
costs, expenses or disbursements of any kind whatsoever that may at any time (whether
before or after the payment of the Loans) be imposed on, incurred by or asserted against
such Agent Indemnitee in any way relating to or arising out of, this Agreement, any of
the other Loan Documents or any documents contemplated by or referred to herein or
therein or the transactions contemplated hereby or thereby or any action taken or omitted
by such Agent Indemnitee under or in connection with any of the foregoing; *provided*
that no Lender shall be liable for the payment of any portion of such liabilities,
obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or
disbursements that are found by a final and non-appealable decision of a court of
competent jurisdiction to have resulted from such Agent Indemnitee's gross negligence
or willful misconduct. The agreements in this Section 8.07 shall survive the termination
of this Agreement and the payment of the Loans and all other amounts payable
hereunder.

Section 8.08.  *Administrative Agent in Its Individual Capacity*.  The
Administrative Agent and its affiliates may make loans to, accept deposits from and
generally engage in any kind of business with any Loan Party as though the
Administrative Agent were not the Administrative Agent.  With respect to its Loans made
or renewed by it, the Administrative Agent shall have the same rights and powers under
this Agreement and the other Loan Documents as any Lender and may exercise the same
as though it were not the Administrative Agent, and the terms "Lender" and "Lenders"
shall include the Administrative Agent in its individual capacity.

Section 8.09.  *Successor Administrative Agent*.  The Administrative Agent may
resign as Administrative Agent upon ten (10) days' notice to the Lenders and the
Borrower. If the Administrative Agent shall resign as Administrative Agent under this
Agreement and the other Loan Documents, then the Required Lenders shall appoint from
among the Lenders a successor agent for the Lenders, which successor agent shall (unless
an Event of Default under Section 7.01(a) or Section 7.01(f) with respect to the Borrower
shall have occurred and be continuing) be subject to approval by the Borrower (which
approval shall not be unreasonably withheld or delayed), whereupon such successor agent
shall succeed to the rights, powers and duties of the Administrative Agent, and the term
"**Administrative Agent**" shall mean such successor agent effective upon such
appointment and approval, and the former Administrative Agent's rights, powers and
duties as Administrative Agent shall be terminated, without any other or further act or
deed on the part of such former Administrative Agent or any of the parties to this
Agreement or any holders of the Loans.  If no successor agent has accepted appointment
as Administrative Agent by the date that is ten (10) days following a retiring
Administrative Agent's notice of resignation, the retiring Administrative Agent's
resignation shall nevertheless thereupon become effective, and the Lenders shall assume
and perform all of the duties of the Administrative Agent hereunder until such time, if
any, as the Required Lenders appoint a successor agent as provided for above. After any

121

retiring Administrative Agent's resignation as Administrative Agent, the provisions of this Article 8 and of Section 9.05 shall continue to inure to its benefit.

ARTICLE 9
MISCELLANEOUS

Section 9.01.  *Amendments and Waivers*.  Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented, modified or waived except in accordance with the provisions of this Section 9.01 (except for amendments, supplements and modifications explicitly permitted by Section 2.19). The Required Lenders and each Loan Party party to the relevant Loan Document may, or, with the written consent of the Required Lenders, the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; *provided*, *however*, that (i) no such waiver and no such amendment, supplement or modification shall (A) forgive any principal amount or extend the final scheduled date of maturity of any Loan, extend the scheduled date of or reduce any amortization payment in respect of any Loan, reduce any fee or interest or any rate of on interest (including, without limitation, any change in (x) clause (a) of the definition of Eurodollar Base Rate or (y) clause (d) of the definition of ABR) or fee payable hereunder) (except in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective as to the Tranche A Loans, Tranche B Loans or Tranche C Loans with the consent of the Required Tranche A Lenders, Required Tranche B Lenders and Required Tranche C Lenders, respectively)) or extend the scheduled date of any payment thereof, in each case without the written consent of each Lender affected thereby; (B) eliminate or reduce the voting rights of any Lender under this Section 9.01 without the written consent of such Lender; (C) amend or modify the definition of Required Lenders or reduce any percentage specified in such term, consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, release all or substantially all of the Collateral or release all or substantially all of the value of the Guarantor Obligations of the Subsidiary Guarantors, in each case without the written consent of all Lenders; (D) amend or modify any definition of (i) Required Tranche A Lenders without the written consent of all Tranche A Lenders, (ii) Required Tranche B Lenders without the written consent of all Tranche B Lenders, (iii) Required Tranche C Lenders without the written consent of all Tranche C Lenders or (iv) Required Tranche B/C Lenders without the written consent of all Tranche B Lenders and all Tranche C Lenders; (E) amend, modify or waive any provision of Section 2.12 or Section 7.02 or 7.03, in each case, without the written consent of each Lender directly affected thereby; (F) without the consent of each Lender, amend, modify or waive any provision of any Loan Document that would have the effect of allowing the aggregate principal amount of

Indebtedness outstanding (or permitted to be outstanding) pursuant to the "Term Loan Documents" (as defined in the Intercreditor Agreement) to exceed the aggregate principal of Loans that would be permitted to be outstanding under the Intercreditor Agreement without the consent of the Supply and Offtake Secured Parties (unless such consent from the Supply and Offtake Secured Parties has been obtained) or (G) amend, modify or waive any provision of Article 8 or any other provision of any Loan Document that affects the Administrative Agent without the written consent of the Administrative Agent and (ii) amend, modify or waive (u) any provision of any Loan Document that gives the Required Tranche B Lenders rights to consent to any action or circumstance or request an action, (v) the definition of Tranche B Specific Event of Default, (w) any provision of Section 2.19 that prevents Incremental Loans from being incurred as Tranche A Loans or any other Loans that would have a priority (as to rights in Collateral or payment) as to any other Loans hereunder, (x) Section 6.17 or Section 7.01(k), (y) the final proviso of Section 6.05 or the final proviso to Section 6.07(z) or (z) without derogating the rights of Tranche B Lenders pursuant to clause (i) above, any provision of this Agreement that benefits the Tranche A Lenders or the Tranche C Lenders disproportionately as compared to the Tranche B Lenders or would disproportionately adversely affect the Tranche B Lenders as compared to the Tranche A Lenders or the Tranche C Lenders, in each case without the written consent of the Required Tranche B Lenders (it being understood that, without limiting the foregoing, any change that would require a payment of principal of the Tranche A Loans or Tranche C Loans on any date earlier than such payment is required, or any increase in interest or fees payable to the Tranche A Lenders or the Tranche C Lenders, in each case, under this Agreement as in effect on the Closing Date shall be deemed disproportionately adverse to the Tranche B Lenders), and (iii) in determining whether the requisite percentage of Lenders have consented to any amendment, modification, waiver or other action, any Affiliate Lenders (other than Debt Fund Affiliates) shall be deemed to have voted in the same proportion as those Lenders who are not Affiliate Lenders, except with respect to (x) any amendment, modification or other action or plan of reorganization which by its terms requires the consent of all Lenders or each affected Lender and (y) any amendment, modification, waiver or other action that by its terms adversely affects any Affiliate Lender in its capacity as a Lender in a manner that differs in any material respect from, and is more adverse to such Affiliate Lender than it is to, other affected Lenders, in which case the consent of such Affiliate Lender shall be required. Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Administrative Agent and all future holders of the Loans. In the case of any waiver, the Loan Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding anything in this Agreement or any other Loan Document to the contrary, the Borrower may enter into Extension Amendments in accordance with Section 2.18, and such Extension Amendments shall be effective to amend the terms of this Agreement and the other applicable Loan Documents, in each case, without any further action or consent of any other party to any Loan Document; *provided* that as to

the Extended Loans borrowed in connection with any such Extension Amendment (a) the Applicable Margin for such Extended Loans shall not be higher than the Applicable Margin for the relevant Loans prior to the relevant Extension, (b) the All-In Yield of such Extended Loans shall not be higher than the All-In Yield for the relevant Loans prior to the relevant Extension and (c) the other terms of the Extended Loans are not more favorable to the lenders of such Extended Loans than the corresponding terms of the relevant Loans prior to the relevant Extension, to the extent such terms are applicable to an Extension.

In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of the Administrative Agent, the Borrower and the Lenders providing the relevant Replacement Loans (as defined below) to permit the refinancing, replacement or modification of all outstanding Loans of a particular Tranche ("**Replaced Loans**") with a replacement term loan tranche hereunder ("**Replacement Loans**"), *provided* that (a) the aggregate principal amount of such Replacement Loans shall not exceed the aggregate principal amount of such Replaced Loans, (b) the Applicable Margin for such Replacement Loans shall not be higher than the Applicable Margin for such Replaced Loans, (c) the All-In Yield of such Replacement Loans shall not be higher than the All-In Yield for such Replaced Loans, (d) the Weighted Average Life to Maturity of such Replacement Loans shall not be shorter than the Weighted Average Life to Maturity of such Replaced Loans at the time of such refinancing and (e) the other terms of the Replacement Loans are not more favorable to the lenders of such Replacement Loans than the corresponding terms of the Replaced Loans.

Furthermore, notwithstanding the foregoing, the Administrative Agent, with the consent of the Borrower, may amend, modify or supplement any Loan Document without the consent of any Lender or the Required Lenders in order to correct, amend or cure any ambiguity, inconsistency or defect or correct any typographical error or other manifest error in any Loan Document; provided that no such amendment, supplement or modification shall become effective or unless such amendment, modification or supplement shall be provided to the Lenders at least 10 Business Days prior to the proposed effectiveness thereof and the Required Lenders and Required Tranche B Lenders have not objected thereto within 5 Business Days of the Lenders being provided such proposed amendment, modification or waiver.

Furthermore, notwithstanding anything in this Agreement or the other Loan Documents to the contrary, each Affiliate Lender (other than a Debt Fund Affiliate) hereby agrees that, if a proceeding under the United States Bankruptcy Code or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law shall be commenced by or against any Borrower or any other Loan Party at a time when such Lender is an Affiliate Lender, such Affiliate Lender irrevocably authorizes and empowers the Administrative Agent to vote on behalf of such Affiliate Lender with respect to the Loans held by such Affiliate Lender in any manner in the Controlling Lenders' sole discretion, unless the Controlling Lenders instruct such Affiliate Lender to vote, in which case such Affiliate Lender shall vote with respect to the Loans held by it as the Controlling Lendersdirect; *provided* that such Affiliate Lender shall be entitled to vote in accordance with its sole discretion (and not in accordance with the direction of the

124

Controlling Lenders) in connection with any plan of reorganization to the extent any such plan of reorganization proposes to treat any such Affiliate Lender or the Obligations held by it in a manner that is less favorable in any material respect to such Affiliate Lender than the proposed treatment of similar Lenders and the Obligations held by them that are not Affiliates of any Borrower.

Notwithstanding anything to the contrary herein, in connection with any amendment, modification, waiver or other action requiring the consent or approval of Required Lenders, Required Tranche A Lenders, Required Tranche B Lenders, Required Tranche C Lenders or Required Tranche B/C Lenders, Lenders that are Debt Fund Affiliates shall not be permitted, in the aggregate, to account for more than 50% of the amounts actually included in determining whether the Required Lenders, Required Tranche A Lenders, Required Tranche B Lenders, Required Tranche C Lenders or Required Tranche B/C Lenders, respectively, have consented to any amendment, modification, waiver, consent or other action that is subject to such vote. The voting power of each Lender that is a Debt Fund Affiliate shall be reduced, pro rata, to the extent necessary in order to comply with the immediately preceding sentence.

Section 9.02.  *Notices*.    All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy) or e-mail, and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three (3) Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed as follows in the case of the Borrower, the Administrative Agent and any Tranche B Lender, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

| Borrower and Guarantors | PES Holdings, LLC |
| | 1735 Market Street |
| | Philadelphia, PA 19103 |
| | Attention: Treasury Department |
| | email:  treasury@pes-companies.com and |
| | legal@pes-companies.com |
| | |
| | With a copy to: |
| | |
| Administrative Agent: | Cortland Capital Market Services LLC |
| | 225 W. Washington St. 9th Floor |
| | Chicago, Illinois 60606 |
| | Attention: Frances Real |
| | and Legal Department |
| | Telecopy: 312-376-0751 |
| | Telephone: 312-600-5100 |
| | email: CPCAgency@cortlandglobal.com and |
| | legal@cortlandglobal.com |

with a copy to:

Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, NY 10019
Attention: H. Stephen Castro
Telecopy: 212-318-3400
Telephone: 212-318-3147
email: stephen.castro@nortonrosefulbright.com

Tranche B Lenders:          As provided in an administrative questionnaire delivered to
                            the Administrative Agent and with a copy to:

                            Cahill Gordon & Reindel LLP
                            80 Pine Street
                            New York, New York 10005
                            Attention:  Susanna Suh, Joel Levitin and Darren Silver
                            (ssuh@cahill.com; jlevitin@cahill.com;
                            dsilver@cahill.com)

*provided* that any notice, request or demand to or upon the Administrative Agent or the
Lenders shall not be effective until received.

Notices and other communications to the Lenders hereunder may be delivered or
furnished by electronic communications pursuant to procedures approved by the
Administrative Agent; The Administrative Agent or the Borrower, agree to accept notices
and other communications to it hereunder by electronic communications pursuant to
procedures approved by it.

Section 9.03.   *No Waiver; Cumulative Remedies*.  No failure to exercise and no
delay in exercising, on the part of the Administrative Agent or any Lender, any right,
remedy, power or privilege hereunder or under the other Loan Documents shall operate
as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or
privilege hereunder preclude any other or further exercise thereof or the exercise of any
other right, remedy, power or privilege. The rights, remedies, powers and privileges
herein provided are cumulative and not exclusive of any rights, remedies, powers and
privileges provided by law.

Section 9.04.   *Survival of Representations and Warranties*.  All representations
and warranties made hereunder, in the other Loan Documents and in any document,
certificate or statement delivered pursuant hereto or in connection herewith shall survive
the execution and delivery of this Agreement and the making of the Loans and other
extensions of credit hereunder.

Section 9.05.   *Payment of Expenses and Taxes*.  The Borrower agrees (a) to pay
or reimburse the Administrative Agent and each of the Lenders for all their reasonable
and documented costs and out-of-pocket expenses incurred in connection with the
development, preparation and execution of, and any amendment, supplement or

modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements of (x) one primary counsel to the Administrative Agent, (y) one New York firm of counsel to each of the Tranche A Lenders, the Tranche B Lenders, and the Tranche C Lenders, and, in the case of an actual or perceived conflict of interest, additional conflicts counsel for each group of such Lenders similarly situated and (z) one local counsel to the Administrative Agent and the Lenders in each applicable jurisdiction, as necessary, in each appropriate jurisdiction and filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Borrower prior to the Closing Date (in the case of amounts to be paid on the Closing Date) and from time to time thereafter to the extent invoiced to the Borrower promptly on a monthly basis in the month after such fees are incurred, (b) to pay or reimburse each Lender and the Administrative Agent for all its reasonable and documented costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents, including the fees and disbursements of counsel to the Administrative Agent, (c) to pay, indemnify, and hold each Lender and the Administrative Agent harmless from all documentary and similar Taxes and charges in respect of the Loan Documents, and (d) to pay, indemnify, and hold each Lender and the Administrative Agent, their respective affiliates, and their respective officers, directors, employees, agents, advisors and controlling persons (each, an "**Indemnitee**") harmless from and against any and all other losses, claims, damages, liabilities and expenses of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including any claim, litigation, investigation or proceeding regardless of whether any Indemnitee is a party thereto and whether or not the same are brought by the Borrower, its equity holders, affiliates or creditors or any other Person, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with Environmental Law or relating to any Environmental Liabilities applicable to any Group Member or any of the Real Property and the reasonable and documented fees and expenses of legal counsel in connection with claims, actions or proceedings by any Indemnitee against any Loan Party under any Loan Document (all the foregoing in this clause (d), collectively, the "**Indemnified Liabilities**"), *provided*, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee, and *provided*, *further*, that this Section 9.05(d) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim. Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws for any matters arising from the Transactions, that any of them might have by statute or otherwise against any Indemnitee, except to the extent such

rights are asserted against an Indemnitee found by a final and non- appealable decision of a court of competent jurisdiction to have engaged in gross negligence or willful misconduct, for claims, demands, penalties, fines, liabilities, settlements, damages, costs or expenses resulting from such gross negligence or willful misconduct. No Indemnitee shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee. No Indemnitee shall be liable for any indirect, special, exemplary, punitive or consequential damages in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby. All amounts due under this Section 9.05 shall be payable not later than ten (10) days after written demand therefor. Statements payable by the Borrower pursuant to this Section 9.05 shall be submitted to the Treasury and Legal Departments(Telephone No. 215-339-1200) (Telecopy No. 866-456-1587), at the address of the Borrower set forth in Section 9.02, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent. The agreements in this Section 9.05 shall survive the termination of this Agreement and the repayment of the Loans and all other amounts payable hereunder.

Section 9.06.  *Successors and Assigns; Participations and Assignments*.  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 9.06.

(b)      (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (each, an "**Assignee**"), other than a natural person or, except to the extent expressly permitted by Section 9.06(e), (f) and (g) below, to the Borrower or any Affiliate of the Borrower, all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) with the prior written consent of:

(A)      the Borrower (such consent not to be unreasonably withheld), *provided* that no consent of the Borrower shall be required for an assignment to a Lender, an affiliate of a Lender, an Approved Fund (as defined below) or, if an Event of Default under Section 7.01(a) or (f) has occurred and is continuing, any other Person; and *provided*, *further*, that the Borrower shall be deemed to have consented to any such assignment unless the Borrower shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof; and

(B)    the Administrative Agent, *provided* that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan to a Lender, an affiliate of a Lender or an Approved Fund.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Loans under any Tranche, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to and recorded by the Administrative Agent) shall not be less than $1,000,000) unless each of the Borrower and the Administrative Agent otherwise consent, *provided* that (1) no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its affiliates or Approved Funds, if any;

(B)    (1) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 and (2) the assigning Lender shall have paid in full any amounts owing by it to the Administrative Agent; *provided* that in the case of contemporaneous assignments by any Lender to one or more Approved Funds, only a single processing and recordation fee shall be payable for all such assignments; and

(C)    the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act and an administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

For the purposes of this Section 9.06, "**Approved Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an affiliate of a

Lender or (c) an entity or an affiliate of an entity that administers or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after date recorded in the Register the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.13, 2.14, 2.15 and 9.05). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.06 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section 9.06.

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and principal amount (and related interest amounts) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and each Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act, the processing and recordation fee referred to in paragraph (b) of this Section 9.06 and any written consent to such assignment required by paragraph (b) of this Section 9.06, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)    Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "**Participant**") to a Person other than Borrower or an Affiliate of Borrower in all or a portion of such

Lender's rights and obligations under this Agreement (including all or a portion of the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (i) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 9.01 and (ii) directly affects such Participant. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.17 with respect to any Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.13, 2.14 and 2.15 (subject to the requirements and limitations therein, including the requirements under Section 2.14(f) (it being understood that the documentation required under Section 2.14(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 9.06; *provided* that such Participant (i) shall be subject to the provisions of Sections 2.13 and 2.14 as if it were an assignee under paragraph (b) of this Section and (ii) shall not be entitled to receive any greater payment under Section 2.13 or 2.14, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from an adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof that occurs after the Participant acquired the applicable participation.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.07(b) as though it were a Lender, *provided* such Participant shall be subject to Section 9.07(a) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Loans or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Loan or other obligation is in registered  form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the

contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 9.06 shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto. The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in this paragraph (d).

(e)     Notwithstanding anything to the contrary contained herein, any Lender may assign all or any portion of its Loans to any Other Affiliate (including any Debt Fund Affiliate), but only if:

(i)     the assigning Lender and Other Affiliate purchasing such Lender's Loans shall execute and deliver to the Administrative Agent an assignment agreement substantially in the form of Exhibit D-2 hereto (an "**Affiliate Lender Assignment and Assumption**") in lieu of an Assignment and Assumption;

(ii)     after giving effect to such assignment, Other Affiliates (other than Debt Fund Affiliates) shall not, in the aggregate, own or hold Loans with an aggregate principal amount in excess of 20.0% of the principal amount of all Loans then outstanding (calculated as of the date of such purchase); and

(iii)     such Other Affiliate and each such Debt Fund Affiliates shall at all times be subject to the voting restrictions specified in Section 9.01 and in the definitions of Required Lenders, Required Tranche A Lenders, Required Tranche B Lenders, Required Tranche C Lenders and Required Tranche B/C Lenders.

(f)     Notwithstanding anything to the contrary herein, any Lender may assign all or any portion of its Loans to the Borrower or any of its Subsidiaries, but only if:

(i)     (x) such assignment is made pursuant to a Dutch Auction open to all Lenders on a pro rata basis or (y) such assignment is made pursuant to an open market purchase;

(ii)     no Event of Default has occurred and is continuing or would result therefrom;

(iii)     any such Loans shall be automatically and permanently cancelled immediately upon acquisition thereof by the Borrower or any of its Subsidiaries; and

(iv)     in the case of an open market purchase, the aggregate principal amount of all Loans purchased pursuant to open market purchases since the

Closing Date shall not, in the aggregate, exceed 20.0% of the principal amount of all Loans then outstanding (calculated as of the date of such purchase).

(g)    (i) Notwithstanding anything to the contrary herein, (i) Affiliate Lenders (other than Debt Fund Affiliates) shall not have any right to attend (including by telephone) any meeting or discussions (or portion thereof) among the Administrative Agent or any other Lender to which representatives of the Borrowers are not then present, (ii) Affiliate Lenders (other than Debt Fund Affiliates) shall not have any right to receive any information or material prepared by the Administrative Agent or any other Lender or any communication by or among the Administrative Agent and one or more other Lenders, except to the extent such information or materials have been made available to the Borrowers or their representatives and (iii) Affiliate Lenders (other than Debt Fund Affiliates) shall not be entitled to receive advice of counsel to the Administrative Agent or other Lenders.

(ii)    Each Lender making an assignment to an Affiliate Lender acknowledges and agrees that in connection with such assignment, (1) such Affiliate Lender then may have, and later may come into possession of, information regarding the Loans or the Loan Parties hereunder that is not known to such Lender and that may be material to a decision by such Lender to assign the Loans ("**Excluded Information**"), (2) such Lender has independently and, without reliance on the Affiliate Lender, the Borrower, any of its Subsidiaries, the Administrative Agent or any of their respective Affiliates, made its own analysis and determination to enter into such assignment notwithstanding such Lender's lack of knowledge of the Excluded Information and (3) none of the Borrower, its Subsidiaries, the Administrative Agent, or any of their respective Affiliates shall have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by law, any claims such Lender may have against the Borrower, its Subsidiaries, the Administrative Agent, and their respective Affiliates, under applicable laws or otherwise, with respect to the nondisclosure of the Excluded Information. Each Lender entering into such an assignment further acknowledges that the Excluded Information may not be available to the Administrative Agent or the other Lenders.

Section 9.07.  *Adjustments; Set off*.  (a) Except to the extent that this Agreement, any Extension Amendment or a court order expressly provides for payments to be allocated to a particular Lender or to the Lenders under a particular Tranche, if any Lender (a "**Benefitted Lender**") shall receive any payment of all or part of the Obligations owing to it (other than in connection with an assignment made pursuant to Section 9.06), or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set off, pursuant to events or proceedings of the nature referred to in Section 7.01(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefitted Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefitted Lender to share the excess payment or

benefits of such collateral ratably with each of the Lenders; *provided, however*, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)     In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any Obligations becoming due and payable by the Borrower (whether at the stated maturity, by acceleration or otherwise), to apply to the payment of such Obligations, by setoff or otherwise, any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender, any affiliate thereof or any of their respective branches or agencies to or for the credit or the account of the Borrower. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such application made by such Lender, *provided* that the failure to give such notice shall not affect the validity of such application.

Section 9.08.   *Counterparts*.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by email or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

Section 9.09.   *Severability*.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 9.10.   *Integration*.  This Agreement and the other Loan Documents represent the entire agreement of the Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

Section 9.11.   ***GOVERNING LAW***.  **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

Section 9.12.   *Submission To Jurisdiction; Waivers*.  The Borrower hereby irrevocably and unconditionally:

(a)      submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof; *provided*, that nothing contained herein or in any other Loan Document will prevent any Lender or the Administrative Agent from bringing any action to enforce any award or judgment or exercise any right under the Security Documents or against any Collateral or any other property of any Loan Party in any other forum in which jurisdiction can be established;

(b)      consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)      agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower, as the case may be at its address set forth in Section 9.02 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)      agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law; and

(e)      waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 9.12 any indirect, special, exemplary, punitive or consequential damages.

Section 9.13.  *Acknowledgements*.  The Borrower hereby acknowledges and agrees that (a) no fiduciary, advisory or agency relationship between the Loan Parties and the Credit Parties is intended to be or has been created in respect of any of the transactions contemplated by this Agreement or the other Loan Documents, irrespective of whether the Credit Parties have advised or are advising the Loan Parties on other matters, and the relationship between the Credit Parties, on the one hand, and the Loan Parties, on the other hand, in connection herewith and therewith is solely that of creditor and debtor, (b) the Credit Parties, on the one hand, and the Loan Parties, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do the Loan Parties rely on, any fiduciary duty to the Loan Parties or their affiliates on the part of the Credit Parties, (c) the Loan Parties are capable of evaluating and understanding, and the Loan Parties understand and accept, the terms, risks and conditions of the transactions contemplated by this Agreement and the other Loan Documents, (d) the Loan Parties have been advised that the Credit Parties are engaged in a broad range of transactions that may involve interests that differ from the Loan Parties' interests and that the Credit Parties have no obligation to disclose such interests and transactions to the Loan Parties, (e) the Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent the Loan Parties have deemed appropriate in the negotiation, execution and delivery of this Agreement and the other

Loan Documents, (f) each Credit Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Loan Parties, any of their affiliates or any other Person, (g) none of the Credit Parties has any obligation to the Loan Parties or their affiliates with respect to the transactions contemplated by this Agreement or the other Loan Documents except those obligations expressly set forth herein or therein or in any other express writing executed and delivered by such Credit Party and the Loan Parties or any such affiliate and (h) no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Credit Parties or among the Loan Parties and the Credit Parties.

Section 9.14.   *Releases of Guarantees and Liens*.   (a) Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 9.01) to take any action requested by the Borrower having the effect of releasing any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 9.01 or (ii) under the circumstances described in paragraph (b) below.

(b)      At such time as the Loans and the other obligations under the Loan Documents (other than obligations under or in respect of Specified Swap Agreements) shall have been paid in full, the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and each Loan Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

Section 9.15.   *Confidentiality*.   Each of the Administrative Agent and each Lender agrees to keep confidential all non-public information provided to it by any Loan Party (whether through the Administrative Agent or directly) pursuant to or in connection with this Agreement that is designated by the provider thereof as confidential; *provided* that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (a) to the Administrative Agent, any other Lender or any Affiliate thereof, (b) subject to an agreement to comply with the provisions of this Section 9.15, to any actual or prospective Transferee or any direct or indirect counterparty to any Swap Agreement (or any professional advisor to such counterparty), (c) to its employees, directors, agents, attorneys, accountants and other professional advisors or those of any of its Affiliates, (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such

Lender, or (i) in connection with the exercise of any remedy hereunder or under any other Loan Document or (j) if agreed by the Borrower in its sole discretion, to any other Person

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities. Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

Section 9.16.   *WAIVERS OF JURY TRIAL*.  THE BORROWER, EACH OTHER LOAN PARTY HERETO, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

Section 9.17.   *USA Patriot Act*.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

Section 9.18.   *Intercreditor Agreement*.  Reference is made to the Intercreditor Agreement dated as of the date hereof (as amended, restated, amended and restated, supplemented, modified, extended, renewed, replaced, refinanced or restructured from time to time, the "**Intercreditor Agreement**"), by and among the Loan Parties, the Administrative Agent, the counterparty under the Supply and Offtake Documents and the collateral agent under the Supply and Offtake Documents. Notwithstanding any provisions in this Agreement or any other Loan Document to the contrary, the terms, conditions and provisions of this Agreement and the other Loan Documents are subject to the terms of the Intercreditor Agreement. To the extent there is a conflict between the Loan Documents and the Intercreditor Agreement, the terms and conditions of the Intercreditor Agreement shall control.

Section 9.19.  *Acknowledgement and Consent to Bail-In of EEA Financial Institutions*.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Bail-In Action of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-in Action on any such liability, including, if applicable:

(i)     a reduction, in full or in part, in the principal amount, or outstanding amount due (including any accrued but unpaid interest) of any such liability;

(ii)     a cancellation of any such liability;

(iii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iv)     a variation of any term of any Loan Document to the extent necessary to give effect to any Bail-In Action in relation to any such liability.

Section 9.20.  *Certain ERISA Matters.*

(a)     Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)     such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans or the Commitments,

(ii)     the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class

exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)     (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)     such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)     In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

(i)     none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and

performance of the Loans, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)     no fee or other compensation is being paid directly to the Administrative Agent or any of its Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Commitments or this Agreement.

(c)     The Administrative Agent hereby informs the Lenders that the Administrative Agent is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that the Administrative Agent has a financial interest in the transactions contemplated hereby in that the Administrative Agent or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans or the Commitments for an amount less than the amount being paid for an interest in the Loans or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

ARTICLE 10
GUARANTEE

Section 10.01. *Guarantee*.     The Guarantors hereby jointly and severally guarantee, as a primary obligor and not as a surety to each Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest on (including any interest, fees, costs or charges that would accrue but for the provisions of the Bankruptcy Code after any bankruptcy or insolvency petition under the Bankruptcy Code) the Loans made by the Lenders to, and the Notes held by each Lender of, the Borrower, and all other Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document or Specified Swap Agreement entered into with a counterparty that is a Secured Party, whether or not enforceable as against the Borrower, whether now or hereafter existing, and whether due or to become due, including principal, interest

(including interest at the contract rate applicable upon default accrued or accruing after the commencement of any proceeding under the Bankruptcy Code, or any applicable provisions of comparable state or foreign law, whether or not such interest is an allowed claim in such proceeding), fees and costs of collection, in each case, strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"). The Guarantors hereby jointly and severally agree that if the Borrower or other Loan Party or Loan Parties shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Loan Parties will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 10.02. *Rights of Secured Parties*.  Each Guarantor agrees that any Secured Party, upon such terms as it deems appropriate, without notice or demand to or on any person and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may, in accordance with the terms of this Article 10 and the other Loan Documents, (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of any Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, any Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of any Guaranteed Obligations and take and hold security for the payment hereof or any Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of any Guaranteed Obligations, any other guaranties of any Guaranteed Obligations, or any other obligation of any person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Secured Party in respect hereof or any Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Secured Party may have against any such security, in each case as such Secured Party in its discretion may determine consistent with the applicable Loan Document or the applicable Specified Swap Agreement and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Borrower or any security for its Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents and any Specified Swap Agreement.

Section 10.03. *Obligations Unconditional*.   The obligations of the Guarantors under Section 10.01 shall constitute a guarantee of payment and, to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity,

regularity or enforceability of the Guaranteed Obligations of the Borrower under this Article 10, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Loan Party (except for payment in full or an amendment or waiver adopted in accordance with Section 9.01). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(a)    at any time or from time to time, without notice to the Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)    any of the acts mentioned in any of the provisions of this Article 10 or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(c)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents, any Specified Swap Agreement or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d)    any Lien or security interest granted to, or in favor of, any Secured Party as security for any of the Guaranteed Obligations shall fail to be perfected; or

(e)    the release of any other Loan Party pursuant to Section 10.10 and Section 9.01.

The Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive (i) any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee, (ii) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or

instrument relating thereto or by reason of the cessation of the liability of the Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations (other than any Unasserted Contingent Obligations), and (iii) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrower or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Secured Parties, and their respective successors and assigns, notwithstanding that from time to time during the term of this Article 10 there may be no Guaranteed Obligations outstanding until payment in full thereof (other than Unasserted Contingent Obligations, or any amendment or waiver adopted in accordance with Section 9.01 or any other express provision set forth in a Loan Document).

Section 10.04. *Reinstatement*.   The obligations of the Guarantors under this Article 10 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 10.05. *Subrogation; Subordination*.   Each Guarantor hereby agrees that, until the payment and satisfaction in full in cash of all Guaranteed Obligations (other than Unasserted Contingent Obligations) and the expiration and termination of the Commitments of the Lenders under this Agreement, it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 10.01, whether by subrogation or otherwise, against the Borrower or any other Loan Party of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations. Any Indebtedness of any Guarantor permitted pursuant to Section 6.01(b) shall be subordinated to such Guarantor's Obligations in the manner set forth in the intercompany note evidencing such Indebtedness.

Section 10.06. *Remedies*.   The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Article 7 (and shall be deemed to have become automatically due and payable in the circumstances provided in Article 7) for purposes of Section 10.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have

become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 10.01.

Section 10.07. *Instrument for the Payment of Money*.  Each Guarantor hereby acknowledges that the guarantee in this Article 10 constitutes an instrument for the payment of money, and consents and agrees that any Lender or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

Section 10.08. *Continuing Guarantee*.  The guarantee in this Article 10 is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 10.09. *General Limitation on Guaranteed Obligations*.  In any action or proceeding involving any state corporate, limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 10.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 10.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any other Loan Party or any other person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 10.11) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 10.10. *Release of Loan Parties*.  If, in compliance with the terms and provisions of the Loan Documents, all of the Capital Stock of any Guarantor are sold or otherwise transferred (a "**Transferred Guarantor**") to a person or persons, none of which is the Borrower, a Guarantor or an Affiliate thereof, such Transferred Guarantor shall, upon the consummation of such sale or transfer, be automatically released from its obligations under this Agreement (including under Section 9.06) and its obligations to pledge and grant any Collateral owned by it pursuant to any Security Document shall be automatically released, and, so long as the Borrower shall have provided the Administrative Agent such reasonable certifications or reasonable documents as the Administrative Agent shall reasonably request, the Administrative Agent shall take such actions as are necessary or reasonably requested by the Borrower to effect each release described in this Section 10.10 in accordance with the relevant provisions of the Security Documents.

Section 10.11. *Right of Contribution*.  Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment. Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 10.05. The provisions of this Section 10.11 shall in no respect limit

144

the obligations and liabilities of any Guarantor to the Administrative Agent and the Lenders, and each Guarantor shall remain liable to the Administrative Agent and the Lenders for the full amount of the Guaranteed Obligations.

Section 10.12. *Default; Remedies; Bankruptcy; Etc.*

(a)    The Guaranteed Obligations of each Guarantor hereunder are independent of and separate from the Obligations of such Guarantor. If any Obligation of the Borrower is not paid when due, or upon any Event of Default hereunder or upon any default by the Borrower as provided in any other Loan Document or Specified Swap Agreement, the Administrative Agent may, at its sole election, proceed directly and at once, without notice, against any Guarantor to collect and recover the full amount or any portion of the Obligations of the Borrower then due, without first proceeding against the Borrower or any other guarantor (including the Guarantors) of its Guaranteed Obligations, or against any Collateral under the Loan Documents or joining the Borrower or any other guarantor (including the Guarantors) in any proceeding against any Guarantor. At any time after maturity of the Guaranteed Obligations of a Guarantor, the Administrative Agent may (unless such Guaranteed Obligations have been paid in full (other than Unasserted Contingent Obligations)), without notice to such Guarantor and regardless of the acceptance of any Collateral for the payment thereof, appropriate and apply toward the payment of such Guaranteed Obligations (a) any indebtedness due or to become due from any Secured Party to such Guarantor and (b) any moneys, credits or other property belonging to such Guarantor at any time held by or coming into the possession of any Secured Party or any of its respective Affiliates.

(b)    So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of the Administrative Agent acting pursuant to the instructions of the Required Lenders or the Controlling Lenders, as applicable, commence or join with any other person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against the Borrower or any other Guarantor (other than the Cases). The obligations of the Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Borrower or any other Guarantor or by any defense which the Borrower or any other Guarantor may have by reason of the order, decree or decision of any court or applicable body resulting from any such proceeding (except as described in Section 10.09). Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in the immediately preceding sentence (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of the Guarantors and the Secured Parties that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Borrower of any portion of such Guaranteed Obligations. Guarantors will permit any trustee in bankruptcy,

receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay the Administrative Agent, or allow the claim of the Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced. In the event that all or any portion of any Guaranteed Obligations are paid by the Borrower, the obligations of the Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment or payments are rescinded or recovered directly or indirectly from any Secured Party as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

Section 10.13. *Keepwell*.    Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Article 10 in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 10.13 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 10.13, or otherwise under this  Article 10, as it relates to such other Loan Party, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section shall remain in full force and effect until this Article 10 is terminated pursuant to Section 10.17. Each Qualified ECP Guarantor intends that this Section 10.13 constitute, and this Section 10.13 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 10.14. *Enforcement Expenses; Indemnification*.

(a)    Each Guarantor agrees to pay or reimburse each Lender and the Administrative Agent for all its documented costs and expenses incurred in collecting against such Guarantor under the guarantee contained in Section 10.01 or otherwise enforcing or preserving any rights under this Article 10 and the other Loan Documents to which such Guarantor is a party, including, without limitation, the fees and disbursements of counsel to the Administrative Agent.

(b)    Each Guarantor agrees to pay, and to save the Administrative Agent and the Lenders harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable in connection with any of the transactions contemplated by this Article 10.

(c)    Each Guarantor agrees to pay, and to save the Administrative Agent and the Lenders harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Article 10 to the extent the Borrower would be required to do so pursuant to Section 9.05.

(d)     The agreements in this Article 10 shall survive repayment of the Obligations and all other amounts payable under this Agreement and the other Loan Documents.

Section 10.15. *Acknowledgements*.  Each Guarantor hereby acknowledges that:

(a)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party;

(b)     neither the Administrative Agent nor any Lender has any fiduciary relationship with or duty to any Guarantor arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Guarantors, on the one hand, and the Administrative Agent and Lenders, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)     no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Guarantors and the Lenders.

Section 10.16. *Additional Guarantors*.  Each Subsidiary of the Borrower that is required to become a party to this Agreement pursuant to Section 5.10 shall become a Guarantor for all purposes of this Agreement upon execution and delivery of an assumption agreement.

Section 10.17. *Releases*.  At such time as the Loans and the other Obligations shall have been paid in full, this Article 10 and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and each Guarantor hereunder shall terminate, all without delivery of any instrument or performance of any act by any party. At the request and sole expense of any Guarantor following any such termination, the Administrative Agent shall execute and deliver to such Guarantor such documents as such Guarantor shall reasonably request to evidence such termination.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

PES HOLDINGS, LLC

By: _____
Name: James T. Rens
Title:   Executive Vice President and
Chief Financial Officer


PHILADELPHIA ENERGY SOLUTIONS
REFINING AND MARKETING LLC

By: _____
Name: James T. Rens
Title:   Executive Vice President and
Chief Financial Officer


PES ADMINISTRATIVE SERVICES, LLC

By: _____
Name: James T. Rens
Title:   Executive Vice President and
Chief Financial Officer


NORTH YARD GP, LLC

By: _____
Name: James T. Rens
Title:   Executive Vice President and
Chief Financial Officer


NORTH YARD LOGISTICS, L.P.

By: _____
Name: James T. Rens
Title:   Executive Vice President and
Chief Financial Officer


[Signature Page to Credit Agreement]

CORTLAND CAPITAL MARKET
SERVICES LLC, as
Administrative Agent

Name:       Matthew Trybula
Title:        Associate Counsel

[Signature Page to Credit Agreement]

[Lenders' Signature Pages on File with Administrative Agent]

## **Schedule 1.01A**

### **Initial Loan Commitments**

(On file with Administrative Agent)

**Schedule 1.01B**

**Mortgaged Property**

The descriptions of the North Yard and West Yard from Schedule 1.01D are hereby incorporated by reference.

ALL THOSE CERTAIN LOTS OR PARCELS OF GROUND, SITUATE IN THE CITY AND COUNTY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA, MORE PARTICULARLY BOUNDED AND DESCRIBED AS LOTS 1 THROUGH AND INCLUDING 12 ON THOSE TWO CERTAIN SUBDIVISION PLANS, EACH ENTITLED "SUBDIVISION PLAN PHILADELPHIA ENERGY SOLUTIONS", DATED SEPTEMBER 4, 2013, LAST REVISED NOVEMBER 3, 2014, PREPARED BY LUDGATE ENGINEERING CORPORATION, ONE OF WHICH HAVING BEEN APPROVED BY THE CITY OF PHILADELPHIA SECOND DISTRICT SURVEYOR & REGULATOR ON NOVEMBER 25, 2014 AND ONE OF WHICH HAVING BEEN APPROVED BY THE CITY OF PHILADELPHIA SEVENTH DISTRICT SURVEYOR & REGULATOR ON NOVEMBER 25, 2014 AND EACH OF WHICH HAVING BEEN APPROVED BY THE PHILADELPHIA CITY PLANNING COMMISSION ON NOVEMBER 25, 2014 AND FURTHER APPROVED BY THE PHILADELPHIA CITY PLANNING COMMISSION ON NOVEMBER 25, 2014 AND FURTHER APPROVED BY THE CITY OF PHILADELPHIA DEPARTMENT OF LICENSES AND INSPECTIONS ON FEBRUARY 11, 2015. SAID LOTS BEING DESCRIBED AS FOLLOWS:

## LOT # 1

Beginning at a point on the western side of 26th Street; thence along the western side of 26th Street the three (3) following courses and distances:

(1) South 15°00'00" West, a distance of 154.24 feet;
(2) South 09°03'03" West, a distance of 100.34 feet;
(3) South 15°00'00" West, a distance of 1225.64 feet to a point a corner of Lot #2;

Thence along Lot #2 the seven (7) following courses and distances:
(1) North 48°46'49" West, a distance of 99.14 feet;
(2) North 62°49'10" West, a distance of 121.15 feet;
(3) North 72°36'22" West, a distance of 588.46 feet;
(4) North 84°48'01" West, a distance of 184.15 feet;
(5) South 10°22'54" West, a distance of 1285.24 feet;
(6) South 65°27'36" East, a distance of 611.68 feet;
(7) South 64°32'53" East, a distance of 274.82 feet to a point on the western side of 26th Street

Thence along the western side of 26th Street the eight (8) following courses and distances:
(1) South 15°00'00" West, a distance of 50.76 feet;
(2) South 15°00'00" West, a distance of 886.62 feet;
(3) South 22°57'10" West, a distance of 103.89 feet;
(4) South 14°51'29" West, a distance of 118.06 feet;

(5) North 72°55'36" West, a distance of 17.81 feet;
(6) South 21°14'20" West, a distance of 552.83 feet to a point of curvature;
(7) By a curve to the left having a radius of 200.76 feet and a central angle of 66°30'30" an arc length of 233.04 feet and a chord which bears South 42°00'58" West 220.17 feet;
(8) South 08°52'58" West, a distance of 293.88 feet;

Thence along the north side of Penrose Avenue South 50°41'00" West, a distance of 664.40 feet to a point of curvature; thence by a curve to the right having a radius of 126.09 feet and a central angle of 73°01'37" an arc length of 160.71 feet a chord which bears North 85°45'57" West 150.04 feet point of reverse curvature; thence by a reverse curve to the left having a radius of 167.93 feet and a central angle of 102°48'24" an arc length of 301.32 feet and a chord South 85°09'07" West and a distance of 262.49 feet;

Thence along the northern side of Lanier Avenue the nine (9) following courses and distances:
(1) South 35°47'20" West, a distance of 84.04 feet;
(2) South 37°07'37" West, a distance of 182.61 feet;
(3) South 40°29'38" West, a distance of 122.68 feet to a point of curvature;
(4) By a curve to the left having a radius of 365.09 feet and a central angle of 10°02'31'' an arc length of 63.98 feet a chord which bears South 45°20'45" West 63.90 feet;
(5) South 52°19'35" West, a distance of 69.72 feet to a point of curvature;(6) By a curve to the left having a radius of 248.69 feet and a central angle of 11 °28'08" an arc length of 49.78 feet a chord which bears South 57°36'38" West 49.69 feet;
(7) South 66°48'15" West, a distance of 125.08 feet;
(8) South 65°20'58" West, a distance of 508.101 feet;
(9) South 65°20'58" West, a distance of 21.41 feet to point on the eastern side of Lanier Avenue;

Thence along the eastern side of Lanier Avenue the two following courses and distances:
(1) North 25°27'55" West, a distance of 535.58 feet;
(2) North 22°27'11" West, a distance of 524.37 feet to a point in line of Lot #3;

Thence along Lot #3 the three following courses and distances:
(1) North 67°46'47" East, a distance of 383.35 feet;
(2) North 12°35'48" East, a distance of 1329.66 feet;
(3) South 85°12'51" West, a distance of 1266.44 feet to a point west of Lanier Avenue;

Thence North 21 °38'40" West, a distance of 197.79 feet to a point of curvature;
Thence by a curve to the right having a radius of 313.20 feet and a central angle of 55°00'4l" an arc length of 300.72 feet a chord which bears North 07°12'42" East, 289.30 feet;
Thence North 33°53'37" East, a distance of 173.27 feet;
Thence North 59°37'22" West, a distance of 188.97 feet to a point on the bulkhead of the Schuylkill River;

Thence along the bulkhead of the Schuylkill River the eight (8) following courses and distances:
(1) North 62°12'31" East, a distance of 200.88 feet;
(2) North 39°11'56" East, a distance of 508.77 feet;
(3) North 26°48'23" East, a distance of 575.84 feet;

(4) North 26°43'36" East, a distance of 675.78 feet;
(5) North 30°27'54" East, a distance of 1105.89 feet;
(6) North 18°21'43" East, a distance of 209.77 feet;
(7) North 09°27'34" East, a distance of 222.69 feet;
(8) North 00°23'52" West, a distance of 148.05 feet;

Thence leaving said bulkhead and going along the southern side of Passyunk Avenue the six (6) following courses and distances:
(1) North 81°59'33" East, a distance of 502.95 feet;
(2) South 08°00'27" East, a distance of 60.00 feet
(3) North 81 °59'33" East, a distance of 346.38 feet to a point of curvature;
(4) By a curve to the left having a radius of 849.49 feet and a central angle of 08°48'00" an arc length of 130.47 feet a chord which bears North 77°35'33" East, 130.34 feet to a point of reverse curvature;
(5) By a reverse curve to the right having a radius of 849.49 feet and a central angle of 08°48'00" an arc length of 130.47 feet a chord which bears North 77°35'33" East, 130.34 feet;
(6) North 81°59'33" East, a distance of 524.87 feet;

Thence leaving said side of Passyunk Avenue and going along lands of Sunoco Partners Marketing the 12 following courses and distance:

(1) South 08°03'30" East, a distance of 362.83 feet;
(2) North 81°56'30" East, a distance of 218.00 feet;
(3) South 08°03'30" East, a distance of 63.00 feet;
(4) South 82°02'36'' East, a distance of 10.00 feet;
(5) South 18°03'30" East, a distance of 60.00 feet;
(6) South 56°03'30" East, a distance of 27.00 feet;
(7) North 78°11'57" East, a distance of 79.00 feet;
(8) North 73°16'57" East, a distance of 201.00 feet;
(9) North 11°56'57" East, a distance of 61.00 feet;
(10) South 78°03'03" East, a distance of 82.00 feet;
(11) North 81°56'57" East, a distance of 253.00 feet;
(12) South 75°03'03" East, a distance of 224.72 feet to the Point of Beginning.

Containing 336.50 Acres (14,650,009 SQ.FT.)
Being known as 3144 W. Passyunk Avenue.
OPA #88-4-0970-45

## LOT # 2

Beginning at a point on the western side of 26th Street; thence along the western side of 26th Street the four following courses and distances:
(1) South 15°00'00" West, a distance of 567.04 feet to a point;
(2) South 15°00'00" West, a distance of 60.00 feet to a point
(3) South 15°00'00" West, a distance of 732.364 feet to a point;

(4) South 15°00'00" West, a distance of 10.26 feet to a point a corner of Lot #1;

Thence along Lot #1 the seven following courses and distances:

(1) North 64°32'53" West, a distance of 274.62 feet;
(2) North 65°27'36" West, a distance of 611.68 feet;
(3) North 10°22'54" East, a distance of 1285.24 feet;
(4) South 84°48'01" East, a distance of 184.15 feet;
(5) South 72°36'22" East, a distance of 588.46 feet;
(6) South 62°49'10" East, a distance of 121.15 feet;
(7) South 48°46'49" East, a distance of 99.14 feet to the Point of Beginning.

Containing 28.91 Acres /1,259,445 sq.ft.
Being known as 2800 S. 26th Street.
OPA #88-4-0970-46

## LOT # 3

Beginning at a point in the pavement of Lanier Avenue and a corner of Lot #4;
thence along Lot #4 the six following courses and distances:
(1) North 24°33'56" West, a distance of 268.18 feet;
(2) North 25°07'50" West, a distance of 352.68 feet;
(3) North 22°17'01" West, a distance of 440.25 feet;
(4) South 67°46'47" West, a distance of 49.50 feet;
(5) North 21°44'15" West, a distance of 793.44 feet;
(6) North 67°46'47" East 1006.58 fee to a point a corner of Lot #1;

Thence along Lot # 1 the four following courses and distances:
(1) South 12°35'48" West, a distance of 966.42 feet;
(2) South 67°46'47" West, a distance of 383.35 feet to a point on the west side of Lanier Avenue;
(3) South 22°27'11" East, a distance of 524.37 feet;
(4) South 25°27'55" East, a distance of 535.58 feet to a point on the right of way of Penrose Avenue;
Thence along Penrose Avenue South 65°20'58" West, 31.75 feet Point of Beginning.

Containing 14.06 Acres/ 612,745 sq.ft.
Being known as 3403 Penrose Avenue.
OPA #88-4-0965-03

## LOT # 4

Beginning at a point on the northern side of Penrose Avenue and being a corner of Lot #5;
Thence along Lot #5 the eleven (11) five following courses and distances:

(1) North 23°59'08'' West, a distance of 447.46 feet;

(2) North 75°16'14" West, a distance of 1528.51 feet;
(3) North 02°43'59" East, a distance of 1510.00 feet;
(4) North 87°11'50" West, a distance of 1292.64 feet;
(5) North 03°20'23" East, a distance of 554.64 feet;
(6) South 84°26'17" West, a distance of 211.15 feet;
(7) South 83°00'07" West, a distance of 101.52 feet;
(8) South 79°42'49" West, a distance of 27.81 feet;
(9) South 51°16'25" West, a distance of 71.95 feet;
(10) South 49°32'20" West, a distance of 89.12 feet;
(11) South 50°48'38" West, a distance of 226.77 feet;

Thence along the bulkhead of the Schuylkill River the seven (7) following courses and distances:
(1) North 15°08'04" East, a distance of 161.71 feet;
(2) North 44°12'02" East, a distance of 199.17 feet;
(3) North 68°18'09" East, a distance of 187.61 feet;
(4) South 88°22'28" East, a distance of 185.42 feet;
(5) South 79°24'56" East, a distance of 980.75 feet;
(6) South 89°57'50" East, a distance of 469.50 feet;
(7) North 62°12'31" East, a distance of 480.48 feet to a point a corner of Lot #1;

Thence along Lot #1 the six (6) following courses and distances:
(1) South 59°37'22" East, a distance of 188.97 feet;
(2) South 33°53'37" West, a distance of 173.27 feet to a point of curvature.
(3) By a curve to the left having a radius of 313.20 feet and a central angle of 55°00'41" an
arc length of 300.72 feet and a chord which bears South 07°12'42" West 289.30 feet of
tangency;
(4) South 21°38'40" East, a distance of 197.79 feet to a point;
(5) North 85°12'51" East, a distance of 1266.44 feet to a point;
(6) South 12°35'48" West a distance of 363.23 feet to a point a corner of lot #3;

Thence along Lot #3 the six (6) following courses and distances:
(1) South 67°46'47" West, a distance of 1006.58 feet;
(2) South 21 °44'15" East, a distance of 793.44 feet;
(3) North 67°46'47" East, a distance of 49.50 feet;
(4) South 22°17'01" East, a distance of 440.25 feet;
(5) South 25°07'50" East, a distance of 352.68 feet;
(6) South 24°33'56" East, a distance of 268.18 feet to a point on the north side of Penrose
Avenue;

Thence along the north side of Penrose Avenue South 65°20'58" West, a distance of 39.96 feet
to a Point of Beginning.

Containing 78.15 Acres/ 3,404,478 sq.ft.
Being known as 3405 Penrose Avenue.
OPA #88-4-0965-05

## LOT # 5

Beginning at a point on the northern side of Penrose Avenue and being a corner of Lot #6; Thence along Lot #6 the 12 following courses and distances:

(1) North 25°33'08" West, a distance of 1091.88 feet;
(2) North 28°09'59" East, a distance of 319.83 feet;
(3) North 25°24'25" West, a distance of 481.80 feet;
(4) North 64°35'32" East, a distance of 348.39 feet;
(5) North 26°37'45" West, a distance of 573.66 feet;
(6) North 87°14'22" West, a distance of 273.37 feet;
(7) North 00°56'44" West, a distance of 282.41 feet;
(8) South 87°15'44" East, a distance of 510.56 feet;
(9) North 02°36'01" East, a distance of 411.10 feet;
(10) North 83°35'09" West, a distance of 105.69 feet;
(11) North 87°17'26" West, a distance of 195.25 feet;
(12) South 83°52'44" West, a distance of 285.25 feet to a point on the bulkhead of the Schuylkill River;

Thence along the bulkhead of the Schuylkill River the two following courses and distances:
(1) North 00°13'54" West, a distance of 490.50 feet;
(2) North 15°08'04" East, a distance of 361.36 feet to a point a corner of Lot #4

Thence along Lot #4 the eleven (11) following courses and distances:
(1) North 25°48'38" East, a distance of 226.77 feet;
(2) North 49°32'20" East, a distance of 89.12 feet;
(3) North 51 °16'25" East, a distance of 71.95 feet;
(4) North 79°42'49" East, a distance of 27.81 feet;
(5) North 83°00'07" East, a distance of 101.52 feet;
(6) North 84°26'17" East, a distance of 211.15 feet;
(7) South 03°20'23" West, a distance of 554.64 feet;
(8) South 87°11'50" East, a distance of 1292.64 feet;
(9) South 02°43'59" West, a distance of 1510.01 feet;
(10) South 75°16'114'' East, a distance of 1528.51 feet;
(11) South 23°59'08" East, a distance of 447.46 feet to a point on the northern side of Penrose Avenue.

Thence along the northern side of Penrose Avenue South 65°20'58" West, a distance of 3051.94 feet to the Point of Beginning.

Containing 164.72 Acres *I* 7,175,447 sq.ft.
Being known as 3407 Penrose Avenue.
OPA #88-4-0965-07

## LOT # 6

Beginning at a point on the northern side of Penrose Avenue and being a corner on the Schuylkill River bulkhead;

Thence along the bulkhead of the Schuylkill River the four following courses and distances:

(1) North 38°42'23" West, a distance of 382.78 feet;
(2) North 22°18'49" West, a distance of 922.16 feet;
(3) North 08°31'47" West, a distance of 1080.15 feet;
(4) North 00°13'54" West, a distance of 875.35 feet to a point a corner of Lot# 5;

Thence along Lot #5 the 12 following courses and distances:

(1) South 89°00'58" East, a distance of 285.25 feet;
(2) South 87°17'26" East, a distance of 195.25 feet;
(3) South 83°35'09" East, a distance of 105.69 feet;
(4) South 02°36'01" West, a distance of 411.10 feet;
(5) North 87°15'44" West, a distance of 510.56 feet;
(6) South 00°56'44" East, a distance of 282.41 feet;
(7) South 87°14'22'' East, a distance of 273.37 feet;
(8) South 26°37'45" East, a distance of 573.66 feet;
(9) South 64°35'32" West, a distance of 348.39 feet;
(10) South 25°24'25" East, a distance of 481.80 feet;
(11) South 28°09'59" West, a distance of 319.83 feet;
(12) South 25°33'08" East, a distance of 1091.88 feet to a point on the northern side of Penrose Avenue;

Thence along the north side of Penrose Avenue South 65°20'58" West, a distance of 55.30 feet to the Point of Beginning.

Containing 19.50 Acres/ 849,766 sq.ft.
Being known as 3409 Penrose Avenue.
OPA #88-4-0965-09

## LOT # 7

Beginning at a point on the southern right of way of Penrose Avenue Bridge and a point on the Pierhead and bulkhead of the Schuylkill River;

thence along the right of way of Penrose Avenue Bridge North 65°20'58'' East, a distance of 2649.81 feet to a point;

thence leaving the said right of way and going along the PECO Sub-station South 14°15'27" West, a distance of 740.07 feet to a point; thence continuing along a portion of the PECO Substation South 75°44'33" East a distance of 341.82 feet;

thence North 43°00'47" East a distance of 225.29 feet;

thence North 89°17'03" East a distance of 52.23 feet to a point in line of lands of Conrail;

thence along lands of Conrail the eleven (11) following courses and distances:

(1) North 42°32'28" East, a distance of 281.77 feet;
(2) North 42°53'28" East, a distance of 273.21 feet;
(3) South 14°52'19'' West, a distance of 1294.83 feet;
(4) South 15°00'25" West, a distance of 144.39 feet;

(5) South 16°17'09'' West, a distance of 320.18 feet;
(6) South 11°32'56'' West, a distance of 122.60 feet;
(7) South 14°44'22'' West, a distance of 30.03 feet;
(8) South 15°15'53'' West, a distance of 118.82 feet;
(9) South 14°05'49'' West, a distance of 139.26 feet;
(10) South 74°35'06'' East, a distance of 89.20 feet to a point;
(11) South 15°03'38'' West, a distance of 230.28 feet to a point on the pierhead and bulkhead of the Schuylkill River;

Thence along the bulkhead of the Schuylkill River the seven (7) following courses and distances:
(1) North 76°27'27'' West, a distance of 535.85 feet;
(2) North 73°49'21'' West, a distance of 708.12 feet;
(3) North 73°49'21'' West, a distance of 189.74 feet;
(4) North 55°27'13'' West, a distance of 206.08 feet;
(5) North 55°27'13'' West, a distance of 299.58 feet;
(6) North 55°27'13'' West, a distance of 446.84 feet;
(7) North 38°42'23'' West, a distance of 705.51 feet to the point of Beginning

Containing 97.79 Acres/ 4,259,975 sq.ft.
Being known as 3406 Penrose Avenue.
OPA #88-4-0965-06

## LOT # 8

Beginning at a point on the southern right of way of Penrose Avenue Bridge and a corner of lands of Conrail;

Thence along lands of Conrail the three following courses and distances:

(1) South 24°46'32'' East, a distance of 95.46 feet to a point of curvature;
(2) By a curve to the right having a radius of 334.87 feet and central angle of 39°39'00'' an arc length of 231.74 feet and a chord which bears South 04°57'02'' East 227.15 feet to a point;
(3) South 14°52'28'' West, a distance of 540.40 feet to a point a corner of Lot #7.

Thence along Lot #7 the four following courses and distances:
(1) South 89°17'03'' West, a distance of 52.23 feet;
(2) South 43°00'47'' West, a distance of 225.29 feet;
(3) North 75°44'33'' West, a distance of 341.82 feet;
(4) North 14°15'27'' East, a distance of 740.07 feet to a point on the southern right of way of Penrose Avenue Bridge.

Thence along said light of way North 65°20'58'' East, a distance of 477.57 feet to a point the place of Beginning.

Containing 9.97 Acres/ 434,433 sq.ft.

Being known as 3404 Penrose Avenue.
OPA #88-4-0965-04

## LOT #9

Beginning at a point a corner of lands of Pacific Atlantic Terminal; thence along lands of Pacific Atlantic Terminal South 85°46'19.04" East, a distance of 987.797 feet to a point on the west side of the Schuylkill River;

Thence along said river the three following courses and distances:
(1) South 00°22'59.50" East, a distance of 289.965 feet;
(2) South 12°04'10.80" East, a distance of 1169.586 feet;
(3) South 25°35'37.20" East, a distance of 953.167 feet;

Thence South 58°25'48.35 West, a distance of 467.758 feet to a point on the east side of lands of Pacific Atlantic Terminal;

Thence along lands of Pacific Atlantic Terminal the two following courses and distances:
(1) North 28°18'52" West, a distance of 2278.734 feet to a point of curvature;
(2) By a curve to the right having a radius of 1397.455 feet a central angle of 25°56'48.28"
an arc length of 632.845 feet a chord which bears North 15°20'27.86" West a distance of 627.452 feet to the Point of Beginning.

Containing 39.77 Acres/ 1,732,742 sq.ft.
Being known as 6906 Essington Avenue.
OPA #88-4-0967-04

## LOT # 10

Beginning at a point on the eastern side of Essington Avenue and a corner of lands of Pacific Atlantic Terminal;

Thence along lands of Pacific Atlantic Terminal the four following courses and distances:

(1) South 78°40'08" East, a distance of 364.693 feet;
(2) South 74°29'09" East, a distance of 666.454 feet to a point of curvature;
(3) By a curve to the left having a radius of 1463.349 feet and a central angle of 25°40'33.76" an arc length of 655.772 feet a chord which bears South 15°28'35.12 East 650.299 feet;
(4) South 28°18'52" East a distance of 1586.100 feet to a point a corner of Lot #11;

Thence along Lot #11 the 14 following courses and distances:

(1) North 73°45'55.82" West, a distance of 316.884 feet;
(2) North 73°39'19.79" West, a distance of 655.756 feet;
(3) South 16°12'18.33 West, a distance of 34.507 feet;

(4) North 73°47'41.67" West, a distance of 270.118 feet;
(5) North 16°11'09.17" East, a distance of 290.706 feet;
(6) North 73°52'15.18" West, a distance of 360.233 feet;
(7) North 16°12'18.33 East, a distance of 1095.661 feet;
(8) North 74°20'38.45" West, a distance of 157.207 feet;
(9) South 16°04'45.41" West, a distance of 35.834 feet;
(10) North 75°22'14.72" West, a distance of 75.952 feet;
(11) South 16°14'57.70" West, a distance of 124.820 feet;
(12) North 74°11'14.92" West, a distance of 215.977 feet;
(13) South 16°20'02.25" West, a distance of 178.945 feet;
(14) North 73°15'29.97" West, a distance of 410.393 feet to a point on the eastern side of
Essington Avenue.

thence along Essington Avenue North 14°21'18" East, a distance of 633.298 feet to the
Point of Beginning.

Containing 39.50 Acres/ 1,720,972 sq.ft. Being
known as 6904 Essington Avenue.
OPA #88-4-0967-03

## LOT # 11

Beginning at a point on the eastern side of Essington Avenue and a corner of Lot #10;
Thence along Lot # 10 the 14 following courses and distances:
(1) South 73°15'29.97" East, a distance of 410.393 feet;
(2) North 16°20'02.25" East, a distance of 178.945 feet;
(3) South 74°11'14.92" East, a distance of 215.977 feet;
(4) North 16°14'57.70" East, a distance of 124.820 feet;
(5) South 75°22'14.72" East, a distance of 75.952 feet;
(6) North 16°04'45.41" East, a distance of 35.834 feet;
(7) South 74°20'38.45" East, a distance of 157.207 feet;
(8) South 16°12'18.33" West, a distance of 1095.661 feet;
(9) South 73°52'15.18" East, a distance of 360.233 feet;
(10) South 16°11'09.17" West, a distance of 290.706 feet;
(11) South 73°47'41.67" East, a distance of 270.118 feet;
(12) North 16°12'18.33" East, a distance of 34.507 feet;
(13) South 73°39'19.79" East, a distance of 655.756 feet;
(14) South 73°45'55.82" East, a distance of 316.884 feet to a point in line of lands of Pacific
Atlantic Terminal;

Thence along lands of Pacific Atlantic Terminal South 28°18'52'' East, a distance of 692.486
feet;

Thence along Mingo Creek South 61 °46'72" West, a distance of 531.355 feet to a point a corner
of Lot #12;

Thence along Lot #12 the 13 following courses and distances:
(1) North 73°21'23.85" West, a distance of 817.222 feet;
(2) North 16°13'40.59" East, a distance of 58.863 feet;
(3) North 73°21'23.85'' West, a distance of 291.434 feet;
(4) North 16°13'14.08" East, a distance of 629.875 feet;
(5) North 73°46'45.92" West, a distance of 498.753 feet;
(6) South 16°13'14.08" West, a distance of 725.198 feet;
(7) North 73°46'45.92" West, a distance of 101.252 feet;
(8) South 16°13'14.08" West, a distance of 1225.421 feet;
(9) North 64°57'05.99" West, a distance of 241.292 feet;
(10) North 16°20'07.97'' East, a distance of 517.687 feet;
(11) North 73°39'52.03" West, a distance of 214.664 feet;
(12) North 16°20'07.97" East, a distance of 1451.316 feet;
(13) North 75°50'45.56" West, a distance of 374.920 feet to the eastern side of Essington Avenue;

Thence along the eastern side of Essington Avenue North 14°21'18" East, a distance of 1138.651 feet to the Point of Beginning.

Containing 72.99 Acres / 3,179,527 sq.ft.
Being known as 6902 Essington Avenue.
OPA #88-4-0967-02

## LOT # 12

Beginning at a point on the eastern side of Essington Avenue and a corner of Lot #11; Thence along Lot #11 the 13 following courses and distances:

(1) South 75°50'45.56" East, a distance of 374.920 feet;
(2) South 16°20'07.97" West, a distance of 1451.316 feet;
(3) South 73°39'52.03" East, a distance of 214.664 feet;
(4) South 16°20'07.97" West, a distance of 517.687 feet;
(5) South 64°57'05.99" East, a distance of 241.292 feet;
(6) North 16°13'14.08" East, a distance of 1225.421 feet;
(7) South 73°46'45.92" East, a distance of 101.252 feet;
(8) North 16°13'14.08" East, a distance of 725.198 feet;
(9) South 73°46'45.92" East, a distance of 498.753 feet;
(10) South 16°13'14.08" West, a distance of 629.875 feet;
(11) South 73°21'23.85" East, a distance of 291.434 feet;
(12) South 16°13'40.59" West, a distance of 58.863 feet;
(13) South 73°21'23.85" East, a distance of 817.222 feet to a point.

Thence along the north side of Mingo Creek South 61°46'58.72" West, a distance of 2159.913 feet to a monument;
Thence North 61°09'05.89" West a distance of 671.429 feet to a point on the eastern side of Mingo Avenue;

Thence along the eastern side of Mingo Avenue North 03°30'13.66" West, a distance of 1414.856 feet to the eastern side of Essington Avenue;
Thence along the eastern side of Essington Avenue North 14°21'18" East, a distance of 724.906 feet to the Point of Beginning.

Containing 57.68 Acres / 2,512,561 sq. ft.
Being known as 6900 Essington Avenue.
OPA #88-4-0967-01

The easements and other rights, privileges and liberties created by and existing pursuant to that certain Easement Agreement dated as of January 6, 2015, effective as of January 1, 2015, and filed in the office of the Philadelphia Department of Records, City and County of Philadelphia, Commonwealth of Pennsylvania on January 15, 2015 as Instrument No. 52871652 by and between Philadelphia Energy Solutions Refining and Marketing LLC, as grantor, and North Yard Logistics, L.P., as grantee, amended by the Amendment to Easement Agreement dated as of November 18, 2015 and filed in the office of the Philadelphia Department of Records, City and County of Philadelphia, Commonwealth of Pennsylvania on December 1, 2015 as Instrument No. 52994883, with respect to an area of the real property known as 3143 West Passyunk Avenue, Philadelphia, PA (OPA #/Tax parcel #884097200), which area is more particularly described by metes and bounds in Exhibit B to each of said Easement Agreement and Amendment to Easement Agreement.

## Schedule 1.01C

## Supply and Offtake Documents

Third Amended and Restated Supply and Offtake Agreement dated as of August 7, 2018 among Philadelphia Energy Solutions Refining and Marketing LLC and Merrill Lynch Commodities, Inc. and the other transaction parties thereto.

Master Transaction Agreement dated as of August 7, 2018 by and among Merrill Lynch Commodities, Inc., ICBC Standard Bank PLC, Philadelphia Energy Solutions Refining and Marketing LLC, PES Inventory Company LLC and the other parties thereto.

Fourth Amended and Restated Pledge and Security Agreement dated as of August 7, 2018 among Philadelphia Energy Solutions Refining and Marketing LLC, the other Grantors party thereto and Merrill Lynch Commodities, Inc.

**Schedule 1.01D**

**North Yard and West Yard**

**NORTH YARD consisting of Parcels B-2, B-3, B-4, H-l and H-2 as identified as such in the Mortgagee's Title Policy**

**PARCEL B-2 Description. (Parcel B-2)**

Beginning at a point on the south side of Passyunk Avenue and on the pierhead and bulkhead of the Schuylkill River; thence along the bulkhead of the Schuylkill River the thirty-three following courses and distances:

1.      North 15°46'02" West, a distance of 155.02 feet;
2.      North 31°09'33" West, a distance of 148.28 feet;
3.      North 39°25'25" West, a distance of 180.29 feet;
4.      North 44°07'32" West, a distance of 80.71 feet;
5.      North 65°32'53" West, a distance of 13.18 feet;
6.      North 49°22'28" West, a distance of 8.41 feet;
7.      North 65°46'02" West, a distance of 30.05 feet;
8.      South 54°50'25" West, a distance of 5.48 feet;
9.      North 40°45'12" West, a distance of 48.68 feet;
10.     North 56°19'58" West, a distance of 156.17 feet;
11.     North 57°58'20" West, a distance of 145.68 feet;
12.     North 75°17'24" West, a distance of 42.80 feet;
13.     North 83°31'11" West, a distance of 86.58 feet;
14.     North 83°31'11" West, a distance of 95.61 feet;
15.     North 83°00'35" West, a distance of 187.03 feet;
16.     South 80°37'47" West, a distance of 809.03 feet;
17.     South 80°01'56" West, a distance of 46.99 feet;
18.     South 85°22'16" West, a distance of 35.86 feet;
19.     South 86°42'51" West, a distance of 95.79 feet;
20.     North 05°28'09" West, a distance of 30.00 feet;
21.     North 72°05'27" West, a distance of 480.36 feet;
22.     North 49°21'34" West, a distance of 277.55 feet;
23.     North 44°46'47" West, a distance of 91.93 feet;
24.     North 27°49'54" West, a distance of 198.68 feet;
25.     North 23°47'26" West, a distance of 139.41 feet;
26.     North 27°22'11" West, a distance of 140.79 feet;
27.     North 00°58'58" West, a distance of 695.54 feet;
28.     North 14°12'09" East, a distance of 375.02 feet;
29.     North 06°23'54" West, a distance of 78.53 feet;
30.     North 18°25'26" East, a distance of 447.84 feet;
31.     South 74°33'15" East, a distance of 65.04 feet;
32.     North 24°55'08" East, a distance of 22.18 feet;
33.     South 81°55'09" East, a distance of 191.39 feet;
34.     North 42°08'32" East, a distance of 43.36 feet;

Thence leaving bulkhead and along lands of Conrail South 82°20'38" East, a distance of 644.83 feet;

Thence continuing along lands of Conrail the 11 following courses and distances:

1.      South 16°15'57" East, a distance of 120.19 feet to a point of curvature;
2.      by a curve to right having a radius of 653.39 feet and a central angle of 54°52'25" an arc length of 625.77 feet a chord which bears South 44°45'52" East 602.12 feet;
3.      South 82°10'05" East, a distance of 379.22 feet;
4.      South 81°54'46" East, a distance of 281.13 feet;
5.      South 82°09'55" East, a distance of 185.06 feet;
6.      South 82°22'37" East, a distance of 375.54 feet;
7.      South 82°19'05" East, a distance of 329.39 feet;
8.      South 81°52'05" East, a distance of 339.43 feet;
9.      South 82°21'18" East, a distance of 639.33 feet;
10.     South 82°07'25" East, a distance of 230.24 feet to a point of curvature;
11.     by a of a curve to the right having a radius of 1028.90 feet and a central angle of 18°15'10 an arc length of 327.78 feet a chord which bears South 73°24'01"East 326.40 feet;

Thence South 07°48'50" West, a distance of 86.27 feet to a point in line of lands owned by the City of Philadelphia; thence along lands of Philadelphia the 16 following courses and distances

1.      by a curve to the left having a radius of 499.91 feet and a central angle of 22°54'36" an arc length of 199.89 feet a chord which bears South 82°53'51" West 198.56 feet;
2.      South 68°52'37" West, a distance of 368.16 feet to a point of curvature;
3.      by a curve to the left having a radius of 759.85 feet and a central angle of 9°50'11" an arc length of 130.45 feet a chord which bears South 74°48'53" West 130.29 feet;
4.      South 79°06'45" West, a distance of 310.68 feet;
5.      South 74°37'16" West, a distance of 96.75 feet;
6.      South 56°20'07" West, a distance of 70.00 feet;
7.      South 64°28'35" West, a distance of 251.25 feet;
8.      South 67°27'07" West, a distance of 302.11 feet;
9.      South 67°27'07" West, a distance of 402.58 feet;
10.     South 67°27'07" West, a distance of 141.14 feet;
11.     South 53°20'14" West, a distance of 50.00 feet;
12.     South 23°28'34" East, a distance of 32.51 feet;
13.     South 23°28'34" East, a distance of 299.99 feet;
14.     South 35°54'01" East, a distance of 737.38 feet;
15.     South 16°59'51" East, a distance of 113.90 feet;
16.     South 44°15'26" East, a distance of 25.66 feet; thence South 74°54'45" West, a distance of 126.56 feet to the Point of Beginning.

Containing 141.00 Acres, more or less.

Being a portion of OPA #88-4-0972-00 - 3143 W. Passyunk Ave

**PARCEL B-3 Description. (Parcel B-3)**

Beginning at a point on the right of way of Moore Street; thence along the southern right of way of Moore Street South 76°59'06" East, a distance of 85.84 feet; thence continuing along said right of way South 76°04'48" East, a distance of 329.50 feet to a point on the western right of way line of 35th Street; thence along the western right of way line of 35th Street South 13°57'01" West, a distance of 518.75 feet; thence South 82°07'46" East, a distance of 497.03 feet to a point on the western right of way line of 34th Street; thence along the western right of way line of 34th Street South 20°22'25" West, a distance of 139.66 feet to a point on the southern right of way line of Maiden Lane; thence along the southern right of way line of Maiden Lane South 64°11'02" East, a distance of 1256.82 feet to a point of curvature; thence by a curve to the right entering the western side of 26th Street having a radius of 491.39 feet and a central angle of 18°49'29" an arc length of 161.45 feet and a chord which bears South 55°27'35" East 160.72 feet; thence along the western side of 26th Street the eight following courses and distances:

1.      South 43°44'58" West, a distance of 2.95 feet;
2.      South 40°36'48" East, a distance of 169.81 feet;
3.      South 37°29'46" East, a distance of 210.70 feet;
4.      South 37°08'53" East, a distance of 599.67 feet;
5.      South 37°13'25" East, a distance of 255.57 feet;
6.      South 45°31'16" West, a distance of 2.49 feet;
7.      South 34°13'50" East, a distance of 144.39 feet;
8.      South 33°56'02" East, a distance of 266.03 feet;

Thence leaving the western side of 26th Street and going along the northern side of lands of Conrail the 24 following courses and distances:

1.      North 81°59'00" West, a distance of 236.77 feet;
2.      North 58°22'13" East, a distance of 33.81 feet;
3.      North 74°29'15" West, a distance of 121.44 feet;
4.      North 76° 18'45" West, a distance of 250.63 feet;
5.      North 84°05'02" West, a distance of 285.50 feet;
6.      South 47°15'52" West, a distance of 15.18 feet;
7.      North 75°52'55" West, a distance of 46.21 feet;
8.      North 82°02'14" West, a distance of 525.00 feet;
9.      North 02°36'38" East, a distance of 6.00 feet;
10.     North 82°03'42" West, a distance of 209.46 feet;
11.     North 82°26'26" West, a distance of 197.26 feet;
12.     North 82°16'24" West, a distance of 149.97 feet;
13.     North 82°06'49" West, a distance of 452.25 feet;
14.     South 11°06'33" West, a distance of 15.19 feet;
15.     North 81°57'23" West, a distance of 288.33 feet;
16.     North 80°02'02" West, a distance of 92.49 feet;
17.     North 83°48'02" West, a distance of 66.93 feet;
18.     North 79°34'03" West, a distance of 240.34 feet to a point of curvature;
19.     by a curve to the right having a radius of 665.76 feet and a central angle of 55°53'57" an arc length of 649.53 feet and a chord which bears North 53°19'49" West 624.07 feet to a point of compound curvature;

20.    by a compound curve to the right having a radius of 733.68 feet and a central angle of 44°51'23" an arc length of 574.39 feet and a chord which bears North 00°47'49" East 559.84 feet;
21.    North 21°41'17" East, a distance of 358.44 feet;
22.    North 26°05'47" East, a distance of 92.79 feet;
23.    South 82°19'34" East, a distance of 223.64 feet;
24.    North 13°55'44" East, a distance of 990.16 feet to the Point of Beginning.

Containing 106.64 Acres, more or less.

Being a portion of OPA #88-4-0972-00 - 3143 W. Passyunk Ave

**PARCEL B-4 Description. (Parcel B-4)**

Beginning at a point on the northerly side of Moore Street with the centerline of the said former 36th Street, stricken from the city plan at 50 feet wide; thence along the centerline of the said former 36th Street North 13°59'19" East, a distance of

240.14 feet to a point on the southerly side of the said former Fish House Lane (at 23.208 feet wide); thence along the said former Fish House Lane the following 5 courses and distances:

1.    North 79°29'59" West, a distance of 30.06 feet;
2.    North 13°59'19" East, a distance of 23.25 feet;
3.    South 79°29'59" East, a distance of 495.93 feet;
4.    South 13°59'19" West, a distance of 23.25 feet;
5.    North 79°29'59" West, a distance of 25.05 feet to a point on the centerline of the said former 35th Street (50 feet wide); thence along the centerline of said former 35th Street South 13°59'19" West, a distance of 266.97 feet to a point on the northerly side of Moore Street;

Thence along the northerly side of Moore Street North 76°00'41" West, a distance of 440.00 feet to the Point of Beginning.

Containing 2.83 Acres, more or less.

OPA#88-4-2141-15 -3515 Moore Street

**PARCELS H-l and H-2 Descriptions.**

ALL THOSE CERTAIN tracts, pieces or parcels of land, situate former 36th Street and Moore Street, 36th Ward, City of Philadelphia, Commonwealth of Pennsylvania, as shown on a plan prepared by Van Demark & Lynch, Inc., Engineers, Planners and Surveyors, Wilmington, Delaware, Drawing No. 39945-F, dated April 23, 2010, entitled "Subdivision Plat, Parcel "H", prepared for Sunoco, Inc." and being more particularly described as follows, to wit:

**PARCEL "H-l":**

BEGINNING at a point, the intersection of the northerly side of Moore Street, shown on the city plan and legally open at 50 feet wide, with the centerline of former 36th Street, stricken from the

29

city plan at 50 feet wide, being the southwesterly corner of Premises 'H-1', Sunoco Propane Terminal (13-S-23/3) on a easterly line for land now or formerly of CSX Transportation, Inc. (13-S-24/4);

THENCE through the said land now or formerly of CSX Transportation, Inc. the seven (7) following described courses and distances:

(Courses 1 through 3 along or near a 6 foot chain link fence)

1.      North 68° 50' 44" West, 77.400 feet to a point;
2.      North 18° 57' 36" East, 199.926 feet to a point;
3.      North 23° 20' 54" East, 201.193 feet to a fence corner;
4.      North 25° 18' 02" East, 84.179 feet to a point;
5.      North 27° 45' 33" East, 22.761 feet to a point; and
6.      South 68° 50' 44" East, 43.650 feet to a point, the northwesterly corner for the herein described Parcel "B" on the westerly line of the said former 36th Street;
(Course 7 along the said westerly side of former 36th Street, being the westerly line for the said Parcel "H-2")
7.      South 21° 09' 16" West, 245.524 feet to a point on the northerly side of former Fish House Lane, at 23.208 feet wide;

THENCE along the northerly side, westerly terminus and southerly side of the said former Fish House Lane the three (3) following described courses and distances:

1.      North 72° 20' 02" West, 5.018 feet to a point;
2.      South 21° 09' 16" West, 23.250 feet to a point; and
3.      South 72° 20'02" East, 30.064 feet to a point on the said centerline of former 36th Street;

THENCE along the said centerline of former 36th Street, South 21° 09' 16" West, 240.143 feet to the point and place of Beginning.

CONTAINING within said metes and bounds, 33,558 square feet (0.770 acres) of land, being the same, more or less.

## PARCEL H-2

BEGINNING at a point, a southeasterly corner for the above described Parcel "H-l", the intersection of the westerly side of former 36th Street, stricken from the city plan at 50 feet wide, with the northerly side of former Fish House Lane, at 23.208 feet wide, being on a southeasterly line for land now or formerly of CSX Transportation, Inc. (13-S-2414), said point being measured the four (4) following courses and distances from the intersection of the northerly side of Moore Street, shown on the city plan and legally open at 50 feet wide, with the centerline of the said former 36th Street;

(Course 1 along the centerline of said former 36th Street)

1.      North 21° 09' 16" East, 240.143 feet to a point on the southerly side of the said former Fish House Lane;

(Course 2 through 4 along the said former Fish House Lane)

2.      North 72° 20' 02" West, 30.064 feet to a point;
3.      North  21° 09' 16" East, 23.250 feet to a point; and
4.      South  72° 20' 02" East, 5.018 feet to the Point of Beginning;

THENCE from said point of Beginning, through the said land now or formerly of CSX Transportation, Inc. the two (2) following courses and distances:

(Course 1 along an easterly line for the said Parcel "H-l")

1.      North  21° 09' 16" East, 245.524 feet to a point; and
2.      South  68° 50' 44" East, 25.000 feet to a point on the centerline for the said formerly 36th Street;

THENCE along the said centerline of the former 36th Street, South 21° 09' 16" West, 244.000 feet to a point on the said northerly side of former Fish House Lane;

THENCE along the said northerly side of former Fish House Lane, North 72° 20' 02" West, 25.046 feet to the point and place of Beginning.

CONTAINING within said metes and bounds, 6,119 square feet (0.140 acres) of land, being the same, more or less.

CONTAINING within said metes and bounds for Parcels "H-l" and "H-2", a total of 39,677 square feet (0.911 acres) of land, being the same, more or less.

***WEST YARD consisting of Parcel E as identified as such in the Mortgagee's Title Policy***

**PARCEL E: West Yard Description. (Parcel E)**

ALL THAT CERTAIN tract or piece of land. SITUATE in the Forty-eighth Ward of the City of Philadelphia, described in accordance with an ALTA/ACSM Land Title Survey made by Ludgate Engineering Corporation dated 5/1/2012, as follows, to wit:

Beginning at a point on the southern right of way of Passyunk Avenue and a corner of lands of now or late Thy B. Ma; thence along said lands of Ma and along lands of now or late Joseph & Rosanna Mitchell South 69°19'58" East, a distance of 315.10 feet to a point a corner of lands of the now or late Phing Tan and Khanh Buu Huynh; thence along said lands and lands of Passyunk Avenue Realty En. North 82°44'45" East, a distance of 601.48 feet to a point a corner of the now or late lands of Passyunk Avenue Realty En; thence along said lands South 61°00'00" East, a distance of 218.91 feet; thence South 68°14'30" East, a distance of 251.05 feet; thence along lands of Auto Recycling Real Estate North 88°16'32" East, a distance of 288.19 feet; thence continuing along said lands and along lands of S.R.S. Inc. North 35°03'05" East, a distance of 1800.00 feet near the Schuylkill River; thence in and along the Schuylkill River the 10 following courses and distances:

1.      South 80°39'14" East, a distance of 401.15 feet;

2.      South 42°01'03" East, a distance of 297.66 feet;
3.      South 04°55'59" West, a distance of 350.17 feet;
4.      South 15°52'29" West, a distance of 487.33 feet;
5.      South 23°42'54" West, a distance of 196.89 feet;
6.      South 22°35'18" West, a distance of 384.45 feet;
7.      South 14°15'27" West, a distance of 121.55 feet;
8.      South 15°59'35" West, a distance of 219.74 feet;
9.      South 21°40'33" West, a distance of 445.70 feet;
10.     South 23°20'44" West, a distance of 324.02 feet to a point a corner of lands of Convoy Realty LP;

thence along lands of Convoy North 63°18'58" West, a distance of 1362.47 feet; thence North 07°11'32" East, a distance of 231.25 feet to a point of curvature; thence by a curve to the left having a radius of 5000.00 feet and a central angle of 1°29'17" an arc length of 129.85 feet a chord which bears North 70°46'37" West 129.85 feet;

thence along lands of Point Breeze Terminal LLC the eight following courses and distances:

1.      North 67°11'05" West, a distance of 14.72 feet;
2.      South 83°51'36" West, a distance of 839.02 feet;
3.      North 60°55'04" East, a distance of 31.00 feet;
4.      North 25°30'00" East, a distance of 145.00 feet;
5.      North 00°00'00" East, a distance of 50.83 feet;
6.      North 00°00'00" East, a distance of 41.00 feet;
7.      North 85°21'56" West, a distance of 972.06 feet;
8.      North 07°07'07" East, a distance of 171.91 feet to a point on the southern side of Passyunk Avenue;

thence along the southern side of Passyunk Avenue the three following courses and distances:

1.      North 74°48'30" East, a distance of 226.91 feet;
2.      South 15°11'30" East, a distance of 6.00 feet;
3.      North 74°48'30" East, a distance of 349.28 feet to the Point of Beginning.
Containing 80.84 Acres, more or less.

OPA# 88-4-0971-30 - 6300 W. Passyunk Avenue
OPA#88-4-0971-40 - 6030 W. Passyunk Avenue
OPA#88-4-0971-10 - 3701 S. 63rd Street

**Schedule 3.03**

**Conflicts with Material Contracts**

None.

## Schedule 3.07

### Subsidiaries

Philadelphia Energy Solutions Refining and Marketing LLC, a Delaware limited liability company, with 100% of limited liability company interests owned by PES Holdings, LLC.

North Yard GP, LLC, a Delaware limited liability company, with 100% of limited liability company interests owned by PES Holdings, LLC.

North Yard Logistics, L.P., a Delaware limited partnership, with (i) 100% of limited partnership interests owned by PES Holdings, LLC and (ii) 100% of non-economic general partnership interests owned by North Yard GP, LLC.

PES Administrative Services, LLC, a Delaware limited liability company, with 100% of equity interests owned by Philadelphia Energy Solutions Refining and Marketing LLC.

**Schedule 3.08(a)**

**Litigation**

Arbitration decision received on June 22, 2018 regarding United Steelworkers' benefit changes.

## **Schedule 3.17**

## **Environmental Matters**

Indemnification dispute between Sunoco Inc. and Philadelphia Energy Solutions Refining and Marketing LLC, under section 6.2(c) of the Contribution Agreement, regarding Environmental Remediation (as defined in the Contribution Agreement) costs associated with the North Yard Terminal.

## Schedule 3.18

## Insurance[2]

*Subject to the terms and conditions as more fully outlined in the policies referenced in this summary*

## Worker's Compensation (WC)/Employer's Liability (EL):
Statutory WC/ USD 2 million EL/ USD 2 million Maritime Employer's Liability (MEL); WC policy to be endorsed to include MEL and USL&H (Longshore Harbor Worker's Compensation).

## Automobile Liability (ex Physical Damage)
USD 2 million each accident; including heavy units/trucking operations, with MCS-90 endorsement.

## Commercial General Liability
USD 10 million per occurrence Self Insured Retention.

## Umbrella/Excess Liability
USD 525 million each occurrence/ annual aggregate; First USD 205 million is placed on occurrence form with additional excess layers placed on occurrence as reported and/or claims made basis.
The umbrella policy has same or broader coverage terms as primary policies (Employers Liability, Auto, Self Insured General Liability, CLL, and MTOL policies) and does cover pollution and clean-up costs of up to USD 525 million limit each occurrence/annual aggregate.

## Premises Pollution Liability
USD 50 million per "Pollution Condition"/ USD 50 million aggregate limit "Pollution Conditions" excess of a USD 1 million "Per Pollution Condition" Retention. Consists of a USD 25 million Primary Layer and an excess layer of USD 25 million

## Marine Terminal Operators Liability (MTOL)
USD 50 million combined Wharfingers/Stevedores Limits excess of a USD 1 million Self-Insured Retention; With Wharfingers/ Stevedores scheduled into the Umbrella/Excess Liability above the USD 50 million layer; Policy includes pollution/environmental clean-up costs. Consists of a USD 5MM Primary Layer and an excess layer of USD 45MM.

## Charterers Legal Liability Coverage (CLL)
Coverage includes USD 50 million primary coverage for liability insurance for practically all maritime legal liability risks associated with the chartering of a vessel. Which includes, but not limited to: Charterers Legal Liability, Damage to Hull, and Cargo Owners Legal Liability. The

---

[2] NB: In addition to the Loan Parties, property insurance insured also includes Philadelphia Energy Solutions Refining and Marketing LLC's subsidiaries, affiliates, parents and related companies.

cover also includes a number of extensions, including Freight Demurrage & Defense (FDD), which is subject to sublimits.

## Business Interruption

Business Interruption coverage is included in the USD 1.25 billion combined Property Damage and Business Interruption limit. Business Interruption amount with an Indemnity Period of 24 months. Business Interruption is covered in excess of 60 working days up to a combined single limit of USD 1.25 billion per occurrence Property Damage and Business Interruption combined.

## Property Damage (PD)

Property Damage is covered on the basis of All Risk coverage with a number of exclusions excess of USD 10 million deductible per occurrence up to a combined single limit Property Damage and Business Interruption combined of USD 1.25 billion per occurrence. Within this loss limit several sublimits apply. There is an aggregated USD 484.5 million in coverage for flood, USD 454.5 million for high hazard flood (Zones A&V), and USD 484.5 million in coverage for Windstorm.

## Terrorism

USD 500 million Property Damage and Business Interruption excess of USD 250 thousand PD and 45 days BI deductible

## Cargo Stock Throughput Policy

USD 90 million Coverage per conveyance / per location. Deductibles per the various locations / conveyances:
Storage Location USD 1 million, Vessel / Barge 0.5% Normal Trade Loss, Pipeline USD 20 thousand, Truck USD 5 thousand.

## Railroad Property

Total Property Schedule of USD 179 million in excess of the USD 100 thousand deductible. All Covered property is for USD 20 million (maximum payout of claim).

## National Flood Insurance Program (NFIP) Policies

7 Individual NFIP policies for the 7 buildings located in the Special Flood Hazard Area. These 7 policies have coverage of USD 500 thousand building and USD 500 thousand contents.

**Schedule 5.11(g)**

**Specified Tranche B Excluded Buildings**

Each Building owned by the Borrower or any of its Subsidiaries as of the Closing Date is a Specified Tranche B Excluded Building except the Buildings listed below.  For the avoidance of doubt, the Buildings listed below are the only Buildings owned by the Borrower or any of its Subsidiaries as of the Closing Date that secure the Obligations with respect to the Tranche B Loans.

| Building # | Location |
|---|---|
| BUILD1022 | Point Breeze North Yard |
| BLDG-620 | Girard Point South Tank Farm |
| BLDG-625 | Girard Point South Tank Farm |
| BUILD2448 | Point Breeze South Yard |
| BUILD2449 | Point Breeze South Yard |
| BUILD6608 | Point Breeze South Yard |
| BUILD3324 | Point Breeze South Yard |
| BUILD4210 | Point Breeze South Yard |
| BUILD5917 | Point Breeze South Yard |
| 00BLD-CCR | Point Breeze South Yard |
| 2453 | Point Breeze South Yard |
| BUILD3295 | Point Breeze South Yard |
| BUILD3316 | Point Breeze South Yard |
| BLDG-745 | Girard Point North Tank Farm |
| BLDG-440 | Girard Point North Tank Farm |
| BLDG-450 | Girard Point North Tank Farm |
| BLDG-650 | Girard Point North Tank Farm |
| BLDG-651 | Girard Point North Tank Farm |

The Buildings listed above are as designated in the "Appraisal of Real Property," Philadelphia Energy Solutions, as of May 25, 2017, prepared by Cushman & Wakefield of Pennsylvania, Inc.

**Schedule 6.01**

**Existing Indebtedness**

NGL Installment Purchase Agreement

**Schedule 6.02**

**Existing Liens**

Liens in connection with that certain Easement Agreement dated as of January 6, 2015, effective as of January 1, 2015, by and between Philadelphia Energy Solutions Refining and Marketing LLC and North Yard Logistics, L.P as amended by the Amendment to Easement Agreement dated as of November 18, 2015.

Liens in connection with that certain site lease agreement and related use, services, operating and similar and related agreements with Point Breeze Renewable Energy, LLC.

Lien in connection with that certain Master Service Agreement by and between Philadelphia Energy Solutions Refining and Marketing LLC (as the successor to Sun Company, Inc.) and Kinder Morgan Liquids Terminals LLC dated as of January 1, 1996.

A $525,000 lien in favor of Bank of America, N.A., securing obligations related to Philadelphia Energy Solutions Refining and Marketing LLC's credit card program.

**Schedule 6.07**

**Existing Investments**

None.

**Schedule 6.08**

**Existing Affiliate Transaction**

None.

**EXHIBIT A**

## FORM OF SECURITY AGREEMENT

[Separately Provided]

**EXHIBIT B**

**FORM OF**
**Notice of Borrowing**

[●], 2018

Cortland Capital Market Services LLC, as
Administrative Agent (the "<u>Administrative
Agent</u>") for the Lenders party to the Credit
Agreement referred to below
Cortland Capital Market Services LLC
225 W. Washington St. 9th Floor
Chicago, Illinois 60606
Attention: Maggie Welch and Legal Department
Telecopy: 312-376-0751
Telephone: 312-600-5100
Email: CPCAgency@cortlandglobal.com
  and legal@cortlandglobal.com
        Ladies and Gentlemen:

The undersigned, PES HOLDINGS, LLC (the "<u>Borrower</u>"), refers to the Credit
Agreement, to be dated on or about August 7, 2018 (the "<u>Credit Agreement</u>", the
capitalized terms defined therein being used herein as therein defined), among the
Borrower, each of the Guarantors party thereto from time to time, the several banks and
other financial institutions or entities from time to time parties thereto (each, a "<u>Lender</u>"
and collectively, the "<u>Lenders</u>"), and you, as Administrative Agent for such Lenders, and
hereby gives you notice, irrevocably, pursuant to Section 2.02 of the Credit Agreement,
that the undersigned hereby requests that the Lenders make certain Loans under the
Credit Agreement, and in that connection sets forth below the information relating to
such Loans as required by Section 2.02 of the Credit Agreement:

    i.   The proposed Borrowing Date is August [  ], 2018.

   ii.   The aggregate principal amount of the proposed Loans is as follows:

          Tranche A Loans: $120,000,000;
          Tranche B Loans: $82,500,000; and
          Tranche C Loans: $417,000,000.

  iii.   The Loans to be made on the proposed Borrowing Date shall be initially
       maintained as [ABR][Eurodollar] Loans.

  iv.   The initial Interest Period for the Loans is [one][two][three][six] month[s].

The undersigned hereby certifies that the following statements are true on the date
hereof, and will be true on the proposed Borrowing Date:

(A)    the representations and warranties of each Loan Party contained in Article 3 of the Credit Agreement or any other Loan Document are true and correct in all material respects (without duplication of any materiality qualifier contained herein or therein) on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (without duplication of any materiality qualifier contained herein or therein) as of such earlier date, and except that the representations and warranties contained in Section 3.04 of the Credit Agreement are deemed to refer to the most recent statements furnished pursuant to Section 5.01(a) and Section 5.01(b) of the Credit Agreement, respectively, and to the financial condition and results of operations of the Borrower and its Subsidiaries; and

(B)    no Default or Event of Default has occurred and is continuing, or would result from such Loans;

[remainder of page intentionally left blank]

Very truly yours,
PES HOLDINGS, LLC, as Borrower
By: _____
    Name:
    Title:

**EXHIBIT C**

**FORM OF
CLOSING CERTIFICATE**

Pursuant to Section 4.01(e)(i) of the Credit Agreement, dated as of August 7, 2018 (the "**Credit Agreement**"; terms defined therein being used herein as therein defined), among PES HOLDINGS, LLC (the "**Borrower**"), the Lenders party thereto and CORTLAND CAPITAL MARKET SERVICES LLC, as administrative agent (in such capacity, the "**Administrative Agent**"), the undersigned [INSERT TITLE OF OFFICER] of [INSERT NAME OF LOAN PARTY] (the "**Certifying Loan Party**") hereby certifies, in its capacity as [INSERT TITLE] and not in its individual capacity, as follows:

1.      The representations and warranties of the Certifying Loan Party set forth in each of the Loan Documents to which it is a party or which are contained in any certificate furnished by or on behalf of the Certifying Loan Party pursuant to any of the Loan Documents to which it is a party are true and correct in all material respects on and as of the date hereof with the same effect as if made on the date hereof, except for representations and warranties expressly stated to relate to a specific earlier date, in which case such representations and warranties were true and correct in all material respects as of such earlier date.

2. _____ is the duly elected and qualified Corporate Secretary of the Certifying Loan Party and the signature set forth for such officer below is such officer's true and genuine signature.

3.      No Default or Event of Default has occurred and is continuing as of the date hereof or after giving effect to the Loans to be made on the date hereof.  [Borrower only]


The undersigned Corporate Secretary of the Certifying Loan Party certifies, in its capacity as Corporate Secretary and not in its individual capacity, as follows:

4.      There are no liquidation or dissolution proceedings pending or to my knowledge threatened against the Certifying Loan Party.

5.      The Certifying Loan Party is a [corporation duly incorporated][limited partnership duly formed][limited liability company duly formed], validly existing and in good standing under the laws of the jurisdiction of its organization.

6.      Attached hereto as Annex 1 is a true and complete copy of [resolutions] duly adopted by the [Board of Directors] of the Certifying Loan Party on            ; such resolutions have not in any way been amended, modified, revoked or rescinded and are in full force and effect on and as of the date hereof and are the only [corporate][limited partnership][limited liability company] proceedings of the Certifying Loan Party now in force relating to or affecting the matters referred to therein.

7.      Attached hereto as <u>Annex 2</u> is a true and complete copy of the [By-Laws][Limited Partnership Agreement][Limited Liability Company Agreement] of the Certifying Loan Party as in effect on the date hereof.

8.      Attached hereto as <u>Annex 3</u> is a true and complete copy of the Certificate of Incorporation of the Certifying Loan Party as in effect on the date hereof.

9.      The following persons are now duly elected and qualified officers of the Certifying Loan Party holding the offices indicated next to their respective names below, and the signatures appearing opposite their respective names below are the true and genuine signatures of such officers, and each of such officers is duly authorized to execute and deliver on behalf of the Certifying Loan Party each of the Loan Documents to which it is a party and any certificate or other document to be delivered by the Certifying Loan Party pursuant to the Loan Documents to which it is a party:

<u>Name</u>                          <u>Office</u>                          <u>Signature</u>

_____

_____

_____

        IN WITNESS WHEREOF, the undersigned have hereunto set our names as of the date set forth below.

_____        _____
Name:                                    Name:
Title:                                   Title:   Corporate Secretary

Date: _____, 20____

**EXHIBIT D**

**FORM OF
ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption (the "**Assignment and Assumption**") is dated as of the Effective Date set forth below and is entered into between the Assignor named below (the "**Assignor**") and the Assignee named below (the "**Assignee**").  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "**Credit Agreement**"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any guarantees included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "**Assigned Interest**"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

| | | |
|---|---|---|
| 1. | Assignor: | _____ |
| 2. | Assignee: | _____ |
| | | [and is an affiliate/Approved Fund of [*identify Lender*][2]/Lender |
| 3. | Borrower(s): | PES Holdings, LLC |
| 4. | Administrative Agent: | Cortland Capital Market Services LLC, as administrative agent under the Credit Agreement |

---

[2]  Select as applicable

5.    Credit Agreement:        The Credit Agreement dated as of August 7, 2018 among PES Holdings, LLC, the Lenders party thereto, and Cortland Capital Market Services LLC, as Administrative Agent

6.    Assigned Interest:

| Tranche Assigned[3] | Aggregate Amount of Loans for all Lenders | Amount of Loans Assigned | Percentage Assigned of Loans[4] |
|---|---|---|---|
| | $ | $ | % |
| | $ | $ | % |
| | $ | $ | % |

Effective Date: _____, 20___ [TO BE INSERTED BY ADMINISTRATIVE    AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN  THE  REGISTER THEREFOR.]

[The Assignee agrees to deliver to the Administrative Agent a completed administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower, the Loan Parties and their Affiliates or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws.][5]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

_____

NAME OF ASSIGNOR

By:    _____
      Name:
      Title:

_____

[3]    Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment (e.g. "Initial Loans").

[4]    Set forth, to at least 9 decimals, as a percentage of the Loans of all Lenders.

[5]    Insert only if Assignee is not a Lender.

<u>ASSIGNEE</u>

_____

NAME OF ASSIGNEE


By:    _____

       Name:

       Title:

[Consented to and]⁶ Accepted:

CORTLAND CAPITAL MARKET
SERVICES LLC, as
Administrative Agent

By: _____
      Name:
      Title:

[Consented to:]⁷

PES HOLDINGS, LLC

By: _____
      Name:
      Title:

---

⁶ To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement

⁷ To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

**ANNEX 1**

Credit Agreement, dated as of August 7, 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among PES Holdings, LLC (the "**Borrower**"), the Lenders party thereto) and Cortland Capital Market Services LLC as administrative agent (in such capacity, the "**Administrative Agent**")

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.        Representations and Warranties.

1.1        Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective  obligations under any Loan Document.

1.2.        Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit  Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender and (v) if it is a Non-U.S. Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other  Lender, and based on such documents and information as it shall deem appropriate at the time, continue  to make its own credit decisions in taking or not taking action under the Loan Documents and (ii) it will perform in accordance with their terms all of the

obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.    <u>Payments</u>.  From and after the Effective Date, the Administrative Agent shall make  all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.    <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by email or telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

**EXHIBIT E**

**FORM OF
PREPAYMENT OPTION NOTICE**

Attention of [          ]
Telecopy No. [          ]

[Date]

Ladies and Gentlemen:

      The undersigned, Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**"), refers to the Credit Agreement, dated as of August 7, 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among PES Holdings, LLC (the "**Borrower**"), the Lenders party thereto and the Administrative Agent.  Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.  The Administrative Agent hereby gives notice of an offer of prepayment made by the Borrower pursuant to Section 2.06(e) of the Credit Agreement of the Loan Prepayment Amount (as described below).  Amounts applied to prepay the Loans shall be applied pro rata to the Loan held by you. The portion of the prepayment amount to be allocated to the Loan held by you and the date on which such prepayment will be made to you (should you elect to receive such prepayment) are set forth below:

(A)     Total Loan Prepayment Amount               _____

(B)     Portion of Loan Prepayment Amount to be     _____
            received by you

(C)     Mandatory Prepayment Date (10 Business Days    _____
            after the date of this Prepayment Option Notice)

      **IF YOU DO NOT WISH TO RECEIVE ALL OF THE LOAN PREPAYMENT AMOUNT TO BE ALLOCATED TO YOU ON THE MANDATORY PREPAYMENT DATE INDICATED IN PARAGRAPH (C) ABOVE**, please sign this notice in the space provided below and indicate the percentage of the Loan Prepayment Amount otherwise payable which you do not wish to receive. Please return this notice as so completed via telecopy to the attention of [                    ] at                     , no later than [10:00] a.m., New York City time, on the Mandatory Prepayment Date, at Telecopy No. [                ].  **IF YOU DO NOT RETURN THIS NOTICE, YOU WILL RECEIVE 100% OF THE LOAN PREPAYMENT AMOUNT ALLOCATED TO YOU ON THE MANDATORY PREPAYMENT DATE.**

[Signature page follows]

Cortland Capital Market Services LLC,
as Administrative Agent


By: _____
         Name:
         Title:


_____
(Name of Lender)

By_____
     Title:

Percentage of Loan
Prepayment Amount Declined: __%

**EXHIBIT F-1**

**FORM OF
U.S. TAX COMPLIANCE CERTIFICATE**

(For Non-U.S. Lenders That Are Not Partnerships For U.S. Federal Income Tax
Purposes)

Reference is made to the Credit Agreement, dated as of August 7, 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among PES Holdings, LLC (the "**Borrower**"), the Lenders party thereto and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.14 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent in writing, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By: _____
　　　Name:
　　　Title:

　　　Dated: _____ ___, 20__

**EXHIBIT F-2**

**FORM OF
U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax
Purposes)

Reference is made to the Credit Agreement, dated as of August 7, 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among PES Holdings, LLC (the "**Borrower**"), the Lenders party thereto and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.14 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]


By: _____
        Name:
        Title:

        Dated: _____ ___, 20__

**EXHIBIT F-3**

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Credit Agreement, dated as of August 7, 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among PES Holdings, LLC (the "**Borrower**"), the Lenders party thereto and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.14 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]


By: _____
    Name:
    Title:


    Dated: _____ ___, 20__

**EXHIBIT F-4**

**FORM OF**

**U.S. TAX COMPLIANCE CERTIFICATE**

(For Non-U.S. Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Credit Agreement, dated as of August 7, 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among PES Holdings, LLC (the "**Borrower**"), the Lenders party thereto and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.14 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent in writing, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By: _____
      Name:
      Title:

      Dated: _____ ___, 20__

**EXHIBIT G**

**FORM OF INTERCREDITOR AGREEMENT**

[Separately Provided]

**EXHIBIT H**

**FORM OF**
**COMPLIANCE CERTIFICATE**

This Compliance Certificate is delivered pursuant to Section 5.02(a) of the Credit Agreement, dated as of August 7, 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among PES Holdings, LLC (the "**Borrower**"), the Lenders party thereto and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

1.      I am the duly elected, qualified and acting Chief Financial Officer of the Borrower.

2.      I have reviewed and am familiar with the contents of this Certificate.

3.      I have reviewed the terms of the Credit Agreement and the Loan Documents and have made or caused to be made under my supervision, a review in reasonable detail of the transactions and condition of the Borrower during the accounting period covered by the financial statements attached hereto as Attachment 1 (the "Financial Statements"). Such review did not disclose the existence during or at the end of the accounting period covered by the Financial Statements, and I have no knowledge of the existence, as of the date of this Certificate, of any condition or event which constitutes a Default or Event of Default, except as previously disclosed pursuant to Section 5.06(a)(i) [or as set forth below].

4.      Attached hereto as Attachment 2 are the computations showing the calculation of the Consolidated Leverage Ratio.

IN WITNESS WHEREOF, I have executed this Certificate this _____day of _____, 20__.

_____
Name:
Title:

**Attachment 1**
**to Compliance Certificate**

[Attach Financial Statements]

**Attachment 2**
**to Compliance Certificate**

The information described herein is as of _____, ____, and pertains to the period from _____, _____ to _____, _____.

[Set forth Calculations]

**EXHIBIT I**

**FORM OF
PERFECTION CERTIFICATE**

[Separately Provided]

EXHIBIT J

**FORM OF
NOTICE OF CONVERSION/CONTINUATION**

[●], 2018

Cortland Capital Market Services LLC, as
Administrative Agent (the "Administrative
Agent") for the Lenders party to the Credit
Agreement referred to below
Cortland Capital Market Services LLC
225 W. Washington St. 9th Floor
Chicago, Illinois 60606
Attention: Maggie Welch and Legal Department
Telecopy: 312-376-0751
Telephone: 312-600-5100
Email: CPCAgency@cortlandglobal.com
 and legal@cortlandglobal.com
        Ladies and Gentlemen:

        The undersigned, PES Holdings, LLC (the "Borrower"), refers to the Credit
Agreement, dated as of August 7, 2018 (as amended, supplemented or otherwise
modified from time to time, the "Credit Agreement", the capitalized terms defined therein
being used herein as therein defined), among the Borrower, each of the Guarantors party
thereto from time to time, the several banks and other financial institutions or entities
from time to time parties thereto (each, a "Lender" and collectively, the "Lenders"), and
you, as Administrative Agent for such Lenders, and hereby gives you notice, irrevocably,
pursuant to Section 2.07 of the Credit Agreement, that the undersigned hereby requests to
[convert] [continue] the Loans referred to below, and in that connection sets forth below
the information relating to such [conversion] [continuation] (the "Proposed [Conversion]
[Continuation]") as required by Section 2.07 of the Credit Agreement:

        i.   The Proposed [Conversion] [Continuation] relates to the Loans originally
             made on _____ _____, 201_ (the "Outstanding Loans") in the
             principal amount of $_____ and currently maintained as
             [ABR][Eurodollar] Loans with an Interest Period ending on _____
             ____, 20__.

        ii.  The Business Day of the Proposed [Conversion] [Continuation] is
             _____ __, ____.[8]

---

[8] With respect to Eurodollar Loans into ABR Loans, shall be a Business Day at least one Business
    Day after the date hereof; provided that such notice shall be deemed to have been given on a
    certain day only if given before 11:00 A.M. (New York City time) on such day.  With respect
    to ABR Loans into Eurodollar Loans, shall be at least three Business Days after the date
    hereof; provided that such notice shall be deemed to have been given on a certain day only if
    given before 11:00 A.M. (New York City time).

iii.  The Outstanding Loans shall be [continued as [ABR][Eurodollar] Loans
with an Interest Period of _____][converted into [ABR][Eurodollar]
Loans with an Interest Period of _____].[9]

[The undersigned hereby certifies that no Default or Event of Default has
occurred and will be continuing on the date of the Proposed [Conversion] [Continuation]
or will have occurred and be continuing on the date of the Proposed [Conversion]
[Continuation].][10]

Very truly yours,
PES HOLDINGS, LLC, as Borrower
By: _____
    Name:
    Title:

---

[9] In the event that either (x) only a portion of the outstanding Loans is to be so converted or
continued or (u) the outstanding Loans are to be divided into separate Loans with different
Interest Periods, the Borrower should make appropriate modifications to this clause to reflect
same.

[10] In the case of a Proposed Conversion or Continuation, insert this sentence only in the event that
the conversion is from a Eurodollar Loan to an ABR Loan or in the case of a continuation of an
ABR Loan.

**Execution Version**

**FIRST AMENDMENT AND INCREMENTAL JOINDER** (this "**Amendment**"), dated as of February 11, 2019, to the Credit Agreement dated as of August 7, 2018 (as amended hereby, the "**Credit Agreement**") by and among PES Holdings, LLC, a Delaware limited liability company, as Borrower, each of the Subsidiaries of the Borrower, as Guarantors, the Lenders from time to time party thereto, and Cortland Capital Market Services LLC, as Administrative Agent.

WHEREAS, the Borrower has requested, and Lenders party hereto constituting the Required Lenders and the Required Tranche B Lenders (the "**Consenting Lenders**") have agreed, to amend the Credit Agreement as set forth and subject to the conditions herein.

WHEREAS, pursuant to Section 2.19 of the Credit Agreement, the Borrower has requested Incremental Loans in an aggregate principal amount not exceeding $58,000,000 (the "**Incremental Tranche A-2 Facility**" and the loans thereunder, "**Incremental Tranche A-2 Loans**"), the proceeds of which shall be used for capital expenditures, working capital and other general corporate purposes.

WHEREAS, the Persons holding Incremental Tranche A-2 Commitments (as defined below) are severally willing to make Incremental Tranche A-2 Loans (the "**Tranche A-2 Lenders**") on the Incremental Tranche A-2 Effective Date (as defined below) in an aggregate amount equal to their respective Incremental Tranche A-2 Commitments, subject to the terms and conditions set forth in this Amendment.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**SECTION 1. Defined Terms.**  Capitalized terms used and not otherwise defined herein have the meanings assigned to them in the Credit Agreement as amended hereby.

**SECTION 2. Amendments and Waiver.**

(a)    On the First Amendment Effective Date, each Consenting Lender party hereto irrevocably consents to this Amendment and all modifications to the Credit Agreement contemplated hereby and in accordance with Section 9.01 of the Credit Agreement and effective as of the First Amendment Effective Date, the Credit Agreement is hereby amended to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the double-underlined text (indicated textually in the same manner as the following example: double-underlined text) as set forth in the conformed copy of the Credit Agreement attached as Annex A hereto.

(b)    Except as otherwise expressly provided in Section 7 of this Amendment, on the First Amendment Effective Date and solely with respect to the Incremental Tranche A-2 Loans being made on the Incremental Tranche A-2 Effective Date, each Consenting Lender party hereto irrevocably waives the requirements set forth in Section 2.19(d)(iii) of the Credit Agreement and the requirement to update Mortgagee's title insurance policies set forth in Section 2.19(d)(iv) of the Credit Agreement.

**SECTION 3. Incremental Tranche A-2 Loans.**

(a)    Subject to the terms and conditions set forth herein, each Incremental Tranche A-2 Lender severally agrees to make Incremental Tranche A-2 Loans to the Borrower on the Incremental Tranche A-2 Effective Date in an aggregate principal amount equal to its Incremental Tranche A-2

Commitment, which shall be made available to the Administrative Agent in immediately available funds in accordance with the Credit Agreement. The "**Incremental Tranche A-2 Commitment**" of any Incremental Tranche A-2 Lender will be the amount set forth opposite such Incremental Tranche A-2 Lender's name on Schedule 1 hereto.

(b)     The Incremental Tranche A-2 Loans shall otherwise be subject to the provisions of the Credit Agreement and the other Loan Documents.

(c)     Upon the occurrence of the Incremental Tranche A-2 Effective Date, each Incremental Tranche A-2 Lender shall have the rights and obligations of a Lender under the Credit Agreement and under any other applicable Loan Documents.

(d)     The Borrower and each other Loan Party acknowledges and agrees that (i) the Incremental Tranche A-2 Loans shall constitute Obligations and have all the benefits thereof and the Borrower shall be liable for all Obligations with respect to all Incremental Tranche A-2 Loans made to the pursuant to this Amendment and (ii) all such Obligations shall constitute Guaranteed Obligations and shall be secured by the Liens granted to the Administrative Agent for the benefit of the Secured Parties and entitled to the benefits of the Security Documents and the Guarantee.

**SECTION 4. Representations and Warranties.**  To induce the other parties hereto to enter into this Amendment, the Borrower and each Loan Party represents and warrants to the other parties hereto on the First Amendment Effective Date that:

(a)     (i) the execution, delivery and performance by such Loan Party of this Amendment (and the Credit Agreement, as amended hereby) is within such Loan Party's powers and have been duly authorized by all necessary limited liability company, corporate and limited partnership action on the part of such Loan Party. This Amendment has been duly executed and delivered by each Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law; and

(b)     the execution and delivery of this Amendment (and the Credit Agreement, as amended hereby) by each Loan Party and the performance by such Loan Party thereof (i) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (A) such as has been obtained or made and are in full force and effect, (B) filings necessary to perfect or maintain Liens created by the Security Documents and (C) consents, approvals, registrations, filings, permits or actions the failure of which to obtain or perform would not reasonably be expected to result in a Material Adverse Effect, (ii) do not violate the Organizational Documents of any Loan Party, (iii) do not violate any Requirement of Law, except for any such violation which would not reasonably be expected to result in a Material Adverse Effect, (iv) do not violate or result in a default or require any consent or approval under any Material Contract binding upon any Loan Party or its property, or give rise to a right under any of the foregoing to require any payment to be made by any Loan Party, except for violations, defaults or the creation of such rights that would not reasonably be expected to result in a Material Adverse Effect and (v) do not result in the creation or imposition of any Lien on any property of any Loan Party, except Liens permitted pursuant to Section 6.02 of the Credit Agreement.

**SECTION 5. First Amendment Effective Date.**  This Amendment shall become effective as of the first date (the "**First Amendment Effective Date**") on which the following conditions shall have been satisfied:

(a)    Administrative Agent shall have received a counterpart signature page of this Amendment duly executed by the Borrower and each Loan Party, the Administrative Agent, the Required Lenders, the Required Tranche B Lenders and each Incremental Tranche A-2 Lender;

(b)    Administrative Agent shall have received from the Borrower in immediately available funds, for the account of each Tranche B Lender that has consented to this Amendment on or prior to the First Amendment Effective Date (each such Tranche B Lender, a "**Consenting Tranche B Lender**") an amendment fee in an amount equal to 0.15% of the principal amount of the Tranche B Loans held by such Consenting Tranche B Lender on the First Amendment Effective Date, which fee shall be non-refundable and not subject to any set-off or counterclaim.  The Borrower hereby agrees to pay such fee to each such Consenting Tranche B Lender on the First Amendment Effective Date in consideration of such Consenting Tranche B Lender's consent to this Amendment; and

(c)    Legal counsel to the Tranche B Lenders shall have received from the Borrower in immediately available funds, $10,000 for fees and expenses of the Tranche B Lenders incurred in connection with this Amendment.

**SECTION 6. Incremental Tranche A-2 Effective Date.** The Incremental Tranche A-2 Loans shall be made of the first date on which each of the following conditions shall have been satisfied (such date, the "**Incremental Tranche A-2 Effective Date**"):

(a)    the First Amendment Effective Date shall have occurred;

(b)    the Administrative Agent shall have received the executed the legal opinion of Latham & Watkins LLP, counsel to the Borrower and the other Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent;

(c)    the Administrative Agent shall have received a certificate of each Loan Party, dated the Incremental Tranche A-2 Effective Date, substantially in the form of Exhibit C to the Credit Agreement with appropriate insertions and attachments, including the certificate of incorporation, formation or limited partnership of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a long form good standing certificate for each Loan Party from its jurisdiction of organization;

(d)    the Administrative Agent shall have received a customary solvency certificate and a certificate of a Responsible Officer as to the satisfaction of the conditions set forth in this Section 6 and Section 4.02(b) and (c) of the Credit Agreement;

(e)    the "Term Expiration Date" under the Fourth Amended and Restated Supply and Offtake Agreement dated as October 22, 2018 among Philadelphia Energy Solutions Refining and Marketing LLC, as PESRM, Merrill Lynch Commodities, Inc., as MLC and certain other parties thereto, shall have been extended from January 29, 2019 to a date that is no earlier than June 28, 2019;

(f)    to the extent requested by the Administrative Agent, the Administrative Agent shall have received all documentation and other information, at least two Business Days prior to the Incremental Tranche A-2 Effective Date, required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act (in each case to the extent so requested no less than ten Business Days prior to the Incremental Tranche A-2 Effective Date);

3

(g)      all fees and expenses required to be paid by (or on behalf of) the Borrower to the Administrative Agent (including pursuant to <u>Section 7</u> hereof) shall have been (or shall substantially contemporaneously be) paid in full in cash (and in the case of expenses, to the extent invoiced at least three Business Days prior to the Incremental Tranche A-2 Effective Date);

(h) PES Energy, Inc. shall have issued certain Capital Stock to the Lenders of the Incremental Tranche A-2 Loans as separately agreed between the Borrower, PES Energy, Inc. and such Lenders; and

(i)      the Administrative Agent shall have received a Notice of Borrowing in respect of the Tranche A-2 Loans to be made on the Incremental Tranche A-2 Effective Date in accordance with the requirements of the Credit Agreement.

For the purpose of determining compliance with the conditions specified in this <u>Section 6</u>, each Tranche A-2 Lender that has signed this Amendment shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this <u>Section 6</u> unless the Administrative Agent shall have received written notice from such Tranche A-2 Lender prior to the Incremental Tranche A-2 Effective Date specifying its objection thereto.

## SECTION 7. Effect of Amendment; Post-Closing Covenants.

(a)      It is the intention of each of the parties hereto that the Credit Agreement be amended pursuant to this Amendment, so as to preserve the validity, perfection and priority of all Liens securing the Obligations and that, after giving effect to this Amendment all Obligations shall be secured by the Collateral and Liens granted under the Security Documents and that this Agreement does not constitute a novation or termination of the Credit Agreement or the other Security Documents.

(b) Except as expressly set forth herein, this Amendment shall not by implication or otherwise limit, impair, constitute a waiver of or otherwise affect the rights and remedies of the Lenders or Agents under the Credit Agreement or any other Loan Document, and shall not alter, modify, amend or in any way affect any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other provision of the Credit Agreement or of any other Loan Document, all of which are ratified and affirmed in all respects and shall continue in full force and effect. Nothing herein shall be deemed to entitle the Borrower to a consent to, or a waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other Loan Document in similar or different circumstances.

(c)      From and after the First Amendment Effective Date, (i) each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein", or words of like import, and each reference to the "Credit Agreement" in any other Loan Document shall be deemed a reference to the Credit Agreement as amended hereby and (ii) each reference in any Loan Document to the "Term Lenders", "Additional Loans", "Additional Term Loans", "Term Loans" or "Term Facility" shall be deemed a reference to the Incremental Tranche A-2 Lenders, the Incremental Tranche A-2 Loans or the Incremental Tranche A-2 Facility.

(d)      This Amendment shall constitute a "Loan Document" for all purposes of the Credit Agreement and the other Loan Documents.

(e)      Not later than 60 days after the First Amendment Effective Date (which period may be extended by the Administrative Agent, acting on the instructions of the Required Lenders), the

4

Administrative Agent (or its counsel) shall have received from the Borrower, at the Borrower's sole cost and expense, (i) additional supplemental open-end mortgages securing the amount of the Incremental Tranche-A2 Facility plus future advances of additional Incremental Loans under the Credit Agreement, in an aggregate principal amount not to exceed $75,000,000, (ii) endorsements to the Mortgagee's existing title insurance policies in the form attached on <u>Annex B</u> hereto, and any additional ancillary documentation related to the existing Mortgages and such supplemental mortgages as reasonably requested by the Required Tranche A-2 Lenders, but not any additional title insurance with respect to such supplemental mortgage or any increase in amount insured under the title insurance policies insuring the existing Mortgages, or any other endorsements to the existing title insurance policies except for the endorsement referenced above in this clause (ii), the form of which is attached hereto in <u>Annex B</u>, and (iii) a legal opinion of Pennsylvania counsel to the Loan Parties in respect of the supplemental open-end mortgages described in clause (i), in form and substance reasonably satisfactory to the Administrative Agent.

(f)     Not later than 120 days after the First Amendment Effective Date (which period may be extended by the Administrative Agent, acting on the instructions of the Required Tranche B Lenders), the Administrative Agent (or its counsel) shall have received from the Borrower, at the Borrower's sole cost and expense, for delivery to the Tranche B Lenders, an appraisal report of the Borrower's refineries (on a fair market value and liquidation basis) in a form reasonably acceptable to the Required Tranche B Lenders, it being understood that an appraisal report in a form substantially similar to the appraisal report from Stancil & Co., dated as of June 17, 2017, is acceptable to the Required Tranche B Lenders.

**SECTION 8. Expenses.**  The Borrower agrees to reimburse the Administrative Agent and the Tranche A-2 Lenders for the reasonable and documented out-of-pocket expenses incurred by them in connection with this Amendment, including the reasonable and documented fees, charges and disbursements of Norton Rose Fulbright, counsel for the Administrative Agent and Davis Polk & Wardwell LLP, counsel for the Tranche A-2 Lenders.

**SECTION 9. Amendments; Severability.**  (a) Once effective, this Amendment may not be amended nor may any provision hereof be waived except pursuant to Section 9.01 of the Credit Agreement.

(b)     Any provision of this Amendment that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**SECTION 10. GOVERNING LAW; Waiver of Jury Trial; Jurisdiction.  THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.** The provisions of Sections 9.11 and 9.12 of the Credit Agreement, as amended by this Amendment, are incorporated herein by reference, *mutatis mutandis*.

**SECTION 11. Headings.**  Section headings herein are included for convenience of reference only and shall not affect the interpretation of this Amendment.

**SECTION 12. Counterparts.**  This Amendment may be executed by one or more of the parties to this Amendment on any number of separate counterparts, and all of said counterparts taken

5

together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Amendment by email or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Amendment signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

[*Remainder of page intentionally left blank*]

6

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

PES HOLDINGS, LLC

By: _____
Name:  Rachel Celiberti
Title:   Chief Financial Officer


PHILADELPHIA ENERGY SOLUTIONS
REFINING AND MARKETING LLC

By: _____
Name:  Rachel Celiberti
Title:   Chief Financial Officer


PES ADMINISTRATIVE SERVICES, LLC,
as Borrower

By: _____
Name:  Rachel Celiberti
Title:   Chief Financial Officer


NORTH YARD GP, LLC

By: _____
Name:  Rachel Celiberti
Title:   Chief Financial Officer


NORTH YARD LOGISTICS, L.P.

By:  NORTH YARD GP, LLC, its general
     partner

By: _____
Name:  Rachel Celiberti
Title:   Chief Financial Officer


PES HOLDINGS, LLC

By: _____
Name:  Rachel Celiberti
Title:   Chief Financial Officer

**CORTLAND CAPITAL MARKET SERVICES LLC,**
as Administrative Agent

By: _____

Name:     Matthew Trybula

Title:      Associate Counsel

[Lenders' Signature Pages on File with Administrative Agent]

**SCHEDULE 1**

| Tranche A-2 Lender | Tranche A-2 Commitment | Percentage |
|---|---|---|
|  | | |
| **Total** | **$58,000,000.00** | **100.00%** |

**ANNEX A**

AMENDMENTS TO CREDIT AGREEMENT

[Attached]

*Execution Version*

~~*Execution Version*~~*Conformed for the First Incremental Amendment dated February 11, 2019*

~~$619,500,000~~

CREDIT AGREEMENT

among

PES HOLDINGS, LLC,

as Borrower,

EACH OF THE SUBSIDIARIES OF THE BORROWER,

as Guarantors

and

The Several Lenders from Time to Time Parties Hereto,

and

CORTLAND CAPITAL MARKET SERVICES LLC,

as Administrative Agent

Dated as of August 7, 2018

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS
1

Section 1.01.  *Defined Terms*  1
Section 1.02.  *Other Definitional Provisions*  42
Section 1.03.  *Accounting Terms; GAAP*  43
Section 1.04.  *Payments Due on Days Other than Business Days*  43

ARTICLE 2 AMOUNT AND TERMS OF COMMITMENTS
44

Section 2.01.  *Initial Loan Commitments.*  44
Section 2.02.  *Procedure for Initial Loan Borrowing*  45
Section 2.03.  *Repayment of Initial Loans*  45
Section 2.04.  *Fees*  46
Section 2.05.  *Optional Prepayments*  46
Section 2.06.  *Mandatory Prepayments and Commitment Reductions*  47
Section 2.07.  *Conversion and Continuation Options*  48
Section 2.08.  *Limitations on Eurodollar Class*  48
Section 2.09.  *Interest Rates and Payment Dates*  49
Section 2.10.  *Computation of Interest and Fees*  51
Section 2.11.  *Inability to Determine Interest Rate*  51
Section 2.12.  *Pro Rata Treatment and Payments*  52
Section 2.13.  *Requirements of Law*  54
Section 2.14.  *Taxes*  55
Section 2.15.  *Indemnity*  60
Section 2.16.  *Change of Lending Office*  60
Section 2.17.  *Replacement of Lenders*  61
Section 2.18.  *Extensions of Loans*  61
Section 2.19.  *Incremental Facilities*  63

ARTICLE 3 REPRESENTATIONS AND WARRANTIES
65

Section 3.01.  *Organization; Powers*  65
Section 3.02.  *Authorizations; Enforceability*  65
Section 3.03.  *Governmental Approvals; No Conflicts.*  66
Section 3.04.  *Financial Statements; Material Adverse Effect; Pro Forma Financial Statements*  66
Section 3.05.  *Properties*  67
Section 3.06.  *Intellectual Property*  67
Section 3.07.  *Capital Stock and Subsidiaries*  67
Section 3.08.  *Litigation; Compliance with Laws; No Default*  68
Section 3.09.  *Federal Reserve Regulations*  68

i

Section 3.10.    *Investment Company Act* ........................................................... 68
Section 3.11.    *[Reserved]* .............................................................................. 69
Section 3.12.    *Taxes* ..................................................................................... 69
Section 3.13.    *No Material Misstatements* ....................................................... 69
Section 3.14.    *Labor Matters* ......................................................................... 69
Section 3.15.    *Solvency* ................................................................................ 70
Section 3.16.    *ERISA* ................................................................................... 70
Section 3.17.    *Environmental Matters* ............................................................. 71
Section 3.18.    *Insurance* ............................................................................... 72
Section 3.19.    *Security Documents* ................................................................. 72
Section 3.20.    *Anti-Terrorism Laws* ................................................................ 73
Section 3.21.    *Affiliate Transactions* ............................................................... 73

ARTICLE 4 CONDITIONS PRECEDENT
                73

Section 4.01.    *Conditions of Effectiveness* ........................................................ 73
Section 4.02.    *Conditions to All Borrowings of Loans* ........................................ 76

ARTICLE 5 AFFIRMATIVE COVENANTS
                77

Section 5.01.    *Financial Statements* ................................................................ 77
Section 5.02.    *Certificates; Other Information* ................................................... 78
Section 5.03.    *Payment of Taxes* .................................................................... 80
Section 5.04.    *Maintenance of Existence; Compliance* ........................................ 80
Section 5.05.    *Maintenance of Property; Insurance* ............................................ 80
Section 5.06.    *Inspection of Property; Books and Records; Discussions* .................. 81
Section 5.07.    *Litigation and Other Notices* ...................................................... 81
Section 5.08.    *Environmental Laws* ................................................................. 82
Section 5.09.    *Credit Rating* .......................................................................... 83
Section 5.10.    *Additional Collateral, etc.* .......................................................... 83
Section 5.11.    *Mortgages, etc.* ....................................................................... 84
Section 5.12.    *Designation of Excluded Subsidiaries* ........................................... 86
Section 5.13.    *Anti-Terrorism Laws, Sanctions, Anti-Corruption Laws* .................. 87

ARTICLE 6 NEGATIVE COVENANTS
                87

Section 6.01.    *Indebtedness* ........................................................................... 87
Section 6.02.    *Liens* ..................................................................................... 90
Section 6.03.    *Fundamental Changes* ............................................................... 95
Section 6.04.    *Disposition of Property* ............................................................. 96
Section 6.05.    *Restricted Payments* ................................................................. 97
Section 6.06.    *Lines of Business* ..................................................................... 100
Section 6.07.    *Investments* ............................................................................ 100

ii

Page

| | | |
|---|---|---|
| Section 6.08. | *Transactions with Affiliates* | 104 |
| Section 6.09. | *Sales and Leasebacks* | 106 |
| Section 6.10. | *Swap Agreements* | 106 |
| Section 6.11. | *Changes in Fiscal Periods* | 106 |
| Section 6.12. | *Negative Pledge Clauses* | 106 |
| Section 6.13. | *Clauses Restricting Subsidiary Distributions* | 107 |
| Section 6.14. | *[Reserved]* | 108 |
| Section 6.15. | *Sanctions, and Anti-Corruption Laws* | 108 |
| Section 6.16. | *Additional Financing Agreement* | 108 |
| Section 6.17. | *Anti-Layering* | 108 |

ARTICLE 7 EVENTS OF DEFAULT
108

| | | |
|---|---|---|
| Section 7.01. | *Events of Default* | 108 |
| Section 7.02. | *Controlling Lenders* | 112 |
| Section 7.03. | *Application of Proceeds* | 114 |

ARTICLE 8 THE ADMINISTRATIVE AGENT
118

| | | |
|---|---|---|
| Section 8.01. | *Appointment* | 118 |
| Section 8.02. | *Delegation of Duties* | 118 |
| Section 8.03. | *Exculpatory Provisions* | 118 |
| Section 8.04. | *Reliance by Administrative Agent* | 119 |
| Section 8.05. | *Notice of Default* | 120 |
| Section 8.06. | *Non-Reliance on Administrative Agent and Other Lenders* | 120 |
| Section 8.07. | *Indemnification* | 120 |
| Section 8.08. | *Administrative Agent in Its Individual Capacity* | 121 |
| Section 8.09. | *Successor Administrative Agent* | 121 |

ARTICLE 9 MISCELLANEOUS
122

| | | |
|---|---|---|
| Section 9.01. | *Amendments and Waivers* | 122 |
| Section 9.02. | *Notices* | 125 |
| Section 9.03. | *No Waiver; Cumulative Remedies* | 126 |
| Section 9.04. | *Survival of Representations and Warranties* | 126 |
| Section 9.05. | *Payment of Expenses and Taxes* | 126 |
| Section 9.06. | *Successors and Assigns; Participations and Assignments* | 128 |
| Section 9.07. | *Adjustments; Set off* | 133 |
| Section 9.08. | *Counterparts* | 134 |
| Section 9.09. | *Severability* | 134 |
| Section 9.10. | *Integration* | 134 |
| Section 9.11. | ***GOVERNING LAW*** | 134 |
| Section 9.12. | *Submission To Jurisdiction; Waivers* | 134 |

iii

Section 9.13.    *Acknowledgements* .................................................................... 135
Section 9.14.    *Releases of Guarantees and Liens* ............................................ 136
Section 9.15.    *Confidentiality* ....................................................................... 136
Section 9.16.    *WAIVERS OF JURY TRIAL* ..................................................... 137
Section 9.17.    *USA Patriot Act* ...................................................................... 137
Section 9.18.    *Intercreditor Agreement* ........................................................ 137
Section 9.19.    *Acknowledgement and Consent to Bail-In of EEA Financial Institutions* ......................................................................... 138
Section 9.20.    *Certain ERISA Matters.* .......................................................... 138

ARTICLE 10 GUARANTEE
140

Section 10.01.    *Guarantee* ............................................................................ 140
Section 10.02.    *Rights of Secured Parties* ...................................................... 141
Section 10.03.    *Obligations Unconditional* .................................................... 141
Section 10.04.    *Reinstatement* ...................................................................... 143
Section 10.05.    *Subrogation; Subordination* .................................................. 143
Section 10.06.    *Remedies* .............................................................................. 143
Section 10.07.    *Instrument for the Payment of Money* .................................... 144
Section 10.08.    *Continuing Guarantee* .......................................................... 144
Section 10.09.    *General Limitation on Guaranteed Obligations* ...................... 144
Section 10.10.    *Release of Loan Parties* ........................................................ 144
Section 10.11.    *Right of Contribution* ............................................................ 144
Section 10.12.    *Default; Remedies; Bankruptcy; Etc.* ..................................... 145
Section 10.13.    *Keepwell* .............................................................................. 146
Section 10.14.    *Enforcement Expenses; Indemnification* ................................ 146
Section 10.15.    *Acknowledgements.* ............................................................... 147
Section 10.16.    *Additional Guarantors* .......................................................... 147
Section 10.17.    *Releases* ............................................................................... 147
Section 10.18.    *Reference to Certain Provisions of the Intercreditor Agreement* ....... 147

iv

**SCHEDULES:**

| | |
|---|---|
| 1.01A | Initial Loan Commitments |
| 1.01B | Mortgaged Property |
| 1.01C | Supply and Offtake Documents |
| 1.01D | North Yard and West Yard |
| 3.03 | Conflicts with Material Contracts |
| 3.07 | Subsidiaries |
| 3.08(a) | Litigation |
| 3.17 | Environmental Matters |
| 3.18 | Insurance |
| 5.11(g) | Specified Tranche B Excluded Buildings |
| 6.01 | Existing Indebtedness |
| 6.02 | Existing Liens |
| 6.07 | Existing Investments |
| 6.08 | Existing Affiliate Transactions |

**EXHIBITS:**

| | |
|---|---|
| A | Form of Security Agreement |
| B | Form of Notice of Borrowing |
| C | Form of Closing Certificate |
| D-1 | Form of Assignment and Assumption |
| D-2 | Form of Affiliated Lender Assignment and Assumption |
| E | Form of Prepayment Option Notice |
| F | Forms of U.S. Tax Compliance Certificate |
| G | Form of Intercreditor Agreement |
| H | Form of Compliance Certificate |
| I | Form of Perfection Certificate |
| J | Form of Notice of Conversion/Continuation |
| K | Form of Assumption Agreement |

CREDIT AGREEMENT (this "**Agreement**"), dated as of August 7, 2018, among PES HOLDINGS, LLC, a Delaware limited liability company (the "**Borrower**"), each of the Guarantors (as defined herein) party hereto from time to time, the several banks and other financial institutions or entities from time to time parties to this Agreement and CORTLAND CAPITAL MARKET SERVICES LLC, as administrative agent.

WHEREAS, the Borrower has requested that the Lenders provide a term loan facility denominated in Dollars in an original aggregate principal amount of $619,500,000 (the "**Facility**"), with all of the Borrower's obligations under the Facility to be guaranteed by each Guarantor, and the Lenders have indicated their willingness to lend on the terms and subject to the conditions set forth herein;

WHEREAS, on January 21, 2018 (the "**Petition Date**"), the Borrower and each of its Subsidiaries (each, a "**Debtor**" and collectively the "**Debtors**") (along with certain of its Affiliates) filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code (each case of the Borrower and each other Debtor, a "**Case**", and collectively the "**Cases**") and have continued in the possession of their assets and the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the joint Reorganization Plan (as hereinafter defined) of the Debtors was confirmed by the Bankruptcy Court on March 26, 2018 and will be consummated on the date hereof;

WHEREAS, the Borrower and the other Guarantors are engaged in related businesses, and each Guarantor will derive substantial direct and indirect benefit from the making of the extensions of credit under this Agreement; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01.  *Defined Terms*.  As used in this Agreement (including the recitals hereof), the terms listed in this Section 1.01 shall have the respective meanings set forth in this Section 1.01.

"**ABR**":  for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1%, (c) the Eurodollar Rate on such day (or, if such day is not a Business Day, the next preceding Business Day) for a deposit in Dollars with a maturity of one month plus 1.0% and (d) 2.00%. Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or such

Eurodollar Rate shall be effective as of the opening of business on the day of such change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate, respectively.

"**ABR Loans**": Loans the rate of interest applicable to which is based upon the ABR.

"**Additional Financing Agreement**": that certain Promissory Note, dated as of the date thereof among PESRM, Sunoco Logistics Partners Operations L.P. and the other parties thereto, as amended, restated, supplemented or otherwise modified from time to time to the extent permitted hereunder and thereunder.

"**Additional Financing Collateral**":  the "Collateral" as defined in the Additional Financing Agreement.

"**Additional Financing Facility**": the debt facility extended to the Borrower and one or more of its Subsidiaries pursuant to the Additional Financing Agreement.

"**Additional Tranche A-2 PIK Principal**": as defined in Section 2.09(d).

"**Additional Tranche B Excluded Buildings**":  each Building that becomes subject to a Mortgage after the Closing Date pursuant to Section 5.10(b) until the date which is 45 days after the delivery referred to in clause (ii) of Section 5.10(b); *provided* that such Building will continue to be an Additional Tranche B Excluded Building if a Tranche B Lender has provided written notice to the Administrative Agent and the other Tranche B Lenders that (i) such Building is located in a flood zone (unless otherwise not subject to the flood insurance requirements of the Federal Emergency Management Agency) and (ii) evidence of sufficient flood insurance coverage to satisfy the Flood Insurance Laws on such Building satisfactory to such Tranche B Lender has not been received by such Tranche B Lender; *provided*, *further*, that any such Building shall cease to constitute an Additional Tranche B Excluded Building if the Tranche B Lender that gave the original notice gives written notice to the Administrative Agent and the other Tranche B Lenders that it withdraws the original notice.

"**Additional Tranche C PIK Principal**": as defined in Section 2.09(e).

"**Administrative Agent**": Cortland Capital Market Services LLC, as the administrative agent for the Lenders under this Agreement and the other Loan Documents, together with any of its successors.

"**Administrative Agent Fee Letter**": that certain fee letter between the Administrative Agent and the Borrower dated as of August 7, 2018.February 11, 2019, as amended, restated, supplemented or otherwise modified from time to time.

"**Affiliate**": as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"**Affiliate Lender Assignment and Assumption**": as defined in Section 9.06(e)(i).

"**Affiliate Lenders**": collectively, the Sponsors and their respective Affiliates, in each case, that become an assignee pursuant to Section 9.06(e) or Section 9.06(f). For the avoidance of doubt, any Sponsor or any of its Affiliates that becomes a Lender hereto by making a Loan pursuant to Section 2.01 shall not be deemed to be an Affiliated Lender with respect to the Loans so made.

"**Aggregate Exposure**": with respect to any Lender at any time, an amount equal to the sum of the aggregate then unpaid principal amount of such Lender's Loans.

"**Aggregate Exposure Percentage**": with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the Aggregate Exposure of all Lenders at such time.

"**Agreement**":  as defined in the preamble hereto.

"**All-In Yield**" means, as to any Indebtedness, the effective yield on such Indebtedness calculated by the Administrative Agent in consultation with the Borrower in a manner consistent with accepted financial practice, taking into account the interest rate, applicable interest rate margins, any interest rate floors or similar devices, interest rate indexes and all fees, including upfront or similar fees or original issue discount (amortized over the shorter of (x) the life of such Indebtedness and (y) the four years following the date of incurrence thereof) payable generally to lenders providing such Indebtedness, but excluding any advisory, consent, structuring, success, ticking, amendment, commitment, underwriting or arrangement fees (and/or similar fees) payable to any arranger (or Affiliate thereof) in connection with the commitment or syndication of such Indebtedness, (regardless of whether such fees are shared generally with the providers of such Indebtedness).

"**Anti-Corruption Law**": any Requirement of Law related to anti-corruption or anti-bribery, including the Foreign Corrupt Practices Act of 1977, as amended and the rules and regulations thereunder.

"**Anti-Terrorism Law**": any Requirement of Law related to terrorism financing or money laundering including the Patriot Act, The Currency and Foreign Transactions Reporting Act (also known as the "**Bank Secrecy Act**", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959) and Executive Order 13224 (effective September 24, 2001).

"**Applicable Margin**": (a) with respect to Tranche A Loans  that are ABR Loans, 5.25% per annum and with respect to Tranche A Loans that are Eurodollar Loans, 6.25% per annum, (b) with respect to Tranche A-2 Loans, the Tranche A-2 Applicable Margin, (c) with respect to Tranche B Loans that are ABR Loans, 3.50% per annum and with respect to Tranche B Loans that are Eurodollar Loans, 4.50% per annum, (ed) with respect to Tranche C Loans, the Tranche C Applicable Margin, (de) with respect to any

Incremental Loans, the rate per annum set forth in the applicable incremental amendment and (ef) with respect to any Extended Loans, the rate per annum set forth in the applicable Extension Amendment.

"**Approved Fund**":  as defined in Section 9.06(b).

"**Asset Sale**": any Disposition or related series of Dispositions of any assets of Borrower or any Subsidiary (A) constituting Collateral that in any fiscal year yields gross proceeds to any Loan Party (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $2,000,000 and (B) not constituting Collateral that in any fiscal year yields gross proceeds to any Borrower or any Subsidiary (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other noncash proceeds) in excess of $5,000,000 (in each case, excluding any such Disposition permitted by Section 6.04(a), (b), (c), (e), (f), (g), (h), (i), (j), (k), (m), (n), (o), (p), (r) or (t)).

"**Assignee**":  as defined in Section 9.06(b)(i).

"**Assignment and Assumption**": an Assignment and Assumption, substantially in the form of Exhibit D or such other form as agreed by the Administrative Agent.

"**Attributable Indebtedness**": when used with respect to any Sale and Leaseback Transaction, as at the time of determination, the present value (discounted at a rate equivalent to the Borrower's and its Subsidiaries' then-current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Leaseback Transaction.

"**Bail-In Action**": the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**": (a) with respect to any EEA Member Country which has implemented, or which at any time implements, Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union establishing a framework for the recovery and resolution of credit institutions and investment firms, the relevant implementing law or regulation for such EEA Member Country as described in the EU Bail-In Legislation Schedule from time to time; and (b) and, in relation to any other state, any analogous law or regulation from time to time which requires contractual recognition of any Write-down and Conversion Powers contained in that law or regulation.

"**Bankruptcy Code**": Title 11 of the United States Code.

"**Bankruptcy Court**": the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**": any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Benefitted Lender**":  as defined in Section 9.07(a).

"**Board**": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Borrower**":  as defined in the preamble hereto.

"**Borrowing Date**": any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"**Building**": as defined in 12 CFR Chapter 11, Section 339.2.

"**Business Day**": a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close, *provided*, that with respect to notices and determinations in connection with, and payments of principal and interest on, Loans having an interest rate determined by reference to the Eurodollar Rate, such day is also a day for trading by and between banks in Dollar deposits in the interbank eurodollar market.

"**Capital Expenditures**": for any period, without duplication, all cash expenditures made directly or indirectly by the Borrower and its Subsidiaries during such period for capital assets as determined in accordance with GAAP, but excluding capital expenditures from: (i) proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets, equipment or other property to the extent such expenditures are made to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other property or otherwise to acquire, maintain, develop, construct, improve, upgrade or repair assets or properties useful in the business of the Borrower or any Guarantor, (ii) any portion of such expenditures attributable solely to acquisitions of property, plant and equipment in Permitted Acquisitions, and (iii) any leases that as of the date hereof qualify as operating leases under GAAP (whether or not such leases are required to be accounted for as capital leases under GAAP after the date hereof). For purposes of this definition, the purchase price of equipment or other fixed assets that are purchased simultaneously with the trade-in of existing assets shall be included in Capital Expenditures only to the extent of

the gross amount by which such purchase price exceeds the credit granted by the seller of such assets for the assets being traded in at such time.

"**Capital Lease Obligations**": as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"**Capital Stock**": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing, but excluding any debt securities convertible into any of the foregoing.

"**Carlyle**": collectively, Carlyle U.S. Equity Opportunity Fund, L.P. and Carlyle Energy Mezzanine Opportunities Fund, L.P.

"**Cases**": as defined in the preamble hereto.

"**Cash Equivalents**":  as to any person,

(a)      securities issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of twelve (12) months or less from the date of acquisition;

(b)      certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any domestic or foreign commercial bank in the United States having capital and surplus of not less than $500,000,000;

(c)      repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clauses (a) and (b) entered into with any financial institution meeting the qualifications specified in clause (b) above;

(d)      commercial paper rated at least P-1 by Moody's or at least A-1 by S&P and in each case maturing within twenty-four (24) months after the date of creation thereof and Indebtedness or preferred stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of twenty-four (24) months or less from the date of acquisition;

(e)        readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having a rating of "BBB+" or higher from S&P or "Baa1" or higher from Moody's with maturities of twenty-four (24) months or less from the date of acquisition; or

(f)        Investments with average maturities of twelve (12) months or less from the date of acquisition in money market funds rated within the top three ratings category by S&P or Moody's.

"**Cash Interest**": as defined in Section 2.09(d).

"**CERCLA**": the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, and any successor statute.

"**Closing Date**": the date on which the conditions precedent set forth in Section 4.01 shall have been satisfied or waived in accordance with Section 9.01.

"**Code**":  the Internal Revenue Code of 1986, as amended.

"**Collateral**": all property upon which a Lien is purported to be created by any Security Document, whether now owned or hereafter acquired.

"**Commitment**": an Initial Loan Commitment or an Incremental Commitment.

"**Commodity Exchange Act**": the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Compliance Certificate**": a certificate duly executed by a Responsible Officer substantially in the form of Exhibit H.

"**Confirmation Order**": the final order confirming the Reorganization Plan.

"**Connection Income Taxes**": Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consolidated Amortization Expense**": for any period, the amortization expense of the Borrower and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP.

"**Consolidated Depreciation Expense**": for any period, the depreciation expense of the Borrower and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP.

"**Consolidated EBITDA**": for any period, Consolidated Net Income for such period, adjusted (without duplication) by (x) adding thereto, in each case only to the extent (and in the same proportion) deducted in determining such Consolidated Net

Income and without duplication (and with respect to the portion of Consolidated Net Income attributable to any Subsidiary of the Borrower that is an Excluded Subsidiary only if a corresponding amount has been, or would be permitted to be, in each case as of the date of determination, distributed to the Borrower by such Subsidiary that is an Excluded Subsidiary without prior approval (that has not been obtained), pursuant to the terms of all agreements, instruments and Requirements of Law applicable to such Subsidiary):

(a)     Consolidated Interest Expense for such period, *plus*

(b)     Consolidated Amortization Expense for such period, *plus*

(c)     Consolidated Depreciation Expense for such period, *plus*

(d)     Consolidated Tax Expense for such period and, to the extent not included in Consolidated Tax Expense, Permitted Tax Distributions actually made by the Borrower, *plus*

(e)     fees, costs, liabilities and expenses incurred through the Closing Date in connection with the Transactions, the Restructuring Transactions and the Supply and Offtake Documents and after the Closing Date in connection with any amendment to any Loan Document or the Supply and Offtake Documents or the replacement of the Supply and Offtake Documents, *plus*

(f)     the aggregate amount of all other non-cash charges, expenses or losses reducing Consolidated Net Income (excluding any non-cash charge, expense or loss relating to write-offs, write-downs or reserves with respect to accounts or inventory) for such period, *plus*

(g)     any fees, charges and expenses incurred during such period (other than Consolidated Depreciation Expense or Consolidated Amortization Expense), in connection with any acquisition, recapitalization, Investment, Asset Sale, other disposition of assets, issuance or repayment of Indebtedness, issuance of Capital Stock by the Borrower or any contribution to capital of the Borrower, refinancing transaction or amendment or modification of any debt instrument (in each case, including any such transaction consummated prior to the Closing Date and any such transaction undertaken but not completed) and any charges or nonrecurring merger costs incurred during such period as a result of any such transaction (including any non-cash expenses or charges recorded in accordance with GAAP relating to equity interests issued to non-employees in exchange for services provided in connection with the transactions contemplated by the Contribution Agreement); provided that the aggregate amount of adjustments included in this clause (g) for such period shall not exceed 10% of Consolidated EBITDA calculated in accordance with this definition (prior to giving effect to any amounts pursuant to this clause (g)), *plus*

(h)     the amount of any restructuring charges, integration costs, retention charges, stock option and any other equity based compensation expenses or other business optimization expenses, including, costs associated with improvements to

IT and accounting functions, costs associated with establishing new facilities, costs or reserves deducted (and not added back) in such period in computing Consolidated Net Income, including any one time costs incurred in connection with acquisitions after the Closing Date and costs related to the closure and/or consolidation of facilities; *provided*, *however*, that the aggregate of amounts under this clause (h) for such period shall not exceed 20% of Consolidated EBITDA calculated in accordance with this definition(prior to giving effect to any amounts pursuant to this clause (h), *plus (or minus in the case of gains)*

(i)     any extraordinary, non-recurring or unusual gains or losses or expenses, *plus*

(j)     any cash receipt during such period in respect of non-cash gains or losses taken during a prior period, *plus*

(k)     any severance, relocation costs or payments and curtailments or modifications to pension and post-retirement employee benefit plans; *provided*, however, that the aggregate of amounts under this clause (k) shall not exceed $1,000,000 for such period, *plus*

(l)     any costs or expense incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such cost or expenses are funded with cash proceeds by third persons that is not Borrower or any Subsidiary contributed to the capital of the Borrower or any of its Subsidiaries, *plus*

(m)     any net loss from disposed or discontinued operations, *plus*

(n)     to the extent not already included in the Consolidated Net Income of Borrower and its Subsidiaries, notwithstanding anything to the contrary in the foregoing, the amount of cash proceeds received from business interruption insurance and reimbursements of any expenses and charges that are covered by indemnification or other reimbursement provisions in connection with any investment or any sale, conveyance, transfer or other disposition of assets permitted hereunder, *plus*

(o)     to the extent deducted from Consolidated Net Income of such Person and its Subsidiaries, all fees and payments made in accordance with Section 6.05(n); and

(y) subtracting therefrom (A) any net gain from disposed or discontinued operations for such period, (B) any cash payments made during such period in respect of non-cash charges taken in a prior period, (C) the aggregate amount of all non-cash items increasing Consolidated Net Income (other than the accrual of revenue or recording of receivables in the ordinary course of business) for such period and (D) only to the extent not deducted in determining Consolidated Net Income, payments made in accordance with Section 6.05(n) during such period.

For the purposes of calculating Consolidated EBITDA for any period of four (4) consecutive Fiscal Quarters (each, a "**Reference Period**"), (i) if at any time during such Reference Period the Borrower or any Subsidiary shall have made any Material Disposition, the Consolidated EBITDA for such Reference Period shall be reduced by an amount equal to the Consolidated EBITDA (if positive) attributable to the property that is the subject of such Material Disposition for such Reference Period or increased by an amount equal to the Consolidated EBITDA (if negative) attributable thereto for such Reference Period and (ii) if during such Reference Period the Borrower or any Subsidiary shall have made a Material Acquisition, Consolidated EBITDA for such Reference Period shall be calculated after giving pro forma effect thereto as if such Material Acquisition occurred on the first day of such Reference Period. As used in this definition, "**Material Acquisition**" means any acquisition of property or series of related acquisitions of property that (a) constitutes assets comprising all or substantially all of an operating unit of a business or constitutes all or substantially all of the common stock (or equivalent ownership interest) of a Person other than Borrower or a Subsidiary and (b) involves the payment of consideration by the Borrower and its Subsidiaries in excess of $1,000,000; and "**Material Disposition**" means any Disposition of property or series of related Dispositions of property that yields gross proceeds to the Borrower or any of its Subsidiaries, or has a fair market value, in each case in excess of $1,000,000.

Consolidated EBITDA for any period shall not include any Consolidated Net Income or, without duplication, any other amounts attributable to an Excluded Subsidiary, except to the extent actually distributed in cash to, and actually received by, a Loan Party during such period.

"**Consolidated Interest Expense**":  for any period, total interest expense (including imputed interest attributable to Capital Lease Obligations in accordance with GAAP and capitalized interest) of the Borrower and its Subsidiaries (other than Excluded Subsidiaries) on a consolidated basis in accordance with GAAP with respect to all outstanding Indebtedness of the Borrower and such Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and after giving effect to Swap Agreements related to interest rates but excluding unrealized gains and losses with respect to Swap Agreements related to interest rates.

Consolidated Interest Expense shall be calculated after giving pro forma effect to any Indebtedness (other than Indebtedness incurred for ordinary course working capital needs under ordinary course revolving credit facilities) incurred, assumed or permanently repaid or extinguished at any time on or after the first day of the Reference Period and prior to the date of determination in connection with any Permitted Acquisitions and Asset Sale (other than any dispositions in the ordinary course of business) as if such incurrence, assumption, repayment or extinguishing had been effected on the first day of such period.

"**Consolidated Leverage Ratio**": as at the last day of any period, the ratio of (a) Consolidated Total Debt on such day to (b) Consolidated EBITDA for such period.

"**Consolidated Net Income**": for any period, the consolidated net income (or loss) of the Borrower and its Restricted Subsidiaries determined on a consolidated basis in accordance with GAAP; *provided*, that there shall be excluded from such net income, to the extent otherwise included therein, without duplication:

(a)     the net income (or loss) of any Person (other than the Borrower or a Guarantor) in which any Person other than the Borrower and the Guarantors has an ownership interest, except to the extent that cash in an amount equal to any such income has actually been received by the Borrower or a Guarantor;

(b)     the net income of any Subsidiary of the Borrower (other than a Guarantor) during such period to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary (other than a Guarantor) of that income is not permitted as of the relevant date of determination by operation of the terms of any Contractual Obligation, Organizational Document or Requirement of Law applicable to that Subsidiary (other than a Guarantor) during such period, except that the Borrower's equity in net loss of any such Subsidiary for such period shall be included in determining Consolidated Net Income;

(c)     the after-tax effect of any extraordinary gain (or loss) realized during such period by the Borrower or any of its Subsidiaries upon any Asset Sale by the Borrower or any of its Subsidiaries;

(d)     the after-tax effect of gains and losses due solely to fluctuations in currency values determined in accordance with GAAP for such period;

(e)     earnings resulting from any reappraisal, revaluation or write-up of assets;

(f)     unrealized gains and losses with respect to obligations in respect of Swap Agreements for such period;

(g)     the after-tax effect of any extraordinary or nonrecurring gain (or extraordinary or non-recurring loss) recorded or recognized by the Borrower or any of its Subsidiaries during such period;

(h)     the cumulative effect of changes in accounting principles during such period;

(i)     the after-tax effects of adjustments (including the effects of such adjustments pushed down to the Borrower and its Subsidiaries) in the property and equipment, inventory and other intangible assets, deferred revenue and debt line items in Borrower or such Subsidiary's consolidated financial statements pursuant to GAAP resulting from the application of purchase accounting in relation to the payment of fees, commissions and expenses in connection with the transactions contemplated by the Contribution Agreement or any consummated acquisition or the amortization or write-off of any amounts related thereto;

(j)        the after-tax effect of income (or loss) from the early extinguishment of Indebtedness or swap obligations under Swap Agreements;

(k)        any impairment charge or asset write-off, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP; and

(l)        any non-cash compensation expense recorded from grants of stock appreciation or similar rights, stock options, restricted stock or other rights.

"**Consolidated Tax Expense**": for any period, the tax expense of the Borrower and its Subsidiaries, for such period, determined on a consolidated basis in accordance with GAAP.

"**Consolidated Total Debt**": at any date, the aggregate principal amount of all Indebtedness of the Borrower and its Restricted Subsidiaries at such date, determined on a consolidated basis in accordance with GAAP.

"**Contractual Obligation**": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Contribution Agreement**": that certain Refinancing Contribution Agreement, dated as of July 2, 2012, by and among Philadelphia Energy Solutions LLC, Sunoco, Inc. and Carlyle PES, L.L.C, as amended by that certain Amendment No. 1 to Refining Contribution Agreement, effective as of September 8, 2012, by and among Philadelphia Energy Solutions LLC, Sunoco, Inc., PESRM and Carlyle PES, L.L.C. and as assigned by that certain Assignment Agreement dated as of January 17, 2018 by and among each of the parties thereto.

"**Controlled Investment Affiliate**": as to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies. For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"**Controlling Lender**": the Required Tranche A Lenders, the Required Tranche A-2 Lenders, the Required Tranche B Lenders, the Required Tranche B/C Lenders or the Required Tranche C Lenders, as determined by Section 7.02, with the rights to instruct the Administrative Agent to take Enforcement Actions, as set forth in Section 7.02.

"**Credit Party**": the Administrative Agent or any other Lender.

"**CSAM**": Credit Suisse Asset Management, LLC.

"**Debt Fund Affiliate**": any Affiliate of the Sponsors (other than the Borrower and its Subsidiaries) that is primarily engaged in, or advises funds or other investment

vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course and with respect to which no Sponsor, directly or indirectly, possesses the power to direct or cause the direction of the investment policies of any such Affiliate.

"**Debtor**" and "**Debtors**": as defined in the preamble hereto.

"**Default**": any of the events specified in Article 7, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"**DIP Credit Agreemen**t": that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of January 25, 2018, by and between PESRM, the lenders thereto, Cortland Capital Market Services LLC, as administrative agent, and the other parties thereto as amended, restated, supplemented or modified on or prior to the date hereof.

"**DIP Loan**": "Loan", as defined in the DIP Credit Agreement.

"**Discharge**": with respect to any Tranche or Series, (a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of an insolvency proceeding, whether or not such interest would be allowed in such proceeding) on all outstanding Obligations under such Tranche or Series and (b) payment in full in cash of all other Obligations (other than Obligations in respect to Specified Swap Agreements) under such Tranche or Series that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (other than indemnification and other contingent Obligations for which no claim or demand for payment has been made at such time).

"**Discharge Control Shift**": as defined in Section 7.02.

"**Disposition**": with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof. The terms "Dispose" and "Disposed of" shall have correlative meanings.

"**Disqualified Capital Stock**":  any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part (other than in Capital Stock that are otherwise not Disqualified Capital Stock), on or prior to the date that is 121 days after the Latest Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Capital Stock referred to in (a) above, in each case at any time on or prior to the date that is 121 days after the Latest Maturity Date, or (c) contains any repurchase obligation for cash purchase which may come into effect prior to the date that is 121 days after the Latest Maturity Date; *provided*, that any Capital Stock that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or

the holders of any security into or for which such Capital Stock is convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Capital Stock upon the occurrence of a change in control or an asset sale occurring prior to the date that is 121 days after the Latest Maturity Date shall not constitute Disqualified Capital Stock if such Capital Stock provides that the issuer thereof will not redeem any such Capital Stock pursuant to such provisions prior to the repayment in full of the Obligations (other than taxes, costs, indemnifications, reimbursements, damages and other claims and liabilities (including Guarantee Obligations) in respect of which no written assertion of liability or no claim or demand for payment has been made at such time).

"**Dollars**" and "**$**":  dollars in lawful currency of the United States.

"**Domestic Subsidiary**": any Subsidiary of the Borrower organized under the laws of any state of the United States or the District of Columbia.

"**Dual Event of Default**": as defined in Section 7.02(c).

"**Dutch Auction**": an auction conducted by the Borrower or one of its Subsidiaries in order to purchase Loans in accordance with procedures as may be agreed to between the Administrative Agent and the Borrower.

"**EB-5 Financing**": a loan or loans made through the U.S. EB-5 Program ("**EB-5 Program**") to finance or refinance Capital Expenditures or other expenses eligible under the EB-5 Program, that (a) has a final maturity date that is later than six (6) months after the Latest Maturity Date (as determined at the time such loans are initially incurred or committed), (b) in respect of which no Liens are granted on any Collateral (other than (i) a first priority Lien on the property or assets constituting Collateral the acquisition, installation, construction or improvement of which is financed with the proceeds of such loan or loans (so long as the amount of such loan or loans does not exceed 100% of the cost of the acquisition, installation, construction or improvement of such Collateral) and (ii) a subordinated lien (subject to the terms of the EB-5 Intercreditor Agreement referred to below) on Collateral), (c) is subject to an intercreditor agreement in form and substance reasonably satisfactory to the Administrative Agent, the Required Tranche A-2 Lenders and the Required Lenders (an "**EB-5 Intercreditor Agreement**"), (d) the material terms of such financing (including interest rates) are generally consistent with prevailing market terms for such type of financing facility at the time such financing facility is entered into and as consented to by the Administrative Agent (acting at the direction of the Required Lenders and the Required Tranche A-2 Lenders) in writing, such consent not to be unreasonably withheld or delayed, (e) any scheduled amortization payments thereunder shall not exceed an amount per annum equal to 1.0% of the principal amount of Indebtedness incurred under such facility, (f) such loans or loans are incurred and guaranteed only by Loan Parties and (g) such loan or loans have a Weighted Average Life to Maturity no shorter than any of the Loans at the time such loan or loans are incurred.

"**EB-5 Intercreditor Agreement**" as defined in the definition of EB-5 Financing.

"**EEA Financial Institution**": (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any Person established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**": any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**": any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Enforcement Action**": an action (in each case, solely to the extent relating to all or a portion of the Collateral) under applicable law to: (a) foreclose, execute, levy, or collect on, take possession or control of, sell or otherwise realize upon (judicially or non-judicially), or lease, license, or otherwise dispose of (whether publicly or privately), Collateral, or otherwise exercise or enforce remedial rights with respect to Collateral under the Loan Documents (including by way of set-off, recoupment notification of a public or private sale or other disposition pursuant to the UCC or other applicable law, notification to account debtors, notification to depositary banks under deposit account control agreements, or exercise of rights under landlord consents, if applicable), (b) solicit bids from third Persons to conduct the liquidation or disposition of Collateral or to engage or retain sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers, or other third Persons for the purposes of valuing, marketing, promoting, and selling Collateral, (c) receive a transfer of Collateral in satisfaction of Indebtedness or any other Obligation secured thereby, (d) otherwise enforce a security interest or exercise another right or remedy, as a secured creditor or otherwise, pertaining to the Collateral at law, in equity, or pursuant to the Loan Documents (including the commencement of applicable legal proceedings or other actions with respect to all or any portion of the Collateral to facilitate the actions described in the preceding clauses, and exercising voting rights in respect of equity interests comprising Collateral), or (e) effect the Disposition of Collateral by the Borrower or any of its Subsidiaries after the occurrence and during the continuation of an Event of Default pursuant to the terms of this Agreement.

"**Environment**": ambient air, indoor air, surface water and groundwater (including potable and non-potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources, flora, fauna, or as otherwise defined in any Environmental Law.

"**Environmental and Necessary Capex**": capital expenditures deemed reasonably necessary by the Loan Parties, in good faith and pursuant to prudent judgment, to satisfy applicable Requirements of Law (including to comply with Environmental Laws).

"**Environmental Claim**": any claim, notice, demand, order, legal action, suit or proceeding alleging liability for or obligation with respect to any investigation, remediation, removal, cleanup, response, corrective action, damages to natural resources, personal injury, property damage, fines, penalties or other costs resulting from, related to or arising out of (i) the presence, Release or threatened Release in or into the Environment of Hazardous Material at any location, (ii) any Environmental Law, or (iii) any Environmental Liability, and shall include any claim seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury to the Environment or, as it relates to exposure to Hazardous Material, to human health.

"**Environmental Laws**": any and all laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning the Environment, human health and safety and including Governmental Real Property Disclosure Requirements, as now or may at any time hereafter be in effect.

"**Environmental Liability**": any liability, contingent or otherwise (including any liability for damages, costs of investigation and remediation, fines, penalties or indemnities), of or relating to the Loan Parties or any Subsidiary directly or indirectly resulting from or based upon (a) any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure of any person to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the Environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**": any permit, license, approval, registration, consent or other authorization under Environmental Law.

"**ERISA**": the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"**ERISA Affiliate**": (a) any entity, whether or not incorporated, that is under common control with a Loan Party within the meaning of Section 4001(a)(14) of ERISA; (b) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Code of which a Loan Party is a member; (c) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code of which a Loan Party is a member; and (d) solely for purposes of Section 412 of the Code and Section 302 of ERISA, with respect to any Loan Party, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Code of which that Loan Party is a member. Any former ERISA Affiliate of any Loan Party shall continue to be considered an ERISA Affiliate of the Loan Party within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Loan Party and with

16

respect to liabilities arising after such period for which the Loan Party is liable under Section 412 of the Code or Title IV of ERISA.

"**ERISA Event**": (a) any Reportable Event; (b) the failure of any Loan Party or ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived in accordance with Section 412(c) of the Code or Section 302(c) of ERISA; (c) a determination that any Pension Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (d) the filing pursuant to Section 412 of the Code or Section 302 of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (e) the occurrence of any event or condition which would constitute grounds under ERISA for the termination by the PBGC of, or the appointment by the PBGC of a trustee to administer, any Pension Plan or the incurrence by any Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA to the PBGC with respect to the termination of any Pension Plan, including but not limited to the imposition on a Loan Party of any Lien in favor of the PBGC or any Pension Plan; (f) the receipt by any Loan Party or any ERISA Affiliate of any notice from the PBGC relating to an intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan under Section 4042 of ERISA; (g) the failure by any Loan Party or any ERISA Affiliate to make any required contribution to a Multiemployer Plan pursuant to Section 431 or 432 of the Code; (h) the incurrence by any Loan Party or any ERISA Affiliate of any liability with respect to its complete withdrawal or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan; (i) the receipt by any Loan Party or any ERISA Affiliate of any notice concerning the imposition of Withdrawal Liability on it or a determination that a Multiemployer Plan is, or is expected to be, Insolvent, in "endangered" or "critical" status (within the meaning of Section 431 or 432 of the Code or Section 304 or 305 of ERISA), or terminated (within the meaning of Section 4041A of ERISA) or that it intends to terminate or has terminated (under Section 4041A or 4042 of ERISA); (j) the failure by any Loan Party or any ERISA Affiliate to pay when due (after expiration of any applicable grace period) any installment payment with respect to Withdrawal Liability under Section 4201 of ERISA; (k) the withdrawal by any Loan Party or any ERISA Affiliate from any Pension Plan with two or more contributing sponsors, or the termination of any such Pension Plan, resulting in liability to such Loan Party or such Affiliate pursuant to Section 4062 or 4064 of ERISA; (l) the imposition of liability on any ERISA Loan Party or any ERISA Affiliate pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (m) receipt from the IRS of notice of the failure of any Plan to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Plan to qualify for exemption from taxation under Section 501(a) of the Code; or (n) the imposition of a Lien pursuant to Section 430(k) of the Code or pursuant to ERISA on the assets of Loan Party with respect to any Pension Plan.

"**ERISA Loan Parties**": PES Holdings, LLC and any direct or indirect subsidiary thereof.

"**EU Bail-In Legislation Schedule**": the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Eurocurrency Reserve Requirements**": for any day as applied to a Eurodollar Loan, the average (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day applicable to any member bank of the Federal Reserve System as published from time to time by the Board at https://federalreserve.gov/monetarypolicy/reservereq.htm (or any successor thereto) or under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"**Eurodollar Base Rate**": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the greater of (a) 1.00% and (b) LIBOR Rate.

"**Eurodollar Class**": the collective reference to Eurodollar Loans under a particular Series the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"**Eurodollar Loans**": Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"**Eurodollar Rate**": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula:

$$\frac{\text{Eurodollar Base Rate}}{1.0 - \text{Eurocurrency Reserve Requirements}}$$

"**Event of Default**": any of the events specified in Article 7, *provided* that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"**Exchange Act**":  as defined in Section 7.01(k).

"**Excluded Information**":  as defined in Section 9.06(g)(ii).

"**Excluded Building Proceeds**": as defined in Section 7.03(a)(i)(D).

"**Excluded Subsidiary**": each Subsidiary formed or acquired after the Closing Date that is designated as an Excluded Subsidiary pursuant to Section 5.12.  For the avoidance of doubt, no Excluded Subsidiary shall be a Guarantor, and to the extent that an Excluded Subsidiary's net income would otherwise be included in the definition of Consolidated Net Income or Consolidated EBITDA or any component thereof such Excluded Subsidiary's net income shall not be included for purposes of calculating

Consolidated Net Income or Consolidated EBITDA, in each case except to the extent provided in such definition.

"**Excluded Swap Obligation**": with respect to any Loan Party, any obligation (a "**Swap Obligation**") to pay or perform under any agreement, contract, or transaction that constitutes a "**swap**" within the meaning of section 1a(47) of the Commodity Exchange Act, if, and to the extent that, all or a portion of the guarantee of such Loan Party of, or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof).

"**Excluded Taxes**": any of the following Taxes imposed on or with respect to a Credit Party or required to be withheld or deducted from a payment to a Credit Party: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Credit Party being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the applicable Commitment or, in the case of a Loan not funded pursuant to a prior Commitment, the date on which such Lender acquires such interest in the applicable Loan (in each case, other than pursuant to an assignment request by the Borrower under Section 2.17) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.14, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Commitment or Loan or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Credit Party's failure to comply with Section 2.14(f) or (g) and (d) any U.S. Federal withholding Taxes imposed under FATCA.

"**Extended Loans**":  as defined in Section 2.18(a).

"**Extending Lender**":  as defined in Section 2.18(a).

"**Extension**":  as defined in Section 2.18(a).

"**Extension Amendment**":  as defined in Section 2.18(c).

"**Extension Offer**":  as defined in Section 2.18(a).

"**Facility**": as defined in the preamble hereto.

"**FATCA**": Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official

19

interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the current Code (or any amended or successor version described above), and any intergovernmental agreements (and any related fiscal or regulatory legislation, rules or official administrative guidance) implementing the foregoing.

"**Federal Funds Effective Rate**": for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three U.S. banks recognized standing selected by it.

"**First Amendment Effective Date**": the date on which the conditions set forth in Section 5 of the First Incremental Amendment are satisfied, which date is February ___, 2019.

"**First Incremental Amendment**": that certain First Amendment and Incremental Joinder, dated as of the First Amendment Effective Date among the Borrower, the Guarantors, the Lenders party thereto and the Administrative Agent.

"**Fiscal Quarter**": three-month period ending on March 31, June 30, September 30, or December 31 of any year.

"**Fiscal Quarter Payment Date**": as defined in Section 2.03(b).

"**Flood Insurance Laws**": collectively, (i) the National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto, (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto, and (iv) all other applicable Laws relating to policies and procedures that address requirements placed on federally regulated lenders relating to flood matters, in each case, as now or hereafter in effect or any successor statute thereto.

"**Foreign Benefit Arrangement**": any employee benefit arrangement mandated by non-US law that is maintained or contributed to by any Loan Party or with respect to which any Loan Party has any material actual or contingent liability.

"**Foreign Plan**": each employee benefit plan (within the meaning of Section 3(3)) of ERISA that is not subject to US law and is maintained or contributed to by any Loan Party or with respect to which any Loan Party has any material actual or contingent liability.

"**Foreign Plan Event**": with respect to any Foreign Benefit Arrangement or Foreign Plan, (a) the failure by a Loan Party to make any employer or employee contributions required by applicable law or by the terms of such Foreign Benefit

Arrangement or Foreign Plan; (b) the failure to register or loss of good standing with applicable regulatory authorities of any such Foreign Benefit Arrangement or Foreign Plan required to be registered; or (c) the failure of any Foreign Benefit Arrangement or Foreign Plan to comply with any material provisions of applicable law and regulations or with the material terms of such Foreign Benefit Arrangement or Foreign Plan.

"**Foreign Subsidiary**": any Subsidiary of the Borrower that is not a Domestic Subsidiary.

"**Funding Office**": the office or account of the Administrative Agent specified in Section 9.02 or such other office or account as may be specified from time to time by the Administrative Agent as its funding office or account by written notice to the Borrower and the Lenders.

"**GAAP**": subject to Section 1.03, generally accepting accounting principles in the United States applied on a consistent basis.

"**Governmental Authority**": any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"**Governmental Real Property Disclosure Requirements**":  any Requirement of Law of any Governmental Authority requiring notification of, by or to the buyer, lessee, mortgagee, assignee or other transferee of any Real Property, facility, establishment or business, or notification, registration or filing to or with any Governmental Authority, in connection with the sale, lease, mortgage, assignment or other transfer (including any transfer of control) of any Real Property, facility, establishment or business, of the actual or threatened presence or Release in or into the Environment, or the use, disposal or handling, of Hazardous Material on, at, under or near the Real Property, facility, establishment or business to be sold, leased, mortgaged, assigned or transferred.

"**Group Members**": the collective reference to the Borrower and its Subsidiaries.

"**Guarantee**": the guarantee of the Guaranteed Obligations pursuant to Article 10.

"**Guarantee Obligation**": as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing Person that guarantees or has the economic effect of guaranteeing, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or has the economic effect of guaranteeing, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct

or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; *provided, however*, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"**Guaranteed Obligations**": as defined in Section 10.01.

"**Guarantor Obligations**": with respect to any Guarantor, all obligations and liabilities of such Guarantor which may arise under or in connection with Article 10 or any other Loan Document, any Specified Swap Agreement to which such Guarantor is a party (other than any Excluded Swap Obligations arising under any Specified Swap Agreement), in each case whether on account of guarantee obligations, reimbursement obligations, fees, indemnities, costs, expenses or otherwise (including, without limitation, all fees and disbursements of counsel to the Administrative Agent or to all or any of the Lenders that are required to be paid by such Guarantor pursuant to the terms of this Agreement or any other Loan Document).

"**Guarantors**": the collective reference to the Subsidiary Guarantors.

"**Halcyon**": Halcyon Capital Management LP.

"**Hazardous Material**": (i) any hazardous substances, hazardous waste, petroleum or fraction thereof, contaminant, polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs, asbestos or any asbestos-containing material in any form or condition, radon or any other radioactive material (including any source, special nuclear or by-product material); and (ii) any other chemical, waste, material, compound, constituent or substance, subject to regulation as hazardous, toxic, a pollutant or a contaminant liability under any Environmental Laws.

"**Hinge Date**": the day falling two years and 180 days following the Closing Date (and if such date is not a Business Day, the next succeeding Business Day).

"**Incremental Commitment**": as to any Person, its obligation to make an Incremental Loan to the Borrower pursuant to Section 2.19(c) in an aggregate principal amount equal to the amount set forth in the relevant Incremental Joinder.

"**Incremental Facility Closing Date**": as defined in Section 2.19(c).

"**Incremental Joinder**": a joinder agreement to this Agreement among the Loan Parties, the Administrative Agent and the relevant Incremental Lenders, in form and substance reasonably satisfactory to the Borrower and the Administrative Agent that will establish an Incremental Commitment.

"**Incremental Lender**": as defined in Section 2.19(a).

"**Incremental Loan**": as defined in Section 2.19(c).

"**Indebtedness**": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all Disqualified Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (g) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, and (j) for the purposes of Section 7.01(e) only, all obligations of such Person in respect of Swap Agreements. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"**Indemnified Liability**": as defined in Section 9.05(d).

"**Indemnified Taxes**": (a) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a) above, all Other Taxes.

"**Indemnitee**": as defined in Section 9.05(d).

"**Initial Lender**": each lender that has an Initial Loan Commitment or that holds an Initial Loan.

"**Initial Loan**": as defined in Section 2.01.

"**Initial Loan Commitment**": a Tranche A Loan Commitment, a Tranche B Loan Commitment or a Tranche C Loan Commitment. The original aggregate amount of the Initial Loan Commitments is $619,500,000.

"**Initial Prepayment Amount**": as defined in Section 2.06(e).

"**Insolvent**": with respect to any Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

"**Intellectual Property**": the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"**Intercreditor Agreement**":  as defined in Section 9.18.

"**Interest Election**": as defined in ~~Section~~Section 2.09(~~e~~f).

"**Interest Election Decrease**": as defined in ~~Section~~Section 2.09(~~e~~f).

"**Interest Payment Date**": (a) as to any ABR Loan, the last Business Day of each March, June, September and December (or, if an Event of Default is in existence, the last Business Day of each calendar month) to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan having an Interest Period of three months or less, the last day of such Interest Period, (c) as to any Eurodollar Loan having an Interest Period longer than three months, (i) each day that is three months, or a whole multiple thereof, after the first day of such Interest Period and (ii) the last day of such Interest Period and (d) as to any Loan, the date of any repayment or prepayment made in respect thereof.

"**Interest Period**": as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower in its Notice of Borrowing or Notice of Conversion/Continuation, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 11:00 A.M., New York City time, on the date that is three (3) Business Days prior to the last day of the then current Interest Period with

respect thereto; *provided* that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(i)      if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)      the Borrower may not select an Interest Period under a particular Tranche that would extend beyond the date final payment is due on the relevant Loans;

(iii)      any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month of such Interest Period;

(iv)      the Borrower shall select Interest Periods so as not to require a payment or prepayment of any Eurodollar Loan during an Interest Period for such Loan.

"**Intermediation Master Transaction Agreement**":  that certain Master Transaction Agreement, dated August 7, 2018, by and between Merrill Lynch Commodities, Inc., ICBC Standard Bank Plc, PES Inventory Company, LLC, Philadelphia Energy Solutions Refining and Marketing LLC and the other parties thereto, as in effect on the Closing Date.

"**Investments**":  as defined in Section 6.07. For purposes of covenant compliance, the amount of any Investment shall be the fair market value of such Investment as of the time made, without adjustment for subsequent increases or decreases in the value of such Investment.

"**IP Rights**":  as defined in Section 3.06.

"**IPO**": the first underwritten public offering by Holdings of its Capital Stock after the Closing Date pursuant to a registration statement filed with the SEC in accordance with the Securities Act of 1933, as amended

"**IRS**":  the United States Internal Revenue Service.

"**Joint Venture**": (a) any Person which would constitute an "equity method investee" of the Borrower or any of its Subsidiaries and (b) any Person in whom the Borrower or any of its Subsidiaries beneficially owns any Capital Stock that is not a Subsidiary.

"**Latest Maturity Date**": at any date of determination, the latest Maturity Date applicable to any Loan hereunder at such time.

"**Lenders**": Initial Lenders, Extending Lenders and Incremental Lenders.

"**LIBOR Rate**": the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on the applicable Bloomberg LIBOR Screen Page as of 11:00 A.M., London time, two (2) Business Days prior to the beginning of such Interest Period; *provided* that such rate does not appear on such page (or otherwise on such screen), the "LIBOR Rate" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered to major banks in immediately available funds in the London interbank market at approximately 11:00 A.M., London time, two (2) Business Days prior to the commencement of such Interest Period.

"**LIBOR Successor Rate**": as defined in ~~Section~~Section 2.09(~~h~~i).

"**LIBOR Successor Rate Conforming Changes**": with respect to any proposed LIBOR Successor Rate, any conforming changes to the definition of ABR, Interest Period, timing and frequency of determining rates and making payments of interest and other administrative matters as may be appropriate, in the reasonable discretion of the Administrative Agent, the Required Tranche A-2 Lenders and the Required Lenders, to reflect the adoption of such LIBOR Successor Rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent, the Required Tranche A-2 Lenders and the Required Lenders reasonably determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such LIBOR Successor Rate exists, in such other manner of administration as the Administrative Agent, the Required Tranche A-2 Lenders and the Required Lenders reasonably determine in consultation with the Borrower).

"**Lien**": with respect to any property, (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge, collateral assignment, hypothecation, security interest or encumbrance of any kind or any arrangement effective to provide priority or preference or any filing of any financing statement under the UCC or any other similar notice of lien under any similar notice or recording statute of any Governmental Authority, including any easement, right-of-way or other encumbrance on title to Real Property, in each of the foregoing cases whether voluntary or imposed by law; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such property; and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loan**": any extension of credit made by any Lender pursuant to this Agreement in the form of an Initial Loan, an Extended Loan or an Incremental Loan.

"**Loan Acceleration**": the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents immediately becoming due and payable.

"**Loan Documents**": this Agreement, the Security Documents, the Notes (if any), the Administrative Agent Fee Letter, the Intercreditor Agreement and any amendment (including the First Incremental Amendment), waiver, supplement or other modification to any of the foregoing.

"**Loan Parties**":  the Borrower and Guarantors.

"**Mandatory Prepayment Date**": as defined in Section 2.06(e).

"**Material Adverse Effect**": a material adverse effect on (a) the business, property, financial condition or results of operations of the Loan Parties, taken as a whole, (b) Loan Parties' ability to fully perform their respective payment obligations under any Loan Document or (c) the rights or remedies of the Administrative Agent or the Lenders hereunder or under any other Loan Document.

"**Material Contract**": the Supply and Offtake Documents and any other agreement or contract to which any Loan Party is a party and the failure of which to keep in full force and effect would reasonably be expected to have a Material Adverse Effect.

"**Material Permit**": permits required for the Borrower to conduct its businesses, operations and Real Property in accordance with Requirements of Law, excluding such permits the absence of which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

"**Maturity Date**": with respect to (a) Loans that have not been extended pursuant to Section 2.18, December 31, ~~2022 and (b~~2022, (b) with respect to the Tranche A-2 Loans, the Tranche A-2 Maturity Date and (c) with respect to Extended Loans, the final maturity date therefor as specified in the applicable Extension Offer accepted by the respective Lenders.

"**Minimum Extension Condition**":  as defined in Section 2.18(b).

"**Moody's**":  Moody's Investors Service, Inc.

"**Mortgaged Properties**": the parcels of Real Property described on Schedule 1.01B (which shall include the easement for the North Yard Terminal) and identified as Lots 1-12 and Parcels B-2, B-3, B-4, H-1, H-2 and E in the Owner's Deeds, as to which the Administrative Agent, acting in its capacity on behalf of the Lenders, shall be granted a Lien pursuant to the Mortgages.

"**Mortgagee's Title Policy**": that certain Mortgagee's Policy of Title Insurance issued by First America Title Insurance Company in favor of the Administrative Agent, including any and all endorsements to the same.

"**Mortgages**": each of the mortgages and deeds of trust made by any Loan Party in favor of, or for the benefit of, the Administrative Agent, acting in its capacity on behalf of the Lenders, in form and substance reasonably satisfactory to the Administrative Agent or the Required Lenders and the Required Tranche A-2 Lenders.

"**Multiemployer Plan**": a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any ERISA Affiliate (i) makes or is obligated to make contributions, (ii) during the preceding five plan years, has made or been obligated to make contributions or (iii) has any actual or contingent liability.

"**Multiple Employer Plan**": an employee pension benefit plan (as defined in Section 3(2) of ERISA) which has two or more contributing sponsors (including any Loan Party or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"**Net Cash Proceeds**": (a) with respect to any Asset Sale or Recovery Event, the cash proceeds actually received by the Borrower or any of its Subsidiaries (other than an Excluded Subsidiary) (including cash proceeds subsequently received (as and when received by the Borrower or any of its Subsidiaries (other than an Excluded Subsidiary)) in respect of non-cash consideration initially received) net of (i) reasonable and documented selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional, advisory, consulting, investment banking and transactional fees, transfer and similar taxes and the Borrower's good faith estimate of income taxes actually paid or payable in connection with such sale); (ii) amounts provided as a reserve, in accordance with GAAP, against (x) any liabilities under any indemnification obligations associated with such Asset Sale or (y) any other liabilities retained by the Borrower or any of its Subsidiaries (other than Excluded Subsidiaries) associated with the properties sold in such Asset Sale (*provided*, that to the extent and at the time any such amounts are released from such reserve, such amounts shall then constitute Net Cash Proceeds); (iii) the Borrower's good faith estimate of payments required to be made with respect to unassumed liabilities relating to the properties sold within 180 days of such Asset Sale (*provided*, that to the extent such cash proceeds are not used to make payments in respect of such unassumed liabilities within 180 days of such Asset Sale, such cash proceeds shall then constitute Net Cash Proceeds); (iv) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness or indebtedness which is secured by a Lien on the properties sold in such Asset Sale (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale) and which is repaid with such proceeds (other than any such Indebtedness or indebtedness assumed by the purchaser of such properties); (v) any survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed, mortgage or other recording taxes, other customary expenses and brokerage, consultant and other customary fees in respect of any such Asset Sale; and (vi) taxes paid or reasonably estimated to be actually payable in connection therewith, or amounts to be distributed as Permitted Tax Distributions in connection therewith, and (b) in connection with any issuance or sale of Capital Stock or any incurrence of Indebtedness, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and

commissions and other customary fees and expenses actually incurred in connection therewith.

"**NGL Installment Purchase Agreement**" means that certain Installment and Sale Purchase Agreement dated as of May 7, 2014, by and among NGL Energy Partners LP and PESRM, as in effect on May 7, 2014 and as amended on or prior to the Closing Date.

"**Non-U.S. Lender**":  a Lender that is not a U.S. Person.

"**North Yard**" the parcels of Real Property commonly referred to as the "north yard" located north of Passyunk Avenue and adjacent to Philadelphia Gas Works property and described by metes and bounds on Schedule 1.01D and identified as Parcels B-2, B-3, B-4, H-1 and H-2 in the Mortgagee's Title Policy.

"**North Yard Terminal**" means that certain crude oil rail unloading terminal which provides logistics services to the Refinery.

"**Notes**": the collective reference to any promissory note evidencing Loans.

"**Notice of Borrowing**": as defined in Section 2.02.

"**Notice of Conversion/Continuation**": as defined in Section 2.07.

"**Obligations**":  the unpaid principal of and interest on (including interest, fees and other amounts accruing after the maturity of the Loans and interest, fees and other amounts accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower and each Guarantor, whether or not a claim for post-filing or post-petition interest, fees or other amounts is allowed in such proceeding) the Loans and all other obligations and liabilities of the Borrower to any Secured Party, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, any Specified Swap Agreement (other than, with respect to any Guarantor, any Excluded Swap Obligations of such Guarantor arising under any Specified Swap Agreement) or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise.

"**OFAC**":  as defined in Sanctioned Persons.

"**Organizational Documents**": with respect to any person, (i) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such person, (ii) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such person, (iv) in the case of any general partnership, the partnership

agreement (or similar document) of such person and (v) in any other case, the functional equivalent of the foregoing.

"**Other Affiliate**": any Sponsor and any Affiliate of a Sponsor, other than the Borrower, any Subsidiary of the Borrower and any natural person.

"**Other Connection Taxes**":  with respect to any Credit Party, Taxes imposed as a result of a present or former connection between such Credit Party and the jurisdiction imposing such Tax (other than connections arising from such Credit Party having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**": all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.17).

"**Owner's Deeds**": any or all of the following deeds: Special Warranty Deed dated September 7, 2012, effective September 8, 2012, recorded on October 3, 2012 in the Public Office as Document ID Number 52542486 from Sunoco, Inc. (R&M), a Pennsylvania corporation, to the Borrower;  Special Warranty Deed dated September 7, 2012, effective September 8, 2012, recorded on October 3, 2012 in the Public Office as Document ID Number 52542487 from Atlantic  Refining & Marketing Corp., a Delaware corporation, to the Borrower; Quitclaim Deed dated September 7, 2012, effective September 8, 2012, recorded on October 3, 2012 in the Public Office as Document ID Number 52542488 from Sunoco, Inc., a Pennsylvania corporation, to the Borrower; and Deed of Confirmation dated February 16, 2015, recorded on February 23, 2015 in the Public Office as Document ID Number 52884740  from the Borrower to the Borrower.

"**Participant**":  as defined in Section 9.06(c).

"**Participant Register**":  as defined in Section 9.06(c).

"**Patriot Act**":  as defined in Section 9.17.

"**PBGC**": the Pension Benefit Guaranty Corporation established under Section 4002 of ERISA and any successor entity performing similar functions.

"**PCB**":  as defined in Hazardous Materials.

"**Pension Plan**": any employee benefit plan (including a Multiple Employer Plan, but not including a Multiemployer Plan) which is subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA (i) which is sponsored, maintained or contributed to by, or required to be contributed to by, any Loan Party or any of their

respective ERISA Affiliates or (ii) with respect to which any Loan Party or any of their respective ERISA Affiliates has any actual or contingent liability.

"**Perfection Certificate**": a certificate duly executed by a Responsible Officer substantially in the form of Exhibit I.

"**Permitted Acquisition**":  as defined in Section 6.07(k).

"**Permitted Holders**": shall mean (a) Carlyle, (b) CSAM, (c) Halcyon, (d) Energy Transfer Partners, L.P. and (e) in each case, Controlled Investment Affiliates of any of the foregoing.

"**Permitted Reporting Company**": PES Inc. or PES Ultimate Holdings, LLC, so long as the Borrower is a direct or indirect Subsidiary of PES Inc. or PES Ultimate Holdings, LLC, respectively, and each Subsidiary of PES Inc. or PES Ultimate Holdings, LLC, respectively, of which the Borrower is a Subsidiary shall not (i) have conducted, transacted or otherwise engaged in, or committed to conduct, transact or otherwise engage in, any business or operations other than those incidental to its ownership of the Capital Stock of the Borrower, (ii) have incurred, created, assumed or suffered to exist any Indebtedness or other liabilities or financial obligations, except (x) nonconsensual obligations imposed by operation of law and (y) obligations with respect to its Capital Stock including contractual obligations incidental to its Capital Stock, and (iii) own, lease, manage or otherwise operate any properties or assets (including cash (other than cash received in connection with dividends made by the Borrower in accordance with Section 6.05 pending application in the manner contemplated by said Section) and cash equivalents) other than the ownership of shares of Capital Stock of the Borrower.

"**Permitted Tax Distributions**": (i) for any taxable year ending after the Closing Date for which the Borrower is treated as a disregarded entity, partnership, or other flow-through entity for federal, state, provincial, territorial, and/or local income Tax purposes, the payment of dividends or other distributions or loans to each of the Borrower's direct owner(s) to fund the federal, state, provincial, territorial, and/or local income Tax liability of such owner(s), as applicable (or, if a direct owner is a pass-through entity, of the indirect owner(s)) for such taxable year attributable to the income of the Borrower, in an aggregate amount not to exceed the product of (x) the taxable income or gain of the Borrower, as determined for federal income tax purposes, allocated to such direct (or indirect) owner for such taxable year, reduced by any taxable loss of the Borrower allocated to such direct (or indirect) owner with respect to any prior taxable years ending after the Closing Date to the extent such taxable loss is of a character and type that would permit such loss to be deducted against the income of the taxable year in question and has not previously been taken into account under this clause (x) and (y) the highest combined marginal income tax rate applicable to corporate taxpayers or natural persons residing in New York, New York, as applicable, taking into account the character of the relevant tax items (e.g., ordinary or capital) and any deduction under Section 199A of the Code; *provided* that the amount of any such dividends, distributions or loans in respect of the taxable period beginning prior to, and ending after, the Closing Date shall be reduced by the amount of any tax distributions that

should have been made for the direct or indirect equity owners of the Borrower to pay estimated taxes prior to the Closing Date (based on the assumptions used in this definition) and (ii) any "Supplemental Tax Distribution" within the meaning of Section 4.01(b)(2)(iv) of the limited liability company agreement of the Borrower.

"**Person**": an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"**PES Inc.**": PES Energy, Inc., a Delaware corporation.

"**PESRM**":  Philadelphia Energy Solutions Refining and Marketing LLC, a Delaware limited liability company.

"**Petition Date**": as defined in the preamble hereto.

"**PIK Interest**": as defined in Section 2.09(d).

"**Plan**": any employee benefit plan as defined in Section 3(3) of ERISA, including any employee welfare benefit plan (as defined in Section 3(1) of ERISA), any employee pension benefit plan (as defined in Section 3(2) of ERISA but excluding any Multiemployer Plan), and any plan which is both an employee welfare benefit plan and an employee pension benefit plan, and in respect of which any Loan Party is an "employer" as defined in section 3(5) of ERISA.

"**Platinum Sale and Leaseback Transaction**": a sale and leaseback transaction with respect to platinum and/or other precious metals used or to be used as a catalyst in the refining process, in an aggregate amount at any time outstanding not to exceed $35,000,000.

"**Point Breeze Site Lease Agreement**": that certain site lease agreement dated as of November 1, 2017 between PESRM and Point Breeze Renewable Energy, LLC, together with the "Other Agreements" referred to in such site lease agreement, as such lease agreement and any such "Other Agreement" was in effect on the date of execution thereof or as amended, modified, waived, supplemented or replaced in any manner not materially adverse to the Lenders.

"**Preferred Stock**": with respect to any person, any and all preferred or preference Capital Stock (however designated) of such person whether now outstanding or issued after the Closing Date.

"**Prepayment Option Notice**": as defined in Section 2.06(e).

"**Prepetition TLA Credit Agreement**": that certain Credit Agreement, dated as of November 24, 2015, among North Yard Logistics, L.P., as borrower, North Yard GP, LLC, as guarantor, the several banks and other financial institutions or entities from time to time parties to such agreement, as lenders and PNC Bank, National Association, as

administrative agent, swingline lender and a letter of credit issuer, as amended, supplemented or otherwise modified from time to time prior to the Petition Date.

"**Prepetition TLA Loans**": "Term Loan", as defined in the Prepetition TLA Credit Agreement.

"**Prepetition TLB Credit Agreement**": the Term Loan Agreement dated as of April 4, 2013, among PESRM, as borrower, the several banks and other financial institutions or entities from time to time parties to such agreement, as lenders and JPMorgan Chase Bank, N.A., as Administrative Agent, as amended, supplemented or otherwise modified from time to time prior to the Petition Date.

"**Prepetition TLB Loans**": "Loan", as defined in the Prepetition TLB Credit Agreement.

"**Prime Rate**": the per annum rate of interest publicly quoted from time to time by The Wall Street Journal as the "Prime Rate" in the United States (or, if The Wall Street Journal ceases quoting a prime rate of the type described, either (as determined by the Administrative Agent) (x) the per annum rate quoted as the base rate on such corporate loans in a different national publication as reasonably selected by Administrative Agent or (y) the highest per annum rate of interest published by the Federal Reserve Board in Federal Reserve statistical release H.15 (519) entitled "Selected Interest Rates" as the bank prime loan rate or its equivalent) or any similar release by the Federal Reserve Board.

"**Pro Forma Financial Statements**":  as defined in Section 3.04(c).

"**Projected Liquidity**": as to the Borrower and its Restricted Subsidiaries on a consolidated basis, the sum of (i) unrestricted cash and Cash Equivalents, (ii) withdrawable funds from brokerage accounts of the Borrower and its Restricted Subsidiaries, in each case on an average daily basis as projected by the Borrower over the twelve month period commencing on the date of such projection.

"**PTE**": a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Office**"; the office of the Department of Records, City and County of Philadelphia, Commonwealth of Pennsylvania.

"**Purchase Money Obligation**": for any person, the obligations of such person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of any property (including Capital Stock of any person) or the cost of installation, construction, development or improvement of any property and any refinancing thereof; *provided*, that (i) such Indebtedness is incurred within one year after such acquisition, installation, construction or improvement of such property by such person and (ii) the amount of such Indebtedness does not exceed 100%

of the cost of such acquisition, installation, construction or improvement, as the case may be.

"**Qualified ECP Guarantor**": in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time such Swap Obligation is incurred or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"**Real Property**": any parcel or tract, or portion thereof, of real property now or hereafter owned by any Loan Party in fee simple, leasehold, easement or other real property interest, together with any and all improvements thereon.

"**Recovery Event**": any involuntary loss of title, any involuntary loss of, damage to or any destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of the Borrower (other than Additional Financing Collateral and SOA Separate Assets and Collateral) or any of its Subsidiaries (other than Excluded Subsidiaries). "Recovery Event" shall include but not be limited to any taking of all or any part of any Real Property of the Borrower (other than Additional Financing Collateral) or any of its Subsidiaries (other than Excluded Subsidiaries) or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any Requirement of Law, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property) of any person or any part thereof by any Governmental Authority, civil or military, or any settlement in lieu thereof.  For the avoidance of doubt "Recovery Event" shall not include proceeds received from business interruption insurance.

"**Reference Period**":  as defined in Consolidated EBITDA.

"**Refinery**": the refinery located in Philadelphia, Pennsylvania (consisting of two formerly separate refining operations commonly known as "**Point Breeze**" and "**Girard Point**").

"**Register**":  as defined in Section 9.06(b)(iv).

"**Regulation T**": Regulation T of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation U**": Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Regulation X**": Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"**Reinvestment Deferred Amount**": with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by any Loan Party in connection therewith that are

not applied to prepay the Loans pursuant to Section 2.06(b) as a result of the delivery of a Reinvestment Notice.

"**Reinvestment Event**": any Asset Sale or Recovery Event in respect of which the Borrower has delivered a Reinvestment Notice.

"**Reinvestment Notice**":  a written notice executed by a Responsible Officer stating that no Event of Default has occurred and is continuing and that the Borrower (directly or indirectly through a Restricted Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale or Recovery Event to acquire or repair assets useful in its business.

"**Reinvestment Notice Date**":  as defined in Section 2.06(b).

"**Reinvestment Prepayment Amount**": with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date to acquire or repair assets useful in the Borrower's business.

"**Reinvestment Prepayment Date**": with respect to any Reinvestment Event, the earlier of (a) the date occurring 365 days following the date of such Reinvestment Event; *provided* that such time may be extended by an additional 180 days if, on or prior to the 365th day following the date of receipt of such proceeds, Borrower delivers a certificate of a Responsible Officer to the Administrative Agent (for prompt distribution to the Lenders) detailing the intended use of such proceeds and certifying that the proceeds will be used in accordance with this clause; and (b) the date on which the Borrower shall have determined not to, or shall have otherwise ceased to, acquire or repair assets useful in the Borrower's business with all or any portion of the relevant Reinvestment Deferred Amount.

"**Related Parties**": with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"**Release**": any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the Environment.

"**Remedies Shift**": as defined in Section 7.02(b).

"**Reorganization Plan**": the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization of PES Holdings, LLC and its Debtor Affiliates dated March 22, 2018 ECF No. 286, Exhibit A, confirmed by the Bankruptcy Court and attached as Exhibit A to the Corrected Order Approving the Debtors' Disclosure Statement for and Confirming the Second Amended Joint Prepackaged Chapter 11 Plan of Reorganization of PES Holdings, LLC and its Debtor Affiliates dated April 2, 2018 ECF No. 357 filed in the main Case of

the jointly administered Debtors, Case No. 18-10122 (KG), with such amendments as shall be approved by the Bankruptcy Court and satisfactory in form and substance to the Required Consenting Cash Flow Creditors (as defined therein).

"**Replaced Loans**":  as defined in Section 9.01.

"**Replacement Loans**":  as defined in Section 9.01.

"**Reportable Event**": any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Pension Plan, other than those events as to which notice is waived pursuant to applicable regulations.

"**Required Lenders**": at any time, Lenders constituting (a) the Required Tranche A Lenders and (b) the Required Tranche B/C Lenders.

"**Required Tranche A Lenders**": at least two Tranche A Lenders (Tranche A Lenders affiliated to each other or under common management being deemed, for purposes of this definition, as one single Tranche A Lender) holding more than 50% of the sum of the aggregate unpaid principal amount of the Tranche A Loans then outstanding; *provided* that the Tranche A Loans held by any Affiliate Lender (other than (x) any Debt Fund Affiliate or (y) solely with respect to such Affiliate Lender's Tranche A Loans held as of the Closing Date, any Affiliate Lender that is or becomes a Lender on the Closing Date) shall be excluded for purposes of making a determination of Required Tranche A Lenders.

"**Required Tranche A-2 Lenders**": at any time, Tranche A-2 Lenders holding more than 50% of the sum of the aggregate unpaid principal amount of the Tranche A-2 Loans (or Commitments to make Tranche A-2 Loans) then outstanding.

"**Required Tranche B Lenders**": at any time, Tranche B Lenders holding more than 50% of the sum of the aggregate unpaid principal amount of the Tranche B Loans then outstanding; *provided* that the Tranche B Loans held by any Affiliate Lender (other than (x) any Debt Fund Affiliate or (y) solely with respect to such Affiliate Lender's Tranche B Loans held as of the Closing Date, any Affiliate Lender that is or becomes a Lender on the Closing Date) shall be excluded for purposes of making a determination of Required Tranche B Lenders.

"**Required Tranche B/C Lenders**": at any time, the holders of more than 50% of the sum of the aggregate unpaid principal amount of the Tranche B Loans and the Tranche C Loans, aggregated together as though such Tranche B Loans and Tranche C Loans were a single tranche, then outstanding; *provided* that the Tranche B Loans and the Tranche C Loans held by any Affiliate Lender (other than (x) any Debt Fund Affiliate or (y) solely with respect to such Affiliate Lender's Tranche B Loans or Tranche C Loans held as of the Closing Date, any Affiliate Lender that is or becomes a Lender on the Closing Date) shall be excluded for purposes of making a determination of Required Tranche B/C Lenders.

"**Required Tranche C Lenders**": at any time, Tranche C Lenders holding more than 50% of the sum of the aggregate unpaid principal amount of the Tranche C Loans then outstanding; *provided* that the Tranche C Loans held by any Affiliate Lender (other than (x) any Debt Fund Affiliate or (y) solely with respect to such Affiliate Lender's Tranche B Loans or Tranche C Loans held as of the Closing Date, any Affiliate Lender that is or becomes a Lender on the Closing Date) shall be excluded for purposes of making a determination of Required Tranche C Lenders.

"**Requirement of Law**": as to any Person, any law, treaty, rule or regulation, official administrative pronouncement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Responsible Officer**":  the chief executive officer, president, chief financial officer, executive vice president of the Borrower, or any executive officer of such Person responsible for administration of the obligations of such Person under this Agreement, but in any event, with respect to financial matters, the chief financial officer or treasurer of the Borrower.

"**Restricted Payments**":  as defined in Section 6.05.

"**Restricted Subsidiary**": each Subsidiary of the Borrower that is not an Excluded Subsidiary.

"**Restructuring Transactions**" shall have the meaning set forth in the Reorganization Plan.

"**S&P**": Standard & Poor's Ratings Services.

"**Sale and Leaseback Transaction**": any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"**Sanctioned Person**": any party that (i) is identified on the "Specially Designated Nationals and Blocked Persons List," the "Sectoral Sanctions Identification List" or any similar sanctions list maintained by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") or the U.S. State Department or is ordinarily resident in, organized or chartered in a country or territory that is the subject of a comprehensive OFAC sanctions or embargo program or (ii) is otherwise a person with whom U.S. persons are prohibited from engaging in transactions or whose property must be blocked by U.S. persons under the International Emergency Economic Powers Act, the Trading With the Enemy Act, or any economic sanctions administered by OFAC other Requirement of Law.

"**Scheduled Unavailability Date**": as defined in ~~Section~~Section 2.09(~~hi~~)(ii).

37

"**SEC**": the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"**Secured Parties**": collectively, the Administrative Agent, the Lenders and other Persons party to a Specified Swap Agreement.

"**Security Agreement**": the Pledge and Security Agreement to be executed and delivered by the Borrower and each Subsidiary Guarantor, substantially in the form of Exhibit A.

"**Security Documents**": the collective reference to the Security Agreement, the Mortgages and all other security documents hereafter delivered to the Administrative Agent granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"**Series**": (a) the Initial Loan Commitments and the Initial Loans made thereafter, (b) each tranche of Extended Loan and (c) the Incremental Commitments and the Incremental Loans thereunder.

"**SOA Separate Assets and Collateral**":  as defined in the Intercreditor Agreement.

"**Specified Swap Agreement**": any Swap Agreement in respect of interest rates, currency exchange rates or commodity prices entered into by the Borrower or any Restricted Subsidiary and any Person that is a Lender or an affiliate of a Lender at the time such Swap Agreement is entered into.

"**Specified Tranche B Excluded Buildings**":  as defined in Schedule 5.11(g).

"**Sponsors**": (a) Carlyle, (b) Energy Transfer Partners, L.P., (c) CSAM, (d) Halcyon, (e) Sunoco, Inc. and (f) each of their respective Control Investment Affiliates but not including, however, any portfolio companies of the foregoing.

"**Standstill Period**": the period of 30 days immediately following the occurrence of an Event of Default during which an Enforcement Action has not occurred at the request of (a) prior to the Discharge of the Tranche A Loans, the Required Tranche A Lenders ~~and~~, (b) on and after the Discharge of the Tranche A Loans but prior to the Discharge of the Tranche A-2 Loans, the Required Tranche A-2 Lenders and (c) on and after the Discharge of the Tranche A Loans and the Discharge of the Tranche A-2 Loans, the Required Tranche B/C Lenders (or, as applicable under Section 7.02, the Required Tranche B Lenders or the Required Tranche C Lenders).

"**Subordinated Indebtedness**": Indebtedness of any Loan Party that is by its terms subordinated in right of payment to the Obligations of the Borrower and the Guarantors, as applicable, on terms reasonably acceptable to the Administrative Agent.

"**Subsidiary**": as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having

ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsidiary Guarantor**": each Subsidiary of the Borrower other than any Excluded Subsidiary and any Foreign Subsidiary.

"**Supply and Offtake Agreement**":  at any given time, one or more of the following agreements that are in effect at such time: (i) the MLC Phase-in SOA (as defined in the Intermediation Master Transaction Agreement), as in effect on the Closing Date, (ii) the ICBCS SOA (as defined in the Intermediation Master Transaction Agreement) or (iii) a successor or phased-in supply and offtake agreement with terms, taken as a whole, that are not materially adverse to the Lenders than the agreements referenced in clauses (i) and (ii) (it being agreed that terms set forth in the Intermediation Master Transaction Agreement are not materially adverse to the Lenders), in each case of clauses (i), (ii) and (iii), as amended, amended and restated, supplemented or modified in a manner not materially adverse to the Lenders.

"**Supply and Offtake Documents**":  collectively, (i) the Supply and Offtake Agreement, (ii) the Intermediation Master Transaction Agreement, (iii) any other material agreements related to the Supply and Offtake Agreement, including those listed on Schedule 1.01C, in each case as in effect on the Closing Date or to be entered into pursuant to the Intermediation Master Transaction Agreement, and (iv) successor or phased-in agreements to those referenced in clause (iii) that are not materially adverse to the Lenders than those agreements as in effect on the Closing Date (it being agreed that terms set forth in the Intermediation Master Transaction Agreement are not materially adverse to the Lenders), and, in each case of clauses (ii), (iii) and (iv), as amended, supplemented or modified in a manner not materially adverse to the Lenders.

"**Swap Agreement**": any agreement related to (a) a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction, forward purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions), (b) a transaction similar to any transaction referred to in clause (a) that is currently, or in the future becomes, regularly entered into in the financial markets (including terms and conditions incorporated by reference into such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities

or other equity instruments, debt securities or other debt instruments, or economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are made and (c) any transaction that is a combination of the transactions described in clauses (a) and (b) above. For the avoidance of doubt, "**Swap Agreement**" shall not include the Supply and Offtake Agreement or the Supply and Offtake Documents or any agreements or obligations entered into in the ordinary course of business to buy or sell any security, commodity, or other financial instrument or instrument in a transaction that contemplates or settles by physical delivery of the underlying security, commodity, or other financial instrument or instrument.

"**Swap Obligation**":  as defined in the definition of Excluded Swap Obligation.

"**Tax Return**": all returns, statements, filings, attachments and other documents or certifications required to be filed in respect of Taxes.

"**Taxes**": all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Title Insurance Company**":  as defined in Section 5.11(b)Section 5.11(c).

"**Tranche**": each tranche of Tranche A Loans, Tranche A-2 Loans, Tranche B Loans and Tranche C Loans, separately.  The Tranche A-2 Loans constitute a sub-Tranche of the Tranche A Loans, and, other than for purposes of Section 7.03, Tranche A Loans and Tranche A-2 Loans shall be treated as separate Tranches of Loans.

"**Tranche A Lender**": the financial institutions named on Schedule 1.01A (as amended or supplemented from time to time) and their respective successors and assigns as permitted hereunder and designated as holding Tranche A Loans, each of which is referred to herein as a Tranche A Lender.

"**Tranche A Loan**": as defined in Section 2.01.

"**Tranche A Loan Commitment**": as to any Tranche A Lender, the obligation of such Tranche A Lender, if any, to make a Tranche A Loan in the form provided in Section 2.01 to the Borrower in a principal amount not to exceed the amount set forth under the heading "**Tranche A Loan Commitment**" opposite such Tranche A Lender's name on Schedule 1.01A. The original aggregate amount of the Tranche A Loan Commitments is $120,000,000.

"**Tranche A-2 Applicable Margin**": with respect to Tranche A-2 Loans that are ABR Loans, Tranche A-2 PIK Interest of 7.00% per annum and with respect to Tranche A-2 Loans that are Eurodollar Loans, Tranche A-2 PIK Interest of 8.00% per annum.

"**Tranche A-2 Effective Date**": the date in on which the conditions set forth in Section 6 of the First Incremental Amendment are satisfied, which date is February ___, 2019

"**Tranche A-2 Lender**": (i) the financial institutions named on Schedule I of the First Incremental Amendment and (ii) any financial institutions which makes Tranche A-2 Loans to the Borrower after the Tranche A-2 Effective Date, and, in each case, their respective successors and assigns as permitted hereunder and designated as holding Tranche A-2 Loans, each of which is referred to herein as a Tranche A-2 Lender.

"**Tranche A-2 Loan**": as defined in Section 2.01.

"**Tranche A-2 Loan Commitment**": as to any Tranche A-2 Lender, the obligation of such Tranche A-2 Lender, if any, to make a Tranche A-2 Loan in the form provided in Section 2.01 to the Borrower in a principal amount, in the case of Tranche A-2 Loans to be made on the Tranche A-2 Effective Date, not to exceed the amount set forth on Schedule I of the First Incremental Amendment and, otherwise, in a principal amount agreed to by such Tranche A-2 Lenders pursuant to the Incremental Joinder providing for such Tranche A-2 Loan Commitment.

"**Tranche A-2 Maturity Date**": February ___, 2022

"**Tranche A-2 PIK Interest**": as defined in Section 2.09(d).

"**Tranche B Excluded Buildings**": the Specified Tranche B Excluded Buildings and the Additional Tranche B Excluded Buildings.

"**Tranche B Loan**": as defined in Section 2.01.

"**Tranche B Loan Commitment**": as to any Tranche B Lender, the obligation of such Tranche B Lender, if any, to make a Tranche B Loan in the form provided in Section 2.01 to the Borrower in a principal amount not to exceed the amount set forth under the heading "**Tranche B Loan Commitment**" opposite such Tranche B Lender's name on Schedule 1.01A. The original aggregate amount of the Tranche B Loan Commitments is $82,500,000.

"**Tranche B Lender**": the financial institutions named on Schedule 1.01A (as amended or supplemented from time to time) and their respective successors and assigns as permitted hereunder and designated as holding Tranche B Loans, each of which is referred to herein as a Tranche B Lender.

"**Tranche B Payment Event of Default**": as defined in the definition of Tranche B Specific Event of Default.

"**Tranche B Specific Event of Default**": any Event of Default resulting from (i) the failure of the Borrower to pay interest on the Tranche B Loans on any date (unless the Borrower also fails to pay all other interest due under this Agreement (other than Tranche A-2 PIK Interest or Tranche C PIK Interest) on such date and thereafter so long as the Borrower fails to pay interest on the Tranche B Loans), (ii) the failure of the Borrower to pay any amortization payment under the Tranche B Loans (each Tranche B Specific Event of Default described in clauses (i) and (ii), a "**Tranche B Payment Event of Default**"), (iii) any default in the observance or performance of any provision of (x) the

final proviso in Section 6.05, (y) the final proviso to Section 6.07 or (z) Section 6.17 or (iv) the incurrence by the Borrower of Incremental Loans deemed to be Tranche A Loans, except as permitted by Section 2.19(g).

"**Tranche B/C Loans**": as defined in Section 7.03(a)(i)(D).

"**Tranche B/C Lenders**": as defined in Section 7.03(a)(i)(D).

"**Tranche C Applicable Margin**": except as otherwise provided pursuant to ~~Section~~Section 2.09(~~e~~f) (a) during the period commencing on the Closing Date and terminating on the Hinge Date, (x) with respect to Tranche C Loans that are ABR Loans, 2.50% per annum and with respect to Tranche C Loans that are Eurodollar Loans, 3.50% per annum plus (y) Tranche C PIK Interest of 3.00% per annum and (b) during the period commencing on the Business Day following the Hinge Date and terminating on the Maturity Date, (x) with respect to Tranche C Loans that are ABR Loans, 3.00% per annum and with respect to Tranche C Loans that are Eurodollar Loans, 4.00% per annum plus (y) Tranche C PIK Interest of 2.50% per annum.

"**Tranche C Lender**": the financial institutions named on Schedule 1.01A (as amended or supplemented from time to time) and their respective successors and assigns as permitted hereunder and designated as holding Tranche C Loans, each of which is referred to herein as a Tranche C Lender.

"**Tranche C Loan**": as defined in Section 2.01.

"**Tranche C Loan Commitment**": as to any Tranche C Lender, the obligation of such Tranche C Lender, if any, to make a Tranche C Loan in the form provided in Section 2.01 to the Borrower in a principal amount not to exceed the amount set forth under the heading "**Tranche C Loan Commitment**" opposite such Tranche C Lender's name on Schedule 1.01A. The original aggregate amount of the Tranche C Loan Commitments is $417,000,000.

"**Tranche C PIK Interest**": as defined in Section 2.09(e).

"**Transactions**": the entry into this Agreement and the other Loan Documents.

"**Transferee**":  any Assignee or Participant.

"**Transferred Guarantor**": as defined in Section 10.10.

"**UCC**": has the meaning assigned to such term in the Security Agreement.

"**Unasserted Contingent Obligations**": taxes, costs, indemnifications, reimbursements, damages and other claims and liabilities in respect of which no written assertion of liability or no claim or demand for payment has been made at such time.

"**United States**":  the United States of America.

"**U.S. Person**": a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**":  as defined in Section 2.14(f)(ii)(B)(3).

"**Voting Stock**":  with respect to any person, any class or classes of Capital Stock pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors of such person.

"**Weighted Average Life to Maturity**": when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal (excluding nominal amortization), including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"**West Yard**": the parcel of real properly (and any improvements to such parcel of Real Property) commonly referred to as the "west yard" described by metes and bounds on Schedule 1.01D.

"**Withdrawal Liability**": any liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are used in sections 4203 and 4205, respectively, of ERISA.

"**Write-Down and Conversion Powers**": (a) in relation to any Bail-In Legislation described in the EU Bail-In Legislation Schedule from time to time, the write-down and conversion powers described as such in relation to that Bail-In Legislation in the EU Bail-In Legislation Schedule; and (b) in relation to any other applicable Bail-In Legislation, (i) any powers under that Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers; and (ii) any similar or analogous powers under that Bail-In Legislation.

Section 1.02.  *Other Definitional Provisions*.  (a) Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)      As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) the words "include",

"includes" and "including" shall be deemed to be followed by the phrase "without limitation", (ii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, and (iv) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)    The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

Section 1.03.  *Accounting Terms; GAAP*.  Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP, as in effect on the date hereof unless otherwise agreed to by the Borrower and the Required Lenders, the Required Tranche A-2 Lenders and the Required Tranche B Lenders. If, after the Closing Date, any change in the accounting principles used in the preparation of the most recent financial statements referred to in Section 5.01 is hereafter required or permitted by the rules, regulations, pronouncements and opinions of the Financial Accounting Standards Board or the American Institute of Certified Public Accountants (or any successors thereto) and such change is adopted by the Borrower and results in a change in any of the calculations required by Article 6 that would not have resulted had such accounting change not occurred, if requested by the Borrower or the Administrative Agent (acting at the direction of the Required Lenders and the Required Tranche A-2 Lenders), the parties hereto agree to enter into negotiations in good faith in order to amend such provisions so as to equitably reflect such change such that the criteria for evaluating compliance with such covenants by Borrower shall be the same after such change as if such change had not been made (subject to the approval of the Required Lenders and the Required Tranche A-2 Lenders and not subject to any amendment fee or increase in pricing hereunder); *provided, however*, that (i) no change in GAAP that would affect a calculation that measures compliance with any covenant contained in Article 6 shall be given effect until such provisions are amended to reflect such changes in GAAP and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between such calculations made before and after giving effect to such change in GAAP. Notwithstanding any other provision of this Agreement to the contrary, for all purposes during the term of this Agreement and any other Loan Document, each lease that pursuant

to GAAP as in effect on the Closing Date would be classified as a capital lease or an operating lease will continue to be so classified, notwithstanding any change in characterization of that lease subsequent to the Closing Date based on changes to GAAP or interpretation of GAAP.

Section 1.04.    *Payments Due on Days Other than Business Days*.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

ARTICLE 2
AMOUNT AND TERMS OF COMMITMENTS

Section 2.01.    *Initial Loan Commitments*.

(a)    Subject to the terms and conditions hereof, each Initial Lender severally agrees to make Initial Loans to the Borrower on the Closing Date in an amount not to exceed the amount of the Initial Loan Commitment of such Lender. The parties hereto acknowledge and agree that on the Closing Date (i) an aggregate principal amount of DIP Loans under and as defined in the DIP Credit Agreement equal to $120,000,000 shall be converted into Tranche A Loans hereunder as set forth in (b) below, (ii) an aggregate principal amount of Prepetition TLA Loans under and as defined in the Prepetition TLA Credit Agreement equal to $82,500,000 shall be converted into Tranche B Loans hereunder as set forth in Section 2.01(c) below and (iii) an aggregate principal amount of Prepetition TLB Loans under and as defined in the Prepetition TLB Credit Agreement equal to $417,000,000 shall be converted into Tranche C Loans hereunder as set forth in Section 2.01(d)) below.

(b)    Subject to the terms and conditions hereof, each Tranche A Lender severally agrees that the DIP Loans made by such Tranche A Lender under the DIP Credit Agreement and outstanding on the Closing Date immediately prior to giving effect to this Agreement shall remain outstanding on and after the Closing Date and shall be converted into loans ("**Tranche A Loans**") in an equal principal amount equal to, in the aggregate, the Tranche A Loan Commitments, and deemed made pursuant to this Agreement on the Closing Date. The conversion by a Tranche A Lender of its DIP Loans shall be deemed to satisfy, dollar for dollar, such Tranche A Lender's obligation to make Tranche A Loans on the Closing Date. Such DIP Loans of each Tranche A Lender shall hereafter be referred to as "Tranche A Loans," and on and after the Closing Date shall have all of the rights and benefits of Loans as set forth in this Agreement and the other Loan Documents.

(c)    Subject to the terms and conditions hereof, each Tranche B Lender severally agrees that the Prepetition TLA Loans made by such Tranche B Lender under the Prepetition TLA Credit Agreement and outstanding on the Petition Date shall remain outstanding on and after the Closing Date and shall be converted into loans ("**Tranche B Loans**") in an equal principal amount equal to, in the aggregate, the Tranche B Loan Commitments, and deemed made pursuant to this Agreement on the Closing Date. The conversion by a Tranche B Lender of its Prepetition TLA Loans shall be deemed to

satisfy, dollar for dollar, such Tranche B Lender's obligation to make Tranche B Loans on the Closing Date. Such Prepetition TLA Loans of each Tranche B Lender shall hereafter be referred to as "Tranche B Loans," and on and after the Closing Date shall have all of the rights and benefits of Loans as set forth in this Agreement and the other Loan Documents.

(d)     Subject to the terms and conditions hereof, each Tranche C Lender severally agrees that the Prepetition TLB Loans made by such Tranche C Lender under the Prepetition TLB Credit Agreement and outstanding on the Petition Date shall remain outstanding on and after the Closing Date and shall be converted into loans ("**Tranche C Loans**" and, together with the Tranche A Loans and the Tranche B Loans, the "**Initial Loans**") in an equal principal amount equal to, in the aggregate, the Tranche C Loan Commitments, and deemed made pursuant to this Agreement on the Closing Date. The conversion by a Tranche C Lender of its Prepetition TLB Loans shall be deemed to satisfy, dollar for dollar, such Tranche C Lender's obligation to make Tranche C Loans on the Closing Date. Such Prepetition TLB Loans of each Tranche C Lender shall hereafter be referred to as "Tranche C Loans," and on and after the Closing Date shall have all of the rights and benefits of Loans as set forth in this Agreement and the other Loan Documents.

(e)     Subject to the terms and conditions hereof and in the First Incremental Amendment, each Tranche A-2 Lender severally agrees to make, on the Tranche A-2 Effective Date, Incremental Loans to the Borrower in an amount equal to the Tranche A-2 Commitment of such Lender (such Incremental Loans, the "**Tranche A-2 Loans**"). Such Tranche A-2 Loans of each Tranche A-2 Lender shall hereafter be referred to as "Tranche A-2 Loans," and on and after the Tranche A-2 Effective Date shall have all of the rights and benefits of Loans as set forth in this Agreement and the other Loan Documents. Tranche A-2 Loans will be a sub-Tranche of the Tranche A Loans, and other than for purposes of Section 7.03, Tranche A Loans and Tranche A-2 Loans shall be treated as separate Tranches of Loans.   The Borrower shall give the Administrative Agent irrevocable written notice (which notice must be received by the Administrative Agent prior to 11:00 A.M., New York City time, three (3) Business Days prior to the date on which such Tranche A-2 Loans are to be made) requesting that the Tranche A-2 Lenders make the Tranche A-2 Loans on the Tranche A-2 Effective Date, specifying the amount to be borrowed, whether such Tranche A-2 Loans are to be ABR Loans or Eurodollar Loans, and the Interest Period applicable to such Eurodollar Loans.  Upon receipt of such Notice of Borrowing, the Administrative Agent shall promptly notify each Tranche A-2 Lender thereof.

Section 2.02.  *Procedure for Initial Loan Borrowing*.  The Borrower shall give the Administrative Agent irrevocable written notice (which notice must be received by the Administrative Agent prior to 11:00 A.M., New York City time, one (1) Business Day prior to the Closing Date) requesting that the Initial Lender make the Initial Loans on the Closing Date, specifying the amount to be borrowed, whether such Initial Loans are to be ABR Loans or Eurodollar Loans, and the Interest Period applicable to such Eurodollar Loans. If the Borrower shall fail to specify the Interest Period applicable, the Borrower shall be deemed to have selected an Interest Period of one month.  Such notice (the

"**Notice of Borrowing**") shall be irrevocable and shall be in writing, substantially in the form of Exhibit B, appropriately completed. Upon receipt of such Notice of Borrowing, the Administrative Agent, shall promptly notify each Initial Lender thereof. Upon the satisfaction of the conditions set forth in Section 4.01 and Section 4.02, the Loans to be made on the Closing Date shall be deemed to have been made as described in Section 2.01 above.

  Section 2.03. *Repayment of Initial Loans*.

  (a) The Borrower shall repay to the Tranche A Lenders on the Maturity Date the aggregate principal amount of all Tranche A Loans outstanding on such date.

  (b) The Borrower shall repay to the Tranche B Lenders the aggregate principal amount of all Tranche B Loans outstanding on the last Business Day of each Fiscal Quarter (such Business Day, a "**Fiscal Quarter Payment Date**") set forth in the table below (commencing with the first full Fiscal Quarter after the Fiscal Quarter in which the Closing Date occurs) in an amount equal to the amount set forth opposite such Fiscal Quarter Payment Date (in each case as reduced pursuant to Section 2.12(b)):

| *Fiscal Quarter Payment Date* | *Repayment Amount* |
| --- | --- |
| Each Fiscal Quarter Payment Date in 2018 | An amount equal to (i) $2,500,000 *divided by* (ii) the number of Fiscal Quarter Payment Dates in such year |
| Each Fiscal Quarter Payment Date in 2019 | An amount equal to (i) $5,000,000 *divided by* (ii) the number of Fiscal Quarter Payment Dates in such year |
| Each Fiscal Quarter Payment Date in 2020 | An amount equal to (i) $7,500,000 *divided by* (ii) the number of Fiscal Quarter Payment Dates in such year |
| Each Fiscal Quarter Payment Date in each year following 2020 | An amount equal to (i) $10,000,000 *divided by* (ii) the number of Fiscal Quarter Payment Dates in such year |

  *provided* that the final principal repayment installment of the Tranche B Loans shall be repaid on the Maturity Date and in any event shall be in an amount

equal to the aggregate principal amount of all Tranche B Loans outstanding on such date.

(c)      The Borrower shall repay to the Tranche C Lenders on the Maturity Date the aggregate principal amount of all Tranche C Loans outstanding on such date.

(d)      The Borrower shall repay to the Tranche A-2 Lenders on the Tranche A-2 Maturity Date the aggregate principal amount of all Tranche A-2 Loans outstanding on such date.

Section 2.04.   *Fees*.  The Borrower agrees to pay to the Administrative Agent the fees in the amounts and on the dates as set forth in the Administrative Agent Fee Letter and to perform any other obligations contained therein.

Section 2.05.   *Optional Prepayments*.  (a) The Borrower may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty (except as set forth in clause (b) below), upon irrevocable written notice delivered to the Administrative Agent no later than 11:00 A.M., New York City time, three (3) Business Days prior thereto, in the case of Eurodollar Loans, and no later than 11:00 A.M., New York City time, one (1) Business Day prior thereto, in the case of ABR Loans, which notice shall specify the date and amount of prepayment and whether the prepayment is of Eurodollar Loans or ABR Loans; *provided*, that if a Eurodollar Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.15. Upon receipt of any such notice, the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid. Partial prepayments of Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple thereof, or, if less, the amount outstanding.

Section 2.06.   *Mandatory Prepayments and Commitment Reductions*.  (a) If any Indebtedness shall be issued or incurred by any Loan Parties (excluding any Indebtedness incurred in accordance with Section 6.01), an amount equal to 100% of the Net Cash Proceeds thereof shall be applied on the date of such issuance or incurrence to the prepayment of the Loans as set forth in Section 2.06(d).

(b)      If, on any date, Borrower or any Subsidiary shall receive Net Cash Proceeds from any Asset Sale or Recovery Event that is in excess of $500,000 and that, when taken together with all Net Cash Proceeds from Asset Sales and Recovery Events occurring during the fiscal year of Borrower in which such Asset Sale or Recovery Event shall have occurred, exceeds $5,000,000, then, unless a Reinvestment Notice shall be delivered in respect thereof on or prior to the fifth Business Day following the receipt of Net Cash Proceeds from such Asset Sale or Recovery Event (the "**Reinvestment Notice Date**"), such Net Cash Proceeds shall be applied after the Reinvestment Notice Date to the prepayment of the Loans as set forth in Section 2.06(d) and  on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event shall be applied to the prepayment of the Loans as set

48

forth in Section 2.06(d); *provided, however*, that for the avoidance of doubt, any cash proceeds received from business interruption insurance shall not be required to be used by the Loan Parties to prepay the Loans under this Section 2.06(b)

(c)    [Reserved].

(d)    Amounts to be applied in connection with prepayments made pursuant to Section 2.06 shall be applied to the prepayment of the Loans in accordance with Section 2.12(b). The application of any prepayment pursuant to Section 2.06 shall be made, first, to ABR Loans and, second, to Eurodollar Loans. Each prepayment of the Loans under Section 2.06 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

(e)    Notwithstanding anything to the contrary in Section 2.06(d) or 2.12, the Borrower will, in lieu of applying the amount of any mandatory prepayment described in Section 2.06 (such amount, the "**Initial Prepayment Amount**") to the prepayment of Loans as provided in paragraph (d) above, on the date specified in Section 2.06 for such prepayment, give the Administrative Agent written notice (each, a "**Prepayment Option Notice**") at least ten (10) Business Days prior to the date of prepayment (each a "**Mandatory Prepayment Date**"). As promptly as practicable after receiving such notice from the Borrower, the Administrative Agent will send to each Lender such Prepayment Option Notice, which shall include an offer by the Borrower to prepay on the relevant Mandatory Prepayment Date the Loans of such Lender by an amount equal to the portion of the Initial Prepayment Amount indicated in such Lender's Prepayment Option Notice as being applicable to such Lender's Loans. On the Mandatory Prepayment Date, the Borrower shall pay to the Administrative Agent for the benefit of the relevant Lenders the aggregate amount necessary to prepay that portion of the outstanding relevant Loans in respect of which such Lenders have accepted prepayment as described above.

Section 2.07.    *Conversion and Continuation Options*.  (a) The Borrower may elect from time to time to convert Eurodollar Loans to ABR Loans by giving the Administrative Agent prior irrevocable written notice of such election, in each case in the form of Exhibit J appropriately completed (the "**Notice of Conversion/Continuation**") no later than 11:00 A.M., New York City time, on the Business Day preceding the proposed conversion date, *provided* that any such conversion of Eurodollar Loans may only be made on the last day of an Interest Period with respect thereto. The Borrower may elect from time to time to convert ABR Loans to Eurodollar Loans by giving the Administrative Agent prior irrevocable written notice of such election no later than 11:00 A.M., New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor), *provided* that no ABR Loan under a particular Tranche may be converted into a Eurodollar Loan when any Event of Default has occurred and is continuing and the Administrative Agent (acting at the direction of the Required Lenders and the Required Tranche A-2 Lenders) have determined in its or their sole discretion not to permit such conversions. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)    Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable written notice to the Administrative Agent, in accordance with the applicable provisions of the term "**Interest Period**" set forth in Section 1.01, of the length of the next Interest Period to be applicable to such Loans, *provided* that no Eurodollar Loan under a particular Tranche may be continued as such (i) when any Event of Default has occurred and is continuing and the Administrative Agent (acting at the direction of the Required Lenders and the Required Tranche A-2 Lenders) has determined in its or their sole discretion not to permit such continuations or (ii) if an Event of Default specified in clause (i) or (ii) of Section 7.01(f) with respect to the Borrower is in existence, and *provided*, *further*, that if the Borrower shall fail to give any required notice as described above in this paragraph or if such continuation is not permitted pursuant to the preceding proviso such Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period. If the Borrower fails to specify the Interest Period applicable, the Borrower shall be deemed to have selected an Interest Period of one month. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

Section 2.08.    *Limitations on Eurodollar Class*.  Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Eurodollar Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Class shall be not less than $1,000,000 or a whole multiple of $100,000 in excess thereof, (b) no more than ten Eurodollar Class shall be outstanding at any one time (or, if less, the entire outstanding principal amount of any Loan) and (c) the proportion of each Tranche made or continued as Eurodollar Loans (as compared to ABR Loans) shall be the same across the Tranches (e.g., if 50% of the Tranche A Loans are Eurodollar Loans, 50% of the Tranche A-2 Loans, 50% of the Tranche B Loans and 50% of the Tranche C Loans shall be Eurodollar Loans), and the allocation of each Tranche among Interest Periods shall be the same across the Tranches (e.g., if 25% of the Tranche A Loans have an Interest Period of one month ending on October 31, 2018, 25% of the Tranche A-2 Loans, 25% of the Tranche B Loans and 25% of the Tranche C Loans shall have an Interest Period of one month ending on October 31, 2018).

Section 2.09.    *Interest Rates and Payment Dates*.

(a)    Except as provided for below in clauses (d) and (e) as to Tranche C Loans, Initial Loans may from time to time be Eurodollar Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.02 and 2.07.

(b)    Each Eurodollar Loan (including any Additional Tranche A-2 PIK Principal and any Additional Tranche C PIK Principal) shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin.

(c)    Each ABR Loan (including any Additional Tranche A-2 PIK Principal and any Additional Tranche C PIK Principal) shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(d)    Tranche CA-2 Loans shall bear both cash pay interest ("**Cash Interest**") and interest in the form of additional amounts added to the outstanding principal amount of the Tranche CA-2 Loans ("**Tranche A-2 PIK Interest**", and the amount of any such Tranche A-2 PIK Interest added to the principal of the Tranche CA-2 Loans on any Interest Payment Date, the "**Additional Tranche A-2 PIK Principal**"), in accordance with the definition of "Tranche A-2 Applicable Margin" (with Cash Interest and Additional Tranche A-2 PIK Principal to be allocated pro rata among the Tranche A-2 Lenders in proportion to the aggregate principal amount of the portion of the Tranche A-2 Loan held by each Tranche A-2 Lender).

(e)    Tranche C Loans shall bear both Cash Interest and interest in the form of additional amounts added to the outstanding principal amount of the Tranche C Loans ("**Tranche C PIK Interest**" and the amount of any such Tranche C PIK Interest added to the principal of the Tranche C Loans on any Interest Payment Date, the "**Additional Tranche C PIK Principal**"), in accordance with the definition of "Tranche C Applicable Margin" (except as provided for below in clause (ef)) (with Cash Interest and Additional Tranche C PIK Principal to be allocated pro rata among the Tranche C Lenders in proportion to the aggregate principal amount of the portion of the Tranche C Loan held by each Tranche C Lender).

(f)    (e) If at any time up to and including the Hinge Date, the Borrower determines that Projected Liquidity, calculated as of the close of business two (2) Business Days immediately prior to any Interest Payment Date is equal to or less than $115,000,000, the Borrower may elect (an "**Interest Election**") to decrease (the "**Interest Election Decrease**") the amount of Cash Interest by any amount up to a maximum of 3.00% per annum by simultaneously increasing the amount of Tranche C PIK Interest by an amount equal to one and one third (1.33) basis points for each single (1.00) basis point of Interest Election Decrease, up to an aggregate cap of $15,000,000 in Additional Tranche C PIK Principal with respect to such Interest Election during the term of this Agreement. Interest Elections may be made by delivering an irrevocable notice to the Administrative Agent no later than six (6) Business Days prior to the effective date of any Interest Election, which notice shall (i) certify the amount of Projected Liquidity, calculated as of the close of business two (2) Business Days immediately prior to such Interest Payment Date (together with a reasonably detailed calculation thereof), (ii) specify the effective date of such Interest Election and (iii) certify the aggregate amount of Additional Tranche C PIK Principal with respect to Interest Elections during the term of this Agreement made as of the date of such notice. An Interest Election (as to the portion of the interest payable as Tranche C PIK Interest subject to such Interest Election only) shall remain in effect until the Maturity Date. The Administrative Agent shall promptly forward such notice to each Lender.

(g)    (f) (i) If all or a portion of the principal amount of any Loan shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), all overdue

Loans shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section 2.09(~~f~~g) plus 2% and (ii) if all or a portion of any interest payable on any Loan or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to ABR Loans under the relevant Tranche plus 2% in each case, with respect to clauses (i) and (ii) above, from the date of such non-payment until such amount is paid in full (as well after as before judgment).

(h) ~~(g)~~ Interest on Tranche A Loans and Tranche B Loans, and Cash Interest on Tranche A-2 Loans and Tranche C Loans, shall be payable in arrears on each Interest Payment Date, *provided* that interest accruing pursuant to Section 2.09(~~f~~g) shall be payable from time to time on demand. Tranche C PIK Interest on each Tranche C Loan shall be payable by increasing the outstanding principal amount of ~~the Tranche C Loans~~such Tranche C Loan by the amount of Additional Tranche C PIK Principal. Tranche A-2 PIK Interest on each Tranche A-2 Loan shall be payable by increasing the outstanding principal amount of such Tranche A-2 Loan by the amount of Additional Tranche A-2 PIK Principal.

(i) ~~(h)~~ Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Borrower or the Required Lenders and the Required Tranche A-2 Lenders notify the Administrative Agent (with, in the case of the Required Lenders and the Required Tranche A-2 Lenders, a copy to the Borrower) that the Borrower or the Required Lenders and the Required Tranche A-2 Lenders (as applicable) have determined, that:

(i) adequate and reasonable means do not exist for ascertaining the LIBOR Rate for any requested Interest Period, including, without limitation, because the LIBOR Rate is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii) the administrator of the LIBOR Rate or a Governmental Authority having jurisdiction over the Administrative Agent or the Required Lenders and the Required Tranche A-2 Lenders has made a public statement identifying a specific date after which the LIBOR Rate shall no longer be made available, or used for determining the interest rate of loans (such specific date, the "**Scheduled Unavailability Date**"), or

(iii) syndicated loans currently being executed, or that include language similar to that contained in this Section 2.09(~~h~~i), are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace the LIBOR Rate,

then, reasonably promptly after such determination by the Administrative Agent or receipt by the Administrative Agent of such notice, as applicable, the Administrative Agent, the Required Lenders and the Required Tranche A-2

52

Lenders and Borrower may amend this Agreement to replace the LIBOR Rate with an alternate benchmark rate (including any mathematical or other adjustments to the benchmark (if any) incorporated therein), giving due consideration to any evolving or then existing convention for similar U.S. dollar denominated syndicated credit facilities for such alternative benchmarks (any such proposed rate, a "**LIBOR Successor Rate**"), together with any proposed LIBOR Successor Rate Conforming Changes and any such amendment shall become effective at 5:00 p.m. (New York time) on the fifth Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and Borrower unless, prior to such time, Lenders comprising the Required Lenders and the Required Tranche A-2 Lenders have delivered to the Administrative Agent written notice that such Required Lenders and the Required Tranche A-2 Lenders do not accept such amendment.

If no LIBOR Successor Rate has been determined and the circumstances under clause (i) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Administrative Agent will promptly so notify Borrower and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain Eurodollar Loans shall be suspended (to the extent of the affected Eurodollar Loans or Interest Periods) and (y) the Eurodollar Rate component shall no longer be utilized in determining the ABR.  Upon receipt of such notice, any Borrower may revoke any pending request for a borrowing of, conversion to or continuation of Eurodollar Loans (to the extent of the affected Eurodollar Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a borrowing of ABR Loans (subject to the foregoing clause (y)) in the amount specified therein.

Section 2.10.   *Computation of Interest and Fees*.  (a) Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed (including the first day but excluding the last day), except that, with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed (including the first day but excluding the last day). The Administrative Agent shall as soon as determined pursuant to this Agreement notify the Borrower and the relevant Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as determined pursuant to this Agreement notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

(b)      Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error. The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.09(a).

Section 2.11.  *Inability to Determine Interest Rate*.  If prior to the first day of any Interest Period:

(a)    the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrower absent a manifest error) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b)    the Administrative Agent shall have received notice from the Required Lenders and the Required Tranche A-2 Lenders that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

the Administrative Agent shall give telecopy or written notice thereof to the Borrower and the relevant Lenders as soon as practicable thereafter. If such notice is given (x) any Eurodollar Loans under the relevant Tranche requested to be made on the first day of such Interest Period shall be made as ABR Loans, (y) any Loans under the relevant Tranche that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans under the relevant Tranche shall be converted, on the last day of the then-current Interest Period, to ABR Loans. Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans under the relevant Tranche shall be made or continued as such, nor shall the Borrower have the right to convert Loans under the relevant Tranche to Eurodollar Loans.

Section 2.12.  *Pro Rata Treatment and Payments*.

(a)    [Reserved].

(b)    Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Loans shall be made *pro rata* according to the respective outstanding principal amounts of the Loans then held by the Lenders (except as otherwise provided in Section 2.06(e) or, in the case of Extended Loans, if the applicable Extension Amendment specifies a less favorable treatment), among each of the Tranches and within each Tranche; *provided* that prepayments of Tranche B Loans and Tranche C Loans will be made on a no less than ratable basis than prepayments with respect to Tranche A Loans and Tranche A-2 Loans, and prepayments of Tranche B Loans will be made on a no less than ratable basis than prepayments made with respect to Tranche C Loans. All prepayments of Tranche B Loans shall be applied to the amortization payments described in Section 2.03(b) on the Tranche B Loans in direct order of maturity. Amounts prepaid on account of the Loans may not be reborrowed.

(c)    All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 Noon, New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders,

at the Funding Office, in Dollars and in immediately available funds. Any such payments made later than 12:00 Noon, New York City time on any day shall be deemed to have been made on the next succeeding Business Day for purposes of calculating interest thereon. The Administrative Agent shall distribute such payments to each relevant Lender promptly upon receipt in like funds as received, net of any amounts owing by such Lender pursuant to Section 8.07.  If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(d)     Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three (3) Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans under the relevant Tranche, on demand, from the Borrower.

(e)     Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrower within three (3) Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

(f)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.12(d), 2.12(e), 2.14(e) or 8.07, then the Administrative Agent may, in its discretion and notwithstanding any contrary provision hereof, (i) apply any amounts thereafter received by the Administrative Agent under any such Section for the account of such Lender to satisfy such Lender's obligations under any such Section until all such unsatisfied obligations are fully paid and/or (ii) hold any such amounts in a segregated account as cash collateral for, and application to, any future funding obligations of such Lender under any such Section, in any order as determined by the Administrative Agent in its discretion.

Section 2.13.   *Requirements of Law*.  (a) If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender or other Credit Party with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)     shall subject any Credit Party to any Taxes (other than (A) Indemnified Taxes and (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) in respect of its Loans, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

(ii)     shall impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in, by any Lender that is not otherwise included in the determination of the Eurodollar Rate; or

(iii)     shall impose on such Lender any other condition (other than Taxes);

and the result of any of the foregoing is to increase the cost to such Lender or such other Credit Party, by an amount that such Lender or other Credit Party deems to be material, of making, converting into, continuing or maintaining Loans, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender or such other Credit Party, upon its demand, any additional amounts necessary to compensate such Lender or such other Credit Party for such increased cost or reduced amount receivable. If any Lender or such other Credit Party becomes entitled to claim any additional amounts pursuant to this paragraph, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)     If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company as a consequence of its obligations hereunder (taking into consideration such Lender's or such Lender's holding company's policies with respect to

capital adequacy or liquidity)by an amount deemed by such Lender to be material and, in any event, to a level below that which such Lender or such Lender's holding company could have achieve but for such change in Requirement of Law , then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for such reduction.

(c)      Notwithstanding anything herein to the contrary, (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented.

(d)      A certificate as to any additional amounts payable pursuant to this Section 2.13 submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error.  Notwithstanding anything to the contrary in this Section 2.13, the Borrower shall not be required to compensate a Lender pursuant to this Section 2.13 for any amounts incurred more than six months prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; *provided* that, if the circumstances giving rise to such claim have a retroactive effect, then such six-month period shall be extended to include the period of such retroactive effect. The obligations of the Borrower pursuant to this Section 2.13 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.14.  *Taxes.*  (a) All payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that, after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.14), the amounts received by the applicable Lender (or, in the case of a payment made to the Administrative Agent for its own account, the Administrative Agent) with respect to this agreement equal the sum which would have been received had no such deduction or withholding been made.

(b)     The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse the Administrative Agent for any Other Taxes.

(c)     As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.14, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)     The Loan Parties shall jointly and severally indemnify each Credit Party, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.14) payable or paid by such Credit Party or required to be withheld or deducted from a payment to such Credit Party and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, setting forth in reasonable detail the basis for the calculations of such payment or liability and including reasonable supporting evidence shall be prima facie evidence thereof absent manifest error.

(e)     Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.06(c) relating to the maintenance of a Participant Register, and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)     (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.

58

In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than documentation relating to U.S. federal withholding taxes, including such documentation set forth in Section 2.14(f)(ii)(A), (B) and (D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

        (ii)      Without limiting the generality of the foregoing,

        (A)      any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

        (B)      any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

        (1)      in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party, executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E;

        (2)      executed originals of IRS Form W-8ECI;

        (3)      in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and that no payments in connection with any Loan Document are effectively connected

with a U.S. trade or business and (y) executed originals of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)     to the extent a Non-U.S. Lender is not the beneficial owner (for example, where the Lender is a partnership, or is a Participant holding a participation granted by a participating Lender), executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Non-U.S. Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner;

(C)     any Non-U.S. Lender shall, to the extent it is legally eligible to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. Federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA to determine whether such Lender has complied with such Lender's obligations under FATCA and, if necessary, to determine the amount to deduct and withhold from such payment. Solely for purposes of this

clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any documentation it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such documentation or promptly notify the Borrower and the Administrative Agent in writing of its legal ineligibility to do so.

Notwithstanding any other provision of this Section 2.14, a Lender shall not be required to provide any documentation pursuant to this Section 2.14(f) that such Lender is not legally eligible to deliver.

Each Lender hereby authorizes the Administrative Agent to deliver to the Loan Parties and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to this Section 2.14(d).

(g)    On or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement, the Administrative Agent shall deliver to the Borrower two duly completed original copies of, if it is not a United States person (as defined in Section 7701(a)(30) of the Code), IRS Form W-8ECI or W-8BEN-E with respect to payments to be received by it as a beneficial owner and IRS Form W-8IMY (together with required accompanying documentation) with respect to payments to be received by it on behalf of the Lenders. If the Administrative Agent is a United States Person (as defined in Section 7701(a)(30) of the Code), the Administrative Agent shall deliver to the Borrower two duly completed original copies of IRS Form W-9. The Administrative Agent shall deliver such documentation on or before any date on which such documentation expires or becomes obsolete or invalid, after the occurrence of any change in the Administrative Agent's circumstances requiring a change in the most recent documentation previously delivered by it to the Borrower, and from time to time thereafter if reasonably requested by the Borrower, and shall promptly notify the Borrower in writing if it is no longer legally eligible to provide any documentation previously provided.

(h)    If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.14 (including by the payment of additional amounts pursuant to this Section 2.14), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.14 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of

61

which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     Each party's obligations under this Section 2.14 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all obligations under the Loan Documents.

(j)     For purposes of this Section 2.14, the term "applicable law" includes FATCA.

Section 2.15.  *Indemnity*.  The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrower has given a Notice of Borrowing or Notice of Conversion/Continuation, as applicable, requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment of or conversion from Eurodollar Loans after the Borrower has given a Notice of Borrowing or Notice of Conversion/Continuation, as applicable, thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto. Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. A certificate as to any amounts payable pursuant to this Section 2.15 submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.16.  *Change of Lending Office*.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.13 or 2.14(a) with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; *provided*, that such designation is made on terms that, in the sole judgment

of such Lender, cause such Lender and its lending offices to suffer no economic, legal or regulatory disadvantage, and *provided*, *further*, that nothing in this Section 2.16 shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.13 or 2.14(a).

Section 2.17.  *Replacement of Lenders*.  The Borrower shall be permitted to replace any Lender that (a) requests reimbursement for amounts owing pursuant to Section 2.13 or 2.14(a), or (b) does not consent to any proposed amendment, supplement, modification, consent or waiver of any provision of this Agreement or any other Loan Document that requires the consent of each of the Lenders or each of the Lenders affected thereby (so long as the consent of the Required Lenders, Required Tranche A Lenders, Required Tranche A-2 Lenders, Required Tranche B Lenders, Required Tranche C Lenders or Required Tranche B/C Lenders, in each case as may be required by Section 9.01, has been obtained), with a replacement financial institution; *provided* that (i) such replacement does not conflict with any Requirement of Law, (ii) no Event of Default shall have occurred and be continuing at the time of such replacement, (iii) prior to any such replacement, such Lender shall not have eliminated the need for payment of amounts owing pursuant to Section 2.13 or 2.14(a), (iv) the replacement financial institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (v) the Borrower shall be liable to such replaced Lender under Section 2.15 if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (vi) the replacement financial institution shall be reasonably satisfactory to the Administrative Agent, (vii) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 9.06 (*provided* that the Borrower shall be obligated to pay the registration and processing fee referred to therein), (viii) until such time as such replacement shall be consummated, the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.13 or 2.14(a), as the case may be, and (ix) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender. Each party hereto agrees that an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee, and that the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective.

Section 2.18.  *Extensions of Loans*.

(a)    Notwithstanding anything to the contrary in this Agreement but subject in all cases to the limitations and requirements of the fourth to last paragraph of Section 9.01, pursuant to one or more offers (each, an "**Extension Offer**") made from time to time by the Borrower to all Lenders of Loans with the same maturity date, in each case on a pro rata basis (based on the aggregate outstanding principal amount of the respective Loans with the same maturity date) and on the same terms to each such Lender, the Borrower is hereby permitted to consummate from time to time transactions with individual Lenders that accept the terms contained in such Extension Offers to extend the maturity date of each such Lender's Loans and otherwise modify the terms of such Loans pursuant to the terms of the relevant Extension Offer (including by increasing the interest

rate or fees payable in respect of such Loans (and related outstandings) and/or modifying the amortization schedule in respect of such Lender's Loans) (each, an "**Extension**", and each group of Loans, in each case as so extended, as well as the original Loans (not so extended), being a "tranche"; any Extended Loans shall constitute a separate tranche of Loans from the tranche of Loans from which they were converted), so long as the following terms are satisfied: (i) no Default or Event of Default shall have occurred and be continuing at the time the offering document in respect of an Extension Offer is delivered to the Lenders, (ii) except as to pricing (interest rate, fees, funding discounts and prepayment premiums), amortization, maturity, required prepayment dates and participation in prepayments (which shall, subject to immediately succeeding clauses (iii), (iv) and (v), be set forth in the relevant Extension Offer and subject to the limitations contained in the fourth to last paragraph of Section 9.01), the Loans of any Lender that agrees to an Extension with respect to such Loans (an "**Extending Lender**") extended pursuant to any Extension ("**Extended Loans**") shall have the same terms as the tranche of Loans subject to such Extension Offer (except for covenants or other provisions contained therein applicable only to periods after the then Latest Maturity Date of the Loans), (iii) the final maturity date of any Extended Loans shall be no earlier than the then Latest Maturity Date, (iv) the Weighted Average Life to Maturity of any Extended Loans shall be no less than 91 days longer than the remaining Weighted Average Life to Maturity of the Tranche extended thereby, (v) any Extended Loans may participate on a pro rata basis or a less than pro rata basis (but not greater than a pro rata basis) in any voluntary or mandatory repayments or prepayments hereunder, in each case as specified in the respective Extension Offer, (vi) if the aggregate principal amount of Loans (calculated on the face amount thereof) in respect of which Lenders shall have accepted the relevant Extension Offer shall exceed the maximum aggregate principal amount of Loans offered to be extended by the Borrower pursuant to such Extension Offer, then the Loans of such Lenders shall be extended ratably up to such maximum amount based on the respective principal amounts (but not to exceed actual holdings of record) with respect to which such Lenders have accepted such Extension Offer, (vii) the Borrower shall have delivered to the Administrative Agent a "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to the Mortgaged Properties or parcels thereof with improvements thereon (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower in the event any portion of such Mortgaged Properties are Collateral and located in a special flood hazard area), and the flood insurance policies contemplated thereby shall have been procured (viii) all documentation in respect of such Extension shall be consistent with the foregoing and (ix) any applicable Minimum Extension Condition shall be satisfied unless waived by the Borrower.

(b)     With respect to all Extensions consummated by the Borrower pursuant to this Section 2.18, (i) such Extensions shall not constitute voluntary or mandatory payments or prepayments for purposes of Section 2.18 and (ii) each Extension Offer shall specify the minimum amount of Loans to be tendered, which shall be with respect to Loans of a Tranche an integral multiple of $1,000,000 and an aggregate principal amount that is not less than $10,000,000 (or if less, the remaining outstanding principal amount thereof) (or such lesser minimum amount reasonably acceptable by the Administrative Agent) (a "**Minimum Extension Condition**"). The transactions contemplated by this

Section 2.18 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Loans on such terms as may be set forth in the relevant Extension Offer) shall not require the consent of any Lender or any other Person (other than as set forth in clause (c) below), and the requirements of any provision of this Agreement (including Section 2.12) or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section 2.18 shall not apply to any of the transactions effected pursuant to this Section 2.18.

(c)     The consent (such consent not to be unreasonably withheld, delayed or conditioned) of the Administrative Agent shall be required to effectuate any Extension. No consent of any Lender or any other Person shall be required to effectuate any Extension, other than the consent of the Borrower and each Lender agreeing to such Extension with respect to one or more of its Loans (or a portion thereof).  All Extended Loans and all obligations in respect thereof shall be Obligations under this Agreement and the other Loan Documents that are secured by the Collateral on a pari passu basis with all other applicable Obligations under this Agreement and the other Loan Documents. The Lenders hereby irrevocably authorize the Administrative Agent to enter into amendments to this Agreement and the other Loan Documents (an "**Extension Amendment**") with the Borrower as may be necessary in order to establish new tranches or sub-tranches in respect of Loans so extended and such technical amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with the establishment of such new tranches or sub-tranches, in each case on terms consistent with this Section 2.18. Without limiting the foregoing, in connection with any Extensions, the respective Loan Parties shall (at their expense) amend (and the Administrative Agent is hereby directed to amend) any Mortgage (i) that has stated within it a maturity date prior to the then Latest Maturity Date so that such stated maturity date is extended to the then Latest Maturity Date (or such later date as may be advised by local counsel to the Administrative Agent), or (ii) covers property in a state where local counsel to the Administrative Agent has advised that because of the establishment of such tranches or sub-tranches and/or the extension of such maturity date, such Mortgage should be amended in the manner specified by such local counsel.

In connection with any Extension, the Borrower shall provide the Administrative Agent at least five (5) Business Days (or such shorter period as may be agreed by the Administrative Agent) prior written notice thereof, and shall agree to such procedures (including, regarding timing, rounding and other adjustments and to ensure reasonable administrative management of the credit facilities hereunder after such Extension), if any, as may be established by, or acceptable to, the Administrative Agent, in each case acting reasonably to accomplish the purposes of this Section 2.18.

Section 2.19.  *Incremental Facilities*.

(a)     Subject to clause (g) below, by no fewer than five (5) Business Days' (or such lesser number of Business Days reasonably satisfactory to the Administrative Agent) notice to the Administrative Agent (which shall promptly notify the Lenders), the Borrower may from time to time, request Incremental Commitments by an amount not exceeding $~~100,000,000~~90,000,000 in the aggregate; provided that (i) any such request

for an increase shall be in a minimum amount of $5,000,000 and (ii) the Borrower may make a maximum of two (2) such requests per fiscal year of the Borrower. No Lender shall be obligated to make Incremental Commitments, and the making of Incremental Commitment by any Lender (in such capacity, an "**Incremental Lender**") shall be in the sole discretion of such Lender.

(b)    Subject to the approval of the Administrative Agent, and only to the extent such approval would be required under Section 9.06 for an assignment to such Persons, the Borrower shall select Persons constituting Assignees to participate in any Incremental Commitments. Each Incremental Lender shall effectuate its Incremental Commitment pursuant to an Incremental Joinder.

(c)    If Incremental Commitments are established in accordance with this Section 2.19, the Administrative Agent and the Borrower shall mutually determine the date (an "**Incremental Facility Closing Date**") on which each Incremental Lender shall extend a term loan to the Borrower (an "**Incremental Loan**") in an aggregate principal amount equal to such Incremental Lender's Incremental Commitment. Such Incremental Loans shall be deemed to be Tranche C Loans, except as provided in clause (g) below.  The Administrative Agent shall promptly notify the Lenders of the occurrence of each Incremental Facility Closing Date.

(d)    As a condition precedent to the making of any Incremental Loans, the Borrower shall deliver to the Administrative Agent (i) a favorable opinion of counsel to the Loan Parties, addressed to the Administrative Agent and each Lender, covering such customary matters as may be reasonably requested by the Administrative Agent in connection with such increase, (ii) a certificate of the Borrower dated as of the Incremental Facility Closing Date signed by a Responsible Officer of the Borrower (A) certifying and attaching the resolutions adopted by the Borrower approving such increase and (B) certifying (on behalf of itself and the other Loan Parties) that, before and after giving effect to such increase, (1) the representations and warranties contained in Article 3, the other Loan Documents and the relevant certificates delivered by the Borrower are true and correct in all material respects (except with respect to representations and warranties which are expressly qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) on and as of the Incremental Facility Closing Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (except with respect to representations and warranties which are expressly qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) as of such earlier date, and except that for purposes of this Section 2.19, the representations and warranties contained in subsection (a) of Section 3.04 shall be deemed to refer to the most recent statements of Borrower and its Subsidiaries (or, as applicable, a Permitted Reporting Company) furnished pursuant to clauses (a) and, (b) and (c), respectively, of Section 5.01, and (2) no Event of Default has occurred and is continuing as of the Incremental Facility Closing Date, (iii) a "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to the Mortgaged Properties or parcels thereof with improvements thereon (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower in the event any portion of

66

such Mortgaged Properties are Collateral and located in a special flood hazard area) and the flood insurance policies contemplated thereby shall have been procured and (iv) such amendments to the Mortgages and updates to Mortgagee's title insurance policies as the Administrative Agent reasonably deems necessary in order for the Obligations (after giving effect to such increase) to continue to be secured on a first lien basis.

(e)    All Incremental Loans, except to the extent expressly set forth herein, shall have the same terms (other than upfront or certain other fees paid to the Lenders as determined by the Borrower) as the other Loans and shall be benefitted by the guarantees from the Guarantors and secured on a pari passu basis by the Collateral.

(f)    This Section 2.19 shall supersede any provisions in Section 2.12 or 9.01 to the contrary.

(g)    Incremental Loans shall be in the form of Tranche C Loans, *provided*, that (i) upon the receipt by the Required Tranche B Lenders of a budget reasonably satisfactory to such Required Tranche B Lenders demonstrating the need, for ordinary working capital purposes, for Incremental Loans in the form of Tranche A Loans, within two Fiscal Quarters of the proposed incurrence of such Incremental Loans, the Borrower may borrow such Incremental Loans in the form of Tranche A Loans in an aggregate principal amount for all such Incremental Loans of up to $15,000,000; *provided* that each Tranche B Lender shall be afforded the opportunity to participate in such Incremental Loans on a ratable basis and (ii) the Borrower may borrow any Incremental Loans in the form of Tranche A-2 Loans in an aggregate principal amount for all such Incremental Loans in the form of Tranche A-2 Loans of up to $75,000,000.

(h)    Any Incremental Loans made by an Other Affiliate shall be subject to the limitations contained in Section 9.06(e)(ii) as if such Incremental Loans were assignments of Loans to such Other Affiliate.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans, the Borrower hereby represents and warrants to the Administrative Agent and each Lender that, as of the Closing Date:

Section 3.01.    *Organization; Powers*.  Each Loan Party (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to carry on its business as now conducted and to own and lease its property and (c) is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except (other than in the case of the Borrower as to the Borrower's jurisdiction of organization) in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.02.  *Authorizations; Enforceability*.  The Transactions to be entered into by each Loan Party are within such Loan Party's powers and have been duly authorized by all necessary limited liability company, corporate and limited partnership action on the part of such Loan Party. This Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03.  *Governmental Approvals; No Conflicts*.  The Transactions (i) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (A) such as has been obtained or made and are in full force and effect, (B) filings necessary to perfect or maintain Liens created by the Security Documents and (C) consents, approvals, registrations, filings, permits or actions the failure of which to obtain or perform would not reasonably be expected to result in a Material Adverse Effect, (ii) do not violate the Organizational Documents of any Loan Party, (iii) do not violate any Requirement of Law, except for any such violation which would not reasonably be expected to result in a Material Adverse Effect, (iv) except as set forth on Schedule 3.03, do not violate or result in a default or require any consent or approval under any Material Contract binding upon any Loan Party or its property, or give rise to a right under any of the foregoing to require any payment to be made by any Loan Party, except for violations, defaults or the creation of such rights that would not reasonably be expected to result in a Material Adverse Effect and (v) do not result in the creation or imposition of any Lien on any property of any Loan Party, except Liens permitted pursuant to Section 6.02.

Section 3.04.  *Financial Statements; Material Adverse Effect; Pro Forma Financial Statements*.

(a)    *Financial Statements*.  All financial statements delivered pursuant to Section 4.01(b) have been prepared in accordance with GAAP consistently applied and present fairly and accurately in all material respects the financial condition and results of operations and cash flows of Borrower and its Subsidiaries as of the dates and for the periods to which they relate, except for, in the case of interim financial statements delivered, the absence of footnote disclosures and normal year-end adjustments.

(b)    *No Material Adverse Effect*.  Since the Closing Date, there has been no event, change, circumstance or occurrence that, individually or in the aggregate, has had or would reasonably be expected to result in a Material Adverse Effect.

(c)    *Pro Forma Financial Statements*.  The unaudited pro forma consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at December 31, 2017 and the related consolidated statement of income for the twelve (12) month period ended on such date (including the notes thereto) (the "**Pro Forma Financial Statements**"), copies of which have heretofore been furnished to the Administrative Agent (for

distribution to each Lender), has been prepared giving effect (as if such events had occurred on such date) to (i) the Transactions, (ii) the Restructuring Transactions and (iii) the payment of fees and expenses expected to have a continuing impact on results of operations. The Pro Forma Financial Statements have been prepared based on the best information available to the Borrower (on a commercially reasonable basis taking into account the context and available timeframe in which they were prepared) as of the date of delivery thereof, and presents fairly on a pro forma basis the estimated financial position of Borrower and its consolidated Subsidiaries as at and for the twelve month period ended on December 31, 2017 assuming that the events specified in the preceding sentence had actually occurred at such date.

Section 3.05.  *Properties*.

(a)    *Generally*.  Each Loan Party has good and marketable title to, a license to or valid leasehold or easement interests in, all its property material to its business, free and clear of all Liens except for Liens permitted pursuant to Section 6.02 and, in the case of all other property, Liens permitted pursuant to Section 6.02 and minor irregularities or deficiencies in title that, individually or in the aggregate, do not interfere with its ability to conduct its business as currently conducted or to utilize such property for its intended purpose in either case, except where the failure to have such title or other interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The property of the Loan Parties, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted) and (ii) constitutes all the property which is required for the business and operations of the Loan Parties as presently conducted.

(b)    *No Recovery Event*.  No Loan Party has received any written notice of, nor has any knowledge of, the occurrence or pendency or contemplation of any Recovery Event affecting all or any portion of its property, which Recovery Event would reasonably be expected to have a Material Adverse Effect.

(c)    *Collateral*.  No claim has been made and remains outstanding that any Loan Party's use of any Collateral does or may violate the rights of any third party that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 3.06.  *Intellectual Property*.  Each Loan Party owns, licenses or possesses the right to use all of the trademarks, service marks, trade names, copyrights, patents, franchises, licenses and other intellectual property rights (collectively, "**IP Rights**") that are necessary for the operation of its respective business, as currently conducted, and such IP Rights do not conflict with the rights of any other Person, except to the extent such failure to own, license or possess or such conflicts, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. The conduct of the business of any Loan Party as currently conducted or as contemplated to be conducted does not infringe upon or violate any rights held by any other Person except for such infringements and violations which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. No claim or litigation

regarding any of the foregoing is pending or, to the knowledge of the Borrower, threatened in writing which, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 3.07. *Capital Stock and Subsidiaries*. Each Loan Party has no Subsidiaries other than those set forth on Schedule 3.07. Schedule 3.07 sets forth the name and jurisdiction of incorporation of each Subsidiary and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by any Loan Party. All of the outstanding Capital Stock in such Subsidiaries that are owned by a Loan Party have been validly issued, are fully paid and non-assessable (to the extent such concepts are applicable in the relevant jurisdiction) and are owned free and clear of all Liens except Liens permitted pursuant to Section 6.02.

Section 3.08. *Litigation; Compliance with Laws; No Default*.

(a)     Except as set forth in Schedule 3.08(a), there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of any Loan Party, threatened in writing against or affecting any Loan Party or any business, property or rights of any Loan Party (i) that involve any Loan Document or, as of the Closing Date, any of the other Transactions or (ii) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)     Except for matters covered by Section 3.17, no Loan Party or any of its businesses, operations and Real Property is in violation of, nor will the continued operation of its businesses, operations or the facilities and properties owned, leased or operated by such Loan Party as currently conducted or contemplated by any Contractual Obligation of such Loan Party violate, any Requirements of Law where such violation or default, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

(c)     No Default or Event of Default has occurred and is continuing.

(d)     The Borrower or any Affiliate thereof has obtained all Material Permits; all such Material Permits are valid and in good standing and, where subject to renewal and/or transfer, the Loan Parties have timely submitted complete renewal and/or transfer applications; the Borrower is currently in compliance with all such Material Permits, other than any non-compliance that would not reasonably be expected to have a Material Adverse Effect.

(e)     No Loan Party is in default under or with respect to any of its Contractual Obligations in any respect that would reasonably be expected to have a Material Adverse Effect.

Section 3.09. *Federal Reserve Regulations*. No Loan Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock (as defined in Regulation U). No part of the

proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that violates the provisions of Regulation T, U or X.

Section 3.10.    *Investment Company Act*.  No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

Section 3.11.    *[Reserved]*.

Section 3.12.    *Taxes*.  Each Loan Party has (a) timely filed or caused to be timely filed all federal Tax Returns and all material state, local and foreign Tax Returns required to have been filed by it and all such Tax Returns are true and correct in all material respects, (b) duly and timely paid, collected or remitted or caused to be duly and timely paid, collected or remitted all Taxes (whether or not shown on any Tax Return) due and payable, collectible or remittable by it and all assessments received by it, except Taxes (i) that are being contested in good faith by appropriate proceedings and for which such Loan Party has set aside on its books adequate reserves in accordance with GAAP or (ii) which the nonpayment of would not be reasonably expected to, individually or in the aggregate result in a Material Adverse Effect and (c) satisfied all of its withholding tax obligations except for failures that would not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect. Each Loan Party has made adequate provision in accordance with GAAP for all material Taxes not yet due and payable. Each Loan Party is unaware of any proposed or pending tax assessments, deficiencies or audits that would be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect.

Section 3.13.    *No Material Misstatements*.  (a) All written information, other than projections and information of a general economic or industry specific nature, that has been made available by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with this Agreement, when taken as a whole, was or is correct in all material respects and did not or does not, when taken as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made (giving effect to all supplements and updates thereto that may have been subsequently delivered), (b) the financial projections and other forward- looking information (giving effect to all supplements and updates thereto that may have been subsequently delivered) that have been made available by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with this Agreement have been prepared in good faith based upon assumptions believed by such Loan Party to be reasonable at the time furnished (it being recognized that such projections are as to future events and are not to be viewed as facts, such projections are subject to significant uncertainties and contingencies, many of which are beyond such Loan Party's control, that no assurance can be given that any such projections will be realized and that actual results during the period or periods covered by any such projections may differ significantly from the projected results and such differences may

be material) and (c) as of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

Section 3.14.  *Labor Matters*.  There are no strikes, lockouts or slowdowns against any Loan Party pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of each Loan Party have not been in violation of the Fair Labor Standards Act of 1938, as amended, or any other Requirement of Law dealing with such matters in any manner which would reasonably be expected to result in a Material Adverse Effect. All payments due from any Loan Party, or for which any claim may be made against any Loan Party, on account of wages, have been paid or accrued as a liability on the books of such Loan Party except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party is bound.

Section 3.15.  *Solvency*.  Immediately after the consummation of the Transactions and the Restructuring Transactions, (a) the sum of the present fair saleable value of the assets owned by the Loan Parties on a consolidated basis, on a going concern basis, is greater than the total amount of liabilities (including contingent and unliquidated liabilities) of the Loan Parties on a consolidated basis as they become absolute and matured, the amount of contingent or unliquidated liabilities having been computed at an amount that, in light of all of the facts and circumstances existing at the Closing Date, represents the amount that can reasonably be expected to become an actual or matured liability, (b) the Loan Parties do not, on a consolidated basis, have unreasonably small capital in relation to their business and (c) the Loan Parties, on a consolidated basis, have not incurred, do not intend to incur, and do not believe they will incur, debts beyond their ability to pay such debts as such debts mature in the ordinary course of business.

Section 3.16.  *ERISA*.   (a) Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) each Loan Party and, with respect to a Pension Plan, as applicable, each ERISA Loan Party is in compliance with all applicable provisions and requirements of ERISA and the Code and other federal and state laws and the regulations and published interpretations thereunder with respect to each Plan and Pension Plan and have performed all their obligations required to have been performed under each Plan and Pension Plan; (ii) no ERISA Event or Foreign Plan Event has occurred or is reasonably expected to occur; (iii) each Plan which is intended to qualify under Section 401(a) of the Code has either received from the Internal Revenue Service a favorable determination letter or, if such Plan is a master or prototype plan, it has received a favorable opinion letter from the Internal Revenue Service or, if such Plan is a volume submitter plan, it has received a favorable advisory letter from the Internal Revenue Service and, there are no circumstances reasonably likely to result in revocation of any such letter; (iv) no liability to the PBGC (other than required premium payments), has been or is expected to be incurred by any Loan Party or any ERISA Affiliate; (v) no ERISA Event has occurred and, to the knowledge of the Borrower, no fact, event or circumstance exists that would reasonably be expected to constitute or result in an ERISA Event; and (vi) each Loan Party and each ERISA

Affiliate have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan, as applicable, and are not in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

(b)    The Borrower is currently not and at any time during the term of this Agreement will not be (i) an employee benefit plan, as defined in, and subject to Title I of ERISA, (ii) a "plan" as defined in, and subject to Section 4975 of the Code, (iii) an entity deemed to hold "plan assets" of any such "employee benefit plan" or "plan" for purposes of the U.S. Department of Labor Regulation located at 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA or (iv) a "governmental plan" within the meaning of 3(32) of ERISA.

Section 3.17.  *Environmental Matters*.  (a) Except as set forth in Schedule 3.17, and except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect:

(i)    The Loan Parties and their businesses, operations and Real Property are in compliance with all and have not violated any applicable Environmental Law and possess all Environmental Permits required to conduct their business and operations in accordance with applicable Environmental Law; all such Environmental Permits are valid and in good standing and, where subject to renewal and/or transfer, the Loan Parties have timely submitted complete renewal and/or transfer applications and timely and adequately responded to any requests from any Governmental Authority in connection with such applications; and there are no proceedings pending or, to the knowledge of the Loan Parties, threatened which would reasonably be expected to affect the validity of any such Environmental Permit or the ability of the Loan Parties to renew, modify or transfer any Environmental Permits as required under any Environmental Law;

(ii)    There has been no Release or, to the knowledge of the Loan Parties, threatened Release of Hazardous Material on, at, under or from any Real Property, or other facilities currently owned, leased or operated by the Loan Parties, or any other location, that has resulted in or would reasonably be expected to result in any Environmental Liability of the Loan Parties;

(iii)    There is no Environmental Claim pending or, to the knowledge of the Loan Parties, threatened against the Loan Parties, or relating to any Real Property, or other facilities currently owned, leased or operated by the Loan Parties, and to the knowledge of the Borrower, there are no actions, activities, circumstances, conditions, events or incidents that could form the basis of such an Environmental Claim;

(iv)    To the knowledge of the Borrower, no Person with an indemnity or contribution obligation to the Loan Parties relating to compliance with or liability under Environmental Law is in default or has defaulted or threatened to default with respect to such obligation;

(v)    To the knowledge of the Loan Parties, no Loan Party is subject to any Environmental Liability and there are no facts, circumstances or conditions arising out of or relating to the operations of any of the Loan Parties, any Real Property or any other facilities currently or formerly owned, operated or leased by any of the Loan Parties that would reasonably be expected to result in any of the Loan Parties incurring any Environmental Liability;

(vi)    No Loan Party is obligated to perform any action or otherwise incur any expense under applicable Environmental Law pursuant to any order, decree, judgment or agreement to which it is bound or has assumed by contract or agreement, and no Loan Party is conducting or financing any investigation, remediation or other response action pursuant to any Environmental Law with respect to any Real Property or any other location;

(vii)    No Real Property or facility is owned, leased or operated by any Loan Party that is material to its business and is listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA or included on any similar list maintained by any Governmental Authority;

(viii)    No Lien has been recorded or, to the knowledge of any Loan Party, threatened under any Environmental Law with respect to any Real Property or other assets of the Loan Parties; and

(ix)    The execution, delivery and performance of this Agreement will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant to any Governmental Real Property Disclosure Requirements or any other applicable Environmental Law.

Section 3.18.    *Insurance*.  Schedule 3.18 sets forth a true, complete and correct description of all insurance maintained by each Loan Party as of the Closing Date. All insurance maintained by the Loan Parties is in full force and effect, all premiums have been duly paid, no Loan Party has received notice of any material violation or cancellation thereof.

Section 3.19.    *Security Documents*.  Each Security Document (and each Mortgage upon delivery thereof) is effective to create in favor of the Administrative Agent for the benefit of the Secured Parties, legal, valid and enforceable (except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law) Liens on, and security interests in, the Collateral to the extent that an enforceable Lien in such Collateral may be created under any applicable law of the United States or any state thereof, including the applicable UCC and when (i) financing statements and other filings in appropriate form are filed in the offices specified on Schedule 5 to the Perfection Certificate with payment of any associated filing fee and (ii) upon the taking of possession or control by the Administrative Agent of the Collateral with respect to which a security interest may be perfected only by possession or control (which possession or

control shall be given to the Administrative Agent to the extent possession or control by the Administrative Agent is required by such Security Document), the Liens created by the Security Documents shall constitute perfected Liens on, and security interests in, all right, title and interest of the grantors in the Collateral (other than such Collateral in which a security interest cannot be perfected under the UCC as in effect at the relevant time in the relevant jurisdiction), in each case subject to no Liens other than Liens permitted pursuant to Section 6.02.

Section 3.20.  *Anti-Terrorism Laws*.

(a)      No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of the respective officers, directors, brokers or agents of such Loan Party or such Subsidiary has violated or is in violation of Anti-Terrorism Laws in a manner that would be material to the interests of the Lenders.

(b)      No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of the respective officers, directors, employees or brokers of such Loan Party, such Subsidiary, or agents of such Loan Party or such Subsidiary acting or benefiting in any capacity in connection with the Loans, is a Sanctioned Person or is owned or controlled by one or more Persons that are Sanctioned Persons.

(c)      Each Loan Party, its Subsidiaries and, to the knowledge of each Loan Party and the respective officers, directors, employees, brokers and agents of such Loan Party or such Subsidiary are in compliance in all material respects with sanctions administered by OFAC, all applicable Anti-Terrorism Laws and all applicable Anti-Corruption Laws.

Section 3.21.  *Affiliate Transactions*.  Except as permitted by Section 6.08, there are no existing or proposed agreements, arrangements, understandings or transactions between any Loan Party, Affiliate of any Loan Party or any of their respective officers, members, managers, directors, stockholders, parents, other interest holders or employees, or any members of their respective immediate families.

ARTICLE 4
CONDITIONS PRECEDENT

Section 4.01.  *Conditions of Effectiveness*.    This Agreement shall become effective upon the satisfaction or waiver of the following conditions precedent:

(a)      *Credit Agreement; Intercreditor Agreement; Security Agreement*. The Administrative Agent shall have received (i) this Agreement, executed and delivered by the Administrative Agent, the Borrower and each Person listed on Schedule 1.01A, (ii) the Intercreditor Agreement, executed and delivered by each Person party thereto and (iii) the Security Agreement, executed and delivered by the Borrower and each Subsidiary Guarantor.

(b)      *Pro Forma Balance Sheet; Financial Statements*.  The Lenders shall have received (i) the Pro Forma Financial Statements, (ii) an audited consolidated balance sheet

of the Borrower as of December 31, 2017 and (iii) unaudited consolidated financial statements of the Borrower for the period, commencing on January 1, 2018 through March 31, 2018.

(c)    *Lien Searches*.  The Administrative Agent (and each Lender that shall have so requested the same) shall have received the results of a recent Lien search with respect to each Loan Party, and such search shall reveal no Liens on any of the assets of the Loan Parties except for Liens permitted by Section 6.02 or discharged on or prior to the Closing Date pursuant to documentation satisfactory to the Administrative Agent.

(d)    *Fees*.  The Lenders and the Administrative Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable and documented fees and expenses of legal counsel), on or before the Closing Date.

(e)    *Closing Certificate; Certified Certificate of Incorporation; Good Standing Certificates; Perfection Certificate*.  The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Closing Date, substantially in the form of Exhibit C, with appropriate insertions and attachments, including the certificate of incorporation, formation or limited partnership of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party, (ii) a long form good standing certificate for each Loan Party from its jurisdiction of organization, and (iii) a Perfection Certificate.

(f)    *Legal Opinions*.  The Administrative Agent shall have received the following executed legal opinions:

(i)    the legal opinion of Kirkland & Ellis LLP, counsel to the Borrower and the other Loan Parties, in form and substance reasonably satisfactory to the Administrative Agent; and

(ii)    the legal opinion of local counsel in Pennsylvania and of such other special and local counsel as may be required by the Administrative Agent, in each case in form and substance reasonably satisfactory to the Administrative Agent.

(g)    *Filings, Registrations and Recordings*.  Each document (including any UCC financing statement) required by the Security Documents delivered on or prior to on the Closing Date or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 6.02), shall be in proper form for filing, registration or recordation.

(h)    *Pledged Stock; Stock Powers; Pledged Notes*.  The Administrative Agent shall have received (i) the original certificates representing the shares of Capital Stock pledged pursuant to the Security Agreement, together with an undated stock or transfer power for each such certificate executed in blank by a duly authorized officer of the

pledgor thereof and (ii) each promissory note (if any) pledged to the Administrative Agent pursuant to the Security Agreement endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(i)    *Solvency Certificate*.  The Administrative Agent shall have received a certificate of the Borrower signed by its chief financial officer, in form and substance reasonably acceptable to it, certifying that the Borrower and the Loan Parties, on a consolidated basis after giving effect to the Transactions and the Restructuring Transactions,  are solvent.

(j)    *Supply and Offtake Documents*.  The Administrative Agent shall have received a duly executed copy of the MLC Phase-in SOA (as defined in the Intermediation Master Transaction Agreement), the Security Agreement (PESRM to MLC) (as defined in the Intermediation Master Transaction Agreement) and the Intermediation Master Transaction Agreement (including all exhibits and annexes thereto), in each case, effective as of the Closing Date.

(k)    *Additional Financing Agreement*.  The Administrative Agent shall have received a duly executed copy of the Additional Financing Agreement, effective as of the Closing Date.

(l)    *Material Approvals*.  All material Governmental Authority and, except as set forth on Schedule 3.03, third party licenses, registrations, permits, consents and approvals necessary in connection with this Agreement and the transactions contemplated hereby shall have been obtained and no law, regulation, order or decree is then in effect that materially and adversely restrains or prevents this Agreement or the Transactions or imposes conditions that materially impair the rights, or materially increase the liabilities or obligations, of the Administrative Agent or the Lenders, without the prior consent of the Administrative Agent each affected Lender (not to be unreasonably withheld or delayed).

(m)    *Flood Insurance*.  The Administrative Agent shall deliver to the Borrower a "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to the Mortgaged Properties or parcels thereof (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party in the event any portion of such Mortgaged Properties are Collateral and located in a special flood hazard area), as well as the flood insurance policies contemplated thereby shall have been procured.

(n)    *Representations and Warranties*.  Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (and in all respects if qualified by materiality) on and as of the Closing Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (without duplication of any materiality qualifier contained herein or therein) as of such earlier date.

(o)    *No Default*.  No Default or Event of Default shall have occurred and be continuing on the Closing Date or after giving effect to the extension of credit hereunder on the Closing Date.

(p)    *Patriot Act Information*.

(i) The Administrative Agent and the Lenders shall have received all documentation and other information about the Loan Parties as is reasonably requested in writing at least three (3) days prior to the Closing Date by the Administrative Agent or the Lenders that they reasonably determine is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act.

(ii) At least five days prior to the Closing Date, any Borrower that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall deliver a Beneficial Ownership Certification in relation to such Borrower.

(q)    *Entry of Confirmation Order*.  The Administrative Agent shall have received reasonably satisfactory evidence of the entry of the Confirmation Order, which shall not have been vacated, reversed, modified, amended or stayed without the consent of the Required Consenting Cash Flow Creditors (as defined in the Reorganization Plan).

(r)    *Effectiveness of the Reorganization Plan*.  All conditions precedent to the effectiveness or consummation of the Reorganization Plan shall have been satisfied or waived, and the Reorganization Plan shall have been, or contemporaneously with the effectiveness of this Agreement shall be, consummated.

(s)    The Administrative Agent shall have received a certificate of a Responsible Officer as to the satisfaction of the conditions set forth in this Section 4.01 and in Section 4.02.

For the purpose of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this Section 4.01 unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 4.02.    *Conditions to All Borrowings of Loans*.  The obligation of each Lender to honor any Notice of Borrowing of Loans, including the deemed making of the Loans on the Closing Date pursuant to Section 2.01, is subject to the following conditions precedent:

(a)    The Closing Date shall have occurred.

(b)    The representations and warranties of each Loan Party contained in Article 3 or any other Loan Document shall be true and correct in all material respects (without duplication of any materiality qualifier contained herein or therein) on and as of the date

of such borrowing of Loans, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (without duplication of any materiality qualifier contained herein or therein) as of such earlier date, and except that for purposes of this Section 4.02, the representations and warranties contained in Section 3.04 shall be deemed to refer to the most recent statements furnished pursuant to Sections 5.01(a) and 5.01(b), respectively, and to the financial condition and results of operations of the Borrower and its Subsidiaries.

(c)    No Default shall exist, or would result from such proposed borrowing of Loans or from the application of the proceeds thereof.

(d)    (i) All fees required to be paid to the Administrative Agent on or before the date of such borrowing of Loans shall have been, or concurrently with the date of such borrowing of Loans are being, paid and (ii) all fees required to be paid to the Lenders on or before the date of such borrowing of Loans shall have been, or concurrently with the date of such borrowing of Loans are being, paid.

(e)    Unless waived by the Administrative Agent, the Required Lenders, the Required Tranche A-2 Lenders and the Required Tranche B Lenders, the Borrower shall have paid all reasonable and documented fees, charges and disbursements of Norton Rose Fulbright US LLP, Davis Polk & Wardwell LLP and Cahill Gordon & Reindel LLP, counsel to the Administrative Agent, counsel to the Tranche A Lenders and the Tranche C Lenders and counsel to the Tranche B Lenders, respectively (directly to such counsel if requested by the Administrative Agent), and local counsel to the Administrative Agent in each applicable jurisdiction, in each case in accordance with Section 9.05 and solely to the extent invoiced no later than three Business Days prior to the date of such borrowing of Loans.

(f)    The Administrative Agent shall have received a Notice of Borrowing in accordance with the requirements hereof.

ARTICLE 5
AFFIRMATIVE COVENANTS

The Borrower hereby agrees that, so long as any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, the Borrower shall and shall cause each of its Restricted Subsidiaries to:

Section 5.01.  *Financial Statements*.  Furnish to the Administrative Agent for prompt distribution to each Lender:

(a)    as soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Borrower ending after the Closing Date, a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries (or, as applicable, consolidated and consolidating balance sheets of a Permitted Reporting Company and its consolidated Subsidiaries) as at the end of such year and the related

audited consolidated (and consolidating in the event that such financial statements are those of a Permitted Reporting Company) statements of income and of cash flows for such year, setting forth in each case in comparative form the figures for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by KPMG LLP or other independent certified public accountants of nationally recognized standing; and

(b)      as soon as available, but in any event not later than sixty (60) days after the end of each of the first three quarterly periods of each fiscal year of the Borrower beginning from the Fiscal Quarter ending on June 30, 2018, and in 2018 only, after the end of the Fiscal Quarter ending December 31, 2018, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries (or, as applicable, consolidated and consolidating balance sheets of a Permitted Reporting Company and its consolidated Subsidiaries) as at the end of such quarter and the related unaudited consolidated (and consolidating in the event that such financial statements are those of a Permitted Reporting Company) statements of income for such quarter and the portion of the fiscal year through the end of such quarter and of cash flows for the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end adjustments and the absence of footnote disclosures); and

(c)      until the Discharge of the Tranche B Loans, as soon as available, but in any event not later than thirty (30) days after the end of each of the first two calendar months of each Fiscal Quarter of the Borrower, beginning with the calendar month ending on January 31, 2019, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries (or, as applicable, consolidated and consolidating balance sheets of a Permitted Reporting Company and its consolidated Subsidiaries) as at the end of such month and the related unaudited consolidated (and consolidating in the event that such financial statements are those of a Permitted Reporting Company) statements of income for such month and the portion of the fiscal year through the end of such month and of cash flows for the portion of the fiscal year through the end of such month, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end adjustments and the absence of footnote disclosures).

Simultaneously with the delivery of each set of financial statements referred to in Section 5.01(a) or, (b) or (c) above, if during any of the periods for which financial statements are required to be delivered hereunder there shall be one or more Excluded Subsidiaries that, when taken together, have total assets or, over the four fiscal quarters, generate Consolidated EBITDA, in each case of over 5% of the total assets or Consolidated EBITDA (as the case may be) of the Borrower and its Subsidiaries for the relevant period, then such financial statements shall be accompanied by information in reasonable detail summarizing the material differences between the financial statements delivered hereunder and the results of operations and financial condition of the Borrower and its Subsidiaries without giving effect to the results or condition of any such Excluded Subsidiaries.

All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied (except as approved by such accountants or officer, as the case may be, and disclosed in reasonable detail therein) consistently throughout the periods reflected therein and with prior periods.

Section 5.02. *Certificates; Other Information.* Furnish to the Administrative Agent for prompt distribution to each Lender (or, in the case of clause (i), to the relevant Lender):

(a) concurrently with the delivery of any financial statements pursuant to Section 5.01, (i) a certificate of a Responsible Officer stating that Responsible Officer has obtained no knowledge of any Default or Event of Default except as previously disclosed pursuant to Section 5.06(a)(i) or as specified in such certificate (and, in such case, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto) and (ii) in the case of quarterly or annual financial statements, (x) a Compliance Certificate containing in the case of any financial statements pursuant to Section 5.01(a), a calculation of Projected Liquidity as of the date of such financial statement and (y) to the extent not previously disclosed to the Administrative Agent and the Lenders, (1) a description of any change in the jurisdiction of organization of any Loan Party, (2) a list of any Trademarks (as such term is defined in the Security Agreement) acquired by any Loan Party and (3) a description of any Person that has become a Group Member, in each case since the date of the most recent report delivered pursuant to this clause (y) (or in the case of the first such report so delivered, since the Closing Date);

(b) (i) as soon as available, and in any event no later than thirty (30) days after the end of each fiscal year of the Borrower, a consolidated budget for the following fiscal year (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year, the related consolidated statements of projected sources and uses of cash and projected income and a description of the underlying principal assumptions applicable thereto), accompanied by a certificate of a Responsible Officer stating that such budget is a reasonable estimate for the periods covered thereby and have been prepared in good faith on the basis of assumptions stated therein, which such assumptions were believed to be reasonable at the time of preparation of such budget, it being understood that actual results may vary from the budget and such variances may be material and (ii) on each June 30 until the Discharge of the Tranche B Loans, (A) an updated budget for the remainder of the applicable fiscal year, accompanied by a certificate of a Responsible Officer stating that such updated budget is a reasonable estimate for the period covered thereby and has been prepared in good faith on the basis of assumptions stated therein, which such assumptions were believed to be reasonable at the time of preparation of such updated budget, it being understood that actual results may vary from the updated budget and such variances may be material and (B) beginning on June 30, 2020, an appraisal report of the Borrower's refineries (on a fair market value and liquidation basis) in a form reasonably acceptable to the Required Tranche B Lenders (it being understood that an appraisal report in a form substantially similar to the appraisal report from Stancil & Co., dated as of June 17, 2017, is acceptable to the Required Tranche B Lenders);

81

(c)     within sixty (60) days after the end of each Fiscal Quarter of the Borrower (or ninety (90) days, in the case of the fourth Fiscal Quarter of each fiscal year), a narrative discussion and analysis of the financial condition and results of operations of the Borrower and its Restricted Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current fiscal year to the end of such Fiscal Quarter, as compared to the previous year, if applicable;

(d)     no later than five (5) Business Days following the effectiveness thereof, copies of any amendment, supplement, waiver or other modification with respect to, or any replacement of, the Supply and Offtake Documents, other than any amendment, supplement, waiver or modification that could not reasonably be expected to adversely affect the Lenders in any material respect;

(e)     within five (5) days after the same are sent, copies of all financial statements and reports that the Borrower sends to the holders of any class of its public debt or equity securities and, within five days after the same are filed, copies of all financial statements and reports that the Borrower may make to, or file with, the SEC (*provided* that such financial statements and reports shall be deemed delivered pursuant to this clause (e) if made available to the Lenders at the SEC's website);

(f)     promptly upon request of the Administrative Agent (*provided* that, for the avoidance of doubt, any Lender may make such request through the Administrative Agent), copies of any documents described in Section 101(k) or 101(l) of ERISA that any Loan Party may request with respect to any Multiemployer Plan to which a Loan Party is obligated to contribute; *provided*, that if the relevant Loan Party has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plans, then, upon reasonable request of such Lender, such Loan Party shall promptly make a request for such documents or notices from such administrator or sponsor and the Loan Party shall provide copies of such documents and notices to such Lender promptly after receipt thereof;

(g)     (i) within seven (7) Business Days (or fifteen (15) Business Days, if the Administrative Agent agrees) after the delivery of financial statements pursuant to Section 5.01(a) or (b), the Borrower shall conduct a meeting by teleconference at a time during normal business hours announced to the Lenders at least one (1) Business Day in advance with the Administrative Agent and the Lenders to discuss such Fiscal Quarter's results and the financial condition of the Borrower and its Restricted Subsidiaries; and (ii) until Borrower provides notice to the Administrative Agent of the occurrence of the Phase III Commencement Date (as defined in the Intermediation Master Transaction Agreement), within seven (7) Business Days (or fifteen (15) Business Days, if the Administrative Agent agrees) after the delivery of monthly financial statements pursuant to Section 5.01(c) for each calendar month beginning with January 2019, the Borrower shall conduct a meeting by teleconference at a time during normal business hours announced to the Lenders at least one (1) Business Day in advance with the Administrative Agent and the Lenders to discuss such fiscal month's results and the financial condition of the Borrower and its Restricted Subsidiaries; and

(h)      promptly, such additional financial and other information as the Administrative Agent (acting at the direction of any Lender) may from time to time reasonably request, including information and documentation reasonably requested by the Administrative Agent (acting at the direction of any Lender) for purposes of compliance with applicable "know your customer" requirements under the PATRIOT Act or other applicable anti-money laundering laws.

Section 5.03.   *Payment of Taxes*.   Pay, discharge or otherwise satisfy before they become delinquent, all its Taxes of whatever nature, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves or other provisions in conformity with GAAP with respect thereto have been provided on the books of the relevant Group Member or the failure to pay would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect.

Section 5.04.   *Maintenance of Existence; Compliance*.   (a) Preserve and keep in full force and effect its organizational existence (except, in the case of any Subsidiary, where the failure to do so would not reasonably be expected to result in a Material Adverse Effect) and (b) comply with all Requirements of Law except to the extent that failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.05.   *Maintenance of Property; Insurance*.   (a) Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted.

(b)      Maintain, and cause each Loan Party to maintain, with financially sound and reputable companies, insurance policies (i) insuring all real and personal property (including the inventory and equipment) against loss by fire, explosion, theft and such other casualties as is customary in all material respects and available on commercially reasonable terms for companies in comparable industries as the Loan Parties and (ii) to the extent requested by the Administrative Agent (acting at the direction of the Required Lenders and the Required Tranche A-2 Lenders) insuring the Loan Parties, the Administrative Agent and the Lenders against liability for personal injury or property damage relating to such inventory and equipment, such policies to be in such form and amounts and having such coverage as is customary in all material respects and available on commercially reasonable terms for companies in comparable industries as the Loan Parties.

(c)      All such insurance shall (i) provide that no cancellation in coverage thereof shall be effective until at least thirty (30) days after receipt by the Administrative Agent of written notice thereof, (ii) name the Administrative Agent as insured party or loss payee with respect to applicable insurance policies, and (iii) if reasonably requested by the Administrative Agent, include a breach of warranty clause.

(d)      If any portion of any Mortgaged Property upon which a Building is located is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a Special Flood Hazard Area with respect to which flood

insurance has been made available under the Flood Insurance Laws, then the Borrower shall, or shall cause each Loan Party to (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent and the Tranche B Lenders, including, without limitation evidence of annual renewals of such insurance.

Section 5.06.  *Inspection of Property; Books and Records; Discussions.*  (a) Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and (b) permit representatives of the Administrative Agent or any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time during normal business hours upon reasonable advance notice and, unless an Event of Default has occurred and is continuing, no more than once per fiscal year of the Borrower, and to discuss the affairs, finances, accounts, prospects and condition of the Group Members (other than Excluded Subsidiaries) with officers and employees of the Group Members (other than Excluded Subsidiaries) and with their independent certified public accountants. Notwithstanding anything to the contrary in this Section 5.06, none of the Group Members will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (i) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives) is prohibited by any Requirement of Law or binding agreement or (ii) that is subject to attorney–client privilege or constitutes attorney work product.

Section 5.07.  *Litigation and Other Notices.*  Furnish to the Administrative Agent written notice of the following promptly for prompt distribution to the Lenders (and, in any event, within five (5) Business Days of a Responsible Officer having knowledge of the occurrence thereof):

(a)      (i) the occurrence of any Default or Event of Default, (ii) the occurrence of any event of default under any Supply and Offtake Document, (iii) the occurrence of any event of default under the Additional Financing Facility or any other agreement evidencing Indebtedness of the Borrower or one or more of its Subsidiaries exceeding $20,000,000 in aggregate principal amount and (iv) no later than five (5) Business Days after delivery thereof, copies of any notices delivered pursuant to any Supply and Offtake Document with respect to any "Default", "Event of Default", or "Termination Event" (as each such term is defined in the Supply and Offtake Documents) or similar term or event under a Supply and Offtake Document;

(b)      the filing or commencement of, or any written threat or notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority, (i) against any Loan Party or any Subsidiary that would reasonably be expected to result in a Material Adverse Effect or (ii) with respect to any Loan Document;

(c)     any litigation or proceeding affecting any Group Member (other than any Excluded Subsidiary)  (i) in which the amount involved is $20,000,000 or more and not covered by insurance or (ii) in which injunctive or similar relief is sought against such Group Member;

(d)     (i) the occurrence of any ERISA Event that alone, or together with any other ERISA Event, would reasonably be expected to result in liability of the Loan Parties in an aggregate amount exceeding $1,000,000 or the imposition of a Lien on the assets of any Loan Party, a written notice specifying the nature thereof, what action any of the Loan Parties is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the IRS, the U.S. Department of Labor or the PBGC with respect thereto; and (ii) with reasonable promptness, upon Administrative Agent's (acting at the direction of any Lender) reasonable request, copies of: (1) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by, any of the Loan Parties with the U.S. Department of Labor with respect to each Pension Plan; (2) all notices received by any of the Loan Parties from a Multiemployer Plan sponsor concerning an ERISA Event; and (3) copies of such other documents or governmental reports or filings relating to any Plan or Pension Plan sponsored by an ERISA Loan Party as Administrative Agent shall reasonably request; and

(e)     any development that has had or would reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 5.07 shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the relevant Group Member proposes to take with respect thereto.

Section 5.08.  *Environmental Laws*.  (a) Except as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, comply in all material respects with, and exert commercially reasonable efforts to ensure compliance in all material respects by all tenants and subtenants, if any, with all applicable Environmental Laws, and obtain and comply in all material respects with and maintain, and exert commercially reasonable efforts to ensure that all tenants and subtenants obtain and comply in all material respects with and maintain, any and all Environmental Permits applicable to its operations required by applicable Environmental Laws.

(b)     Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws, except where failure to conduct such investigations, studies, sampling and testing and such remedial, removal and other actions would not reasonably be expected to result in a Material Adverse Effect, and promptly comply in all material respects with all orders and directives of all Governmental Authorities regarding Environmental Laws, unless all measures to challenge such requirements, orders and directives have been timely taken and the pendency of such measures, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 5.09.  *Credit Rating*.  The Borrower shall use commercially reasonable efforts  to maintain at all times, beginning with the date that is 30 days after the Closing Date, a credit rating (but not a specific rating) by each of Moody's and S&P in respect of the Facility and a corporate credit rating of the Borrower.

Section 5.10.  *Additional Collateral, etc*.  (a) Subject to the terms of the Intercreditor Agreement and this Section 5.10, with respect to any property acquired after the Closing Date by any Group Member (other than (x) any property described in paragraph (b), (c) or (d) below, (y) any property subject to a Lien expressly permitted by Section 6.02(e), 6.02(j), 6.02(p) or 6.02(q) and (z) property acquired by any Excluded Subsidiary or Foreign Subsidiary) that is of the same type as that included as Collateral in the Security Documents and that is intended to be subject to the Lien created by any of the Security Documents as to which the Administrative Agent, acting in its capacity as collateral agent on behalf of the Lenders, does not have a perfected Lien, promptly (and in any event within thirty (30) days after the acquisition thereof (or such longer period of time not to exceed an addition thirty (30) days as may be permitted by the written consent of the Administrative Agent) (i) execute and deliver to the Administrative Agent such amendments to the Security Agreement or such other documents as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a security interest in such property and (ii) take all actions necessary or advisable to grant to the Administrative Agent, acting in its capacity as collateral agent on behalf of the Lenders, a perfected first priority security interest in such property, including the filing of UCC financing statements in such jurisdictions as may be required by the Security Agreement or by law or as may be reasonably requested by the Administrative Agent.

(b)     Subject to the terms of the Intercreditor Agreement and this Section 5.10, with respect to any interest in Real Property having a fair market value (together with improvements thereof) of at least $5,000,000 acquired after the Closing Date (or owned by any Subsidiary that becomes a party to the Security Agreement pursuant to Section 5.10(c)) by any Group Member (other than (x) any such Real Property subject to a Lien expressly permitted by Section 6.02(e) and (y) Real Property acquired by any Excluded Subsidiary or Foreign Subsidiary), promptly (i) execute and deliver a first priority Mortgage, in favor of the Administrative Agent, for the benefit of the Secured Parties, covering such Real Property, (ii) deliver to the Administrative Agent and the Lenders the items referred to in Section 4.01(m) and Section 5.11(b) with respect to each such Real Property and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent the items referred to in Section 5.11.

(c)     Subject to the terms of the Intercreditor Agreement, with respect to any Subsidiary created or acquired after the Closing Date by any Group Member or any Subsidiary that ceases to be an Excluded Subsidiary (but other than any such created or acquired Subsidiary that is an Excluded Subsidiary or Foreign Subsidiary), promptly upon such creation, acquisition or cessation (i) execute and deliver to the Administrative Agent a Joinder to the Security Agreement and such amendments to the Security Agreement as the Administrative Agent deems, in its reasonable discretion, to be necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected

first priority security interest in the Capital Stock of such new Subsidiary that is owned by any Group Member, (ii) deliver to the Administrative Agent the certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Group Member, (iii) cause such new Subsidiary (other than an Excluded Subsidiary or Foreign Subsidiary) (A) to become a Guarantor and Loan Party under this Agreement, by executing an Assumption Agreement, substantially in the form of Exhibit K, and to become a party to the Security Agreement and this Agreement, (B) to take such actions reasonably necessary or advisable to grant to the Administrative Agent for the benefit of the Secured Parties a perfected first priority security interest in the Collateral described in the Security Agreement with respect to such new Subsidiary, including the filing of UCC financing statements in such jurisdictions as may be required by the Security Agreement or by law or as may be reasonably requested by the Administrative Agent, (C) to deliver to the Administrative Agent a certificate of such Subsidiary, substantially in the form of Exhibit C, with appropriate insertions and attachments and (D) if requested by the Administrative Agent, the Required Lenders and the Required Tranche A-2 Lenders deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance comparable or analogous to the applicable opinions delivered on the Closing Date and shall be from counsel reasonably satisfactory to the Administrative Agent.

(d)    Notwithstanding anything in this Agreement or any Security Document to the contrary, in no event shall the Collateral include, and no Loan Party or any Subsidiary shall be required to take any action to create, grant or perfect a security interest in, any property or assets that constitutes Excluded Property (as defined in the Security Agreement).

(e)    Notwithstanding anything in this Section 5.11 to the contrary, each Building that is an Additional Tranche B Excluded Building (so long as it is an Additional Tranche B Excluded Building) shall be deemed not to secure any Obligations in respect of the Tranche B Loans.

Section 5.11.  *Mortgages, etc*.  As soon as available, but in any event within ninety (90) days after the Closing Date (or such later date as the Administrative Agent, the Required Lenders and the Required Tranche A-2 Lenders determine in their reasonable discretion) with respect to the Mortgaged Properties owned by the applicable Loan Party on the Closing Date:

(a)    the Borrower shall deliver to the Administrative Agent Mortgages with respect to the Mortgaged Properties owned on the Closing Date, executed and delivered by a duly authorized officer of the Loan Party thereto and such other documentations related thereto, as may be reasonably requested by the Administrative Agent or the Required Lenders and the Required Tranche A-2 Lenders;

(b)    a copy of, or a certificate as to coverage under, and a declaration page relating to, the insurance policies required by Section 5.05 of this Agreement (except that, with respect to flood insurance, the Administrative Agent must have received a copy of the insurance policies) and the applicable provisions of the Security Documents, each of

which shall (1) be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable); (2) name the Administrative Agent, on behalf of the Secured Parties, as additional insured; (3) in the case of flood insurance, (x) identify the addresses of each property located in a special flood hazard area, (y) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto and (z) provide that the insurer will give the Administrative Agent thirty (30) days' written notice of cancellation or non-renewal and (4) otherwise be in form and substance satisfactory to the Administrative Agent;

(c)     the Borrower shall deliver or cause to be delivered to the Administrative Agent and to the title insurance company issuing the policy referred to in clause (d) below (the "**Title Insurance Company**") maps or plats of an as-built survey of such Mortgaged Properties certified to the Administrative Agent and the Title Insurance Company in a manner reasonably satisfactory to them, dated a date satisfactory to the Administrative Agent and the Title Insurance Company by an independent professional licensed land surveyor reasonably satisfactory to the Administrative Agent; *provided*, that the Administrative Agent hereby acknowledges and agrees that First American Title Insurance Company is a reasonably satisfactory title insurance company and Ludgate Engineering Corporation is a reasonably satisfactory licensed land surveyor;

(d)     the Borrower shall cause the Title Insurance Company to issue to the Administrative Agent in respect of such Mortgaged Properties a mortgagee's title insurance policy (or policies) or marked up unconditional binder for such insurance issued by a nationally recognized title insurance company, insuring the Mortgage referred to above as a first lien on such Mortgaged Properties (subject to any Lien permitted by Section 6.02), in an amount reasonably satisfactory to the Borrower and the Administrative Agent, the Required Lenders and the Required Tranche A-2 Lenders, together with such coinsurance, reinsurance, endorsements and affirmative coverages as the Administrative Agent may reasonably request and consistent with market practice and otherwise in form and substance reasonably satisfactory to the Administrative Agent; the Borrower shall provide the Administrative Agent with evidence satisfactory to it that the Mortgages have unconditionally been delivered to the Title Company with instructions for recordation or that such recordation has occurred, together with evidence that all premiums in respect of such policy, all charges for recording and filing expenses, abstract fees, searches, and all related expenses have been paid; provided, that any and all of the exceptions and the matters or documents stated therein set forth on Schedule B of the Mortgagee's Title Policy pertaining to any or all of the Mortgaged Properties are agreed to be permitted exceptions or Liens explicitly permitted to exist on the relevant Mortgaged Property under Section 6.02 and the relevant Mortgage and any title endorsements as may be agreed by the Administrative Agent and the Borrower;

(e)     the Borrower shall cause the Title Insurance Company to provide to the Administrative Agent a copy of all recorded documents referred to, or listed as exceptions to title in, the title policy or policies referred to in clause (d) above and a copy of all other material documents affecting such Mortgaged Properties;

(f)    the Borrower shall deliver to the Administrative Agent opinions, addressed to the Administrative Agent of (i) outside counsel or in-house counsel, as to the due authorization, execution and delivery of the Mortgage referred to above by the applicable Loan Party, and (ii) local counsel in Pennsylvania, each in form and substance reasonably satisfactory to the Administrative Agent, subject to customary qualifications, exceptions and disclaimers, including those pertaining to interest rate hedges; and

(g)    notwithstanding anything in this Section 5.11 to the contrary, each Building that is a Specified Tranche B Excluded Building (so long as it is a Specified Tranche B Excluded Building) shall be deemed not to secure any Obligations in respect of the Tranche B Loans; *provided* that if a Specified Tranche B Excluded Building ceases to be abandoned or if the fair market value of such Building and contents therein at any time is at least $5,000,000, then (i) the Borrower shall promptly (and in any event within 30 days thereof) deliver to the Administrative Agent and the Tranche B Lenders the items referred to in Sections 4.01(m) and 5.11(b) with respect to such Building and (ii) such Building shall cease to be a Specified Tranche B Excluded Building on the date which is 45 days after the delivery referred to in the foregoing clause (i).

Section 5.12.    *Designation of Excluded Subsidiaries*.  The Borrower may designate any Subsidiary acquired or formed after the Closing Date, within thirty (30) days of the formation or acquisition thereof (or such longer period of time as may be permitted by the Administrative Agent acting at the direction of the Required Lenders and the Required Tranche A-2 Lenders), as an Excluded Subsidiary by written notice to the Administrative Agent (which written notice shall be promptly delivered by the Administrative Agent to the Lenders); *provided*, that (i) immediately before and after such designation, no Default or Event of Default shall have occurred and be continuing, and (ii) after giving effect to such designation, the cash or assets contributed by the Loan Parties or any Subsidiary of Borrower that is not an Excluded Subsidiary to all Excluded Subsidiaries shall not in the aggregate exceed the amount permitted to be contributed to such Excluded Subsidiary pursuant to Section 6.07(aa), measured, in each case, as of the date of each such designation; *provided*, *further*, that such Excluded Subsidiary may be redesignated by the Borrower as a "Subsidiary Guarantor" upon ten (10) Business Days (or such shorter period of time as may be permitted by the Administrative Agent acting at the direction of the Required Lenders and the Required Tranche A-2 Lenders) prior written notice to the Administrative Agent so long as (x) the requirements of Section 5.10 are satisfied either before or concurrently with it becoming a Guarantor and (y) the Consolidated Leverage Ratio for the Loan Parties after such redesignation would be lower than such ratio for the Loan Parties immediately prior to such redesignation.

Section 5.13.    *Anti-Terrorism Laws, Sanctions, Anti-Corruption Laws*.

(a)    The Loan Parties shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming the Loan Parties' compliance with Section 6.15.

(b)    Comply in all material respects with sanctions administered by OFAC, all applicable Anti-Terrorism Laws and all applicable Anti-Corruption Laws.

89

ARTICLE 6
NEGATIVE COVENANTS

The Borrower hereby agrees that, so long as any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

Section 6.01.  *Indebtedness*.  Create, issue, incur, assume, become liable in respect of or suffer to exist any Indebtedness, except:

(a)     Indebtedness of any Loan Party pursuant to any Loan Document;

(b)     Indebtedness of the Borrower to any Restricted Subsidiary and of any Subsidiary Guarantor to the Borrower or any other Restricted Subsidiary;

(c)     Guarantee Obligations (other than Guarantee Obligations in respect of borrowed money) incurred in the ordinary course of business by the Borrower or any of its Restricted Subsidiaries of obligations of the Borrower or any Subsidiary Guarantor;

(d)     Indebtedness outstanding on the date hereof and listed on Schedule 6.01 and any refinancings, refundings, renewals or extensions thereof (without increasing, or shortening the maturity or Weighted Average Life to Maturity of, the principal amount thereof or making the Borrower or any Restricted Subsidiary (other than a Loan Party) an obligor thereunder that was not an obligor with respect to such refinanced, refunded, renewed or extended Indebtedness on the Closing Date);

(e)     Indebtedness (including, without limitation, Purchase Money Obligations, any Attributable Indebtedness and Capital Lease Obligations) secured by Liens permitted by Section 6.02(e), any Indebtedness financing the acquisition, construction, repair, replacement or improvement of any fixed or capital assets and refinancings or renewals thereof and in an aggregate principal amount not to exceed $10,000,000 at any one time outstanding;

(f)     Indebtedness (including any guaranty thereof by any Loan Party) under the Supply and Offtake Documents;

(g)     Indebtedness incurred in connection with EB-5 Financings so long as the principal amount thereof outstanding at any time shall not exceed $125,000,000; *provided* that the first $75,000,000 of such Indebtedness incurred shall be used to indefeasibly repay, prepay, repurchase, redeem, acquire or retire for value any Indebtedness (other than Indebtedness among Borrower and/or one or more of its Subsidiaries) permitted to be incurred hereunder (and, to the extent such Indebtedness is revolving Indebtedness, to permanently and simultaneously reduce the commitments relating thereto);

(h)     Indebtedness (including any guaranty thereof by any Loan Party) under the Additional Financing Agreement and any refinancings, refundings, renewals or extensions thereof (without increasing, or shortening the maturity or Weighted Average Life to

90

Maturity of, the principal amount thereof or making the Borrower or any Restricted Subsidiary (other than a Loan Party) an obligor thereunder that was not an obligor with respect to such refinanced, refunded, renewed or extended Indebtedness on the Closing Date);

(i)    (i) Indebtedness representing deferred compensation or stock-based compensation to directors, officers, employees, consultants or independent contractors of PES Inc., the Borrower and its Restricted Subsidiaries and (ii) Indebtedness consisting of obligations of PES Inc., the Borrower and its Restricted Subsidiaries under deferred compensation to their directors, officers, employees, consultants or independent contractors or other similar arrangements incurred by such Persons in connection with Permitted Acquisitions or any other Investment expressly permitted under Section 6.07;

(j)    Indebtedness in respect of indemnification, purchase price adjustments or other similar obligations incurred by the Borrower or any Restricted Subsidiary in a Permitted Acquisition or Disposition under agreements which provide for indemnification, the adjustment of the purchase price or for similar adjustments;

(k)    Indebtedness consisting of obligations of the Borrower or any Restricted Subsidiary under deferred consideration (e.g., earn-outs, indemnifications, incentive non-competes and other contingent obligations) or other similar arrangements incurred by such Person in connection with any Permitted Acquisition or other Investment permitted under Section 6.07;

(l)    Indebtedness of a Person or Indebtedness attaching to assets of a Person that, in either case, becomes a Restricted Subsidiary (or is merged or consolidated with or into the Borrower or a Restricted Subsidiary) or Indebtedness attaching to assets that are acquired by the Borrower or any Restricted Subsidiary (including any Indebtedness assumed by the Borrower or any Restricted Subsidiary in connection with any acquisition of any assets or Person), in each case after the Closing Date as the result of a Permitted Acquisition or other Investment permitted by Section 6.07 and any refinancings, refundings, renewals or extensions thereof (without increasing, or shortening the maturity or Weighted Average Life to Maturity of, the principal amount thereof or making the Borrower or any Restricted Subsidiary (other than a Loan Party) an obligor thereunder that was not an obligor with respect to such refinanced, refunded, renewed or extended Indebtedness); *provided* that (i) such Indebtedness is not incurred in contemplation of such acquisition and (ii) such Indebtedness shall not exceed $50,000,000 at any one time outstanding;

(m)    Indebtedness in respect of netting services, overdraft protections, credit card programs, automatic clearinghouse arrangements and similar arrangements in each case in connection with deposit accounts and Indebtedness arising from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(n)    Indebtedness in respect of any bankers' acceptance, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of

business (including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims);

(o)     obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any Restricted Subsidiary;

(p)     Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(q)     Indebtedness of the Borrower or any Restricted Subsidiary as an account party in respect of trade letters of credit issued in the ordinary course of business (including with respect to customer deposits of advance payments received);

(r)     (i) unsecured Indebtedness in respect of obligations of the Borrower or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services; *provided* that such obligations are incurred in connection with open accounts extended by suppliers on customary trade terms in the ordinary course of business and not in connection with the borrowing of money and (ii) unsecured Indebtedness in respect of intercompany obligations of the Borrower or any Restricted Subsidiary in respect of accounts payable incurred in connection with goods sold or services rendered in the ordinary course of business and not in connection with the borrowing of money;

(s)     unsecured Indebtedness and Subordinated Indebtedness of any Loan Party in an aggregate amount, for all Indebtedness under this clause (s), not to exceed $10,000,000;

(t)     Indebtedness to current or former officers, directors, managers, consultants and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Capital Stock of the Borrower (or any of its direct or indirect parent companies) (solely to the extent the proceeds of such Indebtedness are ultimately contributed to the Loan Parties) in an aggregate principal amount not to exceed $5,000,000

(u)     Indebtedness incurred in connection with Environmental and Necessary Capex in an amount not to exceed $100,000,000 in the aggregate;

(v)     Indebtedness in respect of letter of credit facilities for the purposes set forth in Section 6.02(dd)(A) in an aggregate amount not to exceed  $50,000,000 at any time outstanding;

(w)     Indebtedness of any Loan Party so long as any recourse against such Loan Party and any of such Loan Party's assets in respect of such Indebtedness is expressly

limited to the Capital Stock of an Excluded Subsidiary or Joint Venture (on which a Lien was permitted to be granted pursuant to Section 6.02(z));

(x)     Indebtedness of any Loan Party in respect of a deferred compensation plan that provides bonus payouts to employees of any Loan Party, PES Inc. or any other direct or indirect parent company of the Borrower over a defined period based on a percentage of the bonus paid in any given year;

(y)     additional Indebtedness of the Borrower or any other Loan Party that does not have a maturity or Weighted Average Life to Maturity shorter than the Loans, if at the time of incurrence of such Indebtedness, the Consolidated Leverage Ratio of the Borrower and its Restricted Subsidiaries as of the last day of the period of four consecutive Fiscal Quarters ended immediately prior to such incurrence (and calculated on a pro forma basis giving effect to the incurrence of such Indebtedness on the first day of such period) shall be less than 3.00:1.00, and, without limiting any of the forgoing, any refinancings, refundings, renewals, replacement, waivers, amendments, amendments and restatements or extensions thereof (without increasing, or shortening the maturity or Weighted Average Life to Maturity of, the principal amount thereof or making the Borrower or any Restricted Subsidiary  (other than a Loan Party) an obligor thereunder that was not an obligor with respect to such refinanced, refunded, renewed or extended Indebtedness); and

(z)     Indebtedness (other than Indebtedness of the type set forth in clauses (a), (c), or to the extent relating to Indebtedness of the type set forth in such clauses (a) or (c), clause (h), in each case of the definition of Indebtedness) consisting of contractual obligations under the Point Breeze Site Lease Agreement.

    Section 6.02.   *Liens*.  Create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except the following:

(a)     Liens for Taxes not yet due or that are being contested in good faith by appropriate proceedings, *provided* that adequate reserves with respect thereto are maintained on the books of the Borrower or its Restricted Subsidiaries, as the case may be, in conformity with GAAP;

(b)     carriers', warehousemen's, mechanics', materialmen's, landlord's, workmen's, suppliers', repairmen's or other like Liens arising in the ordinary course of business that (i) do not in the aggregate materially detract from the value of the operation of the business of the Group Members, taken as a whole, and do not materially impair the use thereof in the operation of the business of the Group Members, taken as a whole, (ii) are not overdue for a period of more than thirty (30) days or (iii) that are being contested in good faith by appropriate proceedings;

(c)     Liens incurred in the ordinary course of business (i) in connection with workers' compensation, unemployment insurance and other social security legislation, (ii) securing liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Restricted Subsidiaries or under self-insurance arrangements in respect of such obligations or (iii)

securing obligations in respect of letters of credit that have been posted by the Borrower or any of its Restricted Subsidiaries to support the payment of items set forth in clauses (i) and (ii);

(d)        Liens to secure the performance of tenders, statutory obligations, bids, trade contracts, governmental contracts, leases and other contracts (other than Indebtedness for borrowed money), statutory obligations (other than any such obligation imposed pursuant to Section 430(k) of the Code or 303(k) of ERISA), surety, stay and appeal bonds, performance and return-of-money bonds, performance and completion guarantees and other obligations of a like nature (including (i) those to secure health, safety and environmental obligations, (ii) those required or requested by any Governmental Authority and (iii) letters of credit issued in lieu of any such bonds or to support the issuance thereof) incurred in the ordinary course of business;

(e)        Liens securing Indebtedness of the Borrower or any Restricted Subsidiary incurred pursuant to Sections 6.01(e) and 6.01(u), in each case, to finance the acquisition of fixed or capital assets (*provided* that (i) such Liens shall be created no later than 180 days after the acquisition of such fixed or capital assets, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and proceeds therefrom, (iii) the amount of Indebtedness secured thereby is not increased and (A) in the case of clause (u), such Liens, if on Collateral, shall be subject to an intercreditor agreement reasonably satisfactory to the Borrower, the Administrative Agent, the Required Lenders and the Required Tranche A-2 Lenders;

(f)        Liens in existence on the date hereof listed on Schedule 6.02 and any Lien granted as a replacement or substitute thereof, *provided* that no such Lien is spread to cover any additional property after the Closing Date (other than after-acquired property that is affixed or incorporated into the property encumbered by such Lien on the Closing Date) and that the amount of Indebtedness secured thereby is not increased;

(g)        easements, rights-of-way, restrictions (including zoning restrictions and other similar permits), covenants, licenses, encroachments, protrusions and other similar charges or encumbrances, in each case existing on the Closing Date or as are incurred in the ordinary course of business and all other non-material exceptions to title that, in the aggregate, are not substantial in amount and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Restricted Subsidiaries;

(h)        (i) any conditions to the Real Property shown on a current survey of the property which has been delivered to the Administrative Agent other than encroachments on such Real Property that materially detract from the value of the property subject thereto or materially and adversely interfere with the ordinary conduct of the business of the Loan Parties (unless otherwise permitted by applicable law) and (ii) all of the exceptions and the matters or documents stated therein set forth on Schedule B of the Mortgagee's Title Policy pertaining to any or all of the Mortgaged Properties;

(i)        Liens created pursuant to the Security Documents;

(j)      any interest or title of a lessor under any lease entered into by the Borrower or any Restricted Subsidiary (i) in the ordinary course of its business and covering only the assets so leased or (ii) pursuant to Section 6.09;

(k)      Liens on Collateral securing obligations under the Supply and Offtake Documents; *provided*, that such Liens are at all times subject to the Intercreditor Agreement as "Supply and Offtake Obligations";

(l)      Liens on SOA Separate Assets and Collateral;

(m)      Liens securing judgments for the payment of money not constituting an Event of Default under Section 7.01(h) and in respect of which the Borrower or such Restricted Subsidiary is contesting such Lien in good faith by appropriate proceedings for which adequate reserves have been established, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien;

(n)      Liens (i) on cash or Cash Equivalents advanced in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 6.07 to be applied against the purchase price for such Investment or (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 6.04, in each case solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(o)      Liens existing on property at the time of its acquisition or existing on the property of any Person that becomes a Restricted Subsidiary after the date hereof and any modifications, replacements, renewals or extensions thereof; *provided* that (i) such Lien was not created in contemplation of such acquisition or such Person becoming a Restricted Subsidiary, (ii) (A) in the case of Liens securing purchase money Indebtedness or Capital Lease Obligations or any replacement, renewal, extension or refinancing thereof, such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and after-acquired property subjected to a Lien pursuant to terms existing at the time of such acquisition or such Person becomes a Restricted Subsidiary, it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition or such Person becoming a Restricted Subsidiary); *provided* that individual financings otherwise permitted to be secured hereunder provided by one Person (or its affiliates) may be cross collateralized to other such financings provided by such Person (or its affiliates) otherwise permitted to be secured hereunder and (B) in the case of Liens securing Indebtedness other than purchase money Indebtedness or Capital Lease Obligations or any replacement, renewal, extension or refinancing thereof, such Liens do not extend to the property of any Person other than such Person and the Person acquired or formed to make such acquisition and (iii) the Indebtedness secured thereby (or, as applicable, any modifications, replacements, renewals or extensions thereof) is permitted under Section 6.01;

(p)     Liens arising from precautionary UCC financing statement filings (or similar filings under applicable law), filings regarding consignment of goods or leases entered into by Borrower or any Restricted Subsidiary, any Sale and Leaseback Transaction permitted pursuant to this Article 6 or the NGL Installment Purchase Agreement;

(q)     any interest or title of a lessor, sublessor, licensee, sublicensee, licensor or sublicensor under any lease, sublease, license or sublicense agreement or secured by a lessor's, sublessor's, licensee's, sublicensee's, licensor's or sublicensor's interest under any lease, sublease, license or sublicense (including software and other technology licenses), in each case as permitted by this Agreement;

(r)     Liens deemed to exist in connection with Investments permitted under Section 6.07;

(s)     receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(t)     Liens that are contractual rights of set-off relating to purchase orders and other agreements entered into with customers, in the ordinary course of business;

(u)     Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(v)     any and all leases, easements, subleases, tenancies, options, concession agreements, rental agreements, occupancy agreements, franchise agreements, access agreements and any other similar or related agreements, liens and encumbrances (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into, affecting the use or occupancy of all or any portion of any Real Property or other property of the Loan Parties, of the properties from any Loan Party to any Affiliate or Subsidiary or to any third party, in any case, granted by such Loan Party (any of the foregoing, a "Lease"), if the following requirements are met: (i) no Event of Default has occurred and is continuing, (ii) the property rights granted under such Lease are not necessary for the business and operations of the Refinery or the North Yard Terminal, (iii) such Lease will not cause at any time any material discontinuation or disruption of the business or operations conducted at the Refinery, (iv) such Lease will not interfere in any material respect with the Borrower's or any other Loan Party's performance of and compliance with its obligations hereunder or under the Supply and Offtake Documents and (v) the members of the Borrower's management have determined that such Loan Party's entry into such Lease is reasonably expected to provide a financial benefit to such Loan Party and is in the best interest of such Loan Party; and (vi) such Loan Party has delivered to the Administrative Agent a certificate certifying as to (i) through (vi) above;

(w)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any company in the ordinary course of business;

(x)     Liens on Additional Financing Collateral securing Indebtedness incurred pursuant to Section 6.01(h);

(y)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(z)     Liens on Capital Stock of an Excluded Subsidiary or Joint Venture;

(aa)     Liens on assets constituting or related to Environmental and Necessary Capex securing Indebtedness permitted by Section 6.01(u);

(bb)     such easements, licenses and access rights granted to SXL (as defined in the Contribution Agreement)  to the extent required for the operation and maintenance of assets of SXL which are located at, under or on the Refinery Real Property (as defined in the Contribution Agreement) as of the Closing Date, on the express condition that the exercise of such access, license or easement rights (x) not interfere with the operation of the Refinery and (y) would reasonably not give rise to a Material Adverse Effect;

(cc)     Liens incurred in the ordinary course of business of any Loan Party with respect to obligations that do not in the aggregate exceed $3,000,000 at any time outstanding, so long as such Liens, to the extent covering any Collateral, are junior to the Liens granted pursuant to the Security Documents;

(dd)     Liens on cash collateral accounts in an aggregate amount not to exceed $50,000,000 at any time outstanding securing obligations in connection with (A) any Governmental Authority, (B) any Swap Agreement, or (C) any letter of credit facilities permitted pursuant to Section 6.01(v);

(ee)     bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more deposit, securities and/or other similar accounts maintained by any Loan Party, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, (i) securing fees, charge-backs and other similar obligations and (ii) securing amounts owing to such bank with respect to credit card programs, cash management and operating account arrangements, including those involving pooled accounts and netting arrangements;

(ff)     Liens not otherwise permitted by this Section 6.02 so long as neither (i) the aggregate outstanding principal amount of the obligations secured thereby nor (ii) the aggregate fair market value (determined as of the date such Lien is incurred) of the assets subject thereto exceeds (as to the Borrower and all Restricted Subsidiaries) $20,000,000 at any one time;

(gg)    [reserved];

(hh)    Liens on property that does not constitute Collateral securing Indebtedness incurred with respect to Swap Agreements, including for the avoidance of doubt Liens on commodity accounts with future commission merchants; and

(ii)    Liens in connection with EB-5 Financings on the assets financed by such EB-5 Financing, and to the extent such Liens are on Collateral, or such Liens are in accordance with clause (b) of the definition of EB-5 Financing and are subject to the EB-5 Intercreditor Agreement.

Section 6.03.    *Fundamental Changes*.  Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, except that:

(a)    any Restricted Subsidiary of the Borrower may be merged or consolidated with or into (x) the Borrower (*provided* that the Borrower shall be the continuing or surviving corporation) or (y) any Subsidiary Guarantor (*provided* that the Subsidiary Guarantor shall be the continuing or surviving corporation);

(b)    any Excluded Subsidiary of the Borrower may be merged or consolidated with any Person or Dispose of any or all of its assets;

(c)    [reserved];

(d)    any Investment expressly permitted by Section 6.07 may be structured as a merger, consolidation or amalgamation so long as (x) if the Borrower is party to such Investment, the Borrower is the surviving Person in such merger, consolidation or amalgamation and (y) if a Subsidiary Guarantor is party to such merger, consolidation or amalgamation, either (i) the surviving Person in such merger, consolidation or amalgamation shall be a Loan Party or (ii) sufficient capacity to make an Investment under Section 6.07 in a Person that is not a Loan Party shall exist to accommodate the surviving Person in such merger, consolidation or amalgamation;

(e)    any Disposition expressly permitted by Section 6.04; and

(f)    any Guarantor may dissolve, liquidate or wind up its affairs at any time; *provided*, that such dissolution, liquidation or winding up, as applicable, is not reasonably expected to have a Material Adverse Effect.

Section 6.04.    *Disposition of Property* .  Consummate any Disposition of any assets in excess of $500,000, except:

(a)    the Disposition of used, surplus, damaged, obsolete, worn out or other immaterial property in the ordinary course of business, including Intellectual Property that is, in the reasonable judgment of the Borrower, no longer commercially desirable to maintain or useful in the conduct of business taken as a whole;

(b)      the sale of inventory or SOA Separate Assets and Collateral in the ordinary course of business;

(c)      the sale or issuance of any Subsidiary's Capital Stock to the Borrower or any Subsidiary Guarantor;

(d)      the Disposition of property that is vacant and not required for ingress or egress for operation of the Refinery; *provided* that such Disposition shall be for fair market value and at least 75% of the consideration for such Disposition shall consist of cash or Cash Equivalents;

(e)      any issuance or sale of Capital Stock of, or Indebtedness or other securities of, an Excluded Subsidiary;

(f)      (i) Dispositions permitted by Section 6.03 (other than clause (d) or (e) thereof), (ii) Investments that would otherwise constitute Dispositions permitted by Section 6.07 (other than clause (g) thereof), (iii) Restricted Payments permitted by Section 6.05, (iv) Liens permitted by Section 6.02, and (v) Dispositions permitted by Section 6.09;

(g)      Dispositions of cash and Cash Equivalents in the ordinary course of business consistent with past practice;

(h)      leases, subleases, licenses or sublicenses, in each case in the ordinary course of business consistent with past practice and which do not materially interfere with the business of the Borrower and its Restricted Subsidiaries, taken as a whole, and any other similar agreements permitted under Section 6.02(v) or 6.02(bb);

(i)      sales, Dispositions or contributions of property (i) between Loan Parties, (ii) between Restricted Subsidiaries that are not Loan Parties or (iii) by Restricted Subsidiaries that are not Loan Parties to the Loan Parties;

(j)      transfers of property subject to Recovery Events upon receipt of the Net Cash Proceeds of such Recovery Event;

(k)      the unwinding of Swap Agreements permitted hereunder;

(l)      transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of property arising from foreclosure or similar action or that have been subject to a casualty to the respective insurer of such Real Property as part of an insurance settlement;

(m)      transactions under the Supply and Offtake Documents;

(n)      Dispositions of property for fair market value to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property that is promptly purchased or (ii) the proceeds of such disposition are promptly

applied to the purchase price of such replacement property (which replacement property is actually promptly purchased);

(o)    Dispositions of Investments in Joint Ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the Joint Venture parties set forth in Joint Venture arrangements and similar binding arrangements;

(p)    Dispositions of accounts receivable or notes receivables in the ordinary course of business in connection with the collection or compromise thereof solely to the extent not constituting Collateral;

(q)    the Disposition of other property for fair market value if (i) at least 75% of the consideration for such Disposition shall consist of cash or Cash Equivalents and (ii) the fair market value of the property subject to such Disposition shall not exceed $25,000,000 in any fiscal year of the Borrower (which amount, if not used in any fiscal year, may be carried forward to the next succeeding fiscal year);

(r)    any Disposition or series of related Dispositions that Disposes of (A) assets constituting Collateral that do not have a fair market value in excess of $2,000,000 and (B) assets not constituting Collateral that do not have a fair market value in excess of $5,000,000;

(s)    a Disposition of the North Yard or the West Yard to Sunoco, Inc. in each case in accordance with Section 11.10 of the Contribution Agreement as in effect on the Closing Date; and

(t)    Dispositions pursuant to any Platinum Sale and Leaseback Transaction.

Section 6.05.  *Restricted Payments* .  Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of the Borrower or any of its Restricted Subsidiaries, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Borrower or any of its Restricted Subsidiaries (collectively, "**Restricted Payments**"), except:

(a)    any Subsidiary may make Restricted Payments to the Borrower or any Subsidiary Guarantor;

(b)    the Borrower may make Restricted Payments (i) if the Borrower shall have delivered audited financial statements for the fiscal year ending on December 31, 2018 pursuant to Section 5.01(a), (ii) the Consolidated Leverage Ratio for the four consecutive Fiscal Quarters of the Borrower ending immediately prior to the declaration of a Restricted Payment pursuant to this Section 6.05(b) is not more than 3.0:1.0 and (iii) no Default or Event of Default shall have occurred and be continuing;

(c)    the Borrower or any Restricted Subsidiary may make Permitted Tax Distributions;

100

(d)    the Borrower or any Restricted Subsidiary may pay any dividend or consummate any irrevocable redemption of Disqualified Capital Stock within sixty (60) days after the date of declaration thereof if on the date of declaration such Restricted Payment would have otherwise been permitted by this Section 6.05;

(e)    the Borrower or any Restricted Subsidiary may make any Restricted Payment in exchange for, or out of, or with the Net Cash Proceeds (i) of the substantially concurrent sale of Capital Stock (other than Disqualified Capital Stock) of the Borrower or (ii) from the substantially concurrent contribution of common equity capital to the Borrower, to the extent, in each case, that such Net Cash Proceeds are not applied to any other use;

(f)    the Borrower or any Restricted Subsidiary may (i) (x) so long as no Default or Event of Default shall have occurred and be continuing, repurchase, redeem or otherwise acquire or retire for value any Capital Stock of the Borrower or any Restricted Subsidiary or (y) make Restricted Payments to PES Ultimate Holdings, LLC to permit such Person to repurchase or redeem such parent company's Capital Stock (other than Disqualified Capital Stock) held by any current or former officer, director or employee of the Borrower or any of its Subsidiaries (or their transferees, estates or beneficiaries under their estates) pursuant to any equity subscription agreement, stock option agreement, shareholders' agreement or similar agreement or compensation plan or upon their death, disability, retirement, severance, resignation or termination of employment or service; *provided* that the aggregate cash consideration paid for all such repurchased, redeemed, acquired or retired equity interests shall not exceed, in any fiscal year of the Borrower (A) $10,000,000 (and up to 50% of such $10,000,000 not used in any fiscal year of the Borrower may be carried forward to the next succeeding (but no other) fiscal year) *plus* (B) the cash proceeds from the sale of Capital Stock that is not Disqualified Capital Stock of the Borrower or any Restricted Subsidiary, in each case, to members of management, directors or consultants of the Borrower, any of its Subsidiaries or any of its direct or indirect parent companies that occurred after the date hereof; *plus* (C) the cash proceeds of key man life insurance policies received by the Borrower after the date hereof; and (ii) cancel Indebtedness owing to the Borrower or any Restricted Subsidiary from any current or former officer, director or employee (or any permitted transferees thereof) of the Borrower or any Restricted Subsidiary (or any direct or indirect parent company thereof), in connection with a repurchase of Capital Stock of the Borrower (or any direct or indirect parent company thereof) from such Persons;

(g)    the Borrower or any Restricted Subsidiary may repurchase Capital Stock deemed to occur upon the exercise of stock options to the extent such Capital Stock represents a portion of the exercise of such stock options;

(h)    so long as no Default or Event of Default has occurred and is continuing, the Borrower or any Restricted Subsidiary may declare and pay regularly scheduled or accrued dividends to holders of any class or series of Disqualified Capital Stock of the Borrower issued on or after the date hereof so long as, at the time of issuance of such Disqualified Capital Stock, the Consolidated Leverage Ratio for the four consecutive Fiscal Quarters of the Borrower then ended is not higher than 3.0:1.0;

(i)    so long as no Default or Event of Default has occurred and is continuing, the Borrower or any Restricted Subsidiary may pay cash, dividends, distributions, advances or other Restricted Payments to allow the payment of cash in lieu of the issuance of fractional shares upon (i) the exercise of options or warrants or (ii) the conversion or exchange of capital stock of any such person;

(j)    so long as no Default or Event of Default has occurred and is continuing, Borrower or any Restricted Subsidiary may repurchase, redeem, defease, acquire or retire for value any Indebtedness of a Loan Party that is contractually subordinated to the Obligations with the Net Cash Proceeds from a substantially concurrent incurrence of Indebtedness of a Loan Party contractually subordinated to the Obligations to the extent permitted hereunder;

(k)    any Group Member may make Restricted Payments (i) to the extent actually used by any direct or indirect parent company of the Borrower to pay franchise Taxes and other fees required to maintain the legal existence of the direct or indirect parent company, and (ii) payments by the Borrower to or on behalf of such direct or indirect parent company in an amount sufficient to pay out-of- pocket legal, accounting and filing costs and other expenses in the nature of overhead in the ordinary course of business of such direct or indirect parent company in an aggregate amount not to exceed $5,000,000 in any fiscal year of the Borrower;

(l)    conveyance, transfer or assignment of the North Yard and the West Yard to Sunoco, Inc., in each case in accordance with Section 11.10 of the Contribution Agreement as in effect on the Closing Date;

(m)    the Borrower or any of its Subsidiaries may declare and make dividend payments or other distributions payable solely in the Capital Stock (other than Disqualified Capital Stock) (on a ratable basis to the holders of such Capital Stock, in the case of such dividends and distributions declared and made by Subsidiaries) of such Person;

(n)    Restricted Payments may be paid to any direct or indirect parent company of the Borrower in connection with customary salary, bonus and other benefits (including retirement, health, stock option and other benefit plans) and indemnification arrangements payable to officers, directors, employees or consultants of such direct or indirect parent company (and such parent's Subsidiaries) of the Borrower to the extent such salaries, bonuses and other benefits are attributable to such officers', employees' or consultants' services provided to the Borrower and its Restricted Subsidiaries;

(o)    the Borrower or any Restricted Subsidiary may apply the proceeds of Indebtedness incurred pursuant to Section 6.01(g) to repay, prepay, repurchase, redeem, defease, acquire or retire for value any Indebtedness of a Loan Party (*provided* that if the Indebtedness so repaid, prepaid, repurchased, redeemed, defeased, acquired or retired is Indebtedness hereunder, it is applied to all Loans ratably in accordance with the aggregate principal amounts of the Loans then outstanding); and

(p)      so long as no Default or Event of Default has occurred and is continuing or would result therefrom, the Borrower may make additional Restricted Payments in amounts up to $50,000,000 during the term of this Agreement;

*provided* that no Restricted Payment may be made, except for Restricted Payments described in clauses (a), (c), (d) (in clause (d), solely to the extent effectuating a Restricted Payment being made pursuant to Section 6.05(a), (c), (g), (i), or (k)), (e), (g), (i), (j), (k), (l), (m), (n), and (o) of this Section 6.05 (as each such clause is in effect on the Closing Date), until the Discharge of the Tranche B Loans.

Section 6.06.   *Lines of Business*.   Enter into any business, either directly or through any Restricted Subsidiary, except for those businesses in which the Borrower and its Subsidiaries are engaged on the date of this Agreement or that are reasonably related or ancillary thereto or are complementary businesses (including related, complementary, synergistic or ancillary technologies).

Section 6.07.   *Investments*.   Make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets constituting a business unit of, or make any other investment in, any Person (all of the foregoing, "**Investments**"), except the Borrower may make:

(a)      investments in Cash Equivalents;

(b)      Guarantee Obligations permitted by Section 6.01(c); *provided* that this clause Section 6.07(b) shall not permit such Guarantee Obligations to the extent made by Borrower or a Subsidiary Guarantor in respect of the obligations of a Subsidiary that is not a Loan Party;

(c)      loans and advances (i) to directors, employees and officers of the Borrower or any of its Restricted Subsidiaries or (ii) to Persons, including employees of PES Inc. or any other direct or indirect parent company of the Borrower, who are engaged in the management or operations of the Borrower or any of its Restricted Subsidiaries and (iii) for bona fide business purposes or to purchase (among other things) or pay taxes related to, Capital Stock of PES Inc. or any other direct or indirect parent company of the Borrower, in an aggregate amount, for all loans and advances made under this Section 6.07(a), not to exceed $2,000,000 at any one time outstanding;

(d)      Investments in assets useful in the business of the Borrower or any of its Restricted Subsidiaries made by the Borrower or any of its Restricted Subsidiaries with the proceeds of any Reinvestment Deferred Amount; provided that, for the avoidance of doubt, this clause (d) shall not permit Investments in Subsidiaries that are not Guarantors;

(e)      intercompany Investments by the Borrower or any of its Restricted Subsidiaries in the Borrower or any Person that, prior to such investment, is a Subsidiary Guarantor and investments by any Restricted Subsidiary that is not a Subsidiary Guarantor into any other Restricted Subsidiary that is not a Subsidiary Guarantor;

(f)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business (including advances made to distributors), Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors, and Investments consisting of prepayments to suppliers in the ordinary course of business;

(g)      to the extent constituting Investments, transactions expressly permitted under Sections 6.01 (other than 6.01(a), (d), (k) or (l)), Section 6.02, 6.03 (other than 6.03(c), (d) or (e)), 6.04 (other than 6.04(e) or (f)) (including the receipt of noncash consideration for the Dispositions of assets permitted thereunder) and Section 6.05;

(h)      Investments (i) existing on the date hereof and/or on the Closing Date that are set forth on Schedule 6.07, (ii) existing on the Closing Date of the Borrower or any Restricted Subsidiary in the Borrower or any Restricted Subsidiary and (iii) in the case of each of clauses (i) and (ii), any modification, replacement, renewal or extension thereof; *provided* no such modification, replacement, renewal or extension shall increase the amount of Investments then permitted under this Section 6.07(h) as otherwise permitted by this Section 6.07;

(i)      Investments in Swap Agreements permitted under Section 6.10;

(j)      promissory notes and other noncash consideration received in connection with Dispositions permitted by Section 6.04;

(k)      (i) any acquisition or other Investments made solely with the Net Cash Proceeds of any substantially concurrent issuance of Capital Stock of the Borrower (other than Disqualified Capital Stock) that is not applied to any other use or (ii) the purchase or other acquisition of all or substantially all of the property and assets or business of, any Person or of assets constituting a business unit, a line of business or division of such Person, or more than 50% of the Capital Stock in a Person that, upon the consummation thereof, will be a Restricted Subsidiary (including as a result of a merger or consolidation) (each, a "**Permitted Acquisition**"); *provided* that, with respect to each purchase or other acquisition made pursuant to this Section 6.07(k)(ii):

(A)      each applicable Loan Party and any such newly created or acquired Restricted Subsidiary shall have complied with the requirements of Section 5.10 or made arrangements reasonably satisfactory to the Administrative Agent for such compliance after the effectiveness of such Permitted Acquisition, as applicable;

(B)      immediately after giving effect to any such purchase or other acquisition and any incurrence of Indebtedness in connection therewith, no Event of Default shall have occurred and be continuing;

(C)      any Person or assets or division acquired in accordance herewith shall be in the same business or lines of business or reasonably related, ancillary or complementary businesses (including related,

complementary, synergistic or ancillary technologies) in which the Borrower and/or its Restricted Subsidiaries are permitted to be engaged; and

(D)    to the extent such acquisition or purchase constitutes an acquisition of property, assets or a business, such property, assets or business shall be acquired or purchased by a Loan Party and to the extent a purchase or acquisition of Capital Stock, the Person whose Capital Stock is acquired or purchased shall become a Loan Party; *provided* that such an acquisition or purchase by a Loan Party of the Capital Stock of a Person that does not become a Loan Party may be made to the extent the portion of the acquisition consideration attributable to such Person is permitted to be made as an Investment pursuant to either clause (z) or clause (aa) of this Section 6.07.

(l)    Investments in the ordinary course of business consisting of endorsements for collection or deposit;

(m)    Investments (including debt obligations and Capital Stock) received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business and upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(n)    the licensing, sublicensing or contribution of intellectual property rights pursuant to joint marketing arrangements with Persons other than the Borrower and its Restricted Subsidiaries in the ordinary course of business;

(o)    loans or advances made to distributors in the ordinary course of business and consistent with past practice;

(p)    Investments of a Person that is acquired and is not designated an Excluded Subsidiary or of a company merged or amalgamated or consolidated into any Restricted Subsidiary, in each case after the Closing Date and in accordance with this Section 6.07 and/or Section 6.04, as applicable, to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(q)    any Investments in a Restricted Subsidiary that is not a Loan Party or in a Joint Venture, in each case, to the extent such Investment is substantially contemporaneously repaid in full with a dividend or other distribution from such Subsidiary or Joint Venture, in each case, to the extent such dividend or distribution has not been applied to any other use;

(r)    the forgiveness or conversion to Capital Stock of the Borrower (other than Disqualified Capital Stock) of any Indebtedness owed to a Loan Party and permitted by Section 6.01;

(s)      advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business;

(t)      to the extent constituting additional Restricted Subsidiaries of the Borrower established or created in compliance with the requirements of Section 5.10, if applicable; *provided* that to the extent any such new Restricted Subsidiary is created solely for the purpose of consummating a transaction pursuant to an acquisition permitted by this Section 6.07, and such new Restricted Subsidiary at no time holds any assets or liabilities other than any merger consideration contributed to it contemporaneously with the closing of such transaction, such new Restricted Subsidiary shall not be required to take the actions set forth in Section 5.10, as applicable, until the respective acquisition is consummated (at which time the surviving or transferee entity of the respective transaction and its Restricted Subsidiaries shall be required to so comply in accordance with the provisions thereof);

(u)      Guarantee Obligations of the Borrower or any Restricted Subsidiary of leases entered into in the ordinary course of business;

(v)      Investments to the extent that payment for such Investments is made with Capital Stock (other than Disqualified Capital Stock) of the Borrower (or any direct or indirect parent of the Borrower);

(w)      Investments in connection with any lease, utility and other similar deposits in the ordinary course of business;

(x)      Capital Expenditures made by the Borrower or any Restricted Subsidiary on behalf of itself, the Borrower or any other Loan Party;

(y)      Capital Expenditures from: (i) proceeds of insurance settlements, condemnation awards and other settlements in respect of lost, destroyed, damaged or condemned assets, equipment or other property to the extent such expenditures are made to replace or repair such lost, destroyed, damaged or condemned assets, equipment or other property or otherwise to acquire, maintain, develop, construct, improve, upgrade or repair assets or properties useful in the business of the Borrower or any Guarantor, (ii) any portion of such expenditures attributable solely to acquisitions of property, plant and equipment in Permitted Acquisitions, and (iii) any leases that as of the date hereof qualify as operating leases under GAAP (whether or not such leases are required to be accounted for as capital leases under GAAP after the date hereof);

(z)      the Borrower may make Investments (1) if the Borrower shall have delivered audited financial statements for the fiscal year ending on December 31, 2018 pursuant to Section 5.01(a), (2) the Consolidated Leverage Ratio for the four consecutive Fiscal Quarters of the Borrower ending immediately prior to the making of an Investments pursuant to this (z) is not more than 3.0:1.0 and (3) no Default or Event of Default shall have occurred and be continuing;

(aa)    in addition to Investments otherwise expressly permitted by this Section 6.07, Investments by the Borrower or any of its Restricted Subsidiaries in an aggregate amount not to exceed $50,000,000 during the term of this Agreement minus capacity utilized under this Section 6.07(aa) pursuant to clause (D) of Section 6.07(k); and

(bb)    Investments by Borrower or any Restricted Subsidiary pursuant to the Joint Venture contemplated by (and not in excess of the Investment set forth in) that certain Letter Agreement, dated as of June 21, 2018, by and between ARFA Enterprises, Inc. and PESRM;

*provided* that no Investment may be made until the Discharge of the Tranche B Loans, except for Investments described in clauses (a) through (y), (aa) and (bb), as each such clause is in effect on the Closing Date.

Section 6.08.    *Transactions with Affiliates*.  Enter into any transaction, including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than the Borrower or any Subsidiary Guarantor) unless such transaction is (a) otherwise permitted under this Agreement, (b) in the ordinary course of business of the Borrower or the relevant Restricted Subsidiary, and (c) upon fair and reasonable terms no less favorable to the Borrower or the relevant Restricted Subsidiary than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate, except that the following shall be permitted:

(a)    Restricted Payments permitted by Section 6.05;

(b)    a conveyance, transfer or assignment of the North Yard and the West Yard to Sunoco, Inc., in each case in accordance with Section 11.10 of the Contribution Agreement, as in effect on the Closing Date;

(c)    [reserved];

(d)    transactions among Loan Parties and the Restricted Subsidiaries (or any entity that becomes a Restricted Subsidiary as a result of such transaction, to the extent such entity was not an Affiliate of the Borrower prior to such transaction);

(e)    the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, current and former directors, officers, employees and consultants of any of the Loan Parties or any direct or indirect parent company of the Loan Parties in the ordinary course of business to the extent attributable to the ownership or operation of the Loan Parties;

(f)    employment, compensation, bonus, incentive, retention and severance arrangements and health, disability and similar insurance or benefit plans or other benefit arrangements between the Borrower, any direct or indirect parent company of the Borrower or any Restricted Subsidiary and their respective directors, officers, employees, managers, consultants or independent contractors (including management and employee benefit plans or agreements, subscription agreements or similar agreements pertaining to

107

the repurchase of Capital Stock pursuant to put/call rights or similar rights with current or former employees, officers, directors, managers, consultants or independent contractors and stock option or incentive plans and other compensation arrangements) in the ordinary course of business or as otherwise approved by the board of directors of the Borrower (or any direct or indirect parent company thereof) or any Restricted Subsidiary;

(g)    transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 6.08 or any amendment to any such agreement to the extent such an amendment is not materially adverse, taken as a whole, to the Lenders in any material respect;

(h)    transactions between a Loan Party and any Person that is an Affiliate solely due to the fact that a director of such Person is also a director of any Loan Party or any direct or indirect parent company of the Borrower; *provided*, *however*, that such director abstains from voting as a director of such Loan Party or such direct or indirect parent company, as the case may be, on any matter involving such other Person;

(i)    [reserved];

(j)    [reserved];

(k)    [reserved];

(l)    any issuance of Capital Stock (other than Disqualified Capital Stock) of PES Inc., the Borrower, or any other direct or indirect parent company of the Borrower, or other payments, awards or grants in cash, securities, Capital Stock (other than Disqualified Capital Stock) of PES Inc. or any other direct or indirect parent company of the Borrower or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans approved by the board of directors of the Borrower or any direct or indirect parent company thereof, as the case may be;

(m)    transactions with Restricted Subsidiaries for the purchase or sale of goods, products, parts and services entered into in the ordinary course of business, in each case, in accordance with past practice;

(n)    transactions with customers, clients, suppliers, Joint Venture partners or purchasers or sellers of goods and services, in each case in the ordinary course of business and otherwise not prohibited by the Loan Documents;

(o)    sales of Capital Stock (other than Disqualified Capital Stock) of the Borrower to Affiliates of the Borrower not otherwise prohibited by the Loan Documents and the granting of registration and other customary rights in connection therewith; and

(p)    any transaction with an Affiliate where the only consideration paid by any Loan Party is Capital Stock (other than Disqualified Capital Stock) of the Borrower.

For the avoidance of doubt, (A) the compliance of the Loan Parties with the terms of the Loan Documents and the performance by the Loan Parties of their obligations

under the Loan Documents shall and (B) the execution and delivery of the Loan Documents, do not in and of themselves, constitute a transaction with an Affiliate restricted by this Section 6.08.

Section 6.09.  *Sales and Leasebacks*.  Other than a Platinum Sale and Leaseback Transaction, enter into any arrangement with any Person providing for the leasing by the Borrower or any Restricted Subsidiary of real or personal property used or useful in its business that has been or is to be sold or transferred by the Borrower or such Restricted Subsidiary to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of the Borrower or such Restricted Subsidiary.

Section 6.10.  *Swap Agreements*.  Enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Restricted Subsidiary has actual exposure (other than those in respect of Capital Stock) and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Restricted Subsidiary.

Section 6.11.  *Changes in Fiscal Periods*.  Permit the fiscal year of the Borrower to end on a day other than December 31 or change the Borrower's method of determining fiscal quarters.

Section 6.12.  *Negative Pledge Clauses*.  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of the Borrower or any Restricted Subsidiary to create, incur, assume or suffer to exist any Lien upon any Collateral, whether now owned or hereafter acquired, to secure its obligations under the Loan Documents to which it is a party other than (i) Requirements of Law, (ii) this Agreement and the other Loan Documents, (iii) the Additional Financing Agreement and the other documents entered into in connection with the Additional Financing Facility , (iv) the Supply and Offtake Documents, (v) any EB-5 Financing, (vi) any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby and any proceeds thereof), (vii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Loan Party, (viii) customary provisions restricting assignment of any agreement entered into by a Loan Party in the ordinary course of business, (ix) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Section 6.04 pending the consummation of such sale, (x) any agreement in effect at the time such Restricted Subsidiary becomes a Loan Party, so long as such agreement was not entered into in connection with or in contemplation of such Person becoming a Loan Party, (xi) any instrument governing Indebtedness assumed in connection with any Permitted Acquisition, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired, (xii) any Liens permitted pursuant to Section 6.02 in respect of assets subject thereto (other than Sections 6.02(g), (h), (k), (l), (m), (s), (t), (u), (v), (bb) and

(cc)), (xiii) customary provisions in Joint Venture agreements and other similar agreements or written arrangements applicable to Joint Ventures permitted hereunder and applicable solely to such Joint Venture, (xiv) customary restrictions in leases, subleases, licenses, asset sale or similar agreements, including with respect to intellectual property and other similar agreements, otherwise permitted hereby so long as such restrictions relate to the assets subject thereto, (xv) customary provisions restricting assignment of any agreement or (xvi) restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business or otherwise permitted hereunder.

Section 6.13.  *Clauses Restricting Subsidiary Distributions.*  Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to (a) make Restricted Payments in respect of any Capital Stock of such Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any other Restricted Subsidiary, (b) make loans or advances to, or other Investments in, the Borrower or any other Restricted Subsidiary or (c) transfer any of its assets to the Borrower or any other Restricted Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under (x) the Loan Documents and (y) any EB-5 Financing, the Supply and Offtake Documents and the Additional Financing Agreement ; (ii) any restrictions with respect to a Restricted Subsidiary imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Subsidiary; (iii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Guarantor; (iv) customary provisions restricting assignment of any agreement entered into by a Guarantor in the ordinary course of business; (v) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Section 6.04 pending the consummation of such sale; (vi) any agreement in effect at the time such Subsidiary becomes a Guarantor of the Borrower, so long as such agreement was not entered into in connection with or in contemplation of such Person becoming a Guarantor of the Borrower; (vii) any instrument governing Indebtedness assumed in connection with any Permitted Acquisition, which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person or the properties or assets of the Person so acquired; (viii) any Liens permitted pursuant to Section 6.02 in respect of assets subject thereto; (ix) customary provisions in Joint Venture agreements and other similar agreements or written arrangements applicable to Joint Ventures permitted hereunder and applicable solely to such Joint Venture; (x) customary restrictions on leases, subleases, licenses, asset sale or similar agreements, including with respect to intellectual property and other similar agreements, otherwise permitted hereby so long as such restrictions relate to the assets subject thereto; (xi) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any of its Subsidiaries; (xii) customary provisions restricting assignment of any agreement; or (xiii) restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business or otherwise permitted hereunder.

Section 6.14.  *[Reserved].*

Section 6.15.  *Sanctions, and Anti-Corruption Laws*.  (a) Directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, (i) to fund any activities or business of or with any Sanctioned Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of comprehensive sanctions administered by OFAC, or (ii) in any other manner that would result in a violation of sanctions administered by OFAC by any Person (including any Person participating in the Loans, whether as lender, underwriter, advisor, investor, or otherwise).

(b)      Directly or indirectly, use the proceeds of the Loans in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any applicable Anti-Corruption Law.

Section 6.16.  *Additional Financing Agreement*.  Amend, restate, supplement or otherwise modify the Additional Financing Agreement in any manner materially adverse to the Lenders; provided however that the foregoing shall not be construed to restrict the ability of any Loan Part to prepay the Additional Financing Facility in whole or in part.

Section 6.17.  *Anti-Layering*.  Notwithstanding anything to the contrary contained in any Loan Document, other than as expressly permitted by Section 2.19(g), the Borrower shall not, and shall not permit any of its Restricted Subsidiaries, to incur or suffer to exist (a) any Indebtedness (or Guarantee Obligation in respect of Indebtedness) that is or purports to be senior in right of payment to the Tranche B Loans or (b) any Lien on Collateral securing any Indebtedness (or Guarantee Obligation in respect of Indebtedness) that is or purports to be senior in right of priority (whether as to exercise of remedies with respect thereto or right to receive proceeds from such Collateral) to any Lien on such Collateral securing the Tranche B Loans.

## ARTICLE 7
## EVENTS OF DEFAULT

Section 7.01.  *Events of Default*.  If any of the following events shall occur and be continuing:

(a)      the Borrower shall fail to pay any principal of any Loan when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan, or any other amount payable hereunder or under any other Loan Document, within five (5) days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)      any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made unless, if such misstatement (and any effect thereof) is capable of being cured, such Loan Party cures such

misstatement (and any effect thereof) within ten (10) Business Days of receipt of notice thereof or a Responsible Officer becoming aware thereof; or

(c)    any Loan Party shall default in the observance or performance of any agreement contained in clause (a) of Section 5.04 (with respect to the Borrower only), Section 5.07(a)(i) or Article 6 of this Agreement or Section 4.5(a) of the Security Agreement; or

(d)    any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section 7.01), and such default shall continue unremedied for a period of thirty (30) days after notice to the Borrower from the Administrative Agent, the Required Lenders and the Required Tranche A-2 Lenders or the Required Tranche B Lenders; or

(e)    any Loan Party shall (A) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Loans) on the scheduled or original due date with respect thereto beyond any applicable grace period; or (B) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (C) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; *provided*, that a default, event or condition described in clause (A), (B) or (C) of this clause (e)(i) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (A), (B) and (C) of this clause (e)(i) shall have occurred and be continuing with respect to Indebtedness the aggregate outstanding principal amount of which is $20,000,000 or more; *provided* that this clause shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is expressly permitted hereunder; or

(f)    (i) an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (A) relief in respect of any Loan Party, or of a substantial part of the property of any Loan Party, under the Bankruptcy Code or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law; (B) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or for a substantial part of the property of any Loan Party or (C) the winding-up or liquidation of any Loan Party; and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered; or (ii) any Loan Party shall (A) voluntarily commence any proceeding or file any petition seeking relief under the Bankruptcy Code

or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law; (B) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in clause (i) above; (C) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Loan Party or for a substantial part of the property of any Loan Party; (D) file an answer admitting the material allegations of a petition filed against it in any such proceeding; (E) make a general assignment for the benefit of creditors; (iii) become unable, admit in writing its inability or fail generally to pay its debts as they become due; (iv) take any action for the purpose of effecting any of the foregoing; or (A) wind up or liquidate (other than as permitted by Section 6.03); or

(g)      (i) an ERISA Event and/or a Foreign Plan Event shall have occurred; (ii) a trustee shall be appointed by a United States district court to administer any Pension Plan; (iii) the PBGC shall institute proceedings to terminate any Pension Plan; or (iv) any Loan Party or any of their respective Affiliates shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such entity does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner; and in each case in clauses (i) through (iv) above, such event or condition, together with all other such events or conditions, if any, would reasonably be expected to result in a Material Adverse Effect; or

(h)      one or more judgments or decrees shall be entered against any Loan Party involving in the aggregate a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $20,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed, insured or bonded pending appeal within thirty (30) days from the entry thereof; or

(i)      this Agreement, any of the Security Documents or any other Loan Document shall cease, for any reason, to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Lien created by any of the Security Documents on Collateral (other than Collateral the value of which is de minimis) shall cease to be enforceable and of the same effect and priority purported to be created thereby subject to Liens that are permitted to exist on such Collateral under Section 6.02; or

(j)      the guarantee contained in Article 10 shall cease, for any reason, to be in full force and effect or any Loan Party or any Affiliate of any Loan Party shall so assert; or

(k)      (i) PES Ultimate Holdings, LLC at any time ceases to own directly or indirectly 100% of the Capital Stock of the Borrower, on a fully diluted basis; or (ii) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**")), other than the Permitted Holders shall "beneficially own" (within the meaning of Rule 13d-3 under the Exchange Act), directly or indirectly, shares representing more than the greater of (x) 35% of the aggregate ordinary voting power represented by the issued and outstanding equity interests of PES Inc. or PES Ultimate Holdings, LLC and (y) the percentage of the aggregate ordinary voting power represented by such equity interests beneficially owned

by such person or group that exceeds the percentage of the aggregate ordinary voting power represented by equity interests of the Borrower then beneficially owned, directly or indirectly, by the Permitted Holders unless (A) the Permitted Holders have, at such time, the right or the ability, directly or indirectly, by voting power, contract or otherwise to elect or designate for election at least a majority of the board of directors of PES Inc. or PES Ultimate Holdings, LLC, as applicable or (B) during any period of twelve (12) consecutive months, a majority of the seats (other than vacant seats) on the board of directors of PES Inc. or PES Ultimate Holdings, LLC, as applicable, shall be occupied by persons who were (x) members of the board of directors of PES Inc. or PES Ultimate Holdings, LLC, as applicable, on the Closing Date or nominated by the board of directors of PES Inc. or PES Ultimate Holdings, LLC, as applicable, or by one or more of the Permitted Holders or persons nominated by one or more of the Permitted Holders or (y) appointed by directors so nominated (it being understood and agreed that, for purposes of this clause (k), a person shall not be deemed to have beneficial ownership of Capital Stock subject to a stock purchase agreement, merger agreement or similar agreement until the consummation of the transactions contemplated by such agreement (unless such agreement provides for the ability of the purchaser therein to vote the Capital Stock) or (iii) a "change of control" or similar event shall occur under any documentation Indebtedness the aggregate outstanding principal amount of which is $20,000,000 or more or under a Supply and Offtake Document;

(l)    there shall occur a permanent suspension or termination (including by expiration) of, or with respect to the transactions contemplated by, the Supply and Offtake Documents, unless, solely in the case of an expiration of the Supply and Offtake Agreement on or following the second anniversary of the Closing Date, such Supply and Offtake Documents and such transactions so contemplated thereby are thereupon replaced with a facility or arrangement that provides raw material supply, product sale and/or marketing benefits and accommodations and working capital availability to the Borrower and the other Loan Parties in a manner and scope customary for independent oil refiners in the United States of America; or

(m)    the Refinery (or any successor refinery or refineries fulfilling the same or substantially the same functions as all or a portion of the Refinery) has permanently or indefinitely suspended operations and such suspension has continued for a period of 12 consecutive months, unless, as of the time of the expiration of such 12 consecutive month period, (i) such suspension would not reasonably be expected to result in a Material Adverse Effect or (ii) the Borrower shall have, as of the time of the expiration of such 12-month period, established a replacement business that is reasonably acceptable to the Administrative Agent or demonstrated to the Administrative Agent's reasonable satisfaction that actions have been commenced to restore or replace business lost as a result of such suspension of operations;

then, subject to Section 7.02, in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (f) above with respect to the Borrower, a Loan Acceleration shall automatically occur and (B) if such event is any other Event of Default, with the consent of the Controlling Lenders that are then permitted to pursue Enforcement Actions under Section 7.02, upon the request of the Controlling Lenders that are then

permitted to pursue Enforcement Actions under Section 7.02, the Administrative Agent shall, by notice to the Borrower, declare a Loan Acceleration to have occurred. Except as expressly provided above in this Section 7.01, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.

Section 7.02.  *Controlling Lenders*.  Following (A) the occurrence of an Event of Default until the Discharge of the Tranche A Loans, the Required Tranche A Lenders shall be the Controlling Lenders authorized to exclusively direct the Administrative Agent to pursue any Enforcement Action and, (B) the occurrence of an Event of Default on and after the Discharge of the Tranche A Loans and prior to the Discharge of the Tranche A-2 Loans, the Required Tranche A-2 Lenders shall be the Controlling Lenders authorized to exclusively direct the Administrative Agent to pursue any Enforcement Action and (C) the occurrence of an Event of Default on and after the Discharge of the Tranche A Loans and on and after the Discharge of the Tranche A-2 Loans, the Required Tranche B/C Lenders shall be the Controlling Lenders authorized to exclusively direct the Administrative Agent to pursue any Enforcement Action (a "**Discharge Control Shift**"), subject in all cases to each of the following:

(a)      whether or not a Discharge Control Shift shall have occurred, after the expiration of a Standstill Period, the Required Tranche A-2 Lenders (other than after the Expiration of a Standstill Period pursuant to clause (b) of the definition thereof), the Required Tranche B Lenders and the Required Tranche C Lenders (but not the Required Tranche A Lenders or, after the Expiration of a Standstill Period pursuant to clause (b) of the definition thereof, the Required Tranche A-2 Lenders) shall each constitute, and have the rights and ability of, the Controlling Lender to initially direct the Administrative Agent to pursue any Enforcement Action (a "**Remedies Shift**"),

(b)      subject to paragraph (c) below, (i) after a period 10 Business Days following the occurrence of a  Tranche B Payment Event of Default, the Required Tranche B Lenders (but not the Required Tranche A Lenders, Required Tranche A-2 Lenders or Required Tranche C Lenders) shall be the Controlling Lenders authorized to exclusively direct the Administrative Agent to pursue any Enforcement Action without the consent of any other Secured Party and (ii) following the occurrence of a Tranche B Specific Event of Default other than a Tranche B Payment Event of Default, the Required Tranche B Lenders (but not the Required Tranche A Lenders, Required Tranche A-2 Lenders or Required Tranche C Lenders) shall be the Controlling Lenders, authorized to exclusively direct the Administrative Agent to pursue any Enforcement Action,

(c)      if any Event of Default in addition to a Tranche B Specific Event of Default has occurred and is continuing (such additional Event of Default, a "**Dual Event of Default**"), both the Required Tranche A Lenders (subject to the Discharge Control Shift) and the Required Tranche B Lenders shall each constitute, and have the rights of, the Controlling Lender to initially direct the Administrative Agent to pursue any Enforcement Action,

(d)      notwithstanding anything to the contrary in this Section 7.02 and subject to the proviso below, (i) if and as long as the Required Tranche A Lenders (subject to the

Discharge Control Shift, Remedies Shift and except following the occurrence of a Tranche B Specific Event of Default when there is not then an occurrence of a Dual Event of Default) pursue an Enforcement Action, such Enforcement Action will be exclusively controlled by the Required Tranche A Lenders (subject to the Discharge Control Shift and/or Remedies Shift), without the requirement of the consent of any other Lender or Secured Party; *provided* that if, in such circumstances, the Required Tranche A Lenders are not diligently pursuing Enforcement Actions against a substantial portion of the Collateral, the Required Tranche A-2 Lenders shall become the Controlling Lenders with the exclusive right to direct the Administrative Agent and control the Enforcement Actions; *provided, further,* that if the Required Tranche A-2 Lenders have become the Controlling Lenders in such circumstances and are not diligently pursuing remedies against a substantial portion of the Collateral, the Required Tranche B/C Lenders shall become the Controlling Lenders with the exclusive right to direct the Administrative Agent and control the Enforcement Actions; *provided*, *further*, that if the Required Tranche B/C Lenders have become the Controlling Lenders in such circumstances and are not diligently pursuing remedies against a substantial portion of the Collateral, the Required Tranche B Lenders shall become the Controlling Lenders with the exclusive right to direct the Administrative Agent and control the Enforcement Actions, (ii) if and as long as the Required Tranche B Lenders pursue an Enforcement Action following the occurrence of a Tranche B Specific Event of Default when there has not been an occurrence of a Dual Event of Default , such Enforcement Action will be exclusively controlled by the Required Tranche B Lenders without the requirement of the consent of any other Lender or Secured Party, (iii) upon a Discharge Control Shift or a Remedies Shift (other than in an event where clause (ii) of this clause (d) applies), if the Required Tranche A-2 Lenders, the Required Tranche B Lenders or the Required Tranche C Lenders have initially directed the Administrative Agent to pursue (or consented to the Administrative Agent's pursuit of) any Enforcement Action, the consequent Enforcement Action will be controlled exclusively by (i) prior to the Discharge of the Tranche A-2 Loans, the Required Tranche A-2 Lenders and (ii) after the Discharge of the Tranche A-2 Loans, the Required Tranche B/C Lenders; *provided* that if, in such circumstances, the Required Tranche A-2 Lenders are not diligently pursuing remedies against a substantial portion of the Collateral, the Required Tranche B/C Lenders shall become the Controlling Lenders with the exclusive right to direct the Administrative Agent and control the Enforcement Actions; *provided, further* that if, in such circumstances, the Required Tranche B/C Lenders are not diligently pursuing remedies against a substantial portion of the Collateral, the Required Tranche B Lenders shall become the Controlling Lenders with the exclusive right to direct the Administrative Agent and control the Enforcement Actions and (iv) subject to the other provisions of this Agreement, including those of this Section 7.02, in the event more than one Tranche constitutes the Controlling Lenders at such time with a right to trigger an Enforcement Action, no tranche of Lenders can prevent any other tranche of Lenders that constitutes the Controlling Lenders from pursuing an Enforcement Action,

(e)      (x) upon the occurrence of (i) any Loan Acceleration of the Tranche A Loans, (ii) an Event of Default under Section 7.01(a) with respect to the Tranche A Loans, and expiration of the subsequent Standstill Period, (iii) an Event of Default under Section 7.01(f) or (iv) any Enforcement Action against a substantial portion of the Collateral by or

116

at the direction of the Tranche A Lenders, each of the Tranche A-2 Lenders, Tranche B Lenders and Tranche C Lenders shall have the option, but not the obligation, to, on customary terms, purchase (*pro rata* among them based on the principal amount of such Tranche A-2 Lenders', Tranche B Lenders' and Tranche C Lenders' Loans then outstanding under the Facility) the Tranche A Loans (in full but not in part) at par plus accrued and unpaid interest (it being understood that if any Tranche A-2 Lender, Tranche B Lender or Tranche C Lender does not exercise its right to participate in such purchase option, the participating Tranche A-2 Lenders, Tranche B Lenders and Tranche C Lenders may, if they wish to exercise such option, ratably increase their participation in such purchase option), and (y) at any time after the Discharge of the Tranche A Loans, upon the occurrence of (i) any Loan Acceleration of the Tranche A-2 Loans, (ii) an Event of Default under Section 7.01(a) with respect to the Tranche A-2 Loans, and expiration of the subsequent Standstill Period, (iii) an Event of Default under Section 7.01(f) or (iv) any Enforcement Action against a substantial portion of the Collateral by or at the direction of the Tranche A-2 Lenders, each of the Tranche B Lenders and Tranche C Lenders shall have the option, but not the obligation, to, on customary terms, purchase (*pro rata* among them based on the principal amount of such Tranche B Lenders' and Tranche C Lenders' Loans then outstanding under the Facility) the Tranche A-2 Loans (in full but not in part) at par plus accrued and unpaid interest (it being understood that if any Tranche B Lender or Tranche C Lender does not exercise its right to participate in such purchase option, the participating Tranche B Lenders and Tranche C Lenders may, if they wish to exercise such option, ratably increase their participation in such purchase option), and

(f)    notwithstanding anything to the contrary in this Section 7.02, and whether or not a Discharge Control Shift, a Remedies Shift, a Tranche B Specific Event of Default, or a Dual Event of Default shall have occurred, (A) in any proceeding referred to in Section 7.01(f), each of the Tranche A Lenders, the Tranche A-2 Lenders, the Tranche B Lenders and Tranche C Lenders may file a claim, proof of claim, or statement of interest with respect to the Obligations relating to such Tranche A Lenders', Tranche A-2 Lenders', Tranche B Lenders' and Tranche C Lenders' Loans, (B) any Tranche A Lender, Tranche A-2 Lender, Tranche B Lender and Tranche C Lender may exercise their rights and remedies as unsecured creditors, to the extent not in contravention of this Agreement, (C) any Tranche A Lender, Tranche A-2 Lender, Tranche B Lender and Tranche C Lender may seek adequate protection with respect to their interests in the Collateral in any proceeding referred to in Section 7.01(f) (*provided* that such adequate protection shall be subject to arrangements substantially similar to the terms of Section 7.02 and Section 7.03) and may file any responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance or avoidance of the claims or Liens of the Tranche A-2 Lenders, Tranche B Lenders and Tranche C Lenders, and (D) any Tranche A Lender, any Tranche A-2 Lender, any Tranche B Lender or Tranche C Lender may vote on any plan of reorganization, plan of liquidation, agreement for composition, or other type of plan of arrangement proposed in or in connection with any proceeding referred to in Section 7.01(f) to the extent in a manner that is not inconsistent with the terms and conditions of this Agreement.

Section 7.03.  *Application of Proceeds*.

(a)      (i) At all times from the date of this Agreement, any amounts or proceeds received (other than cash interest payments made pursuant to Section 2.09 and amortization payments made pursuant to Section 2.03(b) from proceeds of Collateral by the Administrative Agent or any other Secured Party, as the case may be, in respect of the Obligations whether after an Event of Default, acceleration or by sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Administrative Agent or any other Secured Party, as the case may be, of its remedies, or otherwise, shall be applied (including after any Event of Default under this Agreement or in any other Loan Document (or after the Loans and any other Obligations have been accelerated or have otherwise automatically become immediately due and payable as set forth in Section 7.01)), and including any such amounts or proceeds received following the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower and each Guarantor at any time from the date of this Agreement), in full or in part, together with any other sums then held by such Secured Party pursuant to this Agreement, promptly by such Secured Party as follows:

(A)      First, to the payment of all reasonable costs and expenses, fees (including amounts owed under the Administrative Agent Fee Letter) and taxes of such sale, collection or other realization including compensation to the Administrative Agent and its agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent in connection therewith and all amounts for which the Administrative Agent is entitled to indemnification pursuant to the provisions of any Loan Document;

(B)      Second, to the payment of all reasonable costs and expenses of such sale, collection or other realization including compensation to the other Secured Parties and their agents and counsel and all costs, fees, expenses, liabilities and advances made or incurred by the other Secured Parties in connection therewith, therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full, in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(C)      Third, without duplication of amounts applied pursuant to clauses (A) and (B) above, to the indefeasible payment in full in cash, *pro rata*, of the principal amount of Tranche A Loans and interest with respect to the Tranche A Loans, and other amounts constituting Obligations (other than principal) in respect of the Tranche A Loans arising under the Loan Documents (including all amounts owing in respect of post-petition interest, default interest, fees, costs, expenses, premiums, and other charges in respect of the Obligations owed to Tranche A Lenders, irrespective of whether a claim for such amounts is allowed or allowable in such proceeding under any federal, state or

foreign bankruptcy, insolvency, receivership or similar law), in each case, first, equally and ratably amongto the Tranche A Lenders and second, equally and ratably to the Tranche A-2 Lenders, in accordance with the respective amounts thereof then due and owing;

(D)     Fourth, without duplication of amounts applied pursuant to clauses (A) and (B) above, to the indefeasible payment in full in cash, *pro rata*, of the principal amount of the Tranche B Loans and the Tranche C Loans, aggregated together as though such Tranche B Loans and Tranche C Loans were a single tranche (for purposes of this Section 7.03(a)(i)(D), such aggregated Loans being "**Tranche B/C Loans**" and the Lenders of such aggregated Loans being the "**Tranche B/C Lenders**") and interest with respect to the Tranche B/C Loans, and other amounts constituting Obligations (other than principal) in respect of the Tranche B/C Loans arising under the Loan Documents (including all amounts owing in respect of post-petition interest, default interest, fees, costs, expenses, premiums, and other charges in respect of the obligations owed to Tranche B/C Lenders, irrespective of whether a claim for such amounts is allowed or allowable in such proceeding under any federal, state or foreign bankruptcy, insolvency, receivership or similar law) and the Specified Swap Agreements, in each case equally and ratably among the Tranche B/C Lenders and the Secured Parties in their capacities as holders of Specified Swap Agreements in accordance with the respective amounts thereof then due and owing (*provided* that if proceeds from any Tranche B Excluded Buildings ("**Excluded Building Proceeds**") are received before or at the same time as proceeds from other Collateral, such Excluded Building Proceeds shall be applied to the indefeasible payment in full in cash, *pro rata*, of the principal amount of Tranche A Loans and subject to the provisions set forth above in this Section 7.03(a)(i)(D), the Tranche C Loans and interest with respect to the Tranche C Loans, and other amounts constituting Obligations (other than principal) in respect of the Tranche C Loans arising under the Loan Documents (including all amounts owing in respect of post-petition interest, fees, costs, expenses, premiums, and other charges in respect of the Obligations owed to Tranche C Lenders, irrespective of whether a claim for such amounts is allowed or allowable in such proceeding under any federal, state or foreign bankruptcy, insolvency, receivership or similar law) and the Specified Swap Agreements, in each case equally and ratably among the Tranche C Lenders in accordance with the respective amounts thereof then due and owing, with the Tranche B Lenders receiving subject to the provisions set forth above in this Section 7.03(a)(i)(D), *pro rata*, amounts equal to such Excluded Building Proceeds from the proceeds of the other Collateral not constituting Tranche B Excluded Buildings at such time as such proceeds are available, in application to the indefeasible payment in full in cash of the Tranche B Loans and other amounts constituting Obligations (other than principal) in respect of the Tranche B Loans arising under the Loan

119

Documents (including all amounts owing in respect of post-petition interest, fees, costs, expenses, premiums, and other charges in respect of the Obligations owed to Tranche B Lenders, irrespective of whether a claim for such amounts is allowed or allowable in such proceeding under any federal, state or foreign bankruptcy, insolvency, receivership or similar law), in each case equally and ratably among the Tranche B Lenders in accordance with the respective amounts thereof then due and owing); and

(E)    Fifth, the balance, if any, to the person lawfully entitled thereto (including the applicable Loan Party or its successors or assigns) or as a court of competent jurisdiction may direct.

(ii)    In the event that any such proceeds are insufficient to pay in full the items described in clauses (A) through (E) of clause (a)(i) above, the Loan Parties shall remain liable, jointly and severally, for any deficiency.

(b)    At all times from the date of this Agreement, and any amounts or proceeds received (other than cash interest payments made pursuant to Section 2.09) and amortization payments made pursuant to Section 2.03(b)) from sources other than proceeds of Collateral by the Administrative Agent or any other Secured Party, as the case may be, in respect of the Obligations after an Event of Default, including any such amounts or proceeds received following the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower and each Guarantor at any time from the date of this Agreement, acceleration or pursuant to the exercise by the Administrative Agent or any other Secured Party, as the case may be, of its remedies shall be applied (including after any Event of Default under this Agreement or in any other Loan Document (or after the Loans and any other Obligations have been accelerated or have otherwise automatically become immediately due and payable as set forth in Section 7.01)), in full or in part, together with any other sums then held by such Secured Party pursuant to this Agreement, promptly by such Secured Party as follows:

(i)    First, to the payment of all reasonable costs and expenses, fees (including amounts owed under the Administrative Agent Fee Letter) and taxes of the Administrative Agent and its agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent in connection therewith and all amounts for which the Administrative Agent is entitled to indemnification pursuant to the provisions of any Loan Document;

(ii)    Second, to the payment of all reasonable costs and expenses of the other Secured Parties and their agents and counsel and all costs, fees, expenses, liabilities and advances made or incurred by the other Secured Parties in connection therewith, therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full, in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(iii)    Third, without duplication of amounts applied pursuant to clauses (i) and (ii) above, to the indefeasible payment in full in cash, *pro rata*, of the principal amount of the Loans and interest with respect to the Loans, and other amounts constituting Obligations (other than principal) in respect of the Loans arising under the Loan Documents (including all amounts owing in respect of post-petition interest, default interest, fees, costs, expenses, premiums, and other charges in respect of the Obligations owed to Lenders, irrespective of whether a claim for such amounts is allowed or allowable in such proceeding under any federal, state or foreign bankruptcy, insolvency, receivership or similar law) and the Specified Swap Agreements, in each case equally and ratably among the Lenders and the Secured Parties in their capacities as holders of Specified Swap Agreements in accordance with the respective amounts thereof then due and owing; and

(iv)    Fourth, the balance, if any, to the person lawfully entitled thereto (including the applicable Loan Party or its successors or assigns) or as a court of competent jurisdiction may direct.

(c)    If any Secured Party collects or receives any amounts received on account of the Obligations to which it is not entitled under this Section 7.03, such Secured Party shall hold the same in trust for the applicable Secured Parties entitled thereto and shall forthwith deliver the same to the Administrative Agent, for the account of such Secured Parties, to be applied in accordance with this Section 7.03, in each case until the prior payment in full in cash of the applicable Obligations of such Secured Parties.

(d)    Without limiting the generality of the foregoing, it is the intention of the parties hereto that the provisions set forth above in (i) this Section 7.03 shall be deemed to constitute a "subordination agreement" within the meaning of Section 510(a) of the Bankruptcy Code and shall be interpreted to be enforceable to the maximum extent permitted by applicable non-bankruptcy law and, (ii) to the maximum extent permitted by law, the Obligations in respect of the Tranche A Loans (other than the Tranche A-2 Loans) (and the security therefor) constitute a separate and distinct class and separate and distinct claims from the other Obligations (and the rights with respect to the security therefor) and (iii) to the maximum extent permitted by law, the Obligations in respect of the Tranche A-2 Loans (and the security therefor) constitute a separate and distinct class and separate and distinct claims from the other Obligations (and the rights with respect to the security therefor).

# ARTICLE 8
# THE ADMINISTRATIVE AGENT

Section 8.01.    *Appointment*.  Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the

terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.

Section 8.02.  *Delegation of Duties*.  The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys in fact selected by it with reasonable care, except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct.

Section 8.03.  *Exculpatory Provisions*.  Neither the Administrative Agent nor any of its officers, directors, employees, agents, advisors, attorneys in fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and non- appealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder. The Administrative Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.  The Administrative Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; business interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.  The Administrative Agent does not warrant, nor accept responsibility, nor shall Administrative Agent have any liability with respect to the administration, submission, or any other matter related to the rates in the definition of LIBOR Rate or with respect to any comparable or successor rate thereto (including as may be provided pursuant to Section 2.09(h̶i̲)).

Section 8.04.  *Reliance by Administrative Agent*.  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy or email message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Administrative Agent. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders and the Required Tranche A-2 Lenders (or, if so specified by this Agreement, all Lenders or the Controlling Lenders under Section 7, as applicable) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders and the Required Tranche A-2 Lenders (or, if so specified by this Agreement, all Lenders or the Controlling Lenders under Section 7, as applicable) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.  No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby shall require the Administrative Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers. No request given to the Administrative Agent by the Required Lenders and the Required Tranche A-2 Lenders or the Borrower or any Subsidiary Guarantor that in the sole judgment of the Administrative Agent imposes, purports to impose or might reasonably be expected to impose upon the Administrative Agent any obligation or liability not set forth in or arising under this Agreement and the other Loan Documents will be binding upon the Administrative Agent unless the Administrative Agent elects, at its sole option, to accept such direction.

Section 8.05.  *Notice of Default*.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders and the Required Tranche A-2 Lenders or the Controlling Lenders as set forth in Section 7 hereof, as applicable; *provided* that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such

action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

Section 8.06.  *Non-Reliance on Administrative Agent and Other Lenders*.  Each Lender expressly acknowledges that neither the Administrative Agent nor any of its respective officers, directors, employees, agents, advisors, attorneys in fact or affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, advisors, attorneys in fact or affiliates.

Section 8.07.  *Indemnification*.  The Lenders agree to indemnify the Administrative Agent and its officers, directors, employees, affiliates, agents, advisors and controlling persons (each, an "**Agent Indemnitee**") (to the extent not reimbursed by the Borrower and without limiting its obligations to do so), ratably according to their respective Aggregate Exposure Percentages in effect on the date on which indemnification is sought under this Section 8.07 (or, if indemnification is sought after the date upon which the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent Indemnitee in any way relating to or arising out of, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent Indemnitee under or in connection with any of the foregoing; *provided* that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and non-appealable decision of a court of competent jurisdiction

to have resulted from such Agent Indemnitee's gross negligence or willful misconduct. The agreements in this Section 8.07 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 8.08.  *Administrative Agent in Its Individual Capacity*.  The Administrative Agent and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though the Administrative Agent were not the Administrative Agent.  With respect to its Loans made or renewed by it, the Administrative Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" shall include the Administrative Agent in its individual capacity.

Section 8.09.  *Successor Administrative Agent*.  The Administrative Agent may resign as Administrative Agent upon ten (10) days' notice to the Lenders and the Borrower. If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders and the Required Tranche A-2 Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default under Section 7.01(a) or Section 7.01(f) with respect to the Borrower shall have occurred and be continuing) be subject to approval by the Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "**Administrative Agent**" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Administrative Agent by the date that is ten (10) days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders and the Required Tranche A-2 Lenders appoint a successor agent as provided for above. After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this Article 8 and of Section 9.05 shall continue to inure to its benefit.

ARTICLE 9
MISCELLANEOUS

Section 9.01.  *Amendments and Waivers*.  Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented, modified or waived except in accordance with the provisions of this Section 9.01 (except for amendments, supplements and modifications explicitly permitted by Section 2.19). The Required Lenders and the Required Tranche A-2 Lenders and each Loan Party party to the relevant Loan Document may, or, with the written consent of the Required Lenders and the Required Tranche A-2 Lenders, the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (a) enter into written

amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders and the Required Tranche A-2 Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; *provided*, *however*, that (i) no such waiver and no such amendment, supplement or modification shall (A) forgive any principal amount or extend the final scheduled date of maturity of any Loan, extend the scheduled date of or reduce any amortization payment in respect of any Loan, reduce any fee or interest or any rate of on interest (including, without limitation, any change in (x) clause (a) of the definition of Eurodollar Base Rate or (y) clause (d) of the definition of ABR) or fee payable hereunder) (except in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective as to the Tranche A Loans, Tranche A-2 Loans, Tranche B Loans or Tranche C Loans with the consent of the Required Tranche A Lenders, Required Tranche A-2 Lenders, Required Tranche B Lenders and Required Tranche C Lenders, respectively)) or extend the scheduled date of any payment thereof, in each case without the written consent of each Lender affected thereby; (B) eliminate or reduce the voting rights of any Lender under this Section 9.01 without the written consent of such Lender; (C) amend or modify the definition of Required Lenders or reduce any percentage specified in such term, consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, release all or substantially all of the Collateral or release all or substantially all of the value of the Guarantor Obligations of the Subsidiary Guarantors, in each case without the written consent of all Lenders; (D) amend or modify any definition of (i) Required Tranche A Lenders without the written consent of all Tranche A Lenders, (ii) Required Tranche B A-2 Lenders without the written consent of all Tranche B A-2 Lenders, (iii) Required Tranche B Lenders without the written consent of all Tranche B Lenders, (iv) Required Tranche C Lenders without the written consent of all Tranche C Lenders or (iv v) Required Tranche B/C Lenders without the written consent of all Tranche B Lenders and all Tranche C Lenders; (E) amend, modify or waive any provision of Section 2.12 or Section 7.02 or 7.03, in each case, without the written consent of each Lender directly affected thereby; (F) without the consent of each Lender, amend, modify or waive any provision of any Loan Document that would have the effect of allowing the aggregate principal amount of Indebtedness outstanding (or permitted to be outstanding) pursuant to the "Term Loan Documents" (as defined in the Intercreditor Agreement) to exceed the aggregate principal of Loans that would be permitted to be outstanding under the Intercreditor Agreement without the consent of the Supply and Offtake Secured Parties (unless such consent from the Supply and Offtake Secured Parties has been obtained) or (G) amend, modify or waive any provision of Article 8 or any other provision of any Loan Document that affects the Administrative Agent without the written consent of the Administrative Agent and (ii) amend, modify or waive (u) any provision of any Loan Document that gives the Required Tranche B Lenders rights to consent to any action or circumstance or request an action, (v) the definition of Tranche B Specific Event of Default, (w) any provision of Section 2.19 that prevents Incremental Loans from being incurred as Tranche A Loans, Tranche

A-2 Loans or any other Loans that would have a priority (as to rights in Collateral or payment) as to any other Loans hereunder, (x) Section 6.17 or Section 7.01(k), (y) the final proviso of Section 6.05 or the final proviso to Section 6.07(z) or (z) without derogating the rights of Tranche B Lenders pursuant to clause (i) above, any provision of this Agreement that benefits the Tranche A Lenders, Tranche A-2 Lenders or the Tranche C Lenders disproportionately as compared to the Tranche B Lenders or would disproportionately adversely affect the Tranche B Lenders as compared to the Tranche A Lenders, Tranche A-2 Lenders or the Tranche C Lenders, in each case without the written consent of the Required Tranche B Lenders (it being understood that, without limiting the foregoing, any change that would require a payment of principal of the Tranche A Loans or Tranche C Loans on any date earlier than such payment is required, or any increase in interest or fees payable to the Tranche A Lenders or the Tranche C Lenders, in each case, under this Agreement as in effect on the Closing Date shall be deemed disproportionately adverse to the Tranche B Lenders), and (iii) in determining whether the requisite percentage of Lenders have consented to any amendment, modification, waiver or other action, any Affiliate Lenders (other than Debt Fund Affiliates) shall be deemed to have voted in the same proportion as those Lenders who are not Affiliate Lenders, except with respect to (x) any amendment, modification or other action or plan of reorganization which by its terms requires the consent of all Lenders or each affected Lender and (y) any amendment, modification, waiver or other action that by its terms adversely affects any Affiliate Lender in its capacity as a Lender in a manner that differs in any material respect from, and is more adverse to such Affiliate Lender than it is to, other affected Lenders, in which case the consent of such Affiliate Lender shall be required. Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Administrative Agent and all future holders of the Loans. In the case of any waiver, the Loan Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding anything in this Agreement or any other Loan Document to the contrary, the Borrower may enter into Extension Amendments in accordance with Section 2.18, and such Extension Amendments shall be effective to amend the terms of this Agreement and the other applicable Loan Documents, in each case, without any further action or consent of any other party to any Loan Document; *provided* that as to the Extended Loans borrowed in connection with any such Extension Amendment (a) the Applicable Margin for such Extended Loans shall not be higher than the Applicable Margin for the relevant Loans prior to the relevant Extension, (b) the All-In Yield of such Extended Loans shall not be higher than the All-In Yield for the relevant Loans prior to the relevant Extension and (c) the other terms of the Extended Loans are not more favorable to the lenders of such Extended Loans than the corresponding terms of the relevant Loans prior to the relevant Extension, to the extent such terms are applicable to an Extension.

In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of the Administrative Agent, the Borrower and the Lenders providing the relevant Replacement Loans (as defined below) to permit the refinancing, replacement or modification of all outstanding Loans of a particular Tranche ("**Replaced Loans**") with a replacement term loan tranche hereunder ("**Replacement Loans**"), *provided* that (a) the aggregate principal amount of such Replacement Loans shall not exceed the aggregate principal amount of such Replaced Loans, (b) the Applicable Margin for such Replacement Loans shall not be higher than the Applicable Margin for such Replaced Loans, (c) the All-In Yield of such Replacement Loans shall not be higher than the All-In Yield for such Replaced Loans, (d) the Weighted Average Life to Maturity of such Replacement Loans shall not be shorter than the Weighted Average Life to Maturity of such Replaced Loans at the time of such refinancing and (e) the other terms of the Replacement Loans are not more favorable to the lenders of such Replacement Loans than the corresponding terms of the Replaced Loans.

Furthermore, notwithstanding the foregoing, the Administrative Agent, with the consent of the Borrower, may amend, modify or supplement any Loan Document without the consent of any Lender, the Required Lenders or the Required Tranche A-2 Lenders in order to correct, amend or cure any ambiguity, inconsistency or defect or correct any typographical error or other manifest error in any Loan Document; provided that no such amendment, supplement or modification shall become effective or unless such amendment, modification or supplement shall be provided to the Lenders at least 10 Business Days prior to the proposed effectiveness thereof and the Required Lenders, the Required Tranche A-2 Lenders and Required Tranche B Lenders have not objected thereto within 5 Business Days of the Lenders being provided such proposed amendment, modification or waiver.

Furthermore, notwithstanding anything in this Agreement or the other Loan Documents to the contrary, each Affiliate Lender (other than a Debt Fund Affiliate) hereby agrees that, if a proceeding under the United States Bankruptcy Code or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law shall be commenced by or against any Borrower or any other Loan Party at a time when such Lender is an Affiliate Lender, such Affiliate Lender irrevocably authorizes and empowers the Administrative Agent to vote on behalf of such Affiliate Lender with respect to the Loans held by such Affiliate Lender in any manner in the Controlling Lenders' sole discretion, unless the Controlling Lenders instruct such Affiliate Lender to vote, in which case such Affiliate Lender shall vote with respect to the Loans held by it as the Controlling ~~Lendersdirect~~Lenders direct; *provided* that such Affiliate Lender shall be entitled to vote in accordance with its sole discretion (and not in accordance with the direction of the Controlling Lenders) in connection with any plan of reorganization to the extent any such plan of reorganization proposes to treat any such Affiliate Lender or the Obligations held by it in a manner that is less favorable in any material respect to such Affiliate Lender than the proposed treatment of similar Lenders and the Obligations held by them that are not Affiliates of any Borrower.

Notwithstanding anything to the contrary herein, in connection with any amendment, modification, waiver or other action requiring the consent or approval of

Required Lenders, Required Tranche A Lenders, Required Tranche B Lenders, Required Tranche C Lenders or Required Tranche B/C Lenders, Lenders that are Debt Fund Affiliates shall not be permitted, in the aggregate, to account for more than 50% of the amounts actually included in determining whether the Required Lenders, Required Tranche A Lenders, Required Tranche B Lenders, Required Tranche C Lenders or Required Tranche B/C Lenders, respectively, have consented to any amendment, modification, waiver, consent or other action that is subject to such vote. The voting power of each Lender that is a Debt Fund Affiliate shall be reduced, pro rata, to the extent necessary in order to comply with the immediately preceding sentence.

Section 9.02. *Notices*.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy) or e-mail, and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three (3) Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed as follows in the case of the Borrower, the Administrative Agent and any Tranche B Lender, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

| | |
|---|---|
| Borrower and Guarantors | PES Holdings, LLC<br>1735 Market Street<br>Philadelphia, PA 19103<br>Attention: Treasury Department<br>email:  treasury@pes-companies.com and<br>          legal@pes-companies.com |
| | With a copy to: |
| Administrative Agent: | Cortland Capital Market Services LLC<br>225 W. Washington St. 9th Floor<br>Chicago, Illinois 60606<br>Attention: Frances Real<br>and Legal Department<br>Telecopy: 312-376-0751<br>Telephone: 312-600-5100<br>email: CPCAgency@cortlandglobal.com and<br>legal@cortlandglobal.com |
| | with a copy to: |
| | Norton Rose Fulbright US LLP<br>1301 Avenue of the Americas<br>New York, NY 10019<br>Attention: H. Stephen Castro<br>Telecopy: 212-318-3400 |

Telephone: 212-318-3147
email: stephen.castro@nortonrosefulbright.com

Tranche B Lenders:          As provided in an administrative questionnaire delivered to
                            the Administrative Agent and with a copy to:

                            Cahill Gordon & Reindel LLP
                            80 Pine Street
                            New York, New York 10005
                            Attention:  Susanna Suh, Joel Levitin and Darren Silver
                            (ssuh@cahill.com; jlevitin@cahill.com;
                            dsilver@cahill.com)

*provided* that any notice, request or demand to or upon the Administrative Agent or the
Lenders shall not be effective until received.

        Notices and other communications to the Lenders hereunder may be delivered or
furnished by electronic communications pursuant to procedures approved by the
Administrative Agent; The Administrative Agent or the Borrower, agree to accept notices
and other communications to it hereunder by electronic communications pursuant to
procedures approved by it.

        Section 9.03.  *No Waiver; Cumulative Remedies*.  No failure to exercise and no
delay in exercising, on the part of the Administrative Agent or any Lender, any right,
remedy, power or privilege hereunder or under the other Loan Documents shall operate as
a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or
privilege hereunder preclude any other or further exercise thereof or the exercise of any
other right, remedy, power or privilege. The rights, remedies, powers and privileges
herein provided are cumulative and not exclusive of any rights, remedies, powers and
privileges provided by law.

        Section 9.04.  *Survival of Representations and Warranties*.  All representations
and warranties made hereunder, in the other Loan Documents and in any document,
certificate or statement delivered pursuant hereto or in connection herewith shall survive
the execution and delivery of this Agreement and the making of the Loans and other
extensions of credit hereunder.

        Section 9.05.  *Payment of Expenses and Taxes*.  The Borrower agrees (a) to pay
or reimburse the Administrative Agent and each of the Lenders for all their reasonable
and documented costs and out-of-pocket expenses incurred in connection with the
development, preparation and execution of, and any amendment, supplement or
modification to, this Agreement and the other Loan Documents and any other documents
prepared in connection herewith or therewith, and the consummation and administration
of the transactions contemplated hereby and thereby, including the reasonable fees and
disbursements of (x) one primary counsel to the Administrative Agent, (y) one New York
firm of counsel to each of the Tranche A Lenders, the Tranche A-2 Lenders, the Tranche
B Lenders, and the Tranche C Lenders, and, in the case of an actual or perceived conflict

130

of interest, additional conflicts counsel for each group of such Lenders similarly situated and (z) one local counsel to the Administrative Agent and the Lenders in each applicable jurisdiction, as necessary, in each appropriate jurisdiction and filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Borrower prior to the Closing Date (in the case of amounts to be paid on the Closing Date) and from time to time thereafter to the extent invoiced to the Borrower promptly on a monthly basis in the month after such fees are incurred, (b) to pay or reimburse each Lender and the Administrative Agent for all its reasonable and documented costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents, including the fees and disbursements of counsel to the Administrative Agent, (c) to pay, indemnify, and hold each Lender and the Administrative Agent harmless from all documentary and similar Taxes and charges in respect of the Loan Documents, and (d) to pay, indemnify, and hold each Lender and the Administrative Agent, their respective affiliates, and their respective officers, directors, employees, agents, advisors and controlling persons (each, an "**Indemnitee**") harmless from and against any and all other losses, claims, damages, liabilities and expenses of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including any claim, litigation, investigation or proceeding regardless of whether any Indemnitee is a party thereto and whether or not the same are brought by the Borrower, its equity holders, affiliates or creditors or any other Person, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with Environmental Law or relating to any Environmental Liabilities applicable to any Group Member or any of the Real Property and the reasonable and documented fees and expenses of legal counsel in connection with claims, actions or proceedings by any Indemnitee against any Loan Party under any Loan Document (all the foregoing in this clause (d), collectively, the "**Indemnified Liabilities**"), *provided*, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee, and *provided*, *further*, that this Section 9.05(d) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim. Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws for any matters arising from the Transactions, that any of them might have by statute or otherwise against any Indemnitee, except to the extent such rights are asserted against an Indemnitee found by a final and non- appealable decision of a court of competent jurisdiction to have engaged in gross negligence or willful misconduct, for claims, demands, penalties, fines, liabilities, settlements, damages, costs or expenses resulting from such gross negligence or willful misconduct. No Indemnitee shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information

transmission systems, except to the extent any such damages are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee. No Indemnitee shall be liable for any indirect, special, exemplary, punitive or consequential damages in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby. All amounts due under this Section 9.05 shall be payable not later than ten (10) days after written demand therefor. Statements payable by the Borrower pursuant to this Section 9.05 shall be submitted to the Treasury and Legal Departments(Telephone No. 215-339-1200) (Telecopy No. 866-456-1587), at the address of the Borrower set forth in Section 9.02, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent. The agreements in this Section 9.05 shall survive the termination of this Agreement and the repayment of the Loans and all other amounts payable hereunder.

Section 9.06.  *Successors and Assigns; Participations and Assignments*.  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 9.06.

(b)      (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (each, an "**Assignee**"), other than a natural person or, except to the extent expressly permitted by Section 9.06(e), (f) and (g) below, to the Borrower or any Affiliate of the Borrower, all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) with the prior written consent of:

(A)      the Borrower (such consent not to be unreasonably withheld), *provided* that no consent of the Borrower shall be required for an assignment to a Lender, an affiliate of a Lender, an Approved Fund (as defined below) or, if an Event of Default under Section 7.01(a) or (f) has occurred and is continuing, any other Person; and *provided*, *further*, that the Borrower shall be deemed to have consented to any such assignment unless the Borrower shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof; and

(B)      the Administrative Agent, *provided* that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan to a Lender, an affiliate of a Lender or an Approved Fund.

(ii)      Assignments shall be subject to the following additional conditions:

(A)      except in the case of an assignment to a Lender, an affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Loans under any Tranche, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to and recorded by the Administrative Agent) shall not be less than $1,000,000) unless each of the Borrower and the Administrative Agent otherwise consent, *provided* that (1) no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its affiliates or Approved Funds, if any;

(B)      (1) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 and (2) the assigning Lender shall have paid in full any amounts owing by it to the Administrative Agent; *provided* that in the case of contemporaneous assignments by any Lender to one or more Approved Funds, only a single processing and recordation fee shall be payable for all such assignments; and

(C)      the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act and an administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

For the purposes of this Section 9.06, "**Approved Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an affiliate of a Lender or (c) an entity or an affiliate of an entity that administers or manages a Lender.

(iii)      Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after date recorded in the Register the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations

under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.13, 2.14, 2.15 and 9.05). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.06 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section 9.06.

(iv)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and principal amount (and related interest amounts) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and each Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act, the processing and recordation fee referred to in paragraph (b) of this Section 9.06 and any written consent to such assignment required by paragraph (b) of this Section 9.06, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)     Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "**Participant**") to a Person other than Borrower or an Affiliate of Borrower in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that

such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (i) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 9.01 and (ii) directly affects such Participant. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.17 with respect to any Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.13, 2.14 and 2.15 (subject to the requirements and limitations therein, including the requirements under Section 2.14(f) (it being understood that the documentation required under Section 2.14(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 9.06; *provided* that such Participant (i) shall be subject to the provisions of Sections 2.13 and 2.14 as if it were an assignee under paragraph (b) of this Section and (ii) shall not be entitled to receive any greater payment under Section 2.13 or 2.14, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from an adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof that occurs after the Participant acquired the applicable participation.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.07(b) as though it were a Lender, *provided* such Participant shall be subject to Section 9.07(a) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Loans or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Loan or other obligation is in registered  form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 9.06 shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto. The Borrower, upon receipt of written notice from the relevant

Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in this paragraph (d).

(e)    Notwithstanding anything to the contrary contained herein, any Lender may assign all or any portion of its Loans to any Other Affiliate (including any Debt Fund Affiliate), but only if:

(i)    the assigning Lender and Other Affiliate purchasing such Lender's Loans shall execute and deliver to the Administrative Agent an assignment agreement substantially in the form of Exhibit D-2 hereto (an "**Affiliate Lender Assignment and Assumption**") in lieu of an Assignment and Assumption;

(ii)    after giving effect to such assignment, Other Affiliates (other than Debt Fund Affiliates) shall not, in the aggregate, own or hold Loans with an aggregate principal amount in excess of 20.0% of the principal amount of all Loans then outstanding (calculated as of the date of such purchase); and

(iii)    such Other Affiliate and each such Debt Fund Affiliates shall at all times be subject to the voting restrictions specified in Section 9.01 and in the definitions of Required Lenders, Required Tranche A Lenders, Required Tranche B Lenders, Required Tranche C Lenders and Required Tranche B/C Lenders.

(f)    Notwithstanding anything to the contrary herein, any Lender may assign all or any portion of its Loans to the Borrower or any of its Subsidiaries, but only if:

(i)    (x) such assignment is made pursuant to a Dutch Auction open to all Lenders on a pro rata basis or (y) such assignment is made pursuant to an open market purchase;

(ii)    no Event of Default has occurred and is continuing or would result therefrom;

(iii)    any such Loans shall be automatically and permanently cancelled immediately upon acquisition thereof by the Borrower or any of its Subsidiaries; and

(iv)    in the case of an open market purchase, the aggregate principal amount of all Loans purchased pursuant to open market purchases since the Closing Date shall not, in the aggregate, exceed 20.0% of the principal amount of all Loans then outstanding (calculated as of the date of such purchase).

(g)    (i) Notwithstanding anything to the contrary herein, (i) Affiliate Lenders (other than Debt Fund Affiliates) shall not have any right to attend (including by telephone) any meeting or discussions (or portion thereof) among the Administrative Agent or any other Lender to which representatives of the Borrowers are not then present, (ii) Affiliate Lenders (other than Debt Fund Affiliates) shall not have any right to receive any information or material prepared by the Administrative Agent or any other Lender or any communication by or among the Administrative Agent and one or more other

Lenders, except to the extent such information or materials have been made available to the Borrowers or their representatives and (iii) Affiliate Lenders (other than Debt Fund Affiliates) shall not be entitled to receive advice of counsel to the Administrative Agent or other Lenders.

(ii)     Each Lender making an assignment to an Affiliate Lender acknowledges and agrees that in connection with such assignment, (1) such Affiliate Lender then may have, and later may come into possession of, information regarding the Loans or the Loan Parties hereunder that is not known to such Lender and that may be material to a decision by such Lender to assign the Loans ("**Excluded Information**"), (2) such Lender has independently and, without reliance on the Affiliate Lender, the Borrower, any of its Subsidiaries, the Administrative Agent or any of their respective Affiliates, made its own analysis and determination to enter into such assignment notwithstanding such Lender's lack of knowledge of the Excluded Information and (3) none of the Borrower, its Subsidiaries, the Administrative Agent, or any of their respective Affiliates shall have any liability to such Lender, and such Lender hereby waives and releases, to the extent permitted by law, any claims such Lender may have against the Borrower, its Subsidiaries, the Administrative Agent, and their respective Affiliates, under applicable laws or otherwise, with respect to the nondisclosure of the Excluded Information. Each Lender entering into such an assignment further acknowledges that the Excluded Information may not be available to the Administrative Agent or the other Lenders.

Section 9.07.  *Adjustments; Set off*.  (a) Except to the extent that this Agreement, any Extension Amendment or a court order expressly provides for payments to be allocated to a particular Lender or to the Lenders under a particular Tranche, if any Lender (a "**Benefitted Lender**") shall receive any payment of all or part of the Obligations owing to it (other than in connection with an assignment made pursuant to Section 9.06), or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set off, pursuant to events or proceedings of the nature referred to in Section 7.01(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefitted Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefitted Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; *provided, however*, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)     In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any Obligations becoming due and payable by the Borrower (whether at the stated maturity, by acceleration or otherwise), to apply to the payment of such Obligations, by setoff or

otherwise, any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender, any affiliate thereof or any of their respective branches or agencies to or for the credit or the account of the Borrower. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such application made by such Lender, *provided* that the failure to give such notice shall not affect the validity of such application.

Section 9.08.  *Counterparts*.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by email or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

Section 9.09.  *Severability*.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 9.10.  *Integration*.  This Agreement and the other Loan Documents represent the entire agreement of the Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

Section 9.11.  ***GOVERNING LAW*. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

Section 9.12.  *Submission To Jurisdiction; Waivers*.  The Borrower hereby irrevocably and unconditionally:

(a)      submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof; *provided*, that nothing contained herein or in any other Loan Document will prevent any Lender or the Administrative Agent from bringing any action to enforce any award or judgment or exercise any right under the Security Documents or against any Collateral or any other property of any Loan Party in any other forum in which jurisdiction can be established;

138

(b)     consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)     agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower, as the case may be at its address set forth in Section 9.02 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)     agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law; and

(e)     waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 9.12 any indirect, special, exemplary, punitive or consequential damages.

Section 9.13.  *Acknowledgements*.  The Borrower hereby acknowledges and agrees that (a) no fiduciary, advisory or agency relationship between the Loan Parties and the Credit Parties is intended to be or has been created in respect of any of the transactions contemplated by this Agreement or the other Loan Documents, irrespective of whether the Credit Parties have advised or are advising the Loan Parties on other matters, and the relationship between the Credit Parties, on the one hand, and the Loan Parties, on the other hand, in connection herewith and therewith is solely that of creditor and debtor, (b) the Credit Parties, on the one hand, and the Loan Parties, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do the Loan Parties rely on, any fiduciary duty to the Loan Parties or their affiliates on the part of the Credit Parties, (c) the Loan Parties are capable of evaluating and understanding, and the Loan Parties understand and accept, the terms, risks and conditions of the transactions contemplated by this Agreement and the other Loan Documents, (d) the Loan Parties have been advised that the Credit Parties are engaged in a broad range of transactions that may involve interests that differ from the Loan Parties' interests and that the Credit Parties have no obligation to disclose such interests and transactions to the Loan Parties, (e) the Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent the Loan Parties have deemed appropriate in the negotiation, execution and delivery of this Agreement and the other Loan Documents, (f) each Credit Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Loan Parties, any of their affiliates or any other Person, (g) none of the Credit Parties has any obligation to the Loan Parties or their affiliates with respect to the transactions contemplated by this Agreement or the other Loan Documents except those obligations expressly set forth herein or therein or in any other express writing executed and delivered by such Credit Party and the Loan Parties or any such affiliate and (h) no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of

the transactions contemplated hereby among the Credit Parties or among the Loan Parties and the Credit Parties.

Section 9.14.  *Releases of Guarantees and Liens*.  (a) Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 9.01) to take any action requested by the Borrower having the effect of releasing any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 9.01 or (ii) under the circumstances described in paragraph (b) below.

(b)     At such time as the Loans and the other obligations under the Loan Documents (other than obligations under or in respect of Specified Swap Agreements) shall have been paid in full, the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and each Loan Party under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

Section 9.15.  *Confidentiality*.  Each of the Administrative Agent and each Lender agrees to keep confidential all non-public information provided to it by any Loan Party (whether through the Administrative Agent or directly) pursuant to or in connection with this Agreement that is designated by the provider thereof as confidential; *provided* that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (a) to the Administrative Agent, any other Lender or any Affiliate thereof, (b) subject to an agreement to comply with the provisions of this Section 9.15, to any actual or prospective Transferee or any direct or indirect counterparty to any Swap Agreement (or any professional advisor to such counterparty), (c) to its employees, directors, agents, attorneys, accountants and other professional advisors or those of any of its Affiliates, (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender, or (i) in connection with the exercise of any remedy hereunder or under any other Loan Document or (j) if agreed by the Borrower in its sole discretion, to any other Person

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities. Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

Section 9.16.   *WAIVERS OF JURY TRIAL.*   THE BORROWER, EACH OTHER LOAN PARTY HERETO, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

Section 9.17.   *USA Patriot Act*.   Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

Section 9.18.   *Intercreditor Agreement*.   Reference is made to the Intercreditor Agreement dated as of the date hereof (as amended, restated, amended and restated, supplemented, modified, extended, renewed, replaced, refinanced or restructured from time to time, the "**Intercreditor Agreement**"), by and among the Loan Parties, the Administrative Agent, the counterparty under the Supply and Offtake Documents and the collateral agent under the Supply and Offtake Documents. Notwithstanding any provisions in this Agreement or any other Loan Document to the contrary, the terms, conditions and provisions of this Agreement and the other Loan Documents are subject to the terms of the Intercreditor Agreement. To the extent there is a conflict between the Loan Documents and the Intercreditor Agreement, the terms and conditions of the Intercreditor Agreement shall control.

Section 9.19.   *Acknowledgement and Consent to Bail-In of EEA Financial Institutions*.   Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Bail-In Action of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-in Action on any such liability, including, if applicable:

(i)     a reduction, in full or in part, in the principal amount, or outstanding amount due (including any accrued but unpaid interest) of any such liability;

(ii)    a cancellation of any such liability;

(iii)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iv)    a variation of any term of any Loan Document to the extent necessary to give effect to any Bail-In Action in relation to any such liability.

Section 9.20.   *Certain ERISA Matters.*

(a)     Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)     such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans or the Commitments,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)   (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation

in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

   (iv) such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

  (b) In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

   (i) none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

   (ii) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

   (iii) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

   (iv) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)      no fee or other compensation is being paid directly to the Administrative Agent or any of its Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Commitments or this Agreement.

(c)      The Administrative Agent hereby informs the Lenders that the Administrative Agent is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that the Administrative Agent has a financial interest in the transactions contemplated hereby in that the Administrative Agent or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans or the Commitments for an amount less than the amount being paid for an interest in the Loans or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

ARTICLE 10
GUARANTEE

Section 10.01. *Guarantee.*  The Guarantors hereby jointly and severally guarantee, as a primary obligor and not as a surety to each Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest on (including any interest, fees, costs or charges that would accrue but for the provisions of the Bankruptcy Code after any bankruptcy or insolvency petition under the Bankruptcy Code) the Loans made by the Lenders to, and the Notes held by each Lender of, the Borrower, and all other Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document or Specified Swap Agreement entered into with a counterparty that is a Secured Party, whether or not enforceable as against the Borrower, whether now or hereafter existing, and whether due or to become due, including principal, interest (including interest at the contract rate applicable upon default accrued or accruing after the commencement of any proceeding under the Bankruptcy Code, or any applicable provisions of comparable state or foreign law, whether or not such interest is an allowed claim in such proceeding), fees and costs of collection, in each case, strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"). The Guarantors hereby jointly and severally agree that if the Borrower or other Loan Party or Loan Parties shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Loan Parties will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 10.02. *Rights of Secured Parties*.  Each Guarantor agrees that any Secured Party, upon such terms as it deems appropriate, without notice or demand to or on any person and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may, in accordance with the terms of this Article 10 and the other Loan Documents, (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of any Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, any Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of any Guaranteed Obligations and take and hold security for the payment hereof or any Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of any Guaranteed Obligations, any other guaranties of any Guaranteed Obligations, or any other obligation of any person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Secured Party in respect hereof or any Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Secured Party may have against any such security, in each case as such Secured Party in its discretion may determine consistent with the applicable Loan Document or the applicable Specified Swap Agreement and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or non-judicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against the Borrower or any security for its Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents and any Specified Swap Agreement.

Section 10.03. *Obligations Unconditional*.  The obligations of the Guarantors under Section 10.01 shall constitute a guarantee of payment and, to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower under this Article 10, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Loan Party (except for payment in full or an amendment or waiver adopted in accordance with Section 9.01). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(a)        at any time or from time to time, without notice to the Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

145

(b)      any of the acts mentioned in any of the provisions of this Article 10 or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(c)      the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents, any Specified Swap Agreement or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d)      any Lien or security interest granted to, or in favor of, any Secured Party as security for any of the Guaranteed Obligations shall fail to be perfected; or

(e)      the release of any other Loan Party pursuant to Section 10.10 and Section 9.01.

        The Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive (i) any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee, (ii) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations (other than any Unasserted Contingent Obligations), and (iii) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against the Borrower or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit

of the Secured Parties, and their respective successors and assigns, notwithstanding that from time to time during the term of this Article 10 there may be no Guaranteed Obligations outstanding until payment in full thereof (other than Unasserted Contingent Obligations, or any amendment or waiver adopted in accordance with Section 9.01 or any other express provision set forth in a Loan Document).

Section 10.04. *Reinstatement*.   The obligations of the Guarantors under this Article 10 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 10.05. *Subrogation; Subordination*.   Each Guarantor hereby agrees that, until the payment and satisfaction in full in cash of all Guaranteed Obligations (other than Unasserted Contingent Obligations) and the expiration and termination of the Commitments of the Lenders under this Agreement, it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 10.01, whether by subrogation or otherwise, against the Borrower or any other Loan Party of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations. Any Indebtedness of any Guarantor permitted pursuant to Section 6.01(b) shall be subordinated to such Guarantor's Obligations in the manner set forth in the intercompany note evidencing such Indebtedness.

Section 10.06. *Remedies*.   The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Article 7 (and shall be deemed to have become automatically due and payable in the circumstances provided in Article 7) for purposes of Section 10.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 10.01.

Section 10.07. *Instrument for the Payment of Money*.   Each Guarantor hereby acknowledges that the guarantee in this Article 10 constitutes an instrument for the payment of money, and consents and agrees that any Lender or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

Section 10.08. *Continuing Guarantee*.   The guarantee in this Article 10 is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 10.09. *General Limitation on Guaranteed Obligations*.  In any action or proceeding involving any state corporate, limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 10.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 10.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any other Loan Party or any other person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 10.11) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 10.10. *Release of Loan Parties*.  If, in compliance with the terms and provisions of the Loan Documents, all of the Capital Stock of any Guarantor are sold or otherwise transferred (a "**Transferred Guarantor**") to a person or persons, none of which is the Borrower, a Guarantor or an Affiliate thereof, such Transferred Guarantor shall, upon the consummation of such sale or transfer, be automatically released from its obligations under this Agreement (including under Section 9.06) and its obligations to pledge and grant any Collateral owned by it pursuant to any Security Document shall be automatically released, and, so long as the Borrower shall have provided the Administrative Agent such reasonable certifications or reasonable documents as the Administrative Agent shall reasonably request, the Administrative Agent shall take such actions as are necessary or reasonably requested by the Borrower to effect each release described in this Section 10.10 in accordance with the relevant provisions of the Security Documents.

Section 10.11. *Right of Contribution*.  Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment. Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 10.05. The provisions of this Section 10.11 shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent and the Lenders, and each Guarantor shall remain liable to the Administrative Agent and the Lenders for the full amount of the Guaranteed Obligations.

Section 10.12. *Default; Remedies; Bankruptcy; Etc.*

(a)     The Guaranteed Obligations of each Guarantor hereunder are independent of and separate from the Obligations of such Guarantor. If any Obligation of the Borrower is not paid when due, or upon any Event of Default hereunder or upon any default by the Borrower as provided in any other Loan Document or Specified Swap Agreement, the Administrative Agent may, at its sole election, proceed directly and at once, without notice, against any Guarantor to collect and recover the full amount or any portion of the Obligations of the Borrower then due, without first proceeding against the Borrower or any other guarantor (including the Guarantors) of its Guaranteed Obligations, or against

any Collateral under the Loan Documents or joining the Borrower or any other guarantor (including the Guarantors) in any proceeding against any Guarantor. At any time after maturity of the Guaranteed Obligations of a Guarantor, the Administrative Agent may (unless such Guaranteed Obligations have been paid in full (other than Unasserted Contingent Obligations)), without notice to such Guarantor and regardless of the acceptance of any Collateral for the payment thereof, appropriate and apply toward the payment of such Guaranteed Obligations (a) any indebtedness due or to become due from any Secured Party to such Guarantor and (b) any moneys, credits or other property belonging to such Guarantor at any time held by or coming into the possession of any Secured Party or any of its respective Affiliates.

(b)    So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of the Administrative Agent acting pursuant to the instructions of the Required Lenders and the Required Tranche A-2 Lenders or the Controlling Lenders, as applicable, commence or join with any other person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against the Borrower or any other Guarantor (other than the Cases). The obligations of the Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Borrower or any other Guarantor or by any defense which the Borrower or any other Guarantor may have by reason of the order, decree or decision of any court or applicable body resulting from any such proceeding (except as described in Section 10.09). Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in the immediately preceding sentence (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of the Guarantors and the Secured Parties that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Borrower of any portion of such Guaranteed Obligations. Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay the Administrative Agent, or allow the claim of the Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced. In the event that all or any portion of any Guaranteed Obligations are paid by the Borrower, the obligations of the Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment or payments are rescinded or recovered directly or indirectly from any Secured Party as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

Section 10.13. *Keepwell*.    Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of

its obligations under this Article 10 in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 10.13 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 10.13, or otherwise under this Article 10, as it relates to such other Loan Party, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section shall remain in full force and effect until this Article 10 is terminated pursuant to Section 10.17. Each Qualified ECP Guarantor intends that this Section 10.13 constitute, and this Section 10.13 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 10.14. *Enforcement Expenses; Indemnification*.

(a)    Each Guarantor agrees to pay or reimburse each Lender and the Administrative Agent for all its documented costs and expenses incurred in collecting against such Guarantor under the guarantee contained in Section 10.01 or otherwise enforcing or preserving any rights under this Article 10 and the other Loan Documents to which such Guarantor is a party, including, without limitation, the fees and disbursements of counsel to the Administrative Agent.

(b)    Each Guarantor agrees to pay, and to save the Administrative Agent and the Lenders harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable in connection with any of the transactions contemplated by this Article 10.

(c)    Each Guarantor agrees to pay, and to save the Administrative Agent and the Lenders harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Article 10 to the extent the Borrower would be required to do so pursuant to Section 9.05.

(d)    The agreements in this Article 10 shall survive repayment of the Obligations and all other amounts payable under this Agreement and the other Loan Documents.

Section 10.15. *Acknowledgements*.  Each Guarantor hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party;

(b)    neither the Administrative Agent nor any Lender has any fiduciary relationship with or duty to any Guarantor arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Guarantors, on the one hand, and the Administrative Agent and Lenders, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)      no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Guarantors and the Lenders.

Section 10.16. *Additional Guarantors*.   Each Subsidiary of the Borrower that is required to become a party to this Agreement pursuant to Section 5.10 shall become a Guarantor for all purposes of this Agreement upon execution and delivery of an assumption agreement.

Section 10.17. *Releases*.   At such time as the Loans and the other Obligations shall have been paid in full, this Article 10 and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and each Guarantor hereunder shall terminate, all without delivery of any instrument or performance of any act by any party. At the request and sole expense of any Guarantor following any such termination, the Administrative Agent shall execute and deliver to such Guarantor such documents as such Guarantor shall reasonably request to evidence such termination.

[SIGNATURE PAGES FOLLOW]

        IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be
duly executed and delivered by their proper and duly authorized officers as of the day and
year first above written.

PES HOLDINGS, LLC

By: _____
    Name:
    Title:

PHILADELPHIA ENERGY SOLUTIONS
REFINING AND MARKETING LLC

By: _____
    Name:
    Title:

PES ADMINISTRATIVE SERVICES, LLC

By: _____
    Name:
    Title:

NORTH YARD GP, LLC

By: _____
    Name:
    Title:

NORTH YARD LOGISTICS, L.P.

By: _____
    Name:
    Title:

[Signature Page to PES Holdings, LLC Exit Credit Agreement]

CORTLAND CAPITAL MARKET
SERVICES LLC, as
Administrative Agent


By: _____
        Name:
        Title:

_____,
as a Tranche A Lender


By: _____
     Name:
     Title:


[If second signature is required:]

By: _____
     Name:
     Title:

[Signature Page to PES Holdings, LLC Exit Credit Agreement]

_____,
as a Tranche B Lender

By:    _____
      Name:
      Title:

[If second signature is required:]

By:    _____
      Name:
      Title:

_____,
as a Tranche C Lender


By: _____
      Name:
      Title:


[If second signature is required:]

By: _____
      Name:
      Title:

**EXHIBIT A**

**FORM OF SECURITY AGREEMENT**

[Separately Provided]

**EXHIBIT B**

**FORM OF**
**Notice of Borrowing**

[●], 2018

Cortland Capital Market Services LLC, as
Administrative Agent (the "Administrative
Agent") for the Lenders party to the Credit
Agreement referred to below
Cortland Capital Market Services LLC
225 W. Washington St. 9th Floor
Chicago, Illinois 60606
Attention: Maggie Welch and Legal Department
Telecopy: 312-376-0751
Telephone: 312-600-5100
Email: CPCAgency@cortlandglobal.com
  and legal@cortlandglobal.com

      Ladies and Gentlemen:

      The undersigned, PES HOLDINGS, LLC (the "Borrower"), refers to the Credit Agreement, to be dated on or about August 7, 2018 (the "Credit Agreement", the capitalized terms defined therein being used herein as therein defined), among the Borrower, each of the Guarantors party thereto from time to time, the several banks and other financial institutions or entities from time to time parties thereto (each, a "Lender" and collectively, the "Lenders"), and you, as Administrative Agent for such Lenders, and hereby gives you notice, irrevocably, pursuant to Section 2.02 of the Credit Agreement, that the undersigned hereby requests that the Lenders make certain Loans under the Credit Agreement, and in that connection sets forth below the information relating to such Loans as required by Section 2.02 of the Credit Agreement:

      i.   The proposed Borrowing Date is August [  ], 2018.

      ii.   The aggregate principal amount of the proposed Loans is as follows:

           Tranche A Loans: $120,000,000;
           Tranche B Loans: $82,500,000; and
           Tranche C Loans: $417,000,000.

      iii.   The Loans to be made on the proposed Borrowing Date shall be initially maintained as [ABR][Eurodollar] Loans.

      iv.   The initial Interest Period for the Loans is [one][two][three][six] month[s].

      The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the proposed Borrowing Date:

(A)      the representations and warranties of each Loan Party contained in Article 3 of the Credit Agreement or any other Loan Document are true and correct in all material respects (without duplication of any materiality qualifier contained herein or therein) on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (without duplication of any materiality qualifier contained herein or therein) as of such earlier date, and except that the representations and warranties contained in Section 3.04 of the Credit Agreement are deemed to refer to the most recent statements furnished pursuant to Section 5.01(a) ~~and~~, Section 5.01(b) and Section 5.01(c) of the Credit Agreement, respectively, and to the financial condition and results of operations of the Borrower and its Subsidiaries; and

(B)      no Default or Event of Default has occurred and is continuing, or would result from such Loans;

[remainder of page intentionally left blank]

Very truly yours,

PES HOLDINGS, LLC, as Borrower

By: _____

    Name:

    Title:

**EXHIBIT C**

**FORM OF
CLOSING CERTIFICATE**

Pursuant to Section 4.01(e)(i) of the Credit Agreement, dated as of August 7, 2018 (the "**Credit Agreement**"; terms defined therein being used herein as therein defined), among PES HOLDINGS, LLC (the "**Borrower**"), the Lenders party thereto and CORTLAND CAPITAL MARKET SERVICES LLC, as administrative agent (in such capacity, the "**Administrative Agent**"), the undersigned [INSERT TITLE OF OFFICER] of [INSERT NAME OF LOAN PARTY] (the "**Certifying Loan Party**") hereby certifies, in its capacity as [INSERT TITLE] and not in its individual capacity, as follows:

1.      The representations and warranties of the Certifying Loan Party set forth in each of the Loan Documents to which it is a party or which are contained in any certificate furnished by or on behalf of the Certifying Loan Party pursuant to any of the Loan Documents to which it is a party are true and correct in all material respects on and as of the date hereof with the same effect as if made on the date hereof, except for representations and warranties expressly stated to relate to a specific earlier date, in which case such representations and warranties were true and correct in all material respects as of such earlier date.

2.  _____ is the duly elected and qualified Corporate Secretary of the Certifying Loan Party and the signature set forth for such officer below is such officer's true and genuine signature.

3.      No Default or Event of Default has occurred and is continuing as of the date hereof or after giving effect to the Loans to be made on the date hereof.  [Borrower only]

The undersigned Corporate Secretary of the Certifying Loan Party certifies, in its capacity as Corporate Secretary and not in its individual capacity, as follows:

4.      There are no liquidation or dissolution proceedings pending or to my knowledge threatened against the Certifying Loan Party.

5.      The Certifying Loan Party is a [corporation duly incorporated][limited partnership duly formed][limited liability company duly formed], validly existing and in good standing under the laws of the jurisdiction of its organization.

6.      Attached hereto as Annex 1 is a true and complete copy of [resolutions] duly adopted by the [Board of Directors] of the Certifying Loan Party on          ; such resolutions have not in any way been amended, modified, revoked or rescinded and are in full force and effect on and as of the date hereof and are the only [corporate][limited partnership][limited liability company] proceedings of the Certifying Loan Party now in force relating to or affecting the matters referred to therein.

7.      Attached hereto as <u>Annex 2</u> is a true and complete copy of the [By-Laws][Limited Partnership Agreement][Limited Liability Company Agreement] of the Certifying Loan Party as in effect on the date hereof.

8.      Attached hereto as <u>Annex 3</u> is a true and complete copy of the Certificate of Incorporation of the Certifying Loan Party as in effect on the date hereof.

9.      The following persons are now duly elected and qualified officers of the Certifying Loan Party holding the offices indicated next to their respective names below, and the signatures appearing opposite their respective names below are the true and genuine signatures of such officers, and each of such officers is duly authorized to execute and deliver on behalf of the Certifying Loan Party each of the Loan Documents to which it is a party and any certificate or other document to be delivered by the Certifying Loan Party pursuant to the Loan Documents to which it is a party:

<u>Name</u>                          <u>Office</u>                          <u>Signature</u>

                                                            _____

                                                            _____

                                                            _____


        IN WITNESS WHEREOF, the undersigned have hereunto set our names as of the date set forth below.

_____        _____
Name:                                    Name:
Title:                                   Title:   Corporate Secretary

Date: _____, 20____

**EXHIBIT D**

**FORM OF**
**ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption (the "**Assignment and Assumption**") is dated as of the Effective Date set forth below and is entered into between the Assignor named below (the "**Assignor**") and the Assignee named below (the "**Assignee**").  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, the "**Credit Agreement**"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any guarantees included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "**Assigned Interest**"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1.    Assignor:                     _____

2.    Assignee:                     _____
                                    [and is an affiliate/Approved Fund of [*identify Lender*][1]/Lender

3.    Borrower(s):               PES Holdings, LLC

4.    Administrative Agent:   Cortland Capital Market Services LLC, as administrative agent
                                    under the Credit Agreement

---

[1]    Select as applicable

5.    Credit Agreement:          The Credit Agreement dated as of August 7, 2018 among PES Holdings, LLC, the Lenders party thereto, and Cortland Capital Market Services LLC, as Administrative Agent

6.    Assigned Interest:

| Tranche Assigned[2] | Aggregate Amount of Loans for all Lenders | Amount of Loans Assigned | Percentage Assigned of Loans[3] |
|---|---|---|---|
| | $ | $ | % |
| | $ | $ | % |
| | $ | $ | % |
| | $ | $ | % |

Effective Date: _____, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN  THE  REGISTER THEREFOR.]

[The Assignee agrees to deliver to the Administrative Agent a completed administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower, the Loan Parties and their Affiliates or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws.][4]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

_____
NAME OF ASSIGNOR

By:    _____
           Name:
           Title:

---

[2]    Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment (e.g. "Initial Loans").

[3]    Set forth, to at least 9 decimals, as a percentage of the Loans of all Lenders.

[4]    Insert only if Assignee is not a Lender.

<u>ASSIGNEE</u>

_____

NAME OF ASSIGNEE

By: _____

      Name:

      Title:

[Consented to and][5] Accepted:

CORTLAND CAPITAL MARKET
SERVICES LLC, as
Administrative Agent


By: _____
      Name:
      Title:


[Consented to:][6]

PES HOLDINGS, LLC


By: _____
      Name:
      Title:

---

[5]   To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement

[6]   To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

**ANNEX 1**

Credit Agreement, dated as of August 7, 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among PES Holdings, LLC (the "**Borrower**"), the Lenders party thereto) and Cortland Capital Market Services LLC as administrative agent (in such capacity, the "**Administrative Agent**")

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.      Representations and Warranties.

1.1      Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective  obligations under any Loan Document.

1.2.      Assignee. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit  Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender and (v) if it is a Non-U.S. Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other  Lender, and based on such documents and information as it shall deem appropriate at the time, continue  to make its own credit decisions in taking or not taking action under the Loan Documents and (ii) it will perform in accordance with their terms all of the

obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

       2.   <u>Payments</u>.  From and after the Effective Date, the Administrative Agent shall make  all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

       3.   <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by email or telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

**EXHIBIT E**

**FORM OF
PREPAYMENT OPTION NOTICE**

Attention of [          ]
Telecopy No. [          ]

[Date]

Ladies and Gentlemen:

      The undersigned, Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**"), refers to the Credit Agreement, dated as of August 7, 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among PES Holdings, LLC (the "**Borrower**"), the Lenders party thereto and the Administrative Agent.  Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.  The Administrative Agent hereby gives notice of an offer of prepayment made by the Borrower pursuant to Section 2.06(e) of the Credit Agreement of the Loan Prepayment Amount (as described below).  Amounts applied to prepay the Loans shall be applied pro rata to the Loan held by you. The portion of the prepayment amount to be allocated to the Loan held by you and the date on which such prepayment will be made to you (should you elect to receive such prepayment) are set forth below:

(A)      Total Loan Prepayment Amount           _____

(B)      Portion of Loan Prepayment Amount to be    _____
          received by you

(C)      Mandatory Prepayment Date (10 Business Days   _____
          after the date of this Prepayment Option Notice)

      **IF YOU DO NOT WISH TO RECEIVE ALL OF THE LOAN PREPAYMENT AMOUNT TO BE ALLOCATED TO YOU ON THE MANDATORY PREPAYMENT DATE INDICATED IN PARAGRAPH (C) ABOVE**, please sign this notice in the space provided below and indicate the percentage of the Loan Prepayment Amount otherwise payable which you do not wish to receive. Please return this notice as so completed via telecopy to the attention of [          ] at           , no later than [10:00] a.m., New York City time, on the Mandatory Prepayment Date, at Telecopy No. [          ].  **IF YOU DO NOT RETURN THIS NOTICE, YOU WILL RECEIVE 100% OF THE LOAN PREPAYMENT AMOUNT ALLOCATED TO YOU ON THE MANDATORY PREPAYMENT DATE.**

[Signature page follows]

Cortland Capital Market Services LLC,
as Administrative Agent

By: _____
    Name:
    Title:

_____
(Name of Lender)

By_____
    Title:

Percentage of Loan
Prepayment Amount Declined: __%

**EXHIBIT F-1**

**FORM OF
U.S. TAX COMPLIANCE CERTIFICATE**

(For Non-U.S. Lenders That Are Not Partnerships For U.S. Federal Income Tax
Purposes)

Reference is made to the Credit Agreement, dated as of August 7, 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among PES Holdings, LLC (the "**Borrower**"), the Lenders party thereto and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.14 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent in writing, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]


By: _____
       Name:
       Title:

       Dated: _____ ___, 20__

**EXHIBIT F-2**

**FORM OF
U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax
Purposes)

Reference is made to the Credit Agreement, dated as of August 7, 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among PES Holdings, LLC (the "**Borrower**"), the Lenders party thereto and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.14 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By: _____
      Name:
      Title:

      Dated: _____ ___, 20__

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Credit Agreement, dated as of August 7, 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among PES Holdings, LLC (the "**Borrower**"), the Lenders party thereto and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.14 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]


By: _____
    Name:
    Title:


    Dated: _____ ___, 20__

**EXHIBIT F-4**

**FORM OF**

**U.S. TAX COMPLIANCE CERTIFICATE**

(For Non-U.S. Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Credit Agreement, dated as of August 7, 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among PES Holdings, LLC (the "**Borrower**"), the Lenders party thereto and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.14 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent in writing, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By: _____

    Name:

    Title:

    Dated: _____ ___, 20__

**EXHIBIT G**

**FORM OF INTERCREDITOR AGREEMENT**

[Separately Provided]

**EXHIBIT H**

**FORM OF
COMPLIANCE CERTIFICATE**

This Compliance Certificate is delivered pursuant to Section 5.02(a) of the Credit Agreement, dated as of August 7, 2018 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), among PES Holdings, LLC (the "**Borrower**"), the Lenders party thereto and Cortland Capital Market Services LLC, as administrative agent (in such capacity, the "**Administrative Agent**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

1.      I am the duly elected, qualified and acting Chief Financial Officer of the Borrower.

2.      I have reviewed and am familiar with the contents of this Certificate.

3.      I have reviewed the terms of the Credit Agreement and the Loan Documents and have made or caused to be made under my supervision, a review in reasonable detail of the transactions and condition of the Borrower during the accounting period covered by the financial statements attached hereto as Attachment 1 (the "Financial Statements"). Such review did not disclose the existence during or at the end of the accounting period covered by the Financial Statements, and I have no knowledge of the existence, as of the date of this Certificate, of any condition or event which constitutes a Default or Event of Default, except as previously disclosed pursuant to Section 5.06(a)(i) [or as set forth below].

4.      Attached hereto as Attachment 2 are the computations showing the calculation of the Consolidated Leverage Ratio.

IN WITNESS WHEREOF, I have executed this Certificate this _____day of _____, 20__.

_____
Name:
Title:

**Attachment 1**
**to Compliance Certificate**

[Attach Financial Statements]

**Attachment 2**
**to Compliance Certificate**

The information described herein is as of _____, _____, and pertains to the period from _____, _____ to _____, _____.


[Set forth Calculations]

**EXHIBIT I**

**FORM OF
PERFECTION CERTIFICATE**

[Separately Provided]

**EXHIBIT J**

**FORM OF
NOTICE OF CONVERSION/CONTINUATION**

[●], 2018

Cortland Capital Market Services LLC, as
Administrative Agent (the "Administrative
Agent") for the Lenders party to the Credit
Agreement referred to below
Cortland Capital Market Services LLC
225 W. Washington St. 9th Floor
Chicago, Illinois 60606
Attention: Maggie Welch and Legal Department
Telecopy: 312-376-0751
Telephone: 312-600-5100
Email: CPCAgency@cortlandglobal.com
  and legal@cortlandglobal.com

Ladies and Gentlemen:

The undersigned, PES Holdings, LLC (the "Borrower"), refers to the Credit
Agreement, dated as of August 7, 2018 (as amended, supplemented or otherwise modified
from time to time, the "Credit Agreement", the capitalized terms defined therein being
used herein as therein defined), among the Borrower, each of the Guarantors party thereto
from time to time, the several banks and other financial institutions or entities from time
to time parties thereto (each, a "Lender" and collectively, the "Lenders"), and you, as
Administrative Agent for such Lenders, and hereby gives you notice, irrevocably,
pursuant to Section 2.07 of the Credit Agreement, that the undersigned hereby requests to
[convert] [continue] the Loans referred to below, and in that connection sets forth below
the information relating to such [conversion] [continuation] (the "Proposed [Conversion]
[Continuation]") as required by Section 2.07 of the Credit Agreement:

    i.    The Proposed [Conversion] [Continuation] relates to the Loans originally
made on _____ _____, 201_ (the "Outstanding Loans") in the
principal amount of $_____ and currently maintained as
[ABR][Eurodollar] Loans with an Interest Period ending on _____
____, 20__.

    ii.    The Business Day of the Proposed [Conversion] [Continuation] is
_____ __, ____.[7]

---

[7] With respect to Eurodollar Loans into ABR Loans, shall be a Business Day at least one
Business Day after the date hereof; provided that such notice shall be deemed to have been
given on a certain day only if given before 11:00 A.M. (New York City time) on such day.
With respect to ABR Loans into Eurodollar Loans, shall be at least three Business Days after
the date hereof; provided that such notice shall be deemed to have been given on a certain day
only if given before 11:00 A.M. (New York City time).

      iii.  The Outstanding Loans shall be [continued as [ABR][Eurodollar] Loans with an Interest Period of _____][converted into [ABR][Eurodollar] Loans with an Interest Period of _____].[8]

[The undersigned hereby certifies that no Default or Event of Default has occurred and will be continuing on the date of the Proposed [Conversion] [Continuation] or will have occurred and be continuing on the date of the Proposed [Conversion] [Continuation].][9]

> Very truly yours,
> PES HOLDINGS, LLC, as Borrower
> By: _____
>     Name:
>     Title:

---

[8] In the event that either (x) only a portion of the outstanding Loans is to be so converted or continued or (u) the outstanding Loans are to be divided into separate Loans with different Interest Periods, the Borrower should make appropriate modifications to this clause to reflect same.

[9] In the case of a Proposed Conversion or Continuation, insert this sentence only in the event that the conversion is from a Eurodollar Loan to an ABR Loan or in the case of a continuation of an ABR Loan.

**ANNEX B**

FORM OF ENDORSEMENT

*First American Title Insurance Company*

## ENDORSEMENT

Attached to and made a part of Policy Number                    File Number


      The Company insures the Insured against actual loss or damage sustained by reason of the loss of priority of the lien of the Insured Mortgage as a result of the First Amendment and Incremental Joinder to the Credit Agreement dated as of August 7, 2018, which First Amendment is by and between Mortgagor, PES Holdings, LLC, PES Administrative Services, LLC, Northyard GP, LLC, [New Lender] and the Insured dated February __, 2019.


      This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

*IN WITNESS WHEREOF,* the Company has caused this endorsement to be issued and become valid when signed by an authorized officer or licensed agent of the Company.


      First American Title Insurance Company


      By: _____
               Authorized Officer or Licensed Agent


TIRBOP-PA ENDORSEMENT 1070 (General Endorsement) (Rev'd 00/00/07)
OWNER'S AND/OR LOAN POLICY