# Exhibit D

*Execution Version*

# PLEDGE AND SECURITY AGREEMENT

**among**

**PES HOLDINGS, LLC,**

**as Grantor,**

**the other Grantors party hereto,**

**and**

**CORTLAND CAPITAL MARKET SERVICES LLC, as Administrative Agent**

**Dated as of August 7, 2018**

# TABLE OF CONTENTS

PAGE

## ARTICLE 1
### DEFINITIONS AND INTERPRETATION

Section 1.1.  *Definitions* .................................................................................................2
Section 1.2.  *Resolution of Drafting Ambiguities* ................................................................8
Section 1.3.  *Perfection Certificate* ....................................................................................9

## ARTICLE 2
### GRANT OF SECURITY AND SECURED OBLIGATIONS

Section 2.1.  *Grant of Security Interest* ..............................................................................9
Section 2.2.  *Filings* ........................................................................................................10

## ARTICLE 3
### PERFECTION; SUPPLEMENTS; FURTHER ASSURANCES; USE OF PLEDGED COLLATERAL

Section 3.1.  *Financing Statements and Other Filings; Maintenance of Perfected*
            *Security Interest* ..........................................................................................11
Section 3.2.  *Other Actions* .............................................................................................11
Section 3.3.  *Joinder of Additional Guarantors* ................................................................15
Section 3.4.  *Supplements; Further Assurances* ................................................................16

## ARTICLE 4
### REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 4.1.  *Title* ...........................................................................................................16
Section 4.2.  *Validity of Security Interest* .........................................................................17
Section 4.3.  *Defense of Claims; Transferability of Pledged Collateral* ...........................17
Section 4.4.  *Other Financing Statements* .........................................................................17
Section 4.5.  *Chief Executive Office; Change of Name; Jurisdiction of Organization* .....18
Section 4.6.  *Location of Inventory and Equipment* ...........................................................18
Section 4.7.  *Consents, etc* ..............................................................................................18
Section 4.8.  *Pledged Collateral* ......................................................................................19
Section 4.9.  *Trademarks* .................................................................................................19
Section 4.10.  *Pledged Equity Interests* ...........................................................................20

## ARTICLE 5
### CERTAIN PROVISIONS CONCERNING RECEIVABLES

Section 5.1.  *Maintenance of Records* ..............................................................................21
Section 5.2.  *Modification of Terms, etc* ...........................................................................21
Section 5.3.  *Collection* ...................................................................................................21

## ARTICLE 6
### TRANSFERS

Section 6.1.  *Transfers of Pledged Collateral* ...................................................................22

## ARTICLE 7
### REMEDIES

Section 7.1.  *Remedies* .........................................................................................22
Section 7.2.  *Notice of Sale* ..................................................................................25
Section 7.3.  *Waiver of Notice and Claims* ...........................................................25
Section 7.4.  *Certain Sales of Pledged Collateral* ................................................25
Section 7.5.  *No Waiver; Cumulative Remedies* ...................................................26
Section 7.6.  *Deficiency* ........................................................................................27

## ARTICLE 8
### APPLICATION OF PROCEEDS

Section 8.1.  *Application of Proceeds* ...................................................................27

## ARTICLE 9
### MISCELLANEOUS

Section 9.1.  *Concerning the Administrative Agent* ..............................................27
Section 9.2.  *Administrative Agent May Perform; Administrative Agent Appointed Attorney-in-Fact* ...............................................................................................28
Section 9.3.  *Continuing Security Interest; Assignment* ......................................29
Section 9.4.  *Termination; Release* .......................................................................29
Section 9.5.  *Modification in Writing* ....................................................................29
Section 9.6.  *Notices* .............................................................................................30
Section 9.7.  *Governing Law, Consent to Jurisdiction and Service of Process; Waiver of Jury Trial* ........................................................................................30
Section 9.8.  *Severability of Provisions* ...............................................................30
Section 9.9.  *Execution in Counterparts* ..............................................................30
Section 9.10.  *Business Days* ................................................................................30
Section 9.11.  *No Credit for Payment of Taxes or Imposition* ............................30
Section 9.12.  *No Claims Against Administrative Agent* ......................................31
Section 9.13.  *No Release* .....................................................................................31
Section 9.14.  *Obligations Absolute* .....................................................................31
Section 9.15.  *Reference to Certain Provisions of the Credit Agreement* ..........32

EXHIBIT 1 Form of Joinder Agreement

2

## PLEDGE AND SECURITY AGREEMENT

PLEDGE AND SECURITY AGREEMENT, dated as of August 7, 2018 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**"), among PES HOLDINGS, LLC, a limited liability company organized under the laws of Delaware (the "**Borrower**"), as grantor, and the other Grantors listed on the signature pages hereto or becoming party hereto by execution and delivery of a Joinder Agreement (together with the Borrower, the "**Grantors,**" and each a "**Grantor**"), in favor of CORTLAND CAPITAL MARKET SERVICES LLC, in its capacity as Administrative Agent under the Credit Agreement (as hereinafter defined), as secured party (in such capacity and together with any successors in such capacity, the "**Administrative Agent**").

## RECITALS

WHEREAS, in connection with the execution and delivery of this Agreement, the Borrower, the other Grantors, the lending institutions signatory thereto (the "**Lenders**") and the Administrative Agent have entered into that certain Credit Agreement, dated as of the same date hereof (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement,**" which term shall also include and refer to any increase in the amount of indebtedness under the Credit Agreement and any refinancing or replacement of the Credit Agreement (whether under a bank facility, securities offering or otherwise) or one or more successor or replacement facilities whether or not with a different group of agents or lenders (whether under a bank facility, securities offering or otherwise) and whether or not with different obligors upon the Administrative Agent's acknowledgment of the termination of the predecessor Credit Agreement);

WHEREAS, on January 21, 2018 (the "**Petition Date**"), the Borrower and each of its Subsidiaries (each, a "**Debtor**" and collectively the "**Debtors**") (along with certain of its Affiliates) filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code (each case of the Borrower and each other Debtor, a "**Case**", and collectively the "**Cases**") and have continued in the possession of their assets and the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the joint Reorganization Plan (as hereinafter defined) of the Debtors was confirmed by the Bankruptcy Court on March 26, 2018 and will be consummated on the date hereof;

WHEREAS, each Grantor will receive substantial benefits from the execution, delivery and performance of the obligations under the Credit Agreement and the other Loan Documents and each is, therefore, willing to enter into this Agreement;

WHEREAS, this Agreement is given by the Grantors in favor of the Administrative Agent for the benefit of the holders of the Obligations (the "**Secured Parties**") to secure the payment and performance of all of the Obligations;

WHEREAS, certain subsidiaries of the Borrower (the "**Guarantors**") have, pursuant to the guarantee within the Credit Agreement, unconditionally guaranteed the Obligations; and

WHEREAS, it is a condition to the obligations of the Lenders to make the Loans under the Credit Agreement that each of the Grantors executes and delivers the applicable Loan Documents, including this Agreement.

## AGREEMENT

NOW THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantors and the Administrative Agent hereby agree as follows:

ARTICLE 1

DEFINITIONS AND INTERPRETATION

Section 1.1.    *Definitions*.

(a)    Unless otherwise defined herein or in the Credit Agreement, capitalized terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC; provided, that, in any event, the following terms shall have the meanings assigned to them in the UCC:

"**Accounts**"; "**Certificated Securities**"; "**Chattel Paper**"; "**Commercial Tort Claims**"; "**Deposit Account**"; "**Documents**"; "**Electronic Chattel Paper**"; "**Equipment**"; "**Fixtures**"; "**Inventory**"; "**Investment Property**"; "**Letter-of-Credit Rights**"; "**Letters of Credit**"; "**Money**"; "**Payment Intangibles**"; "**Proceeds**"; "**Records**"; "**Security Entitlement**"; "**Supporting Obligations**"; and "**Tangible Chattel Paper.**"

(b)    Terms used but not otherwise defined herein that are defined in the Credit Agreement shall have the meanings given to them in the Credit Agreement. Section 1.02 of the Credit Agreement shall apply herein *mutatis mutandis*.

(c)    The following terms shall have the following meanings:

"**Account Debtor**" shall mean each Person who is obligated on a Receivable or Supporting Obligation related thereto.

"**Administrative Agent**" shall have the meaning assigned to such term in the preamble hereto.

"**Agreement**" shall have the meaning assigned to such term in the preamble hereto.

"**Borrower**" shall have the meaning assigned to such term in the preamble hereto.

2

"**Catalyst Assets**" shall mean all catalyst assets and inventory, precious metals assets and precious metals inventory and all additions, accessions and all rights and privileges related thereto.

"**CFC**" means a Person that is a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**CFC Holdco**" means any Domestic Subsidiary that owns no material assets other than the Equity Interests of one or more Foreign Subsidiaries that are CFCs.

"**Collateral Support**" shall mean all property (real or personal) assigned, hypothecated or otherwise securing any Current Assets Collateral and shall include any security agreement or other agreement granting a Lien on such real or personal property.

"**Contracts**" shall mean, collectively, with respect to the Grantors, all sale, service, performance, equipment or property lease contracts, agreements and grants and all other contracts, agreements or grants (in each case, whether written or oral, or third party or intercompany), in each case, between a Grantor and any third party, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications thereto or thereof.

"**Control**" shall mean (i) in the case of each Deposit Account, "**control,**" as such term is defined in Section 9-104 of the UCC and (ii) in the case of any Security Entitlement, "**control,**" as such term is defined in Section 8-106 of the UCC.

"**Control Agreements**" shall mean any Deposit Account Control Agreement and any other control agreements entered into in connection with this Agreement and the other Loan Documents.

"**Copyrights**" shall mean (a) all copyrights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise, and (b) all registrations and applications for registration of any such copyright in the United States or any other country, including registrations, recordings, supplemental registrations and pending applications for registration in the United States Copyright Office (or any successor office or any similar office in any other country).

"**Credit Agreement**" shall have the meaning assigned to such term in the Recitals.

"**Current Assets Collateral**" shall have the meaning assigned to such term in Section 2.1.

"**Deposit Account Control Agreement**" shall mean an agreement in such form that is reasonably satisfactory to the Administrative Agent establishing the Administrative Agent's Control with respect to any Deposit Account.

"**Equity Interests**" shall mean (a) in the case of a corporation, corporate stock, (b) in the case of an association or business entity, any and all shares, interests,

participations, rights or other equivalents (however designated) of corporate stock, (c) in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests, and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"**Excluded Deposit Account**" shall mean any Deposit Account (i) for which all or substantially all of the funds on deposit therein are used solely to fund payroll, 401(k) and other retirement plans and employee benefits or health care benefits, and any trust accounts with respect to any of the foregoing or (ii) holding at all times less than $2,000,000 in the aggregate, together with all such other Deposit Accounts excluded pursuant to this clause (ii).

"**Excluded Property**" shall mean:

(a)    assets owned by a Grantor on the date hereof or hereafter acquired that are subject to a Lien securing a Purchase Money Obligation or Capital Lease Obligation permitted to be incurred pursuant to the provisions of the Credit Agreement and any cash Proceeds thereof, if the contract or other agreement in which such Lien is granted (or the documentation providing for such Purchase Money Obligation or Capital Lease Obligation) validly prohibits the creation of any other Lien on such assets or Proceeds thereof, it being understood and agreed that, upon the termination of such contract, agreement or documentation, or the extinguishment of the Lien securing such Purchase Money Obligation or Capital Lease Obligation, such assets and Proceeds shall cease to be an Excluded Property unless they shall otherwise independently continue to qualify as such;

(b)    SOA Separate Assets and Collateral and, to the extent not SOA Separate Assets and Collateral, cash or Cash Equivalents securing obligations pursuant to the transactions contemplated by the SOA Master Transaction Agreement as in effect on the Closing Date;

(c)    to the extent constituting Inventory, Catalyst Assets (but only to the extent such Catalyst Assets are "Excluded Property" as defined in the Supply and Offtake Security Documents or the Term Loan Security Documents, as applicable);

(d)    cash or Cash Equivalents, to the extent a Lien on such cash or Cash Equivalents is granted by a Grantor pursuant to Sections 6.02(c), (d) and (dd) of the Credit Agreement;

(e)    (A) each Excluded Deposit Account, to the extent that such Deposit Account, if an Excluded Deposit Account pursuant to clause (ii) of the definition thereof, together with all other Excluded Deposit Accounts pursuant to clause (ii) of the definition thereof, continues to qualify as such pursuant to clause (ii) the definition thereof and (B) each Excluded Deposit Account pursuant to clause (i) of the definition thereof;

(f)      any assets, the granting or perfection of a Lien on which is prohibited by any Requirement of Law after giving effect to the anti-non-assignment provisions of the UCC and other applicable law;

(g)      any other assets, property or property rights of a de minimis value in which a security interest in favor of the Secured Parties is prohibited by, or constitutes a breach or default under or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to such property, except to the extent that the term in such contract, license, agreement, instrument or other document or shareholder or similar agreement providing for such prohibition, breach, default or termination or requiring such consent is ineffective under applicable law;

(h)      Voting Stock of any Subsidiary which is a Foreign Subsidiary or CFC Holdco representing in excess of 65% of the total voting power of all outstanding Voting Stock of such Subsidiary;

(i)      any asset consisting of a leasehold interest in real property;

(j)      cash or Cash Equivalents securing obligations under Swap Agreements, to the extent a Lien on such cash or Cash Equivalents is granted by a Grantor pursuant to Section 6.02(ff) of the Credit Agreement;

(k)      any "Collateral" as defined in that certain Promissory Note, dated as of the date hereof, among Philadelphia Energy Solutions Refining and Marketing LLC, Sunoco Logistics Partners Operations L.P. and the other parties thereto;

(l)      any Vehicles;

(m)      any commodity account of a Grantor in which a lien has been pledged thereon in favor of a future commission merchant and any Swap Agreement contained therein; provided that this clause (n) shall not extend to or include any cash or Cash Equivalents or any assets (other than such Swap Agreement) contained in or covered by such commodity account; provided further that, the foregoing proviso shall not be deemed to limit in any way any other clause of the definition of "Excluded Property";

(n)      any intent-to-use Trademark application (but only until the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto), to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such intent-to-use Trademark application or registration issuing therefrom; and

(o)      to the extent relating to Obligations in respect of the Tranche B Loans only, each Tranche B Excluded Building (solely so long as it constitutes a Tranche B Excluded Building); for the avoidance of doubt, Tranche B Excluded Buildings shall not constitute Excluded Property with respect to any Obligations other than Obligations in respect of the Tranche B Loans.

5

"**General Intangibles**" shall mean, collectively, with respect to each Grantor, all "**general intangibles,**" as such term is defined in the UCC, of the Grantor and, in any event, includes, without limitation, (i) all of such Grantor's rights, title and interest in, to and under all Contracts and insurance policies (including all rights and remedies relating to monetary damages, including indemnification rights and remedies, and claims for damages or other relief pursuant to or in respect of any Contract), (ii) all know-how and warranties relating to any of the Pledged Collateral, (iii) any and all other rights, claims, choses-in-action and causes of action of such Grantor against any other person and the benefits of any and all collateral or other security given by any other person in connection therewith, (iv) all guarantees, endorsements and indemnifications on, or of, any of the Pledged Collateral, (v) all lists, books, records, correspondence, ledgers, printouts, files (whether in printed form or stored electronically), tapes and other papers or materials containing information relating to any of the Pledged Collateral, including all customer or tenant lists, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, appraisals, recorded knowledge, surveys, studies, engineering reports, test reports, manuals, standards, processing standards, performance standards, catalogs, research data, computer and automatic machinery software and programs and the like, field repair data, accounting information pertaining to such Grantor's operations or any of the Pledged Collateral and all media in which or on which any of the information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data, (vi) all licenses, consents, permits, variances, certifications, authorizations and approvals, however characterized, now or hereafter acquired or held by such Grantor, including building permits, certificates of occupancy, environmental certificates, industrial permits or licenses and certificates of operation, and (vii) all rights to reserves, deferred payments, deposits, refunds, indemnification of claims and claims for tax or other refunds against any Governmental Authority.

"**Grantors**" shall have the meaning assigned to such term in the preamble.

"**Guarantors**" shall have the meaning assigned to such term in the Recitals.

"**Instruments**" shall mean, collectively, with respect to each Grantor, all "**instruments,**" as such term is defined in Article 9, rather than Article 3, of the UCC, and includes all promissory notes, drafts, bills of exchange or acceptances.

"**Intellectual Property**" shall mean, collectively, the Trademarks, Patents and Copyrights.

"**Intercreditor Agreement**" shall mean that certain intercreditor agreement, dated as of the date hereof, among the Administrative Agent, Merrill Lynch Commodities, Inc., as the Initial SOA Collateral Agent (as defined therein), ICBC Standard Bank PLC as the Successor SOA Collateral Agent (as defined therein), and the Loan Parties (as amended, restated or otherwise modified from time to time).

"**Issuer**" shall mean an issuer of Pledged Equity Interests.

"**Joinder Agreement**" shall mean an agreement substantially in the form of Exhibit 1 hereto.

"**Lenders**" shall have the meaning assigned to such term in the Recitals.

"**Notice of Exclusive Control**" shall have the meaning assigned to such term in Section 7.1(viii).

"<u>**Patents**</u>" shall mean patents, patent applications, design registrations (and applications therefor) and patent rights, including any such rights granted upon any reissue, reexamination, division, extension, provisional, continuation, continuation-in-part or other application, certificates of invention or equivalent or similar rights anywhere in the world in inventions, designs and discoveries.

"**Perfection Certificate**" shall mean that certain perfection certificate dated as of the date hereof, executed and delivered by each Grantor in favor of the Administrative Agent for the benefit of the Secured Parties, and each other Perfection Certificate (which shall be in form and substance substantially similar to the Perfection Certificate dated the date hereof) executed and delivered by the Grantors in favor of the Administrative Agent for the benefit of the Secured Parties contemporaneously with the execution and delivery of each Joinder Agreement executed in accordance with Section 3.3 hereof, in each case, as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the Credit Agreement or upon the reasonable request of the Administrative Agent.

"**Permitted Liens**" shall mean Liens permitted by Section 6.02 of the Credit Agreement.

"**Pledged Collateral**" shall have the meaning assigned to such term in Section 2.1.

"**Pledged Equity Interests**" shall have the meaning assigned to such term in Section 2.1.

"**Receivables**" shall mean all (i) Accounts, (ii) Chattel Paper, (iii) Payment Intangibles, (iv) General Intangibles, (v) Instruments and (vi) to the extent not otherwise covered above, all other rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, regardless of how classified under the UCC together with all of the Grantors' rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all Records relating thereto.

"**Secured Parties**" shall have the meaning assigned to such term in the Recitals.

"**SOA Collateral Agent**" shall have the meaning assigned to such term in the Intercreditor Agreement.

"**SOA Priority Collateral**" shall have the meaning assigned to such term in the Intercreditor Agreement.

"**SOA Separate Assets and Collateral**" shall have the meaning assigned to such term in the Intercreditor Agreement.

"**SOA Termination Date**" shall have the meaning assigned to such term in the Intercreditor Agreement.

"**Supply and Offtake Secured Party**" shall mean Merrill Lynch Commodities, Inc., as Collateral Agent under the Supply and Offtake Agreement.

"**Term Loan Priority Collateral**" shall have the meaning assigned to such term in the Intercreditor Agreement.

"**Trademarks**" shall mean (i) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, services marks, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto, including, without limitation, any of the foregoing referred to in Schedule 9(a) or 9(b) to the Perfection Certificate, and (ii) the right to obtain all renewals thereof.

"**transferable record**" shall have the meaning assigned to such term in Section 3.2(c).

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; *provided, however*, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Administrative Agent's Lien on any item or portion of the Pledged Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "**UCC**" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"**Vehicles**" shall mean all railcars, cars, trucks, trailers, construction and earth moving equipment and other vehicles covered by a certificate of title law of any state and all tires and other appurtenances to any of the foregoing.

"**Voting Stock**" means, with respect to any Person, any class or classes of Capital Stock pursuant to which the holders thereof have the general voting power under ordinary circumstances to vote in the election of the board of directors or other managers of such Person.

Section 1.2.    *Resolution of Drafting Ambiguities*.  Each Grantor acknowledges and agrees that it was represented by counsel in connection with the execution and delivery hereof, that it and its counsel reviewed and participated in the preparation and negotiation hereof and that it shall not cite to any rule of construction, or make any claim or argument, to the effect that ambiguities should be resolved against the drafting party (i.e., the Administrative Agent or any Lender or any counsel to any Lender) in the interpretation of this Agreement.

Section 1.3.    *Perfection Certificate*.  Each Grantor and the Administrative Agent agree that the Perfection Certificate, and all descriptions of Pledged Collateral, and all schedules, amendments and supplements hereto and thereto, are and shall at all times remain a part of this Agreement.

ARTICLE 2

GRANT OF SECURITY AND SECURED OBLIGATIONS

Section 2.1.    *Grant of Security Interest*.  As collateral security for the payment and performance in full of all of the Obligations, each Grantor hereby pledges and grants to the Administrative Agent for the benefit of the Secured Parties, a Lien on all of the right, title and interest of such Grantor in, to and under the following property, wherever located, and whether now existing or hereafter arising or acquired from time to time (collectively, and in each case excluding any Excluded Property, the "**Pledged Collateral**"):

    (i)    all Accounts;

    (ii)    all Inventory, including all raw materials, work in process and finished goods, relating to any of the foregoing items in this clause (ii);

    (iii)    all Money and Deposit Accounts (to the extent relating to the items in clauses (i) and (ii) above, and together with such items, the "**Current Assets Collateral**");

    (iv)    all of the following: (A) Documents and Chattel Paper, (B) Instruments, (C) General Intangibles and Investment Property, (D) Commercial Tort Claims, and (E) Supporting Obligations and all other forms of obligations owing to any Grantor or in which any Grantor may have any interest, however created or arising and whether or not earned by performance;

    (v)    all Letters of Credit and Letter-of-Credit Rights;

    (vi)    all Equipment;

    (vii)    all Fixtures;

    (viii)    all Intellectual Property;

9

(ix)    all Equity Interests in each Subsidiary directly owned by such Grantor as of the Closing Date (including the Pledged Equity Interests listed on Schedule 7 to the Perfection Certificate) and any other Equity Interests in any Subsidiary directly owned in the future by such Grantor, together in each case with (i) all certificates representing such Equity Interests, (ii) all shares, securities, cash or other property representing a dividend on or a distribution or return of capital on or in respect of such Equity Interests, or resulting from a split-up, revision, reclassification or other like change thereof or otherwise received in exchange therefor, and any warrants, rights or options issued to the holders of, or otherwise in respect of, such Equity Interests, and (iii) without prejudice to any provision of the Credit Agreement prohibiting any merger or consolidation by the Borrower or any of its Subsidiaries, all Equity Interests of any successor entity of any such merger or consolidation (collectively, the "**Pledged Equity Interests**");

(x)    to the extent not otherwise included above, all Records evidencing any of the foregoing; and

(xi)    all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to such Grantor from time to time with respect to any of the foregoing.

Notwithstanding anything to the contrary contained in clauses (i) through (xi) above, inclusive, the security interest created by this Agreement shall not extend to, and the term "**Pledged Collateral**" shall not include, any Excluded Property. The Grantors shall, from time to time or at the reasonable request of the Administrative Agent (or any Lender acting through the Administrative Agent), give written notice to the Administrative Agent identifying in reasonable detail the Excluded Property and shall provide to the Administrative Agent such other information regarding the Excluded Property as the Administrative Agent (or any Lender acting through the Administrative Agent) may reasonably request.

Notwithstanding anything to the contrary in this Agreement if and when any asset of any Grantor of the type described in any clause of Section 2.1 shall cease to be Excluded Property, a Lien on and security in such asset shall be deemed granted therein.

Section 2.2.    *Filings.*  (a) Each of the Grantors hereby irrevocably authorizes the Administrative Agent and its counsel and representatives at any time and from time to time to file in any relevant jurisdiction any financing statements (including fixture filings) and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Pledged Collateral, including (i) whether a Grantor is an organization, the type of organization and any organizational identification number issued to such Grantor and (ii) any financing or continuation statements or other documents without the signature of such Grantor where permitted by law. The Grantors shall provide all information described in the immediately preceding sentence to the Administrative Agent

10

promptly upon request by the Administrative Agent. In addition, each Grantor authorizes and agrees that such financing statements may contain an indication and description of collateral that describes items (i) through (xi) of the definition of Pledged Collateral in Section 2.1 herein or describes Collateral as "all assets" or words of similar effect. Without derogating the Liens granted hereunder, at any time from time to time, at the sole expense of any Grantor, the Administrative Agent shall execute and deliver to such Grantor or otherwise authorize the filing of such instruments, including any financing statement amendment, as such Grantor may reasonably request, to confirm, evidence or otherwise reflect in the public record the exclusion from the Pledged Collateral of all or any portion of the Excluded Property.

(b)     The Administrative Agent and its counsel and representatives are hereby authorized to make any such filing or take other actions necessary to ensure the validity and perfection of the Liens on the Pledged Collateral contemplated in this Agreement.

ARTICLE 3
PERFECTION; SUPPLEMENTS; FURTHER ASSURANCES; USE OF PLEDGED COLLATERAL

Section 3.1.    *Financing Statements and Other Filings; Maintenance of Perfected Security Interest*.  Each Grantor represents and warrants that all financing statements, agreements, instruments and other documents necessary to perfect the security interest granted by it (to the extent such security interest can be perfected by such filings and other actions) to the Administrative Agent in respect of the Pledged Collateral have been delivered to the Administrative Agent in completed and, to the extent necessary or appropriate, duly executed form for filing in each applicable governmental, municipal or other office specified in Schedule 4 to the Perfection Certificate. Each Grantor agrees that at the sole cost and expense of the Grantors, the Grantors will maintain, subject to the terms of the Intercreditor Agreement and the Credit Agreement, the security interest created by this Agreement in the Pledged Collateral as a perfected security interest subject only to Permitted Liens.

Section 3.2.    *Other Actions*.  In order to further ensure the attachment, perfection and priority of, and the ability of the Administrative Agent to enforce, the Administrative Agent's Lien on the Pledged Collateral, each Grantor represents and warrants (as to itself) as follows and agrees, in each case at the Grantors' own expense, to take the following actions with respect to the following Pledged Collateral:

(a)     *Instruments and Tangible Chattel Paper*.  As of the date hereof, no amounts payable under or in connection with any of the Pledged Collateral with an aggregate value in excess of $10,000 are evidenced by any Instrument or Tangible Chattel Paper other than such Instruments and Tangible Chattel Paper listed in Schedule 8 to the Perfection Certificate. Subject to the Intercreditor Agreement, to the extent such Instrument or item of Tangible Chattel Paper has a value in excess of $10,000 in the aggregate for all Grantors, each such Instrument and each item of Tangible Chattel Paper listed in Schedule 8 to the Perfection Certificate has been properly endorsed, assigned and delivered to the Administrative Agent, accompanied by instruments of transfer or assignment duly executed in blank. Subject to the terms of the Intercreditor Agreement, if

11

any amount then payable under or in connection with any of the Pledged Collateral shall be evidenced by any Instrument or Tangible Chattel Paper, and such amount, together with all amounts payable evidenced by any Instrument or Tangible Chattel Paper not previously delivered to the Administrative Agent exceeds $10,000 in the aggregate for all Grantors, the Grantor acquiring such Instrument or Tangible Chattel Paper, shall promptly (but in any event within five Business Days after receipt thereof) endorse, assign and deliver the same to the Administrative Agent, accompanied by such instruments of transfer or assignment duly executed in blank as the Administrative Agent may from time to time specify.

(b)     *Deposit Accounts*.  As of the date hereof, the Grantors have no Deposit Accounts other than the accounts listed in Schedule 5 to the Perfection Certificate. Upon compliance by the Loan Parties with the covenant set forth in Section 5.14 of the Credit Agreement, the Administrative Agent will have a security interest, subject to the Intercreditor Agreement, in each Deposit Account specified on Schedule 5 to the Perfection Certificate hereto, which security interest (other than in the case of an Excluded Deposit Account or a Deposit Account that is Excluded Property) will be perfected by Control by virtue of execution and delivery of a Control Agreement in favor of the Administrative Agent and the SOA Collateral Agent with respect to each such Deposit Account, in each case, within sixty (60) days of the date hereof. Subject to the Intercreditor Agreement, no Grantor shall hereafter establish or maintain, any Deposit Account (other than an Excluded Deposit Account) unless, promptly after such time that the Deposit Account is established or such Deposit Account ceases to be an Excluded Deposit Account, such Grantor enters into a Control Agreement in favor of the Administrative Agent and, if applicable, the SOA Collateral Agent with respect to such Deposit Account. Subject to the Intercreditor Agreement, the Administrative Agent shall not give any instructions directing the disposition of funds from time to time credited to any Deposit Account (excluding Excluded Deposit Accounts) or withhold any withdrawal rights from the Grantors with respect to funds from time to time credited to any Deposit Account (excluding Excluded Deposit Accounts) unless an Event of Default has occurred and is continuing, and upon the cure or waiver of such Event of Default, the Administrative Agent shall deliver a notice rescinding such instructions and thereupon control of such Deposit Account shall revert to the Grantors. Subject to the terms of the Intercreditor Agreement, the Grantors shall not grant or purport to grant Control of any Deposit Account (excluding Excluded Deposit Accounts or any Deposit Account that constitutes Excluded Property) to any person other than the Administrative Agent or, prior to the SOA Termination Date, the SOA Collateral Agent (as collateral agent and bailee for the Administrative Agent pursuant to the Intercreditor Agreement).

(c)     *Electronic Chattel Paper and Transferable Records*.  As of the date hereof, no amount under or in connection with any of the Pledged Collateral is evidenced by any Electronic Chattel Paper or any "**transferable record**" (as that term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction) other than such Electronic Chattel Paper and transferable records listed in Schedule 8 to the Perfection Certificate. Subject to the Intercreditor Agreement, if at any time any amount payable under or in connection with any of the Pledged Collateral shall

be evidenced by any Electronic Chattel Paper or any transferable record, when acquiring such Electronic Chattel Paper or transferable record the Grantors shall promptly notify the Administrative Agent thereof and shall take such action as the Administrative Agent may reasonably request) control of such Electronic Chattel Paper under Section 9-105 of the UCC or control under Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record. The requirement in the preceding sentence shall not apply to the extent that such amount, together with all amounts payable evidenced by Electronic Chattel Paper or any transferable record in which the Administrative Agent has not been vested control within the meaning of the statutes described in the immediately preceding sentence, does not exceed $500,000 in the aggregate for all Grantors. Subject to the Intercreditor Agreement, the Administrative Agent agrees with the Grantors that the Administrative Agent will arrange, pursuant to procedures reasonably satisfactory to the Administrative Agent and so long as such procedures will not result in the Administrative Agent's loss of control, for the Grantors to make alterations to the Electronic Chattel Paper or transferable record permitted under Section 9-105 of the UCC or, as the case may be, Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or Section 16 of the Uniform Electronic Transactions Act for a party in control to allow without loss of control, unless an Event of Default has occurred and is continuing or would occur after taking into account any action by the Grantors with respect to such Electronic Chattel Paper or transferable record.

(d)    *Letter-of-Credit Rights*.  Subject to the Intercreditor Agreement, if any Grantor is at any time a beneficiary under a Letter of Credit that is Pledged Collateral now or hereafter issued, the Grantors shall promptly notify the Administrative Agent thereof and the Grantors shall, at the reasonable request of the Administrative Agent, pursuant to an agreement in form and substance reasonably satisfactory to the Administrative Agent, either (i) arrange for the issuer and any confirmer of such Letter of Credit to consent to an assignment to the Administrative Agent of the proceeds of any drawing under the Letter of Credit or (ii) arrange for the Administrative Agent to become the transferee beneficiary of such Letter of Credit, with the Administrative Agent agreeing, in each case, that the proceeds of any drawing under the Letter of Credit are to be applied as provided in the Intercreditor Agreement. The actions in the preceding sentence shall not be required to the extent that the amount of any such Letter of Credit, together with the aggregate amount of all other Letters of Credit for which the actions described above in clauses (i) and (ii) have not been taken, does not exceed $5,000,000 in the aggregate for all Grantors.

(e)    *Pledged Equity Interests*.

(i)    *Percentage Pledged Equity Interests*.  Each Grantor will cause the Pledged Equity Interests constituting part of the Pledged Collateral to constitute at all times 100% of the total number of Equity Interests of each Issuer then outstanding directly owned by such Grantor.

13

(ii)    *Delivery and Other Perfection*.  Each Grantor, and without limiting its obligations under Section 3.4, shall:

(A)    if any of the Pledged Equity Interests constituting part of the Collateral are received by such Grantor, forthwith (i) deliver to the Administrative Agent the certificates or instruments representing or evidencing the same (if any), duly endorsed in blank or accompanied by such instruments of assignment and transfer in such form and substance as the Administrative Agent may reasonably request, all of which thereafter shall be held by the Administrative Agent, pursuant to the terms of this Agreement, as part of the Pledged Collateral and (ii) take such other action as the Administrative Agent may reasonably deem necessary or appropriate to duly record or otherwise perfect the security interest created hereunder in such Pledged Equity Interests (and each Grantor agrees that the Administrative Agent may from time to time attach as Schedule 7 of the Perfection Certificate an updated list of the Pledged Equity Interests reflecting the addition of such Pledged Equity Interests);

(B)    promptly from time to time enter into such control agreements, each in form and substance reasonably acceptable to the Administrative Agent, as may be required to perfect the security interest created hereby in the Pledged Equity Interests, and will promptly furnish to the Administrative Agent executed copies thereof;

(C)    to the extent that any Pledged Equity Interests are represented by Certificated Securities, keep full and accurate books and records relating to the Pledged Equity Interests, and stamp or otherwise mark such books and records in such manner as the Administrative Agent may reasonably require in order to reflect the security interests granted by this Agreement; and

(D)    only with respect to Grantors other than the Borrower, agrees to comply with the obligations set forth in Section 5.06(b) of the Credit Agreement, as if it were set forth herein mutatis mutandis.

(iii)    *Voting Rights; Dividends*.

(A)    *Voting Rights*.  So long as no Event of Default shall have occurred and be continuing, each Grantor shall have the right to exercise all voting, consensual and other powers of ownership pertaining to the Pledged Equity Interests for any purpose permitted by the terms of this Agreement and the Loan Documents; provided that no such vote shall be cast or such power exercised, and no consent, waiver or ratification shall be given by such Grantor, if in any such case the effect thereof would be to materially impair any of the Pledged Equity Interests or would be in violation of any of the provisions of this Agreement or any of the other

14

Loan Documents. If an Event of Default shall have occurred and be continuing, whether or not the Secured Parties or any of them exercise any available right to declare any Obligations due and payable or seek or pursue any other relief or remedy available to them under applicable law or under this Agreement, the Loan Documents or any other agreement relating to such Obligations, upon request of the Administrative Agent, at the direction of the Controlling Lenders in accordance with Section 7.02 of the Credit Agreement, all such rights of the Grantors shall cease and the Administrative Agent shall have the exclusive right to exercise all voting, consensual and other powers of ownership pertaining to the Pledged Equity Interests, and, if the Administrative Agent shall so request in writing, each Grantor agrees to execute and deliver to the Administrative Agent appropriate additional documents to that end.  Prior to the occurrence of an Event of Default, the Administrative Agent shall execute and deliver to each Grantor or cause to be executed and delivered to such Grantor all such proxies, powers of attorney, dividend and other orders, and all such instruments, without recourse, as such Grantor may reasonably request for the purpose of enabling such Grantor to exercise the rights and powers that it is entitled to exercise pursuant to this Section.

(B)     *Dividends, Etc*. Unless and until an Event of Default shall have occurred and be continuing, each Grantor shall be entitled to receive and retain any dividends, distributions or proceeds in respect of the Pledged Equity Interests. If an Event of Default shall have occurred and be continuing, whether or not the Secured Parties or any of them exercise any available right to declare any Obligations due and payable or seek or pursue any other relief or remedy available to them under applicable law or under this Agreement, the Loan Documents or any other agreement relating to such Obligation, upon request of the Administrative Agent, all dividends and distributions on the Pledged Equity Interests shall be paid directly to the Administrative Agent and retained by it as part of the Pledged Collateral, subject to the terms of this Agreement, and, if the Administrative Agent shall so request in writing, each Grantor agrees to execute and deliver to the Administrative Agent appropriate additional dividend, distribution and other orders and documents to that end, provided that if such Event of Default is cured, any such dividend or distribution theretofore paid to the Administrative Agent shall, upon request of such Grantor (except to the extent theretofore applied to the Obligations), be returned by the Administrative Agent to such Grantor.

Section 3.3.     *Joinder of Additional Guarantors*.  The Grantors shall cause each of their Subsidiaries (other than an Excluded Subsidiary or a Foreign Subsidiary) that, from time to time after the date hereof, shall be required to pledge any assets to the Administrative Agent for the benefit of the Secured Parties pursuant to the provisions of the Credit Agreement and to the extent required thereby, to execute and deliver to the Administrative Agent (i) a Joinder Agreement substantially in the form of Exhibit 1

hereto and (ii) a Perfection Certificate, in each case, within thirty (30) days of the date on which it was acquired or created or ceased to be an Excluded Subsidiary, and upon such execution and delivery, such Subsidiary shall constitute a "**Guarantor**" and a "**Grantor**", for all purposes hereunder with the same force and effect as if originally named as a Guarantor and Grantor herein. The execution and delivery of such Joinder Agreement shall not require the consent of the Grantors hereunder. The rights and obligations of the other Grantors hereunder shall remain in full force and effect notwithstanding the addition of any new Guarantor and Grantor as a party to this Agreement.

Section 3.4.    *Supplements; Further Assurances.*  The Grantors shall take such further actions, and execute and/or deliver to the Administrative Agent such additional financing statements, amendments, assignments, agreements, supplements, powers and instruments, as the Administrative Agent or any Lender (acting through the Administrative Agent) may in its reasonable judgment deem necessary or appropriate in order to create, perfect, preserve and protect the Lien on the Pledged Collateral as provided herein and the rights and interests granted to the Administrative Agent hereunder, to carry into effect the purposes hereof or better to assure and confirm the validity, enforceability and priority of the Administrative Agent's Lien on the Pledged Collateral or, subject to the Intercreditor Agreement, permit the Administrative Agent to exercise and enforce its rights, powers and remedies hereunder with respect to any Pledged Collateral, including the filing of financing statements, continuation statements and other documents (including this Agreement) under the Uniform Commercial Code (or other similar laws) in effect in any jurisdiction with respect to the security interest created hereby and the execution and delivery of Control Agreements, all in form reasonably satisfactory to the Administrative Agent and in such offices wherever required by law to perfect, continue and maintain the validity, enforceability and priority of the Lien on the Pledged Collateral as provided herein and to preserve the other rights and interests granted to the Administrative Agent hereunder, as against third parties, with respect to the Pledged Collateral. Without limiting the generality of the foregoing, the Grantors shall make, execute, endorse, acknowledge, file or refile and/or deliver to the Administrative Agent from time to time upon reasonable request by the Administrative Agent such lists, schedules, descriptions and designations of the Pledged Collateral, copies of warehouse receipts, receipts in the nature of warehouse receipts, bills of lading, documents of title, vouchers, invoices, schedules, confirmatory assignments, supplements, additional security agreements, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments as the Administrative Agent shall reasonably request. If an Event of Default has occurred and is continuing, the Administrative Agent shall, acting at the direction of the Controlling Lenders pursuant to Section 7.02 of the Credit Agreement, institute and maintain, in its own name or in the name of the Grantors, such suits and proceedings as the Controlling Lenders deem necessary, desirable or expedient to prevent any impairment of the Lien on or the perfection thereof in the Pledged Collateral. All of the foregoing shall be at the sole cost and expense of the Grantors.

ARTICLE 4

REPRESENTATIONS, WARRANTIES AND COVENANTS

Each Grantor represents, warrants and covenants as follows:

Section 4.1.    *Title*.  Except for the Lien granted to the Administrative Agent for the ratable benefit of the Secured Parties pursuant to this Agreement and Permitted Liens, each Grantor owns and has rights and, as to Pledged Collateral acquired by it from time to time after the date hereof, will own and have rights in, each item of Pledged Collateral pledged by it hereunder, free and clear of any and all Liens or claims. For the avoidance of doubt, it is understood and agreed that any Grantor may, as part of its business, grant licenses to third parties to use Intellectual Property owned or developed by a Grantor. For purposes of this Agreement and the other Loan Documents, such licensing activity shall not constitute a "**Lien**" on such Intellectual Property. Each of the Administrative Agent and each Lender understands that any such licenses may be exclusive to the applicable licensees, and such exclusivity provisions may limit the ability of the Administrative Agent to utilize, sell, lease or transfer the related Intellectual Property or otherwise realize value from such Intellectual Property pursuant hereto.

Section 4.2.    *Validity of Security Interest*.  The Lien on the Pledged Collateral granted to the Administrative Agent for the benefit of the Secured Parties hereunder constitutes and will at all times constitute (a) a legal and valid Lien on all the Pledged Collateral securing the payment and performance of the Obligations, and (b) subject to the filings and other actions described in Schedule 4 to the Perfection Certificate (to the extent required to be listed on the schedules to the Perfection Certificate as of the date this representation is made or deemed made), and subject to the Intercreditor Agreement, (i) a perfected first priority Lien on all Pledged Collateral that is Term Loan Priority Collateral, subject only to Permitted Liens, and (ii) a Lien on all Pledged Collateral that is SOA Priority Collateral (behind only the liens securing the Supply and Offtake Obligations (as such term is defined in the Intercreditor Agreement)), subject only to Permitted Liens (in each case, to the extent such Lien can be perfected by such filings and other actions that are required pursuant to Section 2.2).

Section 4.3.    *Defense of Claims; Transferability of Pledged Collateral*.  The Grantors shall, at their own cost and expense, defend title to the Pledged Collateral pledged by it hereunder and the security interest therein and Lien thereon granted to the Administrative Agent and the priority thereof against all claims and demands of all persons, at its own cost and expense, at any time claiming any interest therein adverse to the Administrative Agent or any other Secured Party other than Permitted Liens.

Section 4.4.    *Other Financing Statements*.  It has not filed, and has not authorized any third party to file, any valid or effective financing statement (or similar statement, instrument of registration or public notice under the law of any jurisdiction) covering or purporting to cover any interest of any kind in the Pledged Collateral, except such as have been filed in favor of the Administrative Agent pursuant to this Agreement or in favor of any holder of a Permitted Lien with respect to such Permitted Lien or financing statements or public notices relating to the termination statements listed on

17

Schedule 10 to the Perfection Certificate. The Grantors shall not execute, authorize or permit to be filed in any public office any financing statement (or similar statement, instrument of registration or public notice under the law of any jurisdiction) relating to any Pledged Collateral, except financing statements and other statements and instruments filed or to be filed in respect of and covering the security interests granted by the Grantors to the holder of the Permitted Liens.

Section 4.5.    *Chief Executive Office; Change of Name; Jurisdiction of Organization.*  (a) Such Grantor will not, except upon 15 days' prior written notice to the Administrative Agent and delivery to the Administrative Agent of all additional duly authorized and, where required, executed financing statements and other documents reasonably requested by the Administrative Agent to maintain the validity, perfection and priority of the security interests provided for herein, (i) change its jurisdiction of organization or the location of its chief executive office or principal place of business from that referred to on Schedule 2(a) or 2(c) to the Perfection Certificate or (ii) change its name.

(b)    The Administrative Agent may rely on advice of counsel as to whether any or all UCC financing statements of the Grantors need to be amended as a result of any of the changes described in clause (a) above. If the Grantors fail to provide information to the Administrative Agent about such changes on a timely basis, the Administrative Agent shall not be liable or responsible to any party for any failure to maintain a perfected Lien on the Grantors' property constituting Pledged Collateral, for which the Administrative Agent needed to have information relating to such changes. The Administrative Agent shall have no duty to inquire about such changes if the Grantors do not inform the Administrative Agent of such changes, the parties acknowledging and agreeing that it would not be feasible or practical for the Administrative Agent to search for information on such changes if such information is not provided by the Grantors.

Section 4.6.    *Location of Inventory and Equipment.*  On the date hereof, the Inventory and Equipment (other than mobile goods) are kept at the locations listed in the relevant Schedules to the Perfection Certificate. The Grantors shall not move any Inventory that constitutes Eligible Hydrocarbon Inventory (as defined in the Supply and Offtake Agreement as in effect on the date hereof) to any location, other than any location that is listed in the relevant Schedules to the Perfection Certificate or any other location for which a Third Party Consent Agreement (as defined in the Supply and Offtake Agreement as in effect on the date hereof) has been entered into, which locations shall be deemed to be added to the Schedules to the Perfection Certificate, unless they have given the Administrative Agent not less than 10 days' prior written notice (or such shorter period of time as may be permitted by the Administrative Agent, at the direction of the Required Lenders) of its intention so to do, clearly describing such new location and providing such other information in connection therewith as the Administrative Agent may reasonably request; provided, however, that in no event shall any Inventory be moved to any location outside of the continental United States.

Section 4.7.    *Consents, etc.*  In the event that the Administrative Agent exercises any remedies, voting or consensual rights or attorney-in-fact powers set forth in this

Agreement and determines it necessary to obtain any approvals or consents of any Governmental Authority or any other person therefor, then, upon the reasonable request of the Administrative Agent, the Grantors shall use commercially reasonable efforts to assist and aid the Administrative Agent to obtain as soon as practicable any necessary approvals or consents for the exercise of any such remedies, rights and powers.

Section 4.8.    *Pledged Collateral*.  All information set forth herein, including the schedules hereto, and all information contained in any documents, schedules and lists heretofore delivered to any Secured Party, including the Perfection Certificate and the schedules thereto, in connection with this Agreement, in each case, relating to the Pledged Collateral, is accurate and complete in all material respects for the purposes for which it was delivered. The Pledged Collateral described on the schedules to the Perfection Certificate constitutes all of the property of such type of Pledged Collateral required to be so scheduled and owned or held by the Grantors.

Section 4.9.    *Intellectual property*.  (a) Schedule 9(a), (c) and (e) to the Perfection Certificate lists all Trademark, Patent and Copyright applications and registrations owned by such Grantor in its own name on the date hereof.

(b)    On the date hereof, to such Grantor's knowledge all material Trademarks, Patents and Copyrights are valid, subsisting, unexpired and enforceable, have not been abandoned and do not infringe in any material respect the intellectual property rights of any other Person.

(c)    Except as set forth in Schedule 9(b) and (d) to the Perfection Certificate, on the date hereof, none of the Trademarks, Copyrights or Patents are the subject of any licensing or franchise agreement pursuant to which such Grantor is the licensor or franchisor.

(d)    No holding, decision or judgment has been rendered by any Governmental Authority which would limit, cancel or question the validity of, or such Grantor's rights in, any Trademark, Copyright or Patent in any respect that could reasonably be expected to have a Material Adverse Effect.

(e)    No action or proceeding is pending, or, to the knowledge of such Grantor, threatened in writing, on the date hereof (i) seeking to limit, cancel or question the validity of any Trademark, Copyright or Patent or such Grantor's ownership interest therein, or (ii) which, if adversely determined, would have an adverse effect on the value of any Trademark, Copyright or Patent, except in each case as could not reasonably be expected to have a Material Adverse Effect.

(f)    Such Grantor (either itself or through licensees) will (i) continue to use each material Trademark in a manner consistent with the use thereof as of the date of this Agreement, except for any change in such manner in the ordinary course of business, (ii) maintain the quality of products and services offered under such Trademark, Copyright or Patent in a manner consistent with such quality as of the date of this Agreement, and (iii) use such Trademark, Copyright or Patent with notices of registration and other notices

19

and legends in a manner consistent with such use as of the date of this Agreement except in each case of the foregoing (i) through (iii) as could not reasonably be expected to have a Material Adverse Effect.

(g)    Such Grantor will notify the Administrative Agent if it knows, or has reason to know, that any application or registration relating to any material Trademark, Copyright or Patent may become forfeited, abandoned or dedicated to the public, or of any adverse determination or development (including any such determination or development in any proceeding in the United States Patent and Trademark Office or the United States Copyright Office, as applicable) regarding such Grantor's ownership of, or right to register or use such Trademark.

(h)    Whenever such Grantor, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of any Trademark, Copyright or Patent with the United States Patent and Trademark Office or any copyright with the Unites States Copyright Office, such Grantor shall report such filing to the Administrative Agent within ten (10) Business Days after the last day of the fiscal quarter in which such filing occurs. Upon the request of the Administrative Agent, such Grantor shall execute and deliver, and have recorded, any and all agreements, instruments and documents as the Administrative Agent may request to evidence and perfect the Administrative Agent's and the Lenders' security interest in such Trademark, Patent, Copyright or application therefor.

(i)    In the event that any material Trademark, Copyright or Patent is infringed, misappropriated or diluted by a third party, such Grantor shall take such actions as such Grantor shall reasonably deem appropriate under the circumstances to protect such Trademark, Copyright or Patent.

Section 4.10.  *Pledged Equity Interests*.  (a) As of the date hereof, Schedule 7 to the Perfection Certificate correctly sets forth the name and jurisdiction of each Issuer of, and the ownership interest (including class of Equity Interests (if applicable), certificate number (if applicable), number of shares or units and percentage owned) of each Grantor in, the Pledged Equity Interests. As of the date hereof, the Pledged Equity Interests with respect to each Grantor constitute 100% of the issued and outstanding Equity Interests of each Subsidiary of the Borrower that are required to be pledged pursuant to this Agreement and are directly owned by such Grantor on the date hereof. As of the date hereof, each Grantor hereby represents and warrants that none of the limited liability company interests or limited partnership interests of any Subsidiary in which a security interest is granted by such Grantor hereunder are or represent interests in Issuers that (i) are registered investment companies, (ii) are dealt in or traded on securities exchanges or markets or (iii) are issued by an Issuer that has opted to have them treated as securities under the Uniform Commercial Code of any jurisdiction.

(b)    The Pledged Equity Interests listed on Schedule 7 to the Perfection Certificate are, and all other Pledged Equity Interests in which such Grantor shall hereafter grant a security interest pursuant to Section 2.1 will be, (i) duly authorized, validly existing, fully paid and non-assessable (in the case of any shares issued by a

20

corporation) and (ii) duly issued and outstanding (in the case of any equity interest in any other entity), and none of such Pledged Equity Interests are or will be subject to any contractual restriction, or any restriction under the charter, by- laws, or other organizational instrument of the respective Issuer, of any nature that might prohibit, impair, delay or otherwise affect the pledge of such Pledged Collateral hereunder, the sale or disposition thereof pursuant hereto or the exercise by the Administrative Agent of rights and remedies hereunder (except for any such restriction contained herein or in the Credit Agreement or permitted thereunder).

## ARTICLE 5
### Certain Provisions Concerning Receivables

Section 5.1.    *Maintenance of Records*.  The Grantors shall keep and maintain at their own cost and expense complete records of each Receivable, in a manner consistent with prudent business practice, including records of all payments received, all credits granted thereon, all merchandise or inventory returned and all other documentation relating thereto. Subject to the Intercreditor Agreement, the Grantors shall, at the Grantors' sole cost and expense, upon the Administrative Agent's demand made at any time after the occurrence and during the continuance of any Event of Default, deliver all tangible evidence of Receivables, including all documents evidencing Receivables and any books and records relating thereto to the Administrative Agent or to its representatives (copies of which evidence and books and records may be retained by the Grantors). Subject to the Intercreditor Agreement and Section 7.02 of the Credit Agreement, upon the occurrence and during the continuance of any Event of Default, the Administrative Agent may transfer a full and complete copy of the Grantors' books, records, credit information, reports, memoranda and all other writings relating to the Receivables to and for the use by any person that has acquired or is contemplating acquisition of an interest in the Receivables or the Administrative Agent's security interest therein without the consent of any Grantor.

Section 5.2.    *Modification of Terms, etc*.  The Grantors shall not rescind or cancel any obligations evidenced by any Receivable or modify any term thereof or make any adjustment with respect thereto except in the ordinary course of business consistent with prudent business practice, or extend or renew any such obligations except in the ordinary course of business consistent with prudent business practice or compromise or settle any dispute, claim, suit or legal proceeding relating thereto or sell any Receivable or interest therein except in the ordinary course of business consistent with prudent business practice.

Section 5.3.    *Collection*.  The Grantors shall cause to be collected from the Account Debtor of each of the Receivables, as and when due in the ordinary course of business and consistent with prudent business practice (including Receivables that are delinquent, such Receivables to be collected in accordance with generally accepted commercial collection procedures), any and all amounts owing under or on account of such Receivable, and apply promptly upon receipt thereof all such amounts as are so collected to the outstanding balance of such Receivable, except that the Grantors may, with respect to a Receivable, allow in the ordinary course of business (i) a refund or

credit due as a result of returned or damaged or defective merchandise and (ii) such extensions of time to pay amounts due in respect of Receivables and such other modifications of payment terms or settlements in respect of Receivables as shall be commercially reasonable in the circumstances, all in accordance with the Grantors' ordinary course of business consistent with its collection practices as in effect from time to time. The costs and expenses (including attorneys' fees and disbursements) of collection, in any case, whether incurred by the Grantors, the Administrative Agent or any Secured Party, shall be paid by the Grantors.

## ARTICLE 6
### TRANSFERS

Section 6.1.    *Transfers of Pledged Collateral*.  Each Grantor shall not sell, convey, assign or otherwise dispose of, or grant any option with respect to, any of the Pledged Collateral pledged by it hereunder except to the extent expressly permitted by the Loan Documents.

## ARTICLE 7
### REMEDIES

Section 7.1.    *Remedies*.  (a) Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent shall, at the direction of the Controlling Lenders in accordance with Section 7.02 of the Credit Agreement, exercise in respect of the Pledged Collateral, in addition to the other rights and remedies provided for herein or otherwise available to it, the following remedies:

     (i)    Personally, or by agents or attorneys, immediately take possession of the Pledged Collateral or any part thereof, from the Grantors or any other person who then has possession of any part thereof with or without notice or process of law, and for that purpose may enter upon the Grantors' premises where any of the Pledged Collateral is located, remove such Pledged Collateral, remain present at such premises to receive copies of all communications and remittances relating to the Pledged Collateral and use such communications and remittances and any and all services, supplies, aids and other facilities of the Grantors in connection with such removal and possession;

     (ii)    Demand, sue for, collect or receive any money or property at any time payable or receivable in respect of the Pledged Collateral including instructing the obligor or obligors on any agreement, instrument or other obligation constituting part of the Pledged Collateral to make any payment required by the terms of such agreement, instrument or other obligation directly to the Administrative Agent, and in connection with any of the foregoing, compromise, settle, extend the time for payment and make other modifications with respect thereto; provided, however, that in the event that any such payments are made directly to the Grantors, prior to receipt by any such obligor of such instruction, the Grantors shall segregate all amounts received pursuant thereto in trust for the benefit of the Administrative Agent and shall promptly (but in no

22

event later than one (1) Business Day after receipt thereof) pay such amounts to the Administrative Agent;

(iii)    Sell, assign, grant a license to use or otherwise liquidate, or direct the Grantors to sell, assign, grant a license to use or otherwise liquidate, any and all investments made in whole or in part with the Pledged Collateral or any part thereof, and take possession of the proceeds of any such sale, assignment, license or liquidation;

(iv)    Take possession of the Pledged Collateral or any part thereof, by directing the Grantors in writing to deliver the same to the Administrative Agent at any place or places so designated by the Administrative Agent, in which event the Grantors shall at their own expense: (a) forthwith cause the same to be moved to the place or places designated by the Administrative Agent and therewith delivered to the Administrative Agent, (b) store and keep any Pledged Collateral so delivered to the Administrative Agent at such place or places pending further action by the Administrative Agent and (c) while the Pledged Collateral shall be so stored and kept, provide such security and maintenance services as shall be necessary to protect the same and to preserve and maintain them in good condition. The Grantors' obligation to deliver the Pledged Collateral as contemplated in this Section 7.1(iv) is of the essence hereof. Upon application to a court of equity having jurisdiction, the Administrative Agent shall be entitled to a decree requiring specific performance by the Grantors of such an obligation;

(v)    Withdraw all moneys, instruments, securities and other property in any bank, financial securities, deposit or other account of the Grantors constituting Pledged Collateral for application to the Obligations as provided in Article VIII hereof;

(vi)    Exercise any and all rights as beneficial and legal owner of the Pledged Collateral, including perfecting assignment of and exercising any and all other rights and powers with respect to any Pledged Collateral;

(vii)    Exercise all the rights and remedies of a secured party on default under the UCC, and the Administrative Agent may also, without notice except as specified in Section 7.2 hereof, sell, assign or grant a license to use the Pledged Collateral or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any of the Administrative Agent's offices or elsewhere, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as the Administrative Agent may deem commercially reasonable. If so directed by the Controlling Lenders pursuant to Section 7.02 of the Credit Agreement, the Administrative Agent or any other Secured Party or any of their respective Affiliates may be the purchaser, licensee, assignee or recipient of the Pledged Collateral or any part thereof at any such sale and the Administrative Agent shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Pledged Collateral sold, assigned or licensed at such sale, to use and apply any of the

Obligations owed to such person as a credit on account of the purchase price of the Pledged Collateral or any part thereof payable by such person at such sale. Each purchaser, assignee, licensee or recipient at any such sale shall acquire the property sold, assigned or licensed absolutely free from any claim or right on the part of the Grantors, and the Grantors hereby waive, to the fullest extent permitted by law, all rights of redemption, stay and/or appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Unless directed to do so by the Controlling Lenders pursuant to Section 7.02 of the Credit Agreement, the Administrative Agent shall not be obligated to make any sale of the Pledged Collateral or any part thereof regardless of notice of sale having been given. If directed to do so by the Controlling Lenders pursuant to Section 7.02 of the Credit Agreement, the Administrative Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. The Grantors hereby waive, to the fullest extent permitted by law, any claims against the Administrative Agent or any Lender arising by reason of the fact that the price at which the Pledged Collateral or any part thereof may have been sold, assigned or licensed at such a private sale was less than the price which might have been obtained at a public sale, even if the Administrative Agent accepts the first offer received and does not offer such Pledged Collateral to more than one offeree;

(viii)    if directed to do so by the Controlling Lenders pursuant to Section 7.02 of the Credit Agreement, the Administrative Agent shall require such Grantor to cause the Pledged Equity Interests to be transferred of record into the name of the Administrative Agent or its nominee (and the Administrative Agent agrees that if any of such Pledged Equity Interests is transferred into its name or the name of its nominee, the Administrative Agent will thereafter promptly give to such Grantor copies of any notices and communications received by it with respect to the Pledged Equity Interests);

(ix)    if directed to do so by the Controlling Lenders pursuant to Section 7.02 of the Credit Agreement, the Administrative Agent shall send to each bank, securities intermediary or issuer party to any Control Agreement a "**Notice of Exclusive Control**" as defined in and under such agreement or any other similar notice; and

(x)    if directed to do so by the Controlling Lenders pursuant to Section 7.02 of the Credit Agreement, exercise all other rights and remedies with respect to the Receivables and the other Pledged Collateral, including, without limitation, those set forth in Section 9- 607 of the UCC.

The Administrative Agent acknowledges that, in connection with any exercise of remedies pursuant to this Section 7.1, it is subject to all applicable Requirements of Law (including Environmental Laws).

(b)     Each Grantor hereby authorizes and instructs each Issuer of any Pledged Equity Interests pledged by such Grantor hereunder to (i) comply with any instruction received by it from the Administrative Agent in writing that (x) states that an Event of Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and each Grantor agrees that each Issuer shall be fully protected in so complying, and (ii) unless otherwise expressly permitted hereby, pay any dividends or other payments with respect to the Pledged Equity Interests directly to the Administrative Agent; provided that, the Administrative Agent shall not take any such action referred to in this clause (b) unless, subject to the Intercreditor Agreement, an Event of Default shall have occurred and be continuing and the Administrative Agent shall have been instructed to do so by the Controlling Lenders in accordance with Section 7.02 of the Credit Agreement.

Section 7.2.    *Notice of Sale*.  Each Grantor acknowledges and agrees that, to the extent notice of sale or other disposition of the Pledged Collateral or any part thereof shall be required by law, ten (10) days' prior notice to the Grantors of the time and place of any public sale or of the time after which any private sale or other intended disposition is to take place shall be commercially reasonable notification of such matters. No notification need be given to the Grantors if they have signed, after the occurrence and during the continuance of an Event of Default, a statement renouncing or modifying any right to notification of sale or other intended disposition.

Section 7.3.    *Waiver of Notice and Claims*.  Each of the Grantors hereby waives, to the fullest extent permitted by applicable law, notice or judicial hearing in connection with the Administrative Agent's taking possession or the Administrative Agent's disposition of the Pledged Collateral or any part thereof after the occurrence and during the continuance of an Event of Default, including any and all prior notice and hearing for any prejudgment remedy or remedies and any such right that such Grantor would otherwise have under law, and each of the Grantors hereby further waives, to the fullest extent permitted by applicable law, (i) all damages occasioned by such taking of possession, (ii) all other requirements as to the time, place and terms of sale or other requirements with respect to the enforcement of the Administrative Agent's rights hereunder and (iii) all rights of redemption, appraisal, valuation, stay, extension or moratorium now or hereafter in force under any applicable law. The Administrative Agent shall not be liable for any incorrect or improper payment made pursuant to this Article VII in the absence of gross negligence or willful misconduct on the part of the Administrative Agent. Any sale of, or the grant of options to purchase, or any other realization upon, any Pledged Collateral shall operate to divest all right, title, interest, claim and demand, either at law or in equity, of the Grantors therein and thereto, and shall be a perpetual bar both at law and in equity against the Grantors and against any and all persons claiming or attempting to claim the Pledged Collateral so sold, optioned or realized upon, or any part thereof, from, through or under the Grantors.

Section 7.4.    *Certain Sales of Pledged Collateral*.

(a)     Each of the Grantors recognizes that, by reason of certain prohibitions contained in law, rules, regulations or orders of any Governmental Authority, the

Administrative Agent may be compelled, with respect to any sale of all or any part of the Pledged Collateral, to limit purchasers to those who meet the requirements of such Governmental Authority. Each of the Grantors acknowledges that any such sales may be at prices and on terms less favorable to the Administrative Agent than those obtainable through a public sale without such restrictions, and, notwithstanding such circumstances, agrees that any such restricted sale shall be deemed to have been made in a commercially reasonable manner and that, except as may be required by applicable law, the Administrative Agent shall have no obligation to engage in public sales.

(b)     Each of the Grantors further agrees that a breach of any of the covenants contained in this Section 7.4 will cause irreparable injury to the Administrative Agent and the other Secured Parties, that the Administrative Agent and the other Secured Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 7.4 is specifically enforceable against the Grantors. Each of the Grantors agrees not to assert any defenses against an action for specific performance of such covenants, except for a defense that no Event of Default has occurred and is continuing, and any right to assert such other defenses is hereby waived by such Grantor. Each of the Grantors shall reimburse the Secured Parties upon demand for the costs and expenses (including reasonable attorneys' fees, transfer taxes and any other charges) incurred by the Secured Parties in connection with any sale, disposition, repair, replacement, alteration, addition, improvement or retention of any Pledged Collateral hereunder.

Section 7.5.    *No Waiver; Cumulative Remedies*.

(a)     No failure on the part of the Administrative Agent to exercise, no course of dealing with respect to, and no delay on the part of the Administrative Agent in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy; nor shall the Administrative Agent be required to look first to, enforce or exhaust any other security, collateral or guaranties. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law or otherwise available.

(b)     In the event that the Administrative Agent shall have instituted any proceeding to enforce any right, power, privilege or remedy under this Agreement or any other Loan Document by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason shall have been determined adversely to the Administrative Agent, then and in every such case, the Grantors, the Administrative Agent and each other Secured Party shall be restored to their respective former positions and rights hereunder with respect to the Pledged Collateral, and all rights, remedies, privileges and powers of the Administrative Agent and the other Secured Parties shall continue as if no such proceeding had been instituted.

(c)     This Agreement and the Liens on the Pledged Collateral shall be automatically reinstated if and to the extent that for any reason any payment by or on

behalf of the Grantors in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise. Each of the Grantors agrees that it will indemnify the Administrative Agent and the other Secured Parties, and its employees, directors, officers and agents on demand for all reasonable costs and expenses (including reasonable fees, costs and expenses of counsel) incurred by the Administrative Agent and the other Secured Parties or their respective its employees, directors, officers and agents in connection with such reinstatement, rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law.

Section 7.6.    *Deficiency*.  If the proceeds of, or other realization upon, the Pledged Collateral by virtue of the exercise of remedies under this Article VII are insufficient to cover the costs and expenses of such exercise and the payment in full of the Obligations, the Grantors shall remain liable for any deficiency.

## ARTICLE 8
### APPLICATION OF PROCEEDS

Section 8.1.    *Application of Proceeds*.  Subject to the Intercreditor Agreement, the proceeds received by the Administrative Agent in respect of any sale of, collection from or other realization upon all or any part of the Pledged Collateral pursuant to the exercise by the Administrative Agent of its remedies shall, subject to the terms of the Intercreditor Agreement, be applied, together with any other sums then held by the Administrative Agent pursuant to this Agreement, in payment of the Obligations in the order set out in Section 7.03 of the Credit Agreement.

## ARTICLE 9
### MISCELLANEOUS

Section 9.1.    *Concerning the Administrative Agent*.

(a)    The Administrative Agent has been appointed as administrative agent pursuant to the Credit Agreement. The actions of the Administrative Agent hereunder are subject to the provisions of the Credit Agreement. The Administrative Agent shall have the right hereunder to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking action (including the release or substitution of the Pledged Collateral), in accordance with this Agreement and the Credit Agreement. The Administrative Agent may employ agents and attorneys-in-fact in connection herewith and shall not be liable for the negligence or misconduct of any such agents or attorneys-in-fact selected by it with reasonable care. The Administrative Agent may resign and a successor Administrative Agent may be appointed in the manner provided in the Credit Agreement. Upon the acceptance of any appointment as the Administrative Agent by a successor Administrative Agent, that successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent under this Agreement, and the

retiring Administrative Agent shall thereupon be discharged from its duties and obligations under this Agreement. After any retiring Administrative Agent's resignation, the provisions hereof shall inure to its benefit as to any actions taken or omitted to be taken by it under this Agreement while it was the Administrative Agent.

(b)    The Administrative Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Pledged Collateral in its possession if such Pledged Collateral is accorded treatment substantially equivalent to that which the Administrative Agent, in its individual capacity, accords its own property consisting of similar property, instruments or interests, it being understood that neither the Administrative Agent nor any of the Secured Parties shall have responsibility for taking any necessary steps to preserve rights against any person with respect to any Pledged Collateral.

(c)    The Administrative Agent shall be entitled to rely upon any written notice, statement, certificate, order or other document or any telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person, and, with respect to all matters pertaining to this Agreement and its duties hereunder, upon advice of counsel selected by it.

(d)    If any item of Pledged Collateral also constitutes collateral granted to the Administrative Agent under any other deed of trust, mortgage, security agreement, pledge or instrument of any type, in the event of any conflict between the provisions hereof and the provisions of such other deed of trust, mortgage, security agreement, pledge or instrument of any type in respect of such collateral, the terms of this Agreement shall control.

Section 9.2.    *Administrative Agent May Perform; Administrative Agent Appointed Attorney-in-Fact*.  If any of the Grantors fail to perform any covenants contained in this Agreement and such failure results in an Event of Default that has occurred and is continuing, the Administrative Agent shall, at the direction of the Controlling Lenders in accordance with Section 7.02 of the Credit Agreement, do the same or cause it to be done or remedy any such breach, and may expend funds for such purpose; provided, however, that the Administrative Agent shall in no event be bound to inquire into the validity of any tax, Lien, imposition or other obligation that the Grantors fail to pay or perform as and when required hereby and that the Grantors do not contest in accordance with the provisions of the Credit Agreement. The Grantors shall pay any and all amounts so expended by the Administrative Agent in accordance with the provisions of Section 9.5 of the Credit Agreement. Neither the provisions of this Section 9.2 nor any action taken by the Administrative Agent pursuant to the provisions of this Section 9.2 shall prevent any such failure to observe any covenant contained in this Agreement nor any breach of representation or warranty from constituting an Event of Default. The Grantors hereby appoint the Administrative Agent their attorney-in-fact, with full power and authority in the place and stead of the Grantors and in the name of the Grantors, or otherwise, from time to time during the occurrence and continuance of an Event of Default, and the Administrative Agent shall, at the direction of the Consenting Lenders pursuant to Section 7.02 of the Credit Agreement, take any action and to execute any

instrument consistent with the terms of the Credit Agreement, this Agreement and the other Security Documents which the Administrative Agent may deem necessary or advisable to accomplish the purposes hereof, including, in the case of any Trademarks, execute and deliver, and have recorded, any and all agreements, instruments, documents and papers as the Administrative Agent may request to evidence the Administrative Agent's and the Lenders' security interest in such Trademarks and the goodwill and the general intangibles of such Grantor relating thereto or represented thereby (but the Administrative Agent shall not be obligated to and shall have no liability to the Grantors or any third party for failure to so do or take action). The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term hereof. The Grantors hereby ratify all that such attorney shall lawfully do or cause to be done by virtue hereof.

Section 9.3.    *Continuing Security Interest; Assignment*.  This Agreement shall create a continuing Lien on the Pledged Collateral and (i) shall be binding upon the Grantors, their respective successors and assigns and (ii) inures, together with the rights and remedies of the Administrative Agent hereunder, to the benefit of the Administrative Agent and the other Secured Parties and each of their respective successors, transferees and permitted assigns. No other persons (including any other creditor of the Grantors) have any interest herein or any right or benefit with respect hereto. Without limiting the generality of the foregoing clause (ii), any Secured Party may assign or otherwise transfer any indebtedness held by it secured by this Agreement to any other person, and such other person shall thereupon become vested with all the benefits in respect thereof granted to such Secured Party, herein or otherwise, subject however, to the provisions of the Credit Agreement.

Section 9.4.    *Termination; Release*.  When all the Obligations have been paid in full (other than those expressly stated to survive such payment in full), this Agreement shall terminate. Upon termination of this Agreement or upon any sale, transfer or other disposition of Pledged Collateral or any part thereof (other than to another Grantor) in a transaction or series of transactions not prohibited by the provisions of the Credit Agreement (including, without limitation, upon any Pledged Collateral becoming property of an Excluded Subsidiary or a Foreign Subsidiary), the Pledged Collateral, in the case of such termination, (or the applicable part thereof subject to such sale, transfer or disposition) shall automatically be released from the Lien of this Agreement and all rights to the Pledged Collateral shall revert to the Grantors. Upon such release or any such sale, transfer or disposition of Pledged Collateral or any part thereof, the Administrative Agent shall, upon the request and at the sole cost and expense of the Grantors, assign, transfer and deliver to the Grantors, against receipt and without recourse to or warranty by the Administrative Agent except as to the fact that the Administrative Agent has not encumbered the released assets, such of the Pledged Collateral or any part thereof to be released (in the case of a release) as may be in possession of the Administrative Agent and as have been sold or otherwise released pursuant to the terms hereof, and, with respect to any other released Pledged Collateral, proper documents and instruments (including UCC-3 termination financing statements or releases) acknowledging the termination hereof or the release of such Pledged Collateral, as the case may be.

Section 9.5.    *Modification in Writing*.  No amendment, modification, supplement, termination or waiver of or to any provision hereof, nor consent to any departure by the Grantors therefrom, shall be effective unless the same shall be made in accordance with the terms of the Credit Agreement and shall be in writing and signed by the Administrative Agent. Any amendment, modification or supplement of or to any provision hereof, any waiver of any provision hereof and any consent to any departure by the Grantors from the terms of any provision hereof in each case shall be effective only in the specific instance and for the specific purpose for which made or given. Except where notice is specifically required by this Agreement or any other document evidencing the Obligations, no notice to or demand on the Grantors in any case shall entitle the Grantors to any other or further notice or demand in similar or other circumstances.

Section 9.6.    *Notices*.  Unless otherwise provided herein or in the Credit Agreement, any notice or other communication herein required or permitted to be given shall be given in the manner and become effective as set forth in the Credit Agreement, as to the Grantors, addressed to it at the address of the Grantors set forth in the Credit Agreement and as to the Administrative Agent, addressed to it at the address set forth in the Credit Agreement, or in each case at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section 9.6.

Section 9.7.    *Governing Law, Consent to Jurisdiction and Service of Process; Waiver of Jury Trial*.  Sections 9.11, 9.12 and 9.16 of the Credit Agreement are incorporated herein, mutatis mutandis, as if set forth herein in their entirety.

Section 9.8.    *Severability of Provisions*.  Any provision hereof which is invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without invalidating the remaining provisions hereof or affecting the validity, legality or enforceability of such provision in any other jurisdiction.

Section 9.9.    *Execution in Counterparts*.  This Agreement and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same agreement. Delivery of a counterpart by electronic means shall be effective as manual delivery thereof.

Section 9.10.    *Business Days*.  In the event any time period or any date provided in this Agreement ends or falls on a day other than a Business Day, then such time period shall be deemed to end and such date shall be deemed to fall on the next succeeding Business Day, and performance herein may be made on such Business Day, with the same force and effect as if made on such other day.

Section 9.11.    *No Credit for Payment of Taxes or Imposition*.  No Grantor shall be entitled to any credit against the principal, premium, if any, or interest payable under the Credit Agreement, and no Grantor shall be entitled to any credit against any other

sums that may become payable under the terms thereof or hereof, by reason of the payment of any Tax on the Pledged Collateral or any part thereof.

Section 9.12. *No Claims Against Administrative Agent.*  Nothing contained in this Agreement constitutes any consent or request by the Administrative Agent, express or implied, for the performance of any labor or services or the furnishing of any materials or other property in respect of the Pledged Collateral or any part thereof, nor as giving the Grantors any right, power or authority to contract for or permit the performance of any labor or services or the furnishing of any materials or other property in such fashion as would permit the making of any claim against the Administrative Agent in respect thereof or any claim that any Lien based on the performance of such labor or services or the furnishing of any such materials or other property is prior to the Lien hereof.

Section 9.13. *No Release.*  Nothing set forth in this Agreement or any other Loan Document, nor the exercise by the Administrative Agent of any of the rights or remedies hereunder, shall relieve the Grantors from the performance of any term, covenant, condition or agreement on the Grantors' part to be performed or observed under or in respect of any of the Pledged Collateral or from any liability to any person under or in respect of any of the Pledged Collateral; or shall impose any obligation on the Administrative Agent or any other Secured Party to perform or observe any such term, covenant, condition or agreement on the Grantors' part to be so performed or observed; or shall impose any liability on the Administrative Agent or any other Secured Party for any act or omission on the part of the Grantors relating thereto or for any breach of any representation or warranty on the part of the Grantors contained in this Agreement, the Credit Agreement or the other Loan Documents, or under or in respect of the Pledged Collateral or made in connection herewith or therewith. Anything herein to the contrary notwithstanding, neither the Administrative Agent nor any other Secured Party shall have any obligation or liability under any contracts, agreements and other documents included in the Pledged Collateral by reason of this Agreement, nor shall the Administrative Agent or any other Secured Party be obligated to perform any of the obligations or duties of the Grantors thereunder or to take any action to collect or enforce any such contract, agreement or other document included in the Pledged Collateral hereunder. The obligations of the Grantors contained in this Section 9.13 shall survive the termination hereof and the discharge of the Grantors' other obligations under this Agreement, the Credit Agreement and the other Loan Documents.

Section 9.14. *Obligations Absolute.*  All obligations of the Grantors hereunder are absolute and unconditional irrespective of:

(i)    any lack of validity or enforceability of the Credit Agreement, any Specified Swap Agreement or any other Loan Document;

(ii)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any Specified Swap Agreement or any other Loan Document;

(iii)    any pledge, exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Obligations;

(iv)    any exercise, non-exercise or waiver of any right, remedy, power or privilege under or in respect hereof, the Credit Agreement, any Specified Swap Agreement or any other Loan Document except as specifically set forth in a waiver granted pursuant to the provisions of Section 9.5 hereof;

(v)    any other circumstances that might otherwise constitute a defense (other than the defense of payment) available to, or a discharge of, the Grantors; or any bankruptcy, insolvency, reorganization, arrangement, readjustment,

(vi)    composition, liquidation or the like of any Grantor.

Section 9.15.  *Reference to Certain Provisions of the Credit Agreement*. Notwithstanding anything herein to the contrary, the lien and security interest granted to the Administrative Agent, for the benefit of the Secured Parties, pursuant to this Agreement and the exercise of any right or remedy by the Administrative Agent and the other Secured Parties hereunder are subject to Sections 7.02 and 7.03 of the Credit Agreement. In the event of any conflict or inconsistency between such provisions of the Credit Agreement and this Agreement, such provisions of the Credit Agreement shall govern and control.

Section 9.16.  *Reference to Certain Provisions of the Intercreditor Agreement*. Reference is made to the Intercreditor Agreement dated as of August 7, 2018 (as amended, restated, amended and restated, supplemented, modified, extended, renewed, replaced, refinanced or restructured from time to time, the "Intercreditor Agreement"), by and among Cortland Capital Market Services LLC, as agent for the Term Loan Secured Parties (as defined therein), Merrill Lynch Commodities, Inc., as the Initial SOA Collateral Agent (as defined therein), ICBC Standard Bank PLC as the Successor SOA Collateral Agent (as defined therein), PES Holdings, LLC, a Delaware limited liability company, Philadelphia Energy Solutions Refining and Marketing LLC, a Delaware limited liability company, and each of the other Grantors (as defined therein) party thereto.  Notwithstanding anything herein to the contrary, the lien and security interest granted to the Administrative Agent, for the benefit of the Secured Parties, pursuant to this Agreement and the exercise of any right or remedy by the Administrative Agent and the other Secured Parties hereunder are subject to the provisions of the Intercreditor Agreement. In the event of any conflict or inconsistency between the provisions of the Intercreditor Agreement and this Agreement, the provisions of the Intercreditor Agreement shall control.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Grantors and the Administrative Agent have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first above written.

PES HOLDINGS, LLC, as Grantor

By: _____
Name: James T. Rens
Title:   Executive Vice President and
Chief Financial Officer

PHILADELPHIA ENERGY SOLUTIONS
REFINING AND MARKETING LLC, as
Grantor

By: _____
Name: James T. Rens
Title:   Executive Vice President and
Chief Financial Officer

PES ADMINISTRATIVE SERVICES, LLC,
as Grantor

By: _____
Name: James T. Rens
Title:   Executive Vice President and
Chief Financial Officer

NORTH YARD GP, LLC, as Grantor

By: _____
Name: James T. Rens
Title:   Executive Vice President and
Chief Financial Officer

NORTH YARD LOGISTICS, L.P., as
Grantor

By: _____
Name: James T. Rens
Title:   Executive Vice President and
Chief Financial Officer

CORTLAND CAPITAL MARKET
SERVICES LLC, as Administrative Agent

By: _____

Name:    Matthew Trybula
Title:    Associate Counsel

[*Signature Page to Pledge and Security Agreement*]

**EXHIBIT 1**

[Form of]

**JOINDER AGREEMENT**

[Name of New Grantor]
[Address of New Grantor]

[Date]

Ladies and Gentlemen:

Reference is made to the Pledge and Security Agreement, dated as of August 7, 2018 (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the provisions hereof, the "**Security Agreement**"), among PES HOLDINGS, LLC, a limited liability company organized under the laws of Delaware (the "**Borrower**"), as grantor, and the other Grantors party thereto (together with the Borrower and any successors in such capacity, the "**Grantors,**" and each a "**Grantor**"), in favor of CORTLAND CAPITAL MARKET SERVICES LLC, in its capacity as Administrative Agent under the Credit Agreement (as hereinafter defined), as grantee and secured party (in such capacities and together with any successors in such capacities, the "**Agent**"). Capitalized terms used but not otherwise defined herein have the meanings assigned to such terms in the Security Agreement.

This Joinder Agreement supplements the Security Agreement and is delivered by the undersigned, [ENTITY NAME], [ENTITY TYPE AND JURISDICTION] (the "**New Grantor**"), pursuant to Section 3.3 of the Security Agreement. The New Grantor hereby agrees to be bound as a Guarantor and as a Grantor party to the Security Agreement by all of the terms, covenants and conditions set forth in the Security Agreement to the same extent that it would have been bound if it had been a signatory to the Security Agreement on the date of the Security Agreement. Without limiting the generality of the foregoing, the New Grantor hereby grants and pledges to the Administrative Agent, as collateral security for the full, prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Obligations, a Lien on and security interest in, all of its right, title and interest in, to and under the Pledged Collateral and expressly assumes all obligations and liabilities of a Guarantor and Grantor thereunder. The New Grantor hereby makes each of the representations and warranties and agrees to each of the covenants applicable to the Grantor contained in the Security Agreement.

Annexed hereto as Annex A is the Perfection Certificated required to be delivered by the New Grantor pursuant to Section 3.3 of the Security Agreement.

Exhibit 1-1

This Joinder Agreement and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same agreement.

THIS JOINDER AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS JOINDER AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

[*Remainder of Page Intentionally Left Blank*]

Exhibit 1-2

IN WITNESS WHEREOF, the New Grantor has caused this Joinder Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

[NEW GRANTOR]

By: _____

       Name:

       Title:

AGREED TO AND ACCEPTED:

CORTLAND CAPITAL MARKET
SERVICES LLC, as Administrative Agent

By: _____

       Name:

       Title:

Exhibit 1-3

**Annex A to
Joinder Agreement**

**Perfection Certificate**

Attached.

Exhibit 1-4