# Exhibit I

*Execution Version*

## AGREEMENT ON THE EXERCISE OF REMEDIES

This AGREEMENT ON THE EXERCISE OF REMEDIES (this "Agreement"), dated as of July 3, 2019 (the "Effective Date"), is entered into by and among PES Holdings, LLC, as the Borrower (the "Borrower"), the subsidiaries of the Borrower that are parties hereto (the "Guarantors"), Cortland Capital Markets Services LLC, as Administrative Agent for the Lenders under the Credit Agreement described below (the "Administrative Agent"), and the Lenders that are parties hereto.

## PRELIMINARY STATEMENT

WHEREAS, the Lenders party hereto (the "Exercising Lenders") are parties to that certain Credit Agreement, dated as of August 7, 2018, as amended by the First Amendment and Incremental Joinder, dated as of February 11, 2019 (the "Credit Agreement"), among the Borrower, the financial institutions from time to time party thereto as Lenders and the Administrative Agent;

WHEREAS, the Exercising Lenders have determined to diligently pursue Enforcement Actions to enforce their rights and remedies against a substantial portion of the Collateral under the Credit Agreement with respect to the Specified Defaults (as hereinafter defined), and which Enforcement Actions include entry into this Agreement;

WHEREAS, the Loan Parties have requested that the Exercising Lenders limit their Enforcement Actions and their exercise of rights and remedies resulting from the Specified Defaults during the Agreement Period (as hereinafter defined), including with respect to any Collateral, as set forth herein;

WHEREAS, the Loan Parties hereby acknowledge and agree that, subject to the Intercreditor Agreement, (i) all property insurance proceeds that any Loan Party is or may be entitled to (including, without limitation, casualty and business interruption insurance proceeds but, for the avoidance of doubt, excluding directors' and officers' insurance and any other liability insurance directly payable to a third party pursuant to the terms of the applicable insurance policies) as a result of or in any manner related to the fire that occurred in the refinery operated by the Borrower and its Subsidiaries located in Philadelphia, Pennsylvania on or around June 21, 2019 (together with all events and occurrences related thereto, the "June 21 Incident" and such proceeds, the "Specified Insurance Proceeds") constitute Collateral securing the Obligations and (ii) the Secured Parties hold valid and perfected liens over any and all such Specified Insurance Proceeds; and

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties hereto hereby agree as follows:

## AGREEMENT

Section 1.    Definitions. Capitalized terms used herein but not defined herein shall have the meanings given to them in the Credit Agreement, and the rules of interpretation applicable to the Credit Agreement shall apply to this Agreement.

Section 2.    <u>Acknowledgement of Specified Defaults</u>. The Borrower acknowledges and agrees that certain Defaults and/or Events of Default have arisen or may arise on or prior to the Agreement Termination Date (as defined below) under Sections 2.09, 5.05(a), 7.01(a), 7.01(c) and 7.01(e) of the Credit Agreement as a result of (1) the failure of the Borrower to make interest payments on the Loans due on June 28, 2019 pursuant to Section 2.09 of the Credit Agreement, (2) the failure of PESRM to make its required (a) interest payments due on June 28, 2019 pursuant to Section 1(b) of the Additional Financing Agreement, (b) payments due on July 29, 2019 pursuant to Section 1(a) of the Sharing Agreement (as defined in the Additional Financing Agreement) and (c) payments under the Material Base Contracts (as defined in the Additional Financing Agreement) during the Agreement Period, (3) the failure to make required payments under the Supply Offtake Agreement and the NGL Installment Purchase Agreement during the Agreement Period, and (4) any Material Adverse Effect that may have occurred on or prior to any such payment dates. These potential Defaults or Events of Default (the "<u>Specified Defaults</u>") do, or will, constitute (i) an Event of Default, (ii) a Tranche B Specific Event of Default and (iii) a Dual Event of Default under the Credit Agreement

Section 3.    <u>Loan Parties and Exercising Lenders Agreements</u>.

(a)    <u>Loan Parties' Agreements</u>. In consideration for the Exercising Lenders' agreements specified herein, the Loan Parties hereby agree that (i) no later than 10 days after the Effective Date, the Borrower shall hire a reputable investment bank, financial advisor or other consultant (the "<u>Special Advisor</u>") to prepare a strategic analysis and a new business plan that will reflect the effects of the June 21 Incident on the business of the Borrower and its Subsidiaries; (ii) no later than 20 days after the Effective Date, the Borrower shall provide the Administrative Agent and the Lenders with a report developed in consultation with the Special Advisor of the steps the Loan Parties have taken and intend to take as a response to the June 21 Incident; (iii) no later than 7 Business Days after the Effective Date (as defined below), the Borrower shall provide the Administrative Agent and the Lenders with a detailed report summarizing the Borrower's insurance coverage that may be relevant to the June 21 Incident and its results; (iv) the Loan Parties shall have used commercially reasonable efforts to establish, by no later than July 10, 2019, a segregated account under the sole control of the Administrative Agent pursuant to a deposit account control agreement acceptable to the Administrative Agent (the "<u>Insurance Account</u>") and, by no later than July 10, 2019, shall use commercially reasonable efforts to direct all insurance carriers to pay all Specified Insurance Proceeds into such Insurance Account; (v) on an ongoing basis, the Borrower shall and shall cause its advisors to promptly comply with all reasonable requests for information from the Exercising Lenders and their advisors and counsel related to the business of the Borrower and its Subsidiaries; (vi) the Borrower and its Subsidiaries shall not make any Restricted Payments except for Restricted Payments permitted under Sections 6.05(a), (c), (k), (l) and (n) of the Credit Agreement; (vii) without the consent of the Controlling Lenders, the Borrower and its Subsidiaries shall not make any modifications to any employment, severance or compensation arrangements with their respective executive officers (or make any payments with respect to such executive officers, other than to the extent then due and payable pursuant to the terms of the applicable arrangements as in effect on the Effective Date), in each case that are not favorable to the Borrower and its Subsidiaries; (viii) notwithstanding anything to the contrary in the Credit Agreement or any other Loan Document, the Specified Insurance Proceeds will only be spent or reinvested in a manner that is acceptable to the Controlling Lenders; and (ix) by 5:00 pm New

York City time on each Thursday (unless such day is not a Business Day, in which case, then by 5:00 pm New York City time on the next succeeding Business Day) commencing on July 11, 2019, the Borrower shall provide the Administrative Agent and the Lenders with a report detailing the cash balances and liquidity of the Borrower and its Subsidiaries with respect to the most recently ended seven day period.

(b)     Exercising Lenders Agreements. At the request of the Borrower, while the Exercising Lenders are diligently pursuing Enforcement Actions, including under this Agreement, in consideration for the Loan Parties' agreements detailed in Section 3(a) hereof and reliance upon the representations, warranties and covenants of the Loan Parties contained in this Agreement, and upon the terms and subject to the conditions of this Agreement, each of the Exercising Lenders hereby agrees that, during the Agreement Period (as defined below), it shall not, and shall not request the Administrative Agent to, and hereby directs the Administrative Agent not to, (i) declare the unpaid principal amount of outstanding Loans, interest accrued and unpaid thereon, or any other amounts due or payable under the Credit Agreement or under any other Loan Document as a result of Specified Defaults or (ii) exercise on behalf of itself and the Exercising Lenders (or any other lender) any additional rights and remedies, other than as provided under this Agreement, available to it or them as a result of the Specified Defaults, whether arising at law, in equity, by contract or otherwise (including, without limitation, those rights and remedies arising under the Credit Agreement (which, for the avoidance of doubt, shall include any Enforcement Action permitted thereunder and not detailed in this Agreement) and the other Loan Documents).   The Borrower acknowledges and agrees that the agreements detailed in this Section 3(b) are limited to the extent specifically set forth above and no other terms, covenants or provisions of the Credit Agreement or any other Loan Document are intended pursuant to this Section 3 to (or shall) be affected hereby, all of which remain in full force and effect unaffected hereby.  By their delivery of an executed copy of this Agreement to the Administrative Agent, the Exercising Lenders (who constitute the Controlling Lenders under the Credit Agreement) hereby direct the Administrative Agent during the Agreement Period to enter into this Agreement and take the actions contemplated hereby and reasonably incidental thereto and forbear from taking any of the actions specified in clauses (i) and (ii) of the first sentence of this Section 3(b).  By its delivery of an executed copy of this Agreement, the Administrative Agent agrees to act or forbear from acting as so directed by the Exercising Lenders notwithstanding any contrary instruction it may receive from any other Lender(s) (other than the Controlling Lenders).

For purposes hereof, the "Agreement Period" shall mean the period beginning on the Effective Date and terminating on 11:59 pm New York City time on the date that is 21 days after the Effective Date (the "Agreement Termination Date").

(c)     Termination of Exercising Lenders Agreements.    The Borrower acknowledges and agrees that upon the earliest to occur of:

(i)     the occurrence and continuation of any Event of Default that is not a Specified Default;

(ii)     a breach by the Borrower or any other Loan Party of any covenant or provision of this Agreement;

3

(iii)    any representation or warranty contained in this Agreement shall be incorrect in any material respect as of the date hereof;

(iv)    an agreement is reached regarding an in-court or out-of-court restructuring or recapitalization transaction involving the Borrower or any Subsidiary, without the prior written consent of the Exercising Lenders;

(v)    any payment of principal or interest on any Indebtedness for borrowed money of the Borrower or any Subsidiary (other than under the Supply and Offtake Documents);

(vi)    the Borrower shall make any Restricted Payment described in Section 6.05(l) of the Credit Agreement; and

(vii)    the Agreement Termination Date,

(each, an "Agreement Termination Event"), the provisions of Section 3(b) shall automatically and immediately terminate without any further action by, or notice being due from, any Lender, and the Exercising Lenders party hereto may proceed (but are not required), to the extent an Event of Default is then continuing, to exercise any and all rights and remedies which such Exercising Lenders may have upon the occurrence of an Event of Default to the extent an Event of Default is then continuing, including, if an Event of Default is then continuing, declaring the Obligations to be immediately due and payable in accordance with the Credit Agreement.

Section 4.    Conditions to Effective Date.    This Agreement shall become effective as of the Effective Date when, the Borrower shall have paid in full (to the extent invoiced at least one Business Day in advance), (i) all reasonable fees and expenses of the Administrative Agent and its affiliates required to be paid or reimbursed at or prior to the Effective Date and (ii) all reasonable fees and expenses of Davis Polk & Wardwell LLP in connection with the Loan Documents and this Agreement.

Section 5.    Representations and Warranties.    Each of the Loan Parties signatory hereto hereby represents and warrants to the Exercising Lenders that as of the date hereof:

(a)    the execution, delivery and performance by each Loan Party of this Agreement (i) are within such Loan Party's corporate or other powers and have been duly authorized by all necessary corporate or other organizational action and, if required, stockholder, shareholder or other equity-holder action, and (ii) do not (A) contravene the terms of any of such Loan Party's Organizational Documents, (B) conflict with or result in any breach or contravention of or default under, or the creation of any Lien under, or require any payment to be made under any material Contractual Obligation to which such Loan Party is a party or affecting such Loan Party or the properties of such Loan Party or any of its Subsidiaries; or (C) violate any Requirement of Law or any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Loan Party or its property is subject;

(b)    no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement, other than the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect prior to the Effective Date or being obtained in connection herewith;

(c)    the representations and warranties of each Loan Party set forth in Article 3 of the Credit Agreement (other than Sections 3.04(b), 3.05(a), 3.05(b), 3.08(c) (with respect to the Specified Defaults), 3.08(e), 3.15 and 3.17 thereof) and in each other Loan Document is true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct in all respects as so qualified) on and as of the date hereof with the same effect as though made on and as of the date hereof, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; and

(d)    no Default or Event of Default has occurred and is continuing other than the Specified Defaults.

Section 6.    <u>Notice of Default.</u> The Borrower shall provide notice to the Administrative Agent and the Exercising Lenders as soon as possible but in any event within two Business Days of obtaining knowledge of the occurrence any Agreement Termination Event, which notice shall state that such event occurred and set forth, in reasonable detail, the facts and circumstances that gave rise to such event. Such notice shall be delivered by electronic mail to:

Administrative Agent:
Cortland Capital Market Services LLC
225 W Washington Street, 9th Floor
Chicago, IL 60606
Attn:  Kaleigh Rowe and Legal Department
Email:  CPCAgency@cortlandglobal.com and legal@cortlandglobal.com

Exercising Lenders:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn:  Damian Schaible (damian.schaible@davispolk.com) and Christian Fischer (Christian.fischer@davispolk.com)

All notices given in accordance with the provisions of this <u>Section 7</u> shall be deemed to have been given on the date of receipt.

Section 7.    **<u>Governing Law.</u>  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE**

**STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.** The provisions of Sections 9.11 and 9.12 of the Credit Agreement shall apply to this Agreement *mutatis mutandis*.

Section 8.    Headings. The headings contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto, except when used to reference a section. Any reference to the number of a clause, subclause or subsection of any Loan Document immediately followed by a reference in parenthesis to the heading of such Loan Document containing such clause, subclause or subsection is a reference to such clause, subclause or subsection and not to the entire section; *provided, however,* that, in case of direct conflict between the reference to the heading and the reference to the number of such section, the reference to the heading shall govern absent manifest error. If any reference to the number of a section (but not to any clause, subclause or subsection thereof) of any Loan Document is followed immediately by a reference in parenthesis to the heading of any Loan Document, the heading reference shall govern in case of direct conflict absent manifest error.

Section 9.    Severability. The fact that any term or provision of this Agreement is held invalid, illegal or unenforceable as to any person in any situation in any jurisdiction shall not affect the validity, enforceability or legality of the remaining terms or provisions hereof or the validity, enforceability or legality of such offending term or provision in any other situation or jurisdiction or as applied to any person.

Section 10.    Counterparts; Electronic Execution. This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are attached to the same document. Delivery of an executed counterpart by telecopy, PDF or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 11.    No Waiver. Except for and to the extent of the agreements provided in Section 3(b) of this Agreement, the execution, delivery and effectiveness of this Agreement shall not operate as a waiver of any default, Default or Event of Default under the Credit Agreement or any right, power or remedy of the Lenders under the Credit Agreement. The parties hereto reserve the right to exercise any rights and remedies available to them in connection with any present or future breaches or defaults with respect to the Credit Agreement after the Agreement Termination Date. This Agreement shall serve as notice of the Specified Defaults and the June 21 Incident pursuant to Section 5.07(a) and Section 5.07(e) of the Credit Agreement and the Lenders party hereto hereby acknowledge that such notice requirements have been satisfied.

Section 12.    Successors and Assigns. This Agreement shall be binding upon the Exercising Lenders and their successors and permitted assigns and shall inure, together with all rights and remedies of the Exercising Lenders party hereto, to the benefit of the Exercising Lenders party hereto and their respective successors, transferees and assigns.

Section 13.    <u>Entire Agreement</u>.  THIS  AGREEMENT,  THE  CREDIT AGREEMENT (INCLUDING ALL AMENDMENTS, EXHIBITS AND SCHEDULES THERETO) AND THE SECURITY INSTRUMENTS CONSTITUTE THE ENTIRE CONTRACT AMONG THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND SUPERSEDE ANY AND ALL PREVIOUS AGREEMENTS AND UNDERSTANDINGS, ORAL OR WRITTEN, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

Section 14.    <u>Expenses of Advisors</u>.    The Loan Parties hereby expressly acknowledge and agree that the fees, expenses and disbursements of Norton Rose Fulbright US LLP as legal counsel to the Administrative Agent, Davis Polk & Wardwell LLP as legal counsel to the Exercising Lenders and one financial advisor or other consultant to the Exercising Lenders are covered by the reimbursement provisions set forth in Section 9.05 of the Credit Agreement and constitute Obligations and the Loan Parties hereby agree to pay all such fees, expenses and disbursements of the foregoing advisors promptly upon demand.

Section 15.    <u>Miscellaneous</u>.    This Agreement is a Loan Document.   The Borrower and Guarantors expressly reaffirm their obligations under the Loan Documents and agree that except as specifically agreed herein, the terms of the Loan Documents are hereby ratified and confirmed and remain in full force and effect according to their respective terms, and constitute the legal, valid and binding obligations of each of the Borrower and the Guarantors, enforceable against such parties in accordance with their terms.

*[Signature Pages Follow on Next Page]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective duly authorized officers as of the date first written above.

BORROWER:

**PES HOLDINGS, LLC**

By: _____
Name: Rachel Celiberti
Title:  Chief Financial Officer

GUARANTORS:

**PHILADELPHIA ENERGY SOLUTIONS REFINING AND MARKETING LLC,**

By: _____
Name: Rachel Celiberti
Title:  Chief Financial Officer

**PES ADMINISTRATIVE SERVICES, LLC**

By: _____
Name: Rachel Celiberti
Title:  Chief Financial Officer

**NORTH YARD LOGISTICS, L.P.**

By:    North Yard GP, LLC,
       its general partner

By: _____
Name: Rachel Celiberti
Title:  Chief Financial Officer

[PES - Exercise of Rights Agreement]

**NORTH YARD GP, LLC**

By: _____
Name:  Rachel Celiberti
Title:   Chief Financial Officer

ADMINISTRATIVE AGENT:

**CORTLAND CAPITAL MARKETS SERVICES LLC**

By: _____

Name:    Matthew Trybula

Title:    Associate Counsel

████████████████

as a Lender
████████████████████

By: _____
Name: ████████
Title: ██████

████████████████████

as a Lender
████████████████████

By: _____
Name: ████████
Title: ██████

███████████████████, as a Lender

By: ████████ _____
Name: ██████████████
Title: ████

[PES - Exercise of Rights Agreement]



as a Lender

By:
Name:
Title:

[PES - Exercise of Rights Agreement]





, as a Lender

By:
Name:
Title:

[PES - Exercise of Rights Agreement]



as a Lender

By: 
Nam
Title:

[PES - Exercise of Rights Agreement]