**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| PES HOLDINGS, LLC, *et al.*, | Case No. 19-11626 (KG) |
| Debtors.[1] | (Jointly Administered) |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PES, INC., | |
| Intervenor-Defendant and Counterclaim and Cross-Claim Plaintiff, | |
| v. | |
| PES HOLDINGS, LLC, *et al.*, and CORTLAND CAPITAL MARKET SERVICES, LLC, | Adv. Pro. No. 19-50282-KG |
| Plaintiffs and Counterclaim Defendants, | |
| and | |
| ICBC STANDARD BANK PLC, | |
| Defendant and Cross-Claim Defendant. | |

## ANSWER AND COUNTERCLAIM AND CROSS-CLAIM

Intervenor-Defendant and Counterclaim and Cross-Claim Plaintiff, the Official

Committee of Unsecured Creditors (the "Committee"), duly appointed in the above-captioned

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's taxpayer identification number are as follows: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574).  The Debtors' service address is: 1735 Market Street, Philadelphia, Pennsylvania 19103.

chapter 11 cases (the "Chapter 11 Cases") of PES Holdings, LLC ("PES") and the affiliated debtors (collectively, the "Debtors"), by and through undersigned counsel, hereby answers the complaint (the "Underlying Complaint") filed by PES and Cortland Capital Market Services, LLC ("Cortland"), and files this counterclaim against Cortland and cross-claim against ICBC Standard Bank PLC ("ICBCS" and, together with Cortland, the "Counterclaim and Cross-Claim Defendants"), as follows:

### ANSWER

The Committee does not respond to the headers used in the Underlying Complaint.  The use in this Answer of the headers used in the Underlying Complaint is done solely for convenience, and in no way constitutes an admission of any allegation contained in such headers.  With respect to each of the numbered paragraphs of the Underlying Complaint, the Committee answers as follows.  The Committee denies any and all allegations that are not expressly admitted.

### NATURE OF THE ACTION

1.      Paragraph 1 consists of characterizations that are not factual allegations, such that no response is required.  To the extent that any response is required, the Committee lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 1 and therefore denies them.

2.      Paragraph 2 consists of characterizations that are not factual allegations, such that no response is required.  To the extent that paragraph 2 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

3.      Paragraph 3 consists of characterizations that are not factual allegations, such that no response is required.   To the extent that paragraph 3 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

4.      Paragraph 4 consists of characterizations that are not factual allegations, such that no response is required.   To the extent that paragraph 4 purports to quote, paraphrase, or characterize a document, the document speaks for itself.    To the extent that any further response is required, the Committee lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in paragraph 4 and therefore denies them.

## JURISDICTION AND VENUE

5.      Admitted.

6.      Admitted.

7.      Admitted.

8.      Admitted.

9.      Paragraph 9 consists of PES and Cortland's consent to entry of final orders or judgment by this Court, and therefore no response is required.

10.      Admitted.

11.      Admitted.

## THE PARTIES

12.      Admitted.

13.      Admitted.

14.      Admitted.

15.      Admitted.

## FACTUAL BACKGROUND

16.     Admitted.

17.     Admitted.

18.     Admitted.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     Admitted.

26.     Admitted.

27.     Admitted.

28.     Admitted.

29.     Admitted.

30.     The Committee lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 30 and therefore denies them.

31.     The Committee admits that certain of the Debtors filed petitions for relief under the Bankruptcy Code on January 21, 2018.  The Committee lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in paragraph 31 and therefore denies them.

32.    The Committee admits that certain of the Debtors emerged from bankruptcy on August 7, 2018.  The Committee lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegations in paragraph 32 and therefore denies them.

33.    The Committee lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 33 and therefore denies them.

34.    Admitted.

35.    Admitted.

36.    The Committee lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 36 and therefore denies them.

37.    The Committee lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 37 and therefore denies them.

38.    The Committee lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 38 and therefore denies them.

39.    Admitted.

40.    Paragraph 40 does not contain any factual allegations requiring a response.

41.    Admitted.

42.    To the extent that paragraph 42 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

43.    The Committee lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 43 and therefore denies them.

44.    Admitted.

45.    To the extent that paragraph 45 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

46.    To the extent that paragraph 46 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

47.    To the extent that paragraph 47 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

48.    To the extent that paragraph 48 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

49.    To the extent that paragraph 49 purports to quote, paraphrase, or characterize a document, the document speaks for itself.  Further answering, by its terms, the Term Loan Agent Certificate is not a contract and creates no contractual rights.

50.    To the extent that paragraph 50 purports to quote, paraphrase, or characterize a document, the document speaks for itself.  Further answering, by its terms, the Term Loan Agent Certificate is not a contract and creates no contractual rights.

51.    To the extent that paragraph 51 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

52.    To the extent that paragraph 52 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

53.    To the extent that paragraph 53 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

54.    To the extent that paragraph 54 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

55.    To the extent that paragraph 55 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

56.     To the extent that paragraph 56 purports to quote, paraphrase, or characterize a document, the document speaks for itself.  Further answering, by its terms, the ICBCS Certificate is not a contract and creates no contractual rights.

57.     To the extent that paragraph 57 purports to quote, paraphrase, or characterize a document, the document speaks for itself.  Further answering, by its terms, the ICBCS Certificate is not a contract and creates no contractual rights.

58.     Admitted.

59.     Admitted.

60.     Admitted.

61.     Admitted.

62.     To the extent that paragraph 62 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

63.     To the extent that paragraph 63 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

64.     To the extent that paragraph 64 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

65.     To the extent that paragraph 65 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

66.     To the extent that paragraph 66 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

67.     To the extent that paragraph 67 purports to quote, paraphrase, or characterize a document, the document speaks for itself.  Further answering, to the extent that paragraph 67 alleges or implies that either Cortland or ICBCS have a perfected security interest in the Policy

or the proceeds thereof, the Committee denies any such allegations or implications, as set forth in the Counterclaim and Cross-Claim (as defined below).  Neither Cortland nor ICBS can obtain a perfected security interest in Debtors after acquired property which is what any business interruption payment would constitute under the facts and circumstances of this case. Moreover, in order for any party to have a perfected interest, the Policy, in its express terms or in an endorsement, must specifically identify such party as a loss payee, mortgagee, or additional insured.

68.     To the extent that paragraph 68 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

69.     Denied.

70.     To the extent that paragraph 70 purports to quote, paraphrase, or characterize a document, the document speaks for itself.  Further answering, the Term Loan Facility Forbearance Agreement does not create any rights under the Policy and is legally irrelevant to the relative priority of the Debtors' collateral and to the question of whether or not Cortland or ICBCS have perfected liens in the Policy.

71.     To the extent that paragraph 71 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

72.     To the extent that paragraph 72 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

73.     To the extent that paragraph 73 purports to quote, paraphrase, or characterize a document, the document speaks for itself.  The Committee denies that the Policy grants Cortland any interests in the insurance proceeds owed to the Insureds.  The Committee admits that the Intercreditor Agreement governs the priority of competing interests between Cortland and

ICBCS.  The remainder of the allegations in paragraph 73 are legal conclusions such that no response is required.

74.    To the extent that paragraph 74 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

75.    To the extent that paragraph 75 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

76.    To the extent that paragraph 76 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

77.    To the extent that paragraph 77 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

78.    To the extent that paragraph 78 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

79.    To the extent that paragraph 79 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

80.    To the extent that paragraph 80 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

81.    To the extent that paragraph 81 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

82.    To the extent that paragraph 82 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

83.    To the extent that paragraph 83 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

84.    To the extent that paragraph 84 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

85.    To the extent that paragraph 85 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

86.    To the extent that paragraph 86 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

87.    To the extent that paragraph 87 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

88.    To the extent that paragraph 88 purports to quote, paraphrase, or characterize a document, the document speaks for itself.  Further answering, the Committee admits that the business interruption proceeds constitute Term Loan Priority Collateral under the Intercreditor Agreement, but denies that the Term Loan Agent has a valid, duly perfected lien on the business interruption proceeds.

89.    Paragraph 89 does not contain factual allegations, and no response is required.  To the extent a response is required, the Committee denies the allegations.

90.    Admitted.

91.    To the extent that paragraph 91 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

92.    To the extent that paragraph 92 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

93.    To the extent that paragraph 93 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

94.    Paragraph 94 does not contain factual allegations, and no response is required.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

95.    The Committee repeats, realleges, and incorporates by reference each of the foregoing responses as if fully set forth herein.

96.    Admitted.

97.    Denied.

98.    To the extent that paragraph 98 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

99.    To the extent that paragraph 99 purports to quote, paraphrase, or characterize a document, the document speaks for itself.

100.    Denied.  Further answering, neither the Term Loan Lenders nor ICBCS has a right to the June 21 Insurance Proceeds.

101.    Paragraph 101 is a prayer for relief and does not contain factual allegations, such that no response is required.

## PRAYER FOR RELIEF

The Committee denies that Plaintiff is entitled to any of the relief sought in the Underlying Complaint.  Upon resolution of the Counterclaim and Cross-Claim, the Committee requests that the Court award the relief set forth in that Counterclaim and Cross-Claim and any other relief the Court deems just and appropriate.

---

## COUNTERCLAIM AND CROSS-CLAIM

## NATURE OF THE ACTION

1.    The Debtors and Cortland have instituted this adversary proceeding against ICBCS to resolve the respective priorities of their respective purported liens over potential future

recoveries for any losses covered by the Debtors' business interruption insurance policy ("BI Recoveries").   The Underlying Complaint (as defined herein) is focused on Cortland's and ICBCS's respective rights under the Intercreditor Agreement, and glosses over the key threshold issue—neither Cortland nor ICBCS has a valid, duly perfected, non-avoidable lien on the BI Recoveries in the first place.

2.      First, because such BI Recoveries would constitute property acquired by the Debtors after the commencement of these cases and would be payable in respect to projected revenues and profits which would have been generated beginning one month after the commencement of these cases, such proceeds would not be subject to the prepetition security interests of ICBCS and Cortland pursuant to Section 552 of the Bankruptcy Code.   Nor would they constitute proceeds of any prepetition assets in respect to which Cortland or ICBCS had a perfected lien as of the Petition Date (as defined below).   Accordingly, any BI Recoveries received by the Debtors will come into the Debtors' estates as wholly unencumbered assets.

3.      Second, separate and apart from the BI Recoveries being after-acquired property under Section 552, Cortland never obtained a valid, duly perfected lien or other interest on the Policy (as defined below) or BI Recoveries prior to the Petition Date.   In the Underlying Complaint, the Debtors and Cortland allege that Cortland is named as a loss payee in an insurance certificate.   Despite these allegations, an insurance certificate, by its very terms, is not a contract which can be relied upon to perfect or otherwise obtain a legally enforceable interest in an insurance policy; it is an informational document only.   Under applicable New York law, in order to obtain or perfect a security interest in an insurance policy, Cortland would have had to be expressly named as a loss payee in the policy itself or an endorsement thereto.   It was not.

Thus, any such lien which Cortland purports to have is avoidable pursuant to Sections 544 (a)(1) and (2) of the Bankruptcy Code .

4.      Third, although not raised in the Underlying Complaint, as a result of its failure to be named as a loss payee, Cortland also lacks a perfected security interest in any property damage recovery received under the Policy in respect to the Alkylation Unit (as defined below) (the "Real Property Recoveries").  To the extent that Cortland could argue that it has an entitlement to the Real Property Recoveries on account of its mortgage on the Alkylation Unit, its liens on the Real Property Recoveries would still be avoidable under Sections 544(a)(1) and (2) because they would be subject to a judicial lien or execution under applicable state law.

5.      Finally, pursuant to Section 551 of the Bankruptcy Code, as a result of the avoidance of Cortland's unperfected lien on BI Recoveries and Real Property Recoveries and the estates' status as a successor to Cortland in respect to such avoided and preserved lien under the Intercreditor Agreement (as defined below), the Debtors' estates are entitled to step into the shoes of Cortland and preserve its first-priority lien on the BI Recoveries and Real Property Recoveries for the benefit  of the estates as, for the reasons cited by the Debtors and Cortland in the Underlying Complaint, under applicable law and the terms of the Intercreditor Agreement, such recoveries constitute Term Loan Priority Collateral.

**JURISDICTION AND VENUE**

6.      This is an action in intervention in the above-captioned suit as commenced by the complaint filed by the Debtors and Cortland on August 7, 2019 [D.I. 1] (the "Underlying Complaint").  The Underlying Complaint arises under Federal Rules of Bankruptcy Procedure 7001(2) and (9) and 28 U.S.C. § 2201 as an action for declaratory judgment regarding the

respective priorities of Cortland and ICBCS to certain prospective insurance proceeds for business interruption losses.

7.      This Court had and has subject matter jurisdiction over the Underlying Complaint pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This counterclaim and cross-claim (the "Counterclaim and Cross-Claim") is submitted pursuant to a stipulation and order [D.I. 23] (the "Stipulation and Order") by and among the Committee, the Debtors, and the Intervenor- Defendants dated as of September 10, 2019 and entered as an order of this Court on September 11, 2019.

9.      The Committee has standing to intervene and pursue the Counterclaim and Cross-Claim pursuant to the Stipulation and Order.

10.     This Court had and has personal jurisdiction over the Debtors, Cortland, and ICBCS under Federal Rule of Bankruptcy Procedure 7004(f).

11.     In the alternative, this Court had and has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 157(c)(1).  The Committee's claims are directly related to the Debtors' bankruptcy cases and will have significant impact on the Debtors' estates.

12.     Pursuant to Bankruptcy Rule 7008(a), the Committee consents to the entry of final orders or judgment by this Court.  The Committee also consents to the entry of final orders or judgments by this Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

13.     This Counterclaim and Cross-Claim comprises an action and claims arising under Sections 544, 551, and 552 of the Bankruptcy Code.

14.     The Court has jurisdiction over this proceeding under 28 U.S.C. §§ 157 and 1334 because this is a civil proceeding arising under the Bankruptcy Code.

15.     This proceeding constitutes a "core" proceeding under 28 U.S.C. § 157(b).

16.     Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

17.     On August 1, 2019, the United States Trustee appointed the Committee in the Debtors' bankruptcy cases pursuant to Section 1102(a)(1) of the Bankruptcy Code.    The Committee is comprised of the following members: (i) Baker Hughes, a GE company LLC; (ii) CSX Transportation, Inc.; (iii) Fisher Tank Company; (iv) JJ White, Inc.; (v) OSG Bulk Ships Inc.; (vi) Trinity Industries Leasing Company; and (vii) United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union.    The Committee members hold unsecured claims against the Debtors' estates arising from the provision of services and/or the sale of goods on credit.

18.     Debtor PES is a limited liability company organized under the laws of the State of Delaware with its headquarters in the Commonwealth of Pennsylvania.    All other Debtors are privately held limited liability companies and limited partnerships that are parents and subsidiaries of PES, and are organized under the laws of the State of Delaware with their headquarters in the Commonwealth of Pennsylvania.

19.     Cortland is a limited liability company organized under the laws of the State of Delaware with its headquarters in the State of Illinois.    Cortland is the administrative agent for the Term Loan Lenders subject to the Term Loan Credit Agreement, as defined below.

20.     ICBCS is organized under the laws of England and Wales with its headquarters in London, England.

# FACTUAL BACKGROUND[2]

## I.    Events Leading to the Current Chapter 11 Cases

21.    The Debtors' principal asset is a refining complex (the "Refining Complex") located on an approximately 1,300 acre industrial site 2.5 miles from downtown Philadelphia. The Refining Complex includes two interconnected refineries: Girard Point and Point Breeze.

22.    The Refining Complex produced a full range of transportation fuels, such as gasoline and ultra-low sulfur diesel, as well as other refined products.  When fully operational, the Refining Complex had a distillation and refining capacity of approximately 335,000 barrels of crude oil per day.

23.    On June 21, 2019, there was a large-scale, catastrophic explosion of the 433 alkylation unit (the "Alkylation Unit") of the Girard Point refining facility (the "Girard Point Explosion").  The Girard Point Explosion left the Alkylation Unit destroyed and severely damaged surrounding fixtures and structures, rendering the Girard Point refinery currently inoperable.

24.    Following the Girard Point Explosion, the Debtors announced that they would cease operating the Refining Complex after the run-off through the Point Breeze refinery of the limited inventory of crude oil on hand.

25.    These circumstances necessitated the filing by the Debtors of the Chapter 11 voluntary bankruptcy petitions in the current proceedings on July 21, 2019 (the "Petition Date").

---

[2]    To the extent the factual allegations set forth in the Underlying Complaint are relevant to this Counterclaim and Cross-Claim and not otherwise contained herein, this Counterclaim and Cross-Claim incorporates by reference those factual allegations pursuant to Federal Rule of Civil Procedure 10(c) (as incorporated by Federal Rule of Bankruptcy Procedure 7010).  Terms used but not otherwise defined herein shall have the meaning ascribed to them in the Underlying Complaint.

## II.    **PES' Funded Debt**

26.    The Debtors had two main funded debt facilities: a term loan facility (the "Term Loan Facility") governed by a credit agreement dated August 7, 2018 (as amended, the "Term Loan Credit Agreement"), between PES and Cortland as administrative agent, with approximately $698.6 million outstanding, and an intermediation facility (the "Intermediation Facility") governed by an intermediation agreement dated June 18, 2019 (the "Intermediation Agreement"), between certain of the Debtors and ICBCS. Although ICBCS has not quantified its claim under the Intermediation Facility, it asserted early on in this case, that the gross amount outstanding under the Intermediation Facility totaled approximately $300 million. The actual amount of ICBCS's allowed claim remains to be determined, pending removal and sale of the hydrocarbons in which ICBCS claims an interest. Upon information and belief, ICBCS's claim may be significantly less than $300 million.

27.    Under the Intermediation Agreement, ICBCS purports to take title to the crude oil being shipped to the Refining Complex; sell it to the Debtors when it is received at the Refining Complex or another delivery point, and then repurchase the refined products produced by the Refining Complex. Thus, at the time of the Girard Point Explosion, ICBCS purported to own a certain quantum of crude oil and refined product located at the Debtors' Refining Complex. Upon information and belief, some of that crude oil has since been refined and, once again, is deemed owned by ICBCS. As security for the Debtors' obligations to ICBCS, the Debtors granted ICBCS a lien on all of the Debtors' personal property and real estate assets. The Term Loan Facility is also purportedly secured by a lien on such assets.

28.    Each facility is governed by a security agreement setting forth security interests in particular collateral. The respective priority, subordination, and pay-over rights in the collateral as between Cortland and ICBCS are governed by an intercreditor agreement dated August 7,

2018 (the "Intercreditor Agreement") by and among Cortland, Merrill Lynch Commodities, Inc. as Initial SOA Collateral Agent, ICBCS (as Successor SOA Collateral Agent), Debtors PES and Philadelphia Energy Solutions Refining and Marketing LLC.

### a. Term Loan Collateral and Insurance Requirements

29.    Pursuant to Section 5.11(a) of the Term Loan Credit Agreement, "the Borrower shall deliver to [Cortland] Mortgages with respect to the Mortgaged Properties owned on the Closing Date." Cortland properly recorded these mortgages, perfecting its security interest in the Debtors' real property.

30.    Concurrent with the Term Loan Facility, Cortland and PES also executed a security agreement ("Term Loan Security Agreement") granting Cortland a security interest in, among other things:

- Accounts;
- Inventory (including raw materials);
- Money and Deposit Accounts;
- Documents and chattel paper; instruments; general intangibles (including rights, title, and interest in insurance policies) and investment property; commercial tort claims; and supporting obligations; and
- The proceeds of the foregoing.

31.    Pursuant to Sections 5.05(b) and (c) of Term Loan Credit Agreement, PES agreed that it shall maintain insurance policies "(i) insuring all real and personal property . . . against loss by fire, explosion, theft and such other casualties . . ." and  that "all such insurance shall . . . (ii) name [Cortland] as insured party or loss payee with respect to applicable insurance policies . . . ." Section 5.11(b) provides that within ninety (90) days of the closing date, Cortland shall have received "as copy of, or a certificate as to coverage under, and a declaration page relating to, the insurance policies required by Section 5.05 of this Agreement . . . each of which shall (1) be endorsed or otherwise amended to include a 'standard' or 'New York' lender's loss payable

clause or mortgagee endorsement (as applicable); (2) name [Cortland], on behalf of the Secured Parties, as additional insured."

32.     The Term Loan Credit Agreement did not expressly require the Debtors to provide business interruption insurance coverage in favor of Cortland or the Term Loan Lenders.

### b.  ICBCS Collateral and Insurance Requirements

33.     In conjunction with the Intermediation Facility, certain debtors and ICBCS executed a security agreement ("ICBCS Security Agreement"). The ICBCS Security Agreement grants ICBCS a security interest in:

- Accounts;
- Inventory (including raw materials);
- Renewable Identification Numbers;
- Money and Deposit Accounts;
- Letters of Credit;
- Equipment;
- Fixtures;
- Trademarks;
- Equity interests in subsidiaries;
- To the extent evidencing any of the foregoing, Documents; Instruments; General Intangibles; Commercial Tort Claims; and Supporting Obligations;
- Records evidencing the foregoing; and
- All proceeds and products of each of the above, including any and all insurance proceeds.

34.     Pursuant to Section 10.04 of the Intermediation Facility, certain Debtors committed to maintain, among other types of insurance, (1) comprehensive property insurance subject to a minimum amount of $750 million for all risks of physical loss or damage; and (2) business interruption insurance "reasonably satisfactory to ICBCS and otherwise in the manner satisfactory for businesses of similar size engaged in similar activities at similar locations."

35.     Section 10.04 of the Intermediation Facility further provides that all insurance policies "shall name ICBCS as mortgagee, additional insured and loss payee . . . ."

### c.  **Intercreditor Provisions**

36.     As set forth in the Intercreditor Agreement, ICBCS and Cortland have priority, respectively, in the following collateral:

- SOA Priority Collateral (ICBCS):
    - Accounts;
    - Inventory;
    - Money and Deposit Accounts related to the foregoing;
    - Documents, Instruments, General Intangibles, Commercial Tort Claims, and Supporting Obligations, all to the extent related to Accounts and/or Inventory;
    - Letters of Credit supporting payments of Accounts or Inventory; and
    - Proceeds and products of and with respect to any of the foregoing (including insurance payments).

- Term Loan Priority Collateral (Cortland)
    - All collateral that is neither SOA Priority Collateral nor "Excluded Property" (as defined in the Intercreditor Agreement).

37.     The Intercreditor Agreement also provides Cortland with a second lien on the SOA Priority Collateral, and ICBCS with a second lien on the Term Loan Priority Collateral.

38.     Pursuant to Section 2.01(c) of the Intercreditor Agreement, the failure of either Cortland or ICBCS to perfect its liens on any collateral, or the avoidance, invalidation or subordination of either of their liens does not alter the respective rights and priorities among Cortland and ICBCS with respect to such collateral.

39.     Pursuant to Section 4.01(c) of the Intercreditor Agreement, in the event that either ICBCS or Cortland receives any collateral or the proceeds thereof which constitutes the other's priority collateral such recipient is obligated to hold such collateral in trust and turn it over to the other party whose first priority collateral it is until such first priority party's obligations have been paid in full.

40.     For the reasons set forth in the Underlying Complaint, any BI Recoveries stemming from business interruption or property damage would constitute "Term Loan Priority

Collateral" regardless of whether Cortland has a valid priority perfected and non-avoidable lien or other interest in such proceeds.

41.     Certain Debtors are named parties and signatories to the Intercreditor Agreement.

42.     Section 8.09 of the Intercreditor Agreement expressly states that it "shall be binding upon and inure to the benefit of each of the parties hereto and each of the First Priority Secured Parties . . . and their respective successors and permitted assigns . . . ."

### III.    The Debtors' Insurance Policy

43.     The Debtors purchased and are the named insured under a property casualty insurance policy, denoted "All Risk Property Damage including a Time Element" (the "Policy"). The indemnity limits under the Policy are $1.25 billion.  The Policy comprises several insurance policies with different insurers, each of which insures a portion of the coverage limit stipulated in the Policy.  Each insurer's individual policy follows the base Policy referenced above.  The Policy is governed by New York law.

44.     Section II.8 of the Policy describes the basis of recovery related to business interruption, and provides that such recovery "shall be the actual loss sustained by the Insured resulting from the necessary interruption of business caused by direct physical loss or damage, by a peril insured against, to property insured herein."

45.     Section II.10(c) of the Policy states that the period for which business interruption insurance is available "commenc[es] with the date of the direct physical loss or damage but [does] not exceed[] the length of time as would be required, with the exercise of due diligence and dispatch, to rebuild, repair or replace the lost, destroyed or damaged property and not limited by the expiration of this Policy," but, in any case, not exceeding twenty-four months.

46.     Declaration 6 of the Policy further states that any loss attributable to business interruption is subject to a sixty-day waiting period after the loss or damage occurs (the "BI

Deductible"). The Girard Point Explosion occurred on June 21, 2019; the BI Deductible therefore lapsed on August 20, 2019, thirty days after the Petition Date.

47. The BI Recoveries are intended to compensate the Debtors for estimated lost profits that, under the facts of this case, would have been earned, but for the Girard Point Explosion, from and after August 20, 2019.

48. General Condition 33 of the Policy sets forth a "Lenders Loss Payable" clause that states:

> Loss or damage, if any, under this Policy, shall be paid to any lender designated by the Insured and in possession of a written contract, hereinafter referred to as "the Lender", as their interests may appear, its successors and assigns in whatever form or capacity its interests may appear and whether said interest be vested in said Lender in its individual or in its disclosed or undisclosed fiduciary or representative capacity, or otherwise, or vested in a nominee or trustee of said Lender.

49. The Policy also contains four endorsements that either amend, add to, or change the scope of the base Policy. Of relevance here is Endorsement 4, which expressly names ICBCS as Loss Payee/Mortgagee.[3] Cortland is not expressly named as a loss payee/mortgagee under the Policy, pursuant to any endorsement or otherwise.

50. Cortland is identified as a loss payee/mortgagee on a document entitled "Evidence of Property Insurance" (the "Certificate"), which was attached as Exhibit E to the Complaint. The Certificate is not itself a part of the Policy or otherwise a legally binding or enforceable contract or document. The Certificate expressly states:

> This evidence of property insurance is issued as a matter of information only and confers no rights upon the additional interest named below. This evidence does not affirmatively or negatively amend, extend, or alter the coverage afforded by the policies below. This evidence of insurance does not constitute a contract

---

[3] Endorsement 3 named Merrill Lynch, ICBCS's predecessor SOA Collateral Agent, as Loss Payee as well.

between the issuing insurer(s), authorized representative or producer, and the additional interest.

## COUNT I

### DECLARATORY JUDGMENT FOR AFTER-ACQUIRED PROPERTY
### (Against All Counterclaim and Cross-Claim Defendants Pursuant to 11 U.S.C. § 552)

51.    The Committee incorporates all preceding paragraphs as if fully set forth herein.

52.    Pursuant to Section 552(a) of the Bankruptcy Code, secured lenders are not entitled to a lien on any property acquired by the Debtors after the Petition Date ("After-Acquired Property"), except as to the identifiable proceeds of collateral on which they held a valid perfected security interest.

53.    Any loss covered under the business interruption indemnity provisions of the Policy will be predicated on models projecting the revenues and gross profits which would have been earned from the purchase, refining, and sale of crude oil beginning thirty days after the Petition Date.  Any business interruption loss covered by the Policy will thus be after-acquired property, as that term is used in Section 552(a) of the Bankruptcy Code, and would not constitute proceeds of any prepetition assets in respect to which Cortland or ICBCS had a perfected lien as of the Petition Date.

54.    Accordingly, on the Petition Date, there were no, and would be no liens on any payments that may be made pursuant to the Policy to indemnify the Debtors for loss related to business interruption.

55.    The Committee is therefore entitled to a declaration stating that pre-petition liens, including those of the Counterclaim and Cross-Claim Defendants, on the Debtors' assets do not attach to any After-Acquired Property, including the BI Recoveries under the Policy.

## COUNT II

**AVOIDANCE OF LIEN ON BUSINESS INTERRUPTION INSURANCE PROCEEDS**
**(Against Cortland Pursuant to 11 U.S.C. §§ 544)**

56.    The Committee incorporates all preceding paragraphs as if fully set forth herein.

57.    Alternatively, even if any payment in connection with a loss related to business interruption is deemed not to be after-acquired property, Cortland does not have a perfected lien in any such payment.

58.    In order to perfect an interest in a business interruption or property insurance policy or proceeds paid thereunder, under New York state law, lenders must be expressly denominated as the "loss payee" or the "mortgagee" in the policy (or under an endorsement) with respect to the insured collateral.

59.    The Policy does not name Cortland as a loss payee or mortgagee, and Cortland was not designated as such by the Debtors.

60.    In the absence of a provision in or endorsement to the Policy expressly naming Cortland as a loss payee or mortgagee, Cortland is unable to perfect its security interests in the Policy or any amounts received in connection with any business interruption claims by the Debtors pursuant to the Policy.

61.    As a result, pursuant to applicable law, any purported lien by Cortland on any BI Recoveries received by the Debtors pursuant to the Policy is avoidable pursuant to Sections 544(a)(1) and (2) of the Bankruptcy Code, because any lien or interest which Cortland may claim would be subject to the rights of an attaching or judgment lien creditor.

62.    The Committee is therefore entitled to a declaration stating that any of Cortland's pre-petition liens on any amounts received by the Debtors in connection with any business interruption claims made by the Debtors pursuant to the Policy are hereby avoided.

## COUNT III

### AVOIDANCE OF LIEN ON REAL PROPERTY INSURANCE PROCEEDS
#### (Against Cortland Pursuant to 11 U.S.C. § 544)

63.     The Committee incorporates all preceding paragraphs as if fully set forth herein.

64.     In order to perfect an interest in a property insurance policy or proceeds paid thereunder, under New York state law, lenders must be denominated as the "loss payee" or the "mortgagee" in the policy (or under an endorsement) with respect to the insured collateral.

65.     The Alkylation Unit and the surrounding fixtures and structures destroyed or damaged as a result of the Girard Point Explosion constitute real property under Pennsylvania Law for purposes of lien perfection or otherwise.

66.     The Policy does not name Cortland as a loss payee or mortgagee, and Cortland was not designated as such by the Debtors.

67.     In the absence of a provision in or endorsement to the Policy expressly naming Cortland as a loss payee or mortgagee, Cortland has not perfected a security interest in the Policy or in any portion of the Real Property Recoveries attributable to the Alkylation Unit or any other real property in which it purports to have a perfected lien.  Any interest Cortland may have in such recoveries would be subject to the rights of an attaching or judgment lien creditor.

68.     As a result, pursuant to applicable law, any purported liens by Cortland on any Real Property Recoveries are avoidable pursuant to Sections 544(a)(1) and (2) of the Bankruptcy Code.

69.     The Committee is therefore entitled to an order declaring that any lien which Cortland may purport to have on any Real Property Recoveries pursuant to the Policy are hereby avoided.

## COUNT IV

## DECLARATORY JUDGEMENT FOR PRESERVATION OF AVOIDED LIENS FOR BENEFIT OF DEBTORS' ESTATES
### (Against Cortland Pursuant to 11 U.S.C. §§ 544, 551)

70.    The Committee incorporates all preceding paragraphs as if fully set forth herein.

71.    For the reasons set forth in the Underlying Complaint, the insurance proceeds, including, but not limited to, BI Recoveries and Real Property Recoveries, constitute Term Loan Priority Collateral—albeit unperfected and avoidable.

72.    Under Section 551 of the Bankruptcy Code, any and all liens avoided pursuant to Section 544(a) are preserved for the benefit of the Debtors' estates.  Moreover, as the holders of such avoided and preserved lien, the Debtors are successors in interest to Cortland and are entitled to stand in Cortland's shoes under the Intercreditor Agreement with respect to Cortland's senior lien on the BI Recoveries and the Real Property Recoveries.

73.    The Committee is therefore entitled to an order declaring that any and all liens held by Cortland on the Debtors' insurance proceeds including, but not limited to, BI Recoveries and Real Property Recoveries, that are avoided shall be preserved for the benefit of the Debtors' estates with the same senior priority which Cortland's avoided liens would have had under applicable law and the Intercreditor Agreement.

## PRAYER FOR RELIEF

**WHEREFORE**, the Committee respectfully requests that the Court enter judgment against the Counterclaim and Cross-Claim Defendants and order that:

A.    declares that pre-petition liens, including those of the Counterclaim and Cross-Claim Defendants, on the Debtors' assets do not attach to any After-Acquired Property, including without limitation, any BI Recoveries, pursuant to Section 552(a) of the Bankruptcy Code;

B.    avoids Cortland's pre-petition liens on any amounts received by the Debtors in connection with any BI Recoveries pursuant to Section 544(a)(1) or (2) of the Bankruptcy Code;

C.  avoids any of Cortland's pre-petition liens on any Real Property Recoveries pursuant to Section 544(a)(1) or (2) of the Bankruptcy Code;

D.  declares that any and all liens held by Cortland that are avoided hereunder are preserved for the benefit of the Debtors' estates with the senior priority which such liens would have had under applicable non-bankruptcy law and the Intercreditor Agreement pursuant to Section 551 of the Bankruptcy Code; and

E.  such other and further relief as the Court deems just and proper.

Dated:  September 13, 2019

**ELLIOTT GREENLEAF, PC**

*/s/ Jonathan M. Stemerman*
Rafael X. Zahralddin-Aravena (No. 4166)
Jonathan M. Stemerman (No.  4510)
1105 North Market Street, Suite 1700
Wilmington, DE 19801
Tel: (302) 384-9400 / Fax: (302) 384-9399
Email:  rxza@elliottgreenleaf.com
jms@elliottgreenleaf.com

and

**BROWN RUDNICK LLP**
Robert J. Stark (admitted *pro hac vice*)
Max D. Schlan (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800 / Fax (212) 209-4801
Email:  rstark@brownrudnick.com
mschlan@brownrudnick.com

and

Steven B. Levine (*pro hac vice* pending)
James W. Stoll (*pro hac vice* pending)
Sharon I. Dwoskin (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200 / Fax (617) 856-8201
Email:  slevine@brownrudnick.com
jstoll@brownrudnick.com
sdwoskin@brownrudnick.com

*Proposed Counsel to the Official Committee of Unsecured Creditors of PES Holdings, LLC*