## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PES HOLDINGS, LLC, *et al.*,[1] | ) Case No. 19-11626 (KG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| PES HOLDINGS, LLC, *et al.*, CORTLAND | ) |
| CAPITAL MARKET SERVICES, LLC, | ) |
| | ) |
| Plaintiffs, | ) Adv. Pro. No. 19-50282 (KG) |
| | ) |
| v. | ) **Ref. Docket No. 1** |
| | ) |
| ICBC STANDARD BANK PLC, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## ANSWER AND COUNTERCLAIMS OF DEFENDANT AND
## COUNTERCLAIM PLAINTIFF ICBC STANDARD BANK, PLC

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574). The Debtors' service address is: 1735 Market Street, Philadelphia, Pennsylvania 19103.

Defendant and Counterclaim Plaintiff ICBC Standard Bank, Plc ("ICBCS"), through its undersigned counsel, hereby responds to and answers the allegations in the Complaint (the "Complaint")[2] filed by Plaintiffs PES Ultimate Holdings, LLC and its affiliated debtors (collectively, the "Debtor Plaintiffs"), and Cortland Capital Market Services LLC (the "Term Loan Agent," and, collectively with the Debtor Plaintiffs, the "Plaintiffs" or "Counterclaim Defendants"), and states as follows:

## NATURE OF THE ACTION

1.      ICBCS admits the allegations in paragraph 1, except denies that insurance proceeds for business interruption losses resulting from the Girard Point Incident constitute "Term Loan Priority Collateral" as defined in an August 7, 2018 intercreditor agreement ("Intercreditor Agreement") between ICBCS, the Term Loan Agent, and the Debtors.

2.      ICBCS admits the allegations in paragraph 2.

3.      ICBCS admits that it has a priority interest in a defined set of collateral, but otherwise denies the allegations in paragraph 3.

4.      ICBCS admits that the business interruption insurance proceeds are important to these chapter 11 cases but otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 4, and therefore denies the allegations.

## JURISDICTION AND VENUE

5.      ICBCS admits the allegations in paragraph 5.

6.      ICBCS admits the allegations in paragraph 6.

7.      ICBCS admits the allegations in paragraph 7, but notes that there is only one Defendant in this Adversary Proceeding.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Complaint.

8.      ICBCS admits the allegations in paragraph 8.

9.      ICBCS lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 9, and therefore denies the allegations.

10.     ICBCS admits the allegations in paragraph 10.

11.     ICBCS admits the allegations in paragraph 11.

## PARTIES

12.     ICBCS admits that PES Ultimate Holdings is a limited liability company, and that the Debtors are organized under the laws of the State of Delaware with their headquarters in the State of Pennsylvania.  ICBCS denies knowledge or information sufficient to form a belief as to the remainder of the allegations in paragraph 12, and therefore denies such allegations.

13.     ICBCS admits the allegations in paragraph 13.

14.     ICBCS admits the allegations in paragraph 14.

15.     ICBCS admits the allegations in paragraph 15.

## FACTUAL BACKGROUND

**I.      OVERVIEW OF THE DEBTORS AND THEIR BUSINESS.**

16.     ICBCS lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 16, and therefore denies the allegations.

17.     ICBCS lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 17, and therefore denies the allegations.

18.     ICBCS lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 18, and therefore denies the allegations.

19.     ICBCS lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 19, and therefore denies the allegations.

20.     ICBCS lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 20, and therefore denies the allegations.

21.     ICBCS lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 21, and therefore denies the allegations.

22.     ICBCS lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 22, and therefore denies the allegations.

23.     ICBCS lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 23, and therefore denies the allegations.

24.     ICBCS admits the allegations in paragraph 24.

25.     ICBCS admits that certain Debtors are party to the Intermediation Facility, dated as of June 18, 2019, between *inter alia*, PESRM and ICBCS, which helps the Debtors run their business, but otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 25, and therefore denies the allegations.

26.     ICBCS admits the allegations in paragraph 26.

27.     ICBCS admits the allegations in paragraph 27.

28.     ICBCS admits the allegations in paragraph 28, except states that the refined products could also be sold back to PESRM.

29.     ICBCS admits that the Intermediation Facility provides, among other things, in effect, the working capital necessary for the Debtors to run their business, but otherwise denies knowledge or information sufficient to form a belief as to the allegations in paragraph 29 and therefore denies same.

## II.     THE 2018 CHAPTER 11 CASES.

30.     ICBCS lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 30, and therefore denies the allegations.

31.     ICBCS admits that certain of the Debtors filed petitions for relief under the Bankruptcy Code on January 21, 2018, but otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 31, and therefore denies the allegations.

32.     ICBCS admits that certain Debtors emerged from the Prior Chapter 11 Cases on August 7, 2018, and that the Prior Chapter 11 Plan provided for a new Intermediation Facility and Term Loan Facility, but otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 32, and therefore denies the allegations.

### III.     THE GIRARD POINT INCIDENT AND THE 2019 CHAPTER 11 CASES.

33.     ICBCS admits that there was a large-scale explosion at PESRM's Girard Point refining facility, but otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 33, and therefore denies the allegations.

34.     ICBCS lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 34, and therefore denies the allegations.

35.     ICBCS admits that the Debtors announced that they would cease operating the Refining Complex after the run off through the Point Breeze Refinery of the inventory of crude oil on hand, but otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 35, and therefore denies the allegations.

36.     ICBCS lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 36, and therefore denies the allegations.

### IV.     THE DEBTORS CAPITAL STRUCTURE.

37.     ICBCS lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 37, and therefore denies the allegations.

38.     ICBCS lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 38, and therefore denies the allegations.

39.    ICBCS admits the allegations in paragraph 39.

40.    ICBCS admits the allegations in paragraph 40.

**A.     The Term Loan Facility And Term Loan Security Agreement.**

41.    ICBCS admits the allegations in paragraph 41.

42.    ICBCS denies the allegations in paragraph 42, except admits that the Prior Confirmation Order approved the Term Loan Facility and contains the quoted language, and refers to the Prior Confirmation Order for its full contents.

43.    ICBCS lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 43, and therefore denies the allegations.

44.    ICBCS admits the allegations in paragraph 44.

45.    ICBCS denies the allegations in paragraph 45, and refers to the Term Loan Facility for its full contents.

46.    ICBCS admits the allegations in paragraph 46, and refers to the Term Loan Security Agreement for its full contents.

47.    ICBCS admits the allegations in paragraph 47, and refers to the Term Loan Security Agreement for its full contents.

48.    ICBCS admits the allegations in paragraph 48, and refers to the Term Loan Security Agreement for its full contents.

49.    ICBCS lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 49, and therefore denies the allegations.

50.    ICBCS admits that the "Remarks" section of the document attached to the Complaint as Exhibit E includes the quoted language but denies the remainder of the allegations in paragraph 50, and refers to Exhibit E to the Complaint for its full contents.

**B.      The Intermediation Facility And ICBCS Security Agreement.**

51.      Paragraph 51 does not contain any allegations to which a response is required.  To the extent a response is required, ICBCS denies the allegations.

52.      ICBCS admits the allegations in paragraph 52, and refers to the Intermediation Facility for its full contents.

53.      ICBCS admits the allegations in paragraph 53.

54.      ICBCS admits the allegations in paragraph 54.

55.      ICBCS admits the allegations in paragraph 55.

56.      ICBCS admits the allegations in paragraph 56, and avers that the ICBCS Certificate also names ICBCS a "mortgagee" under the Policy.

57.      ICBCS admits the allegations in paragraph 57.

**V.      THE INSURANCE PROCEEDS.**

58.      ICBCS admits the allegations in paragraph 58.

59.      ICBCS admits the allegations in paragraph 59.

60.      ICBCS admits the allegations in paragraph 60.

61.      ICBCS admits the allegations in paragraph 61, and refers to the Policy for its full contents.

62.      ICBCS admits the allegations in paragraph 62, and refers to the Policy for its full contents.

63.      ICBCS admits the allegations in paragraph 63, and refers to the Policy for its full contents.

64.      ICBCS denies the allegations in paragraph 64, and refers to the Policy for its full contents.

A.      **The Term Loan Agent's Interest In The Proceeds.**

65.      ICBCS admits the allegations in paragraph 65, and refers to the Policy for its full contents.

66.      ICBCS admits the allegations in paragraph 66, and refers to the Policy for its full contents.

67.      ICBCS admits the allegations in paragraph 67, and refers to the Policy for its full contents.

68.      ICBCS admits the allegations in paragraph 68, and refers to the Term Loan Security Agreement for its full contents.

69.      ICBCS denies the allegations in paragraph 69.

70.      ICBCS admits that the Term Loan Facility Forbearance Agreement contains the quoted language but denies the remainder of the allegations in paragraph 70, and refers to the Term Loan Facility Forbearance Agreement for its full contents.

B.      **ICBCS's Interest In The Proceeds.**

71.      ICBCS admits the allegations in paragraph 71.

72.      ICBCS admits the allegations in paragraph 72, except states that ICBC is ICBCS.

73.      ICBCS admits that ICBCS has interests in the insurance proceeds owed to the Insureds under the Policy as a consequence of the Girard Point Incident and that the Intercreditor Agreement governs the priority of ICBCS's and the Term Lenders' competing interests in the Common Collateral, but otherwise denies the allegations in paragraph 73.

**VI.      THE INTERCREDITOR AGREEMENT DETERMINES PRIORITY OVER THE COMMON COLLATERAL.**

74.      ICBCS admits the allegations in paragraph 74.

75.     ICBCS admits the allegations in paragraph 75, and refers to the Intercreditor Agreement for its full contents.

**A.     SOA Separate Assets and Collateral.**

76.     ICBCS admits the allegations in paragraph 76, and refers to the Intercreditor Agreement for its full contents.

77.     ICBCS admits that SOA Separate Assets and Collateral include the quoted items, and refers to the Intercreditor Agreement for its full contents.

78.     ICBCS admits the allegations in paragraph 78.

79.     ICBCS admits the allegations in paragraph 79, but avers that the Intercreditor Agreement grants ICBCS a first priority interest in business interruption insurance proceeds and other insurance proceeds that are paid "with respect to" or constitute proceeds of SOA Priority Collateral, and refers to the Intercreditor Agreement for its full contents.

**B.     The Term Loan Lenders Have A First Priority Lien On The Business Interruption Insurance Proceeds.**

80.     ICBCS admits the allegations in paragraph 80, and refers to the Intercreditor Agreement for its full contents.

81.     ICBCS admits the allegations in paragraph 81, and refers to the Intercreditor Agreement for its full contents.

82.     ICBCS admits the allegations in paragraph 82, and refers to the Intercreditor Agreement for its full contents.

83.     ICBCS admits the allegations in paragraph 83, and refers to the Intercreditor Agreement for its full contents.

84.     ICBCS denies the allegations in paragraph 84, and refers to the Intercreditor Agreement for its full contents.

85.    ICBCS admits the allegations in paragraph 85, and refers to the Intercreditor Agreement for its full contents.

86.    ICBCS denies the allegations in paragraph 86, and refers to the Intercreditor Agreement for its full contents.

87.    ICBCS denies the allegations in paragraph 87.

88.    ICBCS denies the allegations in paragraph 88.

## VII.    THE DIP INTERIM ORDER AND THE INSURANCE PROCEEDS ORDER.

89.    ICBCS denies the allegations in paragraph 89.

90.    ICBCS admits the allegations in paragraph 90.

91.    ICBCS admits that the Interim Order contains the quoted language but denies the remainder of the allegations in paragraph 91, and refers to the Interim Order for its full contents.

92.    ICBCS admits the allegations in paragraph 92, and refers to the Interim Order for its full contents.

93.    ICBCS admits the allegations in paragraph 93, and refers to the Interim Order for its full contents.

94.    ICBCS denies the allegations in paragraph 94, but admits that the Debtors filed the Complaint seeking a declaratory judgment determining that the Term Loan Lenders have first priority over the June 21 Insurance Proceeds.

### FIRST CAUSE OF ACTION
### (Declaratory Judgment)

95.    ICBCS repeats and re-alleges each and every response contained in paragraphs 1 through 94 of this Answer as if fully set forth at length herein.

96.    ICBCS admits the allegations in paragraph 96.

97.     ICBCS admits that under the Policy it is a loss payee and has claims to the June 21 Insurance Proceeds, but otherwise lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 97, and therefore denies the allegations.

98.     ICBCS denies the allegations in paragraph 98.

99.     ICBCS denies the allegations in paragraph 99.

100.    ICBCS denies the allegations in paragraph 100.

101.    ICBCS denies the allegations in paragraph 101.

## GENERAL DENIAL

Except as otherwise previously admitted in Paragraphs 1-101, ICBCS denies each and every allegation contained in paragraphs 1-101 of the Complaint, including, without limitation, the headings, subheadings, footnotes, and prayers for relief.  ICBCS expressly reserves the right to amend and/or supplement its Answer.

## AFFIRMATIVE DEFENSE

Plaintiffs have failed to state a claim on which relief may be granted.

## RESERVATION OF RIGHTS

ICBCS reserves the right to assert any and all affirmative defenses when and if they become appropriate, known, or available in this action, including during or after discovery.  The assertion of any affirmative defense does not assume the burden of proof as to which applicable law places the burden on other Parties.

## ICBCS'S COUNTERCLAIMS

1.      ICBCS brings this action to obtain a declaration that (i) any proceeds paid on account of the Debtors' claim against their business interruption insurance policy constitute SOA Priority Collateral (as defined by the Intercreditor Agreement between ICBCS and Plaintiffs) in which ICBCS has a first priority security interest, and (ii) ICBCS has a first priority or exclusive security interest in any proceeds of the Debtors' property damage insurance policy that are paid on account of "Inventory" or "SOA Separate Assets and Collateral" (as defined by the Intercreditor Agreement).  The plain language of the Intercreditor Agreement, relevant provisions of the other pertinent agreements, and applicable law governing security interests in insurance proceeds, all mandate this result.

2.      More specifically, the Intercreditor Agreement provides that SOA Priority Collateral includes, among other things, (i) all of the Debtors' current and future Accounts and Inventory, (ii) General Intangibles, Cash, and Deposits related to Accounts and Inventory, and (iii) any "Proceeds of" or "Insurance with respect to" the foregoing.  In other words, ICBCS has a first priority security interest in all of the assets representing the Debtors' business income.  The business interruption insurance policy—which ICBCS expressly required the Debtors to maintain for ICBCS's benefit—is intended to compensate for the loss of these business income assets.  Thus, the business interruption insurance proceeds are also "Proceeds of" and "insurance with respect to" the business income assets, and fall squarely within the definition of SOA Priority Collateral.

3.      Additionally, the Intercreditor Agreement provides that ICBCS has an exclusive security interest in "SOA Separate Assets and Collateral," which include, among other things, "Certain HydroCarbon Assets," "Certain Refined Products Assets," "Certain Rack Sale Refined Products Assets," and any insurance of or proceeds relating to the foregoing.  Accordingly, any property damage insurance proceeds that the Debtors receive on account of Inventory (which is

SOA Priority Collateral) or "SOA Separate Assets and Collateral" are also plainly subject to ICBCS's first priority or exclusive security interest, respectively.

4.     Nevertheless, in an effort to escape these unambiguous conclusions, the Term Loan Lenders—who are also the Debtors' DIP Lenders—have required, as a condition to the DIP Credit Agreement, that the Debtors stipulate that ***all*** insurance proceeds (the "<u>June 21 Insurance Proceeds</u>") that the Debtors receive in connection with the explosion and fire at PESRM's Girard Point refining facility (the "<u>Girard Point Incident</u>") constitute Term Loan Priority Collateral subject to the Term Loan Agent's first priority security interest, and initiate this Adversary Proceeding seeking a declaration to that effect.

5.     The Term Loan Lenders also seek to utilize the DIP Credit Agreement to mandate the outcome of this litigation, arguing that if the Court does not find that the June 21 Insurance Proceeds constitute Term Loan Priority Collateral, then the Term Loan Lenders may "immediately accelerate the DIP Obligations and terminate the right of the Debtors to use Cash Collateral ... run[ning] the serious risk of [the Debtors] losing access to the cash necessary to pursue the insurance proceeds and emerge as a going concern for the benefit of their stakeholders."

6.     The Term Loan Lenders' threats that they will derail the Debtors' bankruptcy cases—thereby jeopardizing their own potential recoveries—if the Court enforces the Intercreditor Agreement according to its unambiguous terms, are not credible.  Regardless, however, the Term Loan Lenders' machinations plainly cannot, and do not, alter the Intercreditor Agreement's plain language, or its legal impact.  The Term Loan Lenders' *post hac* efforts to re-characterize the business interruption insurance proceeds and all property damage insurance proceeds as Term Loan Priority Collateral are untethered (and directly contrary) to the bargain struck between the

Term Loan Lenders and ICBCS in the Intercreditor Agreement, and cannot succeed in the face of that agreement.

## JURISDICTION AND VENUE

7.      On July 21, 2019 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code.

8.      This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1334. This Adversary Proceeding is a core proceeding under 28 U.S.C. § 157(b).

9.      This Court has personal jurisdiction over each of the Counterclaim Defendants under Bankruptcy Rule 7004(f).

10.     In the alternative, this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 157(c)(1).  ICBCS's Counterclaims are directly related to the Debtors' bankruptcy cases and will have significant impact on the Debtors' estates.

11.     Pursuant to Bankruptcy Rule 7008(a), ICBCS consents to the entry of final orders or judgment by this Court.  ICBCS also consents to the entry of final orders or judgments by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United Sates Constitution.

12.     Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

13.     The Counterclaims are brought under Bankruptcy Rule 7013 and Federal Rule of Civil Procedure 13.

## THE PARTIES

14.     ICBCS is organized under the laws of England and Wales with its headquarters in London, United Kingdom.

15.     The Debtors are organized under the laws of the State of Delaware with their headquarters in the State of Pennsylvania.

16.     The Term Loan Agent is a limited liability company organized under the laws of the State of Delaware with its headquarters in the State of Illinois.

17.     The Term Loan Agent is the administrative agent for the Term Loan Lenders subject to the Intercreditor Agreement.

## FACTUAL BACKGROUND

### I.     THE SOA AND ICBCS SECURITY AGREEMENT

18.     A key aspect of the Debtors' emergence from their Prior Chapter 11 Cases was the "Master Transaction" between ICBCS and certain of the Debtors, pursuant to which ICBCS agreed to provide intermediation services to the Debtors.  Pursuant to the Master Transaction documents, ICBCS exclusively sourced and purchased raw materials and other feedstock from third parties to be refined by the Debtors, in order for the Debtors to supply ICBCS with refined products.  ICBCS maintained title to the raw inventory up until the product was ready to be refined, and then sold the inventory to the Debtors.  Once the product was refined, ICBCS purchased the refined product and coordinated the sale of the product with the Debtors' assistance.  On each day, ICBCS netted the value of the raw materials it supplied against the value of refined product it received, deducted an agreed margin, and deposited the net amount into a cash collateral account held by the Debtors and subject to ICBCS's first priority security interest.  This arrangement enabled the Debtors to significantly reduce their working capital requirements and provided a stable source of raw

materials, both of which were critical to the Debtors' continued operations and emergence from their Prior Chapter 11 Cases.

19.    The Master Transaction was effectuated in three phases.  The third and final phase occurred on June 18, 2019, when ICBCS, PESRM, and certain Debtor guarantors entered into the Sixth Amended and Restated Supply and Offtake Agreement (the "<u>Intermediation Facility</u>" or "<u>SOA</u>").

20.    In contrast to the Term Loan Facility, which contains no such requirement, the Intermediation Facility expressly requires that the Debtors maintain business interruption insurance.  The Intermediation Facility also requires that the Debtors maintain property damage insurance.  The Intermediation Facility further requires that all insurance policies maintained by the Debtors name ICBCS as mortgagee, additional insured, and loss payee.

21.    In conjunction with the Intermediation Facility, the Debtors and ICBCS entered into the ICBCS Security Agreement on June 18, 2019.  Pursuant to the ICBCS Security Agreement, the Debtors granted ICBCS a security interest in the following assets:

i.     all Accounts;

ii.    all Inventory, including all raw materials, work in process and finished goods, relating to any of the foregoing items in this clause (ii);

iii.   all Renewable Identification Numbers wherever located;

iv.    all Money and Deposit Accounts;

v.     all Letters of Credit and Letter-of-Credit Rights supporting payment of any of the foregoing;

vi.    all Equipment;

vii.   all Fixtures;

viii.  all Trademarks;

ix.    all Equity Interests in each Subsidiary directly owned by such Grantor as of the date hereof (including the Pledged Equity Interests listed in *Schedule 7* to the Perfection

Certificate) and any other Equity Interests in any Subsidiary directly owned in the future by such Grantor, together in each case with (A) all certificates representing such Equity Interests, (B) all shares, securities, cash or other property representing a dividend on or a distribution or return of capital on or in respect of such Equity Interests, or resulting from a split-up, revision, reclassification or other like change thereof or otherwise received in exchange therefor, and any warrants, rights or options issued to the holders of, or otherwise in respect of, such Equity Interests, and (C) without prejudice to any provision of the Supply and Offtake Agreement prohibiting any merger or consolidation by PESRM or any of its Subsidiaries, all Equity Interests of any successor entity of any such merger or consolidation (collectively, the "<u>Pledged Equity Interests</u>");

x.  to the extent evidencing any of the foregoing, (A) Documents, (B) Instruments, (C) General Intangibles, (D) Commercial Tort Claims, and (E) Supporting Obligations and all other forms of obligations owing to any Grantor or in which any Grantor may have any interest, however created or arising and whether or not earned by performance;

xi.  to the extent not otherwise included above, all Records evidencing any of the foregoing; and

xii.  all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to such Grantor from time to time with respect to any of the foregoing.

## II.    THE TERM LOAN FACILITY AND TERM LOAN SECURITY AGREEMENT

22.    On August 7, 2018, Debtor PES Holdings and certain other Debtors entered into the Term Loan Facility with the Term Loan Lenders and the Term Loan Agent.

23.    In conjunction with the Term Loan Facility, the Debtors and the Term Loan Agent executed the Term Loan Security Agreement.  Under the Term Loan Security Agreement, the Debtors granted the Term Loan Agent, for the benefit of the Term Loan Lenders, a security interest in the following assets:

i.  all Accounts;

ii.  all Inventory, including all raw materials, work in process and finished goods, relating to any of the foregoing items in this clause (ii);

iii.   all Money and Deposit Accounts (to the extent relating to the items in clauses (i) and (ii) above, and together with such items, the "Current Assets Collateral");

iv.   all of the following: (A) Documents and Chattel Paper, (B) Instruments, (C) General Intangibles and Investment Property, (D) Commercial Tort Claims, and (E) Supporting Obligations and all other forms of obligations owing to any Grantor or in which any Grantor may have any interest, however created or arising and whether or not earned by performance;

v.   all Letters of Credit and Letter-of-Credit Rights;

vi.   all Equipment;

vii.   all Fixtures;

viii.   all Intellectual Property;

ix.   all Equity Interests in each Subsidiary directly owned by such Grantor as of the Closing Date (including the Pledged Equity Interests listed on Schedule 7 to the Perfection Certificate) and any other Equity Interests in any Subsidiary directly owned in the future by such Grantor, together in each case with (i) all certificates representing such Equity Interests, (ii) all shares, securities, cash or other property representing a dividend on or a distribution or return of capital on or in respect of such Equity Interests, or resulting from a split-up, revision, reclassification or other like change thereof or otherwise received in exchange therefor, and any warrants, rights or options issued to the holders of, or otherwise in respect of, such Equity Interests, and (iii) without prejudice to any provision of the Credit Agreement prohibiting any merger or consolidation by the Borrower or any of its Subsidiaries, all Equity Interests of any successor entity of any such merger or consolidation (collectively, the "Pledged Equity Interests");

x.   to the extent not otherwise included above, all Records evidencing any of the foregoing; and

xi.   all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to such Grantor from time to time with respect to any of the foregoing.

## III.   THE INTERCREDITOR AGREEMENT

24.   As set forth above, the collateral packages pledged to the Term Loan Agent and ICBCS include certain of the same assets.  These dual-pledged assets constitute "Common Collateral" under the Intercreditor Agreement.

25.     The Intercreditor Agreement governs the Term Loan Agent's and ICBCS's respective rights and priorities with respect to the Common Collateral.    The Intercreditor Agreement divides the Common Collateral into two subcategories:  "SOA Priority Collateral" in which ICBCS has a first priority security interest, and "Term Loan Priority Collateral" in which the Term Loan Agent has a first priority security interest.

26.     Section 4.01(a) of the Intercreditor Agreement provides that all proceeds of the SOA Priority Collateral shall be distributed first to ICBCS and second to the Term Loan Agent, thereby establishing ICBCS's first priority security interest in the SOA Priority Collateral. ICBCS's first priority right in the SOA Priority Collateral is also protected by a turnover provision, which requires the Term Loan Agent and Term Loan Lenders to turn over to ICBCS any SOA Priority Collateral that the Term Loan Agent or Term Loan Lenders may receive prior to ICBCS being paid in full.

27.     "SOA Priority Collateral" is defined by the Intercreditor Agreement as "with respect to each Grantor, all such Grantor's now existing or hereinafter arising:

(i) Accounts;

(ii) Inventory, including all raw materials, work in process and finished goods, relating to any of the foregoing items in this clause (ii) (together with the items in clauses (i) and (ii) above, the 'Current Assets Collateral');

(iii) all Money and Deposit Accounts relating to the foregoing;

(iv) all of the following: (A) to the extent evidencing Current Assets Collateral, Documents, (B) to the extent evidencing Current Assets Collateral, Instruments, (C) to the extent related to Current Assets Collateral, General Intangibles, (D) to the extent related to Current Assets Collateral, Commercial Tort Claims, and (E) to the extent related to Current Assets Collateral, Supporting Obligations and all other forms of obligations owing to any Grantor or in which any Grantor may have any interest, however created or arising and whether or not earned by performance;

(v) all Letters of Credit and Letter-of-Credit Rights supporting payment of any Current Assets Collateral;

(vi) to the extent not otherwise included above, all Records evidencing any of the foregoing; and

(vii) all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to such Grantor from time to time with respect to any of the foregoing."

28.    The Intercreditor Agreement also provides that ICBCS has an exclusive security interest in "SOA Separate Assets and Collateral," which are defined as:

(i) Certain Hydrocarbon Assets, (ii) Certain Refined Products Assets, (iii) Certain Rack Sale Refined Products Assets, (iv) Certain Hydrocarbon Receivables, (v) all Renewable Identification Numbers (other than those required to satisfy the obligations under the Consent Decree and Environmental Settlement Agreement entered into as of March 12, 2018 among the U.S., the U.S. Environmental Protection Agency and the Company), (vi) all payments under any insurance, indemnity, warranty, or guaranty of the foregoing, (vii) all Letters of Credit or Letters-of-Credit Rights in favor the SOA Collateral Agent supporting payment of any amounts owed by PESRM or any other Grantor or otherwise in connection with the Supply and Offtake Documents, (viii) Catalyst Assets to the extent included in the term "Collateral" as defined in the Supply and Offtake Security Documents, (ix) cash and Cash Equivalents securing obligations pursuant to the transactions contemplated by the SOA Master Transaction Agreement as in effect on the date hereof and all ICBCS Credit Support, (x) all PESRM/PESIC Cash Collateral and (xi) all Proceeds of or with respect to the foregoing.

29.    The Intercreditor Agreement requires the Term Loan Agent and Term Loan Lenders to turn over to ICBCS any SOA Separate Assets and Collateral that the Term Loan Agent or Term Loan Lenders may receive prior to ICBCS being paid in full.

## IV.    THE PESRM POLICY

30.    On January 17, 2019, the Debtors were issued an insurance policy providing a total of $1.25 billion in coverage for property damage and business interruption losses during the period November 1, 2018 through November 1, 2019 (the "PESRM Policy").

31.    The PESRM Policy contains an endorsement naming ICBCS as a "Loss Payee/Mortgagee under this Policy." The PESRM Policy also provides that the "unqualified word 'Insured' wherever used includes any person or organization to whom or to which the insured is

obligated by virtue of a written contract to name such person or organization as an Additional Insured, but only with respect to operations performed by or obligations required of the Insured to or for the Additional Insured under the terms and conditions of said contract."

32.     The business interruption portion of the PESRM Policy "covers actual loss sustained by the Insured resulting from the necessary interruption of business caused by direct physical loss or damage, by a peril insured against, to property insured herein, occurring during the Term of Insurance."  The business interruption policy and the proceeds thereof are intended to compensate for the loss of business income.  The Debtors' business income is composed of, and represented by, their Accounts and Inventory, and Cash, Deposits, and General Intangibles related thereto, all of which constitute SOA Priority Collateral subject to ICBCS's first priority security interest.  The business interruption insurance proceeds are thus "Proceeds" of SOA Priority Collateral, and "insurance ... with respect to" SOA Priority Collateral, and are therefore also SOA Priority Collateral.

33.     Likewise, any property damage insurance proceeds paid to the Debtors on account of Inventory are also SOA Priority Collateral, given that SOA Priority Collateral includes Inventory.  And ICBCS has an exclusive security interest in any property damage insurance proceeds paid on account of SOA Separate Assets and Collateral.

34.     Separate certificates of "Evidence of Property Insurance" relating to the PESRM Policy state that ICBCS and the Term Loan Agent are each a mortgagee, loss payee, and additional insured as their "interests may appear and where required by written contract."[3]

---

[3]  As an additional insured, mortgage, and loss payee under the PESRM Policy, ICBCS also has its own direct contractual rights against the business interruption portion of the Policy.

V.      **THE GIRARD POINT INCIDENT AND SUBSEQUENT BANKRUPTCY FILING**

35.      The Girard Point Incident occurred on June 21, 2019.

36.      Following the Girard Point Incident, on July 21, 2019, the Debtors reentered bankruptcy.  On July 22, 2019, the Debtors announced that they had entered into the DIP Credit Agreement with the Term Loan Lenders.

37.      The Term Loan Lenders' DIP Credit Agreement requires the Debtors to stipulate that "[t]he proceeds of any claim under the Debtors' insurance policies, whether for property damage, business interruption or otherwise, resulting, directly or indirectly, to the fire that occurred in the Girard Point refinery on June 21, 2019 ... constitute Term Loan Priority Collateral."

38.      The Interim Order and DIP Credit Agreement contain milestones requiring that (i) "[w]ithin 21 days of entry of the Interim Order, the Debtors shall file a motion seeking entry of an order of the Bankruptcy Court (the 'Insurance Proceeds Order') determining that the June 21 Insurance Proceeds constitute 'Term Loan Priority Collateral,'" and (ii) "[w]ithin 90 days following entry of the Interim Order, the Debtors shall have obtained entry of the Insurance Proceeds Order."

39.      In accordance with these milestones, on August 7, 2019, the Debtors and the Term Loan Agent initiated this adversary proceeding, seeking a declaration that the June 21 Insurance Proceeds constitute Term Loan Priority Collateral.

## FIRST CAUSE OF ACTION
**Declaratory Judgment That Business Interruption Insurance Proceeds Constitute SOA Priority Collateral Subject To ICBCS's First Priority Security Interest, 28 U.S.C. § 2201(a)**

40.      ICBCS repeats and re-alleges the foregoing allegations as though they were fully set forth in this paragraph.

41.     An actual controversy exists between ICBCS and the Counterclaim Defendants regarding ICBCS's priority of rights to business interruption insurance proceeds.  *See* 28 U.S.C. § 2201.

42.     The Debtors and the Term Loan Lenders are seeking a declaration that the proceeds of the business interruption insurance policy are Term Loan Priority Collateral rather than SOA Priority Collateral.

43.     Pursuant to the plain and unambiguous language of the Intermediation Facility, ICBCS Security Agreement, and Intercreditor Agreement, however, the proceeds of the business interruption policy are SOA Priority Collateral in which ICBCS has a first priority security interest.

44.     Accordingly, ICBCS respectfully requests that the Court: (1) declare and adjudge that any business interruption insurance proceeds paid on account of the Debtors' insurance claim are SOA Priority Collateral (as that term is defined by the Intercreditor Agreement) in which ICBCS has a first priority security interest; and (2) award ICBCS such other and further relief which this Court deems just and proper.

**SECOND CAUSE OF ACTION**
**Declaratory Judgment that ICBCS Has a First Priority Or Exclusive Security Interest In Any Property Damage Insurance Proceeds Paid On Account Of Inventory Or SOA Separate Assets And Collateral, 28 U.S.C. § 2201(a)**

45.     ICBCS repeats and re-alleges the foregoing allegations as though they were fully set forth in this paragraph.

46.     An actual controversy exists between ICBCS and the Counterclaim Defendants regarding ICBCS's priority of rights to property damage insurance proceeds paid on account of Inventory or SOA Separate Assets and Collateral.  *See* 28 U.S.C. § 2201.

47.     The Term Loan Lenders' DIP Credit Agreement requires the Debtors to stipulate that "[t]he proceeds of any claim under the Debtors' insurance policies, whether for property

damage, business interruption or otherwise, resulting, directly or indirectly, to the fire that occurred

in the Girard Point refinery on June 21, 2019 … constitute Term Loan Priority Collateral."

48.     The Intercreditor Agreement, however, provides that the Debtors' Inventory, and

any Proceeds of or insurance with respect to Inventory, constitute SOA Priority Collateral in which

ICBCS has a first priority security interest.

49.     The Intercreditor Agreement also provides that ICBCS has an exclusive security

interest in SOA Separate Assets and Collateral.

50.     Accordingly, ICBCS respectfully requests that the Court: (1) declare and adjudge

that ICBCS has a first priority or exclusive security interest in property damage insurance proceeds

paid on account of Inventory or SOA Separate Assets and Collateral; and (2) award ICBCS such

other and further relief which this Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, ICBCS requests that this Court enter judgment granting the following

relief:

a. declaring and adjudging that any business interruption insurance proceeds paid on account of the Debtors' insurance claim are SOA Priority Collateral (as defined by the Intercreditor Agreement) in which ICBCS has a first priority security interest;

b. declaring and adjudging that ICBCS has a first priority or exclusive security interest in any property damage insurance proceeds paid on account of Inventory or SOA Separate Assets and Collateral; and

c. awarding ICBCS such other and further relief which this Court deems just and proper.

Dated: September 13, 2019
     Wilmington, Delaware

**ASHBY & GEDDES, P.A.**

*/s/ David F. Cook*
William P. Bowden (#2553)
David F. Cook (#6352)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19801
Telephone: (302) 654-1888
Email:  WBowden@ashbygeddes.com
       DCook@ashbygeddes.com

-and-

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

Richard I. Werder, Jr. (*pro hac vice*)
Jane M. Byrne (*pro hac vice*)
Deborah Newman (*pro hac vice*)
Eric Kay (*pro hac vice*)
Zachary Russell (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010

*Counsel to ICBC Standard Bank, Plc*