## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PES HOLDINGS, LLC, *et al.*,<br><br>              Debtors.[1] | Chapter 11<br><br>Case No. 19-11626 (KG)<br><br>(Jointly Administered) |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PES, INC.,<br><br>        Intervenor-Defendant and Counterclaim and Cross-Claim Plaintiff,<br><br>      v.<br><br>PES HOLDINGS, LLC, *et al.*, and CORTLAND CAPITAL MARKET SERVICES, LLC,<br><br>        Plaintiffs and Counterclaim Defendants,<br><br>    and<br><br>ICBC STANDARD BANK PLC,<br><br>        Defendant and Cross-Claim Defendant. | Adv. Pro. No. 19-50282 (KG) |

## MEMORANDUM OF LAW IN SUPPORT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR SUMMARY JUDGMENT

---

[1]    The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's taxpayer identification number are as follows: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574). The Debtors' service address is: 1735 Market Street, Philadelphia, Pennsylvania 19103.

ELLIOTT GREENLEAF, PC
Rafael Xavier Zahralddin-Aravena (No. 4166)
Jonathan M. Stemerman (No. 4510)
1105 N. Market St., Suite 1700
Wilmington, DE 19801
Tel: 302-384-9400

*Co-Counsel to the Official Committee of
Unsecured Creditors*

BROWN RUDNICK LLP
Robert J. Stark (admitted *pro hac vice*)
Max D. Schlan (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800

and

Steven B. Levine (admitted *pro hac vice*)
James W. Stoll (admitted *pro hac vice*)
Sharon I. Dwoskin (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200

*Co-Counsel to the Official Committee of
Unsecured Creditors*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ........................... 1

INTRODUCTION ............................................................................................................... 1

STATEMENT OF UNDISPUTED FACTS .......................................................................... 4

A.    The Girard Point Explosion Damages The Alkylation Unit ................................. 4

B.    The Term Loan ....................................................................................................... 4

C.    The Intermediation Facility .................................................................................. 5

D.    The Intercreditor Agreement ................................................................................ 6

E.    The Policy .............................................................................................................. 8

ARGUMENT ..................................................................................................................... 10

I.      Applicable Legal Standard ................................................................................. 10

II.     Summary Judgment Should Be Granted In Favor Of The Committee
        Because The BI Recoveries Constitute After-Acquired Property. ..................... 11

        a.    Under 11 U.S.C. § 552(a), BI Recoveries Constitute After-Acquired
              Property To Which The Security Interests Of ICBCS And Cortland
              Do Not Attach. ......................................................................................... 11

        b.    BI Recoveries Are Not Proceeds Of The Debtors' Pre-petition Assets
              Under 11 U.S.C. § 552(b). ....................................................................... 13

III.    Cortland Does Not Have A Perfected Lien On The Policy. ................................ 18

        a.    Cortland's Lien On The BI Recoveries Is Unperfected Because
              Cortland Is Not "Loss Payee." ................................................................ 18

        b.    The Certificate Does Not Provide Cortland With Loss Payee Status. ....... 20

IV.     The Debtors' Strong Arm Powers Allow The Committee To Avoid
        Cortland's Unperfected Lien On The Policy ...................................................... 22

        a.    The Committee Can Avoid Cortland's Unperfected Lien On The BI
              Recoveries. ............................................................................................... 22

        b.    The Committee Can Avoid Cortland's Unperfected Lien On The Real
              Property Recoveries. ................................................................................ 23

V.      Cortland's Avoided Liens Are Preserved For The Benefit Of The
        Debtors' Estates. ................................................................................................ 25

CONCLUSION ................................................................................................................. 28

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

Aaron J. Shingala, P.C. v. Allenwear & Assocs.
(In re Allenwear & Assocs.), 89 B.R. 531 (Bankr. E. D. Pa.1988) .........................................24

All Crane Rental of Georgia, Inc. v. Vincent,
47 So. 3d 1024 (La. App. 2010)..........................................................................................21

Am. Ref-Fuel Co. of Hempstead v. Res. Recycling, Inc.,
248 A.D.2d 420, 671 N.Y.S.2d 93 (N.Y. App. Div. 1998) ......................................................21

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986)..........................................................................................................10

Arkison v. Sundt Construction, Inc. (In re Skagit Pac. Corp.),
316 B.R. 330 (B.A.P. 9th Cir. 2004).............................................................................11, 14, 15

Badillo v. Tower Ins. Co. of New York,
92 N.Y.2d 790, 709 N.E.2d 104 (1999)..................................................................................19

Bank of N. Georgia v. Strick Chex Columbus Two, LLC (In Matter of Strick
Chex Columbus Two, LLC), 542 B.R. 914 (Bankr. N.D. Ga. 2015) .......................................15

In re Barbara K. Enters., Inc.,
No. 08-11474 (MG), 2008 WL 2439649 (Bankr. S.D.N.Y. June 16, 2008) ...........................14

Burton v. Teleflex Inc.,
707 F.3d 417 (3d Cir. 2013)................................................................................................10

In re Cafeteria Operators, L.P.,
299 B.R. 400 (Bankr. N.D. Tex. 2003)..................................................................................11

Carr v. Loeser (In re Int'l Auction & Appraisal Servs. LLC),
493 B.R. 460 (Bankr. M.D. Pa. 2013) ..............................................................................22, 23

Cerrato v. BAC Home Loans Services (In re Cerrato),
504 B.R. 23 (Bankr. E.D.N.Y. 2014)....................................................................................22

Citigroup, Inc. v. Indus. Risk Insurers,
336 F. Supp. 2d 282 (S.D.N.Y. 2004), aff'd, 421 F.3d 81 (2nd. Cir. 2005) ...........................20

Falco v. Ins. Co. of N. Am.,
72 Pa. D. & C. 2d 436 (Pa. Com. Pl. 1975) .........................................................................24

Galli v. N.J. Meadowlands Comm'n,
490 F.3d 265 (3d Cir. 2007)................................................................................................10

Genesis Merch. Partners, L.P. v. Gilbride, Tusa, Last & Spellane, LLC,
    157 A.D.3d 479, 69 N.Y.S.3d 30 (N.Y. App. Div. 2018) ........................................................19

GVM, Inc. et al., v. Peoples Bank (In re GVM, Inc.),
    1:19-BK-03013-HWV, 2019 WL 4256349 (Bankr. M.D. Pa. Sept. 6, 2019) .........................12

Hassett v. Revlon, Inc. (In re O.P.M. Leasing Servs., Inc.),
    23 B.R. 104 (Bankr. S.D.N.Y. 1982)..........................................................................23, 24, 25

Howard Stores Corp. v. Foremost Ins. Co.,
    82 A.D.2d 398, 441 N.Y.S.2d 674 (1981), aff'd, 56 N.Y.2d 991, 439 N.E.2d
    397 (1982)....................................................................................................................13, 15

In re HRC Joint Venture,
    175 B.R. 948 (Bankr. S.D. Ohio 1994)...........................................................................14

Jurista v. Amerinox Processing, Inc.,
    492 B.R. 707 (D. N.J. 2013) ...........................................................................................25

In re Kors, Inc.,
    819 F.2d 19 (2d Cir.1987)...............................................................................................27

Lacaille v. Feldman,
    44 Misc. 2d 370, 253 N.Y.S.2d 937 (Sup. Ct. 1964) ....................................................25

In re Lexington Hosp. Grp., LLC,
    No. 17-51568, 2017 WL 5035081 (Bankr. E.D. Ky. Nov. 1, 2017)...............................15

Local Loan Co. v. Hunt,
    292 U.S. 234 (1934)........................................................................................................14

Midatlantic Nat'l Bank v. Bridge (In re Bridge),
    18 F.3d 195 (3d Cir. 1994).............................................................................................22

Miranda v. Banco Popular de Puerto Rico (In re Rivera Mercado),
    599 B.R. 406 (B.A.P. 1st Cir. 2019)..............................................................................26

NC Venture I, L.P. v. Valley Forge Ins. Co.,
    20 Misc. 3d 1133(A), 872 N.Y.S.2d 692 (Sup. Ct. 2008) .............................................19

Ne. Copy Servs., Inc. v. Bridgeport Park Assocs. (In re Ne. Copy Servs., Inc.),
    175 B.R. 580 (Bankr. E.D. Pa. 1994) .......................................................................14, 24

Nw. States Portland Cement Co. v. Hartford Fire Ins. Co.,
    360 F.2d 531 (8th Cir. 1966) .........................................................................................13

Okin v. Isaac Goldman Co.,
    79 F.2d 317 (2d Cir. 1935)..............................................................................................24

Palmer v. Washington Mutual Bank (In re Ritchie),
    416 B.R. 638 (B.A.P. 6th Cir. 2009)................................................................24

Rodriguez v. Drive Fin. Servs., L.P. (In re Trout),
    609 F.3d 1106 (10th Cir. 2010) ....................................................................26

Rosario-Paolo, Inc. v. C & M Pizza Rest., Inc.,
    84 N.Y.2d 379, 643 N.E.2d 85 (1994)............................................................23

In re: Selden,
    62 B.R. 954 (Bankr. D. Neb. 1986) ..............................................................24

Solfanelli v. Corestates Bank, N.A.,
    203 F.3d 197 (3d Cir. 2000).........................................................................16

Staats v. Barry (In re Barry),
    31 B.R. 683 (Bankr. S.D. Ohio 1983)............................................................25

T–H New Orleans Ltd. P'ship v. Fin. Sec. Assurance, Inc. (In re T–H New
    Orleans Ltd. P'ship.), 10 F.3d 1099 (5th Cir. 1993), cert. denied, 511 U.S.
    1083 (1994)..............................................................................................11

United Savs. Ass'n v. Timbers of Inwood Forest Assocs.,
    484 U.S. 365 (1988)...................................................................................16

Wallach v. Brosnahan (In re Brosnahan),
    312 B.R. 220 (Bankr. W.D.N.Y. 2004) ..........................................................26

Weiss v. People Savings Bank (In re Three Partners, Inc.),
    199 B.R. 230 (Bankr. D. Mass. 1995) ...........................................................16

Wheeling and Lake Erie Ry. Co. v. Keach (In re Montreal, Maine & Atl. Ry.,
    Ltd.), 799 F.3d 1 (1st Cir. 2015)..............................................................12, 19

**Statutes**

11 U.S.C. § 544................................................................................22, 25, 26, 27

11 U.S.C. § 544(a) ........................................................................3, 22, 23, 24, 25

11 U.S.C. § 551..................................................................................3, 25, 26, 27

11 U.S.C. § 552(a) ..............................................................................11, 12, 13, 16

11 U.S.C. § 552(b) ........................................................................11, 12, 13, 14, 17

11 U.S.C. § 1107..........................................................................................23

U.C.C. § 9-102(64) ......................................................................................16, 18

U.C.C. § 9-109(d)(8)..................................................................................................18

**Rules**

Fed. R. Bankr. P. 7056...........................................................................................10

Fed. R. Civ. P. 56(a) ..............................................................................................10

**Other Authorities**

5 New Appleman on Insurance Law Library Edition § 46.03[1] (2019).......................................13

5 New Appleman on Insurance Law Library Edition § 41.05[4][c] (2019) .................................19

2 Couch on Ins. § 34:22 ........................................................................................21

John Eggum, Protecting Lender Interest in Insurance Proceeds: Bankruptcy and UCC
    Considerations, 25 Journal of Taxation and Regulation of Financial Institutions 33
    (Nov./Dec. 2011) ....................................................................................19, 21

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

1.      Intervenor-Defendant and Counterclaim and Cross-Claim Plaintiff, the Official Committee of Unsecured Creditors (the "Committee") duly appointed in the above-captioned chapter 11 cases (the "Chapter 11 Cases") of PES Holdings, LLC ("PES") and its affiliated debtors (collectively, the "Debtors"), hereby respectfully submits this memorandum of law in support of its motion against the Debtors and Cortland Capital Market Services, LLC ("Cortland") as Plaintiffs and Counterclaim Defendants, and ICBC Standard Bank, PLC ("ICBCS") as Defendant and Cross-Claim Defendant for summary judgment (the "Motion"). The Committee seeks entry of summary judgment denying the requested declaratory relief in the complaint (the "Underlying Complaint") [D.I. 1] filed by PES and Cortland Capital Market Services, LLC ("Cortland"), and ICBCS's counterclaim (the "ICBCS Counterclaim")[2] [D.I. 25], and granting the relief requested in the Committee's Counterclaim and Cross-Claim (the "Committee Complaint") [D.I. 24].

## INTRODUCTION

2.      Cortland and ICBCS are asking this Court to determine the relative priorities of their respective purported liens on potential future recoveries for losses covered by the Debtors' business interruption insurance related to the Girard Point Explosion (as defined below). Despite their intercreditor dispute, each assumes that they possess perfected security interests in that insurance and any amounts paid on claims asserted thereunder (such recoveries, the "BI Recoveries"). The undisputed facts, however, establish as a matter of law that neither Cortland

---

[2]     ICBCS filed an answer and counterclaim at Docket No. 25, with separately numbered paragraphs. References herein to the answer are cited "ICBCS Answer at ¶ __"), and references to the counterclaim are cited "ICBCS Counterclaim at ¶ __").

nor ICBCS has a valid, duly perfected, non-avoidable lien in the subject insurance policy or BI Recoveries, on the following grounds.[3]

3.     First, any such BI Recoveries would constitute property acquired by the Debtors after the commencement of these cases given that such recoveries would be predicated on projected revenues and profits which would be generated only beginning more than one month after the commencement of these cases.  Therefore, such proceeds would not be subject to the pre-petition security interests of ICBCS and Cortland pursuant to Section 552 of the Bankruptcy Code, nor would they constitute proceeds of any pre-petition assets in respect to which Cortland or ICBCS had a perfected lien as of the Petition Date.[4]  Accordingly, any BI Recoveries received by the Debtors will come into the Debtors' estates unencumbered by the pre-petition liens of either ICBCS or Cortland.

4.     Second, in the event that the Court were to rule that the BI Recoveries are not after-acquired property under Section 552, it would have to find that Cortland never obtained a valid, duly perfected lien on the Policy (as defined below) or the BI Recoveries.   Under applicable New York law, in order to obtain or perfect a security interest in the Policy, Cortland

---

[3]    The Committee understands that (i) the Debtors have not yet finally determined the amount of their claim on the Policy either for property damage or business interruption; (ii) the Debtors have not yet formally submitted their claim to the insurers; and (iii) the insurers have not yet accepted or rejected the Debtors' claim.  Therefore, the existence of, and the amount of, the BI Recoveries remains inchoate as of the date hereof.  Moreover, as discussed further below, the Committee understands that both ISCBC and Cortland were granted adequate protection replacement liens on substantially all assets of the Debtors' estates, but only to the extent of the diminution in value of their secured position as of the commencement of the case.  The DIP Lenders were also granted a lien on these recoveries pursuant to the *Interim Order (I) Authorizing Debtors To (A) Obtain Post-Petition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) And 364(e) And (B) Utilize Cash Collateral Pursuant To 11 U.S.C. § 363; (II) Granting Adequate Protection To Prepetition Secured Parties Pursuant To 11 U.S.C. §§ 361, 362, 363, 364 And 507(b) And (III) Scheduling Final Hearing Pursuant To Bankruptcy Rules 4001(b) and (c)* [D.I. 85] (the "Interim DIP Order").  The Committee is not disputing whether such adequate protection replacement liens or DIP Liens will attach to any BI Recoveries; only whether ICSBC and Cortland have valid, duly perfected and non-avoidable prepetition liens on any such recoveries.

[4]    Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Committee Complaint.

would have had to be expressly named as a loss payee in the policy itself or an endorsement thereto. All parties acknowledge that neither the Policy nor the subsequent endorsements thereto name Cortland as loss payee. Thus, any lien that Cortland purports to have is avoidable pursuant to Sections 544(a)(1) and (2) of the Bankruptcy Code.

5.    Third, although not raised in the Underlying Complaint, Cortland, as a result of its failure to be named as a loss payee, also lacks a perfected security interest in any property damage recovery received under the Policy in respect to the Alkylation Unit (as defined below) and related fixtures (the "Real Property Recoveries"). To the extent that Cortland could argue that it has an entitlement to the Real Property Recoveries on account of its mortgage on the Alkylation Unit and related fixtures, its liens on the Real Property Recoveries would still be avoidable under Sections 544(a)(1) and (2) because they would be subject to a judicial lien or execution under applicable state law.[5]

6.    Finally, the Debtors and Cortland have argued that the BI Recoveries constitute Term Loan Priority Collateral. Thus, pursuant to Section 551 of the Bankruptcy Code, as a result of the avoidance of Cortland's unperfected lien on BI Recoveries and Real Property Recoveries and the estates' status as a successor to Cortland in respect to such avoided and preserved lien under the Intercreditor Agreement, the Debtors' estates are entitled to step into the shoes of Cortland with respect to the turnover provision of the intercreditor agreement that requires ICBCS to pay over to Cortland any BI Recoveries and/or Real Property Recoveries that

---

[5]    The Committee has been granted standing to prosecute the causes of action herein related to the BI Recoveries (Counts I, II, and IV of the Committee Complaint). *Stipulation and Agreed Order Among Debtors, Committee, ICBC Standard Bank PLC and Cortland Capital Market Services LLC in Connection With the Insurance Proceeds Adversary Proceeding* (the "Agreed Order") [D.I. 23] (entered as an order by the Court on September 11, 2019). Each of such counts challenges ICSBC's or Cortland's prepetition liens on the BI Recoveries. With respect to the Committee's claim against Cortland regarding the Real Property Recoveries (Count III of the Committee Complaint), the Debtors have not consented to the Committee's standing. The Committee is thus filing concurrently herewith the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order, Pursuant to Bankruptcy Code Sections 1103(c) and 1109(b), Granting Leave, Standing, and Authority to Commence, Prosecute and, if Appropriate, Settle the Real Property Insurance Claim.*

ICBCS would otherwise be entitled to receive on account of its perfected security interest, and to specifically enforce that provision.

7.      The material facts are undisputed; the existence and/or perfection of liens is purely a question of law.  So too the turn-over rights and obligations under the Intercreditor Agreement.  Summary judgment in the Committee's favor is appropriate.

## STATEMENT OF UNDISPUTED FACTS

### A.  The Girard Point Explosion Damages The Alkylation Unit

8.      On June 21, 2019, there was a large-scale explosion at the 433 alkylation unit (the "Alkylation Unit") of the Debtors' Girard Point Facility (the "Girard Point Explosion"). (Underlying Complaint at ¶ 33; ICBCS Answer at ¶ 33; ICBCS Counterclaim at ¶ 35).

9.      The Debtors claim that as a result of the Girard Point Explosion, the Debtors' refinery on Girard Point (the "Refinery") was rendered inoperable.  (Underlying Complaint at ¶ 34).

10.     On July 21, 2019, the Debtors filed these chapter 11 cases.  (Underlying Complaint at ¶ 5; ICBCS Answer at ¶ 5)

### B.  The Term Loan

11.     PES is the borrower under a term loan facility dated August 7, 2018 (the "Term Loan Facility") by and among PES, the lenders from time to time party thereto, and Cortland Capital Market Services, LLC as administrative agent ("Cortland").  Approximately $698.6 million is outstanding under the Term Loan Facility. (Underlying Complaint, Exhibit B).

12.     The Term Loan Facility does not require that the Debtors purchase and maintain a business interruption insurance policy.  (Underlying Complaint, Exhibit B).

13.     In conjunction with the Term Loan Facility, the Debtors executed a Pledge and Security Agreement (the "Term Loan Security Agreement").  Among the collateral pledged to

4

Cortland in the Term Loan Security Agreement is "any and all Proceeds of any insurance" with respect to security interests granted in, among other things:

- Accounts;
- Inventory (including raw materials);
- Money and Deposit Accounts;
- Documents and chattel paper; instruments; general intangibles (including rights, title, and interest in insurance policies) and investment property; commercial tort claims; and supporting obligations; and
- The proceeds of the foregoing.

(Underlying Complaint, Exhibit D).

### C. The Intermediation Facility

14.    On June 18, 2019, ICBCS and certain Debtors entered into the Sixth Amended and Restated Supply and Offtake Agreement (the "Intermediation Facility"). (Underlying Complaint, Exhibit A).

15.    Pursuant to the Intermediation Facility and related documents, ICBCS provides the Debtors with crude oil and non-crude feedstock requirements of the Debtors' Refining Complex. ICBCS purports to purchase these feedstocks from third parties identified by the Debtors at prices negotiated by the Debtors. Upon delivery to the Debtors, these inputs are stored in tanks at the Refining Complex or at third-party facilities, and are purchased by the Debtors as they are removed from tankage and processed at the Refining Complex. Once the inputs are refined, ICBCS purports to purchase substantially all of the barrels processed through the Refining Complex at a price based on certain specified pricing indexes for each refined product in effect at the time of purchase. ICBCS then sells the refined products to third parties identified by the Debtors at prices negotiated by the Debtors. (Underlying Complaint, Exhibit A and ¶¶ 26-28; ICBCS Answer at ¶¶ 26-28).

16.    In conjunction with the Intermediation Facility, certain debtors and ICBCS executed a security agreement ("ICBCS Security Agreement"). The ICBCS Security Agreement grants ICBCS a security interest in, among other things:

- Accounts;
- Inventory (including raw materials);
- Renewable Identification Numbers;
- Money and Deposit Accounts;
- Letters of Credit;
- Equipment;
- Fixtures;
- Trademarks;
- Equity interests in subsidiaries;
- To the extent evidencing any of the foregoing, Documents; Instruments; General Intangibles; Commercial Tort Claims; and Supporting Obligations;
- Records evidencing the foregoing; and
- All proceeds and products of each of the above, including any and all insurance proceeds.

(Underlying Complaint, Exhibit F).

17.    Pursuant to Section 10.04 of the Intermediation Facility, certain Debtors committed to maintain both property damage and business interruption insurance. The Intermediation Facility also requires that all insurance policies name ICBCS as mortgagee, additional insured, and loss payee. (Underlying Complaint, Exhibit A).

18.    Section 10.04 of the Intermediation Facility further provides that all insurance policies "shall name ICBCS as mortgagee, additional insured and loss payee . . . ." (Underlying Complaint, Exhibit A).

**D. The Intercreditor Agreement**

19.    The respective priority, subordination, and pay-over rights in the collateral as between Cortland and ICBCS are governed by an intercreditor agreement dated August 7, 2018 (the "Intercreditor Agreement") by and among Cortland, Merrill Lynch Commodities, Inc. as Initial SOA Collateral Agent, ICBCS (as Successor SOA Collateral Agent), and Debtors PES

6

and Philadelphia Energy Solutions Refining and Marketing LLC. (Underlying Complaint, Exhibit J).

20.    As set forth in Sections 1.02 and 4.01 of the Intercreditor Agreement, ICBCS and Cortland have priority, respectively, in the following collateral:[6]

- SOA Priority Collateral (ICBCS):
  - Accounts;
  - Inventory;
  - Money and Deposit Accounts related to the foregoing;
  - Documents, Instruments, General Intangibles, Commercial Tort Claims, and Supporting Obligations, all to the extent related to Accounts and/or Inventory;
  - Letters of Credit supporting payments of Accounts or Inventory; and
  - Proceeds and products of and with respect to any of the foregoing (including insurance payments).

- Term Loan Priority Collateral (Cortland)
  - All collateral that is neither SOA Priority Collateral nor "Excluded Property" (as defined in the Intercreditor Agreement).

(Underlying Complaint, Exhibit J).

21.    Additionally, the Intercreditor Agreement provides ICBCS with an exclusive lien on certain collateral (the "SOA Separate Assets and Collateral"), as defined in Section 1.02 of the Intercreditor Agreement. (Underlying Complaint, Exhibit J).

22.    The Intercreditor Agreement provides Cortland with a second lien on the SOA Priority Collateral, and ICBCS with a second lien on the Term Loan Priority Collateral. (Underlying Complaint, Exhibit J).

23.    Pursuant to Section 2.01(c) of the Intercreditor Agreement, the failure of either Cortland or ICBCS to perfect its liens on any collateral, or the avoidance, invalidation or

---

[6]    This list includes only the collateral that the Committee believes could be relevant to ICBCS's claim with respect to the BI Recoveries, and is not a complete list of SOA Priority Collateral.

subordination of either of their liens does not alter the respective rights and priorities among Cortland and ICBCS with respect to such collateral. (Underlying Complaint, Exhibit J).

24.    Pursuant to Section 4.01(c) of the Intercreditor Agreement, in the event that either ICBCS or Cortland receives any collateral or the proceeds thereof which constitutes the other's priority collateral, such recipient is obligated to hold such collateral in trust and turn it over to the other party whose first priority collateral it is until such first priority party's obligations have been paid in full. (Underlying Complaint, Exhibit J).

25.    Debtors PES and Philadelphia Energy Solutions Refining and Marketing LLC are parties to the Intercreditor Agreement. (Underlying Complaint, Exhibit J).

26.    Section 8.09 of the Intercreditor Agreement provides that the Intercreditor Agreement "shall be binding upon and inure to the benefit of each of the parties hereto and each of the First Priority Secured Parties and Second Priority Secured Parties and their respective successors and permitted assigns . . . ." (Underlying Complaint, Exhibit J).

E. **The Policy**

27.    The Debtors purchased and are the named insured under a property casualty insurance policy, denoted "All Risk Property Damage including a Time Element" (the "Policy"). The indemnity limits under the Policy are $1.25 billion. The Policy comprises several insurance policies with different insurers, each of which insures a portion of the coverage limit stipulated in the Policy. Each insurer's individual policy largely follows a base Policy. The Policy is governed by New York law. (Underlying Complaint, Exhibit H and ¶¶ 58-60; ICBCS Answer ¶¶ 58-60).

28.    Section I of the Policy sets forth the extent of and conditions of recovery related to damage to the Debtors' real and personal property, including "crude petroleum and its products, products of natural gas, or other minerals, after initial recovery above ground; and all

8

other products held for sale . . . ." Policy at I.1(i).  Section I.3 states that "[t]his Section of the Policy insures all risks of direct physical loss or damage occurring during the Term of Insurance to Property Insured except as excluded herein." (Underlying Complaint, Exhibit H).

29.    Section II of the Policy sets forth the extent of and conditions of recovery related to business interruption.  Section II.8 of the Policy describes the basis of such recovery, and provides that such recovery "shall be the actual loss sustained by the Insured resulting from the necessary interruption of business caused by direct physical loss or damage, by a peril insured against, to property insured herein." (Underlying Complaint, Exhibit H).

30.    Section II.10(c) of the Policy states that the period for which business interruption insurance is available "commenc[es] with the date of the direct physical loss or damage but [does] not exceed[] the length of time as would be required, with the exercise of due diligence and dispatch, to rebuild, repair or replace the lost, destroyed or damaged property and not limited by the expiration of this Policy," but, in any case, not exceeding twenty-four months. (Underlying Complaint, Exhibit H).

31.    Declaration 6 of the Policy further states that any loss attributable to business interruption is subject to a sixty-day waiting period after the loss or damage occurs (the "BI Deductible"). (Underlying Complaint, Exhibit H).

32.    The BI Recoveries are thus intended to compensate the Debtors for estimated lost profits that would have been earned, but for the Girard Point Explosion, from and after August 20, 2019 (which date is thirty days after the Petition Date). (Underlying Complaint at Exhibit H and ¶ 64; ICBCS Counterclaim at ¶ 32).

33.    The Policy contains an endorsement naming ICBCS as a Loss Payee/Mortgagee. The Policy does not contain an endorsement naming Cortland as a Loss Payee/Mortgagee. (Underlying Complaint, Exhibit H).

34.    Cortland is identified as a loss payee/mortgagee on a document entitled "Evidence of Property Insurance" (the "Certificate"), which was attached as Exhibit E to the Underlying Complaint. The Certificate expressly states:

> This evidence of property insurance is issued as a matter of information only and confers no rights upon the additional interest named below. This evidence does not affirmatively or negatively amend, extend, or alter the coverage afforded by the policies below. This evidence of insurance does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the additional interest.

(Underlying Complaint, Exhibit E).

## ARGUMENT

### I.    Applicable Legal Standard.

35.    Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056.

36.    Once the moving party establishes that there is no genuine dispute as to any material fact, the burden shifts to the non-moving party to identify "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). To avoid the entry of summary judgment, the non-moving party cannot rest upon allegations in the pleadings and "must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." Galli v. N.J. Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007); see also Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013) ("To establish a prima facie case at summary

judgment, 'the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case.'") (quoting Duffy v. Paper Magic Grp., 265 F.3d 163, 167 (3d Cir. 2001)).

## II.    Summary Judgment Should Be Granted In Favor Of The Committee Because The BI Recoveries Constitute After-Acquired Property.

37.    The BI Recoveries are not subject to the pre-petition security interests of ICBCS and Cortland pursuant to Section 552 of the Bankruptcy Code because (i) the BI Recoveries constitute property acquired by the Debtors after the commencement of these Chapter 11 Cases; and (ii) are payable to compensate the Debtors for projected revenues and profits which would have been generated post-petition but for the Girard Point Explosion.

     *a.*    *Under 11 U.S.C. § 552(a), BI Recoveries Constitute After-Acquired Property To Which The Security Interests Of ICBCS And Cortland Do Not Attach.*

38.    Section 552(a) of the Bankruptcy Code provides that "[e]xcept as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a). Section 552(b) of the Bankruptcy Code provides a narrow exception to Section 552(a) for certain proceeds of pre-petition collateral.

39.    "[P]ost-petition property acquired by the debtor's estate, such as revenues generated from operations, is not subject to any liens resulting from pre-petition security agreements" unless the exception for proceeds in Section 552(b) (discussed below) is met. In re Cafeteria Operators, L.P., 299 B.R. 400, 405 (Bankr. N.D. Tex. 2003); see also Arkison v. Sundt Construction, Inc. (In re Skagit Pac. Corp.), 316 B.R. 330, 335 (B.A.P. 9th Cir. 2004) ("Section 552(a) cuts off security interests on property acquired by the debtor after the petition date even if there is an 'after-acquired' clause in the security agreement."); T–H New Orleans Ltd. P'ship v.

11

Fin. Sec. Assurance, Inc. (In re T–H New Orleans Ltd. P'ship.), 10 F.3d 1099, 1104 (5th Cir. 1993), cert. denied, 511 U.S. 1083 (1994) ("[P]roperty acquired by the debtor post-bankruptcy is not subject to a lien created by a security agreement before bankruptcy."); GVM, Inc. et al., v. Peoples Bank (In re GVM, Inc.), 1:19-BK-03013-HWV, 2019 WL 4256349, at *5 (Bankr. M.D. Pa. Sept. 6, 2019) (noting that a pre-petition security interest in inventory and accounts receivable does not attach to post-petition inventory and accounts receivable under 11 U.S.C. § 552(a)).

40.     The BI Recoveries, if any, will come into the estate post-petition, and on that basis alone, constitute after-acquired property under Section 552(a). See Wheeling and Lake Erie Ry. Co. v. Keach (In re Montreal, Maine & Atl. Ry., Ltd.), 799 F.3d 1, 7 (1st Cir. 2015). The question in Montreal was whether a secured creditor could claim an interest in a settlement fund comprised of proceeds of the debtor's business interruption policy. Id. at 4. The First Circuit held that the secured creditor was not entitled to the settlement funds because it did not have a perfected security interest in the business interruption policy under state law. Id. at 11. In so holding, the First Circuit stated that *even if* the secured creditor had a perfected security interest in the debtor's business interruption policy under state law, the debtor's right to payment of the business interruption proceeds would be after-acquired property not subject to the exception in Section 552(b) because the insurer only agreed to pay the settlement after the initiation of the bankruptcy proceedings. Id. at 7. Montreal is on all fours with the facts in this case. Any decision by the insurers to pay the Debtors' business interruption claim will necessarily happen post-petition, and therefore any BI Recoveries would be after-acquired property.

41.     Furthermore, the BI Recoveries are after-acquired property because business interruption insurance is intended to compensate the insured for loss of earnings during the covered period, which covered period *began*, in this case, no earlier than one month after the chapter 11 petition was filed. See Howard Stores Corp. v. Foremost Ins. Co., 82 A.D.2d 398, 400, 441 N.Y.S.2d 674, 676 (1981), aff'd, 56 N.Y.2d 991, 439 N.E.2d 397 (1982) ("[T]he purpose of business interruption insurance is to indemnify the insured against losses arising from the inability to continue normal business operations and functions due to the damage sustained as a result of the hazard insured against."); see also Nw. States Portland Cement Co. v. Hartford Fire Ins. Co., 360 F.2d 531, 534 (8th Cir. 1966) (holding that "the essential nature and purpose of business interruption insurance generally is to protect the earnings which the insured would have enjoyed had there been no interruption of the business" and collecting cases for the same proposition); 5 New Appleman on Insurance Law Library Edition § 46.03[1] (2019) (noting that the purpose of business interruption insurance "is to do for the insured during the period of business interruption what the business would have done had no interruption occurred."). Accordingly, the BI Recoveries are the equivalent of the "revenues generated" from post-petition operations, which revenues are after-acquired property pursuant to Section 552(a) of the Bankruptcy Code.

42.     Therefore, the BI Recoveries will constitute after after-acquired property pursuant to Section 552(a).

  b.    *BI Recoveries Are Not Proceeds Of The Debtors' Pre-petition Assets Under 11 U.S.C. § 552(b).*

43.     Nor can Cortland and ICBCS claim that their liens extend to the BI Recoveries as "proceeds" of pre-petition collateral under the exception in Section 552(b), which provides that "if the debtor and an entity entered into a security agreement before the commencement of the

13

case and if the security interest created by such security agreement extends to property of the debtor acquired *before* the commencement of the case and to *such proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring or profits acquired by the estate after the commencement of the case*[.]"  11 U.S.C. § 552(b)(1) (emphasis added).

44.    Courts evaluating what constitutes "[p]roceeds" under Section 522(b)(1) have generally taken guidance from the Supreme Court's decision in <u>Local Loan Co. v. Hunt</u>, "which forbade 'the creation of an enforceable lien upon a subject not existent when the bankruptcy became effective or even arising from, or connected with, preexisting property, but brought into being solely as the fruit of the subsequent labor of the bankrupt.'" <u>In re Barbara K. Enters., Inc.</u>, No. 08-11474 (MG), 2008 WL 2439649, at *10 (Bankr. S.D.N.Y. June 16, 2008) (examining definition of proceeds under New York Commercial Code and Section 552(b)(1)) (quoting <u>Local Loan Co. v. Hunt</u>, 292 U.S. 234, 243 (1934)).  Accordingly, "revenue generated by the operation of the debtor's business, post-petition, is not considered proceeds of pre-petition property if such revenue represents compensation for goods and services rendered by the debtor in its everyday business performance." <u>Skagit</u>, 316 B.R. at 336; <u>see also</u> <u>In re HRC Joint Venture</u>, 175 B.R. 948, 953 (Bankr. S.D. Ohio 1994) (holding that "proceeds of a post-petition account receivable do not fall within the §552(b) proceeds exception because there is no interest in the right, in the account receivable, created pre-petition where it is only post-petition acts which generated that account receivable"); <u>Ne. Copy Servs., Inc. v. Bridgeport Park Assocs. (In re Ne. Copy Servs., Inc.)</u>, 175 B.R. 580, 583 (Bankr. E.D. Pa. 1994) (holding that cash generated by debtors' post-petition copy services are not proceeds of pre-petition collateral).

45.    In Skagit, a chapter 7 trustee appealed the bankruptcy court's recognition of a secured creditor's security interest in proceeds from an account receivable. The debtor's secured creditor held a valid and enforceable pre-petition security interest in owned and after-acquired accounts receivable and all proceeds of such collateral. The secured creditor alleged that its security interest attached to proceeds of an account receivable created and collected post-petition. The Bankruptcy Appellate Panel of the Ninth Circuit upheld the trustee's appeal for two independent reasons. First, the receivable at issue was created post-petition: "a creditor's security interest only encompasses the cash collected on existing pre-petition accounts." Skagit, 316 B.R. at 336. Second, the debtor's post-petition acts in the manufacturing and production process created the receivable, and what is produced by a debtor's post-petition labor or services is after-acquired property: "revenue generated by the operation of a debtor's business, post-petition, is not considered proceeds if such revenue represents compensation for goods and services rendered by the debtor in its everyday business performance." Id.

46.    The purported "proceeds" at issue in the current case are one step further removed from the post-petition accounts receivable described in Skagit. Business interruption insurance proceeds are premised on an insured's *hypothetical* continued operation and revenues derived therefrom during the period needed to restore the damaged premises. Indeed, the "losses payable under a business interruption policy are estimated based on 'experience of the business before the catastrophe and its probable experience thereafter.'" Howard, 82 A.D.2d at 401 (quoting 15 Couch, Cyclopedia of Insurance Law [2d ed.], § 57:28). Thus, the BI Recoveries are intended as compensation for revenues that *would have been* generated by the Debtors based on their post-petition acts, services, and labor in refining crude oil, and are not traceable to any pre-petition accounts or inventory. Cf. In re Lexington Hosp. Grp., LLC, No. 17-51568, 2017 WL 5035081

(Bankr. E.D. Ky. Nov. 1, 2017), at *13 (holding that portion of debtor's revenues received from services provided is not proceeds of pre-petition collateral); Bank of N. Georgia v. Strick Chex Columbus Two, LLC, (In Matter of Strick Chex Columbus Two, LLC), 542 B.R. 914, 919-20 (Bankr. N.D. Ga. 2015) (same).[7]

47.    Finally, the definition of "proceeds" in the Uniform Commercial Code (the "U.C.C.") requires that the BI Recoveries be received in exchange for an asset in respect to which Cortland or ICBCS had a perfected lien as of the commencement of these Chapter 11 Cases[8] or in compensation for damage or injury done to such an asset. See U.C.C. § 9-102(64). The BI Recoveries do not fit within either element of such definition. First, the claims filed under Section I of the Policy for property damage are intended as compensation for the costs of repairing the physical damage done to the Refinery's machinery, equipment, fixtures and real

---

[7]    The Committee is aware that pre-petition secured creditors often seek and obtain post-petition orders granting them replacement or rollover liens on post-petition property. The need for such creditors to obtain orders granting them such replacement liens proves the Committee's basic point. In the absence of such an order, Section 552(a) would otherwise work to cut off the pre-petition lien on inventory or receivables. See Solfanelli v. Corestates Bank, N.A., 203 F.3d 197, 203 (3d Cir. 2000) (holding that secured creditor did not have rights to post-petition funds because Section 552(a) acted to cut off its lien, and secured creditor did not "procure a replacement lien."); see also Weiss v. People Savings Bank (In re Three Partners, Inc.), 199 B.R. 230, 239 (Bankr. D. Mass. 1995) (holding that "[i]n order for a creditor with a pre-petition lien to continue that lien in property acquired by a debtor post-petition, it is incumbent on the secured party to obtain a court order granting a lien in post-petition property (commonly referred to as a 'rollover lien.'"). Moreover, such replacement liens are granted solely as adequate protection against diminution in the value of pre-petition collateral as it existed as of the Petition Date due to the automatic stay. See United Savs. Ass'n v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371-72 (1988) (creditors are only entitled to adequate protection to the extent that depreciation in the value of the collateral threatens to diminish the priority position that the secured lender had on the Petition Date). Thus, Cortland and ICBCS may therefore be entitled to replacement liens to the extent of the *diminution* in the value of their collateral, as provided in the proposed *Final Order (I) Authorizing Debtors To (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) And 364(e) And (B) Utilize Cash Collateral Pursuant To 11 U.S.C. § 363 And (II) Granting Adequate Protection To Prepetition Secured Parties Pursuant To 11 U.S.C. §§ 361, 362, 363, 364, And 507(b)* [D.I. 358-1] at ¶¶ 15(a), 16 (the "Proposed Final DIP Order"). Similarly, DIP Lenders (as that term is defined in the Proposed Final DIP Order) may claim a lien on any BI Recoveries as security for the DIP Obligations to the extent ultimately provided in such order when it is entered or the Interim DIP Order. However, granting them an interest in the BI Recoveries beyond such adequate protection replacement liens or DIP Liens would represent an enhancement of their secured position during these Chapter 11 Cases of the type that Section 552(a) was intended to prevent, in violation of Timbers.

[8]    The Bankruptcy Code does not define "proceeds." Courts rely instead on the U.C.C. itself, the relevant definitions in which are quoted below.

property collateral, which is the primary element of Cortland's Term Loan Priority Collateral. BI Recoveries do not serve as compensation for physical damage, but for hypothetical lost future revenues. Second, as of the Petition Date, ICBCS had a priority lien or ownership interest in a defined pool of feedstock and refined hydrocarbon product and accounts receivable which existed as of such date. Given that the Refinery is not operating, this is not the typical situation where such prepetition hydrocarbon inventory and receivables will continue to be consumed and recycled through the normal business cycle. Rather, the discrete pool of hydrocarbon inventory and receivables which existed on the petition date largely continues to exist, and to the extent that ICBCS had a valid, perfected and non-avoidable security or ownership interest on such hydrocarbons and receivables as of the Petition Date, it retains such interests as well as an interest in the cash proceeds which have been or will generated from their removal from the storage tanks in which they are held and their sale to third parties (and to the extent, such assets decline in value during the cases and ICBCS is determined to be entitled to adequate protection, ICBCS may look to the replacement lien granted to it pursuant to the Interim DIP Order and the Proposed Final DIP Order). In other words, the entirety of BI Recoveries on account of hypothetical future hydrocarbon purchases, refining, and sales which ICBCS will not be financing under its Intermediation Agreement in no way represent "proceeds" of the discrete pool of pre-petition hydrocarbons in respect to which it had a lien or ownership interest as of the Petition Date. Thus, if ICBCS is *also* found to have a lien on the BI Recoveries payable under Section II of the Policy as "proceeds" of SOA Priority Collateral or SOA Separate Assets and Collateral, ICBCS would be receiving a windfall.

48.    Therefore, the BI Recoveries are not subject to the exception in Section 552(b)(1) of the Bankruptcy Code.

49.     There is no genuine dispute of material fact (and, indeed, the Debtors, Cortland, and ICBCS each admit) that the BI Recoveries are intended to compensate the Debtors for lost profits that would have been earned, but for the Girard Point Explosion, from and after August 20, 2019. Thus, the Committee is entitled to summary judgment with respect to Count I of the Committee Complaint.

### III.    Cortland Does Not Have A Perfected Lien On The Policy.

50.     Cortland does not dispute that it is not named as loss payee on the Policy. Because Cortland is not so named, Cortland's lien on the Policy is not perfected, and the Certificate does not operate to create a loss payee status or otherwise to perfect Cortland's lien.

*a.     Cortland's Lien On The BI Recoveries Is Unperfected Because Cortland Is Not "Loss Payee."*

51.     Cortland has, at best, an unperfected lien on the BI Recoveries because the Policy does not designate Cortland as a "Loss Payee."

52.     The legal requirements for perfecting a security interest in an insurance policy are governed by applicable state law other than the subject state's adopted version of the U.C.C. See U.C.C. § 9-109(d)(8) ("This article does not apply to . . . a transfer of an interest in or an assignment of a claim under a policy of insurance, . . . but Sections 9-315 and 9-322 apply with respect to proceeds and priorities in proceeds"); U.C.C. § 9-102(64): ("'Proceeds' means the following property: . . . (E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral."). As described above, the Debtors' casualty insurance proceeds are payable under Section I of the Policy by reason of the loss of or damage to the collateral; the BI Recoveries, on the other hand, are payable under Section II of the Policy to compensate the Debtors for income that would have been earned post-petition but

18

for the Girard Point Explosion. See also Genesis Merch. Partners, L.P. v. Gilbride, Tusa, Last & Spellane, LLC, 157 A.D.3d 479, 481, 69 N.Y.S.3d 30, 32 (N.Y. App. Div. 2018) (direct security interest in an insurance policy is excluded by the U.C.C.); In re Montreal, Maine & Atl. Ry, 799 F.3d at 5 (same).

53.     In this case, Declaration 8 of the Policy states that "[a]ny dispute relating to this Policy . . ., the interpretation of any provision of the Policy shall be governed by and construed in accordance with the laws of the State of New York, United States." As such, New York law controls whether a security interest in the Policy or proceeds related thereto has been properly perfected. See id. at 10 (concluding that if Article 9 does not control perfection analysis, then parties must resort to relevant state common law).

54.     Under New York law, a party perfects an interest in insurance proceeds by "having itself named in the insurance contract as the loss payee or as an additional insured on the risk." Badillo v. Tower Ins. Co. of New York, 92 N.Y.2d 790, 796, 709 N.E.2d 104, 107 (1999) (holding that insurer properly paid proceeds of insurance policy to named insured and not secured party, where secured party only filed U.C.C.-1 financing statement and did not obtain loss payee endorsement); see also NC Venture I, L.P. v. Valley Forge Ins. Co., 20 Misc. 3d 1133(A), 872 N.Y.S.2d 692 (Sup. Ct. 2008) (same); see generally John Eggum, Protecting Lender Interest in Insurance Proceeds: Bankruptcy and UCC Considerations, 25 Journal of Taxation and Regulation of Financial Institutions 33, 35 (Nov./Dec. 2011) (discussing perfection of interests in insurance policies); 5 New Appleman on Insurance Law Library Edition § 41.05[4][c](2019) ("[a] loss payable provision typically entitles an insured's creditor identified as the loss payee to a portion of the proceeds in the event of property loss.").

55.    General Condition 33 of the Policy sets forth a "Lenders Loss Payable" clause that states:

> Loss or damage, if any, under this Policy, shall be paid to any lender designated by the Insured and in possession of a written contract, hereinafter referred to, as "the Lender", as their interests may appear, its successors and assigns in whatever form or capacity its interests may appear and whether said interest be vested in said Lender in its individual or in its disclosed or undisclosed fiduciary or representative capacity, or otherwise, or vested in a nominee or trustee of said Lender.

56.    Cortland was not "designated by the Insured" as a loss payee.  The Policy itself does not contain any loss payee designations: such designations are located in the endorsements to the Policy.  Endorsement 3 to the Policy names Merrill Lynch Commodities, Inc., ICBCS's predecessor SOA Collateral Agent, as loss payee, and Endorsement 4 names ICBCS as loss payee.  There is no such endorsement naming Cortland as loss payee.  Because Cortland is not a loss payee, it does not have a perfected security interest in the Policy.

### b.    *The Certificate Does Not Provide Cortland With Loss Payee Status.*

57.    Cortland points to two independent documents that it says confirms its status as a named "loss payee:" a certificate of insurance issued after the policy was sold and a forbearance agreement between Cortland and the Debtors.  With respect to the Certificate, it is not part of the Policy, and it expressly reminds the recipient that it is not itself a contract and "confers no rights upon" anyone, including Cortland.   Nor does it "amend, extend, or alter the coverage afforded by the [Policy]."  Thus, the Certificate alone cannot make Cortland a loss payee.[9]

---

[9]    Similarly, the self-serving statement in the Term Loan Facility Forbearance Agreement (as defined in the Underlying Complaint) that the Term Loan Facility lenders 'hold valid and perfected liens over any and all such' insurance proceeds does not create any such liens if they did not already exist.  To the extent it did, it would be avoidable as a preference, as such agreement was executed on July 3, 2019, eighteen days before the Petition Date.  Nor does it "designate" Cortland to the insurers as loss payee under the Policy: the Term Loan Facility Forbearance Agreement is a contract between PES and Cortland only, and did not provide any information or "designation" to the insurers, who were not party to that contract and may not have even seen such contract.

58.    Cortland's reading of the Certificate as granting it loss payee status is not only counter to the terms of the Certificate itself, but to prevailing law, both in New York and elsewhere.    See Citigroup, Inc. v. Indus. Risk Insurers, 336 F. Supp. 2d 282, 292 (S.D.N.Y. 2004) (holding that certificate of insurance could not make party a loss payee under policy), aff'd, 421 F.3d 81 (2nd. Cir. 2005); see also All Crane Rental of Georgia, Inc. v. Vincent, 47 So. 3d 1024, 1029-31 (La. App. 2010) (holding that a certificate of insurance does not operate to modify the terms of an insurance policy); Am. Ref-Fuel Co. of Hempstead v. Res. Recycling, Inc., 248 A.D.2d 420, 423, 671 N.Y.S.2d 93, 96 (N.Y. App. Div. 1998) (finding summary judgment particularly appropriate where the third party who was not designated in the policy proffers only a certificate of insurance); Eggum, Protecting Lender Interest in Insurance Proceeds: Bankruptcy and UCC Considerations at 36 (citing Citigroup and stating "[I]n case after case, courts have found that certificates of insurance do not modify insurance policies, and therefore reliance on certificates of insurance to show evidence of a policy modification or addendum is misplaced."); see generally, 2 Couch on Ins. § 34:22 ("It is critically important for the mortgagee to make sure that the policy of insurance is endorsed to affect the mortgage interest.  Verification of the endorsement should be secured by the mortgagee.  A certificate of insurance would be a general indication that such has been accomplished, but the best evidence is the actual policy or declaration page.").

59.    Therefore, the Certificate does not operate to grant Cortland loss payee status. Because Cortland had not taken the actions required to perfect its lien on the Policy under New York law as of the Petition Date, any lien it may claim on the Policy is unperfected and avoidable.[10]

---

[10]   The Committee does not dispute, however, that Cortland may claim an interest in the property and casualty recovery under the Policy attributable to damage to its equipment and other personal property collateral which

IV.   **The Debtors' Strong Arm Powers Allow The Committee To Avoid Cortland's Unperfected Lien On The Policy.**

a.   *The Committee Can Avoid Cortland's Unperfected Lien On The BI Recoveries.*

60.     Under the "strong arm" provisions of Section 544(a) of the Bankruptcy Code, a bankruptcy trustee has the status of a hypothetical judicial lien or attaching creditor as of the petition date.  See Midatlantic Nat'l Bank v. Bridge, (In re Bridge), 18 F.3d 195, 199 (3d Cir. 1994) (Section "544(a)(1) confers upon the trustee the rights of a hypothetical judgment lien creditor" and Section 544(a)(2) "confers upon the trustee the rights of a hypothetical unsatisfied execution creditor").

61.     Section 544(a)(1) provides that, after the bankruptcy filing, a trustee can avoid any transfer made or obligation incurred by the debtor that would be voidable by a judicial lien creditor under nonbankruptcy law.  See 11 U.S.C. § 544; see also Cerrato v. BAC Home Loans Services, (In re Cerrato), 504 B.R. 23, 31 (Bankr. E.D.N.Y. 2014) (citing In re Kors, Inc., 819 F.2d 19, 22–23 (2d Cir.1987)) (with hypothetical judgment lien creditor status granted under Section 544, the trustee is "entitled to the benefits derived from relevant state laws governing the priority of liens."); Carr v. Loeser (In re Int'l Auction & Appraisal Servs. LLC), 493 B.R. 460, 463 (Bankr. M.D. Pa. 2013) ("Section 544 enables a trustee to use state law to avoid any transfer that an unsecured creditor could have avoided outside of bankruptcy.").  Additionally, Section 544(a)(2) "confers upon the trustee the rights of a hypothetical unsatisfied execution creditor." In re: Bridge, 18 F.3d at 199. Collectively, these provisions both permit the trustee to avoid any unperfected liens of secured creditors.  Upon filing for bankruptcy, a debtor in possession

---

were damaged in the Girard Point Explosion, pursuant to the U.C.C. definition of "proceeds" quoted above. However, such definition does not apply to its real estate collateral, as discussed below.

maintains all the rights and powers held by a trustee, including the right to avoid liens. See 11 U.S.C. § 1107.

62.     Because Cortland is not named as a loss payee under the Policy, any lien Cortland may purport to have on the BI Recoveries pursuant to the Term Loan Security Agreement is unperfected under New York law, and would, therefore, be subject to the rights of an attaching or judicial lien creditor.  Accordingly, Cortland's lien on the BI Recoveries may be avoided by the Committee pursuant to Sections 544(a)(1) and (2) of the Bankruptcy Code. See In re Int'l Auction and Appraisal Servs. LLC, 493 B.R. at 463 ("Section 544 enables a trustee to use state law to avoid any transfer that an unsecured creditor could have avoided outside of bankruptcy."); accord Hassett v. Revlon, Inc. (In re O.P.M. Leasing Servs., Inc.,) 23 B.R. 104, 119 (Bankr. S.D.N.Y. 1982) (noting that unperfected liens are avoidable under state law by judgement lien creditors).

63.     There is no genuine dispute of material fact that Cortland is not a loss payee under the Policy, and thus the Committee is entitled to summary judgment with respect to Count II of the Committee Complaint.

*b.      The Committee Can Avoid Cortland's Unperfected Lien On The Real Property Recoveries.*

64.     Because Cortland is not a loss payee under the Policy, it also lacks a perfected security interest in the Real Property Recoveries, and Cortland's unperfected lien can be avoided pursuant to Section 544(a) of the Bankruptcy Code. See In re Int'l Auction and Appraisal Servs. LLC), 493 B.R. at 463; accord In re O.P.M. Leasing Servs., Inc., 23 B.R. at 119.

65.     At most, Cortland has an equitable lien on the Real Property Recoveries. See Rosario-Paolo, Inc. v. C & M Pizza Rest., Inc., 84 N.Y.2d 379, 383, 643 N.E.2d 85, 87 (1994) (noting that debtor's failure "to name plaintiff as a loss beneficiary did not extinguish plaintiff's

interest in the secured property, nor did it impair plaintiff's status an equitable lienholder.");

Falco v. Ins. Co. of N. Am., 72 Pa. D. & C. 2d 436, 442 (Pa. Com. Pl. 1975) (holding that where an insurance policy is not assigned or made payable to a mortgagee as required under a mortgage, "the agreement to insure, upon a loss, creates an equitable lien on the insurance proceeds in favor of the mortgagee . . . to the extent of the [mortgagee's] interest in the destroyed or damaged property.").

66.     Even if this Court were to find that Cortland has an equitable lien on the Real Property Recoveries, the Debtors can avoid such lien under Sections 544(a)(1) and 544(a)(2) of the Bankruptcy Code because a debtor-in-possession's status as a hypothetical judicial lien or attaching creditor trumps that of an equitable lienholder under state law.   See 11 U.S.C. §§ 544(a)(1), 544(a)(2); see also Palmer v. Washington Mutual Bank (In re Ritchie), 416 B.R. 638, 646 (B.A.P. 6th Cir. 2009) (holding that an equitable lien is simply an unperfected lien which is subordinate to the trustee's subsequent interest as a hypothetical lien creditor); Okin v. Isaac Goldman Co., 79 F.2d 317, 320 (2d Cir. 1935) (interpreting New York law and noting mortgage on after-acquired chattels, while creating an equitable lien on property when it comes into existence as against simple creditors or purchasers with notice, would not prevail against the legal lien of an attaching or execution creditor or trustee in bankruptcy); Aaron J. Shingala, P.C. v. Allenwear & Assocs. (In re Allenwear & Assocs.), 89 B.R. 531, 532–33 (Bankr. E. D. Pa.1988) (holding that under Pennsylvania law, a trustee or debtor-in-possession under Section 544(a) may establish a superior priority to an equitable lienholder as a result of the failure to perfect a security interest); In re: Selden, 62 B.R. 954, 957 (Bankr. D. Neb. 1986) (holding that Section 544(a)(2) allows "the debtor-in-possession [to] take[] priority over unperfected security interests and . . . avoid equitable liens.") (citing In re Harbour House Operating Corp., 26 B.R.

324, 331 (Bankr. D. Mass. 1982)); In re O.P.M. Leasing Servs., Inc., 23 B.R. at 119-20 (holding

that an equitable lien is simply an unperfected lien "subordinate to the subsequent legal lien of a

judgment creditor," and therefore "such lien [was] invalid against the Trustee who has the status

of hypothetical lien creditor."); Lacaille v. Feldman, 44 Misc. 2d 370, 383-84, 253 N.Y.S.2d 937,

953 (Sup. Ct. 1964) (holding that creditor "by obtaining a judgment, docketing it, issuing an

execution and effectuating a levy, . . . created a perfected lien which takes precedence over the . .

. equitable lien of the State.").

67.     Therefore, the Committee, by virtue of the hypothetical judicial lien creditor or

attaching creditor status granted to the Debtors under Section 544(a) of the Bankruptcy Code,

can avoid Cortland's unperfected lien on the Real Property Recoveries.

68.     There is no genuine dispute of material fact that Cortland is not a loss payee under

the Policy, and thus the Committee is entitled to summary judgment with respect to Count III of

the Committee Complaint.

**V.     Cortland's Avoided Liens Are Preserved For The Benefit Of The Debtors' Estates.**

69.     Both the Bankruptcy Code and the Intercreditor Agreement provide that, once

Cortland's lien on the BI Recoveries and the Real Property Recoveries is avoided, the Debtors'

estates step into Cortland's shoes and can exercise all of Cortland's rights with respect to its lien.

70.     Section 551 of the Bankruptcy Code automatically preserves any transfer avoided

under Section 544 (here, Cortland's liens on the BI Recoveries and the Real Property

Recoveries) for the benefit of the estate. "Stated differently, § 551 serves as a 'follow-up'

provision explaining how assets and property avoided under other Code provisions should be

handled." Jurista v. Amerinox Processing, Inc., 492 B.R. 707, 774 (D. N.J. 2013); see also

Staats v. Barry (In re Barry), 31 B.R. 683, 686 (Bankr. S.D. Ohio 1983) ("The purpose of § 551

is to allow a trustee in bankruptcy, upon avoidance of certain preferential or fraudulent transfers,

to increase the assets of the bankruptcy estate. . . . [Section 551] assures that a junior lienor shall not be able to improve its position because a trustee has successfully avoided a lien or a transfer.").

71.     Taken together, Sections 544 and 551 permit the Debtors to "step into the shoes" of Cortland and occupy its senior position with respect to the BI Recoveries and the Real Property Recoveries, as against ICBCS. See Miranda v. Banco Popular de Puerto Rico (In re Rivera Mercado), 599 B.R. 406, 420 (B.A.P. 1st Cir. 2019) (preservation for the benefit of the estate "put[s] the estate in the shoes of the creditor whose lien was avoided.") (citing Carvell v. Lafayette (In re Carvell), 222 B.R. 178, 180 (B.A.P. 1st Cir. 1998)); Rodriguez v. Drive Fin. Servs., L.P. (In re Trout), 609 F.3d 1106, 1110 (10th Cir. 2010) ("[U]pon avoidance of a lien, under § 551 the trustee 'steps into the shoes of the former lienholder, with the same rights in the collateralized property that the original lienholder enjoyed.'") (quoting Morris v. St. John Nat'l Bank (In re Haberman), 516 F.3d 1207, 1210 (10th Cir. 2008)); Wallach v. Brosnahan (In re Brosnahan), 312 B.R. 220, 224 (Bankr. W.D.N.Y. 2004) (when mortgage is avoided and preserved under Section 551, trustee stands in the shoes of mortgagee as against a judgment creditor).

72.     The Debtors' right to occupy Cortland's position with respect to the BI Recoveries and Real Property Recoveries as against ICBCS is also established by the Intercreditor Agreement.    Section 8.09 of the Intercreditor Agreement provides that the Intercreditor Agreement "shall be binding upon and inure to the benefit of each of the parties hereto and each of the First Priority Secured Parties and Second Priority Secured Parties and their respective successors and permitted assigns . . . ."    Pursuant to Section 551, upon avoidance, the estate will become a successor to Cortland for the purposes of this provision. See

11 U.S.C. §§ 551, 544 ("Trustee as lien creditor and as successor to certain creditors and purchasers"). As successor in interest to Cortland's lien on the BI Recoveries and the Real Property Recoveries, the Intercreditor Agreement and the relative priorities of the interests it establishes inure to the benefit of the Debtors.[11]

73.     There is no genuine dispute of material fact that Cortland is not a loss payee under the Policy, and thus the Committee is entitled to summary judgment with respect to Count IV of the Committee Complaint.

---

[11]   The Committee is aware that the Second Circuit decision in Kors may be read as holding contrary to this argument. However, Kors is not binding on this Court and distinguishable from this case. In Kors, the court found that "the trustee would not accede to the benefits of the subordination agreement because [the debtor] was not a part of that agreement." Kors, 819 F.2d at 24. Here, unlike in Kors, the Debtors are indeed parties to the Intercreditor Agreement. As such, the trustee's rights extend to within the bounds of the agreement as permissible under bankruptcy law. See id. (finding that Section 551 of the Bankruptcy Code "preserves[s] those rights and powers belonging to the bankrupt under [state] law."). Moreover, the Intercreditor Agreement explicitly states that the Intercreditor Agreement will be binding on Cortland's successors in interest. See Intercreditor Agreement at § 8.09. Because the Debtors are a party to the agreement, as trustee, the Debtors may serve as successor in interest to Cortland under the terms of the Intercreditor Agreement pursuant to Section 544(a). See 11 U.S.C. § 544(a) (granting the trustee the "rights and powers" to succeed a creditor with an unperfected lien creditor).

## CONCLUSION

For the foregoing reasons, the Committee respectfully requests that the Court grant summary judgement in its favor with respect to (i) the Underlying Complaint; (ii) the Committee Complaint; and (ii) the ICBCS Counterclaim.

Dated:  October 4, 2019

**ELLIOTT GREENLEAF, PC**

*/s/ Jonathan M. Stemerman*
Rafael Xavier Zahralddin-Aravena (No. 4166)
Jonathan M. Stemerman (No. 4510)
1105 North Market Street, Suite 1700
Wilmington, DE 19801
Telephone: (302) 384-9400
Email:  rxza@elliottgreenleaf.com
jms@elliottgreenleaf.com

and

**BROWN RUDNICK LLP**
Robert J. Stark (admitted *pro hac vice*)
Max D. Schlan (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email:  rstark@brownrudnick.com
mschlan@brownrudnick.com

and

Steven B. Levine (admitted *pro hac vice*)
James W. Stoll (admitted *pro hac vice*)
Sharon I. Dwoskin (admitted *pro hac vice*)
One Financial Center
Boston, MA  02111
Telephone: (617) 856-8200
Email:  slevine@brownrudnick.com
jstoll@brownrudnick.com
sdwoskin@brownrudnick.com

*Counsel to the Official Committee*
*of Unsecured Creditors*