## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PES HOLDINGS, LLC, *et al.*,[1] | ) | Case No. 19-11626 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| PES HOLDINGS, LLC, *et al.*, CORTLAND CAPITAL MARKET SERVICES, LLC, | ) ) | |
| | ) | |
| Plaintiffs and Counterclaim Defendants, | ) ) | Adv. Pro. No. 19-50282 (KG) |
| | ) | |
| | ) | **Ref. Docket Nos. 1, 24, 25** |
| v. | ) | |
| | ) | |
| ICBC STANDARD BANK PLC, | ) | |
| | ) | |
| Defendant, Counterclaim Plaintiff and Cross Claim Defendant, | ) ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PES, INC., | ) ) | |
| | ) | |
| Intervenor-Defendant and Counterclaim and Cross-Claim Plaintiff. | ) ) ) | |

## OPENING MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT, COUNTERCLAIM PLAINTIFF, AND <u>CROSSCLAIM DEFENDANT ICBC STANDARD BANK PLC</u>

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574).  The Debtors' service address is: 1735 Market Street, Philadelphia, Pennsylvania 19103.

# TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ................................................................................1

STATEMENT OF UNDISPUTED FACTS ..........................................................6

I.     THE PES PARTIES ENTER INTO THE SOA WITH ICBCS, WHICH
REQUIRES THEM TO MAINTAIN BUSINESS INTERRUPTION AND
PROPERTY DAMAGE INSURANCE NAMING ICBCS AS AN ADDITIONAL
INSURED, LOSS PAYEE, AND MORTGAGEE..............................................6

II.    THE PES PARTIES GRANT ICBCS SECURITY INTERESTS IN
SUBSTANTIALLY ALL OF THEIR ASSETS...................................................8

III.   THE PES PARTIES ENTER INTO THE TERM LOAN CREDIT
AGREEMENT, WHICH DOES NOT REQUIRE THEM TO MAINTAIN
BUSINESS INTERRUPTION INSURANCE...................................................12

IV.   THE PES PARTIES GRANT THE AGENT SECURITY INTERESTS THAT
ARE SUBSTANTIALLY THE SAME AS THOSE GRANTED TO ICBCS.................12

V.    THE INTERCREDITOR AGREEMENT DIVIDES THE PRIORITY
INTERESTS IN THE COMMON COLLATERAL BETWEEN ICBCS AND
THE AGENT ........................................................................................14

VI.   THE POLICY NAMES ICBCS AS A LOSS PAYEE, MORTGAGEE, AND
ADDITIONAL INSURED IN BOTH THE BUSINESS INTERRUPTION AND
PROPERTY DAMAGE INSURANCE...........................................................17

VII.  THE GIRARD POINT INCIDENT OCCURS, AND THE DEBTORS FILE FOR
BANKRUPTCY .....................................................................................19

VIII. THE DEBTORS AND AGENT INITIATE THE ADVERSARY PROCEEDING..........21

ARGUMENT......................................................................................................22

I.    STANDARD OF REVIEW ......................................................................22

II.    ICBCS HAS A FIRST PRIORITY SECURITY INTEREST IN ALL BI
PROCEEDS PAID ON ACCOUNT OF THE DEBTORS' CLAIMS UNDER
THE POLICY ........................................................................................24

III.   ICBCS HAS A FIRST PRIORITY OR EXCLUSIVE SECURITY INTEREST IN
ANY PD PROCEEDS PAID ON ACCOUNT OF INVENTORY OR SOA
SEPARATE ASSETS AND COLLATERAL...................................................30

IV.   THE COMMITTEE'S CHALLENGES TO ICBCS'S LIENS ON THE BI
PROCEEDS SHOULD BE REJECTED ........................................................30

CONCLUSION...................................................................................................34

# TABLE OF AUTHORITIES

**Page**

### Cases

*A. Miller & Co. v. Cincinnati Ins. Co.*,
    577 N.E.2d 885 (1991) ........................................................................................... 25

*Badillo v. Tower Ins. Co. of N.Y.*,
    92 N.Y.2d 790 (1999) ............................................................................................ 32

*Blunt v. Lower Merion Sch. Dist.*,
    767 F.3d 247 (3d Cir. 2014) ............................................................................. 22, 23

*Breed v. Ins. Co. of N. Am.*,
    46 N.Y.2d 351 (1978) ............................................................................................ 23

*Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*,
    773 F.3d 110 (2d Cir. 2015) ................................................................................... 24

*Farmers Ins. Exchange v. RNK, Inc.*,
    632 F.3d 777 (1st Cir. 2011) .................................................................................. 23

*Goldenstein v. Repossessors Inc.*,
    815 F.3d 142 (3d Cir. 2016) ................................................................................... 22

*Greenwich Capital Fin. Prods., Inc. v. Negrin*,
    903 N.Y.S.2d 346 (1st Dep't 2010) ....................................................................... 24

*In re Appalachian Energy Industries, Inc.*,
    25 B.R. 515 (Bankr. M.D. Tenn. 1982) ................................................................. 35

*In re McLean Indus., Inc.*,
    132 B.R. 271 (Bankr. S.D.N.Y. 1991) .................................................... 5, 32, 33, 34

*In re Megamarket of Lexington, Inc.*,
    207 B.R. 527 (Bankr. E.D. Ky. 1997) .................................................................... 33

*In re Moskowitz*,
    14 B.R. 677 (Bankr. S.D.N.Y. 1981) ..................................................................... 34

*In re Suter*,
    181 B.R. 116 (Bankr. N.D. Ala. 1994) .................................................................. 34

*In re Tower Air, Inc.*,
    397 F.3d 191 (3d. Cir. 2005) ............................................................................ 33, 34

*Jackson Nat. Life Ins. Co. v. Ladish Co.*,
  No. 92 CIV. 9358(PKL), 1993 WL 43373 (S.D.N.Y. Feb. 18, 1993) ............................ 23, 24

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*,
  906 F.2d 884 (2d Cir. 1990) ....................................................................................... 24

*MNC Commercial Corp. v. Rouse, 91-0615-CV-W-2*,
  1992 WL 674733 (W.D. Mo. Dec. 15, 1992) ......................................... 2, 25, 26, 27, 28, 33

*Monex Fin. Servs. Ltd. v. Nova Info. Sys., Inc.*,
  657 F. Supp. 2d 447 (S.D.N.Y. 2009) ........................................................................ 23

*Polytech, Inc. v. Affiliated FM Ins.*,
  21 F.3d 271 (8th Cir. 1994) ........................................................................................ 25

*PPG Indus., Inc. v. Hartford Fire Ins. Co.*,
  531 F.2d 58 (2d Cir. 1976) .......................................................................................... 33

*Quality Molding Co. v. Am. Nat. Fire Ins. Co.*,
  272 F.2d 779 (7th Cir. 1959) ...................................................................................... 25

*Roberts v. Consolidated Rail Corp.*,
  893 F.2d 21 (2d Cir. 1989) .......................................................................................... 24

*Schleimer v. Empire Mutual Ins. Co.*,
  337 N.Y.S.2d 872 (1st Dep't 1972) ........................................................................ 32, 34

*Seiden Assoc., Inc. v. ANC Holdings, Inc.*,
  959 F.2d 425, 428 (2d Cir.1992) ................................................................................. 23

*Tsoukanelis v. Country Pure Foods, Inc.*,
  337 F. Supp. 2d 600 (D. Del. 2004) ............................................................................ 23

## Statutory Authorities

11 U.S.C. § 552 ............................................................................................................... 4, 31

## Rules and Regulations

Fed. R. Civ. P. 56(a) ......................................................................................................... 22

## Treatises

1 The Law of Secured Transactions Under the UCC, § 1.08[7][f] (3rd ed. 2019) ...................... 27

*Appleman on Insurance Law & Practice Archive* § 2329 (2d ed. 2011) .................................... 25

## **Additional Authorities**

44 C.J.S. Insurance § 48.................................................................................................. 25

David B. Young, *The Rights of Secured Creditors to the Proceeds of Business
        Interruption Insurance Under UCC Article 9*, 26 U.C.C.L.J. 204 (1994)............................ 27

R. Wilson Freyermuth, *Rethinking Proceeds*:  The History, *Misinterpretation and
        Revision of U.C.C. Section 9-306*, 69 Tul. L. Rev. 645 (1995) ............................................. 27

Defendant, Counterclaim Plaintiff, and Crossclaim Defendant ICBC Standard Bank Plc ("ICBCS"), by and through its undersigned counsel, hereby submits this Memorandum of Law in support of its Motion for Summary Judgment (the "Motion"), pursuant to 11 U.S.C. § 105(a), Fed. R. Civ. P. 56(a) made applicable to this adversary proceeding by Fed. R. Bankr. P. 7056, and L.R. Bankr. P. 7056, seeking entry of an Order granting summary judgment in favor of ICBCS and against Plaintiffs PES Ultimate Holdings, LLC, Philadelphia Energy Solutions Refining and Marketing LLC ("PESRM") and the other affiliated debtors (collectively, the "Debtors") and Cortland Capital Market Services LLC (the "Agent" and, collectively with the Debtors, the "Plaintiffs" or "Counterclaim Defendants"), as agent for the Debtors' term loan lenders (the "Term Loan Lenders"), and Intervenor-Defendant and Counterclaim and Crossclaim Plaintiff, the Official Committee of Unsecured Creditors (the "Committee") with respect to the relief requested in (A) Counts I and II of the *Answer and Counterclaims* of ICBCS [D.I. 25] (the "Answer and Counterclaims");[2] (B) Count I of the *Complaint* filed by the Plaintiffs [D.I. 1] (the "Complaint"); and (C) Count I of the *Answer and Counterclaim and Cross-Claim* filed by the Committee [D.I. 24] (the "Crossclaims").

## SUMMARY OF ARGUMENT

1.      This case presents a straightforward question of contractual interpretation concerning which of two secured parties—ICBCS or the Term Loan Lenders—has a priority security interest in the business interruption insurance proceeds (the "BI Proceeds") and the property damage insurance proceeds (the "PD Proceeds") that the Debtors receive in connection with the explosion and fire at their Girard Point refining facility (the "Girard Point Incident"). The question is governed by the Intercreditor Agreement (defined below) between ICBCS and the Agent (acting for the benefit of the

---

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Answer and Counterclaims.

Term Loan Lenders), which governs the respective priorities of ICBCS's and the Agent's security interests in the BI Proceeds and PD Proceeds.

2.     The Intercreditor Agreement is plain and unambiguous on the questions presented here. ICBCS has a first priority security interest in "SOA Priority Collateral," which includes all of the assets representing the Debtors' business income. This includes, *inter alia*, (i) Accounts (including accounts receivable) and Inventory (each as defined by the Intercreditor Agreement, and collectively defined by the Intercreditor Agreement as "<u>Current Assets Collateral</u>"), and (ii) Money and General Intangibles (each as defined by the Intercreditor Agreement, and including insurance policies) relating to Current Assets Collateral. SOA Priority Collateral also includes any (i) Proceeds of (including "moneys paid on account of" and "insurance payable by reason of the loss of") the foregoing, and (ii) Proceeds of "insurance … payable … with respect to" the foregoing.

3.     The Debtors' business interruption insurance policy (the "<u>BI Policy</u>")—which ICBCS (unlike the Term Loan Lenders) expressly required the Debtors to maintain for its benefit—and the BI Proceeds are intended to compensate for the Debtors' loss of business income. *See, e.g.*, *MNC Commercial Corp. v. Rouse*, 91-0615-CV-W-2, 1992 WL 674733, at *1 (W.D. Mo. Dec. 15, 1992) (the "purpose of the business interruption proceeds was to compensate [the insured] for lost business income that would have been generated but for the fire"). Thus, the BI Proceeds fall squarely within SOA Priority Collateral, as they plainly constitute (i) "monies paid on account of" and "insurance payable by reason of the loss of" the Debtors' business income-related assets included within SOA Priority Collateral (*i.e.*, Accounts, Inventory, and Money and General Intangibles related to Accounts and Inventory), (ii) Proceeds of "insurance … payable … with respect to" such business income-related assets, and (iii) Proceeds of a General Intangible (*i.e.* an insurance policy) relating to Accounts and Inventory.

4.      A similar analysis applies to any PD Proceeds paid on account of Inventory.  SOA Priority Collateral includes Inventory, and any Proceeds of Inventory or "insurance … payable … with respect to Inventory."  PD Proceeds paid on account of Inventory are thus also SOA Priority Collateral, as they are Proceeds (*i.e.* "moneys paid on account of" and "insurance payable by reason of the loss of") Inventory, and Proceeds of "insurance … payable … with respect to" Inventory. Additionally, it is undisputed that the Intercreditor Agreement provides that ICBCS has an exclusive security interest in certain assets defined as "SOA Separate Assets and Collateral" and any Proceeds thereof.  Any PD Proceeds paid on account of damage to SOA Separate Assets and Collateral, therefore, are subject to ICBCS's exclusive security interest.

5.      Nevertheless, in an effort to escape these unambiguous conclusions, the Term Loan Lenders—who are also the Debtors' DIP Lenders—have required, as a condition to the DIP financing, that the Debtors stipulate that *all* insurance proceeds paid in connection with the Girard Point Incident (the "June 21 Insurance Proceeds") constitute "Term Loan Priority Collateral" subject to the Agent's first priority security interest under the Intercreditor Agreement, and initiate this adversary proceeding seeking a declaration to that effect.  The Term Loan Lenders also seek to utilize the DIP financing to mandate the outcome of this litigation, arguing that if the Court does not find that the June 21 Insurance Proceeds constitute Term Loan Priority Collateral, then the Term Loan Lenders may "immediately accelerate the DIP Obligations and terminate the right of the Debtors to use Cash Collateral ... run[ning] the serious risk of [the Debtors] losing access to the cash necessary to pursue the insurance proceeds and emerge as a going concern for the benefit of their stakeholders."  Compl. ¶ 4.

6.      The Term Loan Lenders' threats to derail the Debtors' bankruptcy cases—thereby jeopardizing their own potential recoveries—if the Court enforces the Intercreditor Agreement

according to its unambiguous terms, are not credible.  Regardless, however, the Term Loan Lenders' machinations cannot alter the Intercreditor Agreement's plain language, or its legal impact.  The Term Loan Lenders' *post hoc* efforts to re-characterize the business interruption insurance proceeds and all property damage insurance proceeds as Term Loan Priority Collateral are untethered (and directly contrary) to the bargain struck between the Term Loan Lenders and ICBCS in the Intercreditor Agreement, and cannot succeed in the face of that agreement.  ICBCS thus respectfully requests that the Court enter summary judgment denying the relief sought in the Complaint, and granting the relief sought by ICBCS's Counterclaims.

7.      Summary judgment in ICBCS's favor is also warranted with respect to Count I of the Committee's Crossclaims.  The Committee argues that Section 552(a) of the Bankruptcy Code voids any security interest ICBCS would otherwise have in the BI Proceeds as after-acquired property, because the amount of such proceeds "will be predicated on models projecting the revenues and gross profits which would have been earned from the purchase, refining, and sale of crude oil beginning thirty days after the Petition Date."  Crossclaims ¶ 53.  But Section 552(a) is expressly subject to Section 552(b), which provides that if collateral was subject to a security interest before the bankruptcy filing, then the security interest extends to proceeds of that collateral that the debtor acquires post-petition to the extent provided by the applicable security agreement and nonbankruptcy law.  11 U.S.C. § 552.

8.      The Committee **concedes** that ICBCS had a perfected security interest in the BI Policy before the Debtors' bankruptcy filing.  Crossclaims ¶¶ 3, 49.  Thus, ICBCS's security interest in the BI Proceeds is unquestionably protected by Section 552(b), as both the ICBCS Pledge Agreement (defined below), and applicable nonbankruptcy law, provide that ICBCS's security

interest extends to proceeds of the BI Policy (*i.e.*, the BI Proceeds).  *See In re McLean Indus., Inc.*, 132 B.R. 271, 284 (Bankr. S.D.N.Y. 1991).

9.     Moreover, under the terms of the ICBCS Pledge Agreement and applicable nonbankruptcy law, ICBCS's security interest also extends to the BI Proceeds because the BI Proceeds are Proceeds of the Debtors' Current Assets Collateral, and Money and General Intangibles related to Current Assets Collateral.  *See* New York Uniform Commercial Code ("NYUCC") (which governs the ICBCS Pledge Agreement and Intercreditor Agreement) § 9-315.  These assets were also subject to ICBCS's security interest before the commencement of these cases.  The Committee's Section 552 claim thus fails for this reason as well.

10.     And the Committee's Section 552 claim also fails for the additional and independent reason that the Debtors assigned the BI Proceeds to ICBCS by naming ICBCS as a loss payee, mortgagee, and additional insured on the BI Policy.  This placed the BI Proceeds outside of the Debtors' estates, and rendered them immune from recovery under Section 552.  *See McLean,* 132 B.R. at 284.  ICBCS thus also respectfully requests that the Court enter summary judgment in its favor on Count I of the Crossclaims.

## STATEMENT OF UNDISPUTED FACTS

I.    **THE PES PARTIES ENTER INTO THE SOA WITH ICBCS, WHICH REQUIRES THEM TO MAINTAIN BUSINESS INTERRUPTION AND PROPERTY DAMAGE INSURANCE NAMING ICBCS AS AN ADDITIONAL INSURED, LOSS PAYEE, AND MORTGAGEE**

11.    On January 21, 2018, PESRM and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Prior Chapter 11 Cases").  *See In re PES Holdings LLC, et al.*, Case No. 18-10122 (KG).  The Debtors emerged from the Prior Chapter 11 Cases on August 7, 2018.

12.    A key aspect of the Debtors' emergence from their Prior Chapter 11 Cases was ICBCS's agreement to provide intermediation services to the Debtors (the "Master Transaction").  Pursuant to the documents governing the Master Transaction, ICBCS exclusively sourced and purchased raw materials and other feedstock from third parties to be refined by the Debtors, in order for the Debtors to supply ICBCS with refined products.  ICBCS maintained title to the raw inventory up until the product was ready to be refined, and then sold the inventory to the Debtors.  Once the product was refined, ICBCS purchased the refined product and coordinated the sale of the product with the Debtors' assistance.  *See* Declaration of Deborah Newman dated October 4, 2019 ("Newman Declaration" or "Newman Decl.") ¶ 4.

13.    On each day, ICBCS netted the value of the raw materials it supplied against the value of refined product it received, deducted an agreed margin, and deposited the net amount into a cash collateral account held by the Debtors and subject to ICBCS's first priority security interest.  This arrangement enabled the Debtors to significantly reduce their working capital requirements and provided a stable source of raw materials, both of which were critical to the Debtors' continued operations and emergence from their Prior Chapter 11 Cases.  *See id.* ¶ 5.

14.     In connection with the Master Transaction, on June 18, 2019, ICBCS, PESRM, and certain of PESRM's affiliates (the "Guarantors," and collectively with PESRM, the "PES Parties") entered into the Sixth Amended and Restated Supply and Offtake Agreement (the "SOA").[3] *See id.* ¶ 6.

15.     Unlike the Term Loan Credit Agreement (defined below), the SOA expressly required the PES Parties to maintain business interruption insurance naming ICBCS as an additional insured, loss payee, and mortgagee in an amount satisfactory to ICBCS. Newman Decl. Ex. 1 (SOA) §§ 10.04, 10.12(b), 8.16; Schedules 10.04, 8.16. The SOA also required the PES Parties to maintain comprehensive property insurance naming ICBCS as an additional insured, loss payee, and mortgagee in a minimum amount of $750,000,000. *Id.* at Schedule 10.04.

16.     Section 14.01 of the SOA set forth a list of occurrences that would result in a "PESRM Event of Default." *Id.* at § 14.01. The SOA provided that upon such a PESRM Event of Default, ICBCS was entitled to terminate the SOA, and determine the amount of the "Termination Payment" owing to it from the PES Parties. *Id.* at § 14.04. The Termination Payment was designed to include, among other things, ICBCS's "Loss" and "Unpaid Amounts" as set forth in the SOA, and "any damages, losses, fees, costs and expenses" that ICBCS "pa[id] or incur[red] from, as a result of or in connection with the enforcement of and protection of any of its rights and remedies under" the SOA or any other related transactions or documents as a result of the early termination of the SOA or related transactions or documents. *Id.* Section 14.04 of the SOA provides details of how ICBCS as the non-defaulting party is to calculate the Termination Payment; as part of its calculation, ICBCS is allowed to reasonably determine in good faith and a commercially reasonable manner its total

---

[3]  A true and correct copy of the SOA is attached as Exhibit 1 to the Newman Declaration. The PES Parties are PES Holdings, LLC; North Yard GP, LLC; North Yard Logistics, L.P.; PES Administrative Services, LLC; and PESRM.

losses and costs. Such losses and costs include loss of bargain, cost of funding and amounts incurred as a result of ICBCS "terminating, liquidating, obtaining, amending or reestablishing any" transactions allowed under the SOA. *Id*. § 1.01. ICBCS has the ability to amend the Termination Payment as liquidation costs crystalize further. *Id*. § 14.04.

## II.   THE PES PARTIES GRANT ICBCS SECURITY INTERESTS IN SUBSTANTIALLY ALL OF THEIR ASSETS

17.    In connection with the SOA, and to secure the PES Parties' obligations thereunder, the PES Parties and ICBCS entered into a Pledge and Security Agreement (the "ICBCS Pledge Agreement").[4]

18.    Pursuant to the ICBCS Pledge Agreement, the PES Parties granted ICBCS a lien in substantially all of their assets (the "SOA Pledged Collateral"). *See* Newman Decl. Ex. 2 (ICBCS Pledge Agreement) § 2.1.

19.    Specifically, the SOA Pledged Collateral consists of all of the PES Parties' right, title, and interest in, to, and under the following property, wherever located, and whether now existing or hereafter arising or acquired from time to time:

  i.    all Accounts;

  ii.    all Inventory, including all raw materials, work in process and finished goods, relating to any of the foregoing items in this clause (ii);

  iii.    all Renewable Identification Numbers wherever located;

  iv.    all Money and Deposit Accounts;

  v.    all Letters of Credit and Letter-of-Credit Rights supporting payment of any of the foregoing;

  vi.    all Equipment;

  vii.    all Fixtures;

---

[4]  A true and correct copy of the ICBCS Pledge Agreement is attached to the Newman Declaration as Exhibit 2.

viii.    all Trademarks;

ix.    all Equity Interests in each Subsidiary directly owned by such Grantor as of the date hereof (including the Pledged Equity Interests listed in *Schedule 7* to the Perfection Certificate) and any other Equity Interests in any Subsidiary directly owned in the future by such Grantor, together in each case with (A) all certificates representing such Equity Interests, (B) all shares, securities, cash or other property representing a dividend on or a distribution or return of capital on or in respect of such Equity Interests, or resulting from a split-up, revision, reclassification or other like change thereof or otherwise received in exchange therefor, and any warrants, rights or options issued to the holders of, or otherwise in respect of, such Equity Interests, and (C) without prejudice to any provision of the Supply and Offtake Agreement prohibiting any merger or consolidation by PESRM or any of its Subsidiaries, all Equity Interests of any successor entity of any such merger or consolidation (collectively, the "Pledged Equity Interests");

x.    to the extent evidencing any of the foregoing, (A) Documents, (B) Instruments, (C) General Intangibles, (D) Commercial Tort Claims, and (E) Supporting Obligations and all other forms of obligations owing to any Grantor or in which any Grantor may have any interest, however created or arising and whether or not earned by performance;

xi.    to the extent not otherwise included above, all Records evidencing any of the foregoing; and

xii.    all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to such Grantor from time to time with respect to any of the foregoing.

*Id.*

20.    The ICBCS Pledge Agreement is governed by New York law, and provides that the following terms, *inter alia*, shall have the meanings assigned to them by the NYUCC: "Accounts"; "Inventory"; "Money"; and "Proceeds." *Id.* §§ 1.1(a), 10.7.

21.    The NYUCC defines "Account" as:

[E]xcept as used in "account for" … a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under a charter or other contract, (vii) arising out of the use of a credit or charge card or information contained on or for use with the card, or

(viii) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a State, or person licensed or authorized to operate the game by a State or governmental unit of a State. The term includes health-care-insurance receivables. The term does not include (i) rights to payment evidenced by chattel paper or an instrument, (ii) commercial tort claims, (iii) deposit accounts, (iv) investment property, (v) letter-of-credit rights or letters of credit, or (vi) rights to payment for money or funds advanced or sold, other than rights arising out of the use of a credit or charge card or information contained on or for use with the card.

NYUCC § 9-102(a)(2).

22.     The NYUCC defines "Inventory" as "goods, other than farm products, which: (A) are leased by a person as lessor; (B) are held by a person for sale or lease or to be furnished under a contract of service; (C) are furnished by a person under a contract of service; or (D) consist of raw materials, work in process, or materials used or consumed in a business." *Id.* § 9-102(a)(48).

23.     The NYUCC defines "Money" as "a medium of exchange currently authorized or adopted by a domestic or foreign government. The term includes a monetary unit of account established by an intergovernmental organization or by agreement between two or more countries." *Id.* § 1-201(b)(24).

24.     The NYUCC defines "Proceeds" as:

[E]xcept as used in Section 9-609(b), means the following property: (A) Whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral; (B) *whatever is collected on, or distributed on account of, collateral*; (C) rights arising out of collateral; (D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or (E) *to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral*.

*Id.* § 9-102(a)(64) (emphasis added).

25.     The ICBCS Pledge Agreement defines "General Intangibles" more broadly than the NYUCC, as follows:

[C]ollectively, with respect to each Grantor, all "general intangibles," "as such term is defined in the [NY]UCC, of the Grantor and, in any event, includes (i) *all of such*

***Grantor's rights, title and interest in, to and under all Contracts and insurance policies*** (including all rights and remedies relating to monetary damages, including indemnification rights and remedies, and claims for damages or other relief pursuant to or in respect of any Contract), (ii) all know-how and warranties relating to any of the Pledged Collateral, (iii) any and all other rights, claims, choses-in-action and causes of action of such Grantor against any other person and the benefits of any and all collateral or other security given by any other person in connection therewith, (iv) all guarantees, endorsements and indemnifications on, or of, any of the Pledged Collateral, (v) all lists, books, records, correspondence, ledgers, printouts, files (whether in printed form or stored electronically), tapes and other papers or materials containing information relating to any of the Pledged Collateral, including all customer or tenant lists, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, appraisals, recorded knowledge, surveys, studies, engineering reports, test reports, manuals, standards, processing standards, performance standards, catalogs, research data, computer and automatic machinery software and programs and the like, field repair data, accounting information pertaining to such Grantor's operations or any of the Pledged Collateral and all media in which or on which any of the information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data, (vi) all licenses, consents, permits, variances, certifications, authorizations and approvals, however characterized, now or hereafter acquired or held by such Grantor, including building permits, certificates of occupancy, environmental certificates, industrial permits or licenses and certificates of operation and (vii) all rights to reserves, deferred payments, deposits, refunds, indemnification of claims and claims for tax or other refunds against any Governmental Authority.

ICBCS Pledge Agreement § 1.1(b) (emphasis added).

26.    The NYUCC defines "General Intangible" as "any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software." NYUCC § 9-102(a)(42).

27.    On October 22, 2018 and June 18, 2019, ICBCS filed UCC-1 financing statements providing notice of its perfected security interests in the SOA Pledged Collateral. Newman Decl. ¶ 8.

III.    **THE PES PARTIES ENTER INTO THE TERM LOAN CREDIT AGREEMENT, WHICH DOES NOT REQUIRE THEM TO MAINTAIN BUSINESS INTERRUPTION INSURANCE**

28.    On August 7, 2018, PES Holdings, LLC ("PES Holdings"), the parent company of PESRM and a Guarantor under the SOA, on behalf of itself, PESRM, and the other PES Parties, entered into a credit agreement (the "Term Loan Credit Agreement") with the Agent and "several lenders from time to time [t]hereto," pursuant to which PES Holdings borrowed $619,500,000.[5]

29.    Section 5.05(b) of the Term Loan Credit Agreement requires the PES Parties to maintain insurance covering only real and personal property (and if requested, personal injury insurance), and requires that "such insurance" "name the … Agent as insured party or loss payee" and additional insured. *Id.* § 5.05(c); 5.11(b).  Unlike the SOA, the Term Loan Credit Agreement does not require that the PES Parties maintain business interruption insurance.

30.    Section 2.06 of the Term Loan Credit Agreement is a mandatory prepayment provision triggered upon certain Asset Sales or Recovery Events (as each term is defined in the Term Loan Credit Agreement). *Id.* § 2.06.  The proceeds from any business interruption insurance policies are expressly carved out of the funds that must be used to make such mandatory prepayments. *Id.* §§ 1.01, 2.06(b).

IV.    **THE PES PARTIES GRANT THE AGENT SECURITY INTERESTS THAT ARE SUBSTANTIALLY THE SAME AS THOSE GRANTED TO ICBCS**

31.    In conjunction with the Term Loan Credit Agreement, on August 7, 2018, the PES Parties and the Agent entered into a Pledge and Security Agreement (the "Term Loan Pledge Agreement").[6]  The Term Loan Pledge Agreement grants the Agent security interests in substantially

---

[5]    A true and correct copy of the Term Loan Credit Agreement is attached to the Newman Declaration as Exhibit 3.

[6]    A true and correct copy of the Term Loan Pledge Agreement is attached to the Newman Declaration as Exhibit 4.

the same collateral (the "<u>Common Collateral</u>") that is subject to the security interests granted in the ICBCS Pledge Agreement.[7]

32.      Specifically, under the Term Loan Pledge Agreement, the PES Parties granted the Agent, for the benefit of the Term Loan Lenders, a security interest in the following assets (the "<u>Term Loan Lenders' Pledged Collateral</u>"):

(i)      all Accounts;

(ii)     all Inventory, including all raw materials, work in process and finished goods, relating to any of the foregoing items in this clause (ii);

(iii)    all Money and Deposit Accounts (to the extent relating to the items in clauses (i) and (ii) above, and together with such items, the "<u>Current Assets Collateral</u>");

(iv)     all of the following: (A) Documents and Chattel Paper, (B) Instruments, (C) General Intangibles and Investment Property, (D) Commercial Tort Claims, and (E) Supporting Obligations and all other forms of obligations owing to any Grantor or in which any Grantor may have any interest, however created or arising and whether or not earned by performance;

(v)      all Letters of Credit and Letter-of-Credit Rights;

(vi)     all Equipment;

(vii)    all Fixtures;

(viii)   all Intellectual Property;

(ix)     all Equity Interests in each Subsidiary directly owned by such Grantor as of the Closing Date (including the Pledged Equity Interests listed on Schedule 7 to the Perfection Certificate) and any other Equity Interests in any Subsidiary directly owned in the future by such Grantor, together in each case with (i) all

---

[7]    *Compare* Newman Decl. Ex. 4 (Term Loan Pledge Agreement) § 2.1, *with* Newman Decl. Ex. 2 (ICBCS Pledge Agreement) § 2.1.  The Term Loan Lenders' Pledged Collateral differs from the SOA Pledged Collateral in the following respects:  (i) SOA Pledged Collateral includes Catalyst Assets and Renewable Identification Numbers, while the Term Loan Lenders' Pledged Collateral does not; (ii) the Term Loan Lenders' Pledged Collateral includes all Chattel Paper and Investment Property, while SOA Pledged Collateral does not; (iii) the Term Loan Lenders' Pledged Collateral includes all Documents, Instruments, General Intangibles, Commercial Tort Claims, Supporting Obligations, and Letters of Credit and Letter-of-Credit Rights, while SOA Pledged Collateral only includes those items to the extent they evidence or are related to Current Assets Collateral (defined above); and (iv) the Term Loan Lenders' Pledged Collateral includes all Intellectual Property, while the SOA Pledged Collateral extends only to Trademarks.  *Id.*

certificates representing such Equity Interests, (ii) all shares, securities, cash or other property representing a dividend on or a distribution or return of capital on or in respect of such Equity Interests, or resulting from a split-up, revision, reclassification or other like change thereof or otherwise received in exchange therefor, and any warrants, rights or options issued to the holders of, or otherwise in respect of, such Equity Interests, and (iii) without prejudice to any provision of the Credit Agreement prohibiting any merger or consolidation by the Borrower or any of its Subsidiaries, all Equity Interests of any successor entity of any such merger or consolidation (collectively, the "Pledged Equity Interests");

(x)     to the extent not otherwise included above, all Records evidencing any of the foregoing; and

(xi)    all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to such Grantor from time to time with respect to any of the foregoing.

Newman Decl. Ex. 4 (Term Loan Pledge Agreement) § 2.1.

33.     The Term Loan Pledge Agreement defines "Accounts," "Inventory," "Money," "Proceeds," and "General Intangibles" in the same manner as the ICBCS Pledge Agreement. *Id.* § 1.1.

## V.     THE INTERCREDITOR AGREEMENT DIVIDES THE PRIORITY INTERESTS IN THE COMMON COLLATERAL BETWEEN ICBCS AND THE AGENT

34.     In connection with the SOA and the Term Loan Credit Agreement, the Agent, ICBCS, Merrill Lynch Commodities, Inc. (as the Initial SOA Collateral Agent),[8] and the PES Parties entered into an intercreditor agreement (the "Intercreditor Agreement") governing the relative priority of the Term Loan Lenders' and ICBCS's security interests in, *inter alia*, the Common Collateral.[9] The Intercreditor Agreement is governed by New York law. Newman Decl. Ex. 5 (Intercreditor Agreement) § 8.06(a).

---

[8]   Merrill Lynch Commodities, Inc. provided intermediation services to the Debtors before ICBCS.

[9]   A true and correct copy of the Intercreditor Agreement is attached to the Newman Declaration as Exhibit 5.

35. The Intercreditor Agreement provides that ICBCS shall have a first priority security interest, and the Agent shall have a second priority security interest, in SOA Priority Collateral. Newman Decl. Ex. 5 (Intercreditor Agreement) § 4.01. "SOA Priority Collateral" is defined as each PES Party's "now existing or hereinafter arising":

(i) *Accounts*;

(ii) *Inventory, including all raw materials, work in process and finished goods, relating to any of the foregoing items in this clause (ii)* (together with the items in clauses (i) and (ii) above, the "Current Assets Collateral");

(iii) *all Money and Deposit Accounts relating to the foregoing*;

(iv) all of the following: (A) to the extent evidencing Current Assets Collateral, Documents, (B) to the extent evidencing Current Assets Collateral, Instruments, (C) *to the extent related to Current Assets Collateral, General Intangibles*, (D) to the extent related to Current Assets Collateral, Commercial Tort Claims, and (E) to the extent related to Current Assets Collateral, Supporting Obligations and all other forms of obligations owing to any Grantor or in which any Grantor may have any interest, however created or arising and whether or not earned by performance;

(v) all Letters of Credit and Letter-of-Credit Rights supporting payment of any Current Assets Collateral;

(vi) to the extent not otherwise included above, all Records evidencing any of the foregoing; and

(vii) *all Proceeds and products of each of the foregoing* and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, *and any and all Proceeds of any insurance*, indemnity, warranty or guaranty *payable to such Grantor from time to time with respect to any of the foregoing*.

*Id.* § 1.02 (emphasis added). The Intercreditor Agreement defines "Accounts," "Inventory," "Money," "Proceeds," and "General Intangibles" in the same manner as the ICBCS and Term Loan Pledge Agreements.

36. The Intercreditor Agreement further provides that the Agent shall have a first priority security interest, and ICBCS shall have a second priority security interest, in "Term Loan Priority

15

Collateral." *Id.* § 4.01.  "Term Loan Priority Collateral" is defined as all "Collateral that is not SOA

Priority Collateral or Excluded Property." *Id.* § 1.02.  "<u>Collateral</u>" is defined as "all property upon

which a Lien is purported to be created by any Security Document, whether now owned or hereafter

acquired."  Term Loan Credit Agreement § 1.01.

37.     The Intercreditor Agreement also sets forth certain assets that are subject to ICBCS's

exclusive security interest.  Intercreditor Agreement § 1.02.  These assets are defined as "<u>SOA</u>

<u>Separate Assets and Collateral</u>" and include the following:

(viii)   ***Certain Hydrocarbon Assets***;

(ix)     ***Certain Refined Products Assets***;

(x)      ***Certain Rack Sale Refined Products Assets***;

(xi)     Certain Hydrocarbon Receivables;

(xii)    all Renewable Identification Numbers (other than those required to satisfy the obligations under the Consent Decree and Environmental Settlement Agreement entered into as of March 12, 2018 among the U.S., the U.S. Environmental Protection Agency and the Company);

(xiii)   all payments under any insurance, indemnity, warranty, or guaranty of the foregoing;

(xiv)   all Letters of Credit or Letters-of-Credit Rights in favor the SOA Collateral Agent supporting payment of any amounts owed by PESRM or any other Grantor or otherwise in connection with the Supply and Offtake Documents;

(xv)    Catalyst Assets to the extent included in the term "Collateral" as defined in the Supply and Offtake Security Documents;

(xvi)   cash and Cash Equivalents securing obligations pursuant to the transactions contemplated by the SOA Master Transaction Agreement as in effect on the date hereof and all ICBCS Credit Support;

(xvii)  all PESRM/PESIC Cash Collateral; and

(xviii) all Proceeds of or with respect to the foregoing.

*Id*. §§ 1.02; 9.01 (emphasis added).

## VI.  THE POLICY NAMES ICBCS AS A LOSS PAYEE, MORTGAGEE, AND ADDITIONAL INSURED IN BOTH THE BUSINESS INTERRUPTION AND PROPERTY DAMAGE INSURANCE

38.     On January 18, 2019, the XL Insurance America, Inc. Insurance Policy No. US00064117PR18A (the "Policy") was issued to the PES Parties and their affiliates for the period November 1, 2018 to November 1, 2019.[10]  The Policy includes both the BI Policy and property damage coverage (the "PD Policy").  *See, e.g.*, Newman Decl. Ex. 6 (Policy) at Declarations ¶ 9.

39.     The PD Policy insures against "all risks of direct physical loss or damage" occurring with respect to "Real and Personal Property of the Insured of every kind and description," with certain enumerated types of property and perils expressly excluded.  *Id.* § 1, ¶¶ 1, 3.  The BI Policy insures against "actual loss sustained by the Insured resulting from the necessary interruption of business caused by direct physical loss or damage, by a peril insured against, to property insured herein, occurring during the Term of Insurance."  *Id.* § 2, ¶ 1.

40.     As noted above, the SOA requires that the PES Parties maintain both business interruption and property damage insurance, and that such insurance name ICBCS as an additional insured, loss payee and mortgagee.  *See* Newman Decl. Ex. 1 (SOA) §§ 10.04, 10.12(b), 8.16; Schedules 10.04, 8.16.  Conversely, the Term Loan Credit Agreement requires that the PES Parties maintain insurance covering only real and personal property (and if requested, personal injury insurance), and that "such insurance" "name the … Agent as insured party or loss payee" and additional insured.  Newman Decl. Ex. 3 (Term Loan Credit Agreement) §§ 5.05(c); 5.11(b).

41.     Pursuant to these provisions, the Policy provides that:

It is agreed that the unqualified word "Insured" wherever used includes any person or organization to whom or to which the Insured is obligated by virtue of a written contract to name such person or organization as an Additional Insured, but only with

---

[10]  A true and correct copy of the Policy is attached to the Newman Declaration as Exhibit 6.

respect to operations performed by or obligations required of the Insured to or for the Additional Insured under the terms and conditions of said contract.

The limits and/or coverage available to the Additional Insured shall be those agreed to by virtue of a written contract between the Insured and such Additional Insured but in no event to exceed the limits in aggregate and coverage provided by this Policy.

Newman Decl. Ex. 6 (Policy) at General Conditions ¶ 5 (the "Additional Insured Provision").

42.    The Policy also includes a Lenders Loss Payable Clause, stating that:  "Loss or damage, if any, under this Policy, shall be paid to any lender designated by the Insured and in possession of a written contract, hereinafter referred to as "the Lender", as their interests may appear ...."  *Id.* at General Conditions ¶ 33 (the "Loss Payee Provision").

43.    Additionally, the Policy includes an endorsement listing ICBCS as a Loss Payee/Mortgagee, and providing that "[i]t is hereby understood and agreed that the following entity is named as Loss Payee/Mortgagee under this Policy, as their interests may appear, as required by written contract or agreement, subject to the terms and condition of this Policy:  ICBC Standard Bank PLC."  *Id.* at Endorsements ¶ 4 (the "ICBCS Loss Payee/Mortgagee Endorsement").  The Policy does not include an endorsement naming the Agent as a Loss Payee/Mortgagee.

44.    A Certificate of Evidence of Property Insurance (the "ICBCS Certificate") issued to ICBCS in connection with the PESRM Policy states that "the certificate holder [ICBCS] is named mortgagee, loss payee, and additional insured as their interests may appear and where required by written contract."[11]

45.    Another Certificate of Evidence of Property Insurance (the "Agent Certificate") issued in connection with the Policy states that "the certificate holder [the Agent] is named

---

[11]    A true and correct copy of the ICBCS Certificate is attached to the Newman Declaration as Exhibit 7.

mortgagee, loss payee, and additional insured as their interests may appear and where required by written contract."[12]

46.    The Additional Insured and Loss Payee Provisions name ICBCS and the Agent as additional insureds and loss payees only as "agreed to by virtue of a written contract" and as "designated by the Insured … in a written contract … as their interests may appear," respectively. *Id.* at General Conditions ¶¶ 5, 33.  Given that the SOA requires the Debtors to maintain business interruption and property damage insurance naming ICBCS as an additional insured, loss payee, and mortgagee, these provisions of the Policy (in addition to the ICBCS Loss Payee/Mortgagee Endorsement) operate to name ICBCS as an additional insured, loss payee, and mortgagee with respect to both the BI Policy and PD Policy.[13]  By contrast, because the Term Loan Credit Agreement does not require the PES Parties to maintain business interruption insurance, the Policy does not name the Agent as an additional insured, loss payee, or mortgagee on the BI Policy.

## VII.    THE GIRARD POINT INCIDENT OCCURS, AND THE DEBTORS FILE FOR BANKRUPTCY

47.    The Girard Point Incident occurred on June 21, 2019.  Newman Decl. ¶ 14.

48.    Following the Girard Point Incident, the Debtors announced that they would cease operating the Refining Complex after the run off through their Point Breeze Refinery of the limited inventory of crude oil on hand.  *Id.* ¶ 15.

49.    On July 19, 2019, ICBCS sent PESRM a Notice of Event of Default (i) notifying PESRM that incurable PESRM Events of Default had occurred and were continuing under Sections

---

[12]    A copy of the Agent Certificate that was attached to the Complaint is attached to the Newman Declaration as Exhibit 8.

[13]    As an additional insured, mortgagee, and loss payee under the Policy, ICBCS also has its own direct contractual rights against the business interruption portion of the Policy, which are not at issue in this adversary proceeding.  ICBCS intends to discuss its anticipated pursuit of such rights with the Debtors, and if necessary, to seek relief from the Court.

14.01(a) and 14.01(b) of the SOA; and (ii) terminating the SOA. ICBCS set forth a preliminary

calculation of the Termination Payment due and owing to it by the PES Parties of $303,077,160.00.

*Id.* ¶ 16.

50.    On July 21, 2019, the Debtors reentered bankruptcy. *See In re PES Holdings LLC, et al.*, Case No. 19-11626 (KG).

51.    The Debtors are in the process of preparing and submitting claims to the insurers

under the Policy for both (i) property damage (the "PD Claim") and (ii) business interruption losses

(the "BI Claim") occasioned by the Girard Point Incident. Newman Decl. ¶ 17.

52.    On July 22, 2019, the Debtors announced that they had entered into a credit

agreement for debtor-in-possession financing (the "DIP Credit Agreement") with the Term Loan

Lenders. *See Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to*

*(A) Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b),*

*364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Utilize Cash Collateral Pursuant to*

*11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11*

*U.S.C. §§ 361, 362, 363, 364, and 507(b), and (III) Scheduling Final Hearing Pursuant to*

*Bankruptcy Rules 4001(b) and (c)*, Case No. 19-11626 (KG) [D.I. 37] (the "DIP Motion"). The DIP

Credit Agreement requires the Debtors to stipulate that "[t]he proceeds of any claim under the

Debtors' insurance policies, whether for property damage, business interruption or otherwise,

resulting, directly or indirectly, to the fire that occurred in the Girard Point refinery on June 21, 2019

... constitute Term Loan Priority Collateral," notwithstanding that the plain language of the

Intercreditor Agreement provides otherwise. *Id.* at 21 (Debtor Stipulations).

53.    On July 23, 2019, the Court entered the *Interim Order (I) Authorizing Debtors to (A)*

*Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1),*

*364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Utilize Cash Collateral Pursuant to 11 U.S.C.*

*§ 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C.*

*§§ 361, 362, 363, 364, and 507(b), and (III) Scheduling Final Hearing Pursuant to Bankruptcy*

*Rules 4001(b) and (c)*, [D.I. 85] (the "Interim DIP Order").

54.     The Credit Agreement and Interim DIP Order contain milestones requiring that (i) "[b]y 21 days following entry of Interim Order, the Debtors shall have filed a pleading seeking entry of an order of the Bankruptcy Court determining that [any proceeds of the business interruption policy paid in connection with the Girard Point Incident] constitute 'Term Loan Priority Collateral'" (the "Insurance Proceeds Order"), and (ii) "[b]y 90 days following entry of the Interim Order, the Debtors shall have obtained entry of the Insurance Proceeds Order." DIP Motion at 18 (Milestones); Interim DIP Order ¶ 19(c)(xii); DIP Credit Agreement at 87.

55.     The Interim DIP Order carves out from the Stipulations any determination as to whether the BI Proceeds or the PD Proceeds constitute Term Loan Priority Collateral pending entry of the Insurance Proceeds Order by the Court. Interim DIP Order ¶ 5(d).

## VIII.   THE DEBTORS AND AGENT INITIATE THE ADVERSARY PROCEEDING

56.     In accordance with the milestones set forth in the DIP Credit Agreement and Interim Order, on August 7, 2019, the Debtors and the Term Loan Agent filed the Complaint, initiating this adversary proceeding. The Complaint seeks a declaration that all June 21 Insurance Proceeds paid to the Debtors under the Policy constitute Term Loan Priority Collateral. *See* Complaint ¶¶ 95-101.

57.     On September 13, 2019, ICBCS filed its Answer and Counterclaims, denying the cause of action asserted in the Complaint and asserting two Counterclaims. In its first Counterclaim, ICBCS seeks a declaration that any BI Proceeds paid on account of the Debtors' claims under the BI Policy constitute SOA Priority Collateral. *See* Answer and Counterclaims ¶¶ 40-44. In its second Counterclaim, ICBCS seeks a declaration that it has a first priority or exclusive lien, respectively, on

any PD Proceeds paid on account of damage to Inventory or SOA Separate Assets and Collateral. *Id.* ¶¶ 45-49.

58.     Also on September 13, 2019, the Committee filed its Crossclaims.  Count I of the Committee's Crossclaims seeks to avoid ICBCS's security interests in the BI Proceeds under Section 552 of the Bankruptcy Code.  Crossclaims ¶¶ 51-55.

59.     As discussed in greater detail below, ICBCS is entitled to summary judgment (i) denying the relief sought by the Debtors and the Agent in the Complaint and the relief sought by the Committee in Count I of the Crossclaims, and (ii) granting the relief sought in the Counterclaims.

## ARGUMENT

### I.     STANDARD OF REVIEW

60.     Federal Rule of Civil Procedure 56, made applicable by Federal Rule of Bankruptcy Procedure 7056, provides that a court "shall grant summary judgment if the movant shows that there is no genuine [dispute] as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To prevail, the movant must "demonstrate the absence of a genuine dispute of material fact." *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016).  "[A] factual dispute is material if it bears on an essential element of the plaintiff's claim, and is genuine if a reasonable jury could find in favor of the nonmoving party." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (citation omitted).  "[W]here a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law." *Id.*

61.     The Intercreditor Agreement is governed by New York law.  "New York law allows for the resolution on summary judgment of contract construction claims so long as the contractual language is not ambiguous ...  Generally, if the court finds a contract term unambiguous, the court

can interpret the contract based on the plain and ordinary meaning of the term.  In these cases summary judgment would be appropriate." *Tsoukanelis v. Country Pure Foods, Inc.*, 337 F. Supp. 2d 600, 605 (D. Del. 2004); *see also Farmers Ins. Exchange v. RNK, Inc.*, 632 F.3d 777, 783-84 (1st Cir. 2011) (holding that "[t]he meaning of an unambiguous contract term is a question of law.... Summary judgment is appropriate when ... [the] plain terms [of a contract] unambiguously favor either side."); *Monex Fin. Servs. Ltd. v. Nova Info. Sys., Inc.*, 657 F. Supp. 2d 447, 455 (S.D.N.Y. 2009) (stating that when determination of issues depends upon construction of a written instrument and legal effect to be drawn therefrom, question at issue is essentially one of law only determinable by summary judgment); *Jackson Nat. Life Ins. Co. v. Ladish Co.*, No. 92 CIV. 9358 (PKL), 1993 WL 43373, at *3 (S.D.N.Y. Feb. 18, 1993) ("Summary judgment concerning the proper construction of a contract may be granted where the contract conveys a 'definite and precise meaning absent any ambiguity.'" (*citing Seiden Assoc., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992))).

62.     Under New York law, a contract is unambiguous where it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978).  "Conversely, a 'provision is ambiguous where a natural and reasonable reading of its language allows for two or more possible meanings.'  However, '[l]anguage whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation.'" *Jackson Nat. Life Ins. Co.*, 1993 WL 43373, at *4 (*quoting Roberts v. Consolidated Rail Corp.,* 893 F.2d 21, 24 (2d Cir. 1989) & *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir. 1990)).  Words and phrases should be given their plain meaning.  *See Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2015) ("[T]he words and phrases [in a contract] should be given

23

their plain meaning, and the contract should be construed so as to give full meaning and effect to all

of its provisions."); *Greenwich Capital Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (1st Dep't

2010) (courts construe agreements "in a manner that accords the words their fair and reasonable

meaning and achieves a practical interpretation of the expressions of the parties.") (citation and

internal quotation marks omitted).

## II.    ICBCS HAS A FIRST PRIORITY SECURITY INTEREST IN ALL BI PROCEEDS PAID ON ACCOUNT OF THE DEBTORS' CLAIMS UNDER THE POLICY

### A.    The BI Proceeds Are SOA Priority Collateral Because They Are "Proceeds Of" (i) Current Assets Collateral, (ii) Money and General Intangibles Relating To Current Assets Collateral, and (iii) Insurance Payable With Respect To Such Assets

63.    As noted above, SOA Priority Collateral includes Current Assets Collateral (*i.e.*,

Accounts and Inventory), and Money and General Intangibles relating to Current Assets Collateral.

"SOA Priority Collateral" also includes "Proceeds of" the foregoing assets, with "Proceeds" defined

to include "whatever is … distributed on account of, collateral," and "insurance payable by reason of

the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral."

Newman Decl. Ex. 5 (Intercreditor Agreement) § 1.02; NYUCC § 9-102(a)(64).    SOA Priority

Collateral also includes "Proceeds of ... insurance … payable … with respect to" the Current Assets

Collateral, and Money and General Intangibles related thereto.    Newman Decl. Ex. 5 (Intercreditor

Agreement) § 1.02.

64.    These components of the SOA Priority Collateral definition lead to the unambiguous

and inescapable conclusion that the BI Proceeds are SOA Priority Collateral.    The BI Policy "covers

actual loss sustained by the Insured directly resulting from [the] interruption of business."    Newman

Decl. Ex. 6 (Policy) § II.1.    Put simply, the BI Policy and BI Proceeds are intended to provide the

Debtors with the business income they would have generated but for the Girard Point Incident.    *See*

*MNC Commercial Corp.*, 1992 WL 674733, at *1 (the "purpose of the business interruption

proceeds was to compensate [the insured] for lost business income that would have been generated but for the fire.").[14]   "Business income," in turn, "normally takes the form of cash, accounts receivable or a chose in action," and is the Proceeds of "income producing … inventory and raw materials."   *Id.*

65.     As noted above, each of these business-income assets constitutes SOA Priority Collateral.  The BI Proceeds are thus also SOA Priority Collateral, because they are "distributed on account of," and "insurance payable by reason of the loss of," the business-income assets, which makes them "Proceeds" of the business income assets.   Newman Decl. Ex. 5 (Intercreditor Agreement) § 1.02 ("SOA Priority Collateral" includes "all Proceeds" of the assets listed in (i) – (vi) of the definition, which includes Accounts ((i)), Inventory ((ii)), "all Money and Deposit Accounts relating to the foregoing," ((iii)), and "to the extent relating to Current Assets Collateral, General Intangibles." ((iv(C)))); NYUCC § 9-102(a)(64) (defining "Proceeds" as "whatever is … distributed on account of, collateral," and "insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral").  The BI Proceeds are also SOA Priority Collateral because they are the "Proceeds of … insurance … payable … with respect to"  the business income assets.   Newman Decl. Ex. 5 (Intercreditor Agreement) § 1.02 ("SOA Priority Collateral" includes "any and all Proceeds of any insurance ... payable … with respect to" the enumerated assets).

---

[14]   *See also* 44 C.J.S. Insurance § 48 ("Business interruption insurance is insurance under which the insured is protected in the earnings which the insured would have enjoyed had there been no interruption of business."); 4f-116f Appleman on Insurance Law & Practice Archive § 2329 (2d ed. 2011) ("Generally, the purpose of business interruption insurance is to protect the prospective earnings of the insured business"); *A. Miller & Co. v. Cincinnati Ins. Co.*, 577 N.E.2d 885, 887 (Ill. App. Ct. 1991) ("The general purpose of business interruption insurance is to protect the earnings which the insured would have enjoyed had no interruption occurred."); *Quality Molding Co. v. Am. Nat. Fire Ins. Co.*, 272 F.2d 779, 780 (7th Cir. 1959) ("The purpose of business interruption insurance is to protect the prospective earnings of the insured business."); *Polytech, Inc. v. Affiliated FM Ins.*, 21 F.3d 271, 276 (8th Cir. 1994) (same).

66.    The *MNC Commercial* case is instructive.  There, a bankruptcy trustee challenged the

right of a secured creditor ("MNC") to funds received by the debtor in settlement of the debtor's

claim against its business interruption insurance policy.  *MNC Commercial Corp.*, 1992 WL 674733,

at *1.  In finding that the funds were subject to the secured creditor's security interest, the court

stated:

> The purpose of the business interruption proceeds was to compensate [the debtor] for
> lost business income that would have been generated but for the fire.  Business
> income normally takes the form of cash, accounts receivable or a chose in action – all
> of which MNC has a security interest in pursuant to the Security Agreement.  More
> importantly, MNC also took a security interest in the tangible income-producing
> property of the business, which was [the debtor's] inventory and raw materials ...
> MNC's right to the insurance proceeds is based upon MNC's security interest in [the
> debtor's] business assets, which would otherwise represent, embody, and/or generate
> [the debtor's] business income.  Consequently, the insurance proceeds paid from the
> Business Interruption Policy are derivative proceeds under § 9-306(1),[15] and,
> therefore, are subject to MNC's perfected security interest under the Security
> Agreement.

*Id.* at *1.

67.    The reasoning set forth by the *MNC Commercial* court has also been espoused by

commentators addressing the issue of secured interests in the proceeds of a business interruption

policy:

> Under a correct analysis, a secured creditor with a properly perfected security interest in the
> debtor's accounts and general intangibles should be entitled to priority with respect to
> business interruption payments ... the subject matter of a security interest in accounts and
> general intangibles is the debtor's stream of business income, and that is also the subject
> matter of a business interruption insurance policy.  Thus the insurance payment represents
> the proceeds of the collateral, and any security interest in the collateral will attach to such
> proceeds.

David B. Young, *The Rights of Secured Creditors to the Proceeds of Business Interruption*

*Insurance Under UCC Article 9*, 26 U.C.C.L.J. 204, 205 (1994); *see also* R. Wilson Freyermuth,

---

[15]    The *MNC Commercial* court's reference to "9-306(1)" refers to the definition of "Proceeds" under
Section 9-306(1) of the Uniform Commercial Code as adopted by the states of Missouri and Maryland, which
is substantially identical to the definition of Proceeds under § 9-102(a)(64) of the NYUCC.

*Rethinking Proceeds: The History, Misinterpretation and Revision of U.C.C. Section 9-306*, 69 Tul. L. Rev. 645, 690–91 (1995) ("The purpose of business interruption insurance is to protect the insured party against a loss of prospective earnings due to a business interruption.  As such, business interruption insurance payments are derivative of and a substitute for the accounts and intangibles that Debtor would have generated but for the interruption.  [Where] Secured Party's lien would have covered those accounts and intangible rights directly, security law should treat the insurance moneys as proceeds of Secured Party's collateral."); 1 The Law of Secured Transactions Under the UCC § 1.08[7][f] (3rd ed. 2019) ("The proper analysis was that the creditor's blanket lien on 'accounts and general intangibles' included the stream of business income that the interruption insurance was intended to replace.").

68.    Here, as in *MNC Commercial*, ICBCS has an undisputed perfected first priority security interest in all of the Debtors' business-income assets (*i.e.* Accounts, Inventory, Money and General Intangibles relating to Accounts and Inventory, the Proceeds thereof, and the Proceeds of insurance payable with respect thereto).  Accordingly, ICBCS also has a perfected first priority security interest in the BI Proceeds.

**B.     The BI Proceeds Are SOA Priority Collateral Because The BI *Policy* Is "SOA Priority Collateral," And The BI Proceeds Are "Proceeds Of" The BI Policy And Insurance Payable With Respect To The BI Policy**

69.    The BI Proceeds are also SOA Priority Collateral for the additional and independent reason that the BI ***Policy*** itself is SOA Priority Collateral, and the BI Proceeds are "Proceeds of" the BI Policy, and "insurance … payable … with respect to" the BI Policy.  Newman Decl. Ex. 5 (Intercreditor Agreement) § 1.02.

70.    SOA Priority Collateral includes "General Intangibles," "to the extent related to Current Assets Collateral."  *Id*.  "General Intangibles," in turn, are defined to include all of the PES Parties' "rights, title and interest in, to and under all Contracts and ***insurance policies***."  *Id*.

(emphasis added).  And "Current Assets Collateral" is defined as the Debtors' Accounts and Inventory—the assets that represent, embody, and are exchanged for the business income that the BI Policy and BI Proceeds are intended to replace.  *Id.*; *see also, e.g., MNC Commercial Corp.*, 1992 WL 674733, at *1.  The BI Policy is thus plainly a "General Intangible" related to Current Assets Collateral.

71.     Given that the BI Policy is a General Intangible relating to Current Assets Collateral, there is no question that the BI Proceeds are also SOA Priority Collateral.  SOA Priority Collateral includes the "Proceeds of" General Intangibles relating to Current Assets Collateral, and "insurance … payable … with respect to" General Intangibles relating to Current Assets Collateral.  *Id.*  The BI Proceeds are clearly "Proceeds of" the BI Policy, and "insurance … payable … with respect to" the BI Policy.  *Id.*  The BI Proceeds are thus plainly SOA Priority Collateral.

**C.     Other Provisions Of The Relevant Agreements Also Demonstrate That The BI Proceeds Are SOA Priority Collateral**

72.     ICBCS's first priority security interest in the BI Proceeds is further demonstrated by the fact that ICBCS expressly required the Debtors to maintain business interruption insurance naming ICBCS as an additional insured, loss payee, and mortgagee.  *See* Newman Decl. Ex. 1 (SOA) §§ 10.04, 10.12(b), 8.16; Schedules 10.04, 8.16.  The Term Loan Lenders, by contrast, did not include business interruption insurance within the types of insurance they required the Debtors to maintain.  *See* Newman Decl. Ex. 3 (Term Loan Credit Agreement) § 5.05(b) (requiring the PES Loan Parties to maintain insurance covering only real and personal property (and if requested, personal injury insurance), and that "***such insurance***" "name the … Agent as insured party or loss payee.") (emphasis added); § 5.11(b) (requiring the Borrower to deliver to the Agent and the Term Loan Lenders "a copy of, or a certificate as to coverage under, and a declaration page relating to, ***the insurance policies required by Section 5.05***") (emphasis added).

28

73.     These contrasting provisions demonstrate the parties' intentions with respect to the BI Proceeds.  ICBCS understood that it was to have a first priority security interest in the BI Proceeds, and thus ensured that the Debtors maintained a BI Policy in which ICBCS's first priority security interest was perfected through ICBCS being named as an additional insured, loss payee, and mortgagee.  The Term Loan Lenders, conversely, were concerned only with the PD Policy, requiring that the Debtors procure and name the Agent as a loss payee and additional insured only on that portion of the Policy.[16]

74.     The Term Loan Lenders' acknowledgment that the BI Proceeds constitute SOA Priority Collateral is also evidenced by Section 2.06 of the Term Loan Credit Agreement.  Section 2.06 provides that if the Debtors receive more than $5 million from Asset Sales or Recovery Events (each as defined by the Term Loan Credit Agreement) in a fiscal year, then certain of those funds must be used to prepay the Term Loan.  In recognition of ICBCS's superior rights to the proceeds of business interruption insurance, however, the Term Loan Credit Agreement makes clear that any such proceeds are not included within the prepayment obligation.  The "Recovery Event" definition expressly provides that it "shall not include proceeds received from business interruption insurance." *Id.* § 1.01.  And Section 2.06 is also express that "for the avoidance of doubt, any cash proceeds received from business interruption insurance shall not be required to be used by the Loan Parties to prepay the Loans under this Section 2.06(b)."  *Id.*  § 2.06.

---

[16] In recognition of ICBCS's senior priority security interests in any PD Proceeds paid on account of Inventory or SOA Separate Assets and Collateral, and second priority security interest in any PD Proceeds paid on account of other Common Collateral, the SOA also required that the Debtors maintain property damage insurance naming ICBCS as an additional insured, loss payee, and mortgagee.  *See* SOA §§ 10.04, 10.12(b), 8.16; Schedules 10.04, 8.16.

**III.    ICBCS HAS A FIRST PRIORITY OR EXCLUSIVE SECURITY INTEREST IN ANY PD PROCEEDS PAID ON ACCOUNT OF INVENTORY OR SOA SEPARATE ASSETS AND COLLATERAL**

75.    ICBCS has a clear first priority or exclusive security interest in any PD Proceeds paid on account of Inventory or SOA Separate Assets and Collateral.  SOA Priority Collateral expressly includes Inventory, "Proceeds of" Inventory (including insurance paid on account of Inventory), and "insurance … payable … with respect to" Inventory.  Newman Decl. Ex. 5 (Intercreditor Agreement) § 1.02; NYUCC § 9-102(a)(64).  And Section 9.01 of the Intercreditor Agreement explicitly states that "none of the Term Loan Agent and the Term Loan Secured Parties shall have any Lien on any of the SOA Separate Assets and Collateral" until all SOA Obligations are discharged.  Newman Decl. Ex. 5 (Intercreditor Agreement) § 9.01.  The Plaintiffs admit this.  *See Plaintiff's Answer to ICBCS Answer and Counterclaim and Cross-Claim* [D.I. 28] at ¶ 49. Accordingly, to the extent any PD Proceeds are paid on account of Inventory or SOA Separate Assets and Collateral, such PD Proceeds are subject to ICBCS's first priority or exclusive security interest, respectively.  Unless the assets giving rise to the PD Proceeds are conclusively adjudicated or consensually agreed not to include Inventory or SOA Separate Assets and Collateral, the Debtors should not be permitted to stipulate that all June 21 Insurance Proceeds constitute Term Loan Priority Collateral.[17]

**IV.    THE COMMITTEE'S CHALLENGES TO ICBCS'S LIENS ON THE BI PROCEEDS SHOULD BE REJECTED**

    **A.    ICBCS's First Priority Security Interest Is Protected By Section 552(b) Of The Bankruptcy Code**

76.    The Committee's efforts to challenge ICBCS's security interest in the BI Proceeds under the "after-acquired property" provision of Section 552(a) of the Bankruptcy Code should be

---

[17]    ICBCS has requested that the Debtors provide it with information sufficient to identify the assets giving rise to the Debtors' claim under the PD Policy.  As of the filing of this Motion, the Debtors had not provided the requested information.  Newman Decl. ¶ 18.

rejected out of hand. Section 552(a) is expressly subject to Section 552(b), which provides that if collateral was subject to a security interest before the bankruptcy filing, then the security interest extends to proceeds of that collateral that the debtor acquires post-petition to the extent provided by the applicable security agreement and nonbankruptcy law. 11 U.S.C. § 552. The Committee argues that the BI Proceeds "would not constitute proceeds of any prepetition assets" subject to ICBCS's security interest, because "[a]ny loss covered under the … [BI] Policy will be predicated on models projecting the revenues and gross profits which would have been earned from the purchase, refining, and sale of crude oil beginning thirty days after the Petition Date." Crossclaims ¶ 53.

77.    The Committee's own allegations make clear, however, that ICBCS's security interest in the BI Proceeds is protected by Section 552(b), because the BI Proceeds are proceeds of the BI Policy, and ICBCS held a security interest in the BI Policy prior to the Debtors' bankruptcy filing. Indeed, the Committee acknowledges that (i) "under applicable New York law, in order to obtain or perfect a security in an insurance policy," a creditor must "be expressly named as a loss payee in the policy itself or in an endorsement thereto," and (ii) "Endorsement 4 [of the Policy] expressly names ICBCS as Loss Payee/Mortgagee." Crossclaim ¶¶ 3, 49. Thus, the Committee concedes (as it must) that ICBCS had a perfected security interest in the BI Policy prior to the Debtors' bankruptcy filing.[18]

---

[18]    The Committee's concession is mandated by applicable law, as it is well settled under New York law that a creditor named as a loss payee or additional insured on a debtor's insurance policy has a perfected interest in the policy. *See Badillo v. Tower Ins. Co. of N.Y.*, 92 N.Y.2d 790, 795-96 (1999) ("The existence or non-existence of a duly prepared and filed UCC–1 financing statement seems easily discernible, and usually is, but given the alternatives, there is no need to subject the insurance claims process to the vagaries surrounding the adequacy of UCC–1 filings, which are often enough the subject of protracted litigation …. There is a much simpler road to travel. The secured party always has the conventional option of having itself named in the insurance contract as the loss payee or as an additional insured on the risk.").

78.     Under applicable New York law, the ICBCS Loss Payee/Mortgagee Endorsement and Loss Payee and Additional Insured Provisions also entitle ICBCS to the proceeds of the BI Policy (*i.e.* the BI Proceeds).  *See, e.g.*, *McLean*, 132 B.R. at 284 ("[I]n the case *sub judice*, the revised loss payee clause assigned the insurance proceeds to MARAD as a loss payee and Chemical as an additional assured."); *Schleimer v. Empire Mutual Ins. Co.*, 337 N.Y.S.2d 872, 873 (1st Dep't 1972).  And the ICBCS Pledge Agreement plainly extends ICBCS's security interest to the Proceeds of the BI Policy.  *See* Newman Decl. Ex. 2 (ICBCS Pledge Agreement) § 2.1(a)(xii) (granting lien in Proceeds (as defined by the NYUCC) of enumerated assets); NYUCC § 9-102(a)(64) (defining "Proceeds" as "whatever is … distributed on account of, collateral," and "insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral").  It thus necessarily follows that ICBCS's security interest in the BI Proceeds are valid under Section 552(b), and cannot be invalidated under Section 552(a).

79.     ICBCS's security interest in the BI Proceeds is also protected by Section 552(b) for the additional and independent reason that ICBCS had a  prepetition security interest in the Debtors' Current Assets Collateral (*i.e.* Accounts and Inventory), and Money and General Intangibles relating to Current Assets Collateral.  The BI Proceeds are "Proceeds" of these business-income assets, and are also subject to ICBCS's first priority security interest under the ICBCS Pledge Agreement and the Intercreditor Agreement.  *See supra at* § II.A; *MNC Commercial Corp.*, 1992 WL 674733, at *1. The fact that the dollar amount of the BI Proceeds will be based on projected post-petition income does not void the protection afforded by Section 552, as it is well settled that insurance proceeds collected *after* a debtor's bankruptcy petition on account of loss or damage to collateral subject to a prepetition perfected security interest are also subject to the creditor's perfected security interest under Bankruptcy Code Section 552(b).  *In re Tower Air, Inc.*, 397 F.3d 191, 197–98 (3d. Cir.

2005); *see also McLean*, 132 B.R. at 284 (noting that Section 9-306 of the NYUCC defines proceeds to include "insurance payable by reason of loss of damage to the collateral," and holding that "the intent of 9-306 to cover 'insurance proceeds' cannot be defeated [under Section 552 of the Bankruptcy Code] merely because the insurance proceeds did not exist when the Debtor filed its chapter 11 petition."); *PPG Indus., Inc. v. Hartford Fire Ins. Co.*, 531 F.2d 58, 62 (2d Cir. 1976) (finding that insurance proceeds existed before being crystallized pursuant to a judgment because "the property which was (originally) the subject matter of the security agreement (here, the inventory) was clearly in existence, and (therefore) ... the proceeds of the insurance is merely the collateral in another form.... When [the original collateral] was destroyed, PPG's security interest continued under 9-306(1), first in the existing insurance policy and then in the funds that were paid out on that policy."); *In re Megamarket of Lexington, Inc.*, 207 B.R. 527, 532 (Bankr. E.D. Ky. 1997) ("In this case, the debtor 'acquired' the proceeds, that is the refund, post-petition, but when did the debtor 'acquire' the *right* to receive the refund? If the debtor 'acquired' the right to receive the refund before the petition was filed, the bank's security interest would continue in proceeds acquired post-petition, and the secured lender would be entitled to receive the amounts refunded.").

## B. The BI Proceeds Are Not Property Of The Estate That May Be Recovered For General Unsecured Creditors

80. The Committee's Section 552 challenge also fails because the BI Proceeds are not property of the estate that may be recovered for unsecured creditors. "Insurance proceeds, when specifically assigned by a debtor *cannot* be reclaimed by the debtor." *McLean*, 132 B.R. at 284 (emphasis in original); *In re Moskowitz*, 14 B.R. 677, 680-81 (Bankr. S.D.N.Y. 1981) (holding that insurance proceeds assigned by the Debtors were not property of the estate, and payment of the proceeds was not a voidable preference). Loss payee, mortgagee, and additional insured provisions in an insurance policy—such as the provisions in the Policy naming ICBCS—assign the debtor's

rights to the insurance proceeds to the loss payee, mortgagee, and additional insured at least to the extent of the interests that they hold. *See McLean*, 132 B.R. at 284; *Schleimer*, 337 N.Y.S.2d at 873; *Tower Air,* 397 F.3d at 202. The proceeds subject to such an assignment are held by the debtor in trust for the loss payee/additional insured, and are therefore "not property of the estate" that a debtor (or a Committee standing in its stead) may obtain under Section 552. *McLean*, 132 B.R. at 284; *see also In re Suter*, 181 B.R. 116, 119 (Bankr. N.D. Ala. 1994) ("Because AmSouth was the loss payee of the insurance policy, the proceeds of the policy are not property of the bankruptcy estate and are payable to AmSouth, at least to the extent of AmSouth's interest in the property insured.").

## **CONCLUSION**

For the foregoing reasons, ICBCS respectfully requests that the Court enter an order: (i) denying the relief requested in the Complaint; (ii) denying the relief requested in Count I of the Crossclaims; and (iii) declaring that (a) any BI Proceeds paid on account of the Debtors' claims under the BI Policy constitute SOA Priority Collateral, and (b) ICBCS has a first priority lien on all PD Proceeds paid on account of Inventory and an exclusive lien on all PD Proceeds paid on account of SOA Separate Assets and Collateral.

Dated: October 4, 2019
       Wilmington, Delaware

**ASHBY & GEDDES, P.A.**

*/s/ William P. Bowden*
William P. Bowden (#2553)
David F. Cook (#6352)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19801
Telephone: (302) 654-1888
Email:  WBowden@ashbygeddes.com
       DCook@ashbygeddes.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Richard I. Werder, Jr. (*pro hac vice*)
Jane Byrne (*pro hac vice*)
Deborah Newman (*pro hac vice*)
Eric Kay (*pro hac vice*)
Andrew Soler (*pro hac vice*)
Zachary Russell (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010

*Counsel to ICBC Standard Bank Plc*