## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PES HOLDINGS, LLC, *et. al.*,<br><br>        Debtors,[1] | Chapter 11<br><br>Case No. 19-11626 (KG)<br><br>(Jointly Administered) |
| PES HOLDINGS, LLC, *et. al.*, and CORTLAND CAPITAL MARKET SERVICES, LLC,<br><br>        Plaintiffs and Counterclaim Defendants,<br><br>    v.<br><br>OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PES, INC.,<br><br>        Inventor-Defendant and Counterclaim and Cross-Claim Plaintiff<br><br>    And<br><br>ICBC STANDARD BANK PLC,<br><br>        Defendant and Cross-Claim Defendant. | Adv. Pro. No. 19-50282-KG |

## PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(C)

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's taxpayer identification number are as follows: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574). The Debtors' service address is: 1735 Market Street, Philadelphia, Pennsylvania 19103.

i

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
pkeane@pszjlaw.com
joneill@pszjlaw.com

- and –

Edward O. Sassower, P.C.
Steven N. Serajeddini (*admitted pro hac vice*)
Matthew C. Fagen (*admitted pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: edward.sassower@kirkland.com
steven.serajeddini@kirkland.com
matthew.fagen@kirkland.com

- and –

Michael B. Slade (*admitted pro hac vice*)
Nader R. Boulos (*admitted pro hac vice*)
William T. Pruitt (*admitted pro hac vice*)
Whitney L. Becker (*admitted pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: michael.slade@kirkland.com
nader.boulos@kirkland.com
william.pruitt@kirkland.com
whitney.becker@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

ii

Damian S. Schaible (admitted *pro hac vice*)
James I. McClammy (admitted *pro hac vice*)
David B. Toscano (admitted *pro hac vice*)
Aryeh Ethan Falk (admitted *pro hac vice*)
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
Telephone:        (212) 450-4000
Facsimile:        (212) 701-5800
Email:            damian.schaible@davispolk.com
                  james.mcclammy@davispolk.com
                  david.toscano@davispolk.com
                  aryeh.falk@davispolk.com


Robert J. Dehney
Andrew R. Remming
Paige N. Topper
**MORRIS NICHOLS ARSHT & TUNNELL LLP**
1201 North Market Street
Wilmington, DE 19899
Telephone:        (302) 658-9200
Facsimile:        (302) 658-3989
Email:            rdehney@mnat.com
                  aremming@mnat.com
                  ptopper@mnat.com


*Counsel to the Term Loan Agent*

DOCS_DE:225652.1

## TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDING ................................................................1

SUMMARY OF ARGUMENT ..................................................................................1

FACTUAL BACKGROUND ......................................................................................4

I.      Debtors' Business and Capital Structure. ....................................................4

II.     The Term Loan Agent's and ICBCS's Collateral. ........................................7

III.    Debtors' Business Interruption Insurance. ..................................................9

IV.     The Term Loan Agent's First Priority Lien on Insurance Proceeds. .........11
        A.      ICBCS Exclusive Collateral. ..........................................................12
        B.      Common Collateral. ........................................................................12

V.      The Instant Action. ....................................................................................13

LEGAL STANDARD .............................................................................................14

ARGUMENT .........................................................................................................14

I.      The Term Loan Agent Holds A Perfected Security Interest in the Business
        Interruption Insurance Proceeds. ...............................................................14
        A.      The Term Loan Agent Holds a Perfected Security Interest in the Policy
                Under New York Common Law. ......................................................15
        B.      The Term Loan Agent Holds a Perfected Security Interest in the Insurance
                Proceeds Under the UCC. ...............................................................17
        C.      The Term Loan Agent's Security Interest Was Perfected by Court Order. ...........20

II.     The Term Loan Agent Has Priority over ICBCS with Respect to Both the
        Property and Business Interruption Insurance Proceeds. ...........................21
        A.      The Business Interruption Insurance Proceeds Are Not ICBCS's Exclusive
                Collateral Under the Intercreditor Agreement. ................................22
        B.      The Business Interruption Insurance Proceeds Are Not ICBCS's First
                Priority Common Collateral Under the Intercreditor Agreement. .........23
        C.      The Term Loan Agent Has First Priority Interest In the Business
                Interruption Insurance Proceeds. ....................................................25
        D.      The Term Loan Agent Clearly Has Priority Over ICBCS With Respect to
                Property Insurance Proceeds for Losses Other Than ICBCS's
                Hydrocarbons. ................................................................................27

III.    The Fact That the Debtors Have yet to Collect Insurance Proceeds Does Not
        Destroy the Lenders' Pre-Petition Liens. ...................................................27

CONCLUSION .....................................................................................................30

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Anderson*,
   599 B.R. 504 (D. Md. 2019) ......................................................................4, 25, 26

*In re Bell Fuel Corp.*,
   99 B.R. 602 (E.D. Pa. 1989), *aff'd sub nom. Meridian Bank v. Bell Fuel
   Corp.*, 97 B.R. 193 (E.D. Pa. 1989), *and aff'd sub nom. Appeal of Official
   Creditors' Comm. of Bell Fuel Corp.*, 891 F.2d 282 (3d Cir. 1989) .................18, 19

*Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*,
   10 N.Y.3d 187, 886 N.E.2d 127 (2008)................................................................23

*Cent. Tablet Mfg. Co. v. United States*,
   417 U.S. 673 (1974)..............................................................................................29

*In re Fedders N. Am., Inc.*,
   422 B.R. 5 (Bankr. D. Del. 2010) .........................................................................13

*Firemen's Fund Am. Ins. Co. v. Ken-Lori Knits, Inc.*,
   399 F.Supp. 286 (E.D.N.Y. 1975) ..................................................................14, 15

*In re Flickinger*,
   2010 WL 4923933 (Bankr. M.D. Pa. Nov. 24, 2010)............................................6

*In re Glob. Safety Textiles Holdings LLC*,
   2009 WL 7834658 (Bankr. D. Del. Sept. 21, 2009) .............................................19

*In re Gordon Car & Truck Rental, Inc.*,
   75 B.R. 466 (Bankr. N.D.N.Y. 1987), *aff'd sub nom. In re Gordon Car &
   Truck Rental Inc.*, 80 B.R. 12 (N.D.N.Y. 1987) ..................................................23

*Granite Commercial Indus., LLC v. Landmark Am. Ins. Co.*,
   909 F. Supp. 2d 191 (E.D.N.Y. 2012) ..............................................................2, 14

*In re Heron, Burchette, Ruckert & Rothwell*,
   148 B.R. 660 (Bankr. D.D.C. 1992) .....................................................................25

*In re Holtslander*,
   507 B.R. 779 (Bankr. N.D.N.Y. 2014) ..............................................................2, 17

*In re Island Helicopter Corp.*,
   63 B.R. 515 (Bankr. E.D.N.Y. 1986)....................................................................28

vi

*In re McLean Indus., Inc.*,
 132 B.R. 271 (Bankr. S.D.N.Y. 1991) ..............................................................17, 28

*Mele v. Fed. Reserve Bank of N.Y.*,
 359 F.3d 251 (3d Cir. 2004).............................................................................13

*MNC Commercial Corp. v. Rouse*,
 1992 WL 674733 (W.D. Mo. Dec. 15, 1992) ..............................................18, 19

*In re Montreal, Me. & Atl. Ry., Ltd.*,
 521 B.R. 703 (B.A.P. 1st Cir. 2014) .............................................................23, 24

*PPG Indus., Inc. v. Hartford Fire Ins. Co.*,
 531 F.2d 58 (2d Cir. 1976)..............................................................................16, 17

*Qmect, Inc. v. Burlingame Capital Partners II, L.P.*,
 373 B.R. 682 (N.D. Cal. 2007) ...........................................................................28

*In re Simplexity, LLC*,
 2017 WL 2385404 (Bankr. D. Del. June 1, 2017) .............................................13

*Small v. Beverly Bank*,
 936 F.2d 945 (7th Cir. 1991) .........................................................................19, 20

*State Farm Fire & Cas. Co. v. Ruby*,
 2017 WL 445762 (E.D. Pa. Feb. 2, 2017) ...........................................................13

*In re Tower Air*,
 397 F.3d 191 (3d Cir. 2005)..........................................................................27, 28

*In re Tower Air, Inc.*,
 268 B.R. 404 (Bankr. D. Del. 2001), *aff'd*, 2003 WL 21398007 (D. Del. June
 16, 2003), *aff'd*, 397 F.3d 191 (3d Cir. 2005)..............................................17, 28

*Werner v. Werner*,
 267 F.3d 288 (3d Cir. 2001)..................................................................................6

**Statutes**

11 U.S.C. § 101(36) .................................................................................................19

11 U.S.C. § 552(b) .......................................................................................27, 28, 29

**Rules**

Fed. R. Civ. P. 10(c) ...............................................................................................14

Federal Rules of Bankruptcy Procedure Rule 12(c) and Rule 7012(b) .........................13

DOCS_DE:225652.1

## NATURE AND STAGE OF PROCEEDING

On August 7, 2019, the Debtors and the Term Loan Agent (together "Plaintiffs") jointly initiated this adversary proceeding.  The Complaint had a single, straightforward request: a "judgment that the Debtor Plaintiffs' insurance proceeds for business interruption losses resulting from the Girard Point Incident constitute 'Term Loan Priority Collateral' as defined in an August 7, 2018 intercreditor agreement ("Intercreditor Agreement") between, inter alia, ICBCS, the Term Loan Agent, and the Debtors."  (Adv. Dkt. No. 1, the "Complaint" or "Compl." at ¶ 1).

On September 16, 2019, ICBCS answered the Complaint and asserted counterclaims, generally seeking the converse of the relief requested in the Complaint:  a declaration that ICBCS has priority over the Term Loan Agent on the Debtors' business interruption proceeds.  (*See* Adv. Dkt. No. 25, the "ICBCS Ans." and the "ICBCS CC").  That same day, the Official Committee of Unsecured Creditors (the "Committee") filed a complaint in intervention, arguing that neither ICBCS nor the Term Loan Agent held a perfected security interest in any of the Debtors' insurance proceeds at all.  (Adv. Dkt. No. 24, the "UCC Ans." And the "UCC CC").  On September 26, 2019, Plaintiffs answered and asserted affirmative defenses in response to the Committee's intervention and ICBCS's counterclaims.  (Adv. Dkt. Nos. 26 and 27).

## SUMMARY OF ARGUMENT

1.      All claims, counter-claims, and third party claims in this adversary proceeding are resolved by answering two questions of law: (1) does any party have a perfected security interest in the Debtors' insurance proceeds; and (2) assuming the answer is "yes" (which it clearly is), which of the Term Loan Agent and ICBCS has first priority?  As demonstrated  below, there is no serious doubt that the Debtors' insurance proceeds are the collateral of their secured creditors and, as between those secured creditors, the Term Loan Agent has a perfected, first priority security interest in both the Debtors' property and business interruption proceeds.

1

2.      The Term Loan Agent's security interest in the Debtors' insurance proceeds is perfected for three independently sufficient reasons.  *First*, the Term Loan Agent is designated as an additional insured and loss payee on the Debtors' insurance policies.  *See* Compl. Ex. E, the "Term Loan Agent Certificate", at 1.  Thus, the Term Loan Agent's secured interest is perfected pursuant to New York insurance common law.  *See, e.g., Granite Commercial Indus., LLC v. Landmark Am. Ins. Co.*, 909 F. Supp. 2d 191, 194 (E.D.N.Y. 2012) (creditor with secured interest in debtor's business and named loss payee on debtor's business interruption insurance policy held a perfected security interest in the proceeds of that policy) (applying New York law).

3.      *Second*, the Term Loan Agent is perfected pursuant to Article 9 of the UCC because (a) the property insurance constitutes proceeds of the Term Loan Agent's perfected security interest in real estate (per the Mortgages) and in Equipment and Fixtures (as those terms are defined in the UCC)[2], and (b) the business interruption proceeds are derivative of the Term Loan Agent's perfected security interest in the Debtors' general intangibles.  *See In re Holtslander*, 507 B.R. 779, 783 (Bankr. N.D.N.Y. 2014) ("A perfected security interest in the collateral will give the secured party a perfected security interest in [insurance] proceeds upon damage to or destruction of the collateral.").

4.      *Third*, even if common-law insurance principles and the UCC did not provide perfection (both do), the Term Loan Agent's interest was perfected by prior order of Court; it is thus "judicially perfected."  *See* Compl. Ex. C (the "Confirmation Order") ¶ 84 ("the liens granted and contemplated by the New First Lien Term Loan Documents shall be valid, binding, perfected,

---

[2]      More specifically "Equipment" covers "goods other than inventory, farm products, or consumer goods," and "Fixtures" covers "goods that have become so related to particular real property that an interest in them arises under real property law."  N.Y. U.C.C. Law § 9-102 (McKinney).

2

and enforceable liens on the collateral specified in the New First Lien Term Loan Documents for the benefit of the secured parties under the New First Lien Term Loan Documents.").

5.     The suggestion that the Debtors' insurance proceeds are not encumbered *at all* is frivolous, and the suggestion by the Committee that these insurance proceeds *could not be encumbered* is both without merit and highly dangerous.  The secured creditors lent the Debtors hundreds of millions of dollars so that the Debtors could acquire and maintain an operating refinery.  Anyone lending money to a refinery (or in fact *any* type of physical-capital-intensive manufacturing or processing business) faces a risk that an explosion could cripple the facility.  If a perfected security interest in real estate, Equipment and Fixtures, and related general intangibles, did not also give a durable perfected security interest in the proceeds of these assets—including insurance proceeds arising from their destruction—then lenders' security could vanish when it is needed most.

6.     If the Committee were correct that insurance proceeds collected (or collectable) only after a bankruptcy filing are not encumbered by a secured lender's pre-petition lien, because they were not received until after the bankruptcy filing, no one would (or responsibly could) ever lend money to any manufacturing entity, let alone a refinery like the Debtors'.  Fortunately, the reason that the secured lending marketplace works is that the Committee is wrong:  lenders know that their collateral (and its revenue generation capabilities) can be insured such that even if the collateral is damaged beyond repair, their investment is safe.  There is no authority or reason to justify fundamentally upending the lending market by holding otherwise.

7.     Once the Court determines that the Debtors' insurance proceeds are encumbered, the question turns to priority among the Term Loan Agent, on one hand, and ICBCS on the other.  That question is governed and answered by the terms of the parties' intercreditor agreement.  *See*

3

Compl. Ex. J, ("Intercreditor Agreement").  As shown below, the Debtors' property insurance recoveries on account of damage to the physical facility are clearly within the Term Loan Priority Collateral.[3]  And because business interruption insurance proceeds are derivative of the fixed assets of the broad business, and its real estate and general intangibles—and thus are not derivative of ICBCS's exclusive or priority collateral interests in insurance related to the physical hydrocarbons, refined products, accounts, or inventory—it is "Term Loan Priority Collateral" for the benefit of the Term Loan Agent as a matter of law.  *See In re Anderson*, 599 B.R. 504, 517 (D. Md. 2019) (affirming bankruptcy court enforcement of intercreditor agreement recognizing creditor's priority over insurance proceeds covering loss to creditor's collateral).

8.     For these reasons, Plaintiffs respectfully request that the Court grant judgment on the pleadings in their favor, and judgment on the pleadings against all of the claims raised in ICBCS's and the Committee's respective counterclaims.

## FACTUAL BACKGROUND

### I.     Debtors' Business and Capital Structure.

9.     The Debtors' principal asset is a refining complex (the "Refining Complex") located on an approximately 1,300 acre industrial site 2.5 miles from downtown Philadelphia.  (*See* Compl. ¶ 16; UCC Ans. ¶ 16).  The Refining Complex includes two interconnected refineries: Girard Point and Point Breeze.  (*See* Compl. ¶ 17; UCC Ans. ¶ 17).  The Refining Complex produces a full range of transportation fuels, which are marketed throughout the northeastern United States and to international markets.  (*See* Compl. ¶ 18; UCC Ans. ¶ 18).

---

[3]     ICBCS agrees that the Term Loan Agent has priority with respect to property insurance proceeds related to damage to the physical facility, but suggests it has priority over property insurance proceeds if they reflect the loss of SOA Priority Collateral such as the actual hydrocarbons on which ICBCS has a lien.

10.     On January 21, 2018, due to regulatory and challenging marketing conditions, certain Debtors filed petitions for relief under the bankruptcy code (the "Prior Chapter 11 Cases"). (*See* Compl. ¶ 31).  Approximately eight months later, on August 7, 2018 certain Debtors emerged from the Prior Chapter 11 Cases under the terms of a Plan of Reorganization (the "Prior Chapter 11 Plan") and the Confirmation Order, which conferred a number of benefits on the Debtors, including a term loan agreement (Compl. Ex. B, the "Term Loan Facility") and eventual access to a new working capital arrangement under the Intermediation Facility.  (*See* Compl. ¶ 32; ICBCS Ans. ¶ 32).

11.     The Term Loan Facility, which financed the Debtors' exit from the Prior Chapter 11 Cases, was approved pursuant to the Confirmation Order (attached to the Debtors' Complaint as Ex. C).  (*See* Compl. ¶ 42).  Debtor PES Holdings is the borrower under the approximately $698.6 million Term Loan Facility by and among PES Holdings, the lenders from time to time party thereto (the "The Term Loan Lenders"), and Cortland Capital Market Services LLC, as administrative agent (the "Term Loan Agent"), dated August 7, 2018.  (*See* Compl. ¶ 41; UCC Ans. ¶ 41; ICBCS Ans. ¶ 41).  In conjunction with the Term Loan Facility, Debtors also executed with the Term Loan Agent a Pledge and Security Agreement (Compl. Ex. D, the "Term Loan Security Agreement"), which also was dated August 7, 2018.  (*See* Compl. ¶ 46).  Two of the Debtors—Philadelphia Energy Solutions and Marketing LLC and North Yard Logistics, L.P.— each executed and delivered separate Open-End Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filings (the "Exit Mortgages") effective August 7, 2018, and perfected the Mortgages by recording the land records in Philadelphia, Pennsylvania. [4]  Philadelphia Energy Solutions Refining and Marketing LLC and North Yard

---

[4]     Cortland-PES Open-End Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing ("Open-End Mortgage"), Property Parcel Nos: 884097045; 884097046; 884096503;

Logistics L.P. also each executed and delivered separate Open-End Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filings (the "Incremental Mortgages," collectively with the Exit Mortgages, the "Mortgages"), effective April 5, 2019, and perfected the Mortgages by recording the land records in Philadelphia, Pennsylvania.[5] On August 8, 2018, Term Loan Agent filed a UCC-1 financing statement with the Delaware Department of State covering all of the assets of Philadelphia Energy Solutions, disclosing its security interest in "[a]ll assets of the Debtor of every kind and nature, whether now owned or hereafter acquired and wherever located, and all proceeds and products thereof."[6]  The Term Loan Agent also filed a UCC-1 financing statement covering all of the assets of North Yard Logistics, L.P. with the Delaware Department of State on August 8, 2018, disclosing its security interest in "[a]ll assets of the Debtor of every kind and nature, whether now owned or hereafter acquired and wherever located, and all proceeds and products thereof.[7]  (*See* Declaration of David B. Toscano, (the "Toscano Declaration") and accompanying exhibits).

---

884096505; 884096507; 884096509; 884096506; 884096504; 884096704; 884096703; 884096702; 884096701; 884097200; 884214115; 884097130; 884097140; 884097110, Philadelphia, Pennsylvania recorded as Doc ID 53402701 on Aug. 10, 2018); Cortland-North Yard Open-End Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing ("North Yard Open-End Mortgage"), Property Parcel No: P/O 884097200, Philadelphia County, Pennsylvania (recorded as Doc ID 53402702 on Aug. 10, 2018).

[5]    Cortland-PES Open-End Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing ("PES Incremental Mortgage"), Property Parcel Nos: 884097045; 884097046; 884096503; 884096505; 884096507; 884096509; 884096506; 884096504; 884096704; 884096703; 884096702; 884096701; 884097200; 884214115; 884097130; 884097140; 884097110, Philadelphia County, Pennsylvania (recorded as Doc ID 53497853 on April 9, 2019); Cortland-North Yard Open-End Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing ("North Yard Incremental Mortgage"), Property Parcel No: P/O 884097200, Philadelphia County, Pennsylvania (recorded as Doc ID 53497854 April 9, 2019).

[6]    *See* Cortland- Philadelphia Energy Solutions and Marketing LLC UCC-1 Financing Statement, Initial Filing No: 2018545844, Delaware Dept. of State, (Aug. 8, 2018). The Court may take judicial notice of publicly filed financing statements. *Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001) ("A court may take judicial notice of an adjudicative fact if . . . [it is] generally known within the jurisdiction of the trial court, or [] capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *see, e.g., In re Flickinger*, 2010 WL 4923933, at *3 (Bankr. M.D. Pa. Nov. 24, 2010) (taking judicial notice of the "existence and content of four UCC-1 financing statements" in ruling on a Rule 12(c) motion for judgment on the pleadings).

[7]    Cortland-North Yard UCC-1 Financing Statement, Initial Filing No. 20185455320, Delaware Dept. of State (Aug. 8, 2018).

6

12.     In addition, on June 18, 2019, certain Debtors and ICBCS executed the "Sixth Amended and Restated Supply and Offtake Agreement, among Philadelphia Energy Solutions Refining and Marketing LLC as PESRM, and ICBC Standard Bank PLC, as ICBCS." (Compl. Ex. A, the "Intermediation Facility"). Pursuant to the terms of the Intermediation Facility, ICBCS as Intermediation Facility Provider, supplies substantially all of the crude oil and non-crude feedstock requirements of the Refining Complex. (*Id*. at § 3.01; Compl. ¶ 26; ICBCS Ans. ¶ 26). In addition to the Intermediation Facility, certain of the Debtors executed an Amended and Restated Pledge and Security Agreement among certain of the Debtors as Grantors, and ICBCS as SOA Collateral Agent, dated as of June 18, 2019 (Compl. Ex. F, the "ICBCS Security Agreement"; Compl. ¶ 53; ICBCS Ans. ¶ 53). Under the ICBCS Security Agreement, ICBCS holds a collateral security interest in certain enumerated assets of each guarantor. (ICBCS Security Agreement § 2.1).

13.     On June 21, 2019, there was a large-scale, catastrophic explosion at the Girard Point refining facility (the "Girard Point Incident"). (ICBCS CC ¶ 35). There was significant property damage throughout the refinery. Moreover, the Girard Point Incident rendered the Refining Complex (temporarily) inoperable. (Compl. ¶ 1; UCC CC ¶ 23).

14.     As a direct result of the Girard Point Incident, the Debtors announced that they would cease operating the Refining Complex after the run off through the Point Breeze Refinery of the limited inventory of crude oil on hand, until they could rebuild the facility. (UCC CC ¶ 24). These circumstances necessitated a second chapter 11 filing. (Compl. ¶ 36).

## II.     The Term Loan Agent's and ICBCS's Collateral.

15.     Under the Term Loan Security Agreement, the Term Loan Agent received a collateral security interest in certain assets of each guarantor, as enumerated in Section 2.1 of the Term Loan Security Agreement. (*See* Term Loan Security Agreement § 2.1; Compl. ¶ 47). Section

7

2.1(iv)(C) specifies that "[a]s collateral security … each Grantor hereby pledges and grants to the [Term Loan] Agent for the benefit of [the Term Loan Lenders], a lien on all of the right, title and interest of such Grantor in, to and under the following property … all of the following (A) Documents and Chattel Paper, (B) Instruments, (C) General Intangibles and Investment Property," among other items.  (*Id.*)  The Term Loan Agent's collateral security interest includes, in part, "any and all Proceeds of any insurance" with respect to the granted security interests under Section 2.1.  (*Id.*)  The Term Loan Agent also has a security interest in "(vi) all Equipment [and] (vii) all Fixtures" as those terms are defined under the UCC.  (*Id.*; UCC Ans. ¶ 27) (acknowledging that the Term Loan Facility Agent purportedly has "a lien on all of the Debtors' personal property and real estate assets.").

16.     Under the Mortgages, the Term Loan Agent received "A LIEN ON AND SECURITY INTEREST IN," among other property, "all proceeds of any" insurance policy relating to the real estate or Equipment, "including the right to collect and receive such proceeds," which were perfected upon recording.  Mortgages at 3 (granting clause (g)).

17.     Under the ICBCS Security Agreement, ICBCS received a collateral security interest in certain assets of each guarantor, as enumerated in Section 2.1 of its agreement, which mirrors in large part the Term Loan Facility.  (*See* ICBCS Security Agreement § 2.1).  The ICBCS Pledged Collateral includes, in part, "any and all Proceeds of any insurance" with respect to the granted security interests under Section 2.1.  (*See id.* at § 2.1(a)(xii)).  ICBCS also has a security interest in "(vi) all Equipment [and] (vii) all Fixtures" as those terms are defined under the UCC. (*Id.*; *see also* UCC Ans. ¶ 27 ("As security for the Debtors' obligations to ICBCS, the Debtors granted ICBCS a lien on all of the Debtors' personal property and real estate assets.")).

III.    **Debtors' Business Interruption Insurance.**

18.    The Debtors' insurance program provides $1.25 billion in coverage for property damage and business interruption losses during the period from November 1, 2018 to November 1, 2019.  (*See, e.g.*, Compl. Ex. H, General Security Indemnity Company of Arizona Policy (the "Policy"); ICBCS CC ¶ 30; UCC CC ¶ 43).  That program comprises several insurance policies with different insurers (collectively, the "Insurers"), each of which insures a portion—be it primary, excess, or a quota share of the total—of the $1.25 billion coverage limit stipulated in the Policy.  Each Insurer's policy follows a base insurance contract form, with minor deviations immaterial to the instant litigation.  (*See, e.g.*, *id.*)

19.    The Policy lists PES Energy Inc., PES Ultimate Holdings, LLC, and the other Debtors, as "Named Insureds."  (Policy at Declarations ¶ 1).  Section I of the Policy provides Debtors property insurance for "real and personal property owned by the Insured" including but not limited to vehicles, mobile equipment, contractors equipment, underground gas, railroad rolling stock, dams and dikes as scheduled, civil works, flues, flumes, drains and spillways, underground pipelines, jetties, and docks.  (*Id.* at Section 1 - Physical Damage ¶ 1).  The property policy also covers "real and personal property of others in the Insured's care, custody or control" and crude petroleum and products of natural gas.  (*Id.*).

20.    The "Business Interruption" provision in the "Time Element" section of the Policy covers "actual loss sustained by the Insured resulting from the necessary interruption of business caused by direct physical loss or damage, by a peril insured against, to property insured herein…" (*Id*. at Section II - Time Element Coverage ¶ 1).  Pursuant to the Policy, Debtors are entitled to business interruption insurance proceeds for covered losses sustained over a period not to exceed "twenty-four (24) months after application of the Retentions."  (*Id.* at Section II - Time Element Coverage, ¶ 10(c); UCC CC ¶ 45).  The Policy refers to the retention for business interruption loss

9

as a "waiting period" of 60 days for "any one Occurrence." (*Id*. at Declarations ¶ 6; UCC CC ¶ 46). In sum, the business interruption insurance provision of the Policy provides coverage for losses associated with the Debtors' inability to conduct business after the Girard Point Incident, for a coverage period beginning 60 days after the incident and extending into the future as long as two years.

21. Both the Term Loan Agent and ICBCS are loss payees on Debtors' property and business interruption insurance policy. The Term Loan Agent is a loss payee because, under the Policy's "Loss Payable" clause, "[l]oss, if any, shall be adjusted with and made payable to the first Named Insured, or their order, whose receipt will constitute a full release of the Insurers' liability under this Policy." (*Id*. at Declarations ¶ 2). Further, pursuant to the "Lenders Loss Payable Clause," "[l]oss or damage, if any, under this Policy, shall be paid to any lender designated by the Insured and in possession of a written contract . . . as their interests may appear . . . ." (*Id*. at General Conditions ¶ 33(a)). The "Loss Payable" and "Lender Loss Payable" clauses work together to ensure that insurance proceeds are available to the Debtors as Insureds *and* ultimately to any lender designated by the Debtors, which includes the Term Loan Agent.

22. As discussed above, the Term Loan Security Agreement pledged, in writing, "any and all Proceeds of any insurance" with respect to the granted security interests under Section 2.1, to the Term Loan Agent. (*See* Term Loan Security Agreement § 2.1 (xi)). On November 1, 2018, Cortland Capital Markets Services LLC, as Term Loan Agent was issued an Evidence of Property Insurance Certificate, specifically stating that the Term Loan Agent is an "Additional Insured" and "Loss Payee." (Term Loan Agent Certificate at 1). The "Remarks" of the Term Loan Agent Certificate state "Certificate holder as administrative agent, along with its successors and assigns

10

(hereinafter referred to as the Lender), is named, as applicable, additional insured, mortgagee, and loss payee as its interests may appear and where required by written contract." (*Id*.)

23.     Moreover, the Debtors acknowledged the Term Loan Agent's security interest in the Debtors' property and business interruption insurance proceeds in the forbearance agreement between PES Holdings, LLC and Cortland Capital Market Services LLC on July 3, 2019. (Compl. Ex. I, the "Term Loan Facility Forbearance Agreement" at Preliminary Statement ("acknowledging" that certain "property insurance proceeds" including "business interruption insurance proceeds" that are related to the Girard Point Incident "constitute Collateral securing the Obligations," and that the Term Loan Facility lenders "hold valid and perfected liens over any and all such" insurance proceeds)).

24.     ICBCS is also designated as a loss payee in endorsements to the Policy. (Compl. ¶ 52; ICBCS Ans. ¶ 52). For example, one loss payee clause states that ICBCS is "hereby understood and agreed" to be "named as a Loss Payee / Mortgagee" under the Policy. (Term Loan Facility Forbearance Agreement at Endorsements ¶ 4). Further, on November 1, 2018, ICBCS was issued an Evidence of Property Insurance Certificate stating that ICBCS is an "Additional Insured" and "Loss Payee" under the Policy. (*See* Compl. Ex. G, the "ICBCS Certificate", at 1; Compl ¶ 52; ICBCS Ans. ¶ 52). The Remarks of the ICBCS Certificate state "Certificate holder is named mortgagee, loss payee, and additional insured as their interests may appear and where required by written contract." (ICBCS Certificate.). Because the Term Loan Agents and IBCS properly perfected their interests in both real and business interruption insurance, their liens are not avoidable pursuant to § 544 as the UCC argues in Counts II and III of its Complaint.

## IV.    The Term Loan Agent's First Priority Lien on Insurance Proceeds.

25.     The August 7, 2018 Intercreditor Agreement (Compl. Ex. J) sets forth the priority as between ICBCS and the Term Loan Agent. (ICBCS Ans. ¶ 73 ("the Intercreditor Agreement

11

governs the priority of ICBCS's and the Term Loan Lenders' competing interests in the Common Collateral")).

### A.   ICBCS Exclusive Collateral.

26.     Though ICBCS and the Term Loan Agent have substantially the same collateral, under the Intercreditor Agreement, ICBCS has an exclusive security interest in collateral identified as "SOA Separate Assets and Collateral."  (*See* Intercreditor Agreement §§ 1.02, 9.01).  The SOA Separate Assets and Collateral include, in relevant part, "(i) Certain Hydrocarbon Assets, (ii) Certain Refined Products Assets, (iii) Certain Rack Sale Refined Products Assets, (iv) Certain Hydrocarbon Receivables, (v) all Renewable Identification Numbers (other than those required to satisfy the obligations under the Consent Decree and Environmental Settlement Agreement entered into as of March 12, 2018 among the U.S., the U.S. Environmental Protection Agency and the Company), (vi) all payments under any insurance, indemnity, warranty or guaranty of the foregoing…."  (*Id.* § 1.02, "SOA Separate Assets and Collateral" Definition).  Put differently, ICBCS has an exclusive security interest in Certain Hydrocarbons—and Refined Products generated therefrom—and insurance proceeds only to the extent those proceeds are payments "of the foregoing" hydrocarbons or refined products.

### B.   Common Collateral.

27.     Under the Intercreditor Agreement, the Term Loan Agent has a First Priority Lien in all Common Collateral, unless the collateral is expressly carved out in the Intercreditor Agreement and given to ICBCS as SOA Priority Collateral.  In particular, as to each piece of Common Collateral, one lender will have a "First Priority Lien," and the other lender will have a "Second Priority Lien" which is "expressly junior in priority."  (Intercreditor Agreement § 2.01(a)).  ICBCS has a First Priority Lien on the SOA Priority Collateral, as defined in the Intercreditor Agreement.  (*Id.* § 1.02, Definition of "SOA Priority Collateral"; ICBCS Ans. ¶ 82).

12

The Term Loan Agent has a First Priority Lien in "all 'Collateral' (as defined in the Term Loan Agreement) that is not SOA Priority Collateral or Excluded Property." (*Id*. § 1.02, Definition of "Term Loan Priority Collateral"; ICBCS Ans. ¶ 83).

28.    The Intercreditor Agreement provides ICBCS with First Priority on "all such Grantor's now existing or hereinafter arising (i) Accounts; (ii) Inventory, including all raw materials, work in process and finished goods, relating to any of the foregoing items in this clause (ii) (together with the items in clauses (i) and (ii) above, the "Current Assets Collateral")…." (*See id*. § 1.02, Definition of "SOA Priority Collateral"; ICBCS Ans. ¶ 85). ICBCS also has first priority with respect to a number of items (*e.g.*, Money and Deposit Accounts, General Intangibles, Instruments, Commercial Tort Claims, Supporting Obligations, Letters of Credit), *but only insofar as such items relate to the Current Assets Collateral*. (*See* Intercreditor Agreement at § 1.01, Definition of SOA Priority Collateral (iii)-(vii)).

29.    ICBCS also has First Priority collateral rights to certain insurance proceeds, but those rights are limited. Specifically, under the Intercreditor Agreement's definition of SOA Priority Collateral, ICBCS has First Priority on "any and all Proceeds of any insurance" ***only*** "with respect to any of the foregoing" categories related to the Current Assets Collateral (*i.e.* Accounts or Inventory). (*See id*. at §1.02, Definition of SOA Priority Collateral (vii)).

30.    The Term Loan Agent has priority over all other Common Collateral. ("Term Loan Priority Collateral") (*Id*. at § 1.02, Definition of "Term Loan Priority Collateral").

**V.    The Instant Action.**

31.    On August 7, 2019, Plaintiffs initiated this adversary proceeding. (*See generally* Compl.). The Complaint requests a "judgment that the Debtor Plaintiffs' insurance proceeds for business interruption losses resulting from the Girard Point Incident constitute 'Term Loan Priority

13

Collateral' as defined in an August 7, 2018 intercreditor agreement between, inter alia, ICBCS, the Term Loan Agent, and the Debtors." (*Id.* at ¶ 1).

32.    On September 16, 2019, ICBCS answered the Complaint and asserted counterclaims.  That same day, the Committee filed a complaint in intervention, arguing that neither ICBCS nor the Term Loan Agent held a perfected security interest in any of the Debtors' insurance proceeds.

## LEGAL STANDARD

33.    As ICBCS admits, this is a matter of contract interpretation.  (ICBCS Ans. ¶ 2). Matters of contract interpretation are questions of law often decided on a motion for judgment on the pleadings under Rule 12(c) and Rule 7012(b) of the Federal Rules of Bankruptcy Procedure. *In re Simplexity, LLC*, 2017 WL 2385404, at *2 (Bankr. D. Del. June 1, 2017) (interpreting contracts in deciding Rule 12(c) motion); *In re Fedders N. Am., Inc.*, 422 B.R. 5, 10 (Bankr. D. Del. 2010) (same); *State Farm Fire & Cas. Co. v. Ruby*, 2017 WL 445762, at *2 (E.D. Pa. Feb. 2, 2017). ("[t]he interpretation of an insurance contract is a question of law").  In deciding a motion for judgment on the pleadings, courts may consider "document[s] integral to or explicitly relied upon in the complaint."  *Mele v. Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 256 & n. 5 (3d Cir. 2004) (emphasis removed); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes").

## ARGUMENT

I.    **The Term Loan Agent Holds A Perfected Security Interest in the Business Interruption Insurance Proceeds.**

34.    The Term Loan Agent has a perfected security interest in the Debtors' insurance proceeds in three ways, any one of which is independently sufficient: (1) as loss payee to the Debtors' insurance policy, which is sufficient under New York law; (2) as derivative of its interest

14

in Debtors' business, including its general intangibles, under the UCC, and real property under the

Mortgages; and (3) as ordered by the court in the Prior Confirmation Order.

### A. The Term Loan Agent Holds a Perfected Security Interest in the Policy Under New York Common Law.

35.     The Term Loan Agent holds a perfected security interest under common law

because it was named as a loss payee to the Debtors' insurance policy.  The Debtors' insurance

policies are governed by New York law.  (*See* Compl. Ex. H, Policy at 4; UCC CC ¶ 43).  Under

New York law, loss payees to insurance policies hold perfected security interests in the proceeds

of such policies.  *See Granite Commercial Indus., LLC*, 909 F. Supp. 2d at 194 (creditor who

perfected a security interest in "all of [debtor's] business assets" and was named loss payee on

debtor's business interruption insurance policy held a perfected security interest in that policy);

*see also Firemen's Fund Am. Ins. Co. v. Ken-Lori Knits, Inc.*, 399 F.Supp. 286, 291 (E.D.N.Y.

1975) ("[i]n the absence of any proof of fraud upon other creditors, designation of a creditor as a

beneficiary in a loss payable clause is effective to create a superior claim upon the proceeds of

insurance as against a subsequent attaching creditor").

36.     Here, the Term Loan Agent is loss payee under the Policy.  The Term Loan Agent's

collateral security interest includes, in part, "any and all Proceeds of any insurance" with respect

to the granted security interests under Section 2.1 of the Term Loan Security Agreement.  (Term

Loan Security Agreement § 2.1).  Pursuant to the Lenders Loss Payable Clause, "[l]oss or damage,

if any, under this Policy, shall be paid to any lender designated by the Insured and in possession

of a written contract . . . as their interests may appear . . . ."  (Policy at General Conditions ¶ 33(a)).

Because the Term Loan Security Agreement is a written contract reflecting the Term Loan Agent's

interest in the insurance proceeds, it is a loss payee under the Policy.

37.     The Term Loan Certificate further reflects the Term Loan Agent's status as an "Additional Insured" and "Loss Payee" under the Policy.  (*See* Term Loan Agent Certificate at 1; *id.* ("Certificate holder as administrative agent, along with its successors and assigns (hereinafter referred to as the Lender), is named, as applicable, additional insured, mortgagee, and loss payee as its interests may appear and where required by written contract")).   The Debtors further acknowledged the Term Loan Agent's security interest in the business interruption insurance proceeds in the Term Loan Facility Forbearance Agreement.  (Compl. Ex. I, Term Loan Facility Forbearance Agreement).   In the Term Loan Facility Forbearance Agreement, the Debtors acknowledged that certain "property insurance proceeds" including "business interruption insurance proceeds" that are related to the Girard Point Incident "constitute Collateral securing the Obligations," and that the Term Loan Facility lenders "hold valid and perfected liens over any and all such" insurance proceeds.  (Term Loan Agent Certificate at Preliminary Statement).

38.     In sum, the Term Loan Agent has a secured interest in the business interruption insurance proceeds because the Term Loan Agent has "done everything necessary and possible to perfect its interest in the insurance proceeds, and it is clear that the parties intended that [the creditor] have a secured interest in the proceeds."  *Firemen's Fund Am. Ins.*, 399 F. Supp. at 291 ("Under both the UCC and the plain provisions of the insurance policy, [the creditor-loss payee] had priority in its claim on the insurance proceeds …"); *see also PPG Indus., Inc. v. Hartford Fire Ins. Co.*, 531 F.2d 58, 62-63 (2d Cir. 1976) ("There is no reason, statutory or otherwise, why [a subordinate creditor's] position should be improved at the expense of a secured party who merely sought to afford itself further protection by insisting that the debtor insure its collateral.").

16

**B. The Term Loan Agent Holds a Perfected Security Interest in the Insurance Proceeds Under the UCC.**

39.     In addition to the Term Loan Agent's perfected security interest under New York common law, the Term Loan Agent also has a perfected security interest in insurance proceeds under the UCC because those proceeds are derivative of their broad, perfected security interest in Debtors' business, including its "permanent" real estate, Equipment and Fixtures, and related general intangibles.  Pursuant to the Term Loan Security Agreement, the Term Loan Agent has a security interest in:

> (i) all Accounts; (ii) all Inventory … (iii) all Money and Deposit Accounts, (iv) all of the following: (A) Documents and Chattel Paper, (B) Instruments, (C) General Intangibles and Investment Property, (D) Commercial Tort Claims, and (E) Supporting Obligations and all other forms of obligations owing to any Grantor or in which any Grantor may have any interest, however created or arising and whether or not earned by performance (v) all Letters of Credit and Letter-of-Credit Rights; (vi) all Equipment; (vii) all Fixtures; (viii) all Intellectual Property; (ix) all Equity Interests in each Subsidiary directly owned by such Grantor as of the Closing Date … (x) to the extent not otherwise included above, all Records evidencing any of the foregoing; and (xi) all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to such Grantor from time to time with respect to any of the foregoing.

(Term Loan Security Agreement § 2.1; UCC CC ¶ 30);*see also* Mortgages at 2-4 (granting the Term Loan Agent a security interest in a broad range of rights, titles and interests held by the Debtors in real estate and related property, including "all proceeds… of the foregoing").

40.     The Term Loan Agent perfected its secured interest in the collateral underlying the BI Insurance by filing the Mortgages, and the UCC-1 financing statements covering "[a]ll assets

of the Debtor of every kind and nature, whether now owned or hereafter acquired and wherever located, and all proceeds and products thereof."[8]  *See, e.g.*, U.C.C. § 9-310(a); U.C.C. § 9-502.

41.     Though Article 9 of the UCC "does not apply 'to a transfer of an interest or claim in or under any policy of insurance' … this exclusion applies only to situations where the parties to a security agreement attempt to create a direct security interest in an insurance policy by making the policy itself the immediate collateral securing the transaction."  *PPG Indus., Inc.*, 531 F.2d at 62-63 (applying New York UCC); *see also In re Tower Air, Inc.*, 268 B.R. 404, 408 (Bankr. D. Del. 2001), *aff'd*, 2003 WL 21398007 (D. Del. June 16, 2003), *aff'd*, 397 F.3d 191 (3d Cir. 2005) (same, interpreting substantially similar Arizona version of UCC).

42.     As such, New York courts applying Article 9 of the UCC have held "[a] perfected security interest in the collateral will give the secured party a perfected security interest in the proceeds" of insurance derived from loss to the collateral.  *Holtslander*, 507 B.R. at 783 (applying the New York UCC); *In re McLean Indus., Inc.*, 132 B.R. 271, 282 (Bankr. S.D.N.Y. 1991) ("Courts have agreed that insurance payable by reason of loss to the collateral constitutes proceeds" because "if a creditor holds a perfected security interest in property, that creditor also holds a perfected security interest in the proceeds of that collateral."); *see also* N.Y. UCC § 9-102(a)(64)(E) ("proceeds" defined as "to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects of infringement of rights in, or damage to, the collateral").

43.     Because both the property and the business interruption insurance proceeds are derivative of the loss of the Debtors' fixed assets, business, real estate or their general intangibles,

---

[8]      *See* Cortland-Philadelphia Energy Solutions and Marketing LLC UCC-1 Financing Statement; Cortland-North Yard UCC-1 Financing Statement; Cortland-PES Open-End Mortgages; Cortland-North Yard Open-End Mortgages; Cortland-PES Incremental Mortgages; Cortland-North Yard Incremental Mortgages.

the Term Loan Agent has a perfected security interest in those proceeds.  *E.g., In re Bell Fuel Corp.*, 99 B.R. 602, 605 (E.D. Pa. 1989) (creditors have a perfected security interest in business interruption insurance proceeds under the UCC when creditors have a secured interest in the debtor's business, including its general intangibles), *aff'd sub nom. Meridian Bank v. Bell Fuel Corp.*, 97 B.R. 193 (E.D. Pa. 1989), *and aff'd sub nom. Appeal of Official Creditors' Comm. of Bell Fuel Corp.*, 891 F.2d 282 (3d Cir. 1989); *MNC Commercial Corp. v. Rouse*, 1992 WL 674733 (W.D. Mo. Dec. 15, 1992) (creditor with "broad and comprehensive" security interest in "business operations, including any business income" and "general intangibles" held a perfected security interest in business interruption insurance proceeds).

44.     *Bell Fuel* is instructive.  There, Meridian and Bell entered a security agreement providing Meridian a security interest in all of Bell's general intangibles then owned or after acquired.  *Bell Fuel Corp.*, 99 B.R. at 604, 608.  After the bankruptcy court held Meridian had no interest in the proceeds of Bell's business interruption insurance policy, the district court reversed and held Meridian did have an interest because the proceeds of Bell's business interruption insurance policy were derivative of a loss to Meridian's collateral—*i.e.*, the general intangibles of Bell's business.  *Id.* at 607.  So too here.  Debtors' general intangibles are the Term Loan Agent's collateral, and it therefore holds an interest in the proceeds of Debtors' business interruption insurance policy, which compensate a loss to Term Loan Agent's collateral.

45.     *MNC Commercial* is in accord.  *MNC Commercial* held a perfected security interest in "without limitation, contract rights and general intangibles" of the debtor; yet the bankruptcy court held that this did not effect a perfected security interest in the proceeds of the debtor's business interruption insurance proceeds.  1992 WL 674733, at *1.  The district court reversed, holding MNC Commercial had a perfected security interest in business interruption insurance

19

proceeds because MNC Commercial's interest was "broad and comprehensive in scope" and "encompassed all of [debtor's] business operations, including any business income." *Id.*

46.    Here, the Term Loan Agent holds a similarly "broad and comprehensive interest" in all of Debtors' business, including real estate, equipment, fixtures and general intangibles. (*See* Term Loan Security Agreement at § 2.1(iv)(C)). Therefore, the Term Loan Agent holds a perfected security interest in the business interruption insurance proceeds. *Bell Fuel Corp.*, 99 B.R. at 605; *MNC Commercial*, 1992 WL 674733 at *1.

### C.    The Term Loan Agent's Security Interest Was Perfected by Court Order.

47.    Even if the Term Loan Agent had not perfected its security interest in the Policy and its proceeds under the UCC and New York law (and it has), the Term Loan Agent's interest was judicially perfected. 11 U.S.C. § 101(36) (A perfected lien may be created by "judgment, levy, sequestration, or other legal or equitable process or proceeding"). A creditor need not file a financing statement or take any other steps under state law to perfect a security interest if a bankruptcy court issues an order perfecting that security interest. *See Small v. Beverly Bank*, 936 F.2d 945, 948–49 (7th Cir. 1991); *see also In re Glob. Safety Textiles Holdings LLC*, 2009 WL 7834658, at *11 (Bankr. D. Del. Sept. 21, 2009) (ordering creditor's interest judicially perfected regardless of any "steps" creditors might take "to perfect its security interests and liens under otherwise applicable state law").

48.    For example, in *Small*, a bank lent a post-petition debtor working capital in exchange for a lien, and the bankruptcy court held "[t]he liens granted herein to the [ ] Bank … shall be valid, perfected, and enforceable without any further action by the Debtor, … or [the] Bank, and without the execution or recordation of any financing statements, security agreements, or other documents." *Id.* at 948. The Seventh Circuit reasoned that state law did not preclude the perfection of the lien—and a financing statement was not required to be filed in order to perfect

20

the lien—because "the Bankruptcy Code offers substantial protection to a lender willing to take the risk of extending credit to a trustee or debtor-in-possession.  With this statutory protection in mind, the bankruptcy court granted the Bank a perfected lien with superpriority status as *quid pro quo* for allowing [debtor] to keep operating with the cash collateral that secured its loan from the Bank."  *Id*. at 948-49.

49.    So too here.  The Confirmation Order provides that, on the effective date of the Prior Chapter 11 Plan, "the liens granted and contemplated by the New First Lien Term Loan Documents shall be valid, binding, perfected, and enforceable liens on the collateral specified in the New First Lien Term Loan Documents for the benefit of the secured parties under the New First Lien Term Loan Documents."  (Prior Confirmation Order ¶ 84).  Under the Term Loan Security Agreement, the Term Loan Agent received a collateral security interest in certain assets of each guarantor, as enumerated in Section 2.1 of the Term Loan Security Agreement. (*See* Term Loan Security Agreement § 2.1).  The Term Loan Agent's collateral security interest includes, in part, "any and all Proceeds of any insurance" with respect to the granted security interests under Section 2.1.  *Id*.  Thus, the Prior Confirmation Order judicially perfected the Term Loan Agent's security interest in the Debtors' insurance proceeds in consideration of the risk the Term Loan Lenders took in lending to certain debtors.

## II.    The Term Loan Agent Has Priority over ICBCS with Respect to Both the Property and Business Interruption Insurance Proceeds.

50.    Insurance proceeds are neither ICBCS's exclusive collateral nor its first priority collateral.  Because the Term Loan Agent has priority over all collateral not expressly listed in the Intercreditor Agreement as ICBCS's exclusive or priority collateral, the Term Loan Agent has priority over both the property and the business interruption insurance proceeds. (*See* UCC CC ¶ 40).

21

### A. The Business Interruption Insurance Proceeds Are Not ICBCS's Exclusive Collateral Under the Intercreditor Agreement.

51.     The Intercreditor Agreement sets forth the priority between ICBCS and the Term Loan Agent with respect to collateral pledged.  (*See* Intercreditor Agreement §§ 1.02, 9.01 (separating collateral into three buckets: (1) "SOA Separate Assets and Collateral"; (2) "SOA Priority Collateral," and (3) "Term Loan Priority Collateral"); ICBS Ans. ¶ 2 (ICBCS admitting "This case is a simple matter of contract interpretation … Because both parties have interests, the Intercreditor Agreement governs the priority of those interests")).

52.     The SOA Separate Assets and Collateral provision provides ICBCS with an exclusive right to Certain Hydrocarbon Assets and Receivables, Certain Refined Products Assets, Certain Rack Sale Refined Product Assets, certain Renewable Identification Numbers, and insurance proceeds only to the extent those proceeds are payments "of the foregoing" hydrocarbons or refined products.  (*Id.* § 1.02, "SOA Separate Assets and Collateral" Definition). In other words, the SOA Separate Assets and Collateral provision gives ICBCS an exclusive right to the hydrocarbon and refined products that it purchases pursuant to the Intermediation Facility with Debtors, and an exclusive right to property insurance *on those products*, in the event of destruction or damage to those hydrocarbon and refined products.

53.     The plain language of the Policy controls.  Section I of the Policy, titled Physical Damage, covers "Real and Personal Property of the Insured *of every kind and description*." (Policy, Section I - Physical Damage ¶ 1 (emphasis added)).  That coverage extends generally to "real and personal property of others in the Insured's care custody, or control" and in particular to "crude petroleum and its products…and all other products held for sale."  (*Id.* ¶ 1(b), (i)).

54.     By contrast, the business interruption coverage insures the "actual loss sustained by the Insured resulting from the necessary interruption of business *caused by* direct physical loss or

damage." (Policy at Section II - Time Element Coverage ¶ 1 (emphasis added).  Put another way, ICBCS' SOA Separate Assets and Collateral is the hydrocarbons and the insurance on those hydrocarbons.  But under those plain terms, any loss of the hydrocarbons is a Section I - Physical Damage loss, not a Section II - Business Interruption / Time Element loss.  Thus, the SOA Separate Assets and Collateral provision does not confer any priority with respect to our business interruption insurance proceeds that cover lost business up to two years in the future.

### B.  The Business Interruption Insurance Proceeds Are Not ICBCS's First Priority Common Collateral Under the Intercreditor Agreement.

55.     The respective priority between the Term Loan Agent and ICBCS to "Common Collateral" is governed by the Intercreditor Agreement, which provides ICBCS with a first priority in "(i) Accounts; (ii) Inventory, including all raw materials, work in process and finished goods, relating to any of the foregoing items in this clause (ii) (together with the items in clauses (i) and (ii) above, the "Current Assets Collateral")…," including insurance proceeds related to the Current Assets Collateral.  (*See* Intercreditor Agreement § 1.02, Definition of "SOA Priority Collateral." (emphasis in original)).  ICBCS also has first priority with respect to certain other items (*e.g.*, Deposit Accounts, General Intangibles, Instruments, Commercial Tort Claims, Supporting Obligations, Letters of Credit), but only insofar as they relate to the Current Assets Collateral (*i.e.* Accounts and Inventory).  (*See* Intercreditor Agreement § 1.01, Definition of SOA Priority Collateral (iii)-(vii)).

56.     The business interruption insurance proceeds do not fall within any of these categories.  *First*, the business interruption proceeds are not derivative of "Inventory" as defined pursuant to the UCC under the Intercreditor Agreement.  (*Id.* § 1.01).  Under the UCC, "Inventory" is defined as goods, which, "(A) are leased by a person as lessor; (B) are held by a person for sale or lease or to be furnished under a contract of service; (C) are furnished by a person under a contract

of service, or (D) consist of raw materials, work in process, or materials used or consumed in a business." N.Y. UCC § 9-102(48). These tangible items are distinguishable from business interruption insurance, which is intended "to ensure that [the insured] ha[s] the financial support necessary to sustain its business operation in the event disaster occur[s]." *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 194, 886 N.E.2d 127 (2008). The business interruption insurance policy is not derivative of "Inventory" for the same reason it is not "of the foregoing" Certain Hydrocarbon Assets or Certain Refined Products Assets under ICBCS's exclusive collateral provision—*i.e.*, business interruption insurance does not compensate for damage to products themselves, which are property; it compensates for the inability to operate the business in the future following a loss to property.

57.    *Second,* as a matter of law, Debtors' business interruption insurance proceeds are not derivative of ICBCS's first priority interest in "now existing or hereinafter arising…Accounts" as defined under the UCC. (*See* Intercreditor Agreement § 1.01, providing undefined and capitalized terms in the agreement are given their meaning under the UCC). An "Account" under the UCC, and thus under the Intercreditor Agreement, is the Debtor's "right to payment of a monetary obligation" for "services rendered or to be rendered." N.Y. UCC § 9-102(a)(2); *see also In re Gordon Car & Truck Rental, Inc.*, 75 B.R. 466, 469 (Bankr. N.D.N.Y. 1987), *aff'd sub nom. In re Gordon Car & Truck Rental Inc.*, 80 B.R. 12 (N.D.N.Y. 1987) ("'account' was (and is) a right earned by performance under an agreement for goods sold or leased, or services rendered"). Business interruption insurance proceeds do not fall under the UCC's definition of Accounts because a business interruption policy "insures against the temporal *absence* of accounts," and does not insure the accounts themselves. *In re Montreal, Me. & Atl. Ry., Ltd.*, 521 B.R. 703, 710 (B.A.P. 1st Cir. 2014) (emphasis in original); *aff'd In re Montreal, Me. & Atl. Ry., Ltd.,* 799 F.3d

24

Case 19-50282-KG    Doc 37    Filed 10/04/19    Page 31 of 38

1 (1st Cir. 2015) (party who had a security interest "limited to accounts (including payment intangibles), inventory, and the proceeds thereof" did not have a secured interest in business interruption insurance when its priority did not extend to all income producing assets).[9]  Here, because ICBCS' first priority interest is cabined to Accounts and Inventory, and does not cover the remainder of the business including, but not limited to, its intangible assets (such as goodwill), it does not have a first priority interest in Debtors' business interruption proceeds.

58.     *Third,* even if ICBCS had an interest in business interruption proceeds related to its first priority interests in Accounts and Inventory (which it does not), its interest would be limited to any diminution in value associated with the delayed processing and sale of ICBCS's then-existing collateral at the time of the Girard Point Incident.  Because the Debtors' business interruption policy does not cover the first sixty days of business interruption, to the extent ICBCS had an interest in the business interruption proceeds (which it does not), the value of its interest would be $0 because any alleged damage would fall within the deductible period and thus could not be the basis of any business interruption insurance proceeds recovered by Debtors from its carriers.  (*See* Policy at Declarations ¶ 6).

### C.  The Term Loan Agent Has First Priority Interest In the Business Interruption Insurance Proceeds.

59.     As discussed above, the Term Loan Agent was granted a broad security interest in the Debtors' business, including real estate, equipment, fixtures, general intangibles and "any and

---

[9]     *In re Montreal* also supports the Term Loan Lenders' claim that their interest in business interruption insurance proceeds is covered under Article 9 of the UCC.  (*See supra* Section I).  In *In re Montreal*, the Court held a creditor did not have an secured interest in the business interruption insurance for two reasons: (1) because the creditor's interest was "limited to accounts (including payment intangibles), inventory, and proceeds thereof", and (2) because the creditor argued it had a direct interest to insurance proceeds under the UCC, instead of asserting its interest in insurance proceeds was derivative of its other collateral.  521 B.R. at 710.  In contrast, here, because the Term Loan Agent has a security interest in substantially all assets constituting the broad business and general intangibles, it also has rights to the business interruption insurance as derivative of that interest

DOCS_DE:225652.1

all Proceeds of any insurance" with respect to that interest.  (*See* Term Loan Security Agreement § 2.1).  Additionally, under the Intercreditor Agreement, the Term Loan Agent was provided a first priority interest in all Common Collateral not expressly given to ICBCS as SOA Separate Assets and Collateral or SOA Priority Collateral.  (Intercreditor Agreement § 1.02, Definition of "Term Loan Priority Collateral" (Term Loan Priority Collateral consists of "all 'Collateral' (as defined in the Term Loan Agreement) that is not SOA Priority Collateral or Excluded Property")).

60.     The business interruption insurance proceeds are, for the reasons stated above, derivative of the Debtors' real estate, equipment, fixtures and general intangibles.  *See also In re Heron, Burchette, Ruckert & Rothwell,* 148 B.R. 660, 683 (Bankr. D.D.C. 1992) ("As a general rule, a security interest in general intangibles includes choses in action").  Further, the real estate, equipment, fixtures and general intangibles of Debtors' business are not, for the reasons stated above, SOA Priority Collateral or Excluded Property.  Accordingly, the business interruption insurance proceeds are Term Loan Priority Collateral.  *See Anderson*, 599 B.R. at 517 (affirming bankruptcy court enforcement of intercreditor agreement recognizing creditor's priority over insurance proceeds covering loss to creditor's collateral).

61.     Providing the Term Loan Agent first priority to the business interruption insurance proceeds is wholly consistent with the nature of the parties' relationship.  The Term Loan Lenders have historically funded the Debtors' ongoing business and capital improvements at the Refining Complex, while ICBCS supplied crude and non-crude feedstock.

62.     It logically follows that the Term Loan Agent would have first priority to the business interruption insurance, while ICBCS would have first priority in casualty insurance proceeds for any feedstock originally purchased by ICBCS while it is on Debtors' property (as

well as the resulting refined product and cash accounts associated with the products) in the event it were destroyed in a catastrophic loss situation.

### D. The Term Loan Agent Clearly Has Priority Over ICBCS With Respect to Property Insurance Proceeds for Losses Other Than ICBCS's Hydrocarbons.

63.     The Term Loan Agent also has priority over ICBCS with respect to the property insurance proceeds recoverable from the Girard Point Incident.  As discussed above, ICBCS has only has priority with respect to insurance proceeds related to Certain Hydrocarbons and Refined Products generated therefrom (under the SOA Separate Assets and Collateral provision), or related to "Accounts" and "Inventory" (under the SOA Priority Collateral provision).  (*See* Intercreditor Agreement § 1.02).  The Term Loan Agent has priority to insurance related to all other Common Collateral.  (*Id.*).  This Common Collateral includes all Fixtures and Equipment (as defined under the UCC), *i.e.*, the Debtors' physical property.  (*See* Term Loan Security Agreement § 2.1).

64.     The property damage sustained in the Girard Point Incident consists primarily of damage to the refining facility, as opposed to damage to hydrocarbons or refined products that are arguably SOA Separate Assets and Collateral.  As a result, the property insurance proceeds are almost entirely the Term Loan Agent's priority collateral.

## III.    The Fact That the Debtors Have yet to Collect Insurance Proceeds Does Not Destroy the Lenders' Pre-Petition Liens

65.         Finally, the UCC's Complaint is based on the assertion that because the Debtors did not collect insurance proceeds prior to filing for bankruptcy, neither secured lender has liens attaching to those proceeds.  Specifically, the UCC asserts that because "BI Recoveries… would be payable in respect to projected revenues and profits which would have been generated beginning one month after the commencement of these cases," they are beyond the reach of the Debtors' secured creditors because of § 552 of the Code, which restricts the viability of liens on after-acquired property.  *See* UCC CC ¶ 2.

66.          The UCC's argument is tantamount to an argument that a secured lender with security interest in all of the debtors' assets and the proceeds thereof, (*i.e.*, its future revenue), loses the benefit of that security interest in bankruptcy where an insurance carrier has not paid prior to the filing. That defies common sense: no lender would agree to lend to a borrower on the basis of a security interest in the Debtor's business, including its real estate, equipment, fixtures and general intangibles, if that security interest became worthless in the one scenario where it would matter the most—bankruptcy.

67.          The Bankruptcy Code recognizes lenders' need to have their pre-petition security interests preserved even if their collateral is destroyed and the debtor receives the proceeds of the collateral post-petition. This is why § 552(a) incorporates an express exception, under which a secured lender retains a security interest in "proceeds, products, offspring, or profits" from pre-petition property in which the lender has a perfected security interest (either under a security agreement or applicable state law). *See* 11 U.S.C. § 552(b)(1) (expressly incorporated as an exception to § 552(a)); *see also In re Tower Air*, 397 F.3d 191, 196-97 (3d Cir. 2005) ("Under 11 U.S.C. § 552(b), prepetition security interests that apply to proceeds of collateral also apply to proceeds of such collateral acquired after the bankruptcy petition," such as "[i]nsurance payable by reason of loss or damage to the collateral.").

68.          The UCC's argument in this case incoherently purports to invoke § 552(a), while entirely ignoring the express exception in the provision's opening clause: "Except as provided in subsection (b) of this section . . . ." The Term Loan Lenders have a blanket lien on essentially all of the Debtors' assets. *See* Term Loan Security Agreement § 2.1 (granting broad security interest in the Debtors' assets, including "all Proceeds and products of each of the foregoing…"). Thus, all proceeds generated by the Debtors—including their revenues and profits—are necessarily

proceeds of the Term Loan Lender's collateral.  *See Qmect, Inc. v. Burlingame Capital Partners II, L.P.*, 373 B.R. 682, 688 (N.D. Cal. 2007) (because secured lender had "a blanket lien on all of [debtor's] assets" there were "no sources to which the post-petition accounts receivable could be traced *other than* the secured lenders' collateral," and "so all proceeds, even the increase in value, were proceeds of secured lenders' collateral").

69.    Because the proceeds of the BI Insurance are "merely the [secured lender's] collateral in another form," the Term Loan Lender's interest in the insurance payments remains intact under § 552(b)(1).  *See McLean Indus., Inc.*, 132 B.R. at 284 (because secured lender's "financing statements covers proceeds, under the N.Y. U.C.C., [secured lender's] security interests in the insurance proceeds remain intact even though the proceeds came into existence after the commencement of the bankruptcy case," holding "[s]ection 552 does not apply in this context"); *see also In re Island Helicopter Corp.*, 63 B.R. 515, 522–23 (Bankr. E.D.N.Y. 1986) ("Furthermore, a security interest in proceeds from property acquired before bankruptcy extends to insurance proceeds received by the debtor subsequent to the filing" unless equities of the case mandate otherwise); *Tower Air, Inc.*, 397 F.3d at 195, 198 (court had "decided that the insurance money [paid under accident insurance policy on engine] constitutes 'proceeds,' and that secured lender "has a claim to any proceeds of its collateral under UCC § 9–306 and 11 U.S.C. § 552(b)").

70.    This is not the only reason the UCC's § 552 argument does not make sense.  As demonstrated above, the Term Loan Lenders obtained a security interest in the Debtor's insurance policy under applicable New York common law prior to the petition date.  They therefore have a perfected interest in the proceeds that flow from that insurance policy after the petition date.  *See* § 552(b) (secured lender retains security interest in proceeds of property in which they had a security interest pre-petition).  Moreover, to the extent "property" that gives rise to the business

29

interruption proceeds includes the right to seek payment under the policy (which it logically must), such right arose pre-petition when the loss occurred.  *Cent. Tablet Mfg. Co. v. United States*, 417 U.S. 673, 685 (1974) (holding that under policy regarding a "a fire loss, the obligation to pay arises upon the fire," as "even though the basic question of liability, may be contested… the fundamental contractual obligation that precipitates the transformation from tangible property into a chose in action consisting of a claim for insurance proceeds is fixed by the fire…").  Under this rationale as well, the Term Loan Agent has a right to such proceeds under § 552(b)(1).  The Court should therefore reject the UCC's arguments regarding § 552, and allow the Term Loan Agent to recover the business interruption insurance proceeds which are proceeds of their collateral no matter which way the Court examines the issue.

## <u>CONCLUSION</u>

71.      For the reasons stated above, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion For Entry Of Judgment On The Pleadings pursuant to Federal Rule of Civil Procedure 12(c), enter judgment in favor of Plaintiffs, and enter judgment against ICBCS and the Committee.

Dated: October 4, 2019

Respectfully submitted,

By: */s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Peter J. Keane (DE Bar No. 5503)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
pkeane@pszjlaw.com
joneill@pszjlaw.com

- and –

Edward O. Sassower, P.C.
Steven N. Serajeddini (*admitted pro hac vice*)
Matthew C. Fagen (*admitted pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: edward.sassower@kirkland.com
steven.serajeddini@kirkland.com
matthew.fagen@kirkland.com

- and –

Michael B. Slade (*admitted pro hac vice*)
Nader R. Boulos (*admitted pro hac vice*)
William T. Pruitt (*admitted pro hac vice*)
Whitney L. Becker (*admitted pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: michael.slade@kirkland.com
nader.boulos@kirkland.com
william.pruitt@kirkland.com
whitney.becker@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

31

/s/ Andrew Remming
_____

Damian S. Schaible (admitted *pro hac vice*)
James I. McClammy (admitted *pro hac vice*)
David B. Toscano (admitted *pro hac vice*)
Aryeh Ethan Falk (admitted *pro hac vice*)
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
Telephone:      (212) 450-4000
Facsimile:      (212) 701-5800
Email:          damian.schaible@davispolk.com
                james.mcclammy@davispolk.com
                david.toscano@davispolk.com
                aryeh.falk@davispolk.com

Robert J. Dehney
Andrew R. Remming
Paige N. Topper
**MORRIS NICHOLS ARSHT & TUNNELL LLP**
1201 North Market Street
Wilmington, DE 19899
Telephone:      (302) 658-9200
Facsimile:      (302) 658-3989
Email:          rdehney@mnat.com
                aremming@mnat.com
                ptopper@mnat.com

*Counsel to the Term Loan Agent*

32