**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| PES HOLDINGS, LLC, *et al.*,[1] | Case No. 19-11626 (KG) |
| Debtors. | (Jointly Administered) |
| PES HOLDINGS, LLC, *et al.*, CORTLAND CAPITAL MARKET SERVICES, LLC, | |
| Plaintiffs and Counterclaim Defendants, | Adv. Pro. No. 19-50282 (KG) |
| | **Ref. Docket Nos. 33, 37** |
| v. | |
| ICBC STANDARD BANK PLC, | |
| Defendant, Counterclaim Plaintiff and Cross Claim Defendant, | |
| and | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PES, INC., | |
| Intervenor-Defendant and Counterclaim and Cross-Claim Plaintiff. | |

**MEMORANDUM OF LAW OF DEFENDANT, COUNTERCLAIM PLAINTIFF, AND CROSSCLAIM DEFENDANT ICBC STANDARD BANK PLC IN OPPOSITION TO (I) PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(C) AND (II) THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR SUMMARY JUDGMENT**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574). The Debtors' service address is: 1735 Market Street, Philadelphia, Pennsylvania 19103.

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ....... 1

COUNTERSTATEMENT OF UNDISPUTED FACTS ....... 5

I. THE PES PARTIES ENTER INTO THE SOA, REQUIRING THEM TO MAINTAIN BUSINESS INTERRUPTION AND PROPERTY DAMAGE INSURANCE NAMING ICBCS AS AN ADDITIONAL INSURED, LOSS PAYEE, AND MORTGAGEE ....... 5

II. THE PES PARTIES GRANT ICBCS SECURITY INTERESTS IN SUBSTANTIALLY ALL OF THEIR ASSETS ....... 6

III. THE PES PARTIES ENTER INTO THE TERM LOAN CREDIT AGREEMENT, WHICH DOES NOT REQUIRE BUSINESS INTERRUPTION INSURANCE ....... 9

IV. THE PES PARTIES GRANT THE AGENT SECURITY INTERESTS THAT ARE SUBSTANTIALLY THE SAME AS THOSE GRANTED TO ICBCS ....... 9

V. THE INTERCREDITOR AGREEMENT DIVIDES THE PRIORITY INTERESTS IN THE COMMON COLLATERAL BETWEEN ICBCS AND THE AGENT ....... 10

VI. THE POLICY NAMES ICBCS AS A LOSS PAYEE, MORTGAGEE, AND ADDITIONAL INSURED IN BOTH THE BUSINESS INTERRUPTION AND PROPERTY DAMAGE INSURANCE ....... 11

VII. THE GIRARD POINT INCIDENT OCCURS ....... 13

VIII. THE DEBTORS AND AGENT INITIATE THE ADVERSARY PROCEEDING ....... 14

ARGUMENT ....... 14

I. ICBCS HAS A FIRST PRIORITY SECURITY INTEREST IN ALL BI PROCEEDS PAID ON ACCOUNT OF THE DEBTORS' CLAIMS UNDER THE POLICY ....... 14

II. THE DEBTORS SHOULD NOT BE PERMITTED TO STIPULATE THAT THE PD PROCEEDS ARE TERM LOAN PRIORITY COLLATERAL ....... 24

III. THE COMMITTEE'S EFFORTS TO INVALIDATE ICBCS'S SECURITY INTEREST IN THE BI PROCEEDS SHOULD BE REJECTED ....... 25

CONCLUSION ....... 29

# TABLE OF AUTHORITIES

**Page**

## Cases

*ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*,
307 F.3d 24 (2d Cir. 2002)........................................ 2, 16

*AsiaInfo-Linkage, Inc. v. Zhang*,
47 F. Supp. 3d 214 (D. Del. 2014)........................................ 24

*Badillo v. Tower Ins. Co. of N.Y.*,
92 N.Y.2d 790 (1999)........................................ 21, 22, 25

*In re McLean Indus., Inc.*,
132 B.R. 271 (Bankr. S.D.N.Y. 1991)........................................ *passim*

*In re Megamarket of Lexington, Inc.*,
207 B.R. 527 (Bankr. E.D. Ky. 1997)........................................ 27

*MNC Commercial Corp. v. Rouse*, 91-0615-CV-W-2,
1992 WL 674733 (W.D. Mo. Dec. 15, 1992)........................................ *passim*

*In re Montreal, Me. & Atl. Ry., Ltd.*,
521 B.R. 703 (B.A.P. 1st Cir. 2014)........................................ 20, 21, 22

*In re Montreal, Me. & Atl. Ry., Ltd.*,
799 F.3d 1 (1st Cir. 2015)........................................ *passim*

*In re Moskowitz*,
14 B.R. 677 (Bankr. S.D.N.Y. 1981)........................................ 28

*Periphery Loungewear, Inc. v. Kantron Roofing Corp.*,
190 A.D.2d 457 (N.Y. 1st Dep't 1993)........................................ 19

*Pilot Life Ins. Co. v. Dedeaux*,
481 U.S. 41 (1987)........................................ 2, 16

*PPG Indus., Inc. v. Hartford Fire Ins. Co.*,
531 F.2d 58 (2d Cir. 1976)........................................ 27

*In re Premier Golf Props., L.P.*,
477 B.R. 767 (B.A.P. 9th Cir. 2012)........................................ 25

*Shaw v. Delta Air Lines, Inc.*,
463 U.S. 85 (1983)........................................ 2, 16

*Schleimer v. Empire Mut. Ins. Co.*,
337 N.Y.S.2d 872, 873 (N.Y. 1st Dep't 1972), *aff'd*, 352 N.Y.S.2d 429 (1974) .................. 28

*Matter of Strick Chex Columbus Two, LLC*,
542 B.R. 914 (N.D. Ga 2015) ........................................................................................ 20

*In re Suter*,
181 B.R. 116 (Bankr. N.D. Ala. 1994) ........................................................................... 29

*Texas v. United States*,
523 U.S. 296, 300 (1998)................................................................................................ 29

*In re Tower Air, Inc.*,
397 F.3d 191 (3d. Cir. 2005)........................................................................... 25, 27, 28

**Statutory Authorities**

11 U.S.C. § 552....................................................................................................... *passim*

**Rules and Regulations**

NYUCC § 1.1(a) .......................................................................................................... 7

NYUCC § 10.7............................................................................................................. 7

NYUCC § 1-201(b)(24)................................................................................................. 7

NYUCC § 9-102 .................................................................................................... *passim*

NYUCC § 9-109(d)(8)................................................................................................ 22

Defendant, Counterclaim Plaintiff, and Crossclaim Defendant ICBCS, by and through its undersigned counsel, hereby submits this Memorandum of Law in Opposition to (i) the *Motion for Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c)* [D.I. 37] (the "Plaintiff Motion") filed by Plaintiffs and Counterclaim and Crossclaim Defendants the Debtors and the Agent; and (ii) the *Motion for Summary Judgment* [D.I. 33] (the "Committee Motion") filed by Intervenor-Defendant and Counterclaim and Crossclaim Plaintiff the Committee.[2]

**SUMMARY OF ARGUMENT**

1. Plaintiffs, having initiated this adversary proceeding at the Term Loan Lenders' demand, now seek a judgment that the BI Proceeds are Term Loan Priority Collateral. But Plaintiffs' anemic argument on this point fails to confront the provisions of the Intercreditor Agreement that render the BI Proceeds SOA Priority Collateral on several independent grounds. Rather, Plaintiffs assert only that the BI Proceeds are not themselves Accounts or Inventory and do "not compensate for damage to" Accounts or Inventory, and therefore must be "derivative of the Debtors' real estate, equipment, fixtures and general intangibles." Pl. Mot. ¶¶ 7, 55-62.

2. This argument cannot withstand scrutiny. To begin with, Plaintiffs completely ignore that "SOA Priority Collateral" includes essentially all of the Debtors' existing and hereinafter arising business-income related assets (*i.e.*, the assets that represent, embody, or are sold for, business income). This includes not only Accounts[3] and Inventory, but also: (i) General Intangibles—defined to expressly include insurance policies and payment rights—related to Accounts and Inventory; (ii) Money relating to Accounts or Inventory; (iii) Proceeds of each of the foregoing; and

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them below, in ICBCS's *Opening Memorandum of Law in Support of its Motion for Summary Judgment* [D.I. 35] (the "ICBCS Motion"), or in the Plaintiff Motion.

[3] The Intercreditor Agreement defines "Accounts" to include essentially all accounts receivable arising from the provisions of goods or services. *See infra.* ¶¶ 14, 22.

(iv) "Proceeds of … insurance … payable … with respect to" each of the foregoing.  *See Declaration of Deborah Newman in Support of the ICBCS Motion* dated October 4, 2019 [D.I. 36] ("Newman Declaration") Ex. 5 (Intercreditor Agmt.) § 1.02.  This omission is not surprising, as it cannot be credibly argued that the BI Policy (which is a General Intangible), and BI Proceeds (which are "Proceeds" of the BI Policy, and Money), do not "relate to," or constitute "insurance payable with respect to" Accounts.

      3.      To the contrary, the terms "related to" and "with respect to" are "interpreted broadly" to mean "ha[ving] a connection with" or "reference to."  *See e.g.*, *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983); *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 33-34 (2d Cir. 2002).  And Plaintiffs concede that "a business interruption policy 'insures against the temporal absence of [A]ccounts.'" Pl. Mot. ¶ 57 (emphasis removed).  There is thus no question that the BI Policy and BI Proceeds "have a connection with," and "reference to," and are therefore "related to" and paid "with respect to," the Debtors' Accounts and other business-income related assets.

      4.      Further, in arguing that the BI Proceeds are not "Proceeds" of Accounts because they do not "compensate for damage to" Accounts, Plaintiffs ignore the NYUCC's broad definition of "Proceeds," which includes, *inter alia*, "to the extent of the value of the collateral … insurance payable by reason of the *loss* … of," and "whatever is … distributed *on account of*, collateral." NYUCC § 9-102(a)(64) (emphasis added).  The BI Proceeds, as insurance intended to compensate for the "temporal absence of [A]ccounts," paid in amount equal to such foregone Accounts, fall squarely within this definition.  Pl. Mot. ¶ 57 (emphasis removed); s*ee MNC Commercial Corp. v. Rouse*, 91-0615-CV-W-2, 1992 WL 674733, at *1 (W.D. Mo. Dec. 15, 1992) (holding that business interruption insurance proceeds were derivative of the debtor's "business income" assets such as

"cash, accounts receivable, or a chose in action," and "tangible income-producing property of the business, which was [the debtor's] inventory and raw materials.").

5. Plaintiffs' argument that the BI Proceeds are Term Loan Priority Collateral because they are "derivative of the Debtors' real estate, equipment, fixtures and general intangibles" fares no better. Pl. Mot. ¶ 60. First, Plaintiffs neglect to note that General Intangibles related to Accounts or Inventory are SOA Priority Collateral. *Id.*; Newman Decl. Ex. 5 (Intercreditor Agmt.) § 1.02. Thus, General Intangibles are Term Loan Priority Collateral only to the extent that they ***do not*** relate to Accounts or Inventory. As discussed above, because the BI Policy and the right to payment arising thereunder, each of which are General Intangibles, compensate for the loss of Accounts that would have been generated but for the Girard Point Incident, they are "related to" Accounts, and are thus SOA Priority Collateral. And so are their Proceeds (*i.e.*, the BI Proceeds). *Id.*

6. Second, "Term Loan Priority Collateral" is defined as "all Collateral ***that is not*** SOA Priority Collateral or Excluded Property." *Id.* § 1.02 (emphasis added). Accordingly, given that the BI Proceeds fall squarely within several categories of the SOA Priority Collateral definition, they still would not be Term Loan Priority Collateral even if Plaintiffs were correct that they are derivative of real estate, equipment, or fixtures. And regardless, Plaintiffs are not correct, as the BI Proceeds cannot be said to be "Proceeds" of real estate, equipment, or fixtures under any reasonable construct of the "Proceeds" definition (and certainly not under the construct urged by Plaintiffs). Pl. Mot. ¶ 60; NYUCC § 9-102(a)(64).

7. Finally, Plaintiffs' argument that treatment of the BI Proceeds as Term Loan Priority Collateral is consistent with the nature of the parties' relationship, because the Term Loan Lenders—as opposed to ICBCS—"have historically funded the Debtors' ongoing business and capital improvements" is belied by the Debtors' own prior statements. Pl. Mot. ¶ 61. The Debtors have

repeatedly represented to this Court—including in this proceeding—that the Intermediation Facility is essential to the Debtors' viability, and "provides, among other things, the working capital necessary for the Debtors to operate the refinery." Compl. ¶ 29.[4] It thus makes perfect sense that the parties agreed that ICBCS would have a first priority security interest in all of the Debtors' business-income related assets, while the Term Loan Lenders would have a first priority security interest in everything else (essentially real estate, equipment, and fixtures). Treating the BI Proceeds, which all parties agree are intended to compensate for the loss of business income caused by the Girard Point Incident, as anything but SOA Priority Collateral would be completely at odds not only with the Intercreditor Agreement's plain language as described above, but also with the guiding principle underlying the division of Common Collateral between SOA Priority Collateral and Term Loan Priority Collateral. It would also be inconsistent with the other relevant agreements between the parties, given that only ICBCS—and not the Term Loan Lenders—required the Debtors to maintain business interruption insurance, and that the Term Loan Lenders expressly excluded business interruption insurance proceeds—but not property damage insurance proceeds—from the cash proceeds that would trigger the Term Loan Credit Agreement's mandatory prepayment requirement or be used to make such prepayments. *See* Newman Decl. Ex. 1 (SOA) §§ 10.04, 10.12(b), 8.16; Schedules 10.04, 8.16; Ex. 3 (Term Loan Credit Agmt.) §§ 5.05(b); 5.11(b), 1.01, 2.06.

8. The Committee's effort to invalidate ICBCS's security interest in the BI Proceeds under the "after-acquired property" provision of section 552(a) of the Bankruptcy Code is equally without merit. As the Committee acknowledges, section 552(b) provides that a security interest cannot be avoided under section 552(a) if the after-acquired property constitutes proceeds of collateral subject to a security interest held by the secured creditor prior to the bankruptcy

[4] *See also* D.I. 22 ¶ 1; D.I. 449 ¶ 1 in the Prior Chapter 11 Cases (Case No. 18-10122 (KG)).

proceeding and extending to both the underlying collateral and its proceeds. 11 U.S.C. § 552. Section 552(b) clearly applies here, as the Committee concedes (as it must) that ICBCS held a security interest in both the BI Policy and the BI Proceeds before the Debtors' bankruptcy cases were filed, by virtue of being named as a loss payee, mortgagee and additional insured in the BI Policy. *See* Comm. Br. ¶¶ 33, 54. Where, as here, a creditor is so named, the proceeds of the insurance policy cannot be avoided under section 552. *See In re McLean Indus., Inc.*, 132 B.R. 271, 284 (Bankr. S.D.N.Y. 1991). Further, ICBCS's security interest in the BI Proceeds is also protected by section 552(b) for the additional and independent reason that the BI Proceeds constitute Proceeds of other collateral in which ICBCS held a prepetiton security interest, such as Accounts and other business-income related assets.

9. For all of these reasons and as more fully set forth below, ICBCS respectfully requests that the Plaintiff and Committee Motions be denied.

**COUNTERSTATEMENT OF UNDISPUTED FACTS**

**I. THE PES PARTIES ENTER INTO THE SOA, REQUIRING THEM TO MAINTAIN BUSINESS INTERRUPTION AND PROPERTY DAMAGE INSURANCE NAMING ICBCS AS AN ADDITIONAL INSURED, LOSS PAYEE, AND MORTGAGEE**

10. On January 21, 2018, PESRM and certain of its affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court (the "Prior Chapter 11 Cases"). *See In re PES Holdings LLC, et al.*, Case No. 18-10122 (KG). A key aspect of the Debtors' emergence from their Prior Chapter 11 Cases was ICBCS's agreement to provide intermediation services to the Debtors (the "Intermediation Facility"). Newman Decl. ¶ 4. Pursuant to the documents governing the Intermediation Facility, ICBCS exclusively sourced and purchased raw materials and other feedstock from third parties to be refined by the Debtors, in order for the Debtors to supply ICBCS with refined products. *Id.* ICBCS maintained title to the raw inventory until the product was ready

to be refined, and then sold the inventory to the Debtors. *Id.* Once the product was refined, ICBCS purchased the refined product and coordinated the sale of the product with the Debtors' assistance.

11.     On each day, ICBCS netted the value of the raw materials it supplied against the value of refined product it received, deducted an agreed margin, and deposited the net amount into a cash collateral account held by the Debtors and subject to ICBCS's first priority security interest. *See id.* ¶ 5. This arrangement enabled the Debtors to significantly reduce their working capital requirements and provided a stable source of raw materials, both of which were critical to the Debtors' continued operations and emergence from their Prior Chapter 11 Cases. *Id.*

12.     In connection with the Intermediation Facility, on June 18, 2019, ICBCS, PESRM, and certain of PESRM's affiliates (PESRM and such affiliates collectively, the "PES Parties") entered into the Sixth Amended and Restated Supply and Offtake Agreement (the "SOA").[5] *See id.* ¶ 6. Unlike the Term Loan Credit Agreement, the SOA expressly required the PES Parties to maintain business interruption insurance naming ICBCS as an additional insured, loss payee, and mortgagee, as well as property insurance so naming ICBCS. *Id.* Ex. 1 (SOA) §§ 10.04, 10.12(b), 8.16, Schedules 10.04, 8.16.

## II.     THE PES PARTIES GRANT ICBCS SECURITY INTERESTS IN SUBSTANTIALLY ALL OF THEIR ASSETS

13.     In connection with the SOA, and to secure the PES Parties' obligations thereunder, the PES Parties and ICBCS entered into a Pledge and Security Agreement (the "ICBCS Pledge Agreement").[6] Pursuant to the ICBCS Pledge Agreement, the PES Parties granted ICBCS a lien in substantially all of their assets (the "SOA Pledged Collateral"). *See* Newman Decl. Ex. 2 (ICBCS Pledge Agmt.) § 2.1. Specifically, the SOA Pledged Collateral consists of all of the PES Parties'

---

[5]   A copy of the SOA is attached as Exhibit 1 to the Newman Declaration.

[6]   A copy of the ICBCS Pledge Agreement is attached to the Newman Declaration as Exhibit 2.

right, title, and interest in, to, and under the following property, wherever located, and ***whether now existing or hereafter arising or acquired from time to time***:

i. all Accounts;

ii. all Inventory, including all raw materials, work in process and finished goods, relating to any of the foregoing items in this clause (ii);

iii. all Renewable Identification Numbers wherever located;

iv. all Money and Deposit Accounts;

v. all Letters of Credit and Letter-of-Credit Rights supporting payment of any of the foregoing;

vi. all Equipment;

vii. all Fixtures;

viii. all Trademarks;

ix. all Equity Interests in each Subsidiary directly owned by such Grantor as of the date hereof …;

x. to the extent evidencing any of the foregoing, (A) Documents, (B) Instruments, (C) General Intangibles, (D) Commercial Tort Claims, and (E) Supporting Obligations and all other forms of obligations owing to any Grantor or in which any Grantor may have any interest …;

xi. to the extent not otherwise included above, all Records evidencing any of the foregoing; and

xii. all Proceeds and products of each of the foregoing ....

*Id.*

14. The ICBCS Pledge Agreement is governed by New York law, and defines "Accounts," "Inventory," "Money," and "Proceeds" consistent with the NYUCC. *Id.* §§ 1.1(a), 10.7. As relevant here, the NYUCC defines "Account" as:

> [E]xcept as used in "account for" … a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, [or] (ii) for services rendered or to be rendered ….

NYUCC § 9-102(a)(2). "Inventory" is defined as "goods, other than farm products, which: (A) are leased by a person as lessor; (B) are held by a person for sale or lease or to be furnished under a contract of service; (C) are furnished by a person under a contract of service; or (D) consist of raw

materials, work in process, or materials used or consumed in a business." *Id.* § 9-102(a)(48). "Money" is defined to include "a medium of exchange currently authorized or adopted by a domestic or foreign government." *Id.* § 1-201(b)(24). "Proceeds" are defined as:

> (A) Whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral; (B) ***whatever is collected on, or distributed on account of, collateral***; (C) rights arising out of collateral; (D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or (E) ***to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral***.

*Id.* § 9-102(a)(64) (emphasis added).

15. Unlike the foregoing terms, the ICBCS Pledge Agreement defines "General Intangibles" more broadly than the NYUCC to expressly include insurance policies. Specifically, "General Intangibles" are defined to include the NYUCC definition,[7] as well as, among other things:

> (i) ***all of such Grantor's rights, title and interest in, to and under all Contracts and insurance policies (including all rights and remedies relating to monetary damages, including indemnification rights and remedies, and claims for damages or other relief pursuant to or in respect of any Contract)***, (ii) all know-how and warranties relating to any of the Pledged Collateral, (iii) ***any and all other rights, claims, choses-in-action and causes of action of such Grantor against any other person and the benefits of any and all collateral or other security given by any other person in connection therewith*** ….

Newman Decl. Ex. 2 (ICBCS Pledge Agmt.) § 1.1(c) (emphasis added).

16. On October 22, 2018 and June 18, 2019, ICBCS filed UCC-1 financing statements providing notice of its perfected security interests in SOA Pledged Collateral. Newman Decl. ¶ 8.

---

[7] The NYUCC defines "General Intangible" as "any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software." NYUCC § 9-102(a)(42).

## III. THE PES PARTIES ENTER INTO THE TERM LOAN CREDIT AGREEMENT, WHICH DOES NOT REQUIRE BUSINESS INTERRUPTION INSURANCE

17. On August 7, 2018, PES Holdings, on behalf of itself and the other PES Parties, entered into a credit agreement (the "Term Loan Credit Agreement") with the Agent and the Term Loan Lenders (or their predecessors) pursuant to which PES Holdings borrowed $619,500,000.[8]

18. Section 5.05(b) of the Term Loan Credit Agreement requires the PES Parties to maintain insurance covering only real and personal property, and that "such insurance" "name the … Agent as insured party or loss payee" and additional insured. Newman Decl. Ex. 3 (Term Loan Credit Agmt.) § 5.05(c); 5.11(b). Unlike the SOA, the Term Loan Credit Agreement does not require that the PES Parties maintain business interruption insurance. *Id.*

19. Section 2.06 of the Term Loan Credit Agreement is a mandatory prepayment provision triggered upon certain Asset Sales or Recovery Events (as defined in the Term Loan Credit Agreement). *Id.* § 2.06. Business interruption insurance proceeds are expressly carved out of the funds that would trigger such mandatory prepayments or be used to fund them. *Id.* §§ 1.01, 2.06(b). The proceeds of property damage insurance, conversely, are not. *Id.*

## IV. THE PES PARTIES GRANT THE AGENT SECURITY INTERESTS THAT ARE SUBSTANTIALLY THE SAME AS THOSE GRANTED TO ICBCS

20. In conjunction with the Term Loan Credit Agreement, on August 7, 2018, the PES Parties and the Agent entered into a Pledge and Security Agreement (the "Term Loan Pledge Agreement")[9] granting the Agent security interests in substantially the same collateral (the "Common Collateral") subject to ICBCS's security interests. Newman Decl. Ex. 4 (Term Loan Pledge Agmt.) § 2.1.

---

[8] A copy of the Term Loan Credit Agreement is attached to the Newman Declaration as Exhibit 3.

[9] A copy of the Term Loan Pledge Agreement is attached to the Newman Declaration as Exhibit 4.

## V.    THE INTERCREDITOR AGREEMENT DIVIDES THE PRIORITY INTERESTS IN THE COMMON COLLATERAL BETWEEN ICBCS AND THE AGENT

21.    In connection with the SOA and Term Loan Credit Agreement, the Agent, ICBCS, and the PES Parties entered into the Intercreditor Agreement, which governs the relative priority of the Term Loan Lenders' and ICBCS's interests in the Common Collateral.[10]  The Intercreditor Agreement is governed by New York law.  *Id.* Ex. 5 (Intercreditor Agmt.) § 8.06(a).

22.    The Intercreditor Agreement provides that ICBCS shall have a first priority security interest, and the Agent shall have a second priority security interest, in SOA Priority Collateral.  *Id.* § 4.01.  "SOA Priority Collateral" is defined as each PES Party's "***now existing or hereinafter arising***":

   (i)    ***Accounts***;

   (ii)    ***Inventory, including all raw materials, work in process and finished goods, relating to any of the foregoing items in this clause (ii)*** (together with the items in clauses (i) and (ii) above, the "Current Assets Collateral");

   (iii)    ***all Money and Deposit Accounts relating to the foregoing***;

   (iv)    all of the following: (A) to the extent evidencing Current Assets Collateral, Documents, (B) to the extent evidencing Current Assets Collateral, Instruments, (C) ***to the extent related to Current Assets Collateral, General Intangibles***, (D) to the extent related to Current Assets Collateral, Commercial Tort Claims, and (E) to the extent related to Current Assets Collateral, Supporting Obligations and all other forms of obligations owing to any Grantor or in which any Grantor may have any interest, however created or arising and whether or not earned by performance;

   (v)    all Letters of Credit and Letter-of-Credit Rights supporting payment of any Current Assets Collateral;

   (vi)    to the extent not otherwise included above, all Records evidencing any of the foregoing; and

   (vii)    ***all Proceeds and products of each of the foregoing*** and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, ***and any and all Proceeds of any insurance***, indemnity, warranty or guaranty ***payable to such Grantor from time to time with respect to any of the foregoing***.

---

[10]   A copy of the Intercreditor Agreement is attached to the Newman Declaration as Exhibit 5.

*Id.* § 1.02 (emphasis added). The Intercreditor Agreement defines "Accounts," "Inventory," "Money," "Proceeds," and "General Intangibles" in the same manner as the ICBCS Pledge Agreement. The Intercreditor Agreement further provides that the Agent shall have a first priority security interest, and ICBCS shall have a second priority security interest, in "Term Loan Priority Collateral." *Id.* § 4.01. "Term Loan Priority Collateral" is defined as all "Collateral that is not SOA Priority Collateral or Excluded Property." *Id.* § 1.02.

23. The Intercreditor Agreement also sets forth certain assets that are subject to ICBCS's exclusive security interest ("SOA Separate Assets and Collateral"), which include (i) Certain Hydrocarbon Assets; (ii) Certain Refined Products Assets; and (iii) Certain Rack Sale Refined Products Assets. *Id.* Ex. 5 (Intercreditor Agmt.) §§ 1.02; 9.01.

## VI. THE POLICY NAMES ICBCS AS A LOSS PAYEE, MORTGAGEE, AND ADDITIONAL INSURED IN BOTH THE BUSINESS INTERRUPTION AND PROPERTY DAMAGE INSURANCE

24. On January 18, 2019, the XL Insurance America, Inc. Insurance Policy No. US00064117PR18A (the "Policy") was issued to the PES Parties and their affiliates for the period November 1, 2018 to November 1, 2019.[11] The Policy includes both the BI Policy and property damage coverage (the "PD Policy"). *See, e.g.*, *id.* Ex. 6 (Policy) at Declarations ¶ 9.

25. The PD Policy insures against "all risks of direct physical loss or damage" occurring with respect to "Real and Personal Property of the Insured of every kind and description," with certain enumerated types of property and perils expressly excluded. *Id.* § 1, ¶¶ 1, 3. The BI Policy insures against "actual loss sustained by the Insured resulting from the necessary interruption of business caused by direct physical loss or damage, by a peril insured against, to property insured herein, occurring during the Term of Insurance." *Id.* § 2, ¶ 1.

---

[11] A copy of the Policy is attached to the Newman Declaration as Exhibit 6.

26. The Policy provides that "the unqualified word 'Insured' wherever used includes any person or organization to whom or to which the Insured is obligated by virtue of a written contract to name such person or organization as an Additional Insured …" *Id.* Ex. 6 (Policy) at General Conditions ¶ 5 (the "Additional Insured Provision"). The Policy also includes a Lenders Loss Payable Clause, stating that: "Loss or damage, if any, under this Policy, shall be paid to any lender designated by the Insured and in possession of a written contract, hereinafter referred to as 'the Lender', as their interests may appear ...." *Id.* at ¶ 33 (the "Loss Payee Provision").

27. Additionally, the Policy includes an endorsement listing ICBCS as a Loss Payee/Mortgagee, and providing that "[i]t is hereby understood and agreed that the following entity is named as Loss Payee/Mortgagee under this Policy, as their interests may appear, as required by written contract or agreement, subject to the terms and condition of this Policy: ICBC Standard Bank PLC." *Id.* at Endorsements ¶ 4 (the "ICBCS Loss Payee/Mortgagee Endorsement"). The Policy does not include an endorsement naming the Agent as a Loss Payee/Mortgagee.

28. A Certificate of Evidence of Property Insurance (the "ICBCS Certificate") issued to ICBCS in connection with the PESRM Policy states that "the certificate holder [ICBCS] is named mortgagee, loss payee, and additional insured as their interests may appear and where required by written contract."[12] Another Certificate of Evidence of Property Insurance (the "Agent Certificate") states that "the certificate holder [the Agent] is named mortgagee, loss payee, and additional insured as their interests may appear and where required by written contract."[13]

29. The Additional Insured and Loss Payee Provisions name ICBCS and the Agent as additional insureds and loss payees only as "agreed to by virtue of a written contract" and as "designated by the Insured … in a written contract … as their interests may appear," respectively.

---

[12] A copy of the ICBCS Certificate is attached to the Newman Declaration as Exhibit 7.

[13] A copy of the Agent Certificate is attached to the Newman Declaration as Exhibit 8.

*Id.* at General Conditions ¶¶ 5, 33. Given that the SOA requires the Debtors to maintain business interruption and property damage insurance naming ICBCS as an additional insured, loss payee, and mortgagee, these provisions of the Policy (in addition to the ICBCS Loss Payee/Mortgagee Endorsement) operate to name ICBCS as an additional insured, loss payee, and mortgagee with respect to both the BI Policy and PD Policy.[14] By contrast, because the Term Loan Credit Agreement does not require the PES Parties to maintain business interruption insurance, the Policy does not name the Agent as an additional insured, loss payee, or mortgagee on the BI Policy.

## VII. THE GIRARD POINT INCIDENT OCCURS

30. The Girard Point Incident occurred on June 21, 2019. Newman Decl. ¶ 14. Shortly thereafter, the Debtors announced that they would cease operating the Refining Complex, and on July 21, 2019, the Debtors reentered bankruptcy. *Id.* ¶ 15. The Debtors are currently preparing and submitting claims to the insurers for both property damage and business interruption losses occasioned by the Girard Point Incident. *Id.* ¶ 17.

31. On July 22, 2019, the Debtors announced that they had entered into a credit agreement for debtor-in-possession financing (the "DIP Credit Agreement") with the Term Loan Lenders. The DIP Credit Agreement requires the Debtors to stipulate that all BI and PD Proceeds arising from the Girard Point Incident (the "June 21 Insurance Proceeds") constitute Term Loan Priority Collateral, notwithstanding that the plain language of the Intercreditor Agreement provides otherwise. DIP Motion at 21 (Debtor Stipulations).

32. On July 23, 2019, the Court entered an order authorizing the DIP financing on an interim basis (the "Interim DIP Order"). [D.I. 85] The DIP Credit Agreement and Interim DIP

[14] As an additional insured, mortgagee, and loss payee under the Policy, ICBCS also has its own direct contractual rights against the business interruption portion of the Policy, which are not at issue in this adversary proceeding. ICBCS is currently discussing its anticipated pursuit of such rights with the Debtors.

Order require that the Debtors (i) seek entry of an order determining that all June 21 Insurance Proceeds constitute 'Term Loan Priority Collateral'" (the "Insurance Proceeds Order"), and (ii) obtain entry of the Insurance Proceeds Order within 90 days of entry of the Interim DIP Order.  DIP Motion at 18 (Milestones); Interim DIP Order ¶ 19(c)(xii); DIP Credit Agreement at 87.

## VIII.   THE DEBTORS AND AGENT INITIATE THE ADVERSARY PROCEEDING

33.      On August 7, 2019, Plaintiffs complied with the Term Loan Lenders' demand by initiating this adversary proceeding, seeking a declaration that all June 21 Insurance Proceeds constitute Term Loan Priority Collateral.  *See* Compl. ¶¶ 95-101.  On September 13, 2019, ICBCS filed its Answer and Counterclaims, denying the Complaint and asserting two Counterclaims—one seeking a declaration that any BI Proceeds paid on account of the Debtors' claims under the BI Policy are SOA Priority Collateral, and the other seeking a declaration that ICBCS has a first priority or exclusive lien, respectively, on any PD Proceeds paid on account of damage to Inventory or SOA Separate Assets and Collateral.  Answer and Counterclaims ¶¶ 40-49.  Also on September 13, 2019, the Committee filed its Crossclaims, seeking, among other things, to avoid ICBCS's security interests in the BI Proceeds under section 552 of the Bankruptcy Code.  Crossclaims ¶¶ 51-55.

34.      On October 4, 2019, ICBCS and the Committee moved for summary judgment in favor of their respective positions, and Plaintiffs moved for judgment on the pleadings in their favor.

## ARGUMENT

## I.   ICBCS HAS A FIRST PRIORITY SECURITY INTEREST IN ALL BI PROCEEDS PAID ON ACCOUNT OF THE DEBTORS' CLAIMS UNDER THE POLICY

35.      It is undisputed that ICBCS and the Term Loan Agent each has broad security interests in substantially all of the Debtors' assets, with ICBCS having a first priority security interest, and the Agent having a second priority security interest, in enumerated Common Collateral defined as "SOA Priority Collateral."  Newman Decl. Ex. 5 (Intercreditor Agmt.) §§ 1.02; 4.01.  The

remainder of the Common Collateral is defined as "Term Loan Priority Collateral," and is subject to the Agent's first priority interest, and ICBCS's second priority interest. *Id*.

36. The division between SOA Priority Collateral and Term Loan Priority Collateral is straightforward: Put simply, as relevant to this dispute, ICBCS has a first priority interest in all of the Debtors' assets that represent, embody, or are exchanged for business-income (primarily (i) Accounts, (ii) Inventory, (iii) General Intangibles and Money relating to Accounts and Inventory, and (iv) the Proceeds thereof, or insurance payable with respect to the foregoing), while the Term Loan Lenders have a first priority interest in essentially everything else (primarily (i) real estate, equipment, and fixtures, and (ii) the proceeds of, and insurance payable with respect to, real estate, equipment, and fixtures).

37. Given this demarcation, it is clear that the BI Proceeds are SOA Priority Collateral. As set forth in the ICBCS Motion, and as all parties agree, the "purpose" of business interruption insurance is "to compensate [the insured] for lost business income that would have been generated but for" the event triggering the insurance coverage. *MNC*, 1992 WL 674733, at *1; *see, e.g.*, Pl. Mot. ¶ 57 ("a business interruption policy 'insures against the temporal *absence* of accounts'") (emphasis in original); Comm. Br. ¶ 49 ("There is no genuine dispute of material fact (and indeed, the Debtors, Cortland, and ICBCS each admit) that the BI Recoveries are intended to compensate the Debtors for lost profits that would have been earned, but for the Girard Point Explosion ….").  It thus makes perfect sense, and is entirely consistent with both the letter and spirit of the Intercreditor Agreement, that the BI Proceeds—which are intended to compensate for the loss of business-income related assets constituting SOA Priority Collateral—are also themselves SOA Priority Collateral. Any other result would be entirely at odds with the guiding principle behind the Intercreditor

Agreement's division of Common Collateral, and directly contrary to numerous components of the Intercreditor Agreement's SOA Priority Collateral definition.

38.    Nevertheless, in a blatant effort to assist the Term Loan Lenders in escaping the prepetition bargain that was struck among the parties, Plaintiffs contest this inescapable outcome, arguing simply that the BI Proceeds are Term Loan Priority Collateral because they are not Accounts or Inventory or insurance paid on account of damage to Accounts or Inventory, and must therefore be derivative of real estate, equipment, fixtures, and general intangibles.  Pl. Mot. ¶¶ 55-60.  As set forth below, this assertion is fatally flawed for several reasons.

### A.    Plaintiffs Completely Ignore Several Components Of The "SOA Priority Collateral" Definition

39.    In attempting to argue that the BI Proceeds constitute Term Loan Priority Collateral, Plaintiffs completely ignore that ICBCS has a first priority interest in, among other things, (i) General Intangibles (defined to expressly include insurance policies and payment rights) related to Accounts and Inventory, (ii) Money and essentially all other assets related to Accounts and Inventory, (iii) the Proceeds thereof, and (iv) "Proceeds of … insurance … payable … with respect to" Accounts and Inventory, and essentially all other assets related thereto.  Newman Decl. Ex. 5 (Intercreditor Agmt.) § 1.02.

40.    Courts interpret "related to" and "with respect to" broadly to mean "ha[ving] a connection with" or "reference to."  *See, e.g.*, *Pilot Life*, 481 U.S. at 47; *Shaw*, 463 U.S. at 96-97; *ACE Capital*, 307 F.3d at 33-34.  Here, all parties—including Plaintiffs—acknowledge that the purpose of the BI Policy and BI Proceeds is to compensate for lost Accounts and other business-income assets relating to Accounts and Inventory such as Money.  *See, e.g.*, Pl. Mot. ¶ 57; Comm. Br. ¶ 49.  The BI Policy and BI Proceeds, therefore, plainly have "a connection with" and "reference to" the Debtors' Accounts and other business-income related assets.

41.     Thus, the BI Policy is a General Intangible (*i.e.*, an insurance policy and a right to payment) "related to" the Debtors' Accounts.  The BI Proceeds, in turn, are "Proceeds" of General Intangibles related to Accounts, as they will be "collected on," and "distributed on account of" the BI Policy and the right to payment that arises thereunder.  *Id.*; NYUCC § 9-102(a)(64) (defining Proceeds to include "whatever is collected on, or distributed on account of, collateral").  The BI Proceeds are also Money "related to" Accounts, as they are Money that will be paid to compensate for the Debtors' loss of Accounts.  And the BI Policy and BI Proceeds are also "insurance … payable … with respect to" Accounts and other business-income related assets, as again—as all parties concede—they are insurance paid to compensate for the Debtors' loss of Accounts and other business-income related assets.  *See, e.g.*, Pl. Mot. ¶ 57; Comm. Br. ¶ 49.  The BI Proceeds constitute SOA Priority Collateral on any one of these independent bases.

**B.     Plaintiffs' Ignore The NYUCC's Broad Definition Of Proceeds**

42.     The BI Proceeds are also SOA Priority Collateral for the additional and independent reason that they are "Proceeds" of Accounts.  Plaintiffs' assert that the BI Proceeds are not Proceeds of Accounts because they do not "compensate for damage" to Accounts. Pl. Mot. ¶¶ 56-57.  But the NYUCC definition of "Proceeds" is not limited to insurance compensating for damage to collateral. "Proceeds" also include, *inter alia*, "insurance payable by reason of the *loss* … of," and "whatever is … distributed *on account of*, collateral."  NYUCC § 9-102(a)(64) (emphasis added).

43.     The BI Proceeds fit squarely within this definition with respect to Accounts and other business-income related assets.  As noted above, all parties concede that the BI Proceeds are intended to compensate for the Debtors' loss of Accounts and other business-income related assets as a result of the Girard Point Incident.  *See, e.g.*, Pl. Mot. ¶ 57; Comm. Br. ¶ 49.  The BI Proceeds, therefore, are "insurance payable by reason of the loss of" the Debtors' Accounts and other business-income related assets, and are thus "Proceeds" of Accounts and other business-income related assets

under the NYUCC "Proceeds" definition. *See* NYUCC § 9-102(a)(64); *MNC*, 1992 WL 674733, at *1 (holding that business interruption insurance proceeds were derivative of the debtor's "business income" assets such as "cash, accounts receivable, or a chose in action," and "tangible income producing property of the business, which was inventory and raw materials").

44. Plaintiffs nevertheless argue that even if the BI Proceeds are derivative of Accounts and Inventory, then they are derivative only to the extent of losses the Debtors suffer as a result of their inability to monetize Accounts and Inventory that existed as of the date of the Girard Point Incident. Pl. Mot. ¶58. No such BI Proceeds will be paid on account of such loss, Plaintiffs argue, because the BI Policy does not insure against losses the Debtors suffer during the first 60 days following the incident giving rise to the insurance coverage. *See id*.

45. This makes no sense. There is no reasoned basis why ICBCS's security interest in Accounts would entitle it to business interruption insurance proceeds paid on account of the Debtors' inability to monetize existing Accounts, but not business interruption insurance proceeds paid as a result of the loss of future Accounts. To the contrary, under the NYUCC, business interruption insurance proceeds paid for either reason are "Proceeds" of Accounts, and are therefore SOA Priority Collateral. Newman Decl. Ex. 5 § 2.01; NYUCC § 9-102(a)(64).

### C. Plaintiffs' Assertion That The BI Proceeds Are Term Loan Priority Collateral Because They Are Derivative Of General Intangibles Is Unavailing

46. Plaintiffs' assertion that the BI Proceeds are Term Loan Priority Collateral because they are derivative of General Intangibles is also unavailing. *See, e.g.*, Pl. Mot. ¶¶ 3, 59-60. Plaintiffs assert that "the Term Loan Agent was granted a broad security interest in the Debtors' business, including … general intangibles and 'any and all Proceeds of any insurance' with respect to that interest." *Id.* ¶ 59. Plaintiffs fail to note, however, that the Intercreditor Agreement grants the Agent a first priority interest in General Intangibles ***only*** to the extent that such General Intangibles

***do not*** relate to Current Assets Collateral (*i.e.*, Accounts and Inventory). Newman Decl. Ex. 5 (Intercreditor Agmt.) § 1.02. General Intangibles that relate to Accounts or Inventory, on the other hand, are SOA Priority Collateral. *Id*.

47. Accordingly, the argument that the BI Proceeds are derivative of General Intangibles would render the BI Proceeds Term Loan Priority Collateral ***only if*** the General Intangibles in question ***did not*** relate to Accounts or Inventory. Here, however, the General Intangibles at issue are the BI Policy itself, and the right to payment thereunder. As discussed above, each of these General Intangibles is intended to compensate for the Debtors' loss of Accounts, and thus each General Intangible is "related to" the Debtors' Accounts. As such, these General Intangibles, and any Proceeds thereof, are SOA Priority Collateral.

**D. Plaintiffs' Contention That The BI Proceeds Are "Derivative Of The Debtors' Real Estate, Equipment, And Fixtures" Is Irrelevant And Illogical**

48. Plaintiffs' contention that the BI Proceeds are Term Loan Priority Collateral because they are "derivative of the Debtors' real estate, equipment, and fixtures" is also unpersuasive. Pl. Mot. ¶ 60. To begin with, Term Loan Priority Collateral is defined as "all Collateral that is not SOA Priority Collateral or Excluded Property." Newman Decl. Ex. 5 (Intercreditor Agmt.) § 1.02. Thus, if collateral falls within the definition of SOA Priority Collateral, it cannot be Term Loan Priority Collateral. As discussed above, the BI Proceeds fall squarely within several categories of the SOA Priority Collateral definition. Thus, even if the BI Proceeds could also be said to be derivative of real estate, equipment, or fixtures (and as discussed below, they cannot), they would still constitute SOA Priority Collateral, and would not be Term Loan Priority Collateral.

49. Moreover, Plaintiffs' contention that the BI Proceeds are derivative of real estate, equipment, and fixtures defies logic. Pl. Mot. ¶ 60. Following Plaintiffs' own line of reasoning, the BI Proceeds plainly are not themselves real estate, equipment, or fixtures, and are not being paid to

"compensate for damage" to real estate, equipment, or fixtures. *Id.* ¶¶ 56-57. To the contrary, that is the purpose of the ***PD Proceeds***. The ***BI Proceeds***, conversely, compensate for the loss of the Debtors' Accounts and other business-income related assets in an amount equal to such loss, and are therefore Proceeds of the Accounts and other business-income related assets. *See, e.g.*, *Periphery Loungewear, Inc. v. Kantron Roofing Corp.*, 190 A.D.2d 457, 460 (N.Y. 1st Dep't 1993) (recognizing that "the concept of business interruption loss is one wholly distinct and separate from property damage"); *MNC*, 1992 WL 674733, at *1 ("MNC's right to the insurance proceeds is based upon MNC's security interest in Kroehler's business assets [*i.e.*, cash, accounts receivable, choses in action, raw materials and inventory], which would otherwise represent, embody and/or generate Kroehler's business income.").

50. The BI Proceeds also are not Proceeds of real estate, equipment or fixtures under any of the NYUCC's other definitions of the term. While it is true that the Debtors' real estate, equipment, and fixtures played a role in generating finished products that the Debtors then sold in exchange for business income, that does not make the finished products, the resulting business income they are exchanged for, or the BI Proceeds intended to compensate for such business income, "proceeds" of the real estate, equipment or fixtures. *See In Matter of Strick Chex Columbus Two, LLC*, 542 B.R. 914, 919 (N.D. Ga. 2015) ("[R]evenues generated by a business are not the proceeds of the real property upon which the business is located.... Nor does using equipment to create a good make the revenue generated by the sale of that good 'proceeds' of the equipment.") (internal quotation marks omitted). Further, the Intercreditor Agreement is abundantly clear that finished products (*i.e.*, Inventory), and all business income relating to finished products (*i.e.*, Accounts, and Money and General Intangibles relating to Accounts or Inventory), constitute SOA Priority Collateral. Newman Decl. Ex. 5 (Intercreditor Agmt.) § 1.02. It necessarily follows that the BI

Proceeds, which compensate for the loss of Accounts and other business-income related assets (which again, are all SOA Priority Collateral), are also SOA Priority Collateral.

### E. *In re Montreal* Is Inapposite

51. Plaintiffs' reliance on *In re Montreal*, which held that a secured creditor did not hold a perfected security interest in settlement proceeds paid on account of a claim under the debtor's business interruption insurance policy, is misplaced. Pl. Mot. ¶ 57 (citing *In re Montreal, Me. & Atl. Ry., Ltd.*, 521 B.R. 703, 710 (B.A.P. 1st Cir. 2014) ("Montreal I") *aff'd In re Montreal, Me. & Atl. Ry., Ltd.*, 799 F.3d 1 (1st Cir. 2015) ("Montreal II")). To begin with, the secured creditor in *In re Montreal* ("Wheeling") held a security interest only in a limited pool of assets consisting of Accounts, Inventory, and the Proceeds thereof. *Montreal I*, 521 B.R. at 704. By contrast, here, ICBCS has a broad security interest in substantially ***all*** Debtor assets, including, as discussed above: (a) a first priority interest in, among other things, (i) Accounts and Inventory, (ii) General Intangibles relating to Accounts and Inventory, with General Intangibles expressly defined to include insurance policies and payment rights, (iii) essentially all assets, including Money, relating to Accounts and Inventory, (iv) Proceeds of the foregoing, and (iv) "Proceeds of any insurance payable … with respect to" the foregoing; (b) a second priority interest in the remaining Common Collateral; and (c) an exclusive security interest in SOA Separate Assets and Collateral. Newman Decl. Ex. 5 (Intercreditor Agmt.) §§ 1.02; 4.01.

52. Additionally, "Wheeling did not take any step to perfect its asserted security interest in the Settlement Payment other than to file a UCC-1 financing statement." *Montreal I*, 521 B.R. at 714. Conversely, here, the SOA expressly required that the BI Policy name ICBCS as a loss payee, mortgagee, and additional insured, and the BI Policy complies with this requirement by so naming ICBCS. Newman Decl. Ex. 1 (SOA) §§ 10.04, 10.12(b), 8.16; Schedules 10.04, 8.16; *id.* Ex. 6 (Policy) at Endorsements ¶ 4. Under applicable New York law, this means that ICBCS has a

perfected security interest in both the BI Policy and the BI Proceeds. *See, e.g.*, *Badillo v. Tower Ins. Co. of N.Y.*, 92 N.Y.2d 790, 796 (1999) ("The secured party always has the conventional option of having itself named in the insurance contract as the loss payee or as an additional insured on the risk."); *McLean*, 132 B.R. at 284 ("[I]n the case *sub judice*, the revised loss payee clause assigned the insurance proceeds to MARAD as a loss payee and Chemical as an additional assured.").

53. Further, Wheeling argued only that "the right to receive the Settlement Payment was a form of *original* collateral," which was rejected based on the insurance exclusion in the Maine Uniform Commercial Code (the "Maine UCC") providing that the statute does not apply "to the use of an insurance policy as original collateral or to any assignment of a claim under an insurance policy" (although it can apply to a security interest in insurance proceeds to the extent they constitute "Proceeds" of other collateral). *See Montreal I*, 521 B.R. at 706; 711 (emphasis added); *Montreal II*, 799 F.3d 1, 5; Me. Rev. Stat. Ann. tit. 11, § 9–1109(4)(h).[15] By contrast, here, ICBCS's position that the BI Proceeds are SOA Priority Collateral is based, among other things, on the fact that the BI Proceeds are derivative of other identified collateral in which ICBCS has a first priority interest—*i.e.*, General Intangibles (including the BI Policy itself and any right to payment thereunder), and Accounts and other business-income related assets such as Money.

### F. ICBCS's First Priority Interest In The BI Proceeds Is Supported By The Parties' Relationship And Other Relevant Agreements

54. Finally, Plaintiffs' contention that "[p]roviding the Term Loan Agent first priority to the business interruption insurance proceeds is wholly consistent with the nature of the parties' relationship," because "the Term Loan Lenders have historically funded the Debtors' ongoing

---

[15] The NYUCC contains a similar exception. *See* NYUCC 9-109(d)(8). Unlike Maine law, however, which is silent as to the manner in which a creditor may perfect a security interest in an insurance policy, New York law provides that a secured creditor perfects its interest in an insurance policy by being named as a loss payee or additional insured in the policy, as ICBCS was here. *See Badillo*, 92 N.Y.2d at 795-96; Newman Decl. Ex. 6 (Policy) at Endorsements ¶ 4 and Additional Insured and Loss Payee Provisions.

business and capital improvements at the Refining Complex, while ICBCS supplied crude and non-crude feedstock," is disingenuous. Pl. Mot. ¶ 61. As the Debtors have repeatedly represented to this Court, "[t]he viability of the Debtors' businesses is substantially dependent on their ability to have access to intermediation arrangements," which "reduce[] … the working capital investment required to operate the Debtors' refining business as well as the Debtors' exposure to commodity price volatility."[16]  Indeed, Plaintiffs' own complaint states that "the Intermediation Facility provides, among other things, the working capital necessary for Debtors to operate the refinery." Compl. ¶ 29.

55.      Given the crucial role that ICBCS played in the Debtors' ability to generate business income, it makes perfect sense that the parties agreed to grant ICBCS a first priority interest in the Debtors' business-income related assets, including the BI Proceeds, to secure the PES Parties' obligations under the Intermediation Facility.  More importantly, moreover, the Intercreditor Agreement is unambiguous in doing so.

56.      Additionally, as set forth in the ICBCS Motion, ICBCS's first priority interest in the BI Proceeds is also supported by the other relevant agreements between the PES Parties, ICBCS, and the Term Loan Lenders.  *See* ICBCS Br. ¶¶ 72-74.  Specifically, the SOA expressly required the Debtors to maintain business interruption insurance naming ICBCS as an additional insured, loss payee, and mortgagee, whereas the Term Loan Credit Agreement requires the Debtors to maintain only real and personal property.  *See* Newman Decl. Ex. 1 (SOA) §§ 10.04, 10.12(b), 8.16; Schedules 10.04, 8.16; *id.* Ex. 3 (Term Loan Credit Agmt.) § 5.05(b); § 5.11(b).  Thus, but for ICBCS, there might not be any BI Proceeds at all.

57.      Further, while the Term Loan Credit Agreement requires the PES Parties to prepay the Term Loan if they receive more than $5 million from Asset Sales or Recovery Events (as defined

---

[16]  *See supra* n. 4.

by the Term Loan Credit Agreement) in a fiscal year, in recognition of ICBCS's superior rights to the proceeds of business interruption insurance, such proceeds are expressly carved out of the prepayment requirement. *See* Newman Decl. Ex. 3 (Term Loan Credit Agmt.) §§ 1.01, 2.06. Proceeds of property damage insurance, conversely, are not. *Id.* The other relevant agreements thus further support what the Intercreditor Agreement makes express—that the BI Proceeds are SOA Priority Collateral.

## II. THE DEBTORS SHOULD NOT BE PERMITTED TO STIPULATE THAT THE PD PROCEEDS ARE TERM LOAN PRIORITY COLLATERAL

58. Plaintiffs' position with respect to the PD Proceeds should also strike a death knell for their efforts to procure a stipulation from the Debtors that all June 21 Insurance Proceeds "constitute Term Loan Priority Collateral." DIP Motion at 21 (Debtor Stipulations). Although Plaintiffs argue that the Debtors should be permitted to stipulate that ***all*** PD Proceeds are Term Loan Priority Collateral, they concede that this is not the case. Instead, Plaintiffs state that "[t]he property damage sustained in the Girard Point Incident consists ***primarily*** of damage to the refining facility," and that, "[a]s a result, the property insurance proceeds are ***almost entirely*** the Term Loan Agent's Priority Collateral." Pl. Mot. ¶ 64 (emphasis added).[17] ICBCS thus respectfully requests that the Debtors be precluded from stipulating that all PD Proceeds constitute Term Loan Priority Collateral.[18]

---

17 The question of whether the PD Proceeds are being paid on account of Inventory or SOA Priority Collateral cannot be determined on a motion for judgment on the pleadings. *See AsiaInfo-Linkage, Inc. v. Zhang*, 47 F. Supp. 3d 214, 216 (D. Del. 2014). Moreover, the Debtors still have yet to provide ICBCS with information demonstrating the assets for which they intend to seek PD Proceeds.

18 Prior to the filing of the Motions, ICBCS proposed that the Parties agree to modify the proposed stipulation to reflect that any PD Proceeds paid on account of Inventory and/or SOA Separate Assets and Collateral do not constitute Term Loan Priority Collateral. The Term Loan Lenders rejected this proposal.

## III. THE COMMITTEE'S EFFORTS TO INVALIDATE ICBCS'S SECURITY INTEREST IN THE BI PROCEEDS SHOULD BE REJECTED

### A. ICBCS's First Priority Security Interest In the BI Proceeds Is Protected By Section 552(b) Of The Bankruptcy Code

59. The Committee's efforts to challenge ICBCS's security interest in the BI Proceeds under the "after-acquired property" provision of section 552(a) of the Bankruptcy Code should be rejected out of hand. Section 552(b) is clear that if the BI Proceeds are proceeds of collateral subject to a security interest held by ICBCS prepetition and extending to both the underlying collateral and its proceeds, then ICBCS's security interest in the BI Proceeds cannot be avoided under section 552(a). 11 U.S.C. § 552.

60. The Committee cannot credibly argue against section 552(b)'s application here. To the contrary, New York law is clear, and the Committee concedes, that a party perfects an interest in an insurance policy and the proceeds thereof "by 'having itself named in the insurance contract as the loss payee or as an additional insured on the risk.'" Comm. Br. ¶ 54 (citing *Badillo*, 92 N.Y.2d at 796). The Committee also concedes that the BI Policy "contains an endorsement naming ICBCS as a Loss Payee/Mortgagee," and the BI Policy names ICBCS as an additional insured as well. Comm. Br. ¶ 33; Newman Decl. Ex. 6 (Policy) at Additional Insured Provision.

61. Accordingly, before the Debtors' bankruptcy filing, ICBCS held a perfected security interest in both the BI Policy and any Proceeds thereof. As discussed above, the BI Proceeds are clearly "proceeds" of the BI Policy, as they are "collected on," and "distributed on account of," the BI Policy. NYUCC § 9-102(a)(64); *In re Tower Air, Inc.*, 397 F.3d 191, 197-98 (3d. Cir. 2005) (interpreting the term "proceeds" in section 552(b) consistently with the definition under the Uniform Commercial Code); *In re Premier Golf Props., L.P.*, 477 B.R. 767, 775 (B.A.P. 9th Cir. 2012). ICBCS's security interest in the BI Proceeds is therefore protected by section 552(b), and cannot be invalidated under section 552(a). *See In re McClean*, 132 B.R at 283-84 (holding that

security interests in insurance proceeds held by creditors named as loss payee and additional insured could not be invalidated under section 552).

62. The Committee's reliance on *Montreal II* is misplaced. Comm. Br. ¶ 40. The Committee erroneously asserts that "the First Circuit stated that *even if* the secured creditor had a perfected security interest in the debtor's business interruption policy under state law, the debtor's right to payment of the business interruption proceeds would be after-acquired property not subject to the exception in Section 552(b) because the insurer only agreed to pay the settlement after the initiation of the bankruptcy proceedings." *Id.* (purporting to cite *Montreal II*, 799 F.3d at 7) (emphasis in original). But the First Circuit said no such thing. Rather, the portion of *Montreal II* that the Committee cites addressed the secured creditor's argument that it held a perfected security interest under the Maine UCC in the right to payment that arose when the debtor's business interruption insurer settled the debtor's claim. *Montreal II*, 799 F.3d at 7. The First Circuit clarified that even if the Maine UCC enabled the secured creditor to hold such a perfected security interest (which the First Circuit rejected based on the Maine UCC's insurance exclusion), the interest could be avoided under section 552(a), because the insurer did not agree to settle until after the debtor's bankruptcy filing. *Id*. But the First Circuit went on to hold that the secured creditor had also failed to perfect its interest in the insurance policy under Maine common law, and thus, never addressed the impact section 552 might have had if it had done so. *Id.* at 10-11. That issue was expressly addressed by the court in *In re McLean,* however, which held that where, as here, a secured creditor is named as a loss payee or additional insured before the debtor's bankruptcy filing, the secured creditor's interest in the policy proceeds cannot be avoided under section 552. 132 B.R. at 283-284.

63. Moreover, ICBCS's security interest in the BI Proceeds is also protected by section 552(b) for the additional and independent reason that ICBCS held a prepetition security interest in

the Debtors' existing and future Accounts, and Money and General Intangibles relating to Accounts and Inventory, and the Proceeds thereof.[19] As discussed above, the BI Proceeds are "Proceeds" of these assets, and thus ICBCS's security interest in the BI Proceeds is protected by section 552(b) for this reason as well. *See supra* §§ I.A-I.D; 11 U.S.C. § 552(b).

64. The fact that the dollar amount of the BI Proceeds will be based on projected post-petition income does not void section 552(b)'s protection. To begin with, the BI Policy existed, and was subject to ICBCS's perfected security interest, before the Debtors filed for bankruptcy, and the BI Proceeds are plainly "proceeds" of the BI Policy. NYUCC § 9-102(a)(64). Further, it is well settled that a perfected security interest in insurance proceeds collected ***after*** a debtor's bankruptcy filing, on account of loss of or damage to collateral that occurred before the bankruptcy filing, cannot be invalidated under section 552. *See, e.g.*, *Tower Air*, 397 F.3d at 197-98; *McLean*, 132 B.R. at 284; *PPG Indus., Inc. v. Hartford Fire Ins. Co.*, 531 F.2d 58, 62 (2d Cir. 1976); *In re Megamarket of Lexington, Inc.*, 207 B.R. 527, 532 (Bankr. E.D. Ky. 1997). Notably, the Committee fails to cite a single case holding to the contrary. Rather, the Committee's cases stand for the wholly inapposite proposition that revenue generated solely from a debtor's postpetition provision of services do not fall within the section 552(b) exception. *See* Comm. Br. ¶¶ 44-46. These cases have no bearing here.

65. The Committee's contention that ICBCS will receive a "windfall" if its lien on the BI Proceeds is enforced is also unfounded. Comm. Br. ¶ 47. The Debtors have repeatedly acknowledged the critical role that the Intermediation Facility played in their emergence from the

---

[19] The Committee's characterization of ICBCS's prepetition collateral as only "a defined pool of feedstock and refined hydrocarbon product and accounts receivable which existed as of such date" is completely untethered to the expansive collateral package that was actually subject to ICBCS's security interests prior to the Debtors' bankruptcy. Comm. Br. ¶ 47; Newman Decl. Ex. 2 (ICBCS Pledge Agmt.) § 2.1.

Prior Chapter 11 Cases and their ongoing business.[20] As part of that critical arrangement, ICBCS required that the PES Parties maintain a business interruption policy naming ICBCS as a loss payee, mortgagee and additional insured, and agree that their obligations under the Intermediation Facility would be secured by, among other things, the BI Policy and the BI Proceeds. Newman Decl. Ex. 1 (SOA) §§ 10.04, 10.12(b), 14.04; Ex. 2 (ICBCS Pledge Agmt.) § 2.1. Thus, enforcing ICBCS's lien in the BI Proceeds is consistent with the Intermediation Facility approved by this Court, and is far from a windfall for ICBCS. *See In re PES Holdings LLC, et al.*, Case No. 18-10122 (KG) [D.I. 357] ¶ 58. To the contrary—permitting the Committee to invalidate ICBCS's lien on one of the primary components of its bargained-for collateral package, the existence of which is attributable, at least in part, to ICBCS, would effect a windfall for unsecured creditors.

### B. The BI Proceeds Are Not Property Of The Estate That May Be Recovered For General Unsecured Creditors

66. The Committee's section 552 challenge also fails because the BI Proceeds are not property of the estate that may be recovered for unsecured creditors. "[I]nsurance proceeds, when specifically assigned by a debtor *cannot* be reclaimed by the debtor." *McLean*, 132 B.R. at 284 (emphasis in original); *In re Moskowitz*, 14 B.R. 677, 680-81 (Bankr. S.D.N.Y. 1981) (holding that insurance proceeds assigned by the Debtors were not property of the estate). Loss payee, mortgagee, and additional insured provisions assign the debtor's rights to the insurance proceeds to the loss payee, mortgagee, and additional insured, at least to the extent of the interests that they hold. *See McLean*, 132 B.R. at 284; *Schleimer v. Empire Mut. Ins. Co.*, 337 N.Y.S.2d 872, 873 (N.Y. 1st Dep't 1972), *aff'd*, 352 N.Y.S.2d 429 (1974); *Tower Air*, 397 F.3d at 202. The proceeds subject to such an assignment are held by the debtor in trust for the loss payee/additional insured, and are therefore "not

[20] *See supra* nn. 4 & 16.

property of the estate" that a debtor (or a Committee standing in its stead) may obtain under section 552. *McLean*, 132 B.R. at 284; *see also In re Suter*, 181 B.R. 116, 119 (Bankr. N.D. Ala. 1994).[21]

**CONCLUSION**

For the foregoing reasons, ICBCS respectfully requests that the Court: (i) deny the Plaintiff and Committee Motions, and (ii) grant the ICBCS Motion.

Dated: November 1, 2019
Wilmington, Delaware

**ASHBY & GEDDES, P.A.**

*/s/ William P. Bowden*
William P. Bowden (#2553)
David F. Cook (#6352)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19801
Telephone: (302) 654-1888
Email: WBowden@ashbygeddes.com
DCook@ashbygeddes.com

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Richard I. Werder, Jr. (*pro hac vice*)
Jane Byrne (*pro hac vice*)
Deborah Newman (*pro hac vice*)
Andrew Soler (*pro hac vice*)
Zachary Russell (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010

*Counsel to ICBC Standard Bank Plc*

---

[21] The Committee also argues in its Motion that if the Court finds that the BI or PD Proceeds are Term Loan Priority Collateral, but the Agent's liens therein are unperfected, then the estate may step into the Agent's shoes as a priority lienholder under sections 551 and 544 of the Bankruptcy Code. *See* Comm. Br. ¶¶ 69-73. This argument is unripe, as it is conditioned on findings that the Court has yet to, and may never, make. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."). ICBCS reserves its right to respond to the argument should it ever become ripe.