IN THE UNITED STATES BANKARUPCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| PES HOLDINGS, LLC, *et al.*, | : | Case No. 19-11626 (KG) |
| | : | |
| Debtors | : | (Jointly Administered) |

| | | |
|---|---|---|
| PES HOLDINGS, LLC, *et al.,* and | : | |
| CORTLAND CAPITAL MARKET | : | |
| SERVICES, LLC, | : | |
| | : | |
| Plaintiffs and | : | |
| Counterclaim Defendants | : | |
| | : | |
| v. | : | |
| | : | |
| OFFICIAL COMMITTEE OF | : | |
| UNSECURED CREDITORS OF PES, INC.,: | | |
| | : | Adv. Pro. No. 19-50282 (KG) |
| Inventor-Defendant and | : | |
| Counterclaim and Cross- | : | |
| Claim Plaintiff | : | |
| | : | |
| and | : | |
| | : | |
| ICBC STANDARD BANK PLC, | : | |
| | : | |
| Defendant and Cross- | : | RE:  D.I.'s 32, 33, 37 |
| Claim Defendant | : | |

**OPINION**

## INTRODUCTION

In this Opinion the Court is addressing a complex dispute over the apportionment of business interruption insurance proceeds and property damage insurance proceeds following a catastrophic explosion at an oil refinery in Philadelphia, Pennsylvania. The battle for the proceeds is between and among (1) Debtors and their lender, Cortland Capital Market Services, LLC ("Cortland" or the "Term Loan Agent"), who are plaintiffs and counterclaim defendants, (2) ICBC Standard Bank, PLC, which, pursuant to an Intermediation Facility provided supplies and purchased refined product (oil and gas) from Debtors and is a defendant, counterclaim plaintiff, and cross-claim defendant ("ICBCS") , and (3) the Official Committee of Unsecured Creditors, which is an intervenor defendant and counterclaim and cross-claim plaintiff (the "Committee").

The Plaintiffs moved for judgment on the pleadings, which the Court is treating as a motion for summary judgment with Plaintiffs' consent; and ICBCS and the Committee have moved for summary judgment. In summary, the Court finds for reasons that follow that (1) ICBCS has a first priority lien and Cortland has a second priority lien on the business interruption insurance proceeds, (2) Plaintiffs and ICBCS share in the property damage insurance proceeds as explained, and (3) the Committee's claims are denied.

## FACTS

On August 7, 2019, Debtors[1] and Cortland (collectively, the "Plaintiffs") filed a complaint (the "Complaint" or "Compl.") against Defendant ICBCS regarding entitlement to insurance proceeds. Thereafter ICBCS counterclaimed against Plaintiffs and cross claimed against the Committee and the Committee intervened, cross-claimed, and counterclaimed.

Debtors' Background

The facts are largely undisputed, and the disputed facts are immaterial to the pending motions and this decision. Debtors have two main operational segments: refining and logistics. Compl. ¶ 19, D.I. 1. Debtors' principal asset is a refining complex located on an approximately 1,300-acre industrial site 2.5 miles from downtown Philadelphia, Pennsylvania (the "Refining Complex"). *Id.* at ¶ 16. The Refining Complex includes two interconnected refineries: the Girard Point Refinery and the Point Breeze Refinery. *Id.* at ¶ 17. The Refining Complex produced a full range of transportation fuels, such as gasoline and ultra-low sulfur diesel, as well as other refined products, including home heating oil, jet fuel, kerosene, residual fuel oil, propane, refinery grade propylene, butane, cumene, and sulfur. *Id.* at ¶ 18. These products were marketed and distributed by truck, rail, pipeline, and waterborne vessels throughout the northeastern United States, and by waterborne vessels to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PES Holdings, LLC (8157); North Yard GP, LLC (5458); North Yard Logistics, L.P. (5952); PES Administrative Services, LLC (3022); PES Energy Inc. (0661); PES Intermediate, LLC (0074); PES Ultimate Holdings, LLC (6061); and Philadelphia Energy Solutions Refining and Marketing LLC (9574).

international markets. *Id.* When fully operational, the Refining Complex has a distillation and refining capacity of approximately 335,000 barrels of crude oil per day. *Id.*

Catastrophe struck on June 21, 2019 when there was a large-scale explosion at the 433 alkylation unit (the "Alkylation Unit") of Debtors' Girard Point refining facility (the "Girard Point Incident"). *Id.* at ¶ 33. The Girard Point Incident left the Alkylation Unit destroyed and severely damaged surrounding fixtures and structures, rendering the Girard Point Refinery currently inoperable. *Id.* at ¶ 34. Following the Girard Point Incident, Debtors announced that they would cease operating the Refining Complex after the run-off through the Point Breeze Refinery of the limited inventory of crude oil on hand. Committee's Countercl. and Cross-Cl. ¶ 24, D.I. 24; Pls'. Resp. to Committee's Answer and Countercl. and Cross-Cl. ¶ 24, D.I. 29; ICBCS's Answer to Committee's Cross-Cl. ¶ 24, D.I. 27.

Procedural History

Debtors previously filed with the Court petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), on January 21, 2018. Case No. 18-10122; Compl. ¶ 31; ICBCS's Answer ¶ 31, D.I. 25; Committee's Answer ¶ 31, D.I. 24. On August 7, 2018, certain Debtors successfully emerged from the prior chapter 11 cases. Compl. ¶ 32; ICBCS's Answer ¶ 32; Committee's Answer ¶ 32. Notably, the August 2018 Plan of Reorganization conferred a number of benefits on Debtors, including access to a new Intermediation

Facility and Term Loan Facility. Compl. ¶ 32. Following the Girard Point Incident and before they closed the earlier cases, Debtors filed voluntary petitions for relief under the Bankruptcy Code on July 21, 2019.

The Insurance Proceeds

Debtors purchased an insurance program providing a total of $1.25 billion in coverage for property damage and business interruption losses during the period from November 1, 2018 through November 1, 2019 (respectively, "PD Policy" and "BI Policy," and collectively, the "Policy"). Compl. ¶ 58; ICBCS's Answer ¶ 58; Committee's Answer ¶ 58. The program comprises several insurance policies with different insurers (collectively, the "Insurers"), each of which insures a portion—be it primary, excess, or a quota share of the total—of the $1.25 billion coverage limit stipulated in the Policy. Compl. ¶ 59; ICBCS's Answer ¶ 59; Committee's Answer ¶ 59.

Each Insurer's policy follows—with minor deviations—a base insurance contract form. Compl. ¶ 60, Ex. H ("GSICA Policy"); ICBCS's Answer ¶ 60; Committee's Answer ¶ 60. The Policy lists Debtors, as "Named Insureds." Compl. ¶ 61, GSICA Policy at Declarations ¶ 1. The Policy includes both business interruption and property damage coverage and compensates for losses under both (respectively, "BI Proceeds" or "BI Recovery" and "PD Proceeds" or "PD Recovery"). GSICA Policy at Declarations ¶ 9.

The PD Policy insures against "all risk of direct physical loss or damage" occurring with respect to "Real and Personal Property of the Insured of every kind

and description," with certain enumerated types of property and perils expressly excluded. *Id.* at § I ¶¶ 1, 3. The "Business Interruption" provision in the "Time Element" section of the Policy covers "actual loss sustained by the Insured resulting from the necessary interruption of business caused by direct physical loss or damage, by a peril insured against, to property insured herein . . . ." *Id.* at § II ¶ 1.

Pursuant to the Policy, Debtors are entitled to BI Proceeds for covered losses sustained over a period not to exceed "twenty-four (24) months after application of the Retentions." *Id.* at § II ¶ 10(c). The Policy refers to the Retention for business interruption loss as a "waiting period" for recoverable losses of 60 days following "any one Occurrence." *Id.* at Declarations ¶ 6.

The Policy contains a "Loss Payable" clause, which states, "Loss, if any, shall be adjusted with and made payable to the first Named Insured, or their order, whose receipt will constitute a full release of the Insurers' liability under this Policy." *Id.* at Declarations ¶ 2. The Policy also contains a "Lenders Loss Payable Clause," which states, "Loss or damage, if any, under this Policy, shall be paid to any lender designated by the Insured and in possession of a written contract . . . as their interests may appear . . . ." *Id.* at General Conditions ¶ 33(a). Additionally, the Policy provides that:

It is agreed that the unqualified word 'Insured' wherever used includes any person or organization to whom or to which the Insured is obligated by virtue of a written contract to name such person or organization as an Additional Insured, but only with respect to operations performed by or obligations required of the Insured to or for the Additional Insured under the terms and conditions of said contract. The limits and/or coverage available to Additional Insured shall be those agreed to by

-5-

virtue of a written contract between the Insured and such Additional Insured but in no event to exceed the limits in aggregate and coverage provided by this Policy.

*Id.* at General Conditions ¶ 5.

Term Loan Agent's Interest

*1.  Term Loan Facility*

Debtors are the borrower under the approximately $698.6 million term loan facility by and among PES Holdings, the lenders from time to time (the "Term Loan Lenders"), and Cortland, as administrative agent , dated August 7, 2018 (the "Term Loan Facility").[2] Compl. ¶ 41; ICBCS's Answer ¶ 41; Committee's Answer ¶ 41. The Term Loan Facility is guaranteed by certain subsidiaries of Debtors . Compl. ¶ 44; ICBCS's Answer ¶ 44; Committee's Answer ¶ 44.

The Term Loan Facility financed Debtors' exit from the prior chapter 11 cases and was approved pursuant to the Court's order confirming the prior chapter 11 plan (the "Prior Confirmation Order").[3] Compl. ¶ 42. The Prior Confirmation Order provides that on the effective date of the prior chapter 11 plan, "the liens granted and contemplated by the New First Lien Term Loan Documents shall be valid, binding,

---

[2] A copy of the Term Loan Facility is attached to the Complaint as Exhibit B and thus all citations will refer to Exhibit B of the Complaint as the "Term Loan Facility."

[3] A copy of the Prior Confirmation Order is attached to the Complaint as Exhibit C and thus all citations will refer to Exhibit C of the Complaint as the "Prior Confirmation Order."

perfected, and enforceable liens on the collateral specified in the New First Lien Term Loan Documents for the benefit of the secured parties under the New First Lien Term Loan Documents." Prior Confirmation Order ¶ 84.

Under the Term Loan Facility, Debtors made an affirmative covenant to "maintain . . . insurance policies (i) insuring all real and personal property (including the inventory and equipment) against loss by fire, explosion, theft, and such other causalities as is customary in all material respects and available on commercially reasonable terms for companies in comparable industries as the Loan Parties . . . ." Term Loan Facility § 5.05(b). Debtors further covenanted to "name the Administrative Agent as insured party or loss payee with respect to applicable insurance policies." *Id.* at § 5.05(c). Additionally, Debtors covenanted to deliver:

> [A] copy of, or a certificate as to coverage under, and a declaration page relating to, the insurance policies required by Section 5.05 . . . which shall (1) be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgage endorsement (as applicable); [and] (2) name the Administrative Agent, on behalf of the Secured Parties, as additional insured . . . .

*Id.* at § 5.11(b).

The "Mandatory Prepayments and Commitment Reductions" section is a mandatory prepayment provision triggered upon certain Asset Sales or Recovery Events (as defined in the Term Loan Facility). *Id.* at § 2.06. The provision states, "[F]or the avoidance of doubt, any cash proceeds received from business interruption insurance shall not be required to be used by the Loan Parties to prepay the Loans under this Section 2.06(b)." *Id.* at § 2.06(b). Additionally, the definition of Recovery

Event states, "For the avoidance of doubt 'Recovery Event' shall not include proceeds received from business interruption insurance." *Id.* at § 1.01.

### 2. *Term Loan Security Agreement*

In conjunction with the Term Loan Facility, certain Debtors[4] executed a Pledge and Security Agreement with Cortland, dated August 7, 2018 (the "Term Loan Security Agreement").[5] Compl. ¶ 46.

The Term Loan Security Agreement is governed by New York law, Term Loan Security Agreement § 9.7; Term Loan Facility § 9.11, and incorporates the Uniform Commercial Code's ("the UCC") definition of "Accounts," "Inventory," "Money," and "Proceeds." Term Loan Security Agreement § 1.1(a). The agreement, however, includes its own definition of General Intangibles. In the Definitions section of the Term Loan Security Agreement, it states:

> General Intangibles shall mean, collectively, with respect to each Grantor, all "general intangibles," as such term is defined in the UCC, of the Grantor and, in any event, includes (i) all of such Grantor's rights, title and interest in, to and under all Contracts and insurance policies (including all rights and remedies relating to monetary damages, including indemnification rights and remedies, and claims for damages or other relief pursuant to or in respect of any Contract) . . . .

Term Loan Security Agreement § 1.1(c).

---

[4] The Grantors under the agreement are: PES Holdings, LLC; Philadelphia Energy Solutions Refining and Marketing LLC; PES Administrative Services, LLC; North Yard GP, LLC; and North Yard Logistics, L.P. Term Loan Security Agreement at signature page.

[5] A copy of the Term Loan Security Agreement is attached to the Complaint as Exhibit D and thus all citations will refer to Exhibit D of the Complaint as the "Term Loan Security Agreement."

Under the Term Loan Security Agreement, the Term Loan Agent received a collateral security interest in certain assets of each grantor, as enumerated in Section 2.1 of the Term Loan Security Agreement. Compl. ¶ 47. Pursuant to the Term Loan Security Agreement, the Term Loan Agent was granted a lien on, *inter alia*:

i)    all Accounts; (ii) all Inventory . . . ; (ii) all Money and Deposit Accounts (to the extent relating to the items in clauses (i) and (ii) above . . . .); (iv) . . . (C) General Intangibles . . . ; (v) all Letters of Credit and Letter-of-Credit-Rights . . . ; (vi) all Equipment; (vii) all Fixtures; (viii) all Intellectual Property; . . . and (xi) all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits, and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to such Grantor from time to time with respect to any of the foregoing.

Term Loan Security Agreement § 2.1.

### 3. Certificate

On November 1, 2018, Cortland, as Term Loan Agent, was issued an Evidence of Property Insurance Certificate ("Term Loan Agent Certificate").[6] Compl. ¶ 49. The Remarks on the Term Loan Agent Certificate state, "Certificate holder as administrative agent, along with its successors and assigns (hereinafter

---

[6] A copy of the Term Loan Agent Certificate is attached to the Complaint as Exhibit E and thus all citations will refer to Exhibit E of the Complaint as the "Term Loan Agent Certificate."

referred to as the Lender), is named, as applicable, additional insured, mortgagee, and loss payee as its interests may appear and where required by written contract." Term Loan Agent Certificate at p. 1. The Certificate further states:

> This evidence of property insurance is issued as a matter of information only and confers no rights upon the additional interest named below. This evidence does not affirmatively or negatively amend, extend or alter the coverage afforded by the policies below. This evidence of insurance does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the additional interest.

*Id.* The Additional Remarks of the Certificate restates the "Lenders Loss Payable Clause" as found in the Policy. Term Loan Agent Certificate at p. 2.

On July 3, 2019, Cortland and Debtors executed an Agreement on the Exercise of Remedies (the "Term Loan Facility Forbearance Agreement").[7] Compl. ¶ 70. The Preliminary Statement of the Agreement states:

> [T]he Loan Parties hereby acknowledge and agree that, subject to the Intercreditor Agreement, (i) all property insurance proceeds that any Loan Party is or may be entitled to (including, without limitation, casualty and business interruption insurance proceeds . . .) as a result of or in any manner related to the fire that occurred in the refinery operated by the Borrower and its Subsidiaries located in Philadelphia, Pennsylvania on or around June 21, 2019 (together with all events and occurrences related thereto, the "June 21 Incident" and such proceeds,

---

[7] A copy of the Term Loan Facility Forbearance Agreement is attached to the Complaint as Exhibit I and thus all citations will refer to Exhibit I of the Complaint as the "Term Loan Facility Forbearance Agreement."

the "Specified Insurance Proceeds") constitute Collateral securing the Obligations and (ii) the Secured Parties hold valid and perfected liens over any and all such Specified Insurance proceeds . . . .

Term Loan Facility Forbearance Agreement at Preliminary Statement.

*4. Mortgages*

Two of the Debtors each executed and delivered separate Open-End Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filings effective August 7, 2018 (the "Exit Mortgages"), and recorded the Exit Mortgages in the land records in Philadelphia, Pennsylvania.[8] Debtors also each executed and delivered separate Open-End Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statements and Fixture Filings, effective April 5, 2019 (the "Incremental Mortgages," collectively with the Exit Mortgages, the "Mortgages"), and recorded the Mortgages in the land records in Philadelphia, Pennsylvania.[9]

---

[8] Pls'. Mot. for J. on the Pleadings ¶ 11; Cortland-PES Open-End Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing ("Open-End Mortgage"), Property Parcel Nos: 884097045; 884097046; 884096503; 884096505; 884096507; 884096509; 884096506; 884096504; 884096704; 884096703; 884096702; 884096701; 884097200; 884214115; 884097130; 884097140; 884097110, Philadelphia, Pennsylvania recorded as Doc ID 53402701 on Aug. 10, 2018); Cortland-North Yard Open-End Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing ("North Yard Open-End Mortgage"), Property Parcel No: P/O 884097200, Philadelphia County, Pennsylvania (recorded as Doc ID 53402702 on Aug. 10, 2018). The Court may take judicial notice of the publicly recorded Mortgages because they are public records. *Stefanowicz v. SunTrust Mortg.*, No. 3:16-CV-00368, 2017 WL 1103183, at *1 (M.D. Pa. Jan. 9, 2017), *report and recommendation adopted*, No. 3:16-CV-00368, 2017 WL 1079163 (M.D. Pa. Mar. 22, 2017), *aff'd*, 765 F. App'x 766 (3d Cir. 2019); *Ahmed v. Wells Fargo Bank, NA*, No. CV 19-05316, 2020 WL 127718, at *1 (E.D. Pa. Jan. 9, 2020); *Pagano v. OneWest Bank, F.S.B.*, No. CV 11-00192 DAE-RLP, 2012 WL 74034, at *1 (D. Haw. Jan. 10, 2012).

[9] Cortland-PES Open-End Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing ("PES Incremental Mortgage"), Property Parcel Nos: 884097045; 884097046; 884096503; 884096505; 884096507; 884096509; 884096506; 884096504; 884096704; 884096703; 884096702; 884096701; 884097200; 884214115; 884097130; 884097140; 884097110, Philadelphia County, Pennsylvania (recorded as Doc ID 53497853 on April 9, 2019); Cortland-North Yard Open-End Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing ("North Yard Incremental Mortgage"), Property Parcel No: P/O 884097200,

-11-

Under the Mortgages, the Term Loan Agent received a lien on and security interest in, among other property, "all proceeds of any" insurance policy relating to "Real Estate or Equipment,"[10] "including the right to collect and receive such proceeds. . . ." Mortgages 3 at Granting clause § g; Pls'. Mot. for J. on the Pleadings ¶ 16, D.I. 37.

On August 8, 2018, the Term Loan Agent filed UCC-1 financing statements with the Delaware Department of State covering all of the assets of Debtors, disclosing its security interests in "[a]ll assets of the Debtor of every kind and nature, whether now owned or hereafter acquired and wherever located, and all proceeds and products thereof."[11]

---

Philadelphia County, Pennsylvania (recorded as Doc ID 53497854 April 9, 2019). The Court may take judicial notice of the publicly recorded Mortgages because they are public records. *Stefanowicz v. SunTrust Mortg.*, No. 3:16-CV-00368, 2017 WL 1103183, at *1 (M.D. Pa. Jan. 9, 2017), *report and recommendation adopted*, No. 3:16-CV-00368, 2017 WL 1079163 (M.D. Pa. Mar. 22, 2017), *aff'd*, 765 F. App'x 766 (3d Cir. 2019); *Ahmed v. Wells Fargo Bank, NA*, No. CV 19-05316, 2020 WL 127718, at *1 (E.D. Pa. Jan. 9, 2020); *Pagano v. OneWest Bank, F.S.B.*, No. CV 11-00192 DAE-RLP, 2012 WL 74034, at *1 (D. Haw. Jan. 10, 2012).

[10] In the documents, "Real Estate" is defined as "Land" and "Improvements." Mortgages 1, Background § (C). "Land" is defined as the parcels of real property described on Schedule A. *Id.* "Improvements" is defined as "the buildings, improvements, structures, and fixtures now or subsequently located on the Land." *Id.* In the documents, "Equipment" is defined as "all of the fixtures, chattels, business machines, machinery, apparatus, equipment, furnishings, fittings, appliances and articles of personal property of every kind and nature whatsoever, and all appurtenances and additions thereto and substitutions or replacements thereof (together with, in each case, attachments, components, parts and accessories) currently owned or subsequently acquired by Mortgagor and now or subsequently attached to, or contained in or used or usable in any way in connection with any operation or letting of the Real Estate, including but without limiting the generality of the foregoing, all screens, awnings, shades, blinds, curtains, draperies, artwork, carpets, rugs, storm doors and windows, furniture and furnishings, heating, electrical, and mechanical equipment, lighting, switchboards, plumbing, ventilating, air conditioning, and air-cooling apparatus, refrigerating, and incinerating equipment, escalators, elevators, loading and unloading equipment and systems, stoves, rangers, laundry equipment, cleaning systems (including window cleaning apparatus), telephones, communication systems (including satellite dishes and antennae), televisions, computers, sprinkler systems and other fire prevention and extinguishing apparatus and materials, security systems, motors, engines, machinery, pipes, pumps, tanks, conduits, appliances, fittings and fixtures of every kind and description, but excluding motor vehicles. . . ." Mortgages 2–3, Granting Clause § (d).

[11] Pls'. Mot. for J. on the Pleadings ¶ 11; Cortland-PES Administrative Services, LLC UCC-1 Financing Statement, Initial Filing No. 20185454844, Delaware Dept. of State (Aug. 8, 2018); Cortland-PES Holdings, LLC UCC-1 Financing Statement, Initial Filing No. 20185454885, Delaware Dept. of State (Aug. 8, 2018); Cortland-Philadelphia Energy Solutions Refining and Marketing LLC UCC-1 Financing Statement, Initial Filing No. 20185455056, Delaware Dept. of State (Aug. 8, 2018); Cortland-North Yard GP, LLC UCC-1 Financing Statement, Initial Filing

ICBCS's Interest

Debtors' earnings and cash flow from operations are primarily a function of the relationship between refined product prices for crude oil and other non-crude feedstocks, i.e., how much Debtors must pay for the refinery "inputs," and how much market participants are willing to pay for the refinery "outputs," like gasoline and other refined products. Compl. ¶ 24; Committee's Answer ¶ 24; ICBCS's Answer ¶ 24. Because of the structure of Debtors' operations, certain Debtors are party to a working capital arrangement that helps them run their business: the intermediation facility (defined *infra*). Compl. ¶ 25.

ICBCS, as the Intermediation Facility provider, supplies substantially all of the crude oil and non-crude feedstock requirements of the Refining Complex, purchasing these feedstocks from third parties that Debtors identify at prices based on pricing mechanisms that Debtors negotiate . Compl. ¶ 26; Committee's Answer ¶ 26; ICBCS's Answer ¶ 26. Once the inputs are refined, ICBCS purchases substantially all the barrels processed through the Refining Complex. Compl. ¶ 28; Committee's Answer ¶ 28; ICBCS's Answer ¶ 28. The price ICBCS pays for the refined output is based upon agreed pricing indexes for each refined product at the time of purchase. Compl. ¶ 28; Committee's Answer ¶ 28; ICBCS's Answer ¶ 28.

---

No. 20185455122, Delaware Dept. of State (Aug. 8, 2018); Cortland-North Yard Logistics, L.P. UCC-1 Financing Statement, Initial Filing No. 20185455320, Delaware Dept. of State (Aug. 8, 2018) The Court may take judicial notice of publicly filed financing statements. *Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001) ("A court may take judicial notice of an adjudicative fact if . . . [it is] generally known within the jurisdiction of the trial court, or [] capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *see, e.g.*, *In re Flickinger*, 2010 WL 4923933, at *3 (Bankr. M.D. Pa. Nov. 24, 2010) (taking judicial notice of the "existence and content of four UCC-1 financing statements" in ruling on a Rule 12(c) motion for judgment on the pleadings).

ICBCS then sells the refined product to third parties that Debtors identify and at prices Debtors negotiate. Compl. ¶ 28; Committee's Answer ¶ 28; ICBCS's Answer ¶ 28.

*Intermediation Facility*

On June 18, 2019, Debtors, including Debtor guarantors,[12] and ICBCS executed the Sixth Amended and Restated Supply and Offtake Agreement (the "Intermediation Facility").[13] Compl. ¶ 25; Committee's Answer ¶ 25; ICBCS's Answer ¶ 25. As an affirmative covenant under the agreement, Debtors agreed to "[k]eep its property insured at all times in accordance with the insurance requirements set forth in Schedule 10.04." Intermediation Facility § 10.04(b). Debtors further covenanted to "name ICBCS as mortgagee, additional insured and loss payee" on such insurance policies. *Id.* at § 10.04(c). Schedule 10.04 requires that Debtors maintain business interruption insurance and "shall name ICBCS as an additional insured as their interests may appear," *id.* at Schedule 10.04 § 11, and requires that Debtors maintain "Comprehensive Property Insurance" and "shall name ICBCS as a loss payee and as an Additional Insured as their interest may appear." *Id.* at Schedule 10.04 § 6. It also requires that Debtors "shall provide ICBCS with a certificate of insurance evidencing the required insurance and name ICBCS as additional insured as their interest may appear." *Id.* In addition, Debtors

---

[12] The Debtor guarantors are: PES Holdings, LLC; North Yard GP, LLC; North Yard Logistics, L.P.; and PES Administrative Services, LLC. Intermediation Facility at Signature Page.
[13] A copy of the Intermediation Facility is attached to the Complaint as Exhibit A and thus all citations will refer to Exhibit A of the Complaint as the "Intermediation Facility."

covenanted, with respect to the "Mortgaged Properties," to "deliver to ICBCS a copy of, or certificate as to coverage under, and a declaration page relating to, the insurance policies required by Section 10.04. . . ." *Id.* at §§ 10, 12(b).

### 1.  ICBCS Security Agreement

In addition to the Intermediation Facility, certain of the Debtors executed an Amended and Restated Pledge and Security Agreement among certain of the Debtors as Grantors[14] and ICBCS as SOA Collateral Agent, dated as of June 18, 2019 (the "ICBCS Security Agreement").[15] Compl. ¶ 53.

The ICBCS Security Agreement is governed by New York law, ICBCS Security Agreement § 10.7, and defines "Accounts," "Inventory," "Money," and "Proceeds" consistent with the New York UCC. *Id.* at §1.1(a). Like the Term Loan Security Agreement, however, the ICBCS Security Agreement includes its own definition of General Intangibles. In the Definitions section of the ICBCS Security Agreement, it states:

> "General Intangibles" shall mean, collectively, with respect to each Grantor, all "general intangibles," as such term is defined in the UCC, of the Grantor and, in any event, includes (i) all of such Grantor's rights, title and interest in, to and under all Contracts and insurance policies (including all rights and remedies relating to monetary damages,

---

[14] The Grantors under the agreement are Philadelphia Energy Solutions Refining and Marketing LLC; PES Administrative Services, LLC; PES Holdings, LLC; North Yard GP, LLC; and North Yard Logistics, L.P. ICBCS Security Agreement at Signature Page.

[15] A copy of the ICBCS Security Agreement is attached to the Complaint as Exhibit F and thus all citations will refer to Exhibit F of the Complaint as the "ICBCS Security Agreement."

including indemnification rights and remedies, and claims for damages or other relief pursuant to or in respect of any Contract) . . . .

ICBCS Security Agreement § 1.1(c).


Under the ICBCS Security Agreement, ICBCS received a collateral security interest in certain assets of each grantor, as enumerated in Section 2.1. Compl. ¶ 54. Pursuant to the ICBCS Security Agreement, Debtors granted ICBCS a lien on, *inter alia*, all the right, title and interest of such Grantor in, to and under the following property, wherever located, and whether now existing or hereafter arising or acquired from time to time:

> (i) all Accounts; (ii) all Inventory. . .; (iii) all Renewable Identification Numbers. . .; (iv) all Money and Deposit Accounts; (v) all Letters of Credit and Letter-of-Credit-Rights. . .; (vi) all Equipment; (vii) all Fixtures; (viii) all Trademarks;. . .(x) to the extent evidencing any of the foregoing, . . .(C) General Intangibles. . .; and (xii) all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits, and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to such Grantor from time to time with respect to any of the foregoing. . . .[ (the "SOA Pledged Collateral").]

ICBCS Security Agreement § 2.1(a).

*Certificate, Endorsement, and Prior Confirmation Order*

On November 1, 2018, ICBCS was issued an Evidence of Property Insurance Certificate ("ICBCS Certificate"),[16] stating that ICBCS was an "Additional Insured" and "Loss Payee/Mortgagee" under the Policy. Compl. ¶ 56. The Remarks of the ICBCS Certificate state, "Certificate holder is named mortgage, loss payee, and additional insured as their interests may appear and where required by written contract." ICBCS Certificate at p. 1. The Additional Remarks of the Certificate state: "It is hereby understood and agreed that the following entity is named as Loss Payee/ Mortgagee under this Policy, as their interests may appear, as required by written contract or agreement, subject to the terms and conditions of this Policy: ICBC Standard Bank PLC. . . ." *Id.* at p. 2.

The Certificate further states:

> This evidence of property insurance is issued as a matter of information only and confers no rights upon the additional interest named below. This evidence does not affirmatively or negatively amend, extend or alter the coverage afforded by the policies below. This evidence of insurance does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the additional interest.

*Id.* at p. 1. The Policy itself also contains four Endorsements, two of which are Loss Payee Clauses. GSICA Policy at Endorsements. In particular, one of the Endorsements, entitled "Loss Payee/Mortgagee – ICBC Standard Bank PLC,"

---

[16] A copy of the ICBCS Certificate is attached to the Complaint as Exhibit G and thus all citations will refer to Exhibit G of the Complaint as the "ICBCS Certificate."

states, "It is hereby understood and agreed that the following entity is named as Loss Payee / Mortgagee under this Policy, as their interests may appear, as required by written contract or agreement, subject to the terms and conditions of this Policy: ICBC Standard Bank PLC . . . ." *Id.* at Endorsements ¶ 4.

In addition, the Prior Confirmation Order provides the perfection of the security agreement. It states that, on the effective date of the plan, "the liens granted and contemplated by the New Intermediation Facility shall be valid, binding, perfected, and enforceable liens on the collateral specified in the New Intermediation Facility for the benefit of the secured parties under the New Intermediation Facility . . . ." Prior Confirmation Order ¶ 86.

On October 22, 2018 and June 18, 2019, ICBCS filed UCC-1 financing statements providing notice of its perfected security interests in SOA Pledged Collateral. Newman Decl. ¶ 8.

Intercreditor Agreement

On August 7, 2018, certain Debtors,[17] Cortland, ICBCS, and Merrill Lynch Commodities, Inc., executed an Intercreditor Agreement (the "Intercreditor Agreement").[18] Compl. ¶ 74. The Intercreditor Agreement is governed by New York law. Intercreditor Agreement § 8.06(a).

---

[17] The Grantors under the agreement are: PES Holdings, LLC; Philadelphia Energy Solutions Refining and Marketing LLC; PES Administrative Services, LLC; North Yard GP, LLC; and North Yard Logistics, L.P. Intercreditor Agreement at Annex 1.

[18] A copy of the Intercreditor Agreement is attached to the Complaint as Exhibit J and thus all citations will refer to Exhibit J of the Complaint as the "Intercreditor Agreement."

*1. SOA Separate Assets and Collateral*

Under the Intercreditor Agreement, ICBCS has an exclusive security interest in "SOA Separate Assets and Collateral," which include, in relevant part:

> (i) Certain Hydrocarbon Assets, (ii) Certain Refined Product Assets, (iii) Certain Rack Sale Refined Product Assets, (iv) Certain Hydrocarbon Receivables, (v) all Renewable Identification Numbers (other than those required to satisfy the obligations under the Consent Decree and Environmental Settlement Agreement entered into as of March 12, 2018 among the U.S., the U.S. Environmental Protection Agency and the Company), (vi) all payments under any insurance, indemnity, warranty, or guaranty of the foregoing . . . and (xi) all Proceeds of or with respect to the foregoing.

*Id.* at § 1.02. The definition further states, "It is understood and agreed that assets and property of a Grantor may from time to time constitute either 'Common Collateral' or 'SOA Separate Assets and Collateral' but shall not constitute both simultaneously." *Id.*

Furthermore, section 9.01, entitled "Agreements with Respect to SOA Separate Assets and Collateral," states, "[T]he Term Loan Agent . . . hereby agrees that, unless and until the Discharge of Supply and Offtake Obligations, none of the Term Loan Agent and the Term Loan Secured Parties shall have any Lien on any of the SOA Separate Assets and Collateral." *Id.* at § 9.01.

The Intercreditor Agreement also preserves the relative parties' priority in their respective collateral in the event of an avoidance of their interest. Section 2.01(c) states:

> Notwithstanding any failure by any Secured Party to perfect its Lien on the Common Collateral or any avoidance, invalidation or subordination by any third party or court of competent jurisdiction of the security interests in the Common Collateral granted to such Secured Party, the priority and rights among the Secured Parties with respect to the Common Collateral shall be as set forth herein.

*Id.* at § 2.01(c)

### 2, Common Collateral; SOA Priority Collateral; Term Loan Priority Collateral

The Intercreditor Agreement defines Common Collateral as "collectively, the SOA Priority Collateral and the Term Loan Priority Collateral." *Id.* at § 1.02. A party may have either a "First Priority Lien" or "Second Priority Lien" in Common Collateral, the latter being "expressly junior in priority" with respect to "any and all First Priority Liens." *Id.* at §§ 2.01(a), 4.01. The Intercreditor Agreement provides ICBCS and the Term Loan Agent first priority on an enumerated set of collateral.

The Intercreditor Agreement provides ICBCS with First Priority on SOA Priority Collateral. *Id.* at § 4.01. SOA Priority Collateral includes "all such Grantor's now existing or hereinafter arising (i) Accounts; (ii) Inventory, including all raw materials, work in process and unfinished goods, relating to any of the foregoing items in this clause (ii) (together with the items in clauses (i) and (ii) above, the Current Assets Collateral; (iii) all Money and Deposit Accounts relating to the foregoing," and, "to the extent related to Current Assets Collateral," "Documents,"

"Instruments," "General Intangibles," "Commercial Tort Claims," "Supporting Obligations," "Letters of Credit," and "Records." *Id.* at § 1.01. Furthermore, SOA Priority Collateral includes "all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to such Grantor from time to time with respect to any of the foregoing." *Id.*

The Intercreditor Agreement provides the Term Loan Agent with priority over Term Loan Priority Collateral, defined as "all 'Collateral' (as defined in the Term Loan Agreement) that is not SOA Priority Collateral or Excluded Property." *Id.* at §§ 1.01, 4.01. In the Term Loan Facility, Collateral is defined as "all property upon which a Lien is purported to be created by any Security Document, whether now owned or hereafter acquired." Term Loan Facility § 1.01.

The Intercreditor Agreement also defines "Accounts," "Inventory," "Money," "Proceeds," and "General Intangibles" in, relevant part, the same manner as the ICBCS and Term Loan Security Agreements. Intercreditor Agreement §§ 1.01, 1.02.

## PROCEDURAL POSTURE

In accordance with the milestones set forth in the DIP Credit Agreement and Interim Order,[19] on August 7, 2019, Debtors and the Term Loan Agent filed the

---

[19] On July 23, 2019, the Court entered an Interim Order pertaining to DIP Financing. Compl. ¶ 90. Included in the Order is language borrowed from the DIP Credit Agreement, stating that an "Event of Default" will be triggered, thereby "terminat[ing] the right of the Debtors to use Cash Collateral," if Debtors have not "(a) filed a motion seeking entry of the Insurance Proceeds Order, within 21 calendar days after the entry of the Interim Order; and/or (b) obtained

Complaint, initiating this adversary proceeding. The Complaint seeks a declaration that the June 21 Insurance Proceeds paid to Debtors under the Policy constitute Term Loan Priority Collateral as defined in the existing Intercreditor Agreement. Compl. ¶¶ 95–101. June 21 Insurance Proceeds is defined in the Complaint as "the insurance proceeds owed to the Insureds under the Policy as a consequence of the Girard Point Incident." Compl. ¶ 73. On November 4, 2019, Debtors and the Term Loan Agent filed a Motion for Judgment on the Pleadings seeking entry of a judgment in favor of Plaintiffs and against ICBCS and the Committee. Pls'. Mot. for J. on the Pleadings at Conclusion.

On September 13, 2019, ICBCS filed its Answer and Counterclaims, denying the cause of action asserted in the Complaint and asserting two Counterclaims. In its first Counterclaim, ICBCS seeks a declaration that any BI Proceeds paid on account of Debtors' claims under the BI Policy constitute SOA Priority Collateral. ICBCS's Answer and Countercls. ¶¶ 40–44. In its second Counterclaim, ICBCS seeks a declaration that it has a first-priority or exclusive lien, respectively, on any PD Proceeds paid on account of damage to Inventory or SOA Separate Assets and Collateral. Id. at ¶¶ 45–49.

Also on September 13, 2019, the Committee filed its Answer, Cross-claim, and Counterclaims in intervention.[20] In its Counterclaims and Cross-claim, the

---

entry of the Insurance Proceeds Order, within 90 calendar days after the entry of the Interim Order." Compl. ¶ 92. (citing Interim Order at ¶ 19(c)(xii); DIP Credit Agreement at 87). Under the DIP Credit Agreement, "Insurance Proceeds Order" is defined as "an order of the Bankruptcy Court determining that the June 21 Insurance Proceeds constitute 'Term Loan Priority Collateral'" as defined in the Intercreditor Agreement. Compl. ¶ 93.

[20] On September 11 and October 18, 2019, the parties agreed, and the Court ordered that the Committee was granted leave to intervene in the adversary proceeding and standing to prosecute causes of action related to the BI and PD insurances. D.I.'s 23 and 40.

Committee requests that the Court enter judgment against Debtors and Cortland, as Counterclaim-Defendants, and ICBCS, as Cross-claim Defendant, and an order that: (a) declares that pre-petition liens, including those of the Counterclaim and Cross-claim Defendants, on Debtors' assets do not attach to any after-acquired property, including without limitation, any BI Recoveries pursuant to Section 552(a) of the Bankruptcy Code; (b) avoids Cortland's pre-petition liens on any amounts received by Debtors in connection with any BI Recoveries pursuant to Section 544(a)(1) or (2) of the Bankruptcy Code; (c) avoids any of Cortland's pre-petition liens on any Real Property Recoveries pursuant to Section 544(a)(1) or (2) of the Bankruptcy Code; and (d) declares that any and all liens held by Cortland that are avoided hereunder are preserved for the benefit of Debtors estates with the senior priority which such liens would have had under applicable non-bankruptcy law and the Intercreditor Agreement pursuant to Section 551 of the Bankruptcy Code. Committee's Answer and Countercl. and Cross-cl. at Prayer for Relief.

On November 4, 2019, the Committee filed a motion for summary judgment seeking entry of an order: (i) denying the requested declaratory relief in the Complaint and ICBCS's Counterclaim; and (ii) granting the relief requested in the Committee's Counterclaims and Cross-claim. Mem. of Law in Supp. of Official Comm. of Unsecured Creditors' Mot. for Summ. J. ¶ 1, D.I. 34.

Also on November 4, 2019, ICBCS filed a motion for summary judgment seeking entry of an order: (i) denying the requested declaratory relief in the Complaint and Count I of the Committee's Cross-claim; and (ii) declaring that (a) any BI Proceeds paid on account of Debtors' claims under the BI Policy constitute SOA Priority Collateral, and (b) ICBCS has a first priority lien on all

PD Proceeds paid on account of Inventory and an exclusive lien on all PD Proceeds paid on account of SOA Separate Assets and Collateral. Opening Mem. of Law in Supp. of Mot. For Summ. J. of Def., Countercl. Pl. and Cross-cl. Def. ICBC Standard Bank PLC at Conclusion, D.I. 35.

## JURISDICTION AND VENUE

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. Further, the Court has personal jurisdiction over all Defendants pursuant to Bankruptcy Rule 7004(f). Venue properly lies in this district pursuant to 28 U.S.C. §§ 1408(a) and (b).

## SUMMARY OF ARGUMENT

Plaintiffs

The Plaintiffs argue that Cortland has a first-priority lien on the BI Proceeds and PD Proceeds[21] pursuant to the Intercreditor Agreement because the Proceeds do not constitute SOA Priority Collateral under the Intercreditor Agreement. Compl. ¶¶ 80–88.

---

[21] Cortland does not contest ICBCS' entitlement to PD Proceeds which ICBCS receives on its SOA Separate Assets and Collateral but does contest the collateral to which the PD Proceeds apply.

Term Loan Agents Security Interest in Debtors' insurance proceeds
<u>is perfected for three independently sufficient reasons.</u>

First, the Term Loan Agent is designated as an additional insured and loss payee on Debtors' insurance policies, and thus the Agent's security interest is perfected pursuant to New York insurance common law. Pls'. Mot. for J. on the Pleadings ¶ 2. According to *Granite Commercial Indus.*, LLC, 909 F. Supp. 2d 191,194 (E.D.N.Y. 2012), and *Firemen's Fund Am. Ins. Co. v. Ken-Lori Knits.*, 399 F. Supp. 286, 291 (E.D.N.Y. 1975), Under New York law, loss payees to insurance policies hold perfected security interests in the proceeds of such policies. *Id.* at ¶¶ 2, 35.

To substantiate their argument that Cortland is a loss payee under the Policy, Plaintiffs make three points. First, they direct the Court's attention to the Lenders Loss Payable Clause in the Policy, which states that Policy proceeds "shall be paid to any lender designated by the Insured and in possession of a written contract . . . as their interest may appear . . . ." *Id.* at ¶ 36 (citing GSICA Policy at General Conditions ¶ 33(a)). They then point to the Term Loan Security Agreement, which grants the Term Loan Agent a security interest in "any and all Proceeds of any insurance. . . ." *Id.* at ¶ 36 (citing Term Loan Security Agreement § 2.1). Because the Term Loan Security Agreement is a written contract reflecting the Term Loan Agent's interest in the Proceeds, Cortland is a loss payee under the Policy. *Id.* at ¶ 36. Second, they direct the Court's attention to the Term Loan Certificate, which further reflects the Term Loan Agent's status as an "Additional Insured" and "Loss Payee" under the Policy. *Id.* at ¶ 37 (citing Term Loan Agent Certificate at p. 1). Third, they direct the Court's attention to the Term Loan Facility Forbearance

Agreement, in which Debtors "further acknowledged the Term Loan Agent's security interest in the business interruption insurance proceeds . . . ." *Id.* (citing Term Loan Facility Forbearance Agreement at Preliminary Statement).

Second, the Term Loan Agent is perfected pursuant to Article 9 of the UCC because (a) the property insurance constitutes proceeds of the Term Loan Agent's perfected security interest in real estate (per the Mortgages) and in Equipment and Fixtures (as those terms are defined in the UCC); and (b) the business interruption proceeds are derivative of the Term Loan Agents' perfected security interest in Debtors' general intangibles. *Id.* at ¶ 3. Cortland perfected its security interest in the collateral underlying the BI Policy by filing the Mortgages and the UCC-1 financing statement covering "all assets of the Debtor of every kind and nature, whether now owned or hereafter acquired and wherever located, and all proceeds and products thereof." *Id.* at ¶ 40. Cortland has a perfected security interest in the PD Proceeds because those proceeds are derived from losses to Equipment and Fixtures, as well as real estate, pursuant to the Mortgages, all of which are the Term Loan Agents Collateral. Pls. Omnibus Resp. to ICBCS and Committee's Mots. for Summary J. ¶ 32, D.I. 44. According to *Holstlander* and *McLean*, New York courts applying Article 9 of the UCC have held that a perfected security interest in collateral will give the secured party a perfected security interest in the proceeds of insurance derived from loss to the collateral. Pls'. Mot. for J. on the Pleadings ¶ 42 (citing *In re Holtslander*, 507 B.R. 779, 783 (Bankr. N.D.N.Y. 2014) and *In re McLean Indus., Inc.*, 132 B.R. 271, 282 (Bankr. S.D.N.Y. 1991)). *Bell Fuel* and *MNC Commercial* provide that Cortland has a perfected security interest in those proceeds because both the property and business interruption insurance proceeds are derivative of the loss of Debtors' fixed assets, business, real estate, or their general intangibles. *Id.* at ¶

-26-

43 (citing *In re Bell Fuel Corp.*, 99 B.R. 602 (E.D. Pa. 1989) and *MNC Commercial Corp. v. Rouse*, 1992 WL 674733 (W.D. Mo. Dec. 15, 1992)).

Third, even if common-law insurance principles and the UCC did not provide perfection, the Term Loan Agent's interest was perfected by prior order of the Court and thus is judicially perfected. *Id.* at ¶ 3. Section 101(36) of the Bankruptcy Code, *Beverly Bank*, and *Glob. Safety* provide that a creditor need not file a financing statement or take any other steps under state law to perfect a security interest if a bankruptcy court issues an order perfecting that security interest. *Id.* at ¶¶ 47–49 (citing *Small v. Beverly Bank*, 936 F.2d 945, 948–49 (7th Cir. 1991) and *In re Glob. Safety Textiles Holdings LLC*, 2009 WL 7834658, at *11 (Bankr. D. Del. Sept. 21, 2009)). Plaintiffs direct the Court to the Prior Confirmation Order, which judicially perfected the Term Loan Agent's security interest in Debtor's insurance proceeds. *Id.* The Confirmation Order states, *inter alia*, that "the liens granted and contemplated by the" Term Loan Documents "shall be valid, binding, perfected, and enforceable liens. . . ." Prior Confirmation Order ¶ 84.

Term Loan Agent has priority over ICBCS with respect<br>to both the PD and BI Proceeds

The Proceeds are neither ICBCS's exclusive collateral nor its first-priority collateral. Pls'. Mot. for J. on the Pleadings ¶ 50. Because the Term Loan Agent has priority over all collateral not expressly listed in the Intercreditor Agreement as ICBCS's exclusive or priority collateral, the Term Loan Agent has priority over both the PD and BI Proceeds. *Id.*

The BI Proceeds are not ICBCS's exclusive collateral according to the Intercreditor Agreement. *Id.* at ¶¶ 51–54. Plaintiffs direct the Court to the Intercreditor Agreement, which provides ICBCS with an exclusive security interest in SOA Separate Assets and Collateral, consisting of certain hydrocarbons and the insurance on those hydrocarbons. Because, under the plain terms of the Policy, any loss of the hydrocarbons implicates the PD Policy and not the BI Policy, the SOA Separate Assets and Collateral provision does not confer any priority with respect to the BI Proceeds. *Id.* at ¶ 54.

Second, the BI Proceeds are not ICBCS's first-priority common collateral under the Intercreditor Agreement. *Id.* at ¶¶ 55–58. Plaintiffs direct the Court to the Intercreditor Agreement, which provides ICBCS with a first priority security interest in SOA Priority Collateral, which constitutes, *inter alia*, Accounts, Inventory, General Intangibles as they relate to Accounts and Inventory, and insurance proceeds related to the foregoing. *Id.* at ¶ 53. The BI Proceeds are not derivate of, or proceeds of, ICBCS's first-priority security interest in such collateral.

Regarding Inventory, Plaintiffs cite the UCC for the definition of Inventory, which defines the term as goods, which, "(A) are leased by a person or lessor; (B) are held by a person for sale or lease or to be furnished under a contract of service; (C) are furnished by a person under a contract of service; or (D) consist of raw materials, work in process, or materials used or consumed in a business." *Id.* at ¶ 56 (citing N.Y. UCC § 9-102(48)). Because business interruption insurance does not compensate for damage to products themselves, but rather compensates for the inability to operate the business in the future following a loss to property, the BI Policy is not derivative of Inventory. *Id.* at ¶ 56.

For Accounts, Plaintiffs cite the UCC definition of Accounts, which is the "right to payment of a monetary obligation" for "services rendered or to be rendered." *Id.* at ¶ 57 (citing N.Y. UCC § 9-102(a)(2)). According to *Montreal*, BI Proceeds do not fall under the definition of Accounts because a BI Policy "insures against the temporal absence of accounts" and does not insure the accounts themselves. *Id.* at ¶ 57 (citing *In re Montreal, Me. & Atl. Ry., Ltd.*, 521 B.R. 703, 710 (B.A.P. 1st Cir. 2014)). The BI Proceeds are neither derivative of General Intangibles related to Accounts nor are they Proceeds related to Accounts. Pls'. Reply ¶ 32, D.I. 52. The fact that ICBCS has a priority interest in the General Intangibles related to those then-existing Accounts, or the Accounts that would be generated from the collateral already purchased by ICBCS for Debtors, does not change the analysis because its interests are narrow, are cabined to current Accounts, and coverage does not extend to future Accounts that might hypothetically have come into existence, or to the remainder of Debtors' business. Pls. Omnibus Resp. to ICBCS and Committee's Mots. for Summary J. ¶ 56.

Even if ICBCS has an interest in BI Proceeds related to its first priority interest in SOA Priority Collateral, its interest would be limited to any diminution in value associated with the delayed processing and sale of ICBCS's then existing collateral at the time of the Girard Point Incident. Pls'. Mot. for J. on the Pleadings ¶ 58. Because the BI Policy does not cover the first sixty days of business interruption, to the extent ICBCS has an interest in the BI Proceeds, the value of its interest would be $0 because any alleged damages would fall within the deductible period and thus could not be the basis of any BI Proceeds. *Id.*

### Term Loan Agent has a first-priority interest in the BI Proceeds

Pursuant to *In re Heron* and *In re Anderson*, the BI Proceeds are derivative of Debtors' real estate, equipment, fixtures, and general intangibles. *Id.* at ¶ 60 (citing *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 683 (Bankr. D.D.C. 1992) and *In re Anderson*, 599 B.R. 504, 517 (D. Md. 2019)). Furthermore, because the real estate, equipment, fixtures, and general intangibles of Debtors' business are not SOA Priority Collateral or SOA Separate Assets and Collateral, the BI Proceeds are Term Loan Priority Collateral. *Id.* at ¶ 60. Providing Cortland with the BI Proceeds is "wholly consistent with the nature of the parties' relationship," as the Term Loan Lenders historically funded Debtors' ongoing business and capital improvements at the Refining Complex, while ICBCS supplied crude and non-crude feedstock. *Id.* at ¶ 61.

The plain language of the Policy and Intercreditor Agreement mandate that the BI Proceeds are Term Loan Priority Collateral. Pls. Omnibus Resp. to ICBCS and Committee's Mots. for Summary J. ¶ 58. First, proceeds of Term Loan Priority Collateral are also Term Loan Priority Collateral. *Id.* (citing Intercreditor Agreement § 1.02). Proceeds, include, *inter alia*, "insurance payable by reason of the loss . . . or damage to[] the collateral." *Id.* (citing N.Y. UCC § 9-102(a)(64)(D) and Intercreditor Agreement § 1.1). The Term Loan Agent's perfected interests in the recorded Mortgages include "all proceeds" or "insurance policies now or substantially obtained by" Debtors "relating to the Real Estate or Equipment." *Id.* (citing Mortgages, Granting Clauses § g). Plaintiffs then direct the Court's attention to the BI Policy, which covers "actual loss sustained by the Insured resulting from the necessary interruption of business caused by direct physical loss or damage, by a

peril insured against, to property insured herein . . . ." *Id.* (citing GSICA Policy at § 2 ). Thus, under the plain terms of the Policy, the insurance proceeds are "insurance payable by reason of loss" of the property under the Policy, and such property overwhelmingly comprises the real estate, fixtures, and equipment that are Term Loan Priority Collateral. *Id.* (citing GSICA Policy at § 1 ¶ 1).

Term Loan Agent Has Priority over ICBCS with Respect
to PD Proceeds for losses other than ICBCS's Hydrocarbons

Most of the PD Proceeds are the first-priority collateral of Cortland. Pls'. Mot. for J. on the Pleadings ¶¶ 63–64.  Plaintiffs point to the Intercreditor Agreement, which provides ICBCS with an exclusive lien on certain hydrocarbons and refined products generated therefrom, as SOA Separate Assets and Collateral, as well as a first-priority lien in related Accounts and Inventory, as SOA Priority Collateral. *Id.* at ¶ 63 (citing Intercreditor Agreement § 1.02). In contrast, Cortland has a first-priority lien on insurance related to all other Common Collateral, including all Fixtures and Equipment. *Id.* (citing Intercreditor Agreement § 1.02 and Term Loan Security Agreement § 2.1). Because the property damage sustained in the Girard Point Incident consists primarily of damage to the refining facility, as opposed to damage to hydrocarbons or refined products, the PD Proceeds are almost entirely the Term Loan Agent's priority collateral. *Id.* at ¶ 64.

Plaintiffs concede that, to the extent there are any PD Proceeds related to damage to ICBCS's exclusive collateral, or SOA Separate Assets and Collateral, ICBCS has priority over those proceeds. Pls. Omnibus Resp. to ICBCS and Committee's Mots. for Summary J. ¶ 61.

-31-

## ICBCS

### ICBCS has a first-priority security interest in all
### BI Proceeds paid on account of Debtors' claims under the policy

The BI Proceeds are SOA Priority Collateral because they are "Proceeds Of" (i) Current Assets Collateral, (ii) Money and General Intangibles relating to Current Assets Collateral, and (iii) insurance payable with respect to such assets.

In support of their contention, ICBCS directs the Court to the Intercreditor Agreement, which provides ICBCS with a first-priority security interest in SOA Priority Collateral. Opening Mem. of Law in Supp. of Mot. For Summ. J. of Def., Countercl. Pl. and Cross-cl. Def. ICBC Standard Bank PLC ¶ 64. They note that SOA Priority Collateral consists of, *inter alia*, Accounts and Inventory, or Current Assets Collateral, Money and General Intangibles relating to Current Assets Collateral, "Proceeds of" the foregoing assets, with "Proceeds" defined to include "whatever is . . . distributed on account of, collateral," and "insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral." *Id.* (citing Intercreditor Agreement § 1.02 and NYUCC § 9-10(a)(64)). The definition of SOA Priority Collateral contains, and thus ICBCS has a first-priority security interest on, all the assets representing Debtors' business income. *Id.* at ¶¶ 2, 65. Thus, the components of the SOA Priority Collateral definition mandate that the BI Proceeds are SOA Priority Collateral. *Id.* at ¶ 64.

In support of their argument, they direct the Court's attention to the BI Policy, which states it "covers actual loss sustained by the Insured resulting from [the]

interruption of business . . . ." *Id.* (citing GSICA Policy § II. 1) Pursuant to *MNC Commercial Corp.* and numerous secondary sources, the BI Policy and BI Proceeds are intended to provide Debtors with the business income they would have generated but for the Girard Point Incident. *Id.* (citing *MNC Commercial Corp.,* 1992 WL 674733 at *1; David B. Young, *The Rights of Secured Creditors to the Proceeds of Business Interruption Insurance Under UCC Article 9,* 26 U.C.C.L.J. 204, 205 (1994); R Wilson Freyermuth, *Rethinking Proceeds: The History, Misinterpretation and Revision of U.C.C. Section 9-306,* 69 Tul. L. Rev. 645, 690–91 (1995); 1 Law of Secured Transactions Under the UCC § 1.08[7][f] (3rd ed. 2019)). Because each of the business income assets constitutes SOA Priority Collateral, the BI Proceeds are also SOA Priority Collateral because they are "distributed on account of" and "insurance payable by reason of the loss of," the business income assets, which makes them Proceeds of the business income assets. *Id.* at ¶ 65 (citing Intercreditor Agreement § 1.02 and NYUCC § 9-102). The BI Proceeds are also SOA Priority Collateral because they are the "Proceeds of . . . insurance . . . payable . . . with respect to" the business income assets. *Id.* (citing Intercreditor Agreement § 1.02).

The BI Proceeds are also SOA Priority Collateral for the additional and independent reason that the BI Policy itself is SOA Priority Collateral, and the BI Proceeds are Proceeds of the BI Policy and "insurance . . . payable . . . with respect to" the BI Policy. *Id.* at ¶ 69 (citing Intercreditor Agreement § 1.02).

In support, ICBCS directs the Court's attention to the definition of SOA Priority Collateral, which, *inter alia*, includes "General Intangibles," "to the extent related to Current Assets Collateral." *Id.* at ¶ 70 (citing Intercreditor Agreement § 1.02). "General Intangibles," in turn, are defined to include all of PES Parties'

-33-

"rights, title and interest in, to and under all Contracts and insurance policies." *Id.* at ¶ 70 (citing Intercreditor Agreement § 1.02). And "Current Assets Collateral" is defined as Debtors' Accounts and Inventory—the assets that represent, embody, and are exchanged for the business income that the BI Policy and BI Proceeds are intended to replace. *Id.* at ¶ 70 (citing Intercreditor Agreement § 1.02 and *MNC Commercial. Corp.,* 1992 WL 674733, at *1). Thus, the BI Policy is a "General Intangible" related to Current Assets Collateral and therefore is SOA Priority Collateral. *Id.* at ¶ 70. Because the BI Policy is SOA Priority Collateral, the BI Proceeds are also SOA Priority Collateral as they are "Proceeds of" the BI Policy and "insurance . . . payable . . . with respect to" the BI Policy. *Id.* at ¶ 71.

ICBCS further directs the Court's attention to both ICBCS's Intermediation Facility and Cortland's Term Loan Facility, where ICBCS's first-priority lien status in the BI Proceeds is further demonstrated by the fact that ICBCS expressly required Debtors to maintain business interruption insurance naming ICBCS as an additional insured, loss payee, or mortgagee, while, in contrast, the Term Loan Lenders did not include business interruption insurance within the types of insurance they required Debtors to maintain. *Id.* at ¶ 72 (citing Intermediation Facility §§ 10.04, 10.12(b), 8.16; Schedules 10.04, 8.16 and Term Loan Facility § 5.05(b), 5.11(b)). The contrasting provisions demonstrate the parties' intentions with respect to the BI Proceeds. *Id.* at ¶ 73.

Furthermore, the Term Loan Lenders acknowledged that BI Proceeds constitute SOA Priority Collateral in the Term Loan Facility by failing to include BI Recovery as an event triggering a mandatory prepayment obligation. *Id.* at ¶ 74 (citing Term Loan Facility §§ 2.06, 1.01).

ICBCS has a first-priority or exclusive security interest in any
PD Proceeds paid on account of Inventory or
<u>SOA Separate Assets and Collateral</u>

ICBCS has a first-priority or exclusive  security interest in PD Proceeds paid on account of Inventory or SOA Separate Assets and Collateral, respectively. *Id.* at ¶ 75.

ICBCS directs the Court's attention to the Intercreditor Agreement, which defines SOA Priority Collateral to include Inventory, Proceeds of Inventory, and "insurance . . . payable . . . with respect to" Inventory, and which states "none of the Term Loan Agent or Term Loan Secured Parties shall have any Lien on any of the SOA Separate Assets and Collateral" until all SOA Obligations are discharged. *Id.* at ¶ 75 (citing Intercreditor Agreement §§ 1.02, 9.01; NYUCC 9-102(a)(64)). Thus, to the extent any PD Proceeds are paid on account of Inventory or Separate Assets and Collateral, such PD Proceeds are subject to ICBCS's first-priority or exclusive security interest, respectively. *Id.* at ¶ 75.

BI Proceeds are not property of the estate that may be
<u>recovered for general unsecured creditors</u>

Finally, the BI Proceeds are not property of the estate that may be obtained under Section 522. *McLean* and *Moskowitz* provide that insurance proceeds, when specifically assigned by a debtor, cannot be reclaimed by the debtor.  *Id.* at ¶ 80 (citing *In re McLean Indus., Inc.*, 132 B.R. 271, 284 (Bankr. S.D.N.Y. 1991) and *In re Moskowitz*, 14 B.R. 677, 680–81 (Bankr. S.D.N.Y. 1981)).    Furthermore,

-35-

*McLean, Schleimer* and *Tower Air* provide that loss payee, mortgagee, and additional insured provisions in an insurance policy assign the debtor's rights to the insurance proceeds to the loss payee, mortgagee, and additional insured, and thus the proceeds payable under such policy are not property of the estate. *Id.* (citing *McLean*, 132 B.R. at 284, *Schleimer v. Empire Mutual Ins. Co.*, 337 N.Y.S. 2d 872, 873 (N.Y. App. Term 1972), and *In re Tower Air, Inc.*, 397 F.3d 191, 202 (3d Cir. 2005)). Because ICBCS was named as a loss payee, mortgagee, and additional insured on the BI Policy, the BI Proceeds are not property of the estate that Debtors (or the Committee standing in their shoes) may obtain under Section 552. *Id.*

## The Committee

According to *In re Montreal,* any BI Recoveries would constitute property acquired by Debtors after the commencement of the chapter 11 cases because the recoveries would come into the estate post-petition and any such recoveries would be predicated on projected revenues and profits that would be generated only beginning more than one month after the commencement of the cases. Mem. of Law in Supp. of Official Comm. of Unsecured Creditors' Mot. for Summ. J. ¶¶ 3, 40–41 (citing Wheeling and Lake Erie Ry. Co. v. Keach (*In re Montreal, Maine, & Atl. Ry., Ltd.*), 799 F.3d 1, 7 (1st Cir. 2015)). Because the BI Recoveries would constitute property acquired by Debtors after the commencement of the cases, Section 552 of the Bankruptcy Code would mandate that any such recoveries would not be subject to the pre-petition security interests of ICBCS and Cortland. *Id.* at ¶¶ 40–47. Furthermore, any BI Recoveries would not constitute proceeds of collateral in which ICBCS and Cortland have a perfected lien because the BI Recoveries are intended

as compensation for revenues that would have been generated by Debtors based on their post-petition acts, services, and labor in refining crude oil. *Id.* at ¶ 46.

Second, even if the Court finds that the BI Recoveries are not after-acquired property under § 552 of the Code, Courtland nonetheless lacks a valid, duly perfected lien on the Policy or BI Recoveries. *Id.* at ¶ 4. Under New York law and *Badillo*, in order to obtain or perfect a security interest in the Policy, Cortland would have had to be expressly named as a loss payee in the Policy itself or an endorsement thereto. *Id.* at ¶¶ 52–56 (citing *Badillo v. Tower Ins. Co. of New York*, 709 N.E.2d 104, 107 (N.Y. 1999)). Because neither the Policy nor an endorsement thereto names Cortland as a loss payee, Cortland is unperfected, and any lien it purports to have is avoidable pursuant to §§ 544(a)(1) and (2) of the Code. *Id.* at ¶¶ 55–62.

Third, Cortland, as a result of its failure to be named as a loss payee, also lacks a perfected security interest in any PD Recovery received under the Policy in respect to the Alkylation Unit and related fixtures. *Id.* at ¶ 5. To the extent that Cortland could argue that it has an entitlement to the PD Proceeds on account of its mortgage on the Alkylation Unit and related fixtures, its liens on the PD Proceeds would still be avoidable under §§ 544(a)(1) and (2) of the Code because they would be subject to a judicial lien or execution under applicable state law. *Id.* at ¶¶ 64–67.

Finally, as a result of the avoidance of Cortland's unperfected lien on BI and PD Recoveries and the estate's status as a successor to Cortland in respect to such avoided and preserved lien under the Intercreditor Agreement, Debtors' estates are entitled to step in the shoes of Cortland with respect to the turnover provision of the Intercreditor Agreement that requires ICBCS to pay over to Cortland any BI or

PD Recoveries that ICBCS would be otherwise entitled to receive on account of its perfected security interest, and to specifically enforce that provision. *Id.* at ¶ 6, 69–73 (citing Intercreditor Agreement § 8.09).

## STANDARD OF REVIEW

The Plaintiffs moved for judgment on the pleadings while ICBCS and the Committee both moved for summary judgment. The attorney for Plaintiffs, when asked at oral argument, told the Court that it would be acceptable to convert the Plaintiffs' motion to a motion for summary judgment. Accordingly, the Court will consider Plaintiffs' motion as a motion for summary judgment, not only because of their attorney's concession, but also because of the number of documents which Plaintiffs attached to the Complaint and the fact that the opposing parties have moved for summary judgment. *See, e.g., Chase Manhattan Bank v. BCE Mobil Comm. Inc.*, 722 F. Supp. 2d 505, 506–07 (D. Del. 2010) (converting of motion for judgment on the pleadings to motion for summary judgment is appropriate under some circumstances).

Rule 56 of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 7056, provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56. The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.; see also Celotex Corp. V. Catrett*, 477 U.S. 317, 322 (1986). The burden is solely placed on the moving party to demonstrate no genuine issue of material fact exists, and if

properly shown, judgment will be granted in its favor. *Id.; see also Bailey v. United Airlines*, 279 F.3d 194, 198 (3d Cir. 2002). All the parties have argued that there are no material facts in dispute. Therefore, what is presented for the Court's consideration are legal issues.

New York law governs the Intercreditor Agreement, which is critical to the Court's decision. If the contract, *i.e.* the Intercreditor Agreement, is unambiguous, "the court can interpret the contract based on the plain and ordinary meaning of the terms." In such cases, summary judgment would be appropriate. *Tsoukanelis v. Country Pure Foods, Inc.*, 337 F. Supp. 2d 600, 605 (D. Del. 2004); *Money Fin. Servs. Ltd. v. Nova Info. Sys., Inc.*, 657 F. Supp 2d 447, 455 (S.D.N.Y. 2009) (explaining that if the result of a case depends upon the interpretation of a contract, the question is essentially a legal one determinable by summary judgment). A contract is unambiguous when there is not a reasonable difference of opinion. A contract is ambiguous if a reasonable reading allows for more than one possible meaning. *Breed v. Ins. Co. of N. Am.,* 46 N.Y.2d 351, 355 (N.Y. 1978); and *Roberts v. Consolidated Rail Corp.,* 893 F.2d 21, 24 (2d Cir. 1989).

## ANALYSIS

It is very evident from the Summary of Argument that the parties have submitted many issues and arguments for the Court's consideration. Some of the arguments raise valid concerns and some do not. The Court has taken all the arguments into account and will here address only those that raise serious concerns. Arguments the Court does not address are rejected. In the Court's thinking, there are four basic issues which lead to the correct decision and they are: (i) the nature

of business interruption ("BI") insurance, (ii) whether Cortland and/or ICBCS have perfected secured interests in the BI Proceeds and the PD Proceeds, (iii) who, as between Cortland and ICBCS, has priority to receive the BI Proceeds and the PD Proceeds, and (iv) whether the Term Loan Agent's and/or ICBCS's interests can be avoided. The answers to the foregoing questions will determine the outcome.

## Business Interruption Insurance

The Court largely adopts Plaintiffs' description of Debtors' insurance program. During the period from November 1, 2018, to November 1, 2019, Debtors' insurance program provides $1.25 billion for property damage ("PD") and business interruption ("BI") insurance. Several insurance policies with different insurers provide the coverage. Each policy followed a base form.

The PD insurance provides insurance for "real and personal property owned by the Insured." It includes vehicles, mobile equipment, underground pipelines, crude petroleum and natural gas products.

The BI coverage includes "actual loss sustained by the Insured resulting from the necessary interruption of business caused by direct physical loss or damage . . . . ." Policy, Section II, Time Element Coverage ¶1. The BI coverage begins sixty days after an incident and for as long as two years.

The Committee attempts to invalidate the BI Proceeds as after-acquired property under Bankruptcy Code § 552(a). As the Court will discuss *infra*, the Term Loan Agent and ICBCS both hold a perfected security interest in the BI Policy and

the BI Proceeds and therefore those interests cannot be avoided as after-acquired property. Section 552(b) provides that a security interest cannot be avoided if the after-acquired property is proceeds of collateral subject to a security interest which the secured creditor held prior to the bankruptcy and extends to the underlying collateral and its proceeds. Since both the Term Loan Agent and ICBCS held a security interest in the BI Policy and BI Proceeds as loss payee/mortgagee before the Petition Date, the BI Proceeds cannot be avoided. *In re McLean Indus., Inc.,* 132 B.R. 271, 284 (Bankr. S.D.N.Y. 1991). Also, a perfected security interest in insurance proceeds which are collected post-Petition because of loss or damage that occurred before the bankruptcy is not avoidable under Section 552. *See, e.g., In re Tower Air, Inc.,* 397 F.3d 197–98 (3d Cir. 2005); *PPG Indus., Inc. v. Hartford Fire Ins. Co.,* 531 F.2d 58, 62 (2d Cir. 1976). The Court will discuss the Committee's Section 552(a) avoidance argument in greater detail below.

There is another reason the Section 552(a) argument by the Committee cannot prevail. The BI Proceeds are not property of Debtors' estate. This argument, too, will be discussed below. The insurance proceeds were assigned to ICBCS and the Term Loan Agent as loss payee/ mortgagee and additional insured, and therefore Debtors—or the Committee—cannot recapture the proceeds. *Tower Air,* 397 F.3d at 202.[22]

---

[22] The Committee also argues that ICBCS, and presumably the Term Loan Agent, will receive a windfall if the lien on the BI Proceeds is enforced. However, the Intermediation Facility required Debtors to maintain the BI Policy naming ICBCS as loss payee. Moreover, Debtors' business has been interrupted by the Girard Point Incident and both Plaintiffs and ICBCS have suffered loss.

## PERFECTED SECURITY INTERESTS

### 1.    *Term Loan Agent*

Cortland, as the Term Loan Agent, claims a perfected security interest in the BI Policy in any one of three ways. The Court will discuss and evaluate what it finds is the most convincing path to perfection.

The BI Policy provides that New York law governs the Policy. New York law provides that creditors perfect security interests in insurance policies by being named loss payees. Cortland is a loss payee based on the Court's analysis.

The Policy lists Debtors as "Named Insureds." The Term Loan Agent is a loss payee because the Policy includes the pertinent provisions. First, the "Loss Payable" clause in the Policy provides that any loss "shall be adjusted with and made payable to the first Named Insured, or their order, whose receipt will constitute a full release of the insurers' liability under this Policy." Policy at Declarations ¶2. The Policy provides:

> Loss or damage, if any, under this Policy, shall be paid to any lender designated by the insured and in possession of a written contract, hereinafter referred to as "the Lender," as their interests may appear, its successors and assigns in whatever form or capacity its interests may appear and whether said interest be vested in said Lender in its individual or in its disclosed or undisclosed fiduciary or representative capacity, or otherwise, or vested in a nominee or trustee of said Lender.

*Id.* at General Conditions ¶ 33(a). The Term Loan Security Agreement is a "written contract" and Section 2.1 of the Term Loan Security Agreement states that "any and all Proceeds of any insurance" are for the benefit of the Term Loan Agent. The Court therefore finds that the Policy with the Term Loan Security Agreement provided Cortland with a perfected security interest in the Policy. Under New York law, loss payees to insurance policies hold perfected security interests in the proceeds of such policies. *See, e.g. Granite Com. Indus., LLC v. Landmark Am. Ins. Co.*, 909 F. Supp. 2d 191, 194 (E.D.N.Y. 2013) (explaining that loss payee on debtor's business interruption insurance policy held a perfected security interest in the policy); and *Firemen's Fund Am. Ins. Co. v. Ken-Lori Knits, Inc.*, 399 F. Supp. 286, 291 (E.D.N.Y. 1975) (designating a creditor as a loss payee beneficiary creates a superior claim).

Now, there is a certificate which names the Term Loan Agent as an additional insured and loss payee under the Policy. The certificate likely does not make Cortland a loss payee, but the certificate confirms Cortland's status and serves as a designation of that status.

The Term Loan Agent also claims a perfected security interest in the BI Policy on the basis that the Prior Confirmation Order, which the Court entered in Debtors' previous bankruptcy, provides that "the liens granted and contemplated by [loan documents in favor of the Term Loan Agent] shall be valid, binding, perfected and enforced liens . . . ." Prior Confirmation Order ¶ 84. Accordingly, the Prior Confirmation Order perfected the Term Loan Agent's security interest in the Policy proceeds.

The Committee argues that the Policy at issue is not the same policy in existence when the Court entered the Prior Confirmation Order, and that the power of the Prior Confirmation Order ended when the plan of reorganization became effective. The latter assertion is plainly wrong. The Term Loan Agent loaned many millions of dollars based on the Prior Confirmation Order. The other objection, that the Policy is a different policy than existed at the time the Court entered the Prior Confirmation Order, ignores the fact that the "new" policy was a continuation of the prior policy, not a brand-new policy.

The Committee also contends that the Prior Confirmation Order does not perfect the Term Loan Agent's security interest because it was not publicly filed and therefore did not give notice to others. The answer to the Committee's argument is that the Prior Confirmation Order was not a secret and was filed on a public record —the docket; and what is significant is that the insurer had notice of the Term Loan Agent's interest. The Certificate provided notice to the insurer. *See Genesis Merch. Partners, L.P. v. Gilbride, Tusa, Last & Spellane, LLC*, 69 N.Y.S.3d 30, 32 (N.Y. App. Div. 2018) (reasoning that notice to insurers indicates perfection.). The Term Loan Agent also has a perfected security interest because of the Prior Confirmation Order.

Lastly, the Term Loan Agent claims to have a perfected security interest under the UCC. According to the Term Loan Agent, because it has a broad interest in Debtors' business, including a lien on Debtors' general intangibles, it holds a perfected interest in Debtors' BI Proceeds. Its interest in the BI Proceeds is derivative of its collateral. The Court does not favor the Committee's objection to Cortland's UCC argument. The Term Loan Agent's perfected security interest in

-44-

the insurance proceeds arises because it has a security interest in all accounts, all inventory, equipment and on and on. The Term Loan Agent has a security interest in everything associated with Debtors and their business. Furthermore, Cortland has a security interest in "all proceeds and products of each of the foregoing . . . and any and all Proceeds of **insurance** . . . payable to such Grantor from time to time with respect to any of the foregoing." Term Loan Security Agreement § 2.1 (emphasis supplied).[23]

New York case law makes it clear that by having a security interest in collateral the Term Loan Agent obtained a perfected security interest in insurance proceeds resulting from the loss to collateral. Plaintiffs cite numerous cases which support the Court's finding. The cited cases include *In re McLean Indus., Inc.,* 132 B.R. 271, 282 (Bankr. S.D.N.Y. 1991) (reasoning that a creditor holding a perfected security interest in property also holds perfected security interest in the proceeds of that property); *MNC Com. Corp. v. Rouse,* 1992 WL 674733 (W.D. Mo. Dec. 15, 1992) (reasoning that a creditor holding broad security interest in business operations including general intangibles also held a perfected security interest in business interruption insurance proceeds); and *Meridian Bank v. Bell Fuel Corp. (In re Bell Fuel Corp.),* 99 B.R. 602 (E.D. Pa. 1989), *rev'g* 97 B.R. 193 (Bankr. E.D. Pa. 1989), *aff'd* 891 F.2d 281 (3d Cir. 1989) (reasoning that a creditor had an interest in the proceeds of business interruption insurance policy which were derivative of a loss of general intangibles which were the creditor's collateral).

---

[23] The Term Loan Agent also recorded mortgages and thereby perfected a security interest in "all proceeds of any" insurance policy relating to the real estate or Equipment "including the right to collect and receive such proceeds." Mortgages at 3 (granting clause (g)).

The Committee argues that because the Term Loan Agent's security interest is unperfected, it at most has an equitable lien on the PD Proceeds. The Committee claims that Debtors can avoid the lien pursuant to Bankruptcy Code Sections 544(a)(1) and (a)(2). Together with Bankruptcy Code Section 541, Debtors are then empowered to stand in Cortland's shoes and occupy Cortland's senior position for the BI and PD Proceeds. The Committee's argument fails because the Court has found that the Term Loan Agent has a perfected security interest.

## 2.    *ICBCS*

The Court finds that like the Term Loan Agent, ICBCS has a clear perfected security interest in the BI Policy and Proceeds. Like the Term Loan Security Agreement, the ICBCS Security Agreement gave ICBCS a blanket lien on all of Debtors' assets. The BI Policy has an endorsement which names ICBCS as a loss payee/mortgagee, and the BI Policy also names ICBCS as an additional insured. ICBCS therefore held a perfected security interest before Debtors filed the bankruptcy case. As such, ICBCS's interest includes the Proceeds of the BI Policy which means that ICBCS's security interests in the BI Policy and BI Proceeds are valid and are also safeguarded by Bankruptcy Code Section 552(b). It is settled law that insurance proceeds that are collected post-petition because of loss or damage to collateral that is covered by a pre-petition perfected security interest are also subject to a creditor's perfected security interest under Bankruptcy Code Section 552(b). *In re Tower Air, Inc.*, 397 F.3d 191, 197–98 (3d Cir. 2005); *see also In re Megamarket of Lexington, Inc.*, 207 B.R. 527, 532 (Bankr. E.D. Ky 1997) (reasoning that if debtor's right to receive a refund arose pre-petition then bank's security interest acquired post-petition would continue in proceeds).

The Court also agrees with ICBCS that the BI Proceeds are not property of the estate and cannot be recovered for unsecured creditors. The proceeds cannot be reclaimed. *In re Moskowitz*, 14 B.R. 677, 680–81 (Bankr. S.D.N.Y. 1981) (reasoning that insurance proceeds which debtors assigned were not property of the estate). Instead, the proceeds are held by debtor in trust for the loss payee insured. *McLean*, 132 B.R. at 284.

New York law provides that a party may perfect a security interest in an insurance policy by being named loss payee, mortgagee or additional insured. *See Badillo v. Tower Ins. Co. of N.Y.*, 92 N.Y.2d 790, 795–96 (N.Y. 1999) ("There is a much simpler road to travel [to perfect a security interest in insurance than via the UCC]. The secured party always has the conventional option of having itself named in the insurance contract as the loss payee or as an additional insured on the risk."). Indeed, the Committee conceded that ICBCS perfected its security interest in the BI Policy prior to Debtors' bankruptcy filing, and therefore Bankruptcy Code Section 552(b) is called into play and thereby serves to protect ICBCS's security interest in the BI Policy.

### 3.   *Priority*

Having found that both the Term Loan Agent and ICBCS have perfected security interests in the BI Policy, the Court must now determine who between them has the priority interest.

To begin, ICBCS and Debtors were counterparties to the Intermediation Facility by which (a) ICBCS supplied raw materials Debtors used in their business, (b) ICBCS purchased the refined product from Debtors, (c) ICBCS sold the refined product to parties Debtors identified or to Debtors, and (d) Debtors paid ICBCS for the intermediation services by paying for the raw materials and refined products sold. The Intermediation Facility was critical to Debtors' business. Motion for Implementation of Intermediation Facility ¶2, D.I. 485.

As noted earlier, ICBCS and Debtors entered into the Intermediation Facility on June 18, 2019. The Intermediation Facility required Debtors to maintain business interruption insurance naming ICBCS as an additional insured, loss payee and mortgagee in a minimum amount of $750 million.

Debtors and ICBCS also entered into the ICBCS Security Agreement whereby Debtors granted ICBCS a lien in substantially all of their assets (the "SOA Collateral"), including all Accounts and all Inventory (including all raw materials, work in process and finished goods), all Renewable Identification Numbers, all Money and Deposit Accounts, all Letters of Credit, all Equipment, all Futures, all Trademarks, all Equity Interests in subsidiaries, General Intangibles, Commercial Tort Claims, and all Proceeds.

Debtors also granted the Term Loan Agent a security interest in virtually the same collateral as granted to ICBCS. The Term Loan Security Agreement, by which Debtors gave the Term Loan Agent the security interests, uses the same terminology as do ICBCS's liens.

The Intercreditor Agreement followed, among Debtors, the Term Loan Agent, ICBCS and Merrill Lynch Commodities, Inc. The Intercreditor Agreement is governed by New York law.

The Court finds that by virtue of the Intermediation Facility, ICBCS Security Agreement, and the Intercreditor Agreement, ICBCS's liens have priority over the liens belonging to the Term Loan Agent. The Intercreditor Agreement clarifies the priority question, and the result favors ICBCS. The Court understands that SOA Priority Collateral is Accounts, Inventory, Proceeds and General Intangibles which, by definition, includes insurance policies and payment rights which are related to Accounts or Inventory. SOA Priority Collateral also includes Money relating to Accounts or Inventory, Proceeds from Accounts or Inventory and specifically "Proceeds of . . . insurance . . . payable . . . with respect to" the foregoing. The Court concludes that the BI Proceeds are derivative of SOA Priority Collateral. The BI Policy is a General Intangible.

There are several authorities which confirm that ICBCS has the priority interest in the BI Policy and BI Proceeds.[24] "The purpose of business interruption insurance is to protect the insured party against a loss of prospective earnings due to a business interruption. As such, business interruption insurance payments are derivative of and a substitute for the accounts and intangibles that Debtor would have generated but for the interruption." R. Wilson Freyermuth, *Rethinking Proceeds: The History, Misinterpretation and Revision of U.C.C.* Section 9-306, 69

---

[24] Plaintiffs' reliance on *In re Montreal, Me. & Atl. Ry., Ltd.*, 521 B.R. 703 (B.A.P. 1st Cir. 2014), *aff'd*, 799 F.3d 1 (1st Cir. 2015) does not help to remove ICBCS's priority. The decision held that a secured creditor did not hold a perfected security interest paid under a business interruption insurance policy. But the secured creditor held only a limited security interest and not the broad security interest ICBCS holds in almost all of Debtors' assets.

TUL. L. REV. 645, 90–91.  Further, "a security interest in accounts and general intangibles" is a debtor's business income "which is the subject matter of a business interruption insurance policy."  David B. Young, *The Rights of Secured Creditors to the Proceeds of Business Interruption Insurance Under UCC Article 9*, 26 U.C.C.L.J. 204, 205 (1994).

Plaintiffs' contention that the Term Loan Priority Collateral is a broad coverage of business assets while the SOA Priority Collateral is narrow coverage is a contention the Court cannot accept.  It should be recalled that the Term Loan Priority Collateral is partly defined as all collateral that is not SOA Priority Collateral or Excluded Property.  What is clear to the Court is that ICBCS's non-exclusive priority collateral, that is the SOA Priority Collateral, comprises all of Debtors' business assets.  The Term Loan Agent's priority collateral, *i.e.*, the Term Loan Priority Collateral, is primarily real estate, fixtures and equipment based on the Intercreditor Agreement.  Such collateral does not create a priority security interest in the proceeds from business interruption insurance.  *See Citizens Sav. & Loan Assoc. of N.Y. v. Proprietors Ins. Co.,* 78 A.D. 2d 377, 378.82 (N.Y. App. Div. 1981) (reasoning that a priority interest in real and personal property does not entitle a party to business interruption insurance).

The decision in *MNC Com. Corp. v. Rouse*, 1992 WL 674733 (W.D. Mo. Dec. 15, 1992) is also instructive and supportive of the Court's rationale.  There, the district court on appeal from the bankruptcy court, found that (a) MNC as the creditor held a "broad and comprehensive" security agreement covering all of the debtor's business operations and (b) the creditor took a security interest in the

business interruption insurance proceeds "based upon MNC's security interest in [debtor's] business assets, which would otherwise represent, embody and/or generate [debtor's] business income."

Clearly, business interruption insurance proceeds are meant to replace the business income that would have been generated in the absence of a shutdown. Business income "normally take the form of cash, accounts receivable or a chose in action," all of which ICBCS has a first-priority interest in pursuant to the ICBCS Security Agreement and Intercreditor Agreement, with the caveat that ICBCS has a first-priority interest in Debtors' Money and General Intangibles as they relate to Inventory or Accounts. MNC, 1992 WL 674733, at *1. Furthermore, like in MNC, ICBC also has a first-priority interest in Debtors' Inventory, which is the "tangible income-producing property of the business." Because ICBCS has a first-priority interest in Debtors' Accounts, Inventory, and General Intangibles and Money as it relates to Accounts and Inventory, ICBCS has a perfected security interest that takes priority over the Term Loan Agent's perfected security interest.

The Court understands, however, that ICBCS is very likely not entitled to all of the proceeds from the BI Proceeds, and ICBCS must not prejudice the rights of the Term Loan Agent to recover the remainder or even the bulk of the BI Proceeds for which the Term Loan Agent also has a perfected security interest. It is unlikely, perhaps inconceivable is more appropriate, that the insurers will negotiate with the Term Loan Agent and/or ICBCS without assurance of a full and final release. The Court believes that at some point it will have to hold an evidentiary hearing to determine how best to apportion the BI Proceeds based on the facts and the size of recovery of insurance proceeds. At this moment, there are no proceeds to divide.

-51-

## AVOIDANCE

The Committee, acting on behalf of all unsecured creditors, has attempted to defeat both Plaintiffs and ICBCS. The Committee's arguments are, at the first read, intriguing and caused the Court to read the Committee's briefs several times before recognizing that, in the instant case, the Committee is just wrong.

The Committee first argues that the BI Proceeds will be paid post-petition, are based on post-petition revenues, and are not proceeds from pre-petition collateral. Therefore, the BI Proceeds will be after-acquired property and, pursuant to Bankruptcy Code Section 552(a), "is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." Bankruptcy Code Section 552(a).

The argument is wrong (but argued zealously). The facts and applicable law show, without question, that both ICBCS and the Term Loan Agent have the safeguard which Bankruptcy Code Section 552(b) affords.[25] The facts support the Court's finding that Section 552(b) is applicable.

---

[25] Section 552(b) states in relevant part:

> [I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

Section 552(b) is an exception to Section 552(a), as it preserves security interests. If collateral was subject to a security interest before the bankruptcy, then the security interest extends to proceeds of that collateral that a debtor acquires after the bankruptcy. The BI Proceeds are proceeds of the BI Policy, and both the Term Loan Agent and ICBCS held a security interest in the BI Policy before the bankruptcy. The Term Loan Agent and ICBCS also had a pre-petition security interest in Debtors' Accounts, Inventory, Money, and General Intangibles, all income assets and also subject to the perfected security interests of the Term Loan Agent and ICBCS.

It is also the case that the BI Proceeds are not property of Debtors' estates. Insurance proceeds which a debtor assigns "*cannot* be reclaimed by the debtor." *McLean*, 132 B.R. at 284; *Moskowitz,* 14 B.R. at  677, 680–81 (reasoning that insurance proceeds a debtor assigns are not property of the estate and payment of the proceeds is not a voidable preference); *In re Suter*, 181 B.R. 116, 119 (Bankr. N.D. Ala. 1994) (reasoning that a loss payee means insurance proceeds are not property of the estate). Lastly, the Committee argues that BI Proceeds paid to ICBCS should be reduced by expenses. The argument fails because the BI Proceeds are reduced already. The BI Policy allows recovery of gross earnings less charges and expenses which do not necessarily continue during the interruption of business. The Court rejects the argument because if Plaintiffs and ICBCS are successful the amount the insurer pays will already be reduced.

**PD PROCEEDS**

ICBCS claims that it has a first priority or exclusive security interest in any PD Proceeds paid on account of Inventory or SOA Separate Assets and Collateral, respectively. Not surprisingly, the Term Loan Agent also claims priority to the property insurance proceeds, *i.e.* PD Proceeds. The Term Loan Agent argues that ICBCS has priority only on insurance proceeds related to certain hydrocarbons and their refined products. The property damage sustained at the refinery consists by-and-large of damage to the refining facility as opposed to damage to hydrocarbons or refined products.

The Court therefore finds that ICBCS has priority on the PD Proceeds related to SOA Separate Assets and Collateral and SOA Priority Collateral, which includes Inventory. The Term Loan Agent has priority on the PD Proceeds related to all other Common Collateral, which includes all Fixtures, Equipment, and pursuant to the Mortgages, Real Estate. Further, the damage sustained in the Girard Point Incident was largely to the refining facility and not to hydrocarbons or refined products.

The Court agrees with the Term Loan Agent. It has priority over the PD Proceeds for the facility. ICBCS has priority with respect to the hydrocarbons and refined products.

**CONCLUSION**

In conclusion, the Court has ruled that: (1) Plaintiffs' motion is denied in part (Cortland does not have priority over the BI Policy) and granted in part (Cortland has priority over the PD Policy except as it relates to SOA Separate Assets and

Collateral and SOA Priority Collateral); (2) ICBCS's motion is granted (ICBCS does have priority over the PD Policy as it relates to SOA Separate Assets and Collateral and SOA Priority Collateral and ICBCS has priority over the BI Policy); and (3) the Committee's motion is denied. The Court will issue an Order giving effect to the ruling.


DATE: *February 28, 2020*                     *Kevin Gross*.

KEVIN GROSS*
UNITED STATES BANKRUPTCY JUDGE

---

*     This opinion is my last as a bankruptcy judge. Reflecting upon the past fourteen years on the Bench, what strikes me is the creativity, excellence, hard work and civility of the many professionals who participated in the cases before me. I thank all for the honor and privilege of serving and wish you Shalom.