IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 19-11626 (LSS) |
| PES HOLDINGS, LLC, *et al.*, | : | Jointly Administered |
| | : | |
| Debtors. | : | |
| ———————————————————— | : | |
| CORTLAND CAPITAL MARKET SERVICES, LLC, | : | |
| | : | |
| Appellant, | : | Civ. No. 20-363 (RGA) |
| v. | : | |
| | : | |
| ICBC STANDARD BANK PLC., | : | |
| | : | |
| Appellee. | : | |

_____

### <u>MEMORANDUM OPINION</u>

Damian S. Schaible, James I. McClammy, David B. Toscano (argued), Aryeh Ethan Falk, Davis Polk & Wardwell LLP, New York, New York; Robert J. Dehney, Andrew R. Remming, Paige N. Topper, Morris Nichols Arsht & Tunnell LLP, Wilmington, Delaware, attorneys for Appellant Cortland Capital Market Services, LLC.

Richard I. Werder, Jr., Deborah Newman (argued), David M. Cooper, Zachary Russell, Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York; William P. Bowden, Stacy L. Newman, Ashby & Geddes, P.A., Wilmington, Delaware, attorneys for Appellee ICBC Standard Bank Plc.

January 4, 2021

/s/ Richard G. Andrews
**ANDREWS, UNITED STATES DISTRICT JUDGE:**

This appeal arises in the Chapter 11 bankruptcy cases of PES Holdings, LLC (together with certain affiliates, "Debtors") and concerns which of two secured creditors—ICBC Standard Bank Plc ("ICBCS") or Cortland Capital Market Services, LLC ("Appellant")—has the first priority interest in business interruption insurance proceeds ("BI Proceeds") following a catastrophic explosion at the Debtors' oil refinery in Philadelphia.  Appellant initiated an adversary proceeding seeking declaratory relief, and the parties filed summary judgment motions.  On February 28, 2020, the Bankruptcy Court issued its Opinion, *In re PES Holdings, LLC,* 2020 WL 1047768 (Bankr. D. Del. Feb. 28, 2020) and accompanying Order (Adv. D.I. 67).[1]  The Court held that the answer to this dispute is controlled by an intercreditor agreement governing the relative priority of ICBCS's and Appellant's interests in the Debtors' assets, and that the intercreditor agreement unambiguously provides that ICBCS has the first priority interest.  For the reasons set forth below, the Court will affirm the Order.

I.    **BACKGROUND**

A.    **Prior Chapter 11 Cases**

The Debtors' principal asset was a refining complex located on a 1,300 acre industrial site 2.5 miles from downtown Philadelphia, which included two interconnected refineries: Girard Point and Point Breeze.  (CA0004, Compl. ¶¶ 16-17)  The Refining Complex produced a full range of transportation fuels, which were marketed throughout the northeastern U.S. and to

---

[1] The docket of the Chapter 11 cases, captioned *In re PES Holdings, LLC*, No. 19-11626 (LSS) (Bankr. D. Del.), is cited herein as "Bankr. D.I. __."  The docket of the adversary proceeding, captioned *PES Holdings, LLC v. ICBC Standard Bank Plc.,* Adv. No. 19-50282 (LSS) (Bankr. D. Del.), is cited herein as "Adv. D.I. __."  The appendix (D.I. 15-23) filed in support of Appellant's opening brief is cited herein as "CA__," and the appendix (D.I. 27) filed in support of ICBCS's answering brief is cited herein as "IA__."

international markets. (CA0004-5, Compl. ¶ 18; CA1482, ¶ 18). On January 21, 2018, certain Debtors filed petitions for relief under the Bankruptcy Code (the "Prior Chapter 11 Cases").

### 1. Intermediation Facility

A critical component of the Debtors' emergence from their Prior Chapter 11 Cases was ICBCS's agreement to provide intermediation services to the Debtors (the "Intermediation Facility"). (CA1701, Declaration of Deborah Newman ¶ 4). The record reflects that the Debtors repeatedly represented that the Intermediation Facility was crucial to their continued business operations because it "provides, among other things, the working capital necessary for the Debtors to operate the refinery."[2] Pursuant to the documents governing the Intermediation Facility, ICBCS exclusively sourced and purchased raw materials and other feedstock from third parties to be refined by the Debtors, in order for the Debtors to supply ICBCS with refined products. (CA1701, ¶ 4). ICBCS maintained title to the raw inventory until the product was ready to be refined, and then sold the inventory to the Debtors. (*Id*). Once the product was refined, ICBCS purchased the refined product and coordinated the sale of the product with the Debtors' assistance. (*Id*). Each day, ICBCS netted the value of the raw materials it supplied against the value of the refined product it received, deducted an agreed margin, and deposited the net amount into a cash collateral account held by the Debtors and subject to ICBCS's first priority security interest. (*See id*. ¶ 5). This arrangement enabled the Debtors to reduce their working capital requirements significantly and provided a stable source of raw materials, both of which were critical to the Debtors' emergence from their Prior Chapter 11 Cases. (*Id*.)

---

[2] CA0006, Complaint ¶ 29; *see also* IA028-29, Motion for Intermediation Contracts (Bankr. D.I. 22) ¶¶ 9, 12-13 (Case No. 18-10122 (KG)) ("The Intermediation Contracts … are critical to the operations of the Debtors' business."); IA043, Motion to Modify Plan (Bankr. D.I. 449) ¶ 1 (Case No. 18-10122 (KG)) ("The viability of the Debtors' businesses is substantially dependent on their ability to have access to intermediation arrangements."); IA054, Motion for Implementation of Intermediation Facility ¶ 2 (Bankr. D.I. 485) (Case No. 18-10122 (KG)) ("The new intermediation facility [with ICBCS] is critical to the Debtors' business.").

Services provided in connection with the Intermediation Facility required ICBCS to enter into numerous contracts with third parties—including transportation requirements to get raw materials to the Debtors and refined products from the Debtors, as well as the implementation of significant infrastructure—which exposed ICBCS to significant potential liability in the event that the refinery shut down unexpectedly.  As part of the Intermediation Facility, on June 18, 2019, ICBCS and certain of the Debtors (the "PES Parties") entered into the Sixth Amended and Restated Supply and Offtake Agreement (the "SOA").  (*See id.* ¶ 6).  The SOA required the PES Parties to maintain business interruption insurance naming ICBCS as an additional insured, loss payee, and mortgagee, as well as property insurance so naming ICBCS.  (*See* CA1810, 1818-19, 1823-24, 2201, 2208 (SOA §§ 10.04, 10.12(b), 8.16, Schedules 10.04, 8.16)).

## 2.  ICBCS Pledge Agreement

To secure the PES Parties' obligations under the SOA, the PES Parties and ICBCS entered into the "ICBCS Pledge Agreement," through which the PES Parties granted ICBCS a lien on substantially all of their assets (the "SOA Pledged Collateral").  (*See* CA2284-86, ICBCS Pledge Agmt. § 2.1).  The SOA Pledged Collateral consists of all of the PES Parties':

> right, title, and interest ... in, to and under the following property; wherever located, and whether now existing or hereafter arising or acquired from time to time ... :

  i.     all Accounts;

  ii.    all Inventory, including all raw materials, work in process and finished goods, relating to any of the foregoing items in this clause (ii);

  iii.   all Renewable Identification Numbers wherever located;

  iv.    all Money and Deposit Accounts;

  v.     all Letters of Credit and Letter-of-Credit Rights supporting payment of any of the foregoing;

  vi.    all Equipment;

  vii.   all Fixtures;

  viii.  all Trademarks;

4

ix.     all Equity Interests in each Subsidiary directly owned by such Grantor as of the date hereof …;

x.     to the extent evidencing any of the foregoing, (A) Documents, (B) Instruments, (C) General Intangibles, (D) Commercial Tort Claims, and (E) Supporting Obligations and all other forms of obligations owing to any Grantor or in which any Grantor may have any interest …;

xi.     to the extent not otherwise included above, all Records evidencing any of the foregoing; and

xii.     all Proceeds and products of each of the foregoing …

(*Id.*)  The ICBCS Pledge Agreement is governed by New York law, and defines "Accounts," "Inventory," "Money," and "Proceeds" consistent with the New York Uniform Commercial Code ("NYUCC").   (CA2277, 2310, §§ 1.1(a), 10.7).  The ICBCS Pledge Agreement's definition of "General Intangibles" includes the NYUCC definition but also goes beyond it, and expressly includes (among other things) insurance policies:

> (i) *all of such Grantor's rights, title and interest in, to and under* all Contracts and *insurance policies* (including all rights and remedies relating to monetary damages, including indemnification rights and remedies, and claims for damages or other relief pursuant to or in respect of any Contract) ….

(CA2280, § 1.1(c) (emphasis added)).

### 3.  Term Loan Credit Agreement

On August 7, 2018, PES Holdings, on behalf of itself and the other PES Parties, entered into the "Term Loan Credit Agreement" with Appellant and certain lenders (together with their successors-in-interest, the "Term Loan Lenders"), pursuant to which PES Holdings borrowed $619,500,000.   Unlike the SOA, the Term Loan Credit Agreement requires that the PES Parties maintain insurance covering only real and personal property, and that "such insurance" "name the … Agent [Appellant] as insured party or loss payee" and additional insured.  (CA2404-05, 2409 Term Loan Credit Agmt. § 5.05(c); 5.11(b)).  The Term Loan Credit Agreement does not require that the PES Parties maintain business interruption insurance.  (*Id.*)  In conjunction with

the Term Loan Credit Agreement, on August 7, 2018, the PES Parties and Appellant entered into the "Term Loan Pledge Agreement," granting Appellant security interests in substantially the same collateral (the "Common Collateral") as those subject to ICBCS's security interests. (CA2988-89, § 2.1).

### 4. The Intercreditor Agreement

In connection with the SOA and Term Loan Credit Agreement, Appellant, ICBCS, and the PES Parties entered into the Intercreditor Agreement, which governs the relative priority of Appellant's and ICBCS's interests in the Common Collateral.  The Intercreditor Agreement is governed by New York law.  (CA3060, § 8.06(a)).  The Intercreditor Agreement provides that (i) ICBCS will have a first priority security interest, and Appellant will have a second priority security interest, in "SOA Priority Collateral," and (ii) Appellant will have a first priority security interest, and ICBCS will have a second priority security interest, in "Term Loan Priority Collateral," which consists of everything that is not SOA Priority Collateral (CA3050, § 4.01). "SOA Priority Collateral" is defined as each PES Party's "*now existing or hereinafter arising*":

(i)     *Accounts*;

(ii)    *Inventory, including all raw materials, work in process and finished goods, relating to any of the foregoing items in this clause (ii)* (together with the items in clauses (i) and (ii) above, the "Current Assets Collateral");

(iii)   *all Money and Deposit Accounts relating to the foregoing*;

(iv)    all of the following: (A) to the extent evidencing Current Assets Collateral, Documents, (B) to the extent evidencing Current Assets Collateral, Instruments, (C) *to the extent related to Current Assets Collateral, General Intangibles*, (D) to the extent related to Current Assets Collateral, Commercial Tort Claims, and (E) to the extent related to Current Assets Collateral, Supporting Obligations and all other forms of obligations owing to any Grantor or in which any Grantor may have any interest, however created or arising and whether or not earned by performance;

(v)     all Letters of Credit and Letter-of-Credit Rights supporting payment of any Current Assets Collateral;

(vi)    to the extent not otherwise included above, all Records evidencing any of the foregoing; and

(vii)    *all Proceeds and products of each of the foregoing* and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and *any and all Proceeds of any insurance*, indemnity, warranty or guaranty *payable to such Grantor from time to time with respect to any of the foregoing.*

(CA3033, § 1.02 (emphasis added)).  The Intercreditor Agreement defines "Accounts," "Inventory," "Proceeds," "Money," and "General Intangibles" in the same manner as the ICBCS Pledge Agreement.  "Term Loan Priority Collateral" is defined as all "Collateral that is *not* SOA Priority Collateral or Excluded Property."  (CA3050, § 1.02 (emphasis added)).[3]

### 5.  The Policy

On January 18, 2019, the XL Insurance America, Inc. issued Insurance Policy No. US00064117PR18A (the "Policy") to the PES Parties and their affiliates for the period November 1, 2018 to November 1, 2019.  The Policy includes both property damage coverage (the "PD Policy") and business interruption coverage (the "BI Policy").  (*See, e.g.*, CA3095 at ¶ 9).  Though they are two parts of a single policy, the PD Policy and BI Policy insure against different risks and are set forth in entirely separate sections of the Policy.  The PD Policy, set forth in Section I of the Policy ("Section I"), insures against "all risks of direct physical loss or damage" occurring with respect to "Real and Personal Property of the Insured of every kind and description," with certain enumerated types of property and perils expressly excluded.  (CA1351, § 1, ¶¶ 1, 3).  The BI Policy, set forth at Section II of the Policy ("Section II"), insures against "actual loss sustained by the Insured resulting from the necessary interruption of business caused by direct physical loss or damage, by a peril insured against, to property insured herein…."  (CA1373, § 2, ¶ 1).

### B.    Current Chapter 11 Cases

---

[3] The Intercreditor Agreement sets forth certain assets that are subject to ICBCS's exclusive security interest.  (CA3050, 3063, Intercreditor Agmt. §§ 1.02; 9.01).  Such assets are not at issue in this appeal.

On June 21, 2019, a catastrophic explosion occurred at the Debtors' Girard Point refining facility (the "Big Explosion"). (CA1703). Shortly thereafter, the Debtors announced that they would cease operating their refining complex, and re-entered bankruptcy on July 21, 2019. (*Id.*) The Debtors are currently in the process of collecting on their claims under both the PD Policy and the BI Policy for losses caused by the Big Explosion. (CA1704). As part of the Debtors' bankruptcy cases, on July 23, 2019, the Bankruptcy Court entered an order authorizing the Debtors to enter into debtor-in-possession financing with the Term Loan Lenders on an interim basis (the "Interim DIP Order"). (IA063). The Interim DIP Order required that the Debtors seek entry of an order determining that all proceeds of the Policy paid in connection with the Big Explosion (the "June 21 Insurance Proceeds") constitute "Term Loan Priority Collateral." (IA106, ¶ 19(c)(xii)).[4]

C.     **The Adversary Proceeding**

On August 7, 2019, the Debtors and Appellant initiated an adversary proceeding seeking a declaration that all June 21 Insurance Proceeds constitute Term Loan Priority Collateral. (*See* CA0018-19, Compl. ¶¶ 95-101). ICBCS answered the complaint, and asserted a counterclaim seeking a declaration that the BI Proceeds are SOA Priority Collateral. ICBCS moved for summary judgment and the Debtors and Appellant moved for judgment on the pleadings on the issue of whether the BI Proceeds constitute SOA Priority Collateral or Term Loan Priority Collateral. After oral argument, the Bankruptcy Court issued the Opinion and Order granting summary judgment to ICBCS and declaring that "ICBCS's liens [in the BI Proceeds] have priority over the liens belonging to the Term Loan Agent." *PES Holdings,* 2020 WL 1047768, at *22. The Bankruptcy Court stated:

> Clearly, business interruption insurance proceeds are meant to replace the business income that would have been generated in the absence of a shutdown. Business income

---

[4] The insurance proceeds paid on the PD Policy ("PD Proceeds") are not at issue in this appeal.

"normally take the form of cash, accounts receivable or a chose in action," all of which ICBCS has a first-priority interest in pursuant to the ICBCS Security Agreement and Intercreditor Agreement, with the caveat that ICBCS has a first-priority interest in Debtors' Money and General Intangibles as they relate to Inventory or Accounts…. ICBCS also has a first-priority interest in the Debtors' inventory, which is the "tangible income-producing property of the business." Because ICBCS has a first-priority interest in the Debtors' Accounts, Inventory, and General Intangibles and Money as it relates to Accounts and Inventory, ICBCS has a perfected security interest that takes priority over the Term Loan Agent's perfected security interest.

*Id.* at *23.

Appellant filed a timely notice of appeal. (D.I. 1). The Debtors originally joined in the notice of appeal, but moved to withdraw once the debtor-in-possession financing extended by the Term Loan Lenders was paid in full. I granted the motion to withdraw. (*See* D.I. 13, 24). The appeal is fully briefed. (D.I. 14, 26, 28). I held oral argument. (D.I. 31).

## II.    JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction under 28 U.S.C. § 158(a)(1) over "final judgments, orders, and decrees." A bankruptcy court's legal conclusions, including a grant or denial of summary judgment, are reviewed *de novo*. *See In re Revel AC Inc.*, 909 F.3d 597, 601 (3d Cir. 2018). Summary judgment is proper "if the moving party shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tundo v. City of Passaic*, 923 F.3d 283, 286-87 (3d Cir. 2019) (quoting Fed. R. Civ. P. 56(a)). In reviewing a motion for summary judgment, courts must "view the facts in the light most favorable to the [party opposing the motion] and [draw] all reasonable inferences in that party's favor." *Id.* at 287 (alteration in original) (internal quotations and citation omitted).

## III.    PARTIES' CONTENTIONS

The Term Loan Pledge Agreement granted Appellant security interests in substantially the same collateral –- the Common Collateral –- as those subject to ICBCS's security interests. (CA2988-89, Term Loan Pledge Agmt. § 2.1). There is no dispute that, under the Intercreditor

Agreement, ICBCS has first priority secured interest in the subset of the Common Collateral that

is defined as SOA Priority Collateral, and Appellant has first priority security interest in any

Common Collateral that does not fall under the definition of SOA Priority Collateral:

Appellant's Term Loan Priority Collateral is defined as all "Collateral that is *not* SOA Priority

Collateral."  (CA3050, § 1.02 (emphasis added)).  With the exception of certain "SOA Separate

Assets and Collateral"[5] that are not at issue in this appeal, Appellant takes the position that there

is *no* Common Collateral that falls under the definition of SOA Priority Collateral that would

entitle ICBCS to any of the BI Proceeds from the Policy's business interruption coverage.  (*See*

D.I. 31 at 9:13-17).  Appellant argues that the Bankruptcy Court's declaration that ICBCS has a

first priority lien on the BI Proceeds was erroneous because the Debtors' BI coverage insures

against only physical damage or loss to income-producing property, and does not cover the loss

of hypothetical future Accounts or damage or loss to Inventory.  (D.I. 14 at 2, 18-25; D.I. 28 at

14-16).

In the view of ICBCS, the appeal presents a straightforward issue of contract

interpretation: the Intercreditor Agreement unambiguously grants ICBCS a first priority security

interest in SOA Priority Collateral, and the BI Proceeds fall squarely within the definition of

SOA Priority Collateral definition for four independent reasons: (1) the BI Policy is a General

Intangible related to Current Assets Collateral, and the BI Proceeds are "Proceeds" of the BI

Policy (D.I. 26 at 14-18); (2) the BI Proceeds are "Money" related to Current Assets Collateral

(*id*. at 20-21); (3) the BI Proceeds are "Proceeds of … insurance payable … with respect to"

Current Assets Collateral and other business income assets (*id*. at 21); and (4) the BI Proceeds

are "Proceeds" of the Debtors' Accounts and other business income assets (*id*. at 21-27).  ICBCS

---

[5] *See* CA3050, 3063, Intercreditor Agmt. §§ 1.02; 9.01.

states that Appellant's arguments ignore the language of the Intercreditor Agreement and Policy and the nature of the parties' relationships with the Debtors.  (*Id*. at 3).

## IV.    ANALYSIS

### A.    The Bankruptcy Court Correctly Determined that the Intercreditor Agreement Grants ICBCS a First Priority Security Interest in All BI Proceeds

The Intercreditor Agreement grants ICBCS a first priority interest in "SOA Priority Collateral," which is defined to include, among other things, Accounts (defined to include a "right to payment … for property that has been or is to be sold") and Inventory (defined to include "goods … held by a person for sale"), as well as essentially all assets related to Accounts and Inventory, such as General Intangibles (defined to include insurance policies) and Money. SOA Priority Collateral also includes Proceeds (defined to include "insurance payable by reason of the loss … of," and "whatever is … distributed on account of, collateral") of, and insurance payable with respect to, Accounts and Inventory and assets related to Accounts and Inventory. Essentially, SOA Priority Collateral includes all of the Debtors' assets that represent, embody, or are exchanged for the Debtors' business income.

The Intercreditor Agreement's definition of SOA Priority Collateral plainly includes the BI Proceeds.  Under the Policy, the purpose of the BI Proceeds is to compensate for the absence of Accounts and Money (i.e., business income) that the Debtors would have generated through the sale of Inventory but for the Big Explosion.  Thus, the BI Proceeds are the Proceeds of a General Intangible (i.e., the BI Policy) related to Accounts and Inventory.  The BI Proceeds are also "Money" related to Accounts and Inventory.  The BI Proceeds are also "Proceeds" of insurance payable with respect to Accounts and Inventory and other business income assets constituting SOA Priority Collateral.  The BI Proceeds are also Proceeds of Accounts and other business income assets constituting SOA Priority Collateral.  Any one of these reasons, standing

11

alone, places the BI Proceeds squarely within the Intercreditor Agreement's definition of SOA
Priority Collateral.

1.    **The BI Policy Is a General Intangible Related to Current Assets Collateral,
Including Accounts and Inventory, and the BI Proceeds Are "Proceeds" of
the BI Policy**

SOA Priority Collateral includes "to the extent related to Current Assets Collateral,

General Intangibles."  The Intercreditor Agreement defines "General Intangibles" to include all

of the PES Parties' "rights, title and interest in, to and under *all Contracts and insurance

policies.*"  (CA3029, Intercreditor Agmt. § 1.02 (emphasis added); CA2280, ICBCS Pledge

Agmt. § 1.1(c) (emphasis added)).  The BI Policy is thus a General Intangible, and Appellant

does not dispute this point.  (*See* D.I. 14 at 28).  Rather, Appellant argues that General

Intangibles are SOA Priority Collateral—i.e., collateral in which ICBCS has a first priority

lien—only "to the extent related to Current Assets Collateral," which means the Debtors' "now

existing or hereinafter arising (i) Accounts; (ii) Inventory, including all raw materials, work in

process and finished goods, relating to any of the foregoing items in this clause (ii)."  *Id.*

According to Appellant, the key question is not whether the BI Proceeds are a General

Intangible, but whether they are "related to" Accounts or Inventory.

The BI Policy is "related to Current Assets Collateral," which includes "now existing or

hereinafter arising Accounts [and] Inventory."  The Intercreditor Agreement defines "Account"

as "a right to payment of a monetary obligation, whether or not earned by performance, (i) for

property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, [or]

(ii) for services rendered or to be rendered …."  NYUCC § 9-102(a)(2).  "Inventory" is defined

as "goods, … which: (A) are leased by a person as lessor; (B) are held by a person for sale or

lease or to be furnished under a contract of service; (C) are furnished by a person under a

contract of service; or (D) consist of raw materials, work in process, or materials used or

consumed in a business." *Id.* § 9-102(a)(48). Under the plain terms of these definitions, the BI Policy is "related to"—indeed, directly concerned with—Accounts and Inventory. The BI Policy covers "actual loss sustained by the Insured resulting from the necessary interruption of business caused by direct physical loss or damage …" (CA1373-74, Policy § 2, ¶¶ 1, 8). In other words, the BI Policy insures against the loss of Accounts (i.e., rights to payment) that the Debtors would have generated but for their inability to generate and sell Inventory. The BI Policy is therefore "related to" Accounts and Inventory under any interpretation of the phrase, and certainly the broad formulation applied by New York courts. *See, e.g.*, *Allied Irish Banks, p.l.c. v. Bank of Am., N.A.*, 875 F. Supp. 2d 352, 356 (S.D.N.Y. 2012) (interpreting "related to" and "with respect to" broadly to mean "ha[ving] a connection with" or "reference to.").

Moreover, the BI Proceeds are "Proceeds" of the BI Policy. SOA Priority Collateral includes not only General Intangibles related to Accounts and Inventory, but also all Proceeds of such General Intangibles. (CA3033, § 1.02). "Proceeds" is defined by the Intercreditor Agreement and the NYUCC to include "whatever is collected on, or distributed on account of, collateral." NYUCC § 9-102(a)(64). Appellant does not dispute that the BI Proceeds, which are "collected on," and "distributed on account of," the BI Policy, are Proceeds of the BI Policy. Thus, the BI Proceeds, like the BI Policy, are SOA Priority Collateral.

Appellant raises several arguments on appeal. Appellant's main argument is that the time element coverage component of the Policy expressly excludes coverage of Accounts and does not compensate for physical damages/losses to the hydrocarbon products themselves (i.e., Inventory). The Policy has several forms of time element coverage (*see* CA1373-74, Policy § II – Time Element Coverage ¶¶ 1-6), including with respect to BI insurance:

> This Section of the Policy covers actual loss sustained by the Insured resulting from the necessary interruption of business caused by *direct physical loss or damage*, by a peril insured against, to property insured herein, occurring during the Term of Insurance.

13

(CA1373, Policy, § II – Time Element Coverage ¶ 1) (emphasis added)).  Based on this language, Appellant argues that "the BI coverage is integrally related to the physical damage coverage," "is additional coverage against the same physical damage or loss to the same physical property," and is "not a separate policy."  (D.I. 14 at 14-15).  Thus, according to Appellant, "Accounts are not insured under the Policy's BI coverage because they are not a tangible asset that can be physically lost or damaged."  (*Id*. at 15).

I do not ascribe the same import to the "*direct physical loss or damage"* language contained in the Time Element Coverage provision.  I do not read the Time Element Coverage provision as limiting business interruption coverage, for the "actual loss sustained by the Insured," to only "property that can be physically lost or damaged," as Appellant urges.  A more logical reading of this provision is that "direct physical loss or damage" to property insured under the Policy, which results in the "necessary interruption of business," *triggers* coverage for actual losses sustained by the Insured during the business interruption.  Certainly, to trigger coverage under either the Section I or Section II, there has to be physical damage to insured property.  However, the loss that is being insured in Section II is the loss of Accounts.  Appellant's reading would render useless the BI coverage that ICBCS required in connection with its participation in the Intermediation Facility.

Appellant next argues that the Policy expressly excludes "Accounts" as covered property, and separately provides for a "coverage extension" to insure "Accounts Receivable" against losses resulting only from physical damage to or loss of the physical records that memorialize them.  I disagree.  While Appellant is correct that the portion of the Policy setting forth the PD Policy (Section I) excludes coverage for "physical loss or damage" to "accounts" (*see* CA1366), that exclusion is expressly limited to that section of the Policy.  *Id*.  ("This section of the Policy does not cover physical loss or damage to … accounts ….").  The separate section setting forth

the BI coverage (Section II) (*see* CA1373) has no such exclusion.  Nor would such an exclusion

make sense in the context of the BI Policy, given that (i) the BI Policy does not protect against

physical loss or damage (that is what the PD Policy does), and (ii) as even Appellant has

acknowledged, the very purpose of the BI Policy is to "insure[] against the temporal absence of

[A]ccounts."  (*See* CA3188, ¶ 57 (emphasis removed)).

Appellant's reliance on the Policy's "coverage extension[]"—in a separate section of the

Policy ("Section III")—is also unavailing.  (CA1378, Policy § III – Coverage Extensions ¶ 1

(discussing coverage of accounts receivable separately as a "coverage extension")).  According

to Appellant, the Policy's separate coverage of "Accounts Receivable" in the "coverage

extension" expressly limits any recovery for damages or losses to those situations where the

Debtor "is unable to effect collection thereof as a result of physical loss or damage to records of

accounts receivable."  (D.I. 14 at 15-16).  Appellant therefore argues that "ICBCS's first priority

interest in Accounts has nothing to do with BI coverage proceeds.  It is instead limited under the

plain meaning of the Policy to proceeds stemming from physical losses or damages to the

records of *existing* accounts, and not to accounts that never came into existence."  (*Id*. at 15-16).

The coverage extension, however, says nothing about limiting the coverage provided by Section

II.  (CA1378).  I agree with ICBCS that such a strained interpretation of the coverage extension

would alter the fundamental nature of the BI Policy as insuring against the loss of Accounts.

As ICBCS correctly points out, Appellant has acknowledged the relationship between the

BI Policy and Accounts and Inventory below and in its appeal brief.  (CA3188, ¶ 57 ("[B]usiness

interruption policy 'insures against the temporal *absence* of accounts'") (emphasis in original);

D.I. 14 at 18 (stating "the purpose of business interruption insurance is to compensate for

income," i.e., Accounts and Money generated from the Sale of Inventory).  ICBCS cites several

other independent authorities that also confirm this connection, including *MNC Commercial*

*Corp v. Rouse*, 1992 WL 674733, at *1 (W.D. Mo. Dec. 15, 1992), in which the court found that because "[t]he purpose of the business interruption proceeds was to compensate for lost business income that would have been generated but for the fire," the security interest of a creditor with a lien on "cash, accounts receivable or a chose in action," as well as "inventory and raw materials," extended to business interruption insurance proceeds).

Finally, Appellant argues that the BI Policy Proceeds cannot be "related to" Inventory. (D.I. 14 at 16-17). Appellant argues that the Policy's BI coverage has a 60-day "retention" period, and the first sixty days of BI losses are not covered. (*See* CA1353-54, Policy Decl. ¶ 6.) "Because the Inventory, like the water in a flowing river, was continually being replaced as the refinery operated," Appellant argues, "any Inventory destroyed in the explosion, or its fruits, would have been sold within the next sixty days." (*Id.* at 17). I reject this argument as well. SOA Priority Collateral includes, *inter alia*, all General Intangibles related to Current Assets Collateral. "Current Assets Collateral," in turn, comprises all "*now existing or hereinafter arising*" Accounts and Inventory. (CA3033, Intercreditor Agmt. § 1.02 (emphasis added)). Thus, Appellant's assertion that SOA Priority Collateral is limited to BI Proceeds paid on account of Inventory that existed as of the date of the Big Explosion, and does not extend to BI Proceeds paid on account of Inventory that would have been generated but for the fire, cannot be reconciled with the language of the Intercreditor Agreement.

### 2.    The BI Proceeds Are "Money" Related to Current Assets Collateral

The BI Proceeds are also SOA Priority Collateral because they are Money "related to" Accounts and Inventory. (CA3033, Intercreditor Agmt. § 1.02). "Money" is defined as "a medium of exchange currently authorized or adopted by a domestic or foreign government." *Id.* The BI Proceeds, which will take the form of cash payments, undoubtedly constitute Money. And, as explained above, the BI Proceeds "relate to" Accounts and Inventory because they are

intended to compensate for the Debtors' loss of Accounts as a result of their inability to generate and sell Inventory.  *See MNC*, 1992 WL 674733, at *1.  As such, the BI Proceeds are SOA Priority Collateral.

### 3. The BI Proceeds are "Proceeds of … insurance payable … with respect to" Current Assets Collateral

The Intercreditor Agreement's definition of SOA Priority Collateral also includes "Proceeds of … insurance … payable … with respect to any of the foregoing."  (CA3033, § 1.02).  "[T]he foregoing" refers to "Current Assets Collateral" and other business income assets constituting SOA Priority Collateral (such as Money and General Intangibles related to Current Assets Collateral).  (*Id.*)  This language plainly encompasses BI Proceeds, as they are Proceeds of insurance that is intended to compensate for (and thus are "payable … with respect to") the loss of Accounts and other business income assets caused by the Big Explosion.

### 4. The BI Proceeds Are "Proceeds" of the Debtors' Accounts

The BI Proceeds also constitute SOA Priority Collateral because they are "Proceeds" of Accounts and other business income assets constituting SOA Priority Collateral.  The Intercreditor Agreement states that SOA Priority Collateral includes "Proceeds" of the assets included in the SOA Priority Collateral definition. "Proceeds" are defined to include, *inter alia*, "insurance payable by reason of the *loss … of*," and "whatever is … distributed *on account of*," collateral."  NYUCC § 9- 102(a)(64) (emphasis added).  The BI Proceeds are "distributed on account of," and "insurance payable by reason of the loss of," the Accounts and other business income assets that the Debtors would have generated but for the Big Explosion, which makes them "Proceeds" of those Accounts and other business income assets.  Appellant again argues that the BI Proceeds are not Proceeds of Accounts because Accounts are excluded from the Policy.  (D.I. 14 at 22 n.17).  For the reasons set forth above, this argument is rejected.

ICBCS relies on the *MNC* case.  There, a bankruptcy trustee challenged the right of a secured creditor ("MNC") to funds received under a debtor's business interruption insurance policy.  *See MNC Commercial Corp.*, 1992 WL 674733, at *1.  In finding that the creditor held a lien on the funds, the court reasoned that:

> The purpose of the business interruption proceeds was to compensate [the debtor] for lost business income that would have been generated but for the fire.  Business income normally takes the form of cash, accounts receivable or a chose in action – all of which MNC has a security interest in pursuant to the Security Agreement.  More importantly, MNC also took a security interest in the tangible income-producing property of the business, which was [the debtor's] inventory and raw materials ... MNC's right to the insurance proceeds is based upon MNC's security interest in [the debtor's] business assets, which would otherwise represent, embody, and/or generate [the debtor's] business income.  Consequently, the insurance proceeds paid from the Business Interruption Policy are derivative proceeds under § 9-306(1), and, therefore, are subject to MNC's perfected security interest under the Security Agreement.

*Id.* at *1.  I find the *MNC* case instructive.  *MNC*'s reference to "§ 9-306(1)" refers to the definition of "Proceeds" under the Uniform Commercial Code adopted by Missouri and Maryland, which is substantially identical to the "Proceeds" definition in the NYUCC.

**5.      Appellant's Remaining Arguments Are Unavailing**

Appellant makes a separate argument that the purpose of the BI Proceeds is to replace income, thus the operative question must be "which assets are income-producing assets?"  (D.I. 14 at 19-21).  This question is not rooted in any language found in the Intercreditor Agreement.  The Intercreditor Agreement is clear that assets constituting business income, and the BI Proceeds that are intended to replace it, are SOA Priority Collateral.  Moreover, I agree with ICBCS that, although the Debtors' real estate, equipment, and fixtures were utilized in creating the finished products that the Debtors then sold for business income, that does not make the finished products, the resulting business income they are exchanged for, or the BI Proceeds

intended to compensate for the loss of such business income, "Proceeds" of the real estate, equipment, or fixtures.[6]

Finally, I agree with ICBCS that Appellant's reliance on *In re Montreal*, which held that a secured creditor did not hold a perfected security interest in proceeds from a debtor's business interruption insurance policy, is misplaced. (*See* D.I. 14 at 20-23) (citing *In re Montreal, Me. & Atl. Ry., Ltd.,* 521 B.R. 703, 710 (B.A.P. 1st Cir. 2014) ("*Montreal I*"), *aff'd, In re Montreal, Me. & Atl. Ry., Ltd.,* 799 F.3d 1 (1st Cir. 2015) ("*Montreal II*")). As the Bankruptcy Court explained, "the secured creditor in *Montreal* held only a limited security interest," and not the broad security interest that both ICBCS and Appellant hold in almost all of the Debtors' assets. *PES Holdings*, 2020 WL 1047768, at *22 n.24. Additionally, the creditor in *Montreal* argued only that the insurance policy was part of its original collateral, and thus "the 'proceeds' exception [wa]s not at issue in th[e] case." *Montreal I*, 521 B.R. at 711. By contrast, here, ICBCS's entitlement to the BI Proceeds is based on the fact that they are derivative of other identified collateral in which ICBCS has a first priority interest—i.e., General Intangibles (including the BI Policy itself), and Accounts and other business-income related assets.

Moreover, *Montreal* held that the Maine UCC precluded a creditor from taking a security interest in an insurance policy by filing a UCC-1 financing statement, and that the creditor had

---

[6] *See In re Strick Chex Columbus Two, LLC*, 542 B.R. 914, 919 (N.D. Ga. 2015) ("[R]evenues generated by a business are not the proceeds of the real property upon which the business is located.… Nor does using equipment to create a good make the revenue generated by the sale of that good 'proceeds' of the equipment.") (internal quotations omitted); *Periphery Loungewear, Inc. v. Kantron Roofing Corp.*, 190 A.D.2d 457, 461 (N.Y. App. Div. 1993) ("[F]rom the perspective of insurance coverage, the concept of business interruption loss is one wholly distinct and separate from property damage."); *Citizens Sav. & Loan Ass'n of N.Y. v. Proprietors Ins. Co.*, 78 A.D.2d 377, 378-82 (N.Y. App. Div. 1981) (holding that a mortgagee had no security interest in business interruption insurance proceeds because "[i]n order to establish the existence of an insurable interest in the business, as opposed to the real and personal property with which that business is transacted, an insured must be able to show that he is liable to suffer pecuniary loss from the interruption of the business").

failed to perfect its interest in the policy and proceeds under Maine common law. *Montreal I,* 521 B.R. at 706, 711, 714; *Montreal II,* 799 F.3d 1, 5; Me. Rev. Stat. Ann. tit. 11, § 9–1109(4)(h).  That is not the case here.  Here, the Policy named ICBCS as a loss payee, additional insured, and mortgagee, which, under New York law, resulted in the perfection of ICBCS's security interest in the Policy.  *See Badillo v. Tower Ins. Co. of New York*, 92 N.Y.2d 790, 795-96 (1999).  Finally, *Montreal* is irrelevant to ICBCS's arguments that the BI Proceeds are SOA Priority Collateral because they are (i) Proceeds of a General Intangible related to Current Assets Collateral, with "General Intangibles" expressly defined to include insurance policies, (ii) Money related to Current Assets Collateral, and (iii) Proceeds of insurance payable with respect to Current Assets Collateral or other business income assets—unlike this case, the security agreement in *Montreal* did not provide the creditor with a lien on such assets.

**B.      The Parties' Relationship and Other Agreements Further Support the Ruling**

Although not necessary to my decision, the Court agrees with ICBCS that the SOA and Term Loan Credit Agreement further support the parties' understanding and intention that any BI Proceeds would constitute SOA Priority Collateral.  First, the SOA expressly requires the Debtors to maintain business interruption insurance and name ICBCS as an additional insured, loss payee, and mortgagee in the BI Policy, whereas the Term Loan Credit Agreement requires the Debtors to maintain only real and personal property insurance.  (*See* CA1810, 1818-19, 1823-24, 2201, 2208 (SOA §§ 10.04, 10.12(b), 8.16, Schedules 10.04, 8.16); CA2404-05, 2409 § 5.05(c); 5.11(b)).  Second, section 2.06 of the Term Loan Credit Agreement requires the PES Parties to prepay the Term Loan if they receive more than $5 million from Asset Sales or Recovery Events (as defined by the Term Loan Credit Agreement) in a fiscal year, but, in recognition of ICBCS's first priority interests, expressly carves out the proceeds of BI insurance from the funds that would trigger such mandatory prepayments or be used to fund them.

(CA2357-58, 2371, §§ 1.01, 2.06(b)).   The proceeds of property damage insurance, in contrast, are not so carved out.  (*Id*.)  The terms of Appellant's credit agreement undercut its arguments here.

Appellant disagrees, arguing that the "Term Loan Agent's first priority interest to the BI Proceeds is wholly consistent with the nature of the Debtors' business and credit arrangement [because] [t]he Term Loan Lenders have historically funded, among other things, the Debtors' ongoing business and capital improvements at the Refining Complex, while ICBCS supplied the Debtors with crude and non-crude feedstock."   (D.I. 14 at 26).  The Court notes the Debtors' repeated representations that the "viability of [their] business is substantially dependent on their ability to have access to intermediation arrangements," which "reduce[] … the working capital investment required to operate the Debtors' refining business as well as the Debtors' exposure to commodity price volatility."  (CA0006, ¶ 29; IA043, ¶ 1).  Given the crucial role that ICBCS played in the Debtors' ability to generate business income, it makes sense that the parties agreed that ICBCS would have a first priority interest in the Debtors' business income assets—including the BI Proceeds—to secure the PES Parties' obligations under the SOA.  As set forth above, the Intercreditor Agreement is unambiguous in granting ICBCS this priority.

## V.    CONCLUSION

For the reasons explained above, the Bankruptcy Court correctly determined that the dispute is governed by the Intercreditor Agreement, which unambiguously grants ICBCS a first priority interest in the BI Proceeds.  A separate order shall be entered.